# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN PETROLEUM TANKERS PARENT LLC | ) | |
|   600 West Germantown Pike, Suite 400 | ) | |
|   Plymouth Meeting, PA 19462 | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | Civil Action No. _____ |
| | ) | |
| THE UNITED STATES OF AMERICA | ) | |
|   c/o The United States Attorney | ) | |
|     for the District of Columbia | ) | |
|   Civil Process Clerk | ) | |
|   555 4th Street, NW | ) | |
|   Washington, DC 20001, | ) | |
| | ) | |
| THE SECRETARY OF TRANSPORTATION | ) | |
|   1200 New Jersey Ave., SE | ) | |
|   Washington, DC 20590, | ) | |
| | ) | |
|   and | ) | |
| | ) | |
| THE ADMINISTRATOR, MARITIME ADMINISTRATION, | ) | |
|   1200 New Jersey Ave., SE | ) | |
|   Washington, DC 20590 | ) | |
| | ) | |
| *Defendants.* | ) | |

## COMPLAINT FOR EMERGENCY RELIEF
### IN THE NATURE OF A WRIT OF MANDAMUS AND
### FOR DECLARATORY AND INJUNCTIVE RELIEF

By this Complaint, plaintiff American Petroleum Tankers Parent LLC (APT) seeks
emergency relief in the nature of a writ of mandamus (a) compelling the Administrator of the
Maritime Administration (MarAd) to perform his ministerial task of approving or denying APT's
application for a loan guarantee under chapter 537 of title 46, United States Code by August 31,
2012, which, as explained in detail below, he is required by law to do; and (b) directing the

Secretary of Transportation (Secretary) to cease and desist from further interference with the

Maritime Administrator's performance of his ministerial and discretionary responsibilities

regarding APT's application.  Alternatively, APT seeks judicial review of the Secretary's and

Maritime Administrator's actions and delays and appropriate remedial orders under the

Administrative Procedure Act (APA).

**Summary**

1.   APT owns five 49,000 deadweight ton petroleum tankers that were built at General

Dynamics NASSCO shipyard in San Diego, California between 2006 and 2010.  The tankers are

documented as U.S.-flag vessels and are employed in the coastwise trade of the United States.

Two of the tankers were built with specially designed national defense features approved by the

U.S. Navy and are on charter to the Navy's Military Sealift Command.

2.   On August 31, 2010, APT submitted an application under the loan-guarantee program

established by Title XI of the Merchant Marine Act, 1936, for loan guarantees to refinance the

debt incurred to construct the tankers.  MarAd accepted APT's application as complete in

December 2010.  With subsequent amendments, it became—as MarAd's staff has

acknowledged—one of the strongest, lowest-risk applications ever considered by MarAd.  APT's

application also warrants priority treatment under the Title XI statute and regulations, among

other reasons, because of the national defense features included on two of its tankers.

3.   Contrary to congressional direction and in violation of express statutory provisions,

the Secretary has interposed a Department of Transportation Credit Council into the Title XI

review process and required the Maritime Administrator to obtain the recommendation of that

Council before approving any Title XI application.  MarAd advised APT that it would advocate

for approval of APT's application before the Credit Council, but to date the Council has refused

to act on APT's application, based, not on the merits of the application, but primarily on the fact that APT is owned by investment funds managed by private equity firms.  Not only has MarAd never previously considered the identity of an applicant's owners relevant in its processing of Title XI applications, it has in the past few years approved several applications by companies owned in whole or substantial part by private equity investment funds.  But for the unlawful requirement to obtain prior Credit Council authorization, the Maritime Administrator would likely have already approved APT's application based on its merit.

4.   As the Administrator interprets the provisions of Title XI, if APT's application is not acted upon by August 31, 2012, the application will lapse and therefore be effectively denied, and the limited appropriated funds available for Title XI guarantees will be allocated to other vessel owners whose applications were submitted long after APT's.

**Jurisdiction**

5.   This Court has jurisdiction under 28 U.S.C. §§ 1331, 1346 and 1361.

**Parties**

6.   Plaintiff APT is a limited liability company organized under the laws of Delaware with its primary place of business in Pennsylvania.  APT and its predecessor company have been in operation since 2006.  It is majority-owned by investment funds whose investors include public and private pension funds, not-for-profit foundations, unions and government institutions. These funds are managed by Blackstone Group L.P., a publicly traded alternative asset manager that manages, among other types of funds, private equity funds.

7.   Defendant United States of America is sued in its governmental capacity as the proper party defendant for actions seeking relief under the APA.

8.   Defendant Secretary is the secretary of the cabinet department in which defendant Administrator of the Maritime Administration operates.

9.   Defendant Administrator of the Maritime Administration (Maritime Administrator or Administrator) is the government official in whom Congress has vested exclusive authority to administer the Title XI loan guarantee program for vessels other than fishing vessels.

**Facts**

**A.   The Title XI Vessel Loan Guarantee Program and the Statutory Deadline.**

10. The Title XI loan guarantee program was established by Congress to encourage the growth and modernization of the U.S. merchant marine and to support U.S. shipyards by making federally backed loan guarantees available to shipowners for the purpose of financing or refinancing the construction or reconstruction of vessels in United States shipyards.  Although Title XI, as amended, was codified and enacted into positive law as 46 U.S.C. §§ 53701-35 (by Pub. L. No. 109-304, 120 Stat. 1485 (Oct. 6, 2006)), the program is still commonly known as, and the relevant regulations (46 C.F.R. part 298) still refer to, Title XI loan guarantees or Title XI financing, as will this complaint.

11. Prior to January 2006, the statutory responsibility for administering the Title XI loan guarantee program with respect to vessels other than fishing vessels and the authority to grant or deny applications for loan guarantees with respect to such vessels, rested with the Secretary, who had delegated the authority to carry out the program to the Maritime Administrator, 49 C.F.R. § 1.66(e), while reserving the right to exercise the powers and duties so delegated, *id.* § 1.43(a).

12. In January 2006, however, Congress, in section 3507 of the National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, Div. C, title XXXV, § 3507, 119 Stat. 3555 (2006), which section was entitled "Transfer of Authority for Title XI Non-Fishing Loan Guarantee Decisions to Maritime Administration," transferred from the Secretary directly

to the Maritime Administrator the responsibility for administering the Title XI loan guarantee program with respect to vessels other than fishing vessels and the exclusive authority to grant or deny applications for loan guarantees with respect to such vessels.

13. Because Public Law No. 109-163 was enacted too late for inclusion in the bill that led to the codification of the relevant portion of title 46, U.S. Code, into positive law, the changes made by section 3507 of the 2006 Defense Authorization Act were not reflected in the original codification.  They were nonetheless effective as amendments to the codification.  *See* 46 U.S.C. § 53701, note.

14. The changes to the Title XI program made by the 2006 Defense Authorization Act were repealed and replaced by similar changes by section 3522 of the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, Div. C, title XXXV, § 3522, 122 Stat. 596-98 (Jan. 28, 2008), which also made additional changes to chapter 537 of title 46, U.S. Code.  The congressional findings set out in section 3517(a) of the 2008 Act included the statement, "The current process for review of applications for maritime loans in the Department of Transportation has effectively discontinued the [maritime loan guarantee] program as envisioned by Congress."

15. The "current process for review of applications for maritime loans in the Department of Transportation" to which Congress referred included review by the Department of Transportation Credit Council (DOT Credit Council), which the Secretary had interposed into the Title XI application process by a directive in 2004, which was superseded by an expanded directive in 2009, three years after Congress had explicitly removed Title XI from the Secretary's jurisdiction.  Although this Council has no statutory basis or authority, the Secretary requires action by the Credit Council before MarAd may proceed with various steps in

processing Title XI applications.  Specifically, the Secretary has required MarAd to obtain the

Credit Council's prior authorization before obtaining an independent financial review of a Title

XI application under 46 U.S.C. § 53708(d), which is often a critical prerequisite to the approval

of an application, nor may MarAd ultimately approve an application without first obtaining the

recommendation of the Council.  There are no published guidelines governing the activities of

the Credit Council, and no records or minutes of its meetings are available to the public.  As

explained below, it is the officious conduct of this Credit Council and other Department of

Transportation (DOT) officials, which is contrary to the explicit direction of Congress, that has

caused the unreasonable and unlawful delay of the processing of APT's application.

16. In 2003, because of its displeasure with long delays in MarAd's processing of Title

XI applications, Congress added statutory deadlines for such processing.  Those deadlines are

now set forth in section 53703(a) of title 46, U.S. Code, entitled, "Time for decision," which

provides:

> (1) In general.—The … Administrator shall approve or deny an
> application for a loan guarantee under this chapter within 270 days after
> the date on which the signed application is received by the …
> Administrator;
>
> (2) Extension.—On request by an applicant, the … Administrator
> may extend the 270-day period in paragraph (1) to a date not later than 2
> years after the date on which the signed application is received by the …
> Administrator.

17. APT is informed and believes that MarAd interprets section 53703(a) as a limitation

on its power to grant or deny applications for Title XI loan guarantees.  Under this interpretation,

section 53703(a) prohibits MarAd from approving or denying an application once the prescribed

period has passed, with the result that the application is effectively denied if not acted upon

within the prescribed period.

**B.   APT's Title XI Application.**

18. Over the summer of 2010, APT and its agent, Argent Group Ltd. (Argent), whose principals have over 30 years' experience assisting shipowners with the Title XI Program, met with MarAd to provide background on APT and its five vessels, and filed a signed application for an aggregate of $470 million of Title XI loan guarantees.  That signed application was submitted to, and received by, the Administrator on August 31, 2010.

19. APT intended to press for approval of its application within the 270-day period specified in section 53703(a)(1) and, to that end, APT and Argent immediately began to work with MarAd to identify any issues or deficiencies in APT's application.

20. During the ensuing weeks, MarAd reviewed APT's application for adequacy and completeness and, on October 7, 2010, sent APT a letter asking for more information.

21. APT responded to the items identified by MarAd and supplied the information it had requested, and in early December 2010, before all of APT's tankers had been completed, MarAd informed APT that MarAd considered APT's Title XI application to be complete.

**C.   The Processing of APT's Application and the Agency's Unreasonable Delay.**

22. Between December 2010 and the date of this Complaint, APT's application was subject to numerous delays.  MarAd purported to be processing the application on the merits when, as explained below, the primary reason for the delays was APT's ownership by private equity funds.  APT is informed and believes that the DOT Credit Council was the source of the concerns about APT's ownership and the consequent delays.

23. Upon informing APT that it deemed APT's application to be complete, MarAd also told APT that the next step was to get the Credit Council's authorization to obtain an independent financial review from an outside consultant, at APT's expense.

24. In the normal course of events, MarAd would have sought and obtained the Credit Council's authorization to contract for an independent financial review of APT's application at the Credit Council's December 2010 meeting, and the contract for that review would have been executed soon thereafter.  However, MarAd did not seek such authorization at the Credit Council's December meeting nor at its January 2011 or February 2011 meetings, attributing the delay to a concern that MarAd might not have sufficient appropriated funds to support the amount of guarantees sought by APT.

25. In February 2011, following a number of discussions between APT and Argent and the Administrator and his staff, MarAd finally agreed to seek the Credit Council's authorization to proceed with the independent financial review of APT's application.  MarAd did seek such authorization at the Credit Council's March 2011 meeting, after which the Administrator advised APT that the Credit Council had denied MarAd's request and had, in addition to expressing a funding concern, now raised an issue about whether Title XI financing should be made available to shipping companies owned by private equity firms such as Blackstone.

26. Other than a requirement that a company meet certain citizenship requirements, the Title XI statute and regulations contain no criteria associated with the ownership of an applicant and in particular nothing that would allow discrimination against applicants owned by private equity firms.

27. Based on Argent's long experience with the Title XI program, APT and Argent believe that an applicant's ownership by private equity firms has never before been raised as an impediment to approval of a Title XI application.  Contrary to the Credit Council's apparent current concern, MarAd has, during the past few years, approved several Title XI applications in

which the applicant was owned, in whole or substantial part, by investment funds managed by private equity firms.

28. Recognizing that this extraneous ownership issue presented a serious obstacle to the approval of its application, APT sent a letter to MarAd expressing its strong disagreement with its ownership as a relevant fact in processing its application and continued pressing both the Deputy Secretary and the Maritime Administrator for a meeting to address the Credit Council's concerns about its ownership.

29. On May 13, 2011, realizing that MarAd would not approve its application within the 270-day period provided by section 53703(a)(1), APT requested, and MarAd approved, an extension of the period to two years as provided by section 53703(a)(2).

30. After pressing through various avenues for a meeting for almost five months (during which time there was little to no progress on its application), APT was finally able to meet with the Deputy Secretary in early September 2011.  As a result of that meeting, APT understood that it had resolved the Deputy Secretary's concerns about APT's ownership and that the Deputy Secretary would support submitting the APT application for independent financial review.  In addition, to address any remaining funding concerns and further enhance the economic soundness of its application, APT proposed reducing the amount of the guarantees sought from $470 million to $400 million and reducing the guarantee period from 23.5 to 20 years.

31. On September 20, 2011 APT amended its application to reduce the amount of the loan to be guaranteed to $400 million and reduce the guarantee period to 20 years.

32. MarAd subsequently obtained the Credit Council's authorization and on November 22, 2011 contracted with Scully Capital Services, Inc. for an independent financial review of APT's application.

33. MarAd sent APT a draft of Scully Capital's report on January 12, 2012.  APT disagreed with portions of the report and made those objections known through a January 26, 2012 presentation to MarAd and a March 6, 2012 presentation to the MarAd/DOT working group that was supporting the Credit Council.  During both of these meetings, the MarAd staff indicated their agreement with APT's position on many of the items in the draft Scully report with which APT disagreed.  Throughout this period APT and Argent were continually pressing MarAd for rapid action on APT's application, recognizing that more than a year had already passed since MarAd informed APT that its application was deemed complete.

34. After its March 6 presentation to the Credit Council working group through mid-April 2012, APT understood that the MarAd staff was preparing a memorandum on MarAd's procedures regarding the prioritization of Title XI applications, which the Credit Council staff had demanded as a prerequisite to its consideration of the Scully Capital report and APT's application.  The purpose of the priority memorandum was unclear because both MarAd and the Credit Council already knew that APT's application met the statutory and regulatory requirements for priority treatment and was much more advanced than the two other pending applications, which had been filed almost 18 months after APT's application.

35. In early April 2012, APT requested a meeting with the Maritime Administrator to get an explanation for the further delay in processing APT's application.  Because the Administrator was unavailable, APT met on April 12, 2012 with MarAd's Executive Director and its Associate Administrator to again express APT's concern about the continuing delays and the prospect that APT's application might not be approved before the expiration of the two-year period prescribed in 46 U.S.C. § 53703(a).  APT also expressed this concern through communications with various other members of MarAd's staff.

36. On April 30, 2012, APT met with the Maritime Administrator and several of his senior staff.  At that time, the Administrator expressed his support for APT's application, but advised that, in the aftermath of the Solyndra loan default at the Department of Energy, applications for loan guarantees were being given more scrutiny and that the issue of providing loan guarantees to companies that were portfolio companies of private equity firms had again been raised.  APT expressed dismay that this issue had arisen again, having understood that it had been resolved with the Deputy Secretary months before.  The Administrator asked that APT allow him more time to work on issues that had been raised by DOT officials.

37. On May 2, 2012, in an effort to further enhance its application and expedite its processing, APT further reduced the amount of the guarantee from $400 million to $340 million, consistent with a recommendation in the draft Scully Capital report with which APT had disagreed.  APT is informed and believes that, with this change, its application is among the strongest and lowest-risk Title XI applications ever presented to MarAd in that it substantially exceeds the key financial criteria governing Title XI loan guarantees and carried no construction risk.  The MarAd staff has confirmed this view.  While Title XI permits guaranteed loans in the amount of 87.5% of the actual cost of a vessel and having 25-year terms, APT's application seeks guaranteed loans in the amount of only 51.2% of the cost of its tankers and terms of only 20 years, both of which are well below the average 83% and 22.7 years, respectively, of applications approved during the past decade.  And although the Title XI regulations permit a 2:1debt-to-equity ratio, APT's starting ratio will be 0.88:1 and will decline thereafter.

38. In late May 2012, MarAd informed APT that its application would be reviewed by the Credit Council at its June 12 meeting.  Further, in response to APT's inquiry, the MarAd staff advised that no more information from APT was required for this meeting, that they considered

APT's application to be financially and economically sound, and that they were advocating favorable consideration of APT's application.

39. On June 13, 2012, MarAd advised APT that the Credit Council had deferred consideration of APT's application and that it would be presented to the Credit Council for a vote at its July 10 meeting.

40. APT contacted the Maritime Administrator for an explanation for the Credit Council's action and spoke with him on June 14, 2012.  At that time, the Administrator stated that, while he was continuing to advocate the APT application, "things do not look good."  When pressed for further explanation, he again raised the issue of APT's ownership by a private equity firm and also noted a new concern about providing guarantees for a new company.  APT expressed disappointment that the private equity issue was again being raised and reminded the Administrator that APT was not a new company, since it had been formed in 2006 and has been profitably operating five vessels.  APT again outlined the strength of its application and asked "what do we need to do to get our application approved?"  The Maritime Administrator responded that he did not know.  APT expressed its frustration with the manner in which its application was being treated, repeating that it had been pursuing approval of the application in good faith, that time was running out on the two-year statutory deadline for MarAd to act, and that it would not just stand by and allow time to run out.  The Maritime Administrator merely asked again for more time to deal with issues relating to APT's application.

41. MarAd advised APT again in late June 2012 that it intended to present APT's application to the Credit Council at its July 10 meeting.

42. Despite APT's request that MarAd press to bring the approval of their application to conclusion at the July 10 meeting, APT believes that the Credit Council again deferred

consideration of APT's application at that meeting.  On the afternoon of July 11, 2012, in response to APT's earlier call to the Administrator, APT received a call from MarAd's Chief Counsel and its Associate Administrator informing APT that MarAd was continuing to process its application and that MarAd could not share any information regarding the July 10 Credit Council meeting.

43. The next Credit Council meeting is scheduled for July 31, 2012.  Even if the Credit Council were to consider APT's application at that meeting, APT is informed and believes that, under its procedures, the Credit Council would not take final action on the application until its August meeting, a mere few days before the August 31, 2012 expiration of the two-year deadline for MarAd to act.

44. APT is informed and believes that MarAd has never declined to approve an application that was fully qualified under the criteria set forth in the governing statute and regulations.

**Relief in the Nature of Mandamus**

45. The allegations in paragraphs 1 through 44 are repeated as if fully set forth here.

46. Section 53703(a) imposes a definite and unambiguous ministerial duty on the Administrator to approve or deny APT's Title XI application no later than August 31, 2012.

47. The Administrator has failed and refused to fulfill that statutory duty.

ACCORDINGLY, this Court should issue a writ of mandamus to the Administrator directing him to approve or deny APT's Title XI application no later than August 31, 2012.

**First APA Cause of Action**
**Remedy for Maritime Administrator's Unreasonable Delay**

48. The allegations in paragraphs 1 through 47 are repeated as if fully set forth here.

49. Section 555(b) of the APA requires an agency to "proceed to conclude a matter presented to it" "within a reasonable time," 5 U.S.C. § 555(b), and section 706(1) authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1).

50. By its terms, section 46 U.S.C. § 53703(a) dictates that the Maritime Administrator must approve or deny APT's Title XI application "not later than 2 years after the date on which the signed application is received by the … Administrator."  Because APT's signed application was received by the Administrator on August 31, 2010, the law requires that he approve or deny it not later than August 31, 2012.

51. Under MarAd's interpretation of section 53703(a), the Maritime Administrator lacks authority to approve or deny APT's Title XI application after August 31, 2012.

52. APT will be irreparably harmed if the Maritime Administrator does not approve or deny its Title XI application on or before August 31, 2012.  MarAd normally processes Title XI applications in the order in which they are received.  APT is informed and believes that (a) there are two other applications for Title XI loan guarantees now pending before MarAd, both of which were filed almost 18 months after APT filed its application; and (b) MarAd has sufficient appropriated funds to provide guarantees for only one of the three pending applications.  If APT's current application lapses and APT is thus forced to reapply, there will likely not be sufficient appropriated funds to provide the guarantee APT seeks.

53. The Maritime Administrator has unlawfully withheld and unreasonably delayed his statutorily mandated action of approving or denying APT's Title XI application on or before August 31, 2012.

ACCORDINGLY, this Court should issue an order directing the Maritime Administrator to perform his ministerial, statutorily mandated duty of approving or denying APT's application

for a loan guarantee no later than August 31, 2012 and prohibiting the Secretary and his Department of Transportation Credit Council from interfering with the Administrator's consideration and determination of APT's application.

**Second APA Cause of Action**
**Remedy for Maritime Administrator's Unlawful Conclusion**
**and Unreasonable Delay**

54. The allegations in paragraphs 1 through 53 are repeated as if fully set forth here.

55. Section 555(b) of the APA requires an agency to "proceed to conclude a matter presented to it" "within a reasonable time." 5 U.S.C. § 555(b). Section 706(1) of the APA authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). And section 706(2) authorizes a court to "hold unlawful and set aside agency action … and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

56. The Administrator's interpretation of 46 U.S.C. § 53703(a) is incorrect. That statute, which prescribes deadlines for approving or denying Title XI applications, does not limit the Maritime Administrator's power to grant or deny applications for Title XI loan guarantees after the expiration of the specified periods. Rather, it gives a Title XI applicant a judicially enforceable statutory right to receive an approval or denial of its application before the expiration of the specified periods without affecting the Administrator's authority to take such action thereafter.

57. Nonetheless, if the Maritime Administrator does not approve or deny APT's Title XI application on or before August 31, 2012, he will still have unlawfully withheld and unreasonably delayed his statutorily mandated action of approving or denying APT's Title XI application on or before August 31, 2012, and APT will still have been irreparably harmed.

ACCORDINGLY, this Court should issue an order declaring that 46 U.S.C. § 53703(a) does not limit the Maritime Administrator's power to grant or deny applications for Title XI loan guarantees after the expiration of the specified periods and compelling the Administrator to approve or deny APT's Title XI application on or before August 31, 2012.

### Third APA Cause of Action
### Remedy for the Secretary's Unlawful Interference

58. The allegations in paragraphs 1 through 57 are repeated as if fully set forth here.

59. Section 706(2) of the APA authorizes a Court to "hold unlawful and set aside agency action … found to be …arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

60. In 2006 and again in 2008, Congress, citing obstructions and delays interposed by the Department of Transportation, expressly transferred authority over the Title XI loan guarantee program from the Secretary to the Maritime Administrator.

61. By this action, Congress intended to eliminate obstructions, delays and consideration of extraneous factors injected into the Title XI application process by the Department of Transportation Credit Council.

62. Despite the clear mandate of Congress, the Secretary has continued to require the Maritime Administrator to obtain either an authorization or recommendation from the Credit Council before proceeding with various steps in processing Title XI applications, including the ultimate approval of an application.

63. The Secretary's continued interference with the Maritime Administrator's performance of his ministerial and discretionary responsibilities regarding Title XI applications

in general and APT's application in particular is arbitrary, capricious and otherwise not in

accordance with law and in excess of statutory jurisdiction, authority, or limitations.

64. MarAd has expressed support for APT's application at various times throughout the

past 22 months and, but for the Secretary's interference, the Maritime Administrator would

likely have approved APT's application long ago.

ACCORDINGLY, the Court should issue an order declaring that the DOT Credit Council

has no lawful or valid function with respect to Title XI applications, directing the Secretary to

cease and desist from interfering with the Maritime Administrator's performance of his

ministerial and discretionary responsibilities regarding Title XI applications in general and

APT's application in particular, and directing the Maritime Administrator to cease and desist

from submitting such applications to the DOT Credit Council and to grant or deny APT's

application without regard to the opinion, recommendation or authorization of the Credit

Council.

/s/ Joseph O. Click
Michael Joseph (DC Bar No. 6593)
Alex Blanton (DC Bar No. 169623)
Joseph O. Click (DC Bar No. 417294)
Blank Rome LLP
600 New Hampshire Ave. NW
Washington, D.C.  20037
(202) 772-5966
click@blankrome.com

*Counsel for Plaintiff American Petroleum Tankers
Parent LLC*