## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERICAN PETROLEUM TANKERS PARENT LLC, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | Civil Action No. 12-1165 (CKK) |
| | ) | |
| THE UNITED STATES OF AMERICA; | ) | |
| THE SECRETARY OF TRANSPORTATION; AND | ) | |
| THE ADMINISTRATOR, MARITIME ADMINISTRATION, | ) | |
| | ) | |
| *Defendants.* | ) | |

### SUPPLEMENTAL COMPLAINT FOR JUDICIAL REVIEW OF AGENCY ACTION
### AND FOR DECLARATORY AND INJUNCTIVE RELIEF

By this Supplemental Complaint, plaintiff American Petroleum Tankers Parent LLC

(APT) seeks judicial review, under the Administrative Procedure Act (APA), of two decisions

issued by defendants United States, the Secretary of Transportation (Secretary) and the

Administrator of the Maritime Administration (Administrator) denying APT's initial application

and amended application for U.S. government guarantees of loans used to construct five state-of-

the-art double-hulled petroleum tankers for use in the U.S. coastal trade.[1]

### SUMMARY

1.   APT owns five 49,000 deadweight ton petroleum tankers that were built at General

Dynamics Corporation's NASSCO shipyard in San Diego, California and delivered to APT

between January 2009 and December 2010.  The tankers are documented as U.S.-flag vessels

---

[1]   This Supplemental Complaint is filed in compliance with the Court's November 20, 2012 Order, which directed APT to file an "Amended Complaint" no later than December 10, 2012.  It is denominated a Supplemental Complaint in accordance with Rule 15(d) of the Federal Rules of Civil Procedure, because it alleges transactions, occurrences and events that happened after the date of APT's Original Complaint (Dkt. Item 1).

and are employed in the coastwise trade of the United States.  Two of the tankers were built with specially designed national defense features approved by the U.S. Navy and are on charter to the Navy's Military Sealift Command.

2.     APT is majority-owned by investment funds managed by affiliates of The Blackstone Group L.P., a publicly traded private equity company.  On August 30, 2010 APT submitted an application under the loan-guarantee program established by Title XI of the Merchant Marine Act, 1936, for loan guarantees to refinance the debt incurred to construct the tankers.  The Maritime Administration (MarAd) accepted APT's application as complete in December 2010.  With subsequent amendments, it became—as MarAd's staff has acknowledged—one of the strongest, lowest-risk applications ever considered by MarAd.

3.     Contrary to congressional direction and in violation of express statutory provisions, the Secretary has interjected a Department of Transportation Credit Council into the Title XI review process and required the Maritime Administrator to obtain the "recommendation" of that Council before approving any Title XI application.  In fact, the Secretary and the Administrator have effectively given the Credit Council a veto as to whether an application is granted or denied.  When APT pressed the Administrator for a decision after its application had been pending for more than a year, the Administrator advised APT that he would advocate for approval of APT's application before the Credit Council, but that the Council had thus far refused to act on APT's application, based, not on the merits of the application, but primarily on the fact that APT is owned by private equity firms.  Not only had MarAd never previously considered the identity of an applicant's owners relevant in its assessment of Title XI applications, it has in the past few years (within the tenures of the current Secretary and

Administrator) approved several applications by companies owned, in whole or substantial part, by private equity investment funds.

4.     Under MarAd's interpretation of the provisions of Title XI, APT's application would have lapsed, and thus been effectively denied, if not acted upon by August 31, 2012, two years after it was received by the Administrator.  Thus, in July 2012, APT filed the present action and an emergency motion seeking a writ of mandamus compelling the Administrator to grant or deny APT's application by August 30, 2012 and directing the Secretary and Credit Council to cease and desist from further interference with the Administrator's action on the application.  After the Court held a status hearing, the parties filed a stipulation by which defendants agreed to issue a decision on APT's application by August 31 and APT agreed to withdraw its emergency motion.

5.     On July 30, 2012 APT confirmed its prior commitment to modify its application to (a) reduce the government's exposure under the guarantees by reducing the amount of the guarantees from $400 million to $340 million and (b) convert subordinated debt held by the APT's sponsors to equity.

6.     On August 1, 2012, the Administrator issued a decision letter denying APT's application.  In denying the application, the Administrator failed even to acknowledge that MarAd's independent financial consultant had, in a thorough 57-page analysis of APT's project, concluded that the project was economically feasible, not only when using APT's own "reasonable" projections and assumptions, but also when using the consultant's much more conservative projections and assumptions.  Rather, the Administrator, substituting his own superficial and unsound page-and-a-half analysis, found that APT's project was not economically sound.  This decision was not only economically flawed, but violated MarAd's own regulations in three fundamental respects.  First, the Administrator evaluated APT's

financial performance using net income rather than operating cash flow as required by MarAd's regulations. Second, he found APT's operations "dis-economic" because of the interest payable on subordinated debt owed to its sponsors, even though that interest was not payable in cash (*i.e.*, interest on APT's subordinated debt is payable by issuing additional subordinated debt) and all such debt, including the interest payable as debt, would in any event be fully subordinated to the Title XI debt and treated as equity under MarAd's regulations. Third, the Administrator found APT's viability questionable because the terms of its current tanker charters were not commensurate with the 20-year term of the requested guarantees, ignoring (a) MarAd's regulations, which require projections for only five years and nowhere mention charters for the full guarantee term as a criterion for determining economic soundness, (b) its independent consultant's positive market projections, and (c) the fundamental market facts that the oil companies that charter tankers in the coastwise trade normally charter them for three to five years or less (as MarAd had recognized in granting prior Title XI applications) and have not entered into charters for anywhere near 20-year terms since the 1970s.

7.   The August 1 denial letter went on to state that the Administrator had not considered the modifications confirmed by APT on July 30 because they constituted a "material change" to the application that "requires extensive and time-consuming review of the entire amended application package." The letter offered to undertake such a review, which it said would likely take ten weeks, if APT so requested. APT promptly requested that MarAd do so, and 15 weeks after the August 1 letter, on November 9, 2012, the Administrator issued a second letter denying the "amended" application.

8.   Prior to the second letter, MarAd's independent financial consultant had provided it with a supplemental report again reaching the same favorable conclusions as its original report.

And again, the Administrator, in his November letter, found APT's project economically unsound. This time, the underlying analysis was even more bizarre than the earlier one. The November letter first mischaracterized the August denial as having been based on a finding that APT's "fundamental revenue flow" was not sufficiently strong, although the earlier letter nowhere mentioned such a concept, and then went on to conclude that APT's proposed conversion of its subordinated debt to equity would do little to alleviate this problem. While the conversion of subordinated debt to equity was, according to the August 1 letter, a "material change" requiring extensive review, the November 9 letter concluded that the conversion had only a "nominal" effect because the independent financial consultant's report "had already considered sponsor debt to be equity." Then, again ignoring MarAd's regulations, which treat the subordinated debt as equity and thus make it irrelevant to any analysis of projected operating cash flow (or revenue), the letter inexplicably stated that the subordinated debt's "[p]aid-in-kind interest merely exacerbated an already-unsatisfactory projection of operating revenue." The letter also referred for the first time to previously undisclosed MarAd projections, which caused "grave concern" because they indicated that during "almost half" the guarantee period APT would not have a debt service coverage ratio of 1.5-to-1, which, according to the letter, the independent financial consultant had suggested as "the appropriate standard by which to measure the adequacy of APT's cash flow." In fact, the consultant had made no such suggestion, but had merely recommended that MarAd should prohibit APT from paying dividends if the ratio ever fell below 1.5-to-1. More importantly, MarAd's own regulations require only that the ratio exceed 1-to-1.

9. If MarAd had applied to previous Title XI applicants the analysis the Administrator applied in these two decisions, it would not have approved many, if not most, of the numerous

applications it did approve during the past 30 years, including the two most-recently approved tanker applications.  Both decisions are not merely contrary to MarAd's regulations and unsupported by the record, and thus arbitrary and capricious; their absence of rational analysis makes inescapable the conclusion that the true basis underlying the decisions is the unlawful participation of the Secretary's Credit Council and its unlawful determination to exclude APT from the Title XI program because it is owned by investment funds managed by private equity firms.

### JURISDICTION

10.  This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346.

### PARTIES

11.  Plaintiff APT is a limited liability company organized under the laws of Delaware with its primary place of business in Pennsylvania.  APT and its predecessor company have been in operation since 2006.  It is majority-owned by investment funds whose investors include public and private pension funds, not-for-profit foundations, unions and government institutions. These funds are managed by affiliates of The Blackstone Group L.P., a publicly traded private equity company.

12.  Defendant United States of America is sued in its governmental capacity as the proper party defendant for actions seeking relief under the APA.

13.  Defendant Secretary of Transportation is the government official with general supervisory authority over the department in which defendant Administrator of the Maritime Administration operates, but who, by statute, has been excluded from approving or denying Title XI applications.

14.   Defendant Administrator of the Maritime Administration is the government official in whom Congress has vested exclusive authority to administer the Title XI loan guarantee program for vessels other than fishing vessels.

FACTS

A.   **The Title XI Vessel Loan Guarantee Program.**

15.   The Title XI loan guarantee program was established by Congress to encourage the growth and modernization of the U.S. merchant marine and to support U.S. shipyards by making federally backed loan guarantees available to shipowners for the purpose of financing or refinancing the construction or reconstruction of vessels in United States shipyards.  The Title XI program, in one form or another, has existed since 1936.  Although Title XI, as amended, was codified and enacted into positive law as 46 U.S.C. §§ 53701-35 (by Pub. L. No. 109-304, 120 Stat. 1485 (Oct. 6, 2006)), the program is still commonly known as, and the relevant regulations (46 C.F.R. part 298) still refer to, Title XI loan guarantees or Title XI financing, as will this complaint.

16.   Title XI specifically provides that MarAd may not make a commitment to guarantee or guarantee debt for a ship construction project (whether for initial financing or refinancing of recently built ships) unless it finds that the project is "economically sound," 46 U.S.C. § 53708(a).  MarAd's implementing regulations similarly provide that it cannot approve a loan guarantee unless it finds the project to be "economically sound."  46 C.F.R. § 298.14(a). Accordingly, MarAd's regulations require a Title XI applicant to submit substantial information concerning the project and its economic characteristics, including the need in the specific market for new or additional capacity, the market potential for the vessels, the revenues and expenses associated with operating the vessels, and any charters, freight contracts, or other transportation agreements relevant to their employment.  *See* 46 C.F.R. 298.14; *see also* 46 U.S.C. § 53708(a).

17.   According to its regulations, MarAd is supposed to evaluate a project's economic soundness using "Objective Criteria."  46 C.F.R. § 298.14(d).  In particular, MarAd requires that the projected long-term demand (equal to the length of time for which guarantees are requested) "exceed the supply of similar vessels … in the applicable market."  *Id.*, § 298.14(d)(1).  The regulations also provide, that with respect to the financial aspects of the project,

> The operating cash flow to Obligation debt service ratio over the term of the Guarantee must be in excess of 1:1.  Operating cash flow means revenues less operating and capital expenses including taxes paid but exclusive of interest, accrued taxes, depreciation and amortization for the Title XI asset.  Debt service means interest plus principal.

*Id.*, § 298.14(d)(4).

18.   MarAd's regulations identify evaluation criteria, other than those concerning economic soundness, that MarAd will apply, including

a.   The capability of the Vessel(s)' serving as a naval and military auxiliary in time of war or national emergency.

b.   The financing of the Vessels(s) within one year of delivery.

c.   The acquisition of Vessel(s) currently financed under Title XI by assumption of the total obligation(s).

d.   The Guarantees extend for less than the normal term of loans for that class of vessel.

*Id.*, §298.17(a).

19.   Title XI provides a statutory priority for funding to certain vessels.  Specifically, "In guaranteeing or making a commitment to guarantee an obligation …, the Administrator shall give priority to" vessels that are suitable for service as naval auxiliaries in time of war or national emergency, as determined by the Secretary of Defense.  46 U.S.C. § 53706(c).

20.   The Title XI statute authorizes MarAd to obtain an "independent analysis" of an application, but only where it determines "that aspects of [the] application … require independent analysis to be conducted by third party experts due to risk factors associated with

markets, technology, or financial structures."  Such a determination presupposes that MarAd

requires outside expertise to supplement its in-house capability to make such an analysis.

B.   **The Statutory Removal of the Secretary from the Title XI Approval Process.**

21.   Prior to January 2006, the statutory responsibility for administering the Title XI loan

guarantee program with respect to vessels other than fishing vessels and the authority to grant or

deny applications for loan guarantees with respect to such vessels, rested with the Secretary, who

had delegated the authority to carry out the program to the Maritime Administrator, 49 C.F.R.

§ 1.66(e), while reserving the right to exercise the powers and duties so delegated, *id.* § 1.43(a).

22.   In January 2006, however, Congress, in section 3507 of the National Defense

Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, Div. C, title XXXV, § 3507, 119

Stat. 3555 (2006), which section was entitled "Transfer of Authority for Title XI Non-Fishing

Loan Guarantee Decisions to Maritime Administration," transferred from the Secretary directly

to the Administrator (a) the responsibility for administering the Title XI loan guarantee program

with respect to vessels other than fishing vessels and (b) the exclusive authority to grant or deny

applications for loan guarantees with respect to such vessels.[2]

23.   Because Public Law No. 109-163 was enacted too late for inclusion in the bill that

led to the codification of the relevant portion of title 46, U.S. Code, into positive law, the

changes made by section 3507 of the 2006 Defense Authorization Act were not reflected in the

original codification.  They were nonetheless effective as amendments to the codification.  *See*

46 U.S.C. § 53701, note.

24.   The changes to the Title XI program made by the 2006 Defense Authorization Act

were repealed and replaced by similar changes by section 3522 of the National Defense

---

[2]  Both before and after the changes made in 2006 and 2008, the authority to administer
the Title XI program with respect to fishing vessels has rested with the Secretary of Commerce.

Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, Div. C, title XXXV, § 3522, 122 Stat. 596-98 (Jan. 28, 2008), which also made additional changes to chapter 537 of title 46, U.S. Code.  The congressional findings set out in section 3517(a) of the 2008 Act included the statement, "The current process for review of applications for maritime loans in the Department of Transportation has effectively discontinued the [maritime loan guarantee] program as envisioned by Congress."

25.  The "current process for review of applications for maritime loans in the Department of Transportation" to which Congress referred included review by the Department of Transportation Credit Council (DOT Credit Council), which the Secretary had created by policy order and interjected into the Title XI application process in 2004.  Although this Council has no statutory basis or authority, the Secretary nonetheless required MarAd to obtain authorization from the Credit Council before proceeding with various steps in processing Title XI applications. Specifically, MarAd may not seek an independent financial review of a Title XI application under 46 U.S.C. § 53708(d), which is often a critical prerequisite to the approval of an application, or ultimately approve an application, without prior affirmative action by the Credit Council.  There are no published guidelines governing the activities of the Credit Council, and no records or minutes of its meetings are available to the public.

C.  **APT's Title XI Application.**

26.  During the summer of 2010, APT and its agent, Argent Group Ltd. (Argent), each of whose principals has over 30 years' experience assisting shipowners with the Title XI program, met with MarAd to provide background on APT and its five vessels, and filed a signed application for an aggregate of $470 million of Title XI loan guarantees.  The requested guarantees would cover approximately 70% of the "actual cost" of the five vessels, well below the 87.5% that MarAd is authorized to guarantee.  46 U.S.C. § 53709(b)(2).  APT's application

sought a guarantee for a term of 25 years, the maximum term authorized by Title XI and the normal guarantee term for this class of vessel.  APT's signed application was submitted to, and received by, the Administrator on August 30, 2010.

27.  The Title XI statute provides that MarAd must approve or deny a Title XI application within 270 days after it receives a signed application, unless the applicant requests an extension, in which case the time to approve or deny is extended to within two years after receipt of the application.  46 U.S.C. § 53703(a)(1).  APT intended to press for approval of its application within the specified 270-day period, and, to that end, APT and Argent immediately began to work with MarAd to identify any issues or deficiencies in APT's application.

28.  During the ensuing weeks, MarAd reviewed APT's application for adequacy and completeness and, on October 7, 2010 requested more information from APT.  APT responded to the items identified by MarAd and supplied the information it had requested, and in early December 2010 MarAd informed APT that MarAd considered APT's Title XI application to be complete.

D.  **The Processing of APT's Application.**

29.  From December 2010 through mid-July 2012 APT's application was subject to numerous delays.  MarAd purported to be processing the application in good faith when, as explained below, the primary reason for the delays was an objection to APT's ownership by investment funds managed by private equity firms.  The Administrator informed APT that the DOT Credit Council was the source of the objection about APT's ownership and the consequent delays.

30.  Upon informing APT that it deemed APT's application to be complete, MarAd also told APT that the next step was to obtain authorization from the Credit Council to obtain an independent financial review from an outside consultant, at APT's expense.

31.  Normally, after determining that an application is complete, MarAd seeks and obtains the Credit Council's authorization to contract for an independent financial review of the application at the Credit Council's next meeting, and the contract for that review is executed soon thereafter.  MarAd did not, however, seek such authorization for APT's application at either the Credit Council's December 2010 meeting or at its January or February 2011 meetings, attributing the delay to a concern that MarAd might not have sufficient appropriated funds to support the amount of guarantees sought by APT and other pending applicants.

32.  In February 2011, following a number of discussions between APT and Argent and the Administrator and his staff, MarAd finally agreed to seek the Credit Council's authorization to proceed with the independent financial review of APT's application.  MarAd did seek such authorization at the Credit Council's March 2011 meeting, but the Credit Council denied MarAd's request.

33.  APT then pressed MarAd to continue processing APT's application and sought a meeting with the Deputy Secretary of Transportation, who chairs the Credit Council, to attempt to obtain his support in getting the Credit Council to allow MarAd to proceed with an independent financial review of APT's application.

34.  MarAd informed APT that, in addition to a funding concern, the Credit Council had raised the question whether Title XI financing should be available to companies owned by private equity firms such as The Blackstone Group L.P.

35.  Other than a requirement that a domestic company meet certain citizenship requirements, the Title XI statute and regulations contain no criteria associated with the ownership of an applicant and in particular nothing that would allow discrimination against applicants owned by investment funds managed by private equity firms.  Based on Argent's long

experience with Title XI program, APT and Argent believe that such ownership has never before been raised as an impediment to approval of a Title XI application.  Contrary to the Credit Council's apparent current objection to APT's owner, MarAd has, during the past few years, approved several Title XI applications in which the applicant was owned, in whole or substantial part, by investment funds managed by private equity firms.

36.  Recognizing that this extraneous ownership issue presented a serious obstacle to the approval of its application, APT continued pressing both the Deputy Secretary and the Maritime Administrator for a meeting to address the Credit Council's concerns.

37.  On May 13, 2011, realizing that MarAd would not approve its application within the 270-day period provided by 46 U.S.C. § 53703(a)(1), APT requested, and MarAd approved, an extension of the period to two years as provided by 46 U.S.C. § 53703(a)(2).

38.  After pressing through various avenues for a meeting for almost five months (during which time there was little to no progress on its application), APT was finally able to meet with the Deputy Secretary in early September 2011.  As a result of that meeting, APT understood that it had resolved the Deputy Secretary's and Credit Council's objections about APT's ownership and that the Deputy Secretary would support submitting the APT application for independent financial review.  In addition, APT proposed reducing the amount of the guarantees sought from $470 million to $400 million (approximately 60% of the vessels' cost) and reducing the guarantee period to 20 years to address any remaining funding concerns and further enhance the economic soundness of its application.  On September 20, 2011, APT amended its application to reflect these changes.

39.   MarAd subsequently obtained the Credit Council's authorization and on November 22, 2011 contracted with Scully Capital Services, Inc. (Scully) for an independent financial analysis of APT's application.

40.   MarAd sent APT a draft of Scully's report on January 12, 2012.   APT disagreed with portions of the report and made those objections known through a January 26, 2012 presentation to MarAd and a March 6, 2012 presentation to the MarAd/DOT working group that was supporting the Credit Council.   During both of these meetings, the MarAd staff indicated their agreement with APT's position on many of the items in the draft Scully report with which APT disagreed.   Throughout this period APT and Argent continually pressed MarAd for action on APT's application, recognizing that more than a year had already passed since MarAd informed APT that its application was deemed complete.

41.   Between its March 6 presentation to the Credit Council working group and mid-April 2012, APT understood that the MarAd staff was preparing a memorandum on MarAd's procedures regarding the prioritization of Title XI applications, which the Credit Council had demanded as a prerequisite to its consideration of the Scully Capital report and APT's application.   The purpose of the priority memorandum was unclear because both MarAd and the Credit Council already knew that APT's application met the statutory and regulatory requirements for priority treatment and was much more advanced than the two other pending applications, which had been filed nearly a year and a half after APT's application.

42.   In early April 2012, APT requested a meeting with the Maritime Administrator to get an explanation for the further delay in processing APT's application.   Because the Administrator was unavailable, APT met on April 12, 2012 with MarAd's Executive Director and its Associate Administrator again to express APT's concern about the continuing delays and the prospect that

APT's application might not be approved before the expiration of the two-year period prescribed in 46 U.S.C. § 53703(a)(2).  APT also expressed this concern through communications with various other members of MarAd's staff.

43.  On April 30, 2012, APT met with the Administrator and several of his senior staff. At that time, the Administrator expressed his support for APT's application, but advised that, in the aftermath of the Solyndra loan default at the Department of Energy, applications for loan guarantees were being given more scrutiny and that the issue of providing loan guarantees to applicants owned by private equity firms had again been raised.  APT expressed dismay that the private equity issue had arisen again, having understood that it had been resolved with the Deputy Secretary seven months earlier.  APT was also surprised that the Solyndra loan default was mentioned, as Solyndra had been a speculative venture in a fledgling industry, while APT's application involved loans secured by assets valued at twice the amount of guaranteed debt and employed in an industry successfully promoted by MarAd for decades.  The Administrator asked that APT allow him more time to work on issues that had been raised by DOT officials.

44.  On May 2, 2012, in an effort to further enhance its application and expedite its processing, APT further reduced the amount of the requested guarantees from $400 million to $340 million, consistent with a recommendation in the draft Scully report.  APT is informed and believes that, with this change, its application became among the strongest and lowest-risk Title XI applications ever presented to MarAd in that it substantially exceeded the key financial criteria governing Title XI loan guarantees and carried no construction risk.  The requested guarantees would be for only 51.2% of the cost of the vessels (the lowest ever requested) rather than the permitted 87.5%; they would extend for only 20 years, five years less than the normal 25-year term for tank vessels; and there would be a beginning debt-to-equity ratio of 0.88-to-1,

declining thereafter, rather than the permitted 2-to-1 ratio.  The MarAd staff confirmed this view and advised APT that it believed APT's project was economically sound.

45.  In late May 2012, MarAd informed APT that its application would be reviewed by the Credit Council at its June 12 meeting.  Further, in response to APT's inquiry, the MarAd staff advised that there was no more information required for this meeting, that they considered APT's project to be financially and economically sound, and that they were advocating approval of the application.

46.  On June 13, 2012, MarAd advised APT that the Credit Council had deferred consideration of APT's application and that it would be presented to the Credit Council for a vote at its July 10 meeting.

47.  APT spoke with the Administrator on June 14, 2012 to obtain an explanation for the Credit Council's action.  At that time, the Administrator stated that, while he was continuing to advocate the APT application, "Things do not look good."  When pressed for further explanation, he again raised the issue of APT's ownership by private equity firms and also noted a new concern about providing guarantees for a new company.  APT expressed extreme disappointment that the private equity issue was again being raised and reminded the Administrator that APT was not a new company, since it had been formed in 2006 and has been successfully operating five vessels.  APT again outlined the strength of its application and asked, "What do we need to do to get our application approved?"  The Maritime Administrator responded that he did not know.  APT expressed its frustration with the manner in which its application was being treated, repeating that it had been pursuing approval of the application in good faith, that time was running out on the two-year statutory deadline for MarAd to act, and

that it would not just stand by and allow time to run out.  The Maritime Administrator asked

again for more time to deal with the Credit Council's issues relating to APT's application.

48.  On July 17, 2012, APT commenced the present action, seeking a writ of mandamus

compelling the Maritime Administrator to perform his task of approving or denying APT's

application and directing the Secretary of Transportation to cease and desist from further

interference with the Administrator's performance of that task.  The following day APT filed a

Motion for Emergency Relief seeking an order directing the Administrator to approve or deny

the application by August 31, 2012 and prohibiting the Secretary or the DOT Credit Council

from interfering in the Administrator's consideration and determination of the application.  On

July 23, following a prior status conference with the Court, APT and the defendants filed a

stipulation in which the defendants agreed to issue a decision approving or denying APT's

application by August 31, and APT withdrew its Motion for Emergency Relief.

49.  On July 30, 2012, APT confirmed (by a letter to MarAd dated July 28) its May 2,

2012 reduction of the requested guarantee amount from $400 million to $340 million and a prior

commitment APT had made to convert the subordinated debt held by APT's sponsor to equity.

Attached to its letter were Pro Forma balance sheets and projections of revenue and expenses

reflecting these amendments to APT's application.

50.  On August 1, 2012, defendants sent APT a letter, signed by the Administrator,

(August 1 Letter) denying APT's Title XI application.  The August 1 Letter's denial was based

primarily on the finding that APT's project was economically unsound.  The Letter also

described other factors influencing the decision, including the finding that the requested

guarantee amount was substantial and would "consume almost all of the monies available for the

ship financing program," and found that APT's application was not entitled to any priority under

either the Title XI statute or MarAd's regulations.  The Letter further stated that the

Administrator had "asked the Credit Council for its recommendation on APT's loan guarantee

application," and that "on July 31, 2012, the Credit Council unanimously recommended that

APT's application should be denied."  The Letter stated that the Administrator's decision "was

informed by, but not dependent upon, the Credit Council's recommendation."

51.  The August 1 Letter informed APT that, in reaching the decision to deny the

application, MarAd did not consider APT's amendment committing to convert sponsor debt to

equity and reducing the requested guarantee amount from $400 million to $340 million.  The

letter explained,

> MarAd reviewed the submitted amendment on July 30, and 31, 2012 and
> determined that APT's amendment constituted a material change in its
> application.  This amendment requires extensive and time consuming review of
> the entire amended application package.  We believe a proper assessment of the
> amended application will require, among other things, a comprehensive financial
> analysis by an independent financial analyst and MarAd staff, an analysis of
> supporting financial statements, and a review of the applicant corporate structure.
> Such an undertaking would require up to ten weeks to complete, assuming further
> audited materials were not needed as part of that review.  The need for further
> audited statements or materials would extend that time period.  However, MarAd
> does not have sufficient time to complete this review, as it is required to make a
> decision on your application by August 31, 2012.  *See Am. Petroleum Tankers
> Parent LLC v. United States, et al.*, Civil Action No. 12-1165 (D.D.C.) (ECF 7).
> That case sought to compel MarAd to issue a decision on APT's application by
> August 31, 2012, and on July 23, the government and APT stipulated that the
> government will issue a decision by August 31.  Thus, your submitted amendment
> cannot be considered at this time as part of the application upon which this
> decision is made.

The Letter offered to consider these amendments, however, anticipating that it would take 10

weeks to review the amended application and reach a decision.

52.  In fact, little or no additional review was needed with respect to the conversion to

equity of the subordinated debt held by APT's sponsor.  MarAd staff had informed APT on

several occasions that it considered the subordinated debt as equity, and Scully, the independent

financial consultant, had already treated the subordinated debt as equity in its financial analysis and had found APT's project economically feasible based on both APT's projections, whose underlying assumptions the consultant had found to be "reasonable," and Scully's alternative projections, whose underlying assumptions were especially conservative.  Further, Scully's findings were based on a loan guarantee amount of $400 million, so that the reduction of that amount to $340 million made APT's project all the more economically sound.

53.  Relying on defendants to act in good faith, on August 9, 2012, APT formally requested that MarAd consider the amended application.  Accordingly, on August 10, the parties filed a joint motion asking the Court to extend the time for the filing of a previously scheduled joint status report until October 24, 2012, and to stay all proceedings during that time.

54.  On August 11, the Court stayed all proceedings, and ordered the parties to file a status report updating the Court as to the review of the amended application by the earlier of October 9, 2012, or 10 days after MarAd issued a decision.

55.  Between August 11 and October 9, MarAd made several requests for additional information.  Although these requests, in large part, sought information and documents that APT had previously submitted, APT complied promptly and fully with each request.

56.  On October 5, the parties asked the Court to extend the time for filing a joint status report and, if necessary, a proposed schedule for further proceedings until November 12.  In this joint motion, defendants represented that they needed until October 29 to render a decision because APT's amended application and the additional materials MarAd had requested had to be analyzed by an independent financial analyst before defendants could complete their review.

57.  On October 7, the Court ordered the parties to file a joint status report proposing a schedule for further proceedings (if necessary) within ten business days of the defendants issuing a decision, but no later than November 12.

58.  On November 9, defendants filed an unopposed motion for a further extension until November 19 to file the status update.  In this motion, defendants represented that they were unable to issue a decision before October 29 because the independent financial analysis had not been concluded in time for the DOT Credit Council to consider APT's application before that date.  They further represented that the independent financial analysis had been completed and that APT's amended application would be considered by the Credit Council and a decision would be issued by November 13.

59.  Scully, which had served as the independent financial analyst for the defendants' first decision, continued to serve in that role for APT's amended application.  In early September, APT paid MarAd $20,000 to reimburse it for the cost of Scully's update of its initial report.

60.  Defendants provided APT a copy of Scully's updated report on November 9, 2012. Except for minor alterations and amended projections that reflected the positive effects of the reduced loan guarantee amount, the updated report was virtually identical to Scully's original report.

61.  On November 9, 2012, defendants sent APT a letter, signed by the Administrator, (November 9 Letter) denying APT's amended application.  Like the August 1 Letter, the November 9 Letter's denial was based primarily on the finding that APT's project was economically unsound.  It also found that the requested guarantee amount of $340 million was substantial and would "consume almost all of the monies available for the ship financing

program" and reiterated the August 1 Letter's rationale for concluding that APT's application

was not entitled to any priority under either the Title XI statute or MarAd's regulations.  The

Letter further stated that the Administrator had "asked the Credit Council for its recommendation

on denying APT's modified application," and that "on November 8, 2012, the Credit Council

unanimously recommended that APT's application should be denied."  The Letter stated that the

Administrator's decision "was informed by, but not dependent upon, the Credit Council's

recommendation."

E.  **Economic Soundness in the August 1 Letter.**

62.  With respect to their evaluation of the economic soundness of APT's project,

defendants, in the August 1 Letter denying APT's application, purported to rely upon nothing

other than the initial Scully report, which had concluded that the assumptions and financial and

market projections submitted by APT were "reasonable" and that the project was economically

feasible.

63.  APT's assumptions included projected vessel charter rates, periods in which the

vessels would be out of service, or "off hire," for repairs, operating expenses, and debt service

payments.  While Scully found APT's assumptions and projections reasonable, it also performed

a financial analysis under a so-called "Lender's Case," using substantially more conservative

assumptions:  (a) charter rates would be $38,500/day, a discount of 30% from the $55,000/day

rate projected by Scully's industry market expert and actual market rates in early 2012 and 40%

from actual rates of $65,000/day in late 2012; (b) rates would increase by only 2.5% per year to

account for inflation; (c) the seven off-hire days used by APT would increase to 10 days for

vessels under 10 years of age and to 14-22 days for older vessels and drydocking costs would

increase; and (d) operating expenses would escalate at 3% per year, a rate that was higher than

the assumed rate of inflation.  The Scully report found APT's project economically feasible even

under this ultraconservative Lender's case.  In both analyses, Scully treated the subordinated debt held by APT's sponsor as equity, as required by MarAd's regulations.

64.  In addition, Scully performed a series of "stress tests" to identify "extreme conditions" under which APT's debt service coverage ratio (DSCR), a ratio that indicates the amount of cash available to pay the guaranteed debt, might fall below 1:1.  In each case, the average DSCR exceeded 1:1, or "1x" (one dollar of cash for each dollar of debt due), with the averages ranging from 1.06x to 1.25x.

65.  While the Scully report found that "the Project economics and market application appear to be feasible," it also stated that "the Lender's Case suggests the need for additional protections" for MarAd.  The protections it recommended included a reduction of the guarantee amount from $400 million to $340 million to "further insulate the Title XI debt from downside performance that could occur over the amortization period."  Such a reduction resulted in an average DSCR over the guarantee period of 1.49x, with a minimum of 1.00x, under the very conservative Lender's Case.  Scully also recommended a drydock reserve fund to assure sufficient funds were available for vessel maintenance, and a debt service reserve fund to assure that cash was available to make payments on the guaranteed debt as they became due in the event of "temporary conditions such as depressed market conditions or a vessel going out of service for an extended period of time."  APT agreed to implement those recommendations, thus assuring beyond question that its application met or exceeded all statutory and regulatory requirements.

66.  The August 1 Letter's finding that APT's project was economically unsound was based largely on three underlying findings, each of which is unsupported by the record and contrary to MarAd's own regulations.

67. First, the Letter found that "APT has consistently operated at a net loss, to wit $42 million in 2010, $35.6 million in 2011, and $11 million in the first quarter of 2012." This finding ignored MarAd's regulations, which require MarAd to consider, not "net losses" or even "net income," but rather "operating cash flow." This operating cash flow prescribed by MarAd is similar to both operating income and another financial measure known as Earnings Before Interest, Taxes, Depreciation and Amortization, or EBITDA. *See* 46 C.F.R. § 298.15(d)(4). Like EBITDA, MarAd's definition of "operating cash flow" excludes "interest, accrued taxes, depreciation and amortization." *Id.* Defendants nowhere used the term "operating cash flow" or considered this legally prescribed measure in the August 1 Letter. Had they done so, they would have found APT's project to be economically sound, because the financial statements used in reaching the decision reflected actual positive operating cash flow of $34.3 million in 2010, $66.8 million in 2011, and $14.1 million in just the first quarter of 2012. Had they inquired about the second and third quarters of 2012, they would have found operating cash flow of $26.9 million and $41.5 million, respectively.

68. The August 1 Letter's second underlying finding, quoting from the Scully report, was "significant leverage in [APT's] capital structure" resulting in an inability for APT "to meet interest payment requirements on a current basis." The letter concluded that "[w]ith such large interest expense owed to its equity sponsor, it is apparent that the leverage structure of APT is not viable and even with reduced debt service costs, the underlying APT operation is dis-economic." As the language quoted from Scully's report recognized, however, the "leverage" that defendants found to render APT "dis-economic" consisted of debt held by APT's equity sponsor. This debt would have been subordinated, as to both principal and interest, to the loans guaranteed by MarAd. MarAd's regulations provide that MarAd may permit any equity

contribution required of an applicant to be satisfied with such subordinated debt, and that MarAd will consider such subordinated debt as equity. *See* 46 C.F.R. § 298.13(h). As the Scully report noted, but unmentioned in the August 1 Letter, this subordinated debt "will meet all MarAd's requirements with regard to subordinated debt, and therefore, for the purpose of [Scully's financial analysis] has been assumed to be equivalent to equity."

69. In contravention of MarAd's regulation and ignoring Scully's independent financial analysis, defendants did not consider the subordinated debt as equity in their analysis. Moreover, as the August 1 Letter noted, APT had the right to pay, and in fact had been paying, this debt with "payments in kind," that is, by issuing additional subordinated debt to the debt holder in lieu of cash. Thus, the subordinated debt would not have diminished the cash available to pay the guaranteed loans in any event. And if this were not enough, APT had previously committed to MarAd that it would actually convert the sponsor-held debt to equity, thus eliminating any requirement to pay interest—whether in cash or in kind—to the debt holder, thereby ensuring that the entire subject of the subordinated debt would be irrelevant to any analysis of the project's economic soundness.

70. As its third underlying finding supporting the economic unsoundness finding, the August 1 Letter noted that APT's vessels were currently chartered for less than the 20-year term for which guarantees were sought. This reliance on the length of current vessel charters is also not contemplated by MarAd's regulations. Those regulations nowhere mention the length of vessel charters as a criterion in determining economic soundness. 46 C.F.R. § 298.14(d). There is no requirement that an applicant have in place charters of any particular length, let alone charter terms commensurate with the guarantee period. The vessels covered by MarAd's most-recently approved Title XI applications for tankers were subject to charters with terms of less

than 20 years.  Indeed, MarAd has consistently approved Title XI applications for vessels whose current charters are no longer than APT's charters and has approved some applications in which the vessels had no charter commitments at all.  As defendants well know, the oil companies that charter tankers like APT's rarely, if ever, charter them for 20-year periods.  In fact, the vast majority of charters concluded over the past 25 years have had terms of three to five years or less.

71.  Instead of charter length, MarAd's regulations provide that MarAd will consider "long-term market demand (equal to the length of time [for which the applicant] request[s] financing."  46 C.F.R. § 298.14(d)(1).  Those regulations specify that MarAd will consider, in evaluating long-term demand, existing equipment, similar vessels under construction, and projections of future need for the vessels in the applicable market.  *Id.*  As part of its independent review, Scully retained Wilson Gillette & Co. to conduct such an analysis.  In its 88-page report, Wilson Gillette projected that by the end of 2020, fleet capacity (*i.e.*, supply) would be 2.3 million DWT (deadweight tons, the customary measure of tanker capacity), while even under a "no growth scenario" demand would be 2.7 million DWT, with the deficiency in the number of vessels in 2020 projected to range from 8.7 vessels under a "no growth scenario" to 17.6 vessels in a "low trade growth" scenario.  Although these conclusions fully satisfied the regulations' "long-term market demand" criterion, the August 1 Letter made no mention of the Wilson Gillette Report, instead referring to general truisms in the Scully report, taken out of context, to the effect that APT would be subject to market fluctuations in the future.

F.   **Economic Soundness in the November 9 Letter.**

72.  The economic soundness analysis of the November 9 Letter was no more coherent or rational than that of the August 1 Letter.  Defendants again purported to rely on Scully, this time its November 5, 2012 updated report, to support the finding, but, as in the August 1 Letter, that

reliance took the form of extracting selected sentences, or fragments of sentences, from the updated Scully report, with little mention of Scully's actual conclusions.  In addition, as in the August 1 Letter, defendants failed to follow MarAd's own regulations for making an economic soundness determination.

73.  Like the August 1 Letter, the November 9 Letter did not use the regulatory term "operating cash flow."  Although it did not repeat the previous mistaken use of "net loss," the November 9 Letter nowhere acknowledged that the August 1 Letter had relied on that improper factor.  Instead, the November 9 Letter mischaracterized the August 1 Letter as having found that "the fundamental revenue flow was not sufficiently strong or reliable to support the operation over time in other than very favorable circumstances."  In fact, the August 1 Letter's economic soundness analysis nowhere used the word "revenue," let alone the term "fundamental revenue flow."  Similarly, the November 9 Letter failed to mention that Scully, in both reports, had concluded that APT's projections and assumptions were reasonable, that the Wilson Gillette market study showed future tanker demand exceeding supply, or that Scully concluded that "the outlook for future time charter rates is positive."

74.  The November 9 Letter, rather than providing a proper analysis of APT's projected operating cash flow as required by MarAd's regulations, simply made the bald, unsupported statement that there is a revenue problem, then focused on the amended application's commitment to convert the subordinated debt held by APT's equity sponsor to equity— incorrectly describing that commitment as APT's attempt "[t]o deal with the[e] problem" of insufficient "fundamental revenue flow"—and concluded that the conversion would do little to alleviate the "revenue flow" problem.  This reasoning is all the more astonishing in light of the further statement in the November 9 Letter that "the analytical model used in MarAd's initial

assessment had already considered sponsor debt to be equity for purposes of financial modeling."
This effectively admitted that, contrary to the position taken in the August 1 Letter, (a) the
sponsor debt, and the net losses caused by the paid-in-kind interest on that debt, was never
relevant to MarAd's determination of economic soundness because the debt is required to be
treated as equity and (b) the commitment to convert the sponsor debt to equity, rather than being
a "material" change that would require at least ten weeks of "extensive and time-consuming
review," had already been analyzed by Scully and MarAd before the August 1 Letter.

75.   Like the previous letter, the November 9 Letter also relied upon a supposed
uncertainty in the long-term market for the vessels.  In fact, neither letter provided any facts
indicating a long-term market uncertainty that would adversely affect MarAd's interests.  The
record is to the contrary.  The report prepared for Scully and MarAd by Wilson Gillette projected
under-capacity in the trade in 2012 through at least 2020 (and by implication beyond 2020).  The
Wilson Gillette report projected that, by 2020, the trade would require nine additional vessels
under a "no growth" scenario, 17 additional vessels under a "low trade growth" scenario, and 22
vessels under a high growth scenario.  That report (dated December 2011) projected that there
would be a need for two additional vessels in 2012 under a "no growth" scenario and seven
additional vessels under a "low growth" scenario.  The Wilson Gillette Report also projected that
as early as 2016, there would be a need for 4, 13 or 15 additional vessels in the market under no-
growth, low-growth and high-growth scenarios, respectively.  The soundness of the Wilson
Gillette projections has already been confirmed by recent increases in actual charter rates to
$65,000/day, which is 69% higher than the $38,500/day rate used in Scully's ultraconservative
Lender's Case.

76.   Defendants, in their November 9 Letter, provided no projections concerning future demand, either short-term or long-term.  Nor did defendants set forth or refer to any facts that would support a conclusion that the market for the vessels would contract in the future, or present any significant risk that any of APT's vessels would be unemployed in the short or long term.

77.   As in the August 1 Letter, defendants again relied upon a "core concern" that "APT's charters are much shorter than the guarantee period."  Again, defendants' reliance on current vessel charters is not contemplated by MarAd's regulations, which refer not to an applicant's specific charters, but to "long-term market demand (equal to the length of time [for which the applicant] request[s] financing."  46 C.F.R. § 298.14(d).  And again, defendants ignored the well-known fact that the vast majority of tanker charters concluded over the past 25 years, including those addressed in previously approved Title XI applications, have had terms of three to five years or less.

78.   Unlike the August 1 Letter, the November 9 Letter focused on debt service coverage ratios.  According to defendants, MarAd had developed and applied its own "neither-best-case-nor-worst-case financial model" to analyze APT's projected DSCR.  As stated in the November 9 Letter,

> The IFA [Scully Report] suggested that a 1.5:1 debt service coverage ratio is the appropriate standard by which to measure the adequacy of APT's cash flow.  It is of grave concern that APT is not projected to meet that standard over almost half the period of the requested loan guarantees.  Adjusted for uncertainty, MarAd's neither-best-case-nor-worst-case financial model showed APT's projected operations would not generate sufficient revenue to meet a 1.5:1 cash-flow-to-debt service ratio in nine of the twenty guarantee years.  It is critically important that in three of those nine years the ratio is dangerously close to 1:1, such that any unforeseen disruption of revenue or increase in operating costs would likely result in a payment default.  The IFA found that APT "is exposed to changes in the product tanker market and its ability to meet financial obligations could be impaired should negative changes occur in the future."

In addition to the nine years in which APT is not projected to meet the 1.5:1 ratio, MarAd's analysis shows in four of the other years the projections for APT are below 1.55:1, barely over the acceptable threshold. Also noteworthy is that if loan guarantees were to be provided in 2012, MarAd's projections show that APT would almost immediately, that is as soon as 2014, fail to meet the 1.5:1 ratio. Thus, APT's operations model further amplifies concerns that APT will not be able to repay its debt obligations and is not economically sound.

Assuming that MarAd's neither-best-case-nor-worst-case financial model actually produced these results—results that have never been disclosed to APT—the factual and legal premises of this analysis are incorrect.

79. Contrary to the November 1 Letter's stated premises, Scully never "suggested" in either of its reports that a DSCR of 1.5 to 1 "is the appropriate standard by which to measure the adequacy of APT's cash flow." Rather, Scully stated (on the very pages cited by defendants in the November 9 Letter) that it (Scully) recommended that MarAd include in the loan guarantee agreement a provision *that would prohibit APT from paying dividends* to its equity holders *if* the DSCR "drops below 1.5x in any trailing 12-month period or projected 12-month period." APT agreed to such a provision. Scully made this recommendation so as to "preserve cash of the borrower [APT] under lower-than-expected performance." Scully nowhere even hinted that APT's project would not be economically feasible or economically sound if the DSCR at any time during the period of the loan fell below 1.5:1.

80. Defendants' reliance on a 1.5:1 DSCR was also contrary to MarAd's own "Objective Criteria" for determining economic soundness, which require only that the DSCR be above 1:1. Those regulations state, in clear unambiguous terms, "With respect to the asset for which Obligations are to be issued, the operating cash flow to Obligation debt service ratio [*i.e.*, the DSCR] must be in excess of 1:1." 46 C.F.R. § 298.14(d)(4).

81. Applying MarAd's regulations to the results obtained from MarAd's "neither-best-case-nor-worst-case" financial model, MarAd should have found APT's project financially

sound.  According to the defendants, those results showed that APT's projected DSCR exceeded 1:1 for all 20 years in the guarantee term.  Indeed, APT's projected DSCR exceeded 1.5:1 for 11 of those years.  While it came close to 1:1 for three of the remaining nine years, MarAd's regulations require only that the ratio exceed 1:1.

82.  Further evidencing the contrived, arbitrary and capricious manner in which defendants reached the November 9 decision denying APT's application was the defendants' determination to rely on "the Government's … own analysis" of DSCR and, with the exception cited below, to disregard Scully's analysis of DSCR, both under APT's "reasonable" projections and under Scully's Lender's Case.  Especially so, because MarAd's decision to employ an independent financial analyst evidences a determination that MarAd requires outside expertise to supplement its in-house capability to conduct a complete analysis.

83.  As in its original report, Scully's updated report concluded that APT's financial analysis and projections were "reasonable."  As defendants noted in the November 9 Letter, APT's projected DSCRs ranged from 2.44:1 to 3.53:1.  The DSCRs projected in Scully's supplemental report were even more favorable to MarAd than those in the original report because the guarantee amount was reduced from $400 million to $340 million.  Even under Scully's Lender's Case—using the conservative assumptions of charter rates discounted by 30% to 40% from current rates, escalation of operating costs above the rate of inflation, more days off-hire, etc.—DSCR averaged 1.73x (compared to 1.27x originally) with a minimum DSCR of 1.24x (compared to .85x originally).  Similarly, the results of each of the three stress tests conducted by Scully improved in Scully's updated report.

84.  Defendants' only mention, in the November 9 Letter, of DSCRs projected by Scully in its updated report was the statement, "The IFA's [Scully's] projections forecast debt service

ratios as low as 0.64:1." But defendants' only support for this assertion was a citation to the six pages in the report analyzing various stress cases. Defendants' statement was misleading for several reasons. First, under the conservative Lender's Case analyzed by Scully, average DSCR was 1.73x and the minimum DSCR for any one year was 1.27x. Second, stress cases assume extreme conditions that, while possible, are highly unlikely. And third, APT had already agreed to establish a reserve fund with a substantial cash balance to cover debt service during periods in which its operating cash flow might not otherwise be adequate.

85. The extreme conditions assumed by Scully's stress cases are amply demonstrated by "Stress Case 2," the stress case from which the defendants plucked the "debt service ratio as low as 0.64:1." Stress Case 2 started with the conservative assumptions underlying the Lender's Case, including that initial charter rates were discounted by 30% from then-current rates (and 40% from subsequent rates) with an assumption that rates would increase only 2.5% per year to account for inflation. Stress Case 2 then assumed that one of APT's vessels would be removed from service for an entire year, thus earning no revenue, but that it would continue to incur 100% of its usual operating costs. (Not only would no responsible operator continue to employ a crew for an entire year in which its vessel was out of service, but it is highly unlikely that the newest vessels in the fleet would ever be out of service for an entire year, as evidenced by the fact that APT's tankers have been out of service an average of only two days per year during the past two years). Further, the year in which the vessel was removed from service was 2019. This year was selected for this Stress Case "because it represents a year of already weak performance under the Lender's Case projection." Under this drastic scenario, the DSCR for 2019 was 0.64:1. Even in that extreme case, DSCR fell below 1:1 for only that one year, and the average DSCR for the entire term was 1.70:1, showing that any risks to MarAd would be fully mitigated by the debt-

service reserve fund recommended by Scully, to which ATP had agreed.  Moreover, in the year in which DSCR fell to 0.64:1 in the Scully analysis, APT's cash reserves would have been more than adequate to cover its debt service and the value of MarAd's collateral (the vessels) would have been nearly twice the amount of the remaining balance of the guaranteed loans.

G.  **Other Reasons for Denial in the August 1 and November 9 Letters.**

86.  The other reasons for denial of APT's application set forth in defendants' August 1 and November 9 Letters were two other related factors: (1) a "policy point" favoring new vessels, which in this context means vessels not yet built, over vessels such as APT's, which are recently constructed vessels for which Title XI refinancing guarantees are sought, and (2) the fact that APT's application would exhaust available funds that might otherwise be available to grant pending and possibly forthcoming but unfiled applications that defendants might, in the future, deem more sound and desirable.

87.  There is no "policy point" in the Title XI statute or MarAd's regulations favoring new vessels yet to be built.  MarAd has never adopted or announced a policy—official or unofficial—of giving preference to vessels less than one year old.  To the contrary, MarAd has tended to avoid construction-period financing because of the additional risk that adverse events or conditions might prevent completion and employment of the vessels that serve as MarAd's collateral.  Moreover, at the time APT filed its application, two of its vessels had not yet been delivered and the average age of its three delivered vessels was 1.2 years.

88.  As support for this purported "policy point," the August 1 and November 9 Letters cited 46 C.F.R. §§ 298.09(k) and 298.17.  Those regulations, however, do not set forth, or even support a "policy point" favoring vessels yet to be constructed.  In fact, defendants did not comply with these regulations, and ignored a statute that accords a funding priority to APT's vessels.  46 U.S.C. § 53706(c).

89. The first regulation cited in the letters provides a priority for vessels capable of serving as naval and military auxiliaries. 46 C.F.R. § 298.09(k)(1). All of APT's vessels are eligible for this priority. Indeed, two of APT's vessels were built with National Defense Features and were at the time, and continue to be, chartered to the Navy's Military Sealift Command. They are thus not only capable of being used as naval auxiliaries, they are actually being used as such.

90. Contrary to the requirements of section 298.3(k), defendants gave no processing priority to APT's application. Instead, defendants delayed the processing of APT's application for almost two years after they informed APT that its application was complete, and then made a decision only after APT filed this action in which they faced the prospect of the Court ordering them to do so.

91. Section 298.17 of MarAd's regulations lists six additional factors that MarAd "shall . . . consider" in evaluating Title XI applications. The first factor is "[t]he capability of the Vessel(s) serving as a naval or military auxiliary in time of war or national emergency. *Id.*, § 298.17(a)(1). Again, all of APT's vessels are capable of serving as such auxiliaries and two are currently doing so.

92. Further evidencing the irrational, arbitrary, capricious and contrived nature of defendants' decisions, the August 1 and November 9 Letters refused to give a priority even to the two APT vessels that are under charter to MSC because these vessels are "economically vulnerable." They are vulnerable, say both Letters, because their MSC charters are for one year, with annual options for MSC to charter the vessels for an additional three years. Defendants know, but failed to even acknowledge, that MSC is statutorily prohibited from committing funds to charter a vessel for more than one year and that the existing MSC charters provide a strong

- 33 -

incentive for MSC to extend the charters by requiring MSC to make substantial termination payments to APT if it does not exercise its renewal options.  APT is informed and believes that defendants did not contact MSC to ascertain MSC's current use or projected need or plans for these vessels.  APT is informed and believes also that MSC considers these two vessels to be important, if not critical, to MSC's mission and that MSC intends to charter the vessels for the foreseeable future and has no plans to discontinue their charters.

93.  Instead of obtaining this information from MSC, defendants based their November 9 decision on two June 2012 speeches by Secretary of Defense Panetta, in which, according to defendants, "the Navy announced its plans to homeport more of its ships on the West Coast to assume a 60/40 West Coast-East Coast posture."  Defendants did not explain why this anticipated "posture" would make the MSC-chartered ships "economically vulnerable."  Nor did their November 9 Letter note that the current posture is 50-50, as Secretary Panetta stated, or acknowledge Secretary Panetta's statement that the 60/40 posture would not be effectuated for another eight years, in 2020.   Nor did defendants consider that, as defendants know, these MSC-chartered ships can be deployed to the West Coast or that the vessels are capable of transiting the Panama Canal.

94.  Regardless of MarAd's regulations, Congress has provided an express funding priority for vessels that are suitable for service as naval auxiliaries in time of war or national emergency.  46 U.S.C. § 53706(c).  MarAd cannot adopt any priority that would displace or take precedence over this statutory priority.  Defendants refused to give effect to Congress's statutory priority because, according to defendants, APT's project was not economically sound.  But for defendants' arbitrary and capricious finding that APT's project was not economically sound, defendants would have been required to accord APT's application the statutory priority.

95. Defendants also ignored, in their August 1 and November 9 letters, the fourth factor listed in MarAd's regulations: applications for vessels for which "[t]he Guarantees extend for less than the normal term for that class of vessel." 46 C.F.R. § 298(k)(4). APT's application satisfied this factor. The normal guarantee term for vessels like APT's tankers is 25 years, which is the term of the guarantees that MarAd most recently approved for other tankers operating in the same market as APT's vessels. APT's application seeks guarantees for only 20 years, which significantly reduces MarAd's exposure and enhances the economic soundness of APT's project.

96. MarAd's reliance on the amount of the requested guarantee and other pending applications is contrived. Such factors have no basis in law, and defendants' reliance on them is not authorized by the statute and regulations. Neither of the Letters cited any statute or regulation that allows MarAd to consider or base the denial of an application on other pending applications that may also be eligible for funding in the future as a ground for denying an application that has been completed and is qualified for financing guarantees.

97. Neither the Title XI statute nor MarAd's regulations authorize MarAd to consider other applications that, as MarAd's letter states, "may be forthcoming" in determining whether to approve APT's application. Historically, MarAd's practice has been to process applications in the order filed, unless a processing priority applies, as it does to APT's application. Further, MarAd has previously approved Title XI applications in circumstances where doing so has depleted available funding. Moreover, available funding is continually subject to change, and, APT is informed and believes, MarAd has recently terminated a prior unused loan-guarantee commitment, thereby making available substantial funding that was not available when APT's application was denied.

98.  At the time defendants denied APT's application, two other Title XI applications were pending before MarAd, one filed in January and the other in February 2012, 16 and 17 months after APT filed its application in August 2010.  But for defendants' unreasonable delays, APT's application would have been decided before the other two applications had even been filed.

99.  Among the vessels addressed in the other two pending applications, only one is capable of use as a naval auxiliary.  A determination to deny an application for five vessels capable of adding to the nation's national defense because there is an application pending for one such vessel that MarAd might (or might not) someday decide is more sound and desirable is, on its face, arbitrary, capricious and irrational.

100. Defendants' August 1 and November 9 Letters also relied on the possibility that Title XI applications might be filed for two additional vessels that might be capable of serving as naval auxiliaries.  A denial of an application for five vessels that are capable of adding to the nation's national defense on the ground that there two vessels for which an application might be filed in the future, and that, if an application is filed, defendants might determine to be more sound and desirable, is on its face, arbitrary, capricious and irrational.

101. It is the height of arbitrariness to conclude that an application under consideration must, regardless of its merit when judged by existing statutory and regulatory criteria, be disapproved on the speculation that doing so might limit defendants' ability to approve in the future other pending or not-yet filed applications that might be more deserving.

### FIRST CAUSE OF ACTION
### REMEDY FOR ARBITRARY, CAPRICIOUS AND OTHERWISE UNLAWFUL AGENCY ACTION

102.  The allegations in paragraphs 1 through 101 are repeated as if fully set forth here.

103.  Section 706(2) of the APA authorizes the Court to "hold unlawful and set aside agency action … found to be …arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

104.  In the course of reaching their decisions to deny APT's application, defendants took into account considerations that Congress determined to be irrelevant, namely the opinion and recommendation of the DOT Credit Council.  Their decision thus proceeded from an erroneous premise and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and in excess of statutory jurisdiction, authority, or limitations.

105.  The decision that APT's project was not economically sound (contrary to the conclusion of MarAd's independent financial consultant), cited as the primary ground for denying APT's application, is not supported by the Administrative Record and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

106.  The decision that APT's project does not warrant priority under the Title XI statute and regulations, cited as another ground for denying APT's application, is not supported by the Administrative Record and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

107.  The decision that APT's application should be denied because granting it would exhaust available funds that might otherwise be used to grant pending and possibly forthcoming applications that may be more sound and desirable, cited as another ground for denying APT's application, is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

ACCORDINGLY, the Court should issue an order setting aside the decisions denying APT's Title XI application and remanding this matter to the Administrator for further consideration in accordance with the Title XI statute and regulations and this Court's instructions.

## SECOND CAUSE OF ACTION
### REMEDY FOR THE SECRETARY'S UNLAWFUL INTERFERENCE

108.   The allegations in paragraphs 1 through 107 are repeated as if fully set forth here.

109.   Section 706(2) of the Administrative Procedure Act authorizes the Court to "hold unlawful and set aside agency action … found to be …arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

110.   In 2006 and again in 2008, Congress, citing obstructions and delays interposed by the Department of Transportation, expressly transferred authority over the Title XI loan guarantee program from the Secretary to the Maritime Administrator.

111.   By this action, Congress intended to eliminate obstructions, delays and consideration of extraneous factors injected into the Title XI application process by the DOT Credit Council.

112.   Despite the clear mandate of Congress, the Secretary has continued to require the Administrator to obtain either an authorization or recommendation from the DOT Credit Council before proceeding with various steps in processing Title XI applications, including the ultimate approval of an application.

113.   The Secretary's continued interference with the Administrator's performance of his ministerial and discretionary responsibilities regarding Title XI applications in general and

APT's application in particular is arbitrary, capricious and otherwise not in accordance with law and in excess of statutory jurisdiction, authority, or limitations.

114.  MarAd expressed support for APT's application at various times throughout its processing of that application and, but for the Secretary's interference, the Administrator would likely have approved APT's application.

ACCORDINGLY, the Court should issue an order declaring that the DOT Credit Council has no lawful or valid function with respect to Title XI applications, directing the Secretary to cease and desist from interfering with the Administrator's performance of his ministerial and discretionary responsibilities regarding Title XI applications in general and APT's application in particular, and directing the Administrator (or successor Administrator as required by the Court under the Third Cause of Action, below) to cease and desist from submitting such applications to the DOT Credit Council and to grant or deny APT's application without regard to the opinions, objections, recommendations or authorization of the Credit Council.

### THIRD CAUSE OF ACTION
### ADDITIONAL REMEDY FOR THE SECRETARY'S UNLAWFUL INTERFERENCE

115.  Past interference by the Secretary, other Department of Transportation officials and the DOT Credit Council with the Administrator's performance of his ministerial and discretionary responsibilities regarding APT's Title XI applications has so infected and prejudiced the deliberative process used by, and the judgment of, the incumbent Administrator that he is incapable of fairly assessing the merits of APT's Title XI application.

ACCORDINGLY, the Court should issue an order (a) requiring that the incumbent Administrator revoke his August 1, 2012 denial of APT's original Title XI application and his November 9, 2012 denial of APT's modified application and to recuse himself from any further participation in the consideration of APT's application; and (b) directing that APT's application

be considered *de novo* by the official designated by statute or regulation to succeed to the

position of Maritime Administrator when the incumbent Administrator is disqualified.

/s/ JOSEPH O. CLICK
Michael Joseph (DC Bar No. 6593)
Alex Blanton (DC Bar No. 169623)
Joseph O. Click (DC Bar No. 417294)
Blank Rome LLP
600 New Hampshire Ave. NW
Washington, D.C.  20037
(202) 772-5909
click@blankrome.com

*Counsel for Plaintiff American Petroleum Tankers*
*Parent LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of December, 2012, I electronically filed the

foregoing SUPPLEMENTAL COMPLAINT FOR JUDICIAL REVIEW OF AGENCY

ACTION AND FOR DECLARATORY AND INJUNCTIVE RELIEF with the Clerk of the

District Court using the CM/ECF system, which sent notification of such filing to parties of

record:

/s/ JOSEPH O. CLICK
Michael Joseph (DC Bar No. 6593)
Alex Blanton (DC Bar No. 169623)
Joseph O. Click (DC Bar No. 417294)
Blank Rome LLP
600 New Hampshire Ave. NW
Washington, D.C.  20037
(202) 772-5909
click@blankrome.com

*Counsel for Plaintiff American Petroleum Tankers Parent LLC*