# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERICAN PETROLEUM TANKERS PARENT LLC, | ) ) ) | |
| *Plaintiff*, | ) ) | |
| *v.* | ) ) | Civil Action No. 12-1165-CKK |
| THE UNITED STATES OF AMERICA, *ET AL.*, | ) ) | |
| *Defendants*. | ) ) ) | |

### PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Michael Joseph (DC Bar No. 6593)
Alex Blanton (DC Bar No. 169623)
Joseph O. Click (DC Bar No. 417294)
 Blank Rome LLP
 600 New Hampshire Ave. NW
 Washington, D.C.  20037
 (202) 772-5966
 click@blankrome.com

*Counsel for Plaintiff American Petroleum Tankers Parent LLC*

January 29, 2013

# TABLE OF CONTENTS

Page

STANDARD OF REVIEW…………………………………………………………………3

ARGUMENT ...................................................................................................................... 4

    I.    The Denial of a Title XI Application is Not Committed to Agency
    Discretion by Law and Defendants' Denial of APT's Application Is
    Subject to Judicial Review.................................................................................... 4

        A.    There Are Numerous Standards Against Which to Judge Defendants'
        Denial of APT's Title XI Application ................................................. 6

            1.    The Merchant Marine Act's Objectives and Policy Provide
            Judicially Manageable Standards................................................ 8

            2.    The Title XI Statute Itself Furnishes Judicially Manageable
            Standards.................................................................................... 11

            3.    MarAd's Regulations and Administrative Orders Provide
            Judicially Manageable Standards................................................ 12

        B.    Defendants' Arguments Miss the Mark ............................................. 14

            1.    Defendants' Characterization of the Nature of Decisions
            on Loan Guarantee Applications Is Inapt .................................... 14

            2.    Defendants' Truncated Analysis of the Language and Structure
            of the Title XI Statute Misinterprets the Language of the Statute
            and Ignores its Policy and Structure, as well as MarAd's Regulations
            and Administrative Orders ........................................................ 16

    II.    APT Has Standing to Seek Judicial Review of Defendants' Denial
    of its Title XI Application.................................................................................... 20

    III.    Defendants' Motion to Dismiss APT's Claim Concerning the DOT Credit
    Council's Interference Is a Premature Invitation to Adjudicate the Merits
    of that Claim without Producing the Administrative Record ......................... 23

    IV.    The Court Has Jurisdiction to Order that the Incumbent Administrator Be
    Recused from Further Consideration of APT's Application ......................... 31

CONCLUSION.................................................................................................... 35

# TABLE OF AUTHORITIES

Page(s)

## Cases

\* *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)....................................................5

*Air Transport Ass'n of Am. v. Export-Import Bank*,
   2012 U.S. Dist. LEXIS 99389 (D.D.C. July 18, 2012)...........................................15

*Aktieselskabet AF 21 November 2001 v. Fame Jeans, Inc.*, 525 F.3d 8 (D.C. Cir. 2008)..............3

*Amador County v. Salazar*, 640 F.3d 373 (D.C. Cir. 2011).........................................4

\* *American Cyanamid Co. v. FTC*, 363 F.2d (6th Cir. 1966)....................................33, 34

*American Maritime Ass'n v. United States*, 786 F.2d 1186 (D.C. Cir. 1986) ..............................10

*American Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137 (D.C. Cir. 2011).....................................3

\* *American Trading Transp. Co., Inc. v. United States*, 791 F.2d 942 (D.C. Cir. 1996) ................10

*American WaterWorks Ass'n v. EPA*, 40 F.3d 1266 (D.C. Cir. 1994) ..........................................18

\* *Amos Treat & Co. v. SEC*, 306 F.2d 260 (D.C. Cir. 1962)......................................32, 34

*Appalachian Power Co. v. EPA*, 135 F.3d 791 (D.C. Cir. 1998) ..................................18

*Arent v. Shalala*, 70 F.3d 610 (D.C. Cir. 1995) ..........................................................8

*Association of Data Processsing Serv. Orgs, Inc. v. Camp*, 397 U.S. 150 (1970) .........................4

*Association of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151 (D.C. Cir. 1979) .........................33

*Care Net Pregnancy Ctr. v. U.S. Dep't of Agriculture*, 2012 U.S. Dist. LEXIS 145677
   (D.D.C. Oct. 10, 2012)................................................................................4

*Chicago & N. W. R. Co. v. United Transp. Union*, 402 U.S. 570 (1971) ....................................30

\* *Clifford v. Pena*, 77 F.3d 1414 (D.C. Cir. 1996) ...........................................................7

*Coalition for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 10 (D.D.C. 2010) ....................................18

\* *Cody v. Cox*, 509 F.3d 606 (D.C. Cir. 2007) .......................................................... *passim*

*D. C. Federation of Civic Ass'ns v. Volpe,* 459 F.2d 1231 (D.C. Cir. 1972)................................34

*D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204 (1932) ............................................30

\* *Dickson v. Secretary of Defense*, 68 F.3d 1396 (D.C. Cir. 1995)....................................18

*District No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n v. Maritime
   Administration*, 215 F.3d 37 (D.C. Cir. 2000) ..............................................5

*Drake v. FAA*, 291 F.3d 59 (D.C. Cir. 2002) ................................................14

*Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093 (D.C. Cir. 1970) ...........18

*Evangelical Lutheran Church v. I.N.S.*, 288 F. Supp. 2d 32 (D.D.C. 2003) ................18

*Foster v. Mabus*, 2012 U.S. Dist. LEXIS 140882 (D.D.C. Sept. 29, 2012) ..................6

*FTC v. Cement Institute*, 333 U.S. 683 (1948) ............................................33

*Gilbert v. United States*, 640 F.3d 1293 (11th Cir. 2011)................................31

*Gray v. LaHood*, 2013 U.S. Dist. LEXIS 7669 (D.D.C. Jan. 18, 2013)........................4

*Hazardous Waste Treatment Council v. U.S. EPA*, 861 F.2d 270 (D.C. Cir. 1988)............23

\* *Heckler v. Chaney*, 470 U.S. 821 (1985) ............................................ *passim*

*Helgeson v. BIA*, 153 F.3d 1000 (9th Cir. 1998) ..................................... *passim*

*Independent U.S. Tanker Owners Committee v. Dole*, 809 F.2d 847 (D.C. Cir. 1987)..........9

\* *Jarrott v. Scrivener*, 225 F. Supp. 827 (D.D.C. 1964)...................................27

*Kendall v. United States*, 37 U.S. (12 Pet.) 524 (1838) ..................................9

*Keystone Shipping Co. v. United States,* 801 F. Supp. 771 (D.D.C. 1992) ..................9

*Liberty Maritime Corp. v. United States,* 928 F.2d 413 (D.C. Cir. 1991) ..................9

*Menkes v. Department of Homeland Security*, 486 F.3d 1307 (D.C. Cir. 2007) ...............7

*National Fed'n of Fed. Employees v. United States*, 905 F.2d 400 (D.C. Cir. 1990)........30

\* *Oceana, Inc. v. Locke*, 670 F.3d 1238 (D.C. Cir. 2011) ..................................5

*Oryszak v. Sullivan*, 576 F.3d 522 (D.C. Cir. 2009) ......................................6

\* *Padula v. Webster*, 822 F.2d 97 (D.C. Cir. 1987).......................................23

*Power Co. of Am. v. FERC,* 245 F.3d 839 (D.C. Cir. 2001)..................................28

*Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367 (1969) ................................28

\* *Robbins v. Reagan*, 780 F.2d 37 (D.C. Cir. 1985)...................................8, 15

*Safe Extensions, Inc. v. FAA*, 509 F.3d 593 (D.C. Cir. 2007)...........................................7

*Sierra Club v. Jackson*, 648 F.3d 848 (D.C. Cir. 2011)..................................................22

*Skokie Federal Sav. & Loan Ass'n v. Federal Home Loan Bank Board*,
    400 F. Supp. 1016 (N.D. Ill. 1975) ......................................................................33

*Telephone & Data Sys. v. FCC*, 19 F.3d 42 (D.C. Cir. 1994) ......................................33

*Texaco, Inc. v. FTC*, 336 F.2d 754 (D.C. Cir. 1964), *vacated on other grounds*, 381 U.S.
    739 (1965) ................................................................................................................32

*United States v. Morgan*, 313 U.S. 409 (1941)............................................................33

*Ventura v. Shalala*, 55 F.3d 900 (3d Cir. 1995)...........................................................33

*WildEarth Guardians v. Salazar*, 859 F. Supp. 2d 83 (D.D.C. 2012) .........................22

*Wultz v. Islamic Rep. of Iran*, 762 F. Supp. 2d 18 (D.D.C. 2011) ...............................18

## STATUTES

5 U.S.C. § 701(a)(2)..................................................................................... *passim*

5 U.S.C. § 702.................................................................................................21, 32

5 U.S.C. § 703........................................................................................................32

* 46 U.S.C. § 50101(a) ..............................................................................................9

46 U.S.C. § 50101(b) ..............................................................................................9

46 U.S.C. § 53701, note .......................................................................................25

46 U.S.C. § 53702(a) .......................................................................................I*passim*

46 U.S.C. § 53703................................................................................................11

46 U.S.C. § 53704................................................................................................11

46 U.S.C. § 53706................................................................................................11

* 46 U.S.C. § 53706(c)(2)........................................................................................11

46 U.S.C. § 53707...........................................................................................11, 17

46 U.S.C. § 53708................................................................................................17

* 46 U.S.C. § 53708(a) .......................................................................................11, 19

\* 46 U.S.C. § 53708(d) ................................................................................23

  49 U.S.C. § 109 ................................................................................. *passim*

\* National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, Div. C, title XXXV, § 3507, 119 Stat. 3555 (2006) .......................................24, 25, 29

\* National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, Div. C, title XXXV, § 3522, 122 Stat. 596-98 (Jan. 28, 2008) ........................... *passim*

## REGULATIONS AND ADMINISTRATIVE ORDERS

  46 C.F.R. §§ 298.1 – 298.17 .................................................................12

\* 46 U.S.C. § 298.14(a) .........................................................................13

\* 46 C.F.R. § 298.14(d) .........................................................................13

  46 C.F.R. § 298.14(d)(1) .....................................................................13

  46 C.F.R. § 298.14(d)(4) .....................................................................13

  49 C.F.R. §§ 1.43(a) ............................................................................24

  49 C.F.R. § 1.45(b) .............................................................................34

  49 C.F.R. § 1.66(e) .........................................................................24, 34

\* Maritime Administrative Order MAO 10-2 .............................................33

\* Maritime Administrative Order MAO 520-1, Amend. 2 ...........................13

## LEGISLATIVE REPORTS AND MATERIALS

  H.R. 9756 (92d Cong.1972) ...................................................................17

  H.R. Rep. No. 92-688 (92d Cong. 1971) ................................................17

  Sen. Rep. No. 92-1137 (1972) *reprinted in* 1972 U.S.C.C.A.N. 3851 ..........17

  *The Federal Ship Construction Loan Guarantee Program:  Hearing before the Seapower and Expeditionary Forces Subcomm. of the H. Comm. on Armed Services*, 110th Cong. (2007) .....................................................................................26

## OTHER AUTHORITIES

  *American Heritage Dictionary of the English Language* (1981) ....................18

  *Black's Law Dictionary* (8th ed. 1999) ..................................................18

*Websters New Twentieth Century Dictionary Unabridged* (2d ed. 1956) ....................................18

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| AMERICAN PETROLEUM TANKERS PARENT LLC | ) ) ) | |
| *Plaintiff*, | ) ) | |
| *v.* | ) ) | Civil Action No. 12-1165-CKK |
| THE UNITED STATES OF AMERICA, *ET AL.* | ) ) ) | |
| *Defendants*. | ) ) ) | |

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

This is an action for APA review of defendants' decisions denying plaintiff APT's

application for ship construction loan guarantees under Title XI of the Merchant Marine Act,

1936, as amended.  The Title XI statute and MarAd's regulations set forth specific standards by

which such applications are to be evaluated, most importantly the economic soundness of the

applicant's project and its ability to repay the guaranteed loans, which in turn are to be informed

by, among other things, the market potential for the subject vessels and their projected operating

cash flow.  Although the statute does not prescribe all the terms that MarAd might include *in the*

*guarantees themselves* and allows MarAd to consider other unspecified factors *relevant to the*

*project's economic soundness*, it nowhere otherwise authorizes the agency to depart from the

standards specified in the statute and regulations in determining whether to grant an application.

APT's supplemental complaint alleges that the decisions denying its application violated

these standards in several critical respects: in determining that its project was economically

unsound they (1) failed to consider operating cash flow as required by the regulations (¶¶ 67,

73); (2) did consider the interest payable by APT on its subordinated debt even though the

regulations treat such debt as equity (¶¶ 68, 74); (3) expressed "grave concern" that APT's debt service coverage ratio might fall below 1.5-to-1 even though the regulations require only that the ratio exceed 1-to-1 (¶¶ 78-80); and (4) questioned the viability of the project because APT's existing vessel charters did not extend to the 20-year term of the requested guarantees, even though the regulations require projections for only five years and refer only to long-term market demand, not current charters (¶¶ 6, 70, 77).

The complaint further alleges that defendants took into account the opinion and recommendation of the Secretary of Transportation's Credit Council, even though Congress specifically removed the Secretary from having any role under Title XI and vested the Maritime Administrator with exclusive authority to administer the program (¶¶ 21-25, 61).  The complaint alleges that the decisions were arbitrary, capricious and contrary to law in other respects as well (¶¶ 86-101), and it asks the Court (1) to set aside the decisions and remand the matter to defendants for a proper decision in accordance with law (First Cause of Action), (2) to declare that the Credit Council has no lawful function with respect to Title XI applications and direct defendants to render a decision without regard to the views of the Credit Council (Second Cause of Action), and (3) in light of the prior unlawful influence exerted by the Credit Council on the incumbent Maritime Administrator, to require the incumbent to recuse himself from further participation in the consideration of APT's application (Third Cause of Action).

The supplemental complaint also alleges that, notwithstanding the Administrator's proffered reasons for denying APT's application, the true reason for the denial was the Credit Council's determination to exclude APT from participation in the Title XI program because it is owned by investment funds managed by private equity firms (¶ 9).  It is likely for this reason that defendants, in an effort to avoid scrutiny of the administrative record, now attempt to persuade

2

the Court that it has no jurisdiction over a straightforward APA review action by couching arguments on the merits in jurisdictional terms, misconstruing the plain words of the statute, and mischaracterizing APT's claims.  Thus they lead with a lengthy argument that the Court has no jurisdiction over actions to remove executives appointed by the President (Mem. 11-16), even though APT merely seeks the remedy of the incumbent Administrator's recusal from further participation in proceedings on APT's application on remand.  Pointing out that the statute does not affirmatively command the Administrator to issue guarantees, gives him discretion to prescribe the terms of guarantees and allows him to consider unspecified factors relevant to economic soundness, they conclude that he may therefore grant or deny Title XI applications for whatever reason he chooses and his decisions are thus "committed to agency discretion by law" and unreviewable under the APA.  Astonishingly, they even argue that APT, the party whose application was denied, has no standing to seek review of the denial.

The Court should reject each of defendants' arguments and direct defendants to file the administrative record forthwith so that the Court can know the true basis for the denial of an application that MarAd's staff had deemed to be among the most economically sound the agency had ever received (Supp. Compl. ¶ 44).

### STANDARD OF REVIEW

Defendants acknowledge that their motion to dismiss for lack of subject matter jurisdiction and failure to state a claim is not based on materials outside the record.  Mem. 7 n.2.  Accordingly, their motion is based on the allegations of the supplemental complaint.  The standard of review for both challenges is the same.  The Court construes the complaint liberally, assumes the complaint's allegations are true, and draws all reasonable inferences in the plaintiff's favor.  *American Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (subject matter jurisdiction); *Aktieselskabet AF 21 November 2001 v. Fame Jeans, Inc.*, 525 F.3d

8, 16 (D.C. Cir. 2008) (failure to state a claim); *Care Net Pregnancy Ctr. v. U.S. Dep't of Agriculture*, 2012 U.S. Dist. LEXIS 145677 at *16 (D.D.C. Oct. 10, 2012) (subject matter jurisdiction); *Gray v. LaHood*, 2013 U.S. Dist. LEXIS 7669 at *4-*5 (D.D.C. Jan. 18, 2013) (failure to state a claim).

ARGUMENT

I.   **The Denial of a Title XI Application Is Not Committed to Agency Discretion by Law and Defendants' Denial of APT's Application Is Subject to Judicial Review.**

As defendants correctly note, the APA's judicial review provisions do not apply "to the extent agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Defendants contend that their denial of APT's Title XI application is just such an action, that the Court thus cannot review their denial, and that the supplemental complaint therefore fails to state a claim upon which relief can be granted. Mem. 17-21. In making this argument, however, defendants overlook directly relevant and binding D.C. Circuit precedent that requires the Court to reject their contention.

The Supreme Court has long held that the APA's "generous review provisions" are to be construed "not grudgingly but as serving a broadly remedial purpose." *Association of Data Processsing Serv. Orgs, Inc. v. Camp*, 397 U.S. 150, 156 (1970) (internal quotation marks and citations omitted). There is thus a "strong presumption that Congress intends judicial review of administrative action." *Amador County v. Salazar*, 640 F.3d 373, 379 (D.C. Cir. 2011) (internal quotation marks and citations omitted).

Accordingly, the exception to judicial review for actions "committed to agency discretion by law" is "'a very narrow exception' that applies only in 'rare instances.'" *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971)). "[J]udicial review of a final agency action by an aggrieved person will not be

4

cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967).

The Supreme Court has identified only three "narrow categories [of agency action] that usually satisf[y] the strictures of subsection 701(a)(2)." *Cody v. Cox*, 509 F.3d at 610 (citing *Lincoln v. Vigil*, 508 U.S. 182, 191-92 (1993)). Those categories are (1) "'second guessing executive branch decision[s] involving complicated foreign policy matters'" (*Cody*, 509 F.3d at 610 (internal quotation marks omitted)); (2) "an agency's refusal to undertake an enforcement action" (*id.* (citing *Heckler v. Chaney*, 470 U.S. 821, 831 (1985))), and (3) a "determination about how to spend a lump-sum appropriation" (*id.* (citing *Lincoln*, 508 U.S. at 192)). The D.C. Circuit has identified one other narrow category, actions involving national security. *See, e.g., Oryszak v. Sullivan*, 576 F.3d 522, 526 (D.C. Cir. 2009) (declining to review U.S. Secret Service's revocation of agent's Top Secret security clearance); *District No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n v. Maritime Administration*, 215 F.3d 37 (D.C. Cir. 2000) (declining judicial review of MarAd determination to transfer registry of certain vessels from U.S. to Marshall Islands based on national security, foreign policy and national interest); *National Fed'n of Fed. Employees v. United States*, 905 F.2d 400 (D.C. Cir. 1990) (declining judicial review of Secretary of Defense's base closure decisions under Base Closure and Realignment Act).

Defendants do not claim that the denial of APT's Title XI application falls into any of these narrow categories, and it plainly does not. Accordingly, the only avenue left to defendants is to "rebut the presumption that agency action is judicially reviewable by showing that 'the relevant statute is drawn so that a court would have no meaningful standard against which to

judge the agency's exercise of discretion.'"  *Cody v. Cox*, 509 F.3d at 610 (quoting *Lincoln v. Vigil*, 508 U.S. at 191, and *Heckler v. Chaney*, 470 U.S. at 830).

As shown below, defendants' assertion that the challenged actions are committed to agency discretion is nothing more than *post hoc* wishful thinking.  In each of the two decisions (Mem., Exhs. B and C) the Administrator did assert that a decision whether to approve a Title XI application is "discretionary."  Even if true, however, it does not prevent a court from reviewing the decisions for abuse of that discretion and their compliance with the law.[1]  Nowhere in his decisions or elsewhere does the Administrator assert that such decisions are "committed to agency discretion by law."  To the contrary, each decision cites, and purports to be based on, the criteria set out in the Title XI statute and regulations.  Defendants' current committed-to-agency-discretion assertion is nothing more than a transparent effort to avoid producing the administrative record, which will reveal the true unlawful nature and basis of the decisions.

### A.  There Are Numerous Standards Against Which to Judge Defendants' Denial of APT's Title XI Application.

"Judicially manageable standards may be found in formal and informal policy statements and regulations, as well as in statutes . . . ."  *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987); *see also id.* at 101 (suggesting that "FBI letters to law schools" might provide sufficient basis for review); *see also Foster v. Mabus*, 2012 U.S. Dist. LEXIS 140882, at *22 (D.D.C. Sept. 29, 2012) (considering a "Marine Corps Order" to provide judicially manageable standards to review a decision to decertify an instructor in the Marine Corps Junior ROTC program).  Indeed, the D.C. Circuit has held that policy statements by which MarAd identified the factors it considers in determining an application for a waiver of coastwise trading restrictions "render[s]

---

[1]  Whatever discretion the Administrator might have, the complaint alleges that the Secretary's Credit Council has no authority at all, and thus necessarily no discretion, under Title XI, an issue that is certainly reviewable.

what might arguably be unreviewable agency action reviewable." *Clifford v. Pena*, 77 F.3d 1414, 1417 (D.C. Cir. 1996).

Further, "judicially manageable standards" sufficient to afford judicial review need not be particularly detailed.  In *Cody v. Cox, supra*, veterans sued the Armed Forces Retirement Board for failure to provide health care as required by a statute that merely requires the provision of "cost-effective and high quality" health services.  509 F.3d at 608, 610.  The court of appeals rejected the government's claim that the statute committed the decision to the agency's discretion, observing, "Although 'high quality and cost-effective' health care is a tricky standard for a court to apply, that difficulty is not unique to this statute," and then holding, "The difficulty of defining the boundaries of 'high quality and cost-effective' health care is insufficient to make [the statute] one of those rare instances" where action is committed to agency discretion by law. *Id.* at 610.

In *Safe Extensions, Inc. v. FAA*, 509 F.3d 593 (D.C. Cir. 2007), the court found that a statute authorizing the agency to "prescribe minimum safety standards for . . . operating an airport serving any passenger . . . aircraft designed for at least 31 passenger seats," and directing the agency to "promote safe flight of civil aircraft . . . by prescribing . . . regulations and minimum standards for . . . practices, methods, and procedure[s] the [agency] finds necessary for safety in air commerce" provided "a perfectly workable standard to the guide the court" in reviewing an FAA "Advisory Circular" concerning runway lights.  *Id.* at 601 (quoting 49 U.S.C. § 44701).

In *Menkes v. Department of Homeland Security*, 486 F.3d 1307 (D.C. Cir. 2007), an independent pilot sought judicial review of a Coast Guard decision essentially revoking his eligibility to pilot vessels on the St. Lawrence River based on a determination, among others, that

the local Pilots Association pool had the "physical and economic" ability to provide adequate pilotage service, as specified in a Coast Guard regulation.  The D.C. Circuit held that a court could certainly review "whether the pool has the physical and economic ability to provide sufficient service."  *Id.* at 1313.

In *Arent v. Shalala*, 70 F.3d 610, (D.C. Cir. 1995), the court held that a statute requiring the FDA to issue mandatory nutrition-labeling regulations if the FDA found that food retail stores were not in "substantial compliance" with FDA voluntary guidelines provided judicially manageable standards for reviewing the FDA's determination of "substantial compliance" under the statute.  *Id.* at 612, 614.

In *Dickson v. Secretary of Defense*, 68 F.3d 1396 (D.C. Cir. 1995), the court held that a statute that allowed the military to excuse an untimely filing of a request to correct a military record "in the interest of justice" provided a sufficiently meaningful standard against which to judge the military's denial of such a request.  *Id.* at 1399, 1404.

Here, there are many sources of "judicially manageable standards" against which to review defendants' denial of APT's Title XI application, namely (1) the statutory objectives and policy of the Merchant Marine Act; (2) the Title XI statute itself; (3) MarAd's Title XI regulations; and (4) MarAd's administrative orders.

## 1. The Merchant Marine Act's Objectives and Policy Provide Judicially Manageable Standards.

"Even when there are no clear statutory guidelines, courts often are still able to discern from the statutory scheme a congressional intention to pursue a general goal.  If the agency action is found not to be reasonably consistent with this goal, then courts must invalidate it." *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985).  The objectives and policy of the Merchant Marine Act, in which the Title XI program was originally included, provide judicially

8

manageable standards.  The Act's "objectives are to foster the development and encourage the

maintenance of an American merchant marine, in both foreign and domestic commerce, that is

> (a) sufficient to carry its domestic water-borne commerce and a substantial
> portion of the water-borne export and import commerce of the United States and
> to provide shipping service essential for maintaining the flow of such domestic
> and foreign water-borne commerce at all times, (b) capable of serving as a naval
> and military auxiliary in time of war or national emergency, (c) owned and
> operated under the United States flag by citizens of the United States, insofar as
> may be practicable, (d) composed of the best-equipped, safest, and most suitable
> types of vessels, constructed in the United States and manned with a trained and
> efficient citizen personnel, and (e) supplemented by efficient facilities for
> shipbuilding and ship repair.

*Independent U.S. Tanker Owners Committee v. Dole*, 809 F.2d 847, (D.C. Cir. 1987) (quoting

former 46 U.S.C. app. § 1101(a) (1982) (now codified at 46 U.S.C. § 50101(a))).  Congress has

declared these objectives to be the official and formal "policy" of the United States.  46 U.S.C.

§ 50101(b).[2]

The D.C. Circuit has used the Act's objectives and policy in determining whether actions

taken by MarAd were arbitrary, capricious, contrary to law or an abuse of discretion.  *See, e.g.,*

*Independent U.S. Tanker Owners Committee*, 809 F.2d at 851-54 ("the Secretary's statement of

basis and purpose fails to give an adequate account of how the [challenged action] serves [the

---

[2]  The Act seeks to effectuate these goals through various programs.  The Construction-
Differential subsidy program of Title V, which is no longer operative, promoted the construction
of vessels in U.S. shipyards and their operation under the U.S. flag, by subsidizing the difference
between the cost of constructing a vessel in a foreign shipyard and the higher cost of its
construction in a U.S. shipyard.  Title VI established a program promoting the operation of U.S.-
flag vessels in international trade, by subsidizing the difference between costs of operating a
vessel under foreign flag and the higher costs of operating it under the U.S. flag.  The Act's
Capital Construction Fund (CCF) program helps owners and operators of U.S. flag vessels
accrue the large amount of capital necessary to construct, reconstruct, or modernize their vessels
through the deferment of taxes on funds deposited into a CCF account.  And, of course, the Title
XI program promotes the construction of U.S.-flag vessels in U.S. shipyards, as is the case with
APT's five tankers, by providing a U.S. government guarantee of debt obligations issued to
construct such vessels, thus allowing the ship owner to borrow at favorable interest rates.  *See
generally Liberty Maritime Corp. v. United States*, 928 F.2d 413, 414-415 (D.C. Cir. 1991);
*Keystone Shipping Co. v. United States*, 801 F. Supp. 771, 773-74 (D.D.C. 1992)

Merchant Marine Act's] objectives and why alternative measures were rejected in light of them"); *American Trading Transp. Co., Inc. v. United States*, 791 F.2d 942, 948 (D.C. Cir. 1986) ("When Marad ignores their pleas [*i.e.*, the objections of the owners of unsubsidized coastwise petroleum tankers to requested waivers to permit coastwise operation of subsidized tankers], the agency shuts from its view a principal goal of the [Merchant Marine Act]:  protection of the unsubsidized fleet"); *American Maritime Ass'n v. United States*, 786 F.2d 1186, 1189 (D.C. Cir. 1986) ("Appellant's most significant challenge … is its claim that the [agency] erroneously concluded that its action furthered the Merchant Marine Act's policy of maintaining a merchant marine 'capable of serving as a naval and military auxiliary in time of war or national emergency.'").[3]

The objectives, policy and structure of the Act evidence a strong congressional intent to promote the U.S.-flag merchant fleet.  The Court is certainly capable of reviewing the administrative record in this case and measuring defendants' actions against the standards so established.  At the very least, the Act's objectives and legislatively-mandated policy provide standards that are no less precise and judicially manageable than the standards identified as sufficient in other cases, such as the "cost-effective and high quality" healthcare standard in *Cody v. Cox*, 509 F.3d at 608, 610.  And certainly, the Court can review the administrative record to assess whether the denial of APT's application conforms to the Act's purposes, and whether the denial is irrational, arbitrary, capricious and an abuse of discretion.

---

[3]  MarAd itself has used the general purposes of the Act as its basis for determining whether to grant applications under other provisions of the Act.  *See American Trading Transp. Co., Inc., supra*, 791 F.2d at 945.

**2.   The Title XI Statute Itself Furnishes Judicially Manageable Standards.**

In addition to the objectives, policy and structure of the Act, the specific provision of Title XI provide detailed standards that specify the factors the Administrator must consider and findings he must make with respect to a Title XI application.  These detailed standards likewise inform applicants as to the documentation they must present and standards they must meet, to obtain a Title XI guarantee.  The statute (1) affirmatively requires the Administrator to make a decision on a Title XI application within a specific time (46 U.S.C. § 53703); (2) specifies and limits the amount of funding for which the Administrator can issue a guarantee (*id.*, § 53704); (3) prescribes the purposes for which the Administrator can issue guarantees (*id.*, § 53706); and (4) specifies requirements that the borrower and vessel operator must meet to obtain a guarantee (*id.*, § 53707).

As particularly relevant here, the Title XI statute requires the Administrator to find (and thus the applicant to demonstrate) that the project for which a guarantee is sought is "economically sound."  *Id.*, § 53708(a).  And as to the "economic soundness" standard, the statute affirmatively requires that the Administrator consider specific factors, including the need in the industry for new and additional equipment, the market potential for employing the vessel, projected revenues and expenses for the vessel's operation, and any charters or other contracts relevant to the vessel's employment.  *Id.*  It directs MarAd to give priority for funding to vessels that are capable of serving as naval auxiliaries in time of war or national emergency.  46 U.S.C. § 53706(c)(2).

These statutory standards are all judicially manageable, particularly those relating to the economic soundness, the basis on which defendants purported to deny APT's application.  The Court can certainly review the administrative record to ascertain, for example, whether the Administrator properly applied those standards in considering the need for APT's vessels in the

industry and the market potential for those vessels.  In evaluating defendants' professed concern over long-term market uncertainty, the Court is quite capable of ascertaining what, if anything, the record contains that contradicts the 88-page report of the recognized industry expert, concluding that there will be a growing need for these vessels in the trade and demonstrating that the market potential for vessels such as APT's is positive.  *See* Supp. Compl. ¶¶ 71, 75.

Similarly, the Court can review the administrative record with respect to projected revenues and expenses for the vessel's operation to ascertain whether the Administrator's decisions concerning the vessels' projected profitability, "net losses" and "fundamental cash flow" are consistent with the statutory standards and supported by the record.  Courts regularly review financial statements and experts' reports in, for example, accounting fraud cases, both in deciding summary judgment motions and rendering judgments in bench trials.  Again, the Court can easily review the financial evaluations in the administrative record that are contrary to the positive economic-feasibility conclusions of MarAd's independent financial consultant.  *See id.*, ¶¶ 60, 62, 70.

### 3. MarAd's Regulations and Administrative Orders Provide Judicially Manageable Standards.

If the Merchant Marine Act's general objectives and policy and Title XI's specific statutory provisions were not enough, MarAd's regulations and administrative orders remove any conceivable doubt as to the availability of meaningful standards against which to judge defendants' action.   MarAd's regulations concerning Title XI applications fill almost 15 pages in the Code of Federal Regulations.  *See* 46 C.F.R. §§ 298.1 - 298.17.  They provide even more detail as to the information applicants must submit, the requirements applicants must meet, and the factors the Administrator must consider and the findings he must make with respect to a Title XI application.

Of particular significance here, MarAd's regulations make the project's "economic soundness" and the applicant's "ability to repay the Obligations [for which guarantees are issued] … the primary basis for [the] approval" of an application.  46 U.S.C. § 298.14(a).  The regulations further require MarAd to evaluate a project's economic soundness using "Objective Criteria."  46 C.F.R. § 298.14(d).  MarAd requires that the projected long-term demand (equal to the length of time for which guarantees are requested) "exceed the supply of similar vessels … in the applicable market."  *Id.*, § 298.14(d)(1).  The regulations also provide, with respect to the financial aspects of the project:

> The operating cash flow to Obligation debt service ratio over the term of the Guarantee must be in excess of 1:1.  Operating cash flow means revenues less operating and capital expenses including taxes paid but exclusive of interest, accrued taxes, depreciation and amortization for the Title XI asset.  Debt service means interest plus principal.

*Id.*, § 298.14(d)(4).

MarAd's Administrative Orders (MAOs) drive home the primacy of the 1:1 ratio of operating cash flow to debt service contained in the regulations.  Amendment 2 to MAO 520-1 was issued "to clarify existing policies and procedures" used by MarAd in evaluating Title XI applications.  It emphasizes the importance of "economic soundness" and "operating cash flow" to the Title XI decision process, and concludes, "Although the financed asset is an important part of MARAD's security in a Title XI loan guarantee, the economic soundness of the project and the ability of the borrower to repay the indebtedness *shall be the basis* for all approvals."  *Id.*, section 3.02.1 (emphasis added).  It then goes on to direct that "[t]he Title XI loan guarantee approval process should give *primary consideration* to operating cash flow to debt-service ratios of more than 1:1 on existing debt."  *Id.*, § 3.02.5 (emphasis added).

Again, the Court can easily review the Administrator's decisions to determine whether his assessment of economic soundness, including operating cash flow and debt-service ratios, are consistent with these standards and supported by the record.

**B.   Defendants' Arguments Miss the Mark.**

Quoting *Secretary of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006), and *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002), defendants assert that the "nature of the agency action" and the "language of the statute" establish that the decision to deny a Title XI application is committed to agency discretion.  Defendants' analysis is crabbed and misses the mark entirely.

**1.   Defendants' Characterization of the Nature of Decisions on Loan Guarantee Applications is Inapt.**

In arguing that the "nature of the action" shows that a denial of a Title XI application is an action that is committed to agency discretion, defendants first assert that "the decision not to issue a loan guarantee" is "quintessentially a matter of agency discretion" and quote a Ninth Circuit case for the proposition that government loans are "'usually reserved to agency discretion'" because they involve "'nice issues of judgment and choice … which require the exercise of informed discretion.'"  Mem. 17 (quoting *Helgeson v. BIA*, 153 F.3d 1000, 1004 (9th Cir. 1998)).

*Helgeson* is not binding on this Court, is inconsistent with D.C. Circuit cases, and is, in any event, inapposite.  As shown below, the two statutory standards at issue in *Helgeson*, which were based expressly and solely on the Secretary's "judgment" and "opinion," bear little resemblance to the detailed standards set out in Title XI and MarAd's regulations and administrative orders.  *Helgeson* did acknowledge, however, that "the BIA's decision making

process" and its "outcome" are unreviewable only to the extent that "BIA relies on the statutory factors in arriving at its loan decisions."   153 F.3d at 1004.

Moreover, defendants' assertion that a decision on a loan application is "quintessentially" the kind of decision committed to agency discretion is belied by *Air Transport Ass'n of Am. v. Export-Import Bank*, 2012 U.S. Dist. LEXIS 99389 (D.D.C. July 18 2012), the only decision in this Circuit that they cite for this proposition.  Mem. 17.  In that case, Judge Boasberg held that the Export-Import Bank's decision to issue a loan guarantee to a foreign airline was not only reviewable, but reviewable in an action brought by a third party.  *Id.* at *56-*62.  Citing *Robbins v. Reagan*, *supra*, Judge Boasberg stated, "The provisions of the Bank Act Plaintiffs seek to enforce evince a clear congressional intent to protect the interests of domestic industry and domestic employees. . . . This goal provides the agency with a regulatory polestar and affords the Court a mark by which to evaluate its determinations."  *Id.* at *59 (citation omitted).  Here, of course, APT is not a third party, but the very entity whose interests are directly and adversely affected by defendants' conduct.  And the Merchant Marine Act serves to protect the interests of the U.S.-flag merchant fleet, particularly through the Title XI program and particularly with respect to vessels, such as APT's, that are capable of serving as naval auxiliaries.

Relying on *Heckler*, *supra*, defendants also assert (Mem. 18) that the denial of APT's application is committed to agency discretion by law because "[a] loan decision involves considerations similar to those evaluated when an agency decides not to enforce a statute—an agency action that is not reviewable," and involves consideration of how "'agency resources are best spent,'" "'best fits the agency's overall policies, and indeed, whether the agency has enough resources to undertake action at all.'"  Mem. 18 (quoting *Heckler*, 470 U.S. at 831-32).  The comparison is, to be charitable, a stretch.

15

Government enforcement action involves conduct of an entirely different order than a decision on a loan guarantee.  As *Heckler* explained, agency enforcement of a statute involves an "exercise [of] its *coercive* power over an individual's liberty or property rights …."  470 U.S. at 832 (emphasis in original).  The Supreme Court further explained that "when an agency *does* act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner."  *Id.* (emphasis in original).  A decision on a loan guarantee application does not involve government "coercive" power at all, much less the taking of an individual's liberty or property.  Moreover, a failure to enforce is action that benefits the target of an agency's enforcement authority, whereas a failure to approve a loan guarantee almost always harms the applicant, as is the case here.  Similarly, a decision to enforce "provides a focus or judicial review" (*id.*), while the likelihood that person whose loan guarantee application is granted will seek judicial review is nil.

Even if the comparison with enforcement decisions were apt, it would not support defendants' position.  The Supreme Court in *Heckler* "emphasize[d] that the decision [not to enforce a statute] is only presumptively unreviewable; the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement power."  *Id.* at 832-33.  Here, again, there are numerous guidelines for the Administrator to follow that are more than sufficient to enable the Court to review defendants' actions.

2. **Defendants' Truncated Analysis of the Language and Structure of the Title XI Statute Misinterprets the Language of the Statute and Ignores its Policy and Structure, as Well as MarAd's Regulations and Administrative Orders.**

Defendants assert that the language and structure of "the relevant statute and regulations also support [their assertion] that this agency action is committed to agency discretion" and that "loan guarantees under the Title XI program are entirely discretionary."  Mem. 18.  They place

principal reliance on the primary authorization provision, which provides that "the

Administrator, *on terms the ... Administrator may prescribe, may* guarantee or make a

commitment to guarantee the payment of the principal and interest on an obligation eligible to be

guaranteed under this chapter."  Mem. 18 (quoting 46 U.S.C. § 53702(a)) (emphasis added by

defendants).  First, section 53702(a) merely authorizes the Administrator to issue guarantees, and

the phrase, "on terms the ... Administrator may prescribe," unmistakably refers to terms that the

Administrator, at his discretion, may prescribe for inclusion in the final guarantee contracts.[4]

(For example, as alleged in paragraph 65 of the complaint, the independent financial consultant's

report here recommended that the Administrator include several terms in APT's guarantee

agreements, and APT agreed to all of them.)  The section does not address applications for

guarantees and does not refer to the factors, such as economic soundness, including the market

potential for the vessels and their projected revenues and expenses (46 U.S.C. § 53708) or the

applicant's qualifications (46 U.S.C. § 53707), that the Administrator must consider in deciding

whether to approve or deny an application.  Defendants' attempt to translate the word "terms" to

---

[4]  The language "on terms the . . . Administrator may prescribe" now appearing in section 53702(a) appeared added by section 3 of H.R. 9756 (92d Cong.1972) and ultimately in former 46 U.S.C. app. § 1104(a).  The House Report accompanying H.R. 9756 began its description of section 3 by explaining that the legislation converted Title XI's mortgage insurance program into a loan guarantee program and then explained:

> The lender's primary concern in the transaction would be with the terms of the bond or other obligations.  The terms of the security arrangements would be left primarily to the borrower and the United States of America, represented by the Secretary of Commerce.  The security arrangement between the obligor and the Secretary will incorporate provision for the protection of the interest of the Government similar to those which are contained in the present arrangements.

H.R. Rep. No. 92-688 at 8 (1971); *see also* Sen. Rep. No. 92-1137 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3851, 3857.

mean factors, criteria or standards for the Administrator to consider in reviewing an application is simply contrary to its plain meaning.[5]

No more persuasive is defendants' observation that the statute does not command the Administrator to issue loan guarantees, but is merely a grant of authority and thus provides only that he "may" issue them.  "When a statute uses a permissive term such as 'may' rather than a mandatory term such as 'shall,' this choice of language suggests that Congress intends to confer some discretion on the agency, and that courts should accordingly show deference to the agency's determination.  *However, such language does not mean the matter is committed exclusively to agency discretion*."  *Dickson*, 68 F.3d at 1401 (emphasis added) (citing *Mulloy v. United States*, 398 U.S. 410, 414 (1970) and *Barlow v. Collins*, 397 U.S. 159, 165-66 (1970)); *see also Appalachian Power Co. v. EPA*, 135 F.3d 791, 807 (D.C. Cir. 1998); *Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093, 1098 (D.C. Cir. 1970); *Coalition for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 10, 20 (D.D.C. 2010); *Evangelical Lutheran Church v. I.N.S.*, 288 F. Supp. 2d 32, 45 (D.D.C. 2003).

While defendants seem to recognize that the Administrator must consider the statutory "factors" such as economic soundness and its components, they assert that section 53708(a)(5)

---

[5]   Courts "generally assume that the Congress intends the words it uses to have their ordinary meaning[.]"  *American WaterWorks Ass'n v. EPA*, 40 F.3d 1266, 1271 (D.C. Cir. 1994). Thus, they "must ascribe to the words their plain and ordinary meaning, absent substantial evidence that Congress intended some other definition."  *Wultz v. Islamic Rep. of Iran*, 762 F. Supp. 2d 18, 25 (D.D.C. 2011).  The ordinary meaning of the word "term" is "A contractual stipulation <the delivery term provided for shipment within 30 days> or "Provisions that define an agreement's scope; conditions or stipulations <terms of sale>" (*Black's Law Dictionary* at 1509-10 (8th ed. 1999); "conditions of a contract, agreement, sale, etc. that limit or define its scope or the actions involved; as in *terms* of payment or the *terms* of a treaty" (*Websters New Twentieth Century Dictionary Unabridged* at 1882 (2d ed. 1956) (emphasis in original)); and when pluralized, "Conditions or stipulations that define the nature and limits of an agreement," *peace terms* (*The American Heritage Dictionary of the English Language* at 1328 (1981) (emphasis in original)).

also allows him "to consider 'other relevant criteria' *without limitation*" (Mem. 19 (emphasis added)), implying that the Administrator may essentially evaluate and deny an application based on whatever factors he chooses.  This might suggest that the Administrator does indeed have the absolute unreviewable discretion that defendants claim, if that were in fact what the statute provided.  What the statute actually says, however, is that the Administrator may not issue a guarantee unless he "finds that the … project … will be economically sound" and, "*[i]n making that finding*," he shall consider market potential, projected revenue and "other relevant criteria." 46 U.S.C. § 53708(a).  Again, the Court will have little difficulty in determining whether a factor considered by the Administrator is relevant to the economic soundness of the project, whether he gave it proper consideration, and whether his decision is supported by the administrative record.

Finally in this connection, defendants assert that the Ninth Circuit's decision in *Helgeson* "is instructive and explains why the court may not sit as a 'judicial loan review committee.'" Mem. 20 (quoting 153 F.3d at 1004).  *Helgeson* is actually instructive, however, in demonstrating just how broad a statute's language must be before it will be deemed sufficient to overcome the strong presumption of reviewability.  In *Helgeson*, Native Americans sought judicial review of the Bureau of Indian Affairs' denial of their application for a loan.  The Ninth Circuit held that the decision was committed to agency discretion by law because the relevant statute provided only two criteria upon which the Secretary was to base a loan decision, both of which were so broad as to preclude review:  the Secretary's "judgment" as to whether there was a "reasonable prospect of repayment" and the Secretary's "opinion" as to "the adequacy of alternate financing." *Helgeson*, 153 F.3d at 1003.  Here, in contrast, the Title XI statute nowhere refers to the Administrator's "judgment" or "opinion."  And, as shown, the Merchant Marine Act, the provisions of Title XI, and MarAd's implementing regulations and administrative orders

establish readily ascertainable and judicially manageable standards against which to judge

defendants' denial of APT's application.

Moreover, even the *Helgeson* court recognized that an agency decision that is otherwise

committed to agency discretion is reviewable to determine whether the agency's decision was in

fact based on the prescribed statutory criteria:

> An agency's decision is subject to review to determine if the agency departed
> from statutory criteria. *See Heckler*, 470 U.S. at 833 ("Congress did not set
> agencies free to disregard legislative direction in the statutory scheme that the
> agency administers.").  The discretionary exception contained in 5 U.S.C.
> § 701(a)(2) does not apply to an allegation that an agency has exceeded statutory
> guidelines, because the claim does not involve a question "committed to agency
> discretion by law."  Indeed, when statutory language supplies sufficient standards
> constraining agency discretion, judicial review is appropriate. *Heckler*, 470 U.S.
> at 832-33 (observing that an agency's enforcement action "at least can be
> reviewed to determine whether the agency exceeded its statutory powers").
> Accordingly, despite our refusal to assess whether a "reasonable prospect of
> repayment" of the Helgesons' requested loans does exist, we review the BIA's
> determination to see if the agency in fact transgressed the boundaries of its
> discretion by relying upon a criterion that [the statute] does not contain.

153 F.3d at 1004.  Here, of course, APT alleges that the Administrator's denial of APT's

application was based on criteria not contained in the statute or regulations.

## II.    APT Has Standing to Seek Judicial Review of Defendants' Denial of its Title XI Application.

Defendants make a two-paragraph argument that APT, the very entity whose application

for Title XI loan guarantees was denied, lacks standing to bring this action.  Their reasoning goes

like this:  (1) to meet constitutional standing requirements, it must be likely that the plaintiff's

injury will be redressed by a favorable decision, (2) APT's injury is not redressable because even

if its application meets all of the statutory and regulatory criteria and is entitled to a statutory

priority, "the Administrator could still deny the application because granting Plaintiff's loan

guarantee application would 'exhaust available funds,'" and (3) he could do this because "[t]he

Administrator can consider any factors he 'may prescribe' in evaluating a loan guarantee

application" and the "the Administrator *must* consider whether funding one application will mean that other pending and/or future applications will be denied."  Mem. 22 (emphasis added). In other words, the Administrator has full discretion to deny Title XI guarantees whenever he thinks he might prefer to save MarAd's Title XI funds for some future project or projects rather than use them for a currently completed and eligible project.

Defendants' argument must be rejected.  First, the APA confers standing on any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action."  5 U.S.C. § 702.  The injury that APT seeks to have redressed is the denial of its application *on a basis that was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law*.  It does not ask the Court to direct defendants to grant its application, but merely to direct them to make a reasoned, non-arbitrary decision based upon the statutory and regulatory factors and the record before it.  APT is the quintessential "aggrieved party" within the meaning of the APA, and if the Court grants the relief APT requests, its injury will have been redressed.

Second, defendants' argument is nothing more than an argument on the merits, embellished with the words jurisdiction, standing and redressability.  As they themselves note, the Administrator offered the "exhaustion of funds" argument in his letters denying APT's application.  Whether this ground for denying a Title XI application is legitimate or, as APT alleges (Supp. Compl. ¶ 107), is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law is an issue that goes to the merits of this case, as does the Administrator's consideration of whether funding one application will mean that other pending or future applications will be denied.

Moreover, the entire premise of defendants' argument is "[t]he Administrator can consider any factors he 'may prescribe' in evaluating a loan guarantee application."  Mem. 22. This is just another way of saying the decision on a Title XI application is committed to agency discretion by law under 5 U.S.C. § 701(a)(2), an assertion (fully addressed in the preceding section) that does not implicate jurisdiction at all.  *See Sierra Club v. Jackson*, 648 F.3d 848, 853-54 (D.C. Cir. 2011); *WildEarth Guardians v. Salazar*, 859 F. Supp. 2d 83, 97, n.11 (D.D.C. 2012).

Third, even if preserving available funds for future hypothetical applications were a valid basis to deny a Title XI application, defendants' standing argument rests on their conjecture as to what might happen on remand if the Court sets aside the decisions denying APT's application and remands the matter for further consideration.  It is true that the Administrator's November 9 denial letter said that the guarantees requested by APT "would nearly exhaust available resources, when there are other pending applications for guarantees to finance new vessels, which may be economically sound, or preferable for other reasons."  Mem. Ex. C.  Those remarks, of course, were made in the context of the Administrator's finding that APT's project was not economically sound, a finding that APT here contends was unlawful.  Whether the Administrator will in fact deny APT's application on the basis of available funds under a different view of its economic soundness will depend upon numerous unknowable factors. Whether APT's project will exhaust available funds, for example, will depend upon the amount of funds then available, and APT's complaint (¶ 97) alleges that termination of a prior unused guarantee commitment has already made available substantial funding that was not available when APT's application was denied.

The short answer to defendants' speculation is provided by the court of appeals in *Telephone & Data Sys. v. FCC*, 19 F.3d 42 (D.C. Cir. 1994), where, in response to a similar standing argument, the court noted:

> The contingency upon which the Commission relies to defeat standing relates solely to the Commission's own conduct in the future, rather than to the unfettered choices made by independent actors not before the courts.… [D]ecisions in like cases have held the suit to be justiciable so long as the relief sought would constitute a necessary first step on a path that could ultimately lead to relief fully redressing the injury. … [Plaintiff] may not prevail even if we vacate the [challenged] order, but it cannot prevail unless we do so, and that is enough to ensure that the relief requested will produce tangible, meaningful results in the real world.

19 F.3d at 47 (internal quotations and citations omitted).  *See also Power Co. of Am. v. FERC*, 245 F.3d 839, 842 (D.C. Cir. 2001)*; Hazardous Waste Treatment Council v. U.S. EPA*, 861 F.2d 270, 273 (D.C. Cir. 1988).

III.    **Defendants' Motion to Dismiss APT's Claim Concerning the DOT Credit Council's Interference Is a Premature Invitation to Adjudicate the Merits of that Claim Without Producing the Administrative Record.**

APT's Supplemental Complaint recites numerous details about the Credit Council's interference with the Administrator's processing of and decision on APT's Title XI application. It alleges, among other things, that the Secretary of Transportation and the DOT Credit Council exercise complete authority over the Administrator's processing of Title XI applications by (a) requiring the Administrator to invoke his discretionary authority, under 46 U.S.C. § 53708(d), to obtain an independent financial review of every Title XI application and preventing the Administrator from exercising that authority without the Credit Council's permission (¶¶ 30-32, 39); (b) arbitrarily interposing objections and obstacles that have no basis in the Title XI statute or regulations (¶¶ 34, 36, 38, 41 and 47); and (c) prohibiting the Administrator from approving an application without first obtaining a recommendation from the Credit Council and arbitrarily delaying or avoiding approval by deferring consideration of, or refusing to consider, applications

(¶¶ 41, 45-47).  Indeed, it alleges that the true, unstated basis for defendants' denial of APT's

application was the Credit Council's determination to exclude APT from the Title XI program

because it is owned by investment funds managed by private equity firms (¶ 9).  Defendants

know that the Court is, for purposes of a motion to dismiss, required to accept these allegations

as true.  It nevertheless asks the Court to ignore APT's allegations and pretend, without benefit

of an administrative record disclosing the Credit Council's actual activities, that the Credit

Council did nothing more than render an advisory recommendation on APT's application, and

even that at the Administrator's request.  The motion to dismiss APT's claim regarding the

Credit Council's activities is thus out of order and must be denied.

Furthering their propensity to disregard the facts, defendants also ignore the 2006 and

2008 statutes by which Congress expressed its disapproval of the Credit Council's interference in

the Title XI program and specifically amended the Title XI statute to eliminate that interference.

Prior to 2006, the authority to administer the Title XI loan guarantee program was vested in the

Secretary of Transportation.  The Secretary delegated that authority to the Maritime

Administrator, reserving the right to exercise the powers and duties so delegated.  *See* 49 C.F.R.

§§ 1.43(a), 1.66(e).  Since then, Congress has twice passed legislation divesting the Secretary of

that authority, and conferring it instead on the Administrator.

First, in January 2006, in a section entitled, "Transfer of Authority for Title XI Non-

Fishing Loan Guarantee Decisions to Maritime Administration," Congress transferred the

authority to approve or deny applications for Title XI loan guarantees with respect to vessels

other than fishing vessels from the Secretary to the Administrator.  *See* section 3507 of the

National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, Div. C, title

XXXV, § 3507, 119 Stat. 3555 (2006) (the 2006 NDAA).  This provision, however, was enacted

too late for inclusion in the 2006 Act that re-codified the federal maritime laws generally, and codified the relevant portion of Title 46, U.S. Code, including the Title XI program, into positive law.  Accordingly the changes made by section 3507 of the 2006 NDAA were not reflected in chapter 537 of title 46 (the chapter codifying the former Title XI of the Merchant Marine Act) as it was enacted in 2006.[6]

In any event, the change mandated by the 2006 NDAA was apparently ignored by the Secretary, whose Credit Council continued to participate in the Title XI loan guarantee process. Consequently, Congress, after conducting hearings on the subject, again divested the Secretary of his authority over the Title XI program in 2008.  In section 3522 of the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, Div. C, title XXXV, § 3522, 122 Stat. 596-98 (Jan. 28, 2008) (2008 NDAA), Congress repealed the changes to the Title XI program made by the 2006 NDAA and replaced them with similar changes.[7]  In addition, Congress included a specific finding that "[t]he current process for review of applications for maritime loans in the Department of Transportation has effectively discontinued the [Title XI loan guarantee] program as envisioned by Congress."  *Id.*, § 3517(a)(3).  The "current process for review of applications for maritime loans in the Department of Transportation" to which Congress referred included review by the DOT Credit Council, which the Secretary, without statutory basis or authority, had interjected into the Title XI application process in 2004.[8]

---

[6]  The transfer of authority effectuated by the 2006 NDAA should nonetheless have been effective as an amendment to the codification.  *See* 46 U.S.C. § 53701, note.

[7]  Like the 2006 NDAA, the 2008 NDAA expressly deleted the Secretary of Transportation and substituted the Maritime Administrator in at least 25 provisions of chapter 537 of title 46.  Pub. L. 110-181 § 3522, 122 Stat. 596-98.

[8]  If the plain language of these enactments is not enough to convey Congress's intent that the Secretary and the DOT Credit Council cease their role in the Title XI process, then the legislative history of sections 3517 and 3522 of the 2008 NDAA, which APT will present to the Court in detail at an appropriate time, removes all doubt.  Briefly, at a March 15, 2007 hearing

Thus, based on its objections to the Credit Council's intermeddling, which it found had effectively discontinued the Title XI loan guarantee program, Congress, within the four and a half years preceding APT's submission of its Title XI application, twice enacted legislation whose plain language removed the authority to administer the Title XI loan guarantee program from the Secretary and placed that authority exclusively with the Administrator.  Defendants try to divert attention from this legislation by focusing on one section (§ 53702(a)) of the amended chapter 537, which simply refers to the Administrator rather than the Secretary.  Mem. 23-24.  But it is not so much the language of the amended chapter 537 that conveys Congress's intent as it is the 2006 and 2008 Acts themselves, in which Congress expressed its displeasure with the Department of Transportation's role and meticulously deleted every word that conveyed authority over the Title XI program on the Secretary of Transportation and replaced them with words conveying that authority on the Maritime Administrator alone.  It is those actions that could have no purpose other than to eliminate the Credit Council's role in the Title XI program.

The Credit Council's participation would be improper even if, as defendants suggest (Mem. 23), its role were merely advisory.  The Credit Council was established by the Secretary, who, as defendants note (Mem. 24), is the Administrator's immediate supervisor.  It is chaired by the Deputy Secretary, who also exercises authority over the Administrator.  As defendants admit (*id.*), the relevant secretarial order requires the Administrator to submit all Title XI applications

---

focusing on problems with the Title XI program, the House of Representatives' Seapower and Expeditionary Forces Subcommittee heard several witnesses, including a former MarAd Deputy Administrator and a former MarAd General Counsel, who described the Credit Council's meddlesome activities and urged Congress to eliminate them.  *See The Federal Ship Construction Loan Guarantee Program:  Hearing before the Seapower and Expeditionary Forces Subcomm. of the H. Comm. on Armed Services*, 110th Cong. (2007).  This legislative history shows that the principal reason Congress, in section 3522 of the 2008 NDAA, conferred exclusive authority to approve or deny Title XI applications to the Maritime Administrator was to eliminate participation by the Secretary of Transportation, and specifically the DOT Credit Council, from the Title XI process.

to the Credit Council and prevents him from approving an application without seeking, receiving

and considering the Council's recommendation.  *See* Mem. Exh. A, DOT Order 2301.1B.  In

practice, as noted above (and in the Supplemental Complaint), the Credit Council is much more

intrusive and obstructive.  This Court has previously noted the insidious effect that nominally

non-compulsory input from "highly placed officers" may have on the decisions of subordinates.

> Two of the [decision makers] … were relatively subordinate government
> employees and the contacts were made by highly placed officers of the Federal
> and District Governments.  If nothing else, these two [decision makers] were
> made to know that a favorable decision would be pleasing, and an unfavorable
> decision displeasing, to persons in very high governmental brackets.  These
> officials possess vast power to bestow or not to bestow benefits of various kinds
> upon subordinate employees.  The pressures were not crudely or indelicately
> exerted.  There was no threat or command.  There was no promise of reward.  But
> the pressures were nevertheless real, and the [decision makers] could not fail to be
> aware that they would incur administrative displeasure if they decided the appeal
> unfavorably.

*Jarrott v. Scrivener*, 225 F. Supp. 827, 834 (D.D.C. 1964).  That insidious effect is even worse

here, where the decision maker is a direct subordinate of the officer whose "non-compulsory"

body is making the "recommendation."

Defendants say that "[t]he relevant statutory amendment occurred in 2006" and suggest

that "legislative history" that occurred after enactment of the 2006 NDAA and before enactment

of the 2008 NDAA is "not persuasive."  Mem. 24, n.6 (citing *Consumer Product Safety Comm'n*

*v. GTE Sylvania, Inc.*, 447 U.S. 102, 117-18 (1980), for the proposition that "the views of a

subsequent Congress form a hazardous basis for inferring the intent of an earlier one.")  This

position has two fundamental flaws.  First, it is based on defendants' belief that the "2008 Act

*postdates* the relevant statutory change by two years and does not … specifically address the

change of authority to the Administrator."  *Id.*  As shown (and alleged in the complaint),

however, the 2008 NDAA repealed the changes made by the 2006 NDAA then reenacted them,

along with a finding that made Congress's intentions even clearer.  Second, the "legislative

history" to which defendants refer (Mem. 24, n.6, citing Supp. Compl. ¶¶ 22-24) is, in fact, the

subsequent legislation itself, namely, sections 3517 and 3522 of the 2008 NDAA.  To the extent

that Congress's intent in the 2006 NDAA is relevant and the 2008 NDAA is useful for inferring

that intent, the appropriate guidance is found in *Red Lion Broadcasting Co. v. FCC*, 395 U.S.

367, 380-81 (1969), in which the Court declared that, unlike subsequent legislative history,

"[s]ubsequent legislation declaring the intent of an earlier statute is entitled to great weight in

statutory construction."

Given that defendants' only basis for questioning the persuasiveness of their mistakenly

identified "legislative history" is demonstrably incorrect, defendants must, for the sake of logic

and consistency, concede that the 2008 legislation (sections 3517 and 3522 of the 2008 NDAA)

shows that Congress intended to eliminate the influence of the Secretary and the DOT Credit

Council from the Title XI program.

Defendants' only remaining argument against this obvious conclusion is that Congress

cannot achieve its desired result without modifying the general Department of Transportation

organizational statute, 49 U.S.C. § 109, which provides that the "Administrator [of the Maritime

Administration] shall report directly to the Secretary of Transportation and carry out the duties

prescribed by the Secretary," *id.* § 109(b), and that "[a]ll duties and powers of the Maritime

Administration are vested in the Secretary," *id.* § 109(d).

Section 109 is one of several sections in chapter I of title 49 that provide for the general

organization of the Department of Transportation and its component agencies.  It dates to the

Maritime Act of 1981, Pub. L. No. 97-31 (Aug. 6, 1981), by which the Maritime Administration

was transferred from the Department of Commerce to the Department of Transportation, and its

relevant subsections have remained substantively unchanged since that time.

Defendants say both 49 U.S.C. § 109 (vesting the duties and powers of the Maritime Administration in the Secretary) and 46 U.S.C. § 53702(a) (authorizing the Maritime Administrator alone to issue loan guarantees) are applicable here and must be read "in harmony and given their full effect." Mem. 25. They then suggest that this can be done by ignoring the latter provision and pretending that nothing was changed by section 3507 of the 2006 NDAA and sections 3517 and 3522 of the 2008 NDAA. *Id.* The fallacy of defendants' argument is reflected in their previous assertion, "Although Congress changed the statute in 2006 to make the Administrator the final decision maker, instead of the Secretary, the changed language did not strip the Secretary of any involvement in the evaluation process." Mem. 23. As noted, it is not just the changed language of chapter 537 that strips the Secretary of his involvement in the Title XI program, it is, more to the point, sections 3517 and 3522 of the 2008 NDAA, in which Congress expressly declared its disapproval of the Secretary's involvement and painstakingly eliminated him from the Title XI process.[9] It might be possible to read the bare words of section 109 of title 49 and chapter 537 of title 46 and reasonably conclude that the Secretary may properly inject his Credit Council into the Title XI application evaluation process, but it is impossible to read sections 3517 and 3522 of the 2008 NDAA without concluding that Congress intended to completely eliminate the Secretary and his Credit Council from that process. It defies logic and common sense to conclude, as defendants apparently do, that Congress, after

---

[9] Congress's entrustment of specific duties to a subordinate executive department official to the exclusion of an official who might otherwise be the official's superior does not present a problem. "There are certain political duties imposed upon many officers in the executive department, the discharge of which is under the direction of the President. But it would be an alarming doctrine, that congress cannot impose upon any executive officer any duty they may think proper, which is not repugnant to any rights secured and protected by the constitution; and in such cases, the duty and responsibility grow out of and are subject to the control of the law, and not to the direction of the President." *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 610 (1838).

identifying a problem, expending valuable legislative time and resources addressing the problem, and assiduously amending the relevant statute to remedy the problem, nevertheless left the problem exactly where it found it.  Yet that is exactly the result of defendants' analysis: Congress's 2006 and 2008 enactments, which could have had no purpose other than eliminating the Credit Council's interference in the Title XI program, left the Credit Council free to interfere in the Title XI program.  It is inconceivable that such a result was intended.

The Secretary cannot just ignore Congress's command.  If he wishes to regain his erstwhile role in the Title XI program, he should ask Congress to again amend the law.  "When a statute commands an agency without qualification to carry out a particular program in a particular way, the agency's duty is clear; if it believes the statute untoward in some respect, then 'it should take its concerns to Congress,' for '[i]n the meantime it must obey [the statute] as written.'"  *Oceana, Inc. v. Locke*, 670 F.3d 1238, 1243 (D.C. Cir. 2011) (quoting *Natural Res. Def. Council v. EPA*, 643 F.3d 311, 323 (D.C. Cir. 2011)).

In any event, contrary to defendants' suggestion, it is unnecessary to harmonize 49 U.S.C. § 109 and 46 U.S.C. § 53702(a).  As specific, later enacted statutes, sections 3517 and 3522 of the 2008 NDAA and the resulting amended chapter 537 prevail over section 109, an earlier, general statute.  "Specific terms prevail over the general in the same or another statute which otherwise might be controlling."  *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932).  Where there is an "irreconcilable conflict between the policies of the earlier, general [statutory] provisions … and those of the subsequent, more specific provisions …, the latter would prevail under familiar principles of statutory construction."  *Chicago & N. W. R. Co. v. United Transp. Union*, 402 U.S. 570, 582 (1971).  "An ambiguous or general statutory provision enacted at an earlier time must yield to a specific and clear provision enacted at a later time."

*Gilbert v. United States*, 640 F.3d 1293, 1308-09 (11th Cir. 2011), *cert denied*, 132 S. Ct. 1001 (2012). Thus the general language of section 109, enacted in 1983, must yield to the specific mandate of section 3522 of the 2008 NDAA whose only purpose was to create an exception to the general rule that "all duties and powers of the Maritime Administration are vested in the Secretary."

## IV.    The Court Has Jurisdiction to Order that the Incumbent Administrator Be Recused from Further Consideration of APT's Application.

APT's Third Cause of Action seeks "Additional Relief for the Secretary's Unlawful Interference." It alleges that, because of the past interference by the Secretary, other Department of Transportation officials and the Credit Council with the incumbent Administrator's performance of his responsibilities concerning APT's application, that he is incapable of fairly assessing the merits of the application. Accordingly, it asks that the Court "issue an order . . . directing that APT's application be considered de novo by the official designated by statute or regulation to succeed to the position of Maritime Administrator when the incumbent Administrator is disqualified." Defendants suggest that this claim should be dismissed for lack of subject matter jurisdiction because (1) the United States has not waived its sovereign immunity with respect to such a claim and (2) the claim somehow interferes with the President's appointment powers and thus involves a non-justiciable political question.

As an initial matter, defendants' challenge should be rejected because it is premature. APT's Third Cause of Action concerns only a remedy. If the Court ultimately enters judgment for defendants, it need not reach any issues as to remedy. And if the Court enters judgment for APT, it may elect to do so in an opinion that provides guidance to the Administrator sufficient to satisfy the Court that the Administrator will act in accordance with the law. There is no reason to decide issues raised by defendants regarding remedy at this time.

In any event, defendants' two jurisdictional arguments have no application to APT's Third Cause of Action.  First, the United States has indeed waived its sovereign immunity with respect to the relief APT requests.  The APA explicitly provides that "An action in a court of the United States seeking relief other than monetary damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein denied on the ground that it is against the United States or that the United States is an indispensable party."  5 U.S.C. § 702.  "The form of proceeding for judicial review is … any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction."  *Id.*, § 703.  If the Court has jurisdiction to issue a mandatory injunction against an agency official, it necessarily has jurisdiction to direct an official not to participate in proceedings on remand if it finds him disqualified.

Thus the D.C. Circuit has disqualified an administrative decision-maker from participating in a decision without any suggestion that the government has not waived sovereign immunity.  *See Amos Treat & Co. v. SEC*, 306 F.2d 260 (D.C. Cir. 1962); *Texaco, Inc. v. FTC*, 336 F.2d 754, 760 (D.C. Cir. 1964) ("If [lack of impartiality] were the only infirmity in the order, we would be constrained to remand the cases to the Commission for de novo consideration in which Chairman Dixon does not take part"), *vacated on other grounds*, 381 U.S. 739 (1965) (*per curiam*) (directing the court of appeals to remand the case to the FTC for de novo review without the chairman's participation).  The Supreme Court and other federal courts (including the D.C. Circuit) have, over the years, considered and decided claims seeking disqualification of an administrative decision-maker without any suggestion by the courts or the government that sovereign immunity (or the political question doctrine) deprives a federal court of jurisdiction to

32

review claims of bias or order disqualification. *See United States v. Morgan*, 313 U.S. 409, 421-22 (1941); *FTC v. Cement Institute*, 333 U.S. 683, 701-02 (1948); *Association of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1170 (D.C. Cir. 1979); *American Cyanamid Co. v. FTC*, 363 F.2d, 757, 763-68 (6th Cir. 1966); *Skokie Federal Sav. & Loan Ass'n v. Federal Home Loan Bank Board*, 400 F. Supp. 1016 (N.D. Ill. 1975); *cf. Ventura v. Shalala*, 55 F.3d 900, 904 (3d Cir. 1995) ("We hold that the ALJ's offensive conduct prevented claimant from receiving a full and fair hearing, and, therefore, a new hearing must be held before another ALJ . . . .").

Defendants' Appointment Clause argument is based on an overstatement of APT's Third Cause of Action.  Defendants pretend that APT is asking that the Court evaluate the Administrator's job performance over the last four years, determine that the Administrator is incompetent to serve as Administrator and thus remove him from office.[10]  APT is not asking the Court to remove the Administrator from his position; it is merely asking for relief that assures that its application is decided fairly by a neutral decision-maker who has not been influenced by the unlawful participation of his superiors.  As noted, courts over the years have considered such claims, and in some cases have ordered disqualification.

Moreover, the Third Cause of Action requests little more than what the Administrator's own Administrative Orders already provide.  MAO 10-2, entitled "Designation and Delegation of Authority to Act as the Maritime Administrator" provides in section 2.01 that the Deputy Maritime Administrator is authorized to perform the duties, except for nondelegable statutory

---

[10]  *See* Mem. 14 ("the Court would need to review the Administrator's skills and performance, determine that he is 'prejudiced' and not capable of doing his job"); Mem. 13 ("Adjudicating this claim would interfere with the President's appointment and removal power"); Mem. 14 (disqualification or recusal by the Court "encroaches on the Executive's constitutionally mandated role to appoint and 'retain' executive officers"); Mem. 13-14 ("No function is more completely internal to a branch of government than the selection and retention or dismissal of its employees") (quoting *Bailey v. Richardson*, 182 F.2d 46, 57 (D.C. Cir. 1950)).

and regulatory duties, of the Maritime Administration in the absence or disability of the

Maritime Administrator, and during a vacancy in the office of the Maritime Administrator.[11]  If

the Deputy Administrator has express authority to decide a Title XI application when the

Administrator is out of the country (*i.e.*, "in the absence … of the Maritime Administrator), then

an order imposing a legal disability on the Administrator, *i.e.*, disqualification or recusal, would

only result in APT's application being considered by the person designated to do so by the

Administrator himself.  Granting such relief hardly interferes with the President's authority

under the Appointments Clause and certainly does not create a constitutional crisis.

As the Sixth Circuit has explained in another agency review case involving

disqualification, "It is fundamental that both unfairness and the appearance of unfairness should

be avoided.  Wherever there may be reasonable suspicion of unfairness, it is best to disqualify."

*American Cyanamid Co.*, 363 F.2d at 768.  An administrative proceeding "must be attended, not

only with every element of fairness but with the very appearance of fairness.  Only thus can the

tribunal conducting a quasi-adjudicatory proceeding meet the basic requirement of due process."

*Amos Treat & Co.*, 306 F.2d at 267; *see also D. C. Federation of Civic Ass'ns v. Volpe,* 459 F.2d

1231, 1246-47 (D.C. Cir. 1972) ("With regard to judicial decisionmaking, whether by court or

agency, the appearance of bias or pressure may be no less objectionable than the reality.").  The

---

[11]  Nothing in the Title XI statute establishes the decision on a Title XI application as "nondelegable."  The Department of Transportation's regulations—which were superseded with respect to the Title XI program when Congress divested the Secretary of his previous authority— shows that the Administrator's Title XI authority is indeed delegable.  In 49 C.F.R. § 1.66(e), the Secretary delegated authority to the Administrator to carry out the Merchant Marine Act, and in 49 C.F.R. § 1.45(b), the Secretary authorized the Administrator to redelegate that authority within MarAd.

notion that an order providing for a neutral decision-maker and assuring fundamental fairness is somehow unconstitutional under the Appointments Clause must be rejected.[12]

## CONCLUSION

For the foregoing reasons, the Court should deny defendants' motion to dismiss and direct them to file the administrative record forthwith.

Respectfully submitted,

/s/Michael Joseph
Michael Joseph (DC Bar No. 6593)
Alex Blanton (DC Bar No. 169623)
Joseph O. Click (DC Bar No. 417294)
  Blank Rome LLP
  600 New Hampshire Ave. NW
  Washington, D.C.  20037
  (202) 772-5966
  click@blankrome.com

*Counsel for Plaintiff American Petroleum Tankers Parent LLC*

January 29, 2013

---

[12] Defendants also assert that APT's Third Cause of Action fails to state a claim because it does not allege any agency action.  The Court is required, however, to interpret APT's complaint liberally in APT's favor.  The 114 paragraphs preceding the Third Cause of Action unarguably state a state a claim under the APA.