# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN PETROLEUM TANKERS PARENT LLC, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 1:12-CV-001165-CKK |
| v. | ) ) | Notice of Filing of Administrative Record |
| The UNITED STATES OF AMERICA, *et al.*, | ) ) ) | |
| Defendants. | ) | |

## NOTICE OF FILING OF VOLUME 7 OF THE ADMINISTRATIVE RECORD

Defendants hereby give notice that attached hereto is **Volume 7** of the redacted

Administrative Record in this action, which is being filed in 26 separate volumes.

Respectfully Submitted,

STUART F. DELERY
Acting Assistant Attorney General

RONALD C. MACHEN, JR.
United States Attorney

DIANE KELLEHER
Assistant Branch Director

*s/ Daniel Bensing*
DANIEL BENSING
Senior Counsel
(D.C. Bar No. 334268)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W. Room 6114
Washington D.C. 20530
Tel.: (202) 305-0693
Fax:  (202) 616-8460
Email:  Daniel.Bensing@USDOJ.gov

Attorneys for Defendants

CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2013 I electronically filed the foregoing Notice of Filing of Volume 7 of the Administrative Record with the Clerk of the Court by using the CM/ECF system.


/s/ *Daniel Bensing*
DANIEL BENSING

*General and Administrative Expenses*

General and administrative expenses increased to $0.5 million in 2010 from $0.3 million in 2009 as a result of the addition of APT Parent's new Chief Executive Officer in January 2010 and Chief Financial Officer in September 2010, as well as an increase in legal fees primarily due to the restructuring of the Company.

*Depreciation*

Depreciation expense increased to $4.6 million in 2010 from $2.7 million in 2009. The changes were primarily due to the deliveries of the *Sunshine State* in December 2009 and the *Empire State* in July 2010. Once a vessel is delivered and commences operation, the depreciation associated with that particular vessel is recorded as an expense.

*Management Fees*

Management fees increased to $0.7 million in 2010 from $0.3 million in 2009, primarily due to the deliveries of the *Sunshine State* in December 2009 and the *Empire State* in July 2010 and the corresponding payment of fees in connection with the technical management of such vessels.

*Settlement Fees and Related Legal Expenses*

Until July 28, 2009, USS Product Manager LLC ("Product Manager"), a wholly-owned subsidiary of U.S. Shipping Partners L.P. (the "Partnership") and an affiliate of USS Product Carriers LLC, a former Class B Member of APT, managed the construction of, and until September 28, 2009 the operation of, the tankers for APT. On July 10, 2009, Product Carriers, Product Manager, the Partnership and USS PC Holdings LLC (collectively "USS Entities"), the Class A Members of APT, the Sponsor Facility lenders to APT (together with the Class A Members, the "Blackstone/Cerberus Entities") and APT entered into a settlement agreement to settle litigation between the USS Entities and the Blackstone/Cerberus Entities relating to control of APT. Under the terms of the settlement, which was approved by the U.S. Bankruptcy Court Southern District of New York (the "Bankruptcy Court") on July 17, 2009 and effective on July 28, 2009, the management agreement (except for certain provisions) was terminated and Product Manager ceased to manage APT's tankers and provide construction supervision services. As a result, a $14 million settlement fee was paid to the Product Manager and recorded as Settlement Fees and Related Legal Expenses in the third quarter of 2009. Additionally, the Company incurred $3.9 million in legal fees in connection with the litigation.

*Interest Expense*

Interest expense increased to $17.2 million during the third quarter of 2010 compared to $2.9 million during the third quarter of 2009. The increase is primarily the result of: (a) a higher weighted-average outstanding balance of our Revolving Notes Facility (the "Sponsor Facility") due to additional borrowings and capitalized paid-in-kind interest; (b) a higher interest rate following the conversion of the Sponsor Facility's interest rate in May 2010 from a variable rate to a fixed rate; (c) interest expense incurred in 2010 under the Notes, which were issued into in May 2010; and (d) a decrease in interest capitalized as part of the construction cost of the vessels due to the delivery of four vessels in January, June and December 2009 and July 2010.

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

### Derivative (Losses) Gains

Derivative (losses) gains decreased to losses of $0.3 million during the third quarter of 2010 compared with losses of less than $0.1 million during the third quarter of 2009 due to a decrease in the fair value of our interest rate cap.

### Net Loss

As a result of the foregoing factors, net loss was $12.6 million for the third quarter of 2010, compared to net losses of $16.9 million for the third quarter of 2009.

## Nine Months Ended September 30, 2010 versus Nine Months Ended September 30, 2009

### Revenues

In 2009, the *Golden State* and *Pelican State* generated revenues in the aggregate of $19.0 million through charters with BP and Marathon, respectively. In 2009, we had an average utilization rate of 94% based on 342 operating days and 365 ownership days. In 2010, the *Golden State, Pelican State, Sunshine State,* and *Empire State* generated revenues in the aggregate of $42.9 million through charters with BP, Marathon, Chevron, and MSC, respectively. Overall utilization was 98% based on 878 operating days and 891 ownership days.

### Vessel Operating Expenses

Operating expenses were $16.6 million in 2010 compared to $7.7 million in 2009. Operating expenses increased in 2010 primarily due to the deliveries of the *Pelican State* and *Sunshine State* in June and December 2009, respectively and the *Empire State* in July 2010.

### General and Administrative Expenses

General and administrative expenses increased to $1.4 million in 2010 from $0.6 million in 2009. This was a result of the addition of APT Parent's new executive officers as well as an increase in legal fees primarily due to the restructuring of the Company.

### Depreciation

Depreciation expense increased to $12.1 million in 2010 from $5.7 million in 2009, primarily due to the deliveries of the *Pelican State* and *Sunshine State* in the June and December 2009, respectively, and the *Empire State* in July 2010. Once a vessel is delivered and commences operation, the depreciation associated with that particular vessel is recorded as an expense.

### Management Fees

Management fees decreased to $1.7 million in 2010 from $2.3 million in 2009 primarily as a result of the one-time payment to Product Manager of a $0.8 million delivery fee for the delivery of the *Golden State* and a $0.8 million oversight fee during the first half of 2009. This decrease is partially offset by an increase in management fees paid in 2010 as a result of the deliveries of the *Sunshine State* and *Empire State* and the payment of fees in connection with technical management of such vessels.

### Settlement Fees and Related Legal Expenses

On July 10, 2009, the USS Entities, the Blackstone/Cerberus Entities and APT entered into a settlement agreement to settle litigation between the USS Entities and the Blackstone/Cerberus Entities relating to control of APT. Under the terms of the settlement, which was approved by the Bankruptcy

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

26

Court on July 17, 2009 and effective on July 28, 2009, the management agreement (except for certain provisions) was terminated and Product Manager ceased to manage APT's tankers and provide construction supervision services. As a result, a $14.0 million settlement fee was paid to the Product Manager and recorded as Settlement Fees and Related Legal Expenses in the third quarter of 2009. Additionally, the Company incurred $3.9 million in legal fees in connection with the litigation.

### Interest Expense

Interest expense increased to $32.2 million in 2010 compared to $4.3 million in 2009. The increase is primarily the result of: (a) a higher weighted-average outstanding balance of our Sponsor Facility due to additional borrowings and capitalized paid-in-kind interest; (b) a higher interest rate following the conversion of the Sponsor Facility's interest rate in May 2010 from a variable rate to a fixed rate; (c) interest expense incurred in 2010 under the DVB Facility, which was entered into in August 2009, and subsequently extinguished in May 2010; (d) interest expense incurred in 2010 under the Notes, which was entered into in May 2010; and (e) a decrease in interest capitalized as part of the construction cost of the vessels due to the delivery of four vessels in January, June and December 2009 and July 2010.

### Debt Extinguishment Expense

Debt extinguishment expense of $7.6 million was recorded during 2010 in connection with the prepayment of the DVB Facility on May 17, 2010. This amount consisted of a $2.8 million prepayment penalty and the write-off of $4.8 million of unamortized debt financing costs.

### Derivative (Losses) Gains

Derivative (losses) gains decreased to losses of $2.0 million in 2010 compared with gains of $1.5 million in 2009 due to a decrease in the fair value of our interest rate cap.

### Net Loss

As a result of the foregoing factors, net loss was $30.7 million for 2010, compared to a net loss of $18.0 million for 2009.

## Liquidity and Capital Resources

Working capital at September 30, 2010 was $23.6 million compared with $(93.5) million at December 31, 2009. This increase is primarily due to the issuance of the Notes on May 17, 2010. Net proceeds of $169.9 million were placed in an escrow account to fund the remaining construction costs of the Company's vessels. A scheduled payment of $80.9 million was paid to NASSCO in July 2010.

We operate in a capital intensive industry. Our primary liquidity requirements relate to operating expenses, capital expenditures for the construction of vessels, semi-annual payments for interest under the Notes and payments under our management and administrative service agreements. Our long-term liquidity needs primarily relate to interest and principal debt payments under the Notes and Sponsor Facility, which mature in 2015 and 2016, respectively.

In connection with the issuance of the Notes, APT Parent and AP Tankers Co. entered into a registration rights agreement ("Registration Rights Agreement") which requires the use of reasonable efforts to register notes having substantially identical terms as the Notes with the Securities and Exchange Commission under the Securities Act of 1933, as amended, prior to May 12, 2011.

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

APT V. USA

Our time charter contracts are structured such that we are paid in advance of providing the service, typically at the start of each month. As a result, we receive cash prior to recognizing revenue or expense, thus minimizing working capital requirements.

We believe that cash flows from operations and borrowings from the Sponsor Facility and the issuance of the Notes will be sufficient to meet our existing liquidity needs for the next 12 months. We were in compliance with all of the financial covenants contained in our debt agreements as of September 30, 2010.

*Cash Flows*

|  | For the Nine Months Ended September 30, | |
|---|---|---|
|  | 2010 | 2009 |
|  | (dollars in thousands) | |
| Net cash flow provided by (used in) operating activities | $    23,399 | $     (6,697) |
| Net cash flow used in investing activities | (174,559) | (221,944) |
| Net cash flow provided by financing activities | 167,614 | 239,160 |

*Operating cash flows*—Net cash flow provided by (used in) operating activities was $23.4 million and $(6.7) million for the nine months ended September 30, 2010 and 2009, respectively.

Net cash flow from operating activities will depend upon the timing and amount of drydocking expenditures, repairs and maintenance activity, vessel additions and dispositions and fluctuations in working capital balances. Our operating cash flows were also impacted by the August 2009 amendment to the Sponsor Facility to allow the monthly interest payments to be treated as paid-in-kind in lieu of cash payments. For the nine months ended September 31, 2010, the Company has recorded $22.0 million of paid-in-kind interest. Operating cash flows are also impacted by the timing of the semi-annual interest payments on the Notes, which are due in November and May. The Company paid an interest payment of $13.3 million on November 1, 2010, of which $10.8 million was accrued at September 30, 2010.

*Investing cash flows*—Net cash used in investing activities was $174.6 million and $221.9 million for the nine months ended September 30, 2010 and 2009, respectively. Payments of $88.3 million were made for the construction of vessels in 2010. Deposits of $170.8 million were made to restricted cash accounts, including deposits of $0.8 million made to certain deposit accounts restricted in accordance with the DVB Facility prior to the prepayment of the debt, and $169.9 million placed in an escrow account, restricted for the construction of vessels, from the net proceeds of the Notes issued on May 17, 2010. In connection with the issuance of the Notes, a portion of the proceeds was used to prepay the DVB Facility, thereby releasing the requirement to maintain the drydock and liquidity reserve deposit accounts. Therefore, the aggregate balance in these deposit accounts has been withdrawn and classified as cash and cash equivalents.

*Financing cash flows*—Net cash provided by financing activities was $167.6 million and $239.2 million for the nine months ended September 30, 2010 and 2009, respectively. During the nine months ended September 30, 2010, APT received net proceeds of $277.0 million from the issuance of the Notes at a price of 97.203%. A portion of these proceeds was used to pay $93.8 million for the prepayment of the DVB Facility, $2.8 million for prepayment penalties, and $9.7 million for debt

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

28

issuance costs. Additionally, regularly scheduled principal payments of $3.1 million were made prior
to the prepayment of the DVB Facility.

### Long Term Debt

Long-term debt consists of the following:

| | September 30, 2010 | | December 31, 2009 |
|---|---|---|---|
| | (dollars in thousands) | | |
| Senior Secured Loan Facility | $ | - | $ 96,904 |
| 10 1/4% First Priority Senior Secured Notes, net of $7,377 unamortized original issuance discount | | 277,623 | - |
| Sponsor Facility | | 351,681 | 329,680 |
| | | 629,304 | 426,584 |
| Less current portion | | - | (12,384) |
| | $ | 629,304 | $ 414,200 |

In 2006, we entered into the Sponsor Facility with Blackstone Corporate Debt Administration
L.L.C., as administrative agent, and The Bank of New York Mellon, as security agent, pursuant to
which the class A members of APT or their affiliates agreed to make available $325 million of
revolving credit loans. Of this amount, $3.8 million was available as of September 30, 2010. We
incur a commitment fee on the unused portion of the Sponsor Facility of 1.0% per year. In addition, the
security agent is due a fee of 0.005% of borrowings outstanding and the administrative agent is due a
fee of $0.3 million per year. We made draws of approximately $144.5 million, $135.5 million and
$24.9 million during 2009, 2008 and 2007, respectively. On August 17, 2009 and October 30, 2009,
we amended our Sponsor Facility to allow the monthly interest payments due and payable, beginning
July 2009, to be treated as paid-in-kind in lieu of monthly cash payments. The paid-in-kind interest
payments of approximately $8.4 million in 2009 are capitalized as additions to the outstanding
principal balance of the Sponsor Facility in accordance with the amended Sponsor Facility. Due to
these amendments, we are allowed to exceed our total commitment under the Sponsor Facility with
paid-in-kind capitalized interest. Concurrent with the issuance of the Notes, we have amended the
Sponsor Facility to effect an interest rate conversion from a variable rate of LIBOR + 4.5% to a fixed
rate of 12% payable in kind, the extension of the maturity of the Sponsor Facility to 2016 and a
subordination of our first lien security interest on *Sunshine State*, *Evergreen State*, and *Empire State* to
a second lien, resulting in a second lien security interest on all five of our vessels. The Sponsor Facility
is subject to an intercreditor agreement with the holders of the notes. See Note 7 "Long-Term Debt" in
the unaudited consolidated financial statements for more information.

A portion of the net proceeds raised from the issuance of the Notes on May 17, 2010 were used to
prepay $97.6 million related to the DVB Facility (including principal, interest and prepayment
penalty). On May 17, 2010, the DVB Facility was fully repaid and no longer outstanding. See Note 7
"Long-Term Debt" in the unaudited consolidated financial statements for more information.

*Capital Expenditures.* During the nine months ended September 30, 2010, we spent
approximately $88.3 million for construction of our vessels, consisting mostly of a payment of $80.9
million to NASSCO and interest costs capitalized. We estimate that we will spend up to an aggregate
of $162.1 million (inclusive of the $80.9 million already paid) in fiscal 2010 and $7.7 million in 2011
for construction installments and related account payables to NASSCO for the construction of our new
build vessels. We anticipate that funds generated through the issuance of the Notes and through

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

29

operations and borrowings under the Sponsor Facility will be sufficient to fund these currently planned capital expenditures.

### Item 3. Quantitative and Qualitative Disclosures about Market Risks

All of our debt has fixed interest rates, and is comprised of outstanding borrowings at September 30, 2010 of $277.6 million under the Notes, maturing in 2015, and $351.7 million under the Sponsor Facility maturing in 2016. Except in limited circumstances, we do not have an obligation to prepay our fixed-rate debt prior to maturity and, as a result, interest rate risk and changes in fair value should not have a significant impact on fixed rate borrowings unless we would be required to refinance such debt.

As of September 30, 2010, we had one outstanding interest rate cap with a notional amount of $100.0 million. This interest rate cap of the three-month U.S. Dollar LIBOR of 6.0% is intended to reduce the potential negative impacts to the Company's cash flows that could result in movements in interest rates between the date a chartering contract is entered into and the anticipated sale date of such combined vessel and chartering contract. The Company recognizes all derivatives as either assets or liabilities in the balance sheet and measures those instruments at fair value. Changes in the fair value of those instruments are reported in earnings, as the Company did not designate the interest rate cap as a hedge. We are exposed to credit related losses in the event of non-performance by counterparties to these instruments; however, the counterparties are major financial institutions and we consider such risk of loss to be minimal. We do not hold or issue derivative financial instruments for trading purposes.

### Item 4. Controls and Procedures.

As of the date hereof, no certifications or attestations concerning the unaudited condensed consolidated financial statements or disclosure controls and procedures or internal controls that would otherwise be required pursuant to the Sarbanes-Oxley Act of 2002 are required under the Company's reporting requirements.

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

## PART II - OTHER INFORMATION

### Item 1.  Legal Proceedings

There have been no material developments in legal proceedings involving us since those reported in the Offering Circular.

### Item 1A.  Risk Factors

There have been no material changes to any of the risk factors disclosed in the Offering Circular.

### Item 2.  Unregistered Sales of Equity Securities and Use of Proceeds

None.

### Item 3.  Defaults Upon Senior Securities

None.

### Item 4.  (Reserved)

### Item 5.  Other Information

None.

### Item 6.  Exhibits

None.

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

APT V. USA

## SIGNATURES

The Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

American Petroleum Tankers Parent LLC
(Registrant)

Date:  11/16/10

By:  _____
Robert K. Kurz
Chief Executive Officer
(Principal Executive Officer)

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

32

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

APT V. USA

1654

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

FORM MA-440

U.S. DEPARTMENT OF TRANSPORTATION
MARITIME ADMINISTRATION

## COST ESTIMATE - SUMMARY SHEET

| OWNER | CHARACTERISTICS | | ESTIMATE NUMBER | |
|---|---|---|---|---|
| TYPE | L.O.A. | SPEED | PREPARED BY | |
| | L.B.P. | MACH. TYPE | | |
| DESIGN | BEAM | CREW | APPROVED BY | |
| | DRAFT | PASS. | | |
| BID DATE | DEPTH | DWT | DATE | |
| | SHP(N) | L.S. | | |

| ITEM | WT | QUANTITY OR PERCENT | MATERIAL COST PER UNIT QUANTITY | MANHOUR LABOR PER UNIT QUANTITY | MATERIAL AND TOTAL COST | LABOR HOURS | LABOR RATE | LABOR COST |
|---|---|---|---|---|---|---|---|---|
| STEEL | | | | | | | | |
| OUTFIT | | | | | | | | |
| MACHINERY | | | | | | | | |
| | | | | | | | | |
| Sub-Total | | | | | | | | |
| INDIRECT | | | | | | | | |
| ENGINEERING | | | | | | | | |
| Total Direct | | | | | | | | |
| LABOR | | | | | | | | |
| OVERHEAD | | | | | | | | |
| Sub-Total | | | | | | | | |
| PROFIT | | | | | | | | |
| TOTAL | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| FORM MA-133 | US Department of Transportation | | | Number | |
|---|---|---|---|---|---|
| | Maritime Administration | | | | |
| | **Cost Estimate Detail Summary** | | | Date | |

| Type | Design | Characterisrics | Prepared By |
|---|---|---|---|
| | | | Approved By |

| No. | Work Sheet No. | Item | Qty. | Material Cost per Unit Qty. | Manhours Cost per Unit Qty. | Material | Labor Manhours | Remarks |
|---|---|---|---|---|---|---|---|---|
| | | **STEEL** | | | | | | |
| 1 | | Steel | | | | | | |
| 2 | | Kingpost and masts | | | | | | |
| 3 | | Rudder | | | | | | |
| | | Margin or: | | | | | | |
| | | | | | | | | |
| | | **TOTAL** | | | | | | |
| | | | | | | | | |
| | | **OUTFIT** | | | | | | |
| 4 | | Hull Attachments | | | | | | |
| 5 | | Steel hatch covers & beams | | | | | | |
| 6 | | Rigging & canvas | | | | | | |
| 7 | | Anchor chains & lines | | | | | | |
| 8 | | Boats & boat handling | | | | | | |
| 9 | | Wood Work | | | | | | |
| 10 | | Joiner work insulation sheathing and furniture | | | | | | |
| 11 | | Deck covering | | | | | | |
| 12 | | Galley, pantry and utility space equipment | | | | | | |
| 13 | | Steward outfit | | | | | | |
| 14 | | Misc. outfit | | | | | | |
| 15 | | Ventilation & heating | | | | | | |
| 16 | | Refrigeration | | | | | | |
| 17 | | Air condition machinery | | | | | | |
| 18 | | Hull piping engineering | | | | | | |
| 19 | | Cargo oil system | | | | | | |
| 20 | | Hull piping domestic | | | | | | |
| 21 | | Deck machinery | | | | | | |
| 22 | | Electric generation and distribution | | | | | | |
| 23 | | Electronics | | | | | | |
| 24 | | Paint & cement | | | | | | |
| | | | | | | | | |
| | | **TOTAL** | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| FORM MA-133 | US Department of Transportation | | | Number | |
| | Maritime Administration | | | | |
| | **Cost Estimate Detail Summary** | | | Date | |

| Type | Design | Characterisrics | Prepared By |
| | | | Approved By |

| No. | Work Sheet No. | Item | Qty. | Material Cost per Unit Qty. | Manhours Cost per Unit Qty. | Material | Labor Manhours | Remarks |
|-----|------|------|------|------|------|------|------|------|
| | | **MACHINERY** | | | | | | |
| 25 | | Main engine | | | | | | |
| 26 | | Shafting & propellers | | | | | | |
| 27 | | Condensers | | | | | | |
| 28 | | Boilers | | | | | | |
| 29 | | Fuel oil piping | | | | | | |
| 30 | | Steam piping | | | | | | |
| 31 | | Feed, condensate, circulating & drain piping | | | | | | |
| 32 | | Lube oil piping | | | | | | |
| 33 | | Salt water evap. System | | | | | | |
| 34 | | Feed heaters and other heat exchangers | | | | | | |
| 35 | | Pumps | | | | | | |
| 36 | | Misc. auxiliaries | | | | | | |
| 37 | | Misc. mach sp equipt | | | | | | |
| 38 | | Access | | | | | | |
| 39 | | Instruments & gages | | | | | | |
| 40 | | Engineer workshop | | | | | | |
| 41 | | Non-structural tanks | | | | | | |
| 42 | | Seachests & shell conn | | | | | | |
| | | | | | | | | |
| | | **TOTAL** | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

1

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

1669

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION



CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

1

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

**Vandeventer, Margaret (MARAD)**

| | |
|---|---|
| ɔm: | Rob Kurz <rob.kurz@americanpetroleumtankers.com> |
| ent: | Monday, January 10, 2011 11:38 AM |
| To: | Matsuda, David (MARAD); Haskins, Harry (MARAD) |
| Subject: | APT Title XI Application - Point Paper |
| Attachments: | APT Points_MarAd.doc |

Dave and Harry:

As promised, please find attached a point paper which summarizes all of the issues discussed with you during our meeting last Friday. Again, we are very eager to move our application to external review and believe that for the reasons specified, and in particular the fact that there is statutory preference given to militarily useful vessels, an exception to Credit Council policy is clearly justified and should be granted. After you have had an opportunity to confer on this, please let me know how you think we should proceed from here. Thanks very much again for your continued excellent counsel and support!

Best regards,

Rob

Robert K. Kurz
Chief Executive Officer
American Petroleum Tankers Parent LLC
`15 Park Avenue
:w York, NY 10154
E-mail: Rob.Kurz@AmericanPetroleumTankers.com
(P): 215-776-0173
(Fax): 215-646-4391

1

CONFIDENTIAL BUSINESS INFORMATION

**Vandeventer, Margaret (MARAD)**

| | |
|---|---|
| ᴐm: | Rob Kurz <rob.kurz@americanpetroleumtankers.com> |
| ᴬnt: | Wednesday, March 16, 2011 4:57 PM |
| **To:** | Matsuda, David (MARAD) |
| **Cc:** | Vandeventer, Margaret (MARAD) |
| **Subject:** | Requested Letter |
| **Attachments:** | Scan_Doc0155.pdf |

Dave:

Please find attached the letter you requested during our telephone conversation of last Thursday. I look forward to discussing it with you when you have a moment. Thanks and hope all is well.
Very best,

Rob

Robert K. Kurz
Chief Executive Officer
American Petroleum Tankers Parent LLC
345 Park Avenue
New York, NY 10154
E-mail: Rob.Kurz@AmericanPetroleumTankers.com
ᴾ): 215-776-0173
ᴊx): 215-646-4391

1

American Petroleum Tankers Parent LLC
345 Park Avenue, 29th Floor
New York, NY 10154

March 16, 2011

Mr. David Matsuda
Maritime Administrator
Maritime Administration
1200 New Jersey Ave., S.E.
Room W22-314 (West Building)
Washington, DC 20590

Re:     American Petroleum Tankers Parent LLC ("*APT*" or "*Applicant*") Title XI Application
        dated August 30, 2010

Dear Mr. Matsuda:

        This letter is in response to our telephone conversation last Thursday in which you
informed me of the decision taken by the Department of Transportation Credit Council to not
submit the above-referenced APT application for a Title XI Guarantee (the "*Application*") to
external review. In our conversation, you indicated that this decision by the Credit Council was
based upon the view that it is "inappropriate" to provide such a guarantee in a situation in which
a portion of the proceeds of the debt supported by that guarantee would be used to repay a
portion of the debt investment in APT by its equity sponsors, The Blackstone Group L.P.
("*Blackstone*") and Cerberus Capital Management, L.P. ("*Cerberus*"). We strongly object to the
position taken by the Credit Council and request a meeting with the Deputy Secretary of
Transportation (Chairman of the DOT Credit Council) to discuss this matter.

        APT filed the Application on August 30, 2010. On October 7, 2010, a deficiency letter
containing fifteen items was received from the Maritime Administration. APT provided its
responses to the deficiency letter on October 18, 2010 and October 20, 2010. Shortly thereafter,
the Maritime Administration informed APT that its application was complete. APT is unaware
of any outstanding questions or requests for information from the Maritime Administration and
has been in dialogue with the Maritime Administration about moving the Application on to
external review since November of 2010.

        APT believes that it has submitted a very strong application and that the Application is
fully compliant with the statute and regulations and even enjoys a statutory priority. As you
know, the Application is for five newly-built product tankers, two of which are on charter to the
Military Sealift Command. These two vessels are the only new product tankers that have been
built with National Defense Features.     The Title XI statute (46 USC Chapter 537,

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

| From: | Rob Kurz [rob.kurz@americanpetroleumtankers.com] |
|---|---|
| Sent: | Friday, May 13, 2011 12:40 PM |
| To: | Matsuda, David (MARAD) |
| Cc: | Bloom, Murray (MARAD); Ladd, Daniel (MARAD); 'Nancy J. Mattson' |
| Subject: | American Petroleum Tankers Parent LLC - Title XI Application Dated August 30, 2010 |
| Attachments: | Extension Request Letter To David Matsuda.pdf |

Dave:

Please find attached a letter requesting an extension of the 270-day period to approve or deny subject application.
Thanks and best regards,

Rob

Robert K. Kurz
Chief Executive Officer
American Petroleum Tankers Parent LLC
345 Park Avenue
New York, NY 10154
E-mail: Rob.Kurz@AmericanPetroleumTankers.com
(O): 610-940-1677
(M): 215-776-0173
(Fax): 610-825-7579

1

American Petroleum Tankers Parent LLC
345 Park Avenue, 29th Floor
New York, NY 10154

May 13, 2011

Mr. David T. Matsuda
Maritime Administrator
Maritime Administration
1200 New Jersey Avenue, SE
Room W22-314
Washington, DC 20590

> Re: American Petroleum Tankers Parent LLC ("*Applicant*") Title XI Application dated
> August 30, 2010

Dear Mr. Matsuda:

Pursuant to 46 USC 53703(a)(2), Applicant hereby requests that the Maritime Administration extend the 270-day period to approve or deny the above-referenced application for a loan guarantee to a date not later than 2 years after the date on which the signed application was received by the Maritime Administration. Please call me with any questions on this request.

Please note that this letter and any attachments hereto constitute "trade secrets and commercial or financial information [that is] privileged or confidential" within the meaning of 49 CFR 7.13(c)(4) and the Freedom of Information Act and accordingly is submitted with the understanding that it is not subject to disclosure under FOIA. Disclosure of such information would cause substantial harm to the Applicant. The Applicant is submitting this information under your previously-given assurances that it will not be released by the Maritime Administration or the Department of Transportation unless a court determines that its release is required by law. The Applicant further understands that in the event a request is received for such information, the Maritime Administration or the Department of Transportation will notify the Applicant expeditiously and will permit the Applicant to submit written objections to release pursuant to 49 CFR 7.17(a), unless the Maritime Administration or the Department of Transportation determines (as we expect that it will for the reasons discussed above) that the information should not be disclosed as provided in 49 CFR 7.17(c).

Sincerely,

Robert K. Kurz
Chief Executive Officer

cc:    Murray Bloom, Maritime Administration
        Daniel Ladd, Maritime Administration
        Nancy Mattson, Argent Group Ltd.

CONFIDENTIAL BUSINESS INFORMATION

1

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

APT V. USA

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

| | |
|---|---|
| **From:** | Nancy J. Mattson [njmattson@argentgroupltd.com] |
| **Sent:** | Tuesday, September 20, 2011 1:27 PM |
| **To:** | Ladd, Daniel (MARAD) |
| **Cc:** | rob.kurz@americanpetroleumtankers.com; Doherty; Cindy J. Koehn; Martin E. Gottlieb |
| **Subject:** | APT Title XI Application: Evergreen Class Cert & COI and Financial Statements |
| **Attachments:** | 5 - Evergreen State Class Certif and COI.pdf; 2010 APT Holding LLC & Subsidiaries - Audit.pdf; 2011 Q1 American Petroleum Tankers Quarterly Report.PDF; 2011 Q2 American Petroleum Tankers Quarterly Report.PDF |

Dan:

Attached are the following materials relating to the APT Title XI Application that have become available since the applications was filed:

1. Class Certificate and COI for the Evergreen State; and
2. 2010 year-end and 2011 quarterly financial statements.

Please note that this email and any attachments hereto constitute "trade secrets and commercial or financial information [that is] privileged or confidential" within the meaning of 49 CFR 7.13(c)(4) and the Freedom of Information Act and accordingly is submitted with the understanding that it is not subject to disclosure under FOIA. Disclosure of such information would cause substantial harm to American Petroleum Tankers Parent LLC (the "Applicant"). The Applicant is submitting this information under your previously-given assurances that it will not be released by the Maritime Administration or the Department of Transportation unless a court determines that its release is required by law. The Applicant further understands that in the event a request is received for such information, the Maritime Administration or the Department of Transportation will notify the Applicant expeditiously and will permit the Applicant to submit written objections to release pursuant to 49 CFR 7.17(a), unless the Maritime Administration or the Department of Transportation determine (as we expect that it will for the reasons discussed above) that the information should not be disclosed as provided in 49 CFR 7.17(c).

Please call me with any questions on the above information.

Regards - Nancy

Nancy J. Mattson
Managing Director
Argent Group Ltd.
Phone:   (415) 982-7883
Mobile:   (415) 793-9993
e-mail:   njmattson@argentgroupltd.com

CONFIDENTIALITY NOTICE

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers.

1

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

COPY ONLY

Certificate No.: 10203453-1943456-001



# AMERICAN BUREAU OF SHIPPING

CHARTERED 1862

NUMBER 10203453

## CERTIFICATE OF CLASSIFICATION

### EVERGREEN STATE

*Description* OIL AND CHEMICAL CARRIER

*Dimensions, Length* 174 m   *Breadth* 32.2 m   *Depth* 19.4 m

*Tonnage, Gross* 29606   *Net* 12859

*Owner* AMERICAN PETROLEUM TANKERS, LLC

*Shipbuilder* GENERAL DYNAMICS NASSCO

*Engine Builder* DOOSAN ENGINE CO., LTD.

*Date of Build* 07 December 2010   *Hull Number* 505

*This is to Certify that the above has been surveyed in accordance with the Rules of this Bureau and entered in the Record with the Class*

✠A1, Chemical Carrier, Oil Carrier, ⓒ, ✠AMS, ✠ACCU, VEC, FL 25, SH, SHCM

24 February 2011
Issue Date

06 December 2015
Expiration Date

Chief Surveyor

M. C. Adams
Assistant Secretary

**NOTE:** This certificate evidences compliance with one or more of the Rules, Guides, standards or other criteria of American Bureau of Shipping and is issued solely for the use of the Bureau, its committees, its clients or other authorized entities. The classification certificate is a representation only that the vessel, structure, item of material, equipment or machinery or any other item covered by this certificate has met one or more of the Rules of American Bureau of Shipping. **The certificate is governed by the terms and conditions on the reverse side hereof,** and governed by the Rules and standards of American Bureau of Shipping who shall remain the sole judge thereof.

PAGE 1 OF 4

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)



Certificate No.: 10203453-1943456-001

## TERMS AND CONDITIONS

**1.**  The issuance and interpretation of the class certificate is subject to the terms and conditions of the "Request for Classification and Agreement"  (hereinafter "the Agreement") which are hereby incorporated by reference.

**2.  REPRESENTATIONS AS TO CLASSIFICATION**

Classification is a representation by ABS as to the structural and mechanical fitness for a particular use or service in accordance with its Rules and standards.  The Rules of American Bureau of Shipping are not meant as a substitute for the independent judgment of professional designers, naval architects and marine engineers nor as a substitute for the quality control procedures of shipbuilders, engine builders, steel makers suppliers, manufacturers and sellers of marine vessels, materials, machinery or equipment.  ABS being a technical society can only act through Surveyors or others who are believed by it to be skilled and competent.

ABS represents solely to the vessel Owner or other client (hereinafter "Client") of ABS that when assigning class it will use due diligence in the development of Rules, Guides and standards and in using normally applied testing standards, procedures and techniques as called for by the Rules, Guides, standards or other criteria of ABS for the purpose of assigning and maintaining class.  ABS further represents to the Client of ABS that its certificates and reports evidence compliance only with one or more of the Rules, Guides, standards or other criteria of ABS in accordance with the terms of such certificate or report.  Under no circumstances whatsoever are these representations to be deemed to relate to any third party.

**3.  RESPONSIBILITY AND LIABILITY**

It is understood and agreed that the class certificate (hereinafter referred to as "certificate") issued as part of the services rendered under the Agreement is a representation only that the vessel, structure, item of material, equipment or machinery or any other item covered by a certificate has met one or more of the Rules or standards of American Bureau of Shipping and is issued solely for the use of ABS, its committees, clients or other authorized entities.  The validity, applicability and interpretation of a certificate issued under the terms of or in contemplation of the Agreement is governed by the Rules and standards of American Bureau of Shipping who shall remain the sole judge thereof.  Nothing contained in this certificate or in any report issued in contemplation of this certificate shall be deemed to relieve any designer, builder, owner, manufacturer, seller, supplier, repairer, operator or other entity of any warranty express or implied nor to create any interest, right, claim or benefit in any third party.  It is understood and agreed that nothing expressed herein is intended or shall be construed to give any person, firm or corporation, other than the parties hereto, any right, remedy or claim hereunder or under any provisions herein contained; all provisions hereof are for the sole and exclusive benefit of the parities hereto.

**4.  SUSPENSION AND CANCELLATION OF CLASS**

The continuance of the Classification of any vessel is conditional upon the Rule requirements for periodical, damage and other surveys being duly carried out. The Committee reserves the right to reconsider, withhold, suspend, or cancel the class of any vessel or any part of the machinery for noncompliance with the Rules, for defects reported by the Surveyors which have not been rectified in accordance with their recommendations, or for nonpayment of fees which are due on account of Classification, Statutory and Cargo Gear Surveys.  Suspension or cancellation of class may take effect immediately or after a specified period of time.

**5.  LIMITATION**

ABS makes no representations beyond those contained herein and in the provisions of the request for classification regarding its reports, statements, plan review, surveys, certificates or other services.

**6.  HOLD HARMLESS**

THE PARTY TO WHOM THIS CERTIFICATE IS ISSUED, OR HIS ASSIGNEE OR SUCCESSOR IN INTEREST, AGREES TO RELEASE ABS AND TO INDEMNIFY AND HOLD HARMLESS ABS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, LAWSUITS, OR ACTIONS FOR DAMAGES, INCLUDING LEGAL FEES, TO PERSONS OR OTHER LEGAL ENTITIES AND/OR PROPERTY, TANGIBLE, INTANGIBLE OR OTHERWISE WHICH MAY BE BROUGHT AGAINST ABS INCIDENTAL TO, ARISING OUT OF OR IN CONNECTION WITH THE WORK DONE, SERVICES PERFORMED OR MATERIAL TO BE FURNISHED UNDER THIS CERTIFICATE, EXCEPT FOR THOSE CLAIMS CAUSED SOLELY AND COMPLETELY BY THE NEGLIGENCE OF ABS, ITS AGENTS, EMPLOYEES, OFFICERS, DIRECTORS OR SUBCONTRACTORS.

ANY OTHER INDIVIDUAL OR PARTY WHO CLAIMS A RIGHT HEREUNDER OR WHO CLAIMS TO BE A BENEFICIARY OR ANY PORTION OF THE SERVICES RENDERED IN CONTEMPLATION OF THIS CERTIFICATE SHALL INDEMNIFY AND HOLD ABS HARMLESS FROM AND AGAINST ALL CLAIMS, DEMANDS, LAWSUITS OR ACTIONS FOR DAMAGES, INCLUDING LEGAL FEES, TO PERSONS AND/OR PROPERTY, TANGIBLE, INTANGIBLE OR OTHERWISE WHICH MAY BE BROUGHT AGAINST ABS BY ANY PERSON OR ENTITY AS A RESULT OF THE SERVICES PERFORMED IN CONTEMPLATION OF THIS CERTIFICATE, EXCEPT FOR THOSE CLAIMS CAUSED SOLELY AND COMPLETELY BY THE NEGLIGENCE OF ABS, ITS AGENTS, EMPLOYEES, OFFICERS, DIRECTORS, OR SUBCONTRACTORS.

**7.  LIMITATION OF LIABILITY**

THE COMBINED LIABILITY OF AMERICAN BUREAU OF SHIPPING, ITS COMMITTEES, OFFICERS, EMPLOYEES, AGENTS OR SUB-CONTRACTORS FOR ANY LOSS, CLAIM OR DAMAGE ARISING FROM ITS NEGLIGENT PERFORMANCE OR NONPERFORMANCE OF ANY OF ITS SERVICES OR FROM BREACH OF ANY IMPLIED OR EXPRESS WARRANTY OF WORKMANLIKE PERFORMANCE IN CONNECTION WITH THOSE SERVICES, OR FROM ANY OTHER REASON, TO ANY PERSON, CORPORATION, PARTNERSHIP, BUSINESS ENTITY, SOVEREIGN, COUNTRY OR NATION, WILL BE LIMITED TO THE GREATER OF A) $100,000 OR B) AN AMOUNT EQUAL TO TEN TIMES THE SUM ACTUALLY PAID FOR THE SERVICES ALLEGED TO BE DEFICIENT.

THE LIMITATION OF LIABILITY MAY BE INCREASED UP TO AN AMOUNT TWENTY-FIVE (25) TIMES THAT SUM PAID FOR SERVICES UPON RECEIPT OF CLIENT'S WRITTEN REQUEST AT OR BEFORE THE TIME OF PERFORMANCE OF SERVICES AND UPON PAYMENT BY CLIENT OF AN ADDITIONAL FEE OF $10.00 FOR EVERY $1,000.00 INCREASE IN THE LIMITATION.

**8.  ARBITRATION**

Any and all differences and disputes of whatsoever nature arising out of this certificate shall be put to arbitration before a board of three persons, consisting of one arbitrator to be appointed by ABS, one by Client and one by the two so chosen.  The decision of any two of the three on any point or points shall be final.  Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this certificate for hearing and determination.  The arbitrators may grant any relief other than punitive damages which they, or a majority of them, deem just and equitable and within the scope of the agreement of the parties, including, but not limited to specific performance.  Awards made in pursuance to this clause may include costs including a reasonable allowance for attorney's fees and judgment may be entered upon any award made hereunder in any court having jurisdiction.  ABS and Client hereby mutually waive any and all claims to punitive damages in any forum.

Client shall be required to notify ABS within thirty (30) days of the commencement of any arbitration between it and third parties which may concern ABS's work in connection with this certificate and shall afford ABS an opportunity, at ABS's sole option, to participate in the arbitration.

APT V. USA

1721

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

Certificate No.: 10203453-1943456-001

## ADDITIONAL INFORMATION

### ICE CLASS NOTATION

MINIMUM ENGINE OUTPUT:

MAXIMUM ICE DRAUGHT FORWARD:

MINIMUM ICE DRAUGHT FORWARD:

MAXIMUM ICE DRAUGHT AMIDSHIPS:

MINIMUM ICE DRAUGHT AMIDSHIPS:

MAXIMUM ICE DRAUGHT AFT:

MINIMUM ICE DRAUGHT AFT:

### AUTOMATION NOTATION

NUMBER OF UNATTENDED HOURS:        24

### OPERATING RESTRICTIONS

### ADDITIONAL NOTATIONS

RRDA, ESP, UWILD, NVIC 2-95 Change 2 ACP, CRC, RW

### RECORD COMMENTS

COW (Crude Oil Washing)

PAGE 3 OF 4

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)



Certificate No.: 10203453-1943456-001

## ANNUAL SURVEY ENDORSEMENT

Place _____    Date _____

_____    Surveyor to the American Bureau of Shipping
(Signature)

Place _____    Date _____

_____    Surveyor to the American Bureau of Shipping
(Signature)

Place _____    Date _____

_____    Surveyor to the American Bureau of Shipping
(Signature)

Place _____    Date _____

_____    Surveyor to the American Bureau of Shipping
(Signature)

## INTERMEDIATE SURVEY ENDORSEMENT

Place _____    Date _____

_____    Surveyor to the American Bureau of Shipping
(Signature)

## EXTENSION OF CLASS CERTIFICATE
## THIS CLASSIFICATION CERTIFICATE IS EXTENDED UNTIL

_____
Date

Place _____    Date _____

_____    Surveyor to the American Bureau of Shipping
(Signature)

**Please note that the classification of this vessel is automatically suspended and the certificate automatically becomes invalid, if not endorsed annually within three months of the due date of the annual survey, or if the certificate is not endorsed for completion of the intermediate survey within three months of the due date of the third annual survey.**

## THIS CERTIFICATE IS NOT A CONFIRMATION OF CLASS

PAGE 4 OF 4