## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN PETROLEUM TANKERS PARENT LLC, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| The UNITED STATES OF AMERICA, *et al.*, | ) |
| | ) |
| | ) |
| Defendants. | ) |

Civil Action No. 1:12-CV-001165-CKK

Notice of Filing of Administrative Record

### <u>NOTICE OF FILING OF VOLUME 20 OF THE ADMINISTRATIVE RECORD</u>

Defendants hereby give notice that attached hereto is **Volume 20** of the redacted

Administrative Record in this action, which is being filed in 26 separate volumes.

Respectfully Submitted,

STUART F. DELERY
Acting Assistant Attorney General

RONALD C. MACHEN, JR.
United States Attorney

DIANE KELLEHER
Assistant Branch Director

*s/ Daniel Bensing*
DANIEL BENSING
Senior Counsel
(D.C. Bar No. 334268)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W. Room 6114
Washington D.C. 20530
Tel.: (202) 305-0693
Fax:  (202) 616-8460
Email:  Daniel.Bensing@USDOJ.gov

Attorneys for Defendants

CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2013 I electronically filed the foregoing Notice of Filing of Volume 20 of the Administrative Record with the Clerk of the Court by using the CM/ECF system.


/s/ *Daniel Bensing*
DANIEL BENSING

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1. CONTRACT ID CODE<br>J | PAGE OF PAGES | |
|---|---|---|---|---|
| | | | 1 | 7 |

| 2. AMENDMENT/MODIFICATION NO.<br>P00012 | 3. EFFECTIVE DATE<br>19-Dec-2011 | 4. REQUISITION/PURCHASE REQ. NO.<br>SEE SCHEDULE | 5. PROJECT NO.(If applicable) |
|---|---|---|---|

| 6. ISSUED BY                         CODE | N00033 | 7. ADMINISTERED BY  (If other than item 6)         CODE | N00033 |
|---|---|---|---|
| MILITARY SEALIFT COMMAND, N1033/PM5<br>914 CHARLES MORRIS COURT SE<br>WASHINGTON NAVY YARD DC 20398-5540 | | MILITARY SEALIFT COMMAND, N1023<br>914 CHARLES MORRIS CT SE<br>WASHINGTON NAVY YARD DC 20398-5540 | |

| 8. NAME AND ADDRESS OF CONTRACTOR  (No., Street, County, State and Zip Code) | | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|
| AMERICAN PETROLEUM TANKERS LLC<br>MR. ROBERT KURZ<br>345 PARK AVE FL 29<br>C/O BLACKSTONE CAPITAL PARTNERS V US<br>NEW YORK NY 10154-0004 | | |
| | | 9B. DATED (SEE ITEM 11) |
| | X | 10A. MOD. OF CONTRACT/ORDER NO.<br>N00033-07-C-5416 |
| | | 10B. DATED  (SEE ITEM 13) |
| CODE    5SZC7 | FACILITY CODE   5SZC7 | X    06-Jul-2007 |

### 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14.  The hour and date specified for receipt of Offer ☐ is extended,  ☐ is not extended.

Offer must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended by one of the following methods:
(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted;
or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers.  FAILURE OF YOUR ACKNOWLEDGMENT TO BE
RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN
REJECTION OF YOUR OFFER.  If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter,
provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

### 12. ACCOUNTING AND APPROPRIATION DATA (If required)

| 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS.<br>IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14. | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO:  (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE<br>CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying<br>office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(B). |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:<br>Mutual Agreement of the Parties |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT:   Contractor   ☐ is not,   ☒ is required to sign this document and return   1   copies to the issuing office.

### 14. DESCRIPTION OF AMENDMENT/MODIFICATION  (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

Modification Control Number:    villanid12641

The purpose of this modification is to incoporate revised option year rates and cancellation costs into the contract.  Please see attached.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)<br>KEN ALLEN / CONTRACTING OFFICER |  |
|---|---|---|
| | TEL:  (202) 685-5825          EMAIL:  kenneth.allen@navy.mil | |
| 15B. CONTRACTOR/OFFEROR<br><br>_____<br>(Signature of person authorized to sign) | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA<br>BY  *K. A. Allen*<br>(Signature of Contracting Officer) | 16C. DATE SIGNED<br>20-Dec-2011 |

SECTION SF 30 BLOCK 14 CONTINUATION PAGE

**The following items are applicable to this modification:**

MODIFICATION P00012

The purpose of this modification is to incorporate revised option year rates into Section B and cancellations costs into Section H-42.  Accordingly:

1.  Section H-42 of the contract did not detail any cancellations costs in the event of a Government failure to exercise an option.

2.  In consideration for the incorporation of these cancellation costs into the contract, the Contractor has agreed to decrease its per diem rates for Option Years 2, 3 and 4.

3.  The parties hereby agree that the change in terms and conditions of the contract set forth herein provide them with the full and complete adjustment to which each is entitled for the changes described herein.  The parties hereby waive all right, title, and interest, if any, to further adjustment for the aforesaid changes.

4.  All terms and conditions of the contract, as modified, remain in full force and effect.

**SUMMARY OF CHANGES**

ALL CHANGES HAVE BEEN HIGHLIGHTED IN YELLOW.

SECTION  SF 30 - BLOCK 14 CONTINUATION PAGE

The following have been modified:

BOXES

**TWO SHIPS – With Termination Liability**

| 13. MT EMPIRE STATE | BOX NOS., SHIP STATUS, AND EXPENDITURE TYPES | | |
| --- | --- | --- | --- |
| | 14.  FOS 2521K | 15.  ROS<10 DAYS 2521K | 16.  ROS≥10 DAYS 2521K |
| Firm Period (on/about 01 Oct 2010 – 30 Sept 2011) | $74,000.00 | $74,000.00 | $69,146.00 |
| First Option (01 Oct 2011 – 30 Sept 2012) | $57,910.00 | $57,910.00 | $52,862.00 |
| Second Option (01 Oct 2012 – 30 Sept 2013) | $52,500.00 | $52,500.00 | $49,660.00 |
| Third Option (01 Oct 2013 – 30 Sept 2014) | $53,500.00 | $53,500.00 | $51,031.00 |
| Fourth Option (01 Oct 2014 – 31 Aug 2015) | $54,500.00 | $54,500.00 | $52,244.00 |

| 13a. MT EVERGREEN STATE | BOX NOS., SHIP STATUS, AND EXPENDITURE TYPES | | |
|---|---|---|---|
| | 14a.  FOS 2521K | 15a.  ROS<10 DAYS 2521K | 16a.  ROS≥10 DAYS 2521K |
| Firm Period (on/about 01 Jan 2011 – 30 Sept 2011) | $79,422.00 | $79,422.00 | $74,568.00 |
| First Option (01 Oct 2011 – 30 Sept 2012) | $57,910.00 | $57,910.00 | $52,862.00 |
| Second Option (01 Oct 2012 – 30 Sept 2013) | $52,500.00 | $52,500.00 | $49,660.00 |
| Third Option (01 Oct 2013 – 30 Sept 2014) | $53,500.00 | $53,500.00 | $51,031.00 |
| Fourth Option (01 Oct 2014 – 31 Aug 2015) | $54,500.00 | $54,500.00 | $52,244.00 |

SECTION B - SUPPLIES OR SERVICES AND PRICES

CLIN 2001
    The CLIN extended description has changed from Charter Hire - MT EMPIRE STATE.  Option Period Two.  $54,910.00 x 365 days = $20,042,150.00.  Period of Performance - 01 October 2012 - 30 September 2013. to Charter Hire - MT EMPIRE STATE.  Option Period Two.  $52,500.00 x 365 days = $19,162,500.00.  Period of Performance - 01 October 2012 - 30 September 2013..
        The unit price amount has decreased by $879,650.00 from $20,042,150.00 to $19,162,500.00.
        The total cost of this line item has decreased by $879,650.00 from $20,042,150.00 to $19,162,500.00.


CLIN 2003
    The CLIN extended description has changed from Charter Hire - MT EVERGREEN STATE.  Option Period Two.  $54,910.00 x 365 days = $20,042,150.00.  Period of Performance - 01 October 2012 - 30 September 2013. to Charter Hire - MT EVERGREEN STATE.  Option Period Two.  $52,500.00 x 365 days = $19,162,500.00.  Period of Performance - 01 October 2012 - 30 September 2013..
        The unit price amount has decreased by $879,650.00 from $20,042,150.00 to $19,162,500.00.
        The total cost of this line item has decreased by $879,650.00 from $20,042,150.00 to $19,162,500.00.


CLIN 3001
    The CLIN extended description has changed from Charter Hire - MT EMPIRE STATE.  Option Period Three.  $56,491.00.00 x 365 days = $20,619,215.00.  Period of Performance - 01 October 2013 - 30 September 2014. to Charter Hire - MT EMPIRE STATE.  Option Period Three.  $53,500.00 x 365 days = $19,527,500.00.  Period of Performance - 01 October 2013 - 30 September 2014..
        The unit price amount has decreased by $1,091,715.00 from $20,619,215.00 to $19,527,500.00.
        The total cost of this line item has decreased by $1,091,715.00 from $20,619,215.00 to $19,527,500.00.


CLIN 3003
    The CLIN extended description has changed from Charter Hire - MT EVERGREEN STATE.  Option Period Three.  $56,491.00.00 x 365 days = $20,619,215.00.  Period of Performance - 01 October 2013 - 30 September 2014. to Charter Hire - MT EVERGREEN STATE.  Option Period Three.  $53,500.00 x 365 days = $19,527,500.00.  Period of Performance - 01 October 2013 - 30 September 2014..

The unit price amount has decreased by $1,091,715.00 from $20,619,215.00 to $19,527,500.00.
The total cost of this line item has decreased by $1,091,715.00 from $20,619,215.00 to $19,527,500.00.

CLIN 4001
The CLIN extended description has changed from Charter Hire - MT EMPIRE STATE.  Option Period
Four.  $57,922.00 x 335 days = $19,403,870.00.  Period of Performance - 01 October 2014 - 31 August 2015. to
Charter Hire - MT EMPIRE STATE.  Option Period Four.  $54,500.00 x 335 days = $18,257,500.00.  Period of
Performance - 01 October 2014 - 31 August 2015..
The unit price amount has decreased by $1,146,370.00 from $19,403,870.00 to $18,257,500.00.
The total cost of this line item has decreased by $1,146,370.00 from $19,403,870.00 to $18,257,500.00.

CLIN 4003
The CLIN extended description has changed from Charter Hire - MT EVERGREEN STATE.  Option
Period Four.  $57,922.00 x 335 days = $19,403,870.00.  Period of Performance - 01 October 2014 - 31 August 2015.
to Charter Hire - MT EVERGREEN STATE.  Option Period Four.  $54,500.00 x 335 days = $18,257,500.00.
Period of Performance - 01 October 2014 - 31 August 2015..
The unit price amount has decreased by $1,146,370.00 from $19,403,870.00 to $18,257,500.00.
The total cost of this line item has decreased by $1,146,370.00 from $19,403,870.00 to $18,257,500.00.

SUPPLIES OR SERVICES AND PRICE

## SECTION B – SUPPLIES OR SERVICES AND PRICE

B.1 **Charter Hire**

*The following table is provided to document the anticipated CLIN structure of the contract.*
*CLINs for the base period of performance shall be added as funding is made available in*
*accordance with FAR 52.232-18, Subject to the Availability of Funds (April 1984).  The daily*
*charter hire rates included below reflect the FOS Charter Hire rates included within the*
*Contractor's proposal from Box 13 and Box 13a:*

| CLIN # | Description | Daily Charter Hire (FOS) | Number of Days | Total |
|---|---|---|---|---|
| 0001 | **Charter Hire** **MT EMPIRE STATE** **Base Period** | **$74,000.00** | **365** | **$27,010,000.00** |
| 0002 | **Reimbursable Items** **MT EMPIRE STATE** **Base Period** | **N/A** | **N/A** | **TBD** |
| 0003 | **Charter Hire** **MT EVERGREEN STATE** **Base Period** | **$79,422.00** | **273** | **$21,682,206.00** |
| 0004 | **Reimbursable Items** **MT EVERGREEN STATE** **Base Period** | **N/A** | **N/A** | **TBD** |
| 1001 | **Charter Hire** **MT EMPIRE STATE** **Option Period 1** | **$57,910.00** | **366** | **$21,195,060.00** |
| 1002 | **Reimbursable Items** **MT EMPIRE STATE** | **N/A** | **N/A** | **TBD** |

N00033-07-C-5416
P00012
Page 5 of 7

| | | | | |
|---|---|---|---|---|
| | **Option Period 1** | | | |
| 1003 | **Charter Hire**<br>**MT EVERGREEN STATE**<br>**Option Period 1** | **$57,910.00** | **366** | **$21,195,060.00** |
| 1004 | **Reimbursable Items**<br>**MT EVERGREEN STATE**<br>**Option Period 1** | **N/A** | **N/A** | **TBD** |
| 2001 | **Charter Hire**<br>**MT EMPIRE STATE**<br>**Option Period 2** | **$52,500.00** | **365** | **$19,162,500.00** |
| 2002 | **Reimbursable Items**<br>**MT EMPIRE STATE**<br>**Option Period 2** | **N/A** | **N/A** | **TBD** |
| 2003 | **Charter Hire**<br>**MT EVERGREEN STATE**<br>**Option Period 2** | **$52,500.00** | **365** | **$19,162,500.00** |
| 2004 | **Reimbursable Items**<br>**MT EVERGREEN STATE**<br>**Option Period 2** | **N/A** | **N/A** | **TBD** |
| 3001 | **Charter Hire**<br>**MT EMPIRE STATE**<br>**Option Period 3** | **$53,500.00** | **365** | **$19,527,500.00** |
| 3002 | **Reimbursable Items**<br>**MT EMPIRE STATE**<br>**Option Period 3** | **N/A** | **N/A** | **TBD** |
| 3003 | **Charter Hire**<br>**MT EVERGREEN STATE**<br>**Option Period 3** | **$53,500.00** | **365** | **$19,527,500.00** |
| 3004 | **Reimbursable Items**<br>**MT EVERGREEN STATE**<br>**Option Period 3** | **N/A** | **N/A** | **TBD** |
| 4001 | **Charter Hire**<br>**MT EMPIRE STATE**<br>**Option Period 4** | **$54,500.00** | **335** | **$18,257,500.00** |
| 4002 | **Reimbursable Items**<br>**MT EMPIRE STATE**<br>**Option Period 4** | **N/A** | **N/A** | **TBD** |
| 4003 | **Charter Hire**<br>**MT EVERGREEN STATE**<br>**Option Period 4** | **$54,500.00** | **335** | **$18,257,500.00** |
| 4004 | **Reimbursable Items**<br>**MT EVERGREEN STATE**<br>**Option Period 4** | **N/A** | **N/A** | **TBD** |

SECTION H - SPECIAL CONTRACT REQUIREMENTS

The following have been modified:

SPECIAL CONTRACT REQUIREMENTS

H-42 TERMINATION/CANCELLATION LIABILITY

N00033-07-C-5416
P00012
Page 6 of 7

The contractor and Government agree the purpose of this clause is to induce the contractor to offer to provide and to provide the required services when the contractor otherwise would not offer to provide them because of the contractor's inability to recover its costs in the event the Government does not exercise an option to extend the term of the contract or terminates the contract for the convenience of the Government.

In the event the Government does not exercise an option to extend the term of the contract or terminates the contract for convenience, the contractor shall be entitled to not-to-exceed cancellation costs subject to the following conditions and according to the following schedule:

Date of Government failure to exercise option or Date of Termination for Convenience: Cancellation Costs*:

1. Prior to delivery (of vessel or layberth)    $0.00  *(per vessel)*

2. During 1st fixed performance period    $0.00  *(per vessel)*

3. During 2nd fixed performance period    $0.00  *(per vessel)*

4. During 3rd fixed performance period    $3,860,493.00  *(per vessel)*

5. During 4th fixed performance period    $2,781,481.00  *(per vessel)*

6. During 5th fixed performance period    $1,702,468.00  *(per vessel)*

* The Government shall insert final accepted prices in the schedule above prior to contract award.

"Cancellation costs" means, and only means, costs specifically identified by the contractor in its proposal and actually incurred by the contractor between contract award and vessel delivery to the Government including, and limited to, the following categories of costs: costs incurred by the contractor for vessel acquisition, reflagging costs and modification, or conversion costs, and only to the extent such modification, or conversion costs were incurred in order for the vessel to meet contract requirements. The Government has sufficient working capital funds for these cancellation costs. The present value of the cancellation costs must be less than 25% of the vessel value upon delivery. See 10 U.S.C. § 2401.

When requesting payment of cancellation costs as a result of the Government's failure to exercise an option, the contractor shall provide evidence satisfactory to the contracting officer verifying that contractor actually incurred the specified categories of cancellation costs prior to delivery of the vessel to the Government and the amount thereof. The cancellation costs must be reasonable, allowable, and allocable to the contract. In no event will the amount payable to the Contractor for such costs exceed the amount that would have been payable under the Termination for Convenience Clause had the subject contract been for 59 months and the Government terminated the contract for convenience on the date of the conclusion of the then current performance period.

In the event the Government terminates the contract for convenience, the Government will not be obligated in any event to reimburse the contractor for the specified categories of cancellation costs in excess of the amount allotted in the schedule above for each contract period regardless of anything to the contrary in the clause entitled "Termination for Convenience of the Government."

The contractor agrees that payment of the specified cancellation costs according to the schedule above for any contract period fully compensates the contractor for the specified categories of cancellation costs.  The contractor waives any right it may have to claim any additional costs for the specified categories of cancellation costs in the event such cancellation costs become payable, whether as a result of a termination for convenience or as a result of the Government's failure to exercise an option.   As used in this clause, the total amount payable by the Government for the specified categories of cancellation costs in the event the Government does not exercise an option or terminates for convenience is as set forth in the schedule above.

This clause does not limit the rights of the Government under the clause entitled "Default" or under the clause entitled "Termination for Convenience of the Government."

The Cancellation Costs consist of the following expenses:

- Vessel improvements under NASSCO Contract Modification 31; and
- Financing fees associated with the bond offering in May 2010, the proceeds of which were used to complete the construction of the *Empire State* and *Evergreen State*.

(End of Summary of Changes)

**From:** Martin E. Gottlieb [megottlieb@argentgroupltd.com]
**Sent:** Wednesday, December 21, 2011 12:22 PM
**To:** boakley@scullycapital.com; Ladd, Daniel (MARAD)
**Cc:** Nancy J. Mattson
**Subject:** RE: Follow-Up Question on Trailing Financials

I'll check with the company and get back to you.

**From:** boakley@scullycapital.com [mailto:boakley@scullycapital.com]
**Sent:** Wednesday, December 21, 2011 9:15 AM
**To:** Martin E. Gottlieb; daniel.ladd@marad.dot.gov
**Cc:** Nancy J. Mattson
**Subject:** RE: Follow-Up Question on Trailing Financials

Martin,

I was hoping to get the tanker-level financials. (For example, APT Sunshine State LLC.). The tanker co's are listed as guarantors, a term which could cause some confusion since each is a wholly-owned subsidiary of the Applicant.

I'm just looking financials prepared by management (not audited) and don't need any commentary or MD & A. Also, I recognize that some of these co's have only one or two years of operating history.

Do you think those are available?

Thanks,
Brian

**From:** Martin E. Gottlieb [mailto:megottlieb@argentgroupltd.com]
**Sent:** Wednesday, December 21, 2011 12:08 PM
**To:** daniel.ladd@marad.dot.gov; boakley@scullycapital.com
**Cc:** Nancy J. Mattson
**Subject:** FW: Follow-Up Question on Trailing Financials

Hi Brian. Nancy is traveling today so I am going to try to respond, but I want to be clear as to what you want financial statements? Your email referred to guarantors as well presenting and understanding the trailing financial performance of APT Parent, LLC. Am I correct that you would like to get 2008-2010 audits and of APT Parent LLC or is it something else that you would like to get?

Best regards.

Martin E. Gottlieb
Managing Director
Argent Group Ltd.
100 Pine Street, Suite 2820
San Francisco, CA 94111
Phone: (415) 982-7881
Fax: (415) 982-7885
Mobile: (415) 407-8474
e-mail: megottlieb@argentgroupltd.com

1

CONFIDENTIALITY NOTICE

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers.

-----Original message-----
**From:** "boakley@scullycapital.com" <boakley@scullycapital.com>
**To:** "Nancy J. Mattson" <njmattson@argentgroupltd.com>
**Cc:** "daniel.ladd@dot.gov" <daniel.ladd@dot.gov>
**Sent:** Wed, Dec 21, 2011 15:46:54 GMT+00:00
**Subject:** Follow-Up Question on Trailing Financials

Nancy,

For efficiency, I am cc'ing Dan on this question...

Are guarantor-level financials available for the period 2008 to present (as applicable)? I think this would be helpful in presenting and understanding the trailing financial performance of APT Parent, LLC.

I know you're traveling, if you can reply to Dan and cc: me, I think that would help in expediting our analysis.

Thanks in advance,

Brian

Brian Oakley
*Principal*

**Scully Capital Services, Inc.**
1133 15th Street N.W.,
Suite 900
Washington, DC 20005

202-775-3434 - Office Voice
202-775-6049 - Office Fax
202-236-2006 - Cell
www.scullycapital.com

 SCULLY CAPITAL

This message has been sent via the Internet. Internet communications are not secure against interception or modification. Therefore, Scully Capital cannot guarantee that this message has not been modified in transit, and this message on its own should not be viewed as contractually binding. This message and any files transmitted with it are confidential and intended solely for the use of the addressee. If you have received this message in error, please notify the sender and destroy your copies of the message and any attached files.

CONFIDENTIAL BUSINESS INFORMATION

1

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

1

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

| From: | Nancy J. Mattson [njmattson@argentgroupltd.com] |
|---|---|
| Sent: | Tuesday, January 31, 2012 1:50 PM |
| To: | Ladd, Daniel (MARAD) |
| Cc: | 'rob.kurz@americanpetroleumtankers.com' (rob.kurz@americanpetroleumtankers.com); 'phil.doherty@americanpetroleumtankers.com' (phil.doherty@americanpetroleumtankers.com); Martin E. Gottlieb; Cindy J. Koehn |
| Subject: | APT Title XI Application: Updated "Applicant Case" |
| Attachments: | 2012-01-30 APT Model to MarAd.xls; Guar Fee 2012-01-30.pdf |

Dan –

On behalf of the Applicant, I am forwarding the attached financial model (used to create Exhibit 6 and Attachment IV-B to the Application) that has been updated to reflect the new Pelican State charter rate fixture that we discussed in our meeting last week and the Wilson Gillette "No Trade Growth" charter rate projection contained in Appendix A to the Scully Capital report to the Maritime Administration.  I am also attaching updated Exhibit 7 – Capital Costs information reflecting the invoices that have been forwarded to you.

Please note that this email and any attachments hereto constitute "trade secrets and commercial or financial information [that is] privileged or confidential" within the meaning of 49 CFR 7.13(c)(4) and the Freedom of Information Act and accordingly is submitted with the understanding that it is not subject to disclosure under FOIA.  Disclosure of such information would cause substantial harm to American Petroleum Tankers Parent LLC (the "Applicant").  The Applicant is submitting this information under your previously-given assurances that it will not be released by the Maritime Administration or the Department of Transportation unless a court determines that its release is required by law.  The Applicant further understands that in the event a request is received for such information, the Maritime Administration or the Department of Transportation will notify the Applicant expeditiously and will permit the Applicant to submit written objections to release pursuant to 49 CFR 7.17(a), unless the Maritime Administration or the Department of Transportation determine (as we expect that it will for the reasons discussed above) that the information should not be disclosed as provided in 49 CFR 7.17(c).

Please feel free to call me with any questions on the above information.

R/Nancy

Nancy J. Mattson
Managing Director

Argent Group Ltd.
One Market Street
Spear Tower, Suite 3600
San Francisco, CA  94105
Phone:   (415) 982-7883
Mobile:   (415) 793-9993
e-mail:   njmattson@argentgroupltd.com

CONFIDENTIALITY NOTICE

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon this information. If you received this transmission

1

in error, please contact the sender and destroy all printed copies and delete the material
from all computers.

2

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

1

CONFIDENTIAL BUSINESS INFORMATION

2

CONFIDENTIAL BUSINESS INFORMATION

1

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

3

CONFIDENTIAL BUSINESS INFORMATION

1

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

| From: | Nancy J. Mattson [njmattson@argentgroupltd.com] |
|---|---|
| Sent: | Thursday, March 08, 2012 11:14 AM |
| To: | Hanan, Christopher (MARAD) |
| Cc: | Ladd, Daniel (MARAD); 'rob.kurz@americanpetroleumtankers.com' (rob.kurz@americanpetroleumtankers.com); 'phil.doherty@americanpetroleumtankers.com' (phil.doherty@americanpetroleumtankers.com); Martin E. Gottlieb |
| Subject: | APT Title XI Application: charter information |
| Attachments: | N00033-07-C-5416-P00012 APT STATE Class revised rates and canx fees Fully Executed (2).pdf; Golden State BP Charter Party 2006-12-08.pdf; Sunshine State Chevron Charter Extension 2010-06-04.pdf; FW: PELICAN STATE / Shell time-c/p 1-24-12  fixture recap (confirmation) |
| Importance: | High |

Chris –

On behalf of the Applicant, I can confirm the following:

1. The MSC charters for the Empire State and Evergreen State that you forwarded (and that are attached hereto) are the most up-to-date version.  This version was transmitted to MarAd on December 20, 2011.
2. The Golden State charter that was incorporated in Exhibit 5 to the APT application submitted on August 30, 2010 is the most up-to-date version.  I am attaching a copy of that charter hereto.
3. The Sunshine State charter and charter extension that was incorporated in Exhibit 5 to the APT application submitted on August 30, 2010 is the most up-to-date version.  I am attaching a copy of the charter extension hereto.
4. Attached is the email confirmation of the Pelican State fixture with Shell completed in January 2012.

Please note that this email and any attachments hereto constitute "trade secrets and commercial or financial information [that is] privileged or confidential" within the meaning of 49 CFR 7.13(c)(4) and the Freedom of Information Act and accordingly is submitted with the understanding that it is not subject to disclosure under FOIA.  Disclosure of such information would cause substantial harm to American Petroleum Tankers Parent LLC (the "Applicant").  The Applicant is submitting this information under your previously-given assurances that it will not be released by the Maritime Administration or the Department of Transportation unless a court determines that its release is required by law.  The Applicant further understands that in the event a request is received for such information, the Maritime Administration or the Department of Transportation will notify the Applicant expeditiously and will permit the Applicant to submit written objections to release pursuant to 49 CFR 7.17(a), unless the Maritime Administration or the Department of Transportation determine (as we expect that it will for the reasons discussed above) that the information should not be disclosed as provided in 49 CFR 7.17(c).

Please feel free to call me with any questions on the above information.

R/Nancy

Nancy J. Mattson
Managing Director

Argent Group Ltd.
One Market Street
Spear Tower, Suite 3600
San Francisco, CA  94105

1

CONFIDENTIAL BUSINESS INFORMATION

`

2

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

2

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

| | |
|---|---|
| **From:** | Nancy J. Mattson [njmattson@argentgroupltd.com] |
| **Sent:** | Monday, March 12, 2012 2:14 PM |
| **To:** | Ladd, Daniel (MARAD) |
| **Cc:** | 'rob.kurz@americanpetroleumtankers.com' (rob.kurz@americanpetroleumtankers.com); 'phil.doherty@americanpetroleumtankers.com' (phil.doherty@americanpetroleumtankers.com); Martin E. Gottlieb; Cindy J. Koehn |
| **Subject:** | APT Title XI Application: Draft 2011 Year-End Financial Statements |
| **Attachments:** | APT 2011 Financial Statements - draft 03092012.pdf |

Dan –

On behalf of the Applicant and as discussed at our meeting last week, I am forwarding the draft 2011 year-end financial statements.  We will forward the final version as soon as it is completed.

Please note that this email and any attachments hereto constitute "trade secrets and commercial or financial information [that is] privileged or confidential" within the meaning of 49 CFR 7.13(c)(4) and the Freedom of Information Act and accordingly is submitted with the understanding that it is not subject to disclosure under FOIA. Disclosure of such information would cause substantial harm to American Petroleum Tankers Parent LLC (the "Applicant").  The Applicant is submitting this information under your previously-given assurances that it will not be released by the Maritime Administration or the Department of Transportation unless a court determines that its release is required by law.  *The Applicant further understands that in the event a request is received for such information, the Maritime Administration or the Department of Transportation will notify the Applicant expeditiously and will permit the Applicant to submit written objections to release pursuant to 49 CFR 7.17(a), unless the Maritime Administration or the Department of Transportation determine (as we expect that it will for the reasons discussed above) that the information should not be disclosed as provided in 49 CFR 7.17(c).*

Please feel free to call me with any questions on the above information.

R/Nancy

Nancy J. Mattson
Managing Director

Argent Group Ltd.
One Market Street
Spear Tower, Suite 3600
San Francisco, CA  94105
Phone:    (415) 982-7883
Mobile:   (415) 793-9993
e-mail:    njmattson@argentgroupltd.com

CONFIDENTIALITY NOTICE

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers.

1

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)
**DRAFT 03092012**

**ITEM 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**INDEX TO FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 1 |
| Consolidated Balance Sheets as of December 31, 2011 and 2010 | 2 |
| Consolidated Statements of Operations for the Years Ended December 31, 2011, 2010 and 2009 | 3 |
| Consolidated Statements of Changes in Members' Equity for the Years Ended December 31, 2011, 2010, and 2009 | 4 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2011, 2010 and 2009 | 5 |
| Notes to Consolidated Financial Statements for the Years Ended December 31, 2011, 2010 and 2009 | 6 |



Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

## INDEPENDENT AUDITORS' REPORT

## TO BE PROVIDED BY DELOITTE

To the Board of Directors and Stockholders of
American Petroleum Tankers LLC
New York, New York

We have audited the accompanying consolidated balance sheet of American Petroleum Tankers LLC
(the "Company") as of December 31, 2011, and 2010, and the related consolidated statements of
operations, changes in members' equity, and cash flows for each of the three years in the period ended
December 31, 2011. These financial statements are the responsibility of the Company's management.
Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States
of America. Those standards require that we plan and perform the audit to obtain reasonable assurance
about whether the financial statements are free of material misstatement. An audit includes
consideration of internal control over financial reporting as a basis for designing audit procedures that
are appropriate in the circumstances, but not for the purpose of expressing an opinion on the
effectiveness of the Company's internal control over financial reporting. Accordingly, we express no
such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and
disclosures in the financial statements, assessing the accounting principles used and significant
estimates made by management, as well as evaluating the overall financial statement presentation. We
believe that our audit provides a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the
financial position of the Company as of December 31, 2011 and 2010, and the results of its operations
and its cash flows for the years then ended in conformity with accounting principles generally
accepted in the United States of America.

DELOITTE & TOUCHE LLP

Jacksonville, Florida
March XX, 2012

1

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

**American Petroleum Tankers Holding LLC**
**Consolidated Balance Sheets**
**as of December 31, 2011 and 2010**
**(in thousands)**

|  | 2011 | 2010 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 31,402 | $ 18,241 |
| Accounts receivable | 9,820 | 11,095 |
| Prepaid expenses and other current assets | 3,073 | 453 |
| Restricted cash | - | 7,923 |
| Total Current Assets | 44,295 | 37,712 |
| Deferred financing costs, net | 9,586 | 12,255 |
| Other assets | 3,267 | 3,573 |
| Vessels and equipment, net | 669,260 | 692,178 |
| Total Assets | $ 726,408 | $ 745,718 |
| | | |
| **Liabilities and Members' Equity** | | |
| Accrued expenses and other liabilities | $ 3,958 | $ 6,385 |
| Accrued interest | 4,408 | 4,869 |
| Payable due USS Entities | 250 | 320 |
| Unearned revenue | 4,629 | 4,508 |
| Total Current Liabilities | 13,245 | 16,082 |
| | | |
| Long-term debt (includes amounts to related parties of $405,998 and $361,959 at December 31, 2011 and 2010, respectively) | 659,141 | 639,985 |
| Total Liabilities | 672,386 | 656,067 |
| Commitments and Contingencies (Notes 6 and 14) | | |
| **Members' Equity** | 54,022 | 89,651 |
| Total Liabilities and Members' Equity | $ 726,408 | $ 745,718 |

The accompanying notes are an integral part of these consolidated financial statements.

2

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

**American Petroleum Tankers Holding LLC**
**Consolidated Statements of Operations**
**For the Years Ended December 31, 2011, 2010 and 2009**
**(in thousands)**

| | 2011 | 2010 | 2009 |
|---|---|---|---|
| **Revenues** | $ 106,282 | $ 63,600 | $ 28,867 |
| **Expenses:** | | | |
| Vessel operating expenses | 34,306 | 24,771 | 11,917 |
| General and administrative expenses | 2,246 | 2,058 | 1,063 |
| Depreciation and amortization | 23,749 | 17,302 | 8,398 |
| Management fees (includes amounts to related parties of $1,991 for 2009) | 2,969 | 2,489 | 2,740 |
| Settlement fees and related legal expenses (including amounts to related parties for $14,000 in 2009) | - | - | 17,901 |
| Total Expenses | 63,270 | 46,620 | 42,019 |
| **Operating income (loss)** | 43,012 | 16,980 | (13,152) |
| **Other income (expense):** | | | |
| Interest income | 7 | 125 | 15 |
| Interest expense (includes amounts to related parties, as discussed in Note 9) | (75,710) | (50,312) | (8,639) |
| Debt extinguishment expense | (2,220) | (7,640) | - |
| Derivative (losses) gains | (718) | (1,561) | 1,751 |
| **Net loss** | $ (35,629) | $ (42,408) | $ (20,025) |

The accompanying notes are an integral part of these consolidated financial statements.

3

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

**American Petroleum Tankers Holding LLC**
**Consolidated Statements of Changes in Members' Equity**
**For the Years Ended December 31, 2011, 2010, and 2009**
**(in thousands)**

|  | Member Interests | | Total Members' Equity |
|  | Class A | Class B |  |
|---|---|---|---|
| **Beginning balance at January 1, 2009** | $ 93,067 | $ 59,017 | $ 152,084 |
| Reallocation of Class A and B member interests | 787 | (787) | - |
| Net loss | - | (20,025) | (20,025) |
| **Ending balance at December 31, 2009** | 93,854 | 38,205 | 132,059 |
| Net loss | (4,203) | (38,205) | (42,408) |
| **Ending balance at December 31, 2010** | 89,651 | -- | 89,651 |
| Net loss | (35,629) | -- | (35,629) |
| **Ending balance at December 31, 2011** | $ 54,022 | $ -- | $ 54,022 |

The accompanying notes are an integral part of these consolidated financial statements.

4

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

**American Petroleum Tankers Holding LLC**
**Consolidated Statements of Cash Flows**
**For the Years Ended December 31, 2011, 2010, and 2009**
**(in thousands)**

| | 2011 | 2010 | 2009 |
|---|---|---|---|
| **OPERATING ACTIVITIES:** | | | |
| Net loss | $ (35,629) | $ (42,408) | $ (20,025) |
| Adjustments to reconcile net loss to net cash | | | |
| provided by (used in) operating activities: | | | |
| Straight-line charter revenues | (216) | (1,148) | (1,460) |
| Depreciation and amortization | 23,749 | 17,302 | 8,398 |
| Amortization of deferred financing costs | 2,532 | 3,013 | 2,977 |
| Amortization of discount on notes issued | 1,495 | 997 | - |
| Debt prepayment penalty fees | 810 | 2,814 | - |
| Write-off of deferred financing costs | 787 | 4,826 | - |
| Write-off of discount on notes issued | 623 | - | - |
| Derivative losses (gains) | 718 | 1,561 | (1,751) |
| Interest paid-in-kind | 44,038 | 32,279 | 8,431 |
| Changes in current assets and liabilities: | | | |
| Accounts receivables | 1,275 | (6,578) | (4,517) |
| Prepaid expenses and other current assets | (308) | (47) | (227) |
| Accrued expenses and other liabilities | (4,511) | 4,776 | 3,650 |
| Payable due USS Entities | (70) | (166) | (426) |
| Unearned revenue | 121 | 1,217 | 3,291 |
| Net cash provided by (used in) operating activities | 35,414 | 18,438 | (1,659) |
| **INVESTING ACTIVITIES:** | | | |
| Vessel and equipment additions | (1,006) | (170,387) | (223,309) |
| Software additions | (252) | - | - |
| Change in restricted cash | 7,923 | (5,123) | (2,800) |
| Net cash provided by (used in) investing activities | 6,665 | (175,510) | (226,109) |
| **FINANCING ACTIVITIES:** | | | |
| Proceeds from the issuance of debt | - | 277,029 | 100,000 |
| Proceeds from revolver borrowings | - | - | 144,528 |
| Payment on long-term debt | (27,000) | (96,904) | (3,096) |
| Debt prepayment penalty fees | (810) | (2,814) | - |
| Payment of debt issuance costs | (1,108) | (9,891) | (5,787) |
| Net cash (used in) provided by financing activities | (28,918) | 167,420 | 235,645 |
| Net increase in cash and cash equivalents | 13,161 | 10,348 | 7,877 |
| Cash and cash equivalents at beginning of year | 18,241 | 7,893 | 16 |
| Cash and cash equivalents at end of year | $ 31,402 | $ 18,241 | $ 7,893 |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES:** | | | |
| Vessel and construction-in-progress accruals | $ - | $ 2,380 | $ 87,366 |
| Interest paid-in-kind | $ 44,038 | $ 32,279 | $ 8,431 |

The accompanying notes are an integral part of these consolidated financial statements.

5

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

### Note 1—Formation and Nature of Operations

American Petroleum Tankers LLC (formerly USS Products Investor LLC) ("APT") was formed on August 7, 2006 as a Limited Liability Company under the laws of the State of Delaware for purposes of financing the construction of and operating five 49,000 deadweight tons ("dwt") double-hulled tankers pursuant to a contract between USS Product Carriers LLC ("Product Carriers"), a wholly-owned subsidiary of U.S. Shipping Partners L.P. (the "Partnership"), and National Steel and Shipbuilding Company ("NASSCO"), a subsidiary of General Dynamics Corporation ("General Dynamics") as assigned to APT with respect to five tankers pursuant to the Assignment and Assumption Agreement between Product Carriers and APT on August 7, 2006 (the "Construction Contract Assignment"). Equity interests in APT were owned by affiliates of The Blackstone Group and Cerberus Capital Management, L.P. ("Class A Members") and by Product Carriers ("Class B Member"). Several subsidiaries of APT have been formed to own the vessels constructed upon delivery and hold the charters entered into by APT. From APT's formation through September 28, 2009, USS Product Manager LLC ("Product Manager"), a wholly-owned subsidiary of the Partnership, served as the manager and operator of APT's vessels pursuant to a Management Agreement among APT, the Partnership and the subsidiaries of APT, as described in Note 11. As a result of the settlement of the litigation described in Note 2, on July 28, 2009 Product Carriers transferred its Class B membership interest to the Class A Members and Product Manager began the transition of manager and operator of APT to another operator chosen by APT. This transition was completed on September 29, 2009. Furthermore, the Company changed its name from USS Products Investor LLC to American Petroleum Tankers LLC on July 28, 2009.

On May 14, 2010, APT consummated a restructuring of its corporate organization, resulting in: (i) the formation of American Petroleum Tankers Holding LLC ("APT Holding", the "Company", "we", "our", or "us") as the new parent holding company; (ii) the formation of American Petroleum Tankers Parent LLC ("APT Parent"), as a new wholly-owned subsidiary of APT Holding, and AP Tankers Co., as a new wholly-owned subsidiary of APT Parent; and (iii) the contribution down of the interests of: (a) the former parent holding company, APT, and (b) APT Intermediate Holdco LLC ("Intermediate Holdco"), such that APT and Intermediate Holdco became wholly-owned subsidiaries of APT Parent. As a result of this restructuring, APT, Intermediate Holdco and AP Tankers Co. are entities at the same corporate level, each a directly, wholly-owned subsidiary of APT Parent. As the reorganization occurred among entities under common control, the consolidated financial statements of the predecessor company, American Petroleum Tankers LLC, are presented as the historical financial statements of APT Holding.

### Note 2 - Settlement of Litigation Among the Class A Members, Class B Member and Its Affiliates and the Company's Lender

In April 2009, Product Carriers and Product Manager commenced litigation against the Class A Members and the lenders to APT regarding the Class A Members' right to remove the Class B Member as managing member of APT, APT's right to terminate Product Manager as manager of APT under the management agreement, and the lenders' right to foreclose on the vessel the *Golden State*. On July 10, 2009, Product Carriers, Product Manager, the Partnership and USS PC Holdings LLC (collectively "USS Entities"), the Class A Members, the lenders to APT (together with the Class A Members the "Blackstone/Cerberus Entities") and APT entered into a settlement agreement to settle litigation between the USS Entities and the Blackstone/Cerberus Entities relating to control of APT. Under the terms of the settlement, which was approved by the Bankruptcy Court on July 17, 2009 and effective on July 28, 2009 (the "Effective Date"):

    (i) on the Effective Date, Product Carriers transferred its Class B member interest to the Class A Members and no longer has an interest in, or the right to act as Managing Member of, the Company;

    (ii) in consideration of the termination of the Management Agreement,

        a. the Blackstone/Cerberus Entities agreed to pay Product Manager an aggregate of $14,000, of which $9,000 was paid on the Effective Date, $2,300 was paid on November 9, 2009, and $2,700 was paid from an escrow account in equal monthly installments through December 2010;

6

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

    b.   the Company agreed to pay to Product Manager 50% of the first $1,000 of any cost savings received by the Company in respect of the last three vessels constructed if those vessels are completed and delivered such that the actual cost of construction is less than the cost anticipated in the contract, up to a maximum of $500 in the aggregate; and

    c.   the Company agreed to pay to Product Manager 50% of the first $500 of any cost savings received by the Company in respect of the last vessel under construction if that vessel is delivered under the contracted cost, up to a maximum of $250, provided that this amount was not used in the application of clause (ii)(b) above;

(iii) the USS Entities have a right of first offer to purchase the vessels to the extent the Company determines to offer all or any portion of them for sale in the future, although the Company has no obligation to accept any offer;

(iv) the contracts between the USS Entities or their affiliates and the Company are being terminated (subject to certain limited exceptions);

(v) the USS Entities and the Blackstone/Cerberus Entities exchanged broad, global releases (subject to certain limited exceptions); and

(vi) on the Effective Date, all the litigation between the USS Entities and the Blackstone/Cerberus Entities was dismissed with prejudice.

With respect to item (ii)(a) above, APT recorded in 2009 the settlement payment of $14,000 and associated legal fees of $3,901 as Settlement Fees and Related Legal Expenses in the accompanying Consolidated Statements of Operations. With respect to item (ii)(b) above, APT made a payment of $500 in 2010 for cost savings realized on the construction of one vessel completed in 2009. With respect to item (ii)(c) above, the Company has recorded $250 at December 31, 2010 in Payable due USS Entities in the accompanying Consolidated Balance Sheets for cost savings realized on the construction of the last vessel completed in December 2010. The $250 was still payable at December 31, 2011, subject to the final settlement of the Construction Contract as discussed in Note 6.

*Note 3 - Summary of Significant Accounting Principles*

**Principles of Consolidation**

      These financial statements present the consolidated financial position, results of operations, changes in members' equity and cash flows for American Petroleum Tankers Holding LLC and its subsidiaries. All intercompany transactions and balances have been eliminated in consolidation.

**Basis of Presentation**

      The accompanying consolidated financial statements for the Company have been prepared in accordance with accounting principles generally accepted in the United States of America for annual financial information and in accordance with the instructions to Form 10-K.

**Cash and Cash Equivalents**

      The Company considers all highly liquid investments, with original maturities of three months or less, of which are primarily investments in money market funds, to be cash equivalents.

**Accounts Receivable**

      Accounts Receivable consists of trade receivables. Based upon historical collection experience and the credit risk of customers, there was no allowance for doubtful accounts recorded.

**Deferred Financing Costs**

      Direct costs associated with obtaining long-term financing are deferred and generally amortized utilizing the effective interest method over the term of the related financing.

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

### Vessels and Equipment

Vessels are stated at cost.  Construction costs of new vessels are capitalized and included in construction-in-progress until completed.  The Company records construction costs of new vessels and its obligations to NASSCO on a percentage of completion basis as work is completed. Normal repair and maintenance expenditures are expensed as incurred.  Depreciation is computed using the straight-line method over the vessels' estimated useful lives of 30 years based on the vessels cost less their estimated salvage value.  Interest is capitalized in conjunction with the Company's construction of vessels.

The Company assesses recoverability of the carrying value of a long-lived asset when indicators of impairment are present by estimating the future undiscounted net cash flows expected to result from the asset, including eventual disposition.  If the future net cash flows are less than the carrying value of the asset, an impairment loss is recorded equal to the difference between the asset's carrying value and its fair value.  There have been no vessel impairments recorded.

### Revenue and Expense Recognition

Revenues from long-term time charters of vessels with fixed annual escalation clauses are recognized on a straight-line basis over the term of the contract. The Company currently has long-term charters on two vessels of three and seven years, respectively, charters on two vessels of one year, and an evergreen charter on one vessel. Certain of the charter agreements allow the company to prebill for charter fees one month in advance.  Such prebillings are recognized as accounts receivable and unearned revenue. Based on the terms of the time charter agreements, expenses such as fuel, port charges, canal dues, and cargo handling operations are either paid by the customer or paid by the Company and reimbursed by the customer.  Such expenses, if paid by the Company, are presented net of reimbursements from customers. All other expenses are recognized by the Company as incurred.

### Insurance

The Company retains risk up to $100 deductible per occurrence for marine, liability and protection and indemnity.  Reinsurance is obtained to cover losses in excess of certain limits. Provisions for losses are determined on the basis of claim adjusters' evaluations and other estimates including those for salvage and subrogation recoveries. Such provisions and any related claim receivables are recorded when insured events occur. The determinations of such estimates and the establishment of the related reserves are continually reviewed and updated. Any adjustments resulting from these reviews are reflected in current operations.

### Derivative Instruments

The Company's use of derivative instruments, principally an interest rate cap, is limited to non-trading purposes and is designed to manage exposure to interest rate risks.  The Company recognizes all derivatives on the balance sheet at fair value.  Changes in the fair value of those instruments are reported in earnings or other comprehensive income depending on the use of the derivative and whether it qualifies for hedge accounting. Derivatives that are not designated as hedges or are not effective hedges must be adjusted to fair value through earnings and are recorded to Derivative (Losses) Gains.  If the derivative is an effective hedge, a change in the fair value of the derivative is recognized in Other Comprehensive Income (Loss) until the hedged item is reflected in earnings (cash flow hedge).  The ineffective portion (that is, the change in fair value of the derivative that does not offset the change in fair value of the hedged item) of an effective hedge and the full amount of an ineffective hedge are immediately recognized in earnings in Derivative (Losses) Gains in the accompanying Consolidated Statements of Operations.

The Company does not plan to hold or issue derivative financial instruments for trading purposes, but has not performed the activities necessary to qualify its interest rate cap for hedge accounting treatment.

### Concentrations of Credit Risk

The Company places its temporary cash investments with high credit quality financial institutions and, by policy, limits the amount of credit exposure to any one financial institution. In 2011, the Company chartered its

8

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

vessels to four customers for various charter periods, representing approximately 49%, 19%, 19%, and 13% of total revenues. In 2010, the Company chartered its vessels to four customers, representing approximately 32%, 31%, 19% and 18% of total revenues. In 2009, the Company chartered its vessels to two customers, of which revenues from those two customers represented 65% and 34% of total revenues, respectively. The Company monitors its credit risk by chartering to customers with a high credit quality. The Company regularly monitors its exposure to counterparty credit risk, ensuring that it only contracts with major institutions with strong credit ratings. The Company had outstanding trade receivables with three customers at December 31, 2011 of 62%, 20%, and 18%, and with three customers at December 31, 2010 of 66%, 19%, and 15%, recorded in Accounts Receivable in the accompanying Consolidated Balance Sheets.

### Taxes

As a limited liability company, the Company is treated similar to a partnership for income tax purposes. Accordingly, the Company is generally not subject to federal and state taxes, and its profits and losses are passed directly to its members for inclusion in their respective income tax returns. The Company is subject to certain state franchise and other taxes, which are recorded as General and Administrative expenses when incurred.

### Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

### New Accounting Pronouncements

[Deloitte to provide]

### Note 4 - Restricted Cash

In connection with the issuance of $285,000 of 10¼% First Priority Senior Secured Notes (the "Notes") on May 17, 2010, as discussed in Note 9, $169,900 of the net proceeds were placed in an escrow account to fund the remaining construction costs of the Company's vessels. The balance in the escrow account at December 31, 2010 was $7,923. As discussed in Note 6, the Company was scheduled to make its final vessel construction payments (excluding warranty escrow payments) during the first quarter of 2011; however, the final payment under the Company's vessel construction contract is being deferred until the expiration of the last vessel warranty period in December 2011, with payment in 2012. The company has recorded $1,900 as payable to NASSCO. The remaining balance in the escrow account was released from escrow after the first anniversary of the Notes issuance date.

### Note 5 - Deferred Financing Costs, Net

The gross carrying amount and accumulated amortization of the Company's deferred financing charges at December 31 are as follows:

|  | 2011 | 2010 |
|---|---|---|
| Gross carrying amount | $ 23,983 | $ 23,333 |
| Accumulated amortization | (14,397) | (11,078) |
| Total deferred financing costs, net | $ 9,586 | $ 12,255 |

In connection with issuing the Notes on May 17, 2010, $10,407 of costs were capitalized as deferred financing costs and are being amortized over the five year term of the Notes using the effective interest method.

9

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

On August 13, 2009, the Company executed a senior secured loan facility, the "DVB Facility", and incurred $5,787 of deferred financing costs. With the issuance of the Notes on May 17, 2010, the DVB facility was prepaid with a portion of the proceeds, as discussed on Note 9. The remaining unamortized deferred financing costs in the amount of $4,826 was written off and recognized as a loss on extinguishment of debt.

Amortization of deferred financing costs of $2,532, $3,013, and $2,977, was recorded to Interest Expense during the years ended December 31, 2011, 2010, and 2009, respectively. Amortization of deferred financing costs related to financings associated with the construction of the vessels is included in capitalized interest, as further disclosed in Note 9.

The amortization expense for all deferred financing costs for each of the five succeeding fiscal years ending December 31 is estimated to be as follows:

| | |
|---|---|
| 2012 | $ 2,511 |
| 2013 | 2,511 |
| 2014 | 2,511 |
| 2015 | 1,229 |
| 2016 | 204 |

### Note 6 - Construction Contract

Product Carriers entered into a contract in 2006 with NASSCO, a subsidiary of General Dynamics, for the construction of nine 49,000 dwt double-hulled tankers. General Dynamics provided a performance guarantee to Product Carriers in respect of the obligations of NASSCO under the construction contract. Upon formation of the Company, Product Carriers assigned its rights and obligations with respect to the construction of the first five tankers to the Company. The Company did not exercise its right to elect to have rights and obligations under the NASSCO contract to construct up to four additional tankers assigned to the Company. In 2007, the Company and Product Carriers reached an agreement with NASSCO to accelerate the construction of the five product tankers being constructed for the Company. Under the original arrangement with NASSCO, these five product tankers were to be delivered between the second quarter of 2009 and the third quarter of 2011. As a result of the amendment, the five vessels were delivered in January 2009, June 2009, December 2009, July 2010 and December 2010, respectively. NASSCO and the Company share in any cost savings achieved, as measured against the original contract price based on the terms of the construction contract.

The Company was invoiced monthly from NASSCO for completed progress on the construction of the vessels based on the percentage of completion of the vessels until August 2009 when the contract was amended. In conjunction with the contract changes entered into between NASSCO and the Company, a revised billing schedule was agreed to, which provided for the following payments: (a) $87,500 in August 2009 representing amounts then-currently due and an upfront payment that included amounts that would otherwise have been payable over the next few months for the remaining vessels; and (b) $80,900 upon delivery of the Empire State in July 2010 and $81,200 upon the delivery of the Evergreen State in December 2010.

After the contract changes entered into between the Company and NASSCO, the Company continued to receive from NASSCO percentage of completion schedules of the vessels under construction. As the vessels constructed by NASSCO are built to the Company's specifications, the Company determined that they had incurred the legal liability as the economic performance of the construction of the vessels under the contract had been completed. At December 31, 2010, the Company had accrued $1,835 payable to NASSCO for completion of the final vessel delivered in December 2010. At December 31, 2011, the Company had accrued $1,900 payable to NASSCO for the final settlement of all construction costs. The Company has capitalized these costs within Vessels and Equipment, Net and accrued the liability within Accrued Expenses and Other Liabilities in the accompanying Consolidated Balance Sheets. Future commitments under this contract are further discussed in Note 14.

10

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

### Note 7 - Vessels and Equipment, Net

Vessels and Equipment, Net consists of the following at December 31:

|  | 2011 | 2010 |
|---|---|---|
| Vessels and equipment | $ 718,654 | $ 717,878 |
| Less accumulated depreciation | (49,394) | (25,700) |
| Total vessels and equipment, net | $ 669,260 | $ 692,178 |

Depreciation of vessels was $23,694, $17,302 and $8,398 for the years ended December 31, 2011, 2010, and 2009, respectively.

Capitalized interest is recorded as part of the asset to which it relates and is amortized over the estimated useful life of the asset. Interest expense of $5,988 and $10,597 was capitalized in 2010 and 2009, respectively.

### Note 8 - Lease Receipts

The Company currently leases its vessels on a time charter basis. The *Golden State*, delivered and placed in service in January 2009, is operating under a seven year time charter with three extension options exercisable by the charterer of one year each. The *Pelican State*, delivered in June 2009 and placed in service in July 2009, is operating under a three year time charter. The *Pelican State* will begin a new three year charter with two extension options of one year each, commencing in July 2012. The *Sunshine State*, delivered in December 2009 and placed in service in January 2010, is operating under an evergreen type time charter arrangement which is currently in the first of four six month extension options, as exercisable by the charterer. The *Empire State* and *Evergreen State*, delivered and placed in service in July and December 2010, respectively, are operating under one year time charters, with three one year extension options and one 11 month extension option exercisable by the charterer. Future minimum annual receipts required under operating leases that have initial or remaining noncancelable lease terms in excess of one year, excluding renewal options, as of December 31, 2011 are summarized as follows:

| | |
|---|---|
| 2012 | $ 40,325 |
| 2013 | 40,463 |
| 2014 | 41,324 |
| 2015 | 32,193 |
| 2016 | 810 |
| | $ 155,115 |

### Note 9 - Long-Term Debt

Long-term debt consists of the following at December 31:

|  | 2011 | 2010 |
|---|---|---|
| Notes, net of $4,856 and $6,974 unamortized original issuance discount at December 31, 2011 and 2010, respectively | $ 253,143 | $ 278,026 |
| Sponsor Facility | 405,998 | 361,959 |
| | $ 659,141 | $ 639,985 |

**First Priority Senior Secured Notes**

On May 17, 2010, APT Parent and AP Tankers Co. issued $285,000, 10 1/4% First Priority Senior Secured Notes (the "Notes") due 2015 at a price of 97.203%. Interest on the Notes is payable on May 1 and November 1 of each year, beginning November 1, 2010. On May 17, 2010, net proceeds of $271,329, (net of underwriters' discounts and commissions) were received from the Notes. The original issuance discount, $7,971 at the time of issue, is being amortized over the five year term of the Notes using the effective interest method. As of December 31, 2011, the unamortized original issue discount was $4,856. The net proceeds were used to place $169,900 cash in escrow for the construction of vessels, prepay $97,574 related to the DVB Facility (including principal, interest, and

11

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

prepayment penalty), and the remainder was used to pay related transaction fees and expenses, of which $10,407 of costs were capitalized as debt issuance costs within Deferred Financing Costs in the accompanying Consolidated Balance Sheets.

In connection with the issuance of the Notes, APT Parent and AP Tankers Co. entered into a registration rights agreement ("Registration Rights Agreement") which required the use of reasonable efforts to register notes having substantially identical terms as the Notes with the Securities and Exchange Commission ("SEC") under the Securities Act of 1933, as amended, prior to May 12, 2011. The Company completed the registration of the Notes and an exchange offer, exchanging unregistered Notes for Notes registered with the SEC, on May 12, 2011 (the "Exchange Offer").

Prior to May 1, 2012, the Notes may be redeemed in part or in full at a redemption price equal to 100% of the principal amount, plus a make-whole premium calculated in accordance with the indenture governing the Notes and accrued and unpaid interest. In addition, prior to May 1, 2012, a portion of the Notes may be redeemed at: (a) 110.25% plus accrued and unpaid interest with the net proceeds of certain equity offerings, provided that at least 65% of the Notes remain outstanding, and/or (b) 103% plus accrued and unpaid interest provided that not more than 10% of the original aggregate principal amount of the Notes issued is redeemed during any twelve month period. On or after May 1, 2012, the Notes may be redeemed in part or in full at the following percentages of the outstanding principal amount prepaid plus accrued and unpaid interest: 105.125% prior to May 1, 2013; 102.563% prior to May 1, 2014; and 100% on or after May 1, 2014.

Under the terms of the indenture governing the Notes, the Company may redeem up to 10% of the original issue amount in a twelve month period prior to May 1, 2012 at 103%. On March 28, 2011, the Company provided notice to the trustee that pursuant to the indenture the Company would redeem $27,000 of the principal amount of the Notes unconditionally. The redemption was completed on April 28, 2011 with the principal payment of $27,000 plus debt prepayment fees of $810 and accrued interest of $1,361. As a result, the Company recognized a loss on redemption of the Notes of $2,220 in the second quarter of 2011, representing the debt prepayment fees of $810, write-off of deferred financing costs of $787, and write-off of discounts on notes issued of $623.

The indenture governing the Notes contains customary covenants and restrictions on the activities of APT Parent and AP Tankers Co. and APT Parent's restricted subsidiaries, including, but not limited to, limitations on the incurrence of debt, certain restricted payments, dividends and other payments affecting restricted subsidiaries, asset sales, transactions with affiliates, liens, and sale and leaseback transactions. The indentures also contain provisions requiring us to offer to repurchase the Notes upon a change of control.

**Sponsor Facility**

In 2006, the Company entered into a Revolving Notes Facility Agreement (the "Sponsor Facility") pursuant to which the Class A Members or their affiliates made available $325,000 of revolving credit loans. In 2009, the Company amended its Sponsor Facility to allow the monthly interest payments due and payable, beginning July 2009, to be treated as paid-in-kind in lieu of monthly cash payments. As a result, the Company is allowed to exceed its total commitment under the Sponsor Facility for the capitalized paid-in-kind payments. On April 23, 2010, APT entered into Amendment No. 4 to the Sponsor Facility Agreement in connection with the corporate restructuring to permit the incurrence of indebtedness under the Notes and to include APT Parent as obligor under the Sponsor Facility. On May 5, 2010, APT entered into Amendment No. 5 to the Sponsor Facility Agreement to convert the revolving credit loans to a term loan, extend the maturity to May 2016, increase the paid-in-kind interest rate to a fixed rate of 12%, and to permit quarterly and annual financial reporting to be made on the same timetable as the financial reporting required pursuant to the indenture governing the Notes. As a result, the outstanding balance of the Sponsor Facility has been recorded as long-term debt. In addition, the security agent is due a fee of 0.005% of borrowings outstanding and the administrative agent is due a fee of $300 per year.

In 2011, the Company recorded $44,038 for interest-in-kind payments that were capitalized in the Sponsor Facility balance, including an interest-in-kind accrual of $30,074 at December 31, 2011. In 2010, the Company recorded $32,279 for interest-in-kind payments that were capitalized in the Sponsor Facility balance, including an interest-in-kind accrual of $26,812 at December 31, 2010. In 2009, the Company recorded $8,431 for interest-in-kind payments that were capitalized in the Sponsor Facility balance, including an interest-in-kind accrual of $608 at

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

December 31, 2009.  The Company estimates total paid-in-kind interest of $332,699 to be capitalized under the amended Sponsor Facility for the period May 5, 2010 through May 5, 2016.  The Sponsor Facility is secured by substantially all of the assets of APT Parent and its subsidiaries on a second priority basis.

Under the terms of the Sponsor Facility, the ability to borrow additional amounts against this facility ceased in June 2011.

**Debt Extinguishment Expense**

In connection with the prepayment of the DVB Facility on May 17, 2010, the Company recognized a loss on extinguishment of debt totaling $7,640. This amount consisted of a $2,814 prepayment penalty and the write-off of $4,826 of unamortized deferred financing costs.

The restrictive covenants under the company's debt include limitations on: (a) restricted payments and investments; (b) dividends and other payments affecting restricted subsidiaries; (c) debt and guarantees; (d) asset sales and asset acquisitions; (e) transactions with affiliates; (f) liens and negative pledges; (g) sale and leaseback transactions; (h) activities of AP Tankers Co., (i) creation of unrestricted subsidiaries; (j) capital expenditures; (k) consolidations, mergers, etc.; (l) business activities; and (m) modifications to collateral and other documents.

The maturities of long-term debt subsequent to December 31, 2011, excluding accreted interest on the Sponsor Facility subsequent to December 31, 2011, are as follows:

| | | |
|---|---:|---:|
| 2015 | $ | 253,143 |
| 2016 | | 405,998 |
| | $ | 659,141 |

A reconciliation of Interest Expense and Debt Extinguishment Expense for the years ended December 31, 2011, 2010 and 2009 is as follows:

| | 2011 | 2010 | 2009 |
|---|---:|---:|---:|
| Cash paid for interest - other (1) | $   27,806 | $   15,352 | $   2,070 |
| Cash paid for interest to member (1) | - | - | 5,407 |
| Paid-in-kind interest to members | 44,038 | 32,279 | 8,431 |
| Amortization of deferred financing costs | 2,532 | 3,013 | 2,977 |
| Amortization of discounts on notes issued | 1,495 | 997 | - |
| Administrative fee to members | 300 | 300 | 300 |
| Change in interest accrual | (461) | 4,359 | 51 |
| Gross interest expense | 75,710 | 56,300 | 19,236 |
| Less capitalized interest | - | (5,988) | (10,597) |
| **Net Interest Expense** | $   75,710 | $   50,312 | $   8,639 |
| Cash paid for debt prepayment fee | $   810 | $   2,814 | $   - |
| Write-off of deferred financing costs | 787 | 4,826 | - |
| Write-off of discount on notes issued | 623 | - | - |
| **Debt Extinguishment Expense** | $   2,220 | $   7,640 | $   - |

(1)  Represents additional cash flow disclosures.

13

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

*Note 10 - Capital Structure and Limited Liability Company Agreement*

The Company was formed on August 7, 2006 for purposes of financing the construction of and operating five tankers pursuant to the NASSCO contract. The Class A Members and Class B Member committed to provide $105,000 and $70,000, respectively, of equity financing to the Company, which was fully funded at December 31, 2008.

The LLC Agreement governs the rights and obligations of the members. The LLC agreement specifies, among other matters, the following: a) the rights and obligations of the Class A Members and the Class B Members, including voting rights; b) maintenance of individual capital accounts; c) allocations of profits and losses; and d) distributions to the members. Profits of the Company are allocated first to the Class A Members until they receive a specified return, then to the Class B Member until it receives a specified return, and then on a shared basis dependent on the returns generated. Losses of the Company are allocated to the Class B interests until their respective capital accounts have been reduced to zero and any further losses will be allocated to the Class A Members.

*Note 11 - Related Party Transactions*

**USS Entities**

During 2011, 2010 and 2009, the Company reimbursed the Partnership $70, $166, and $8,399, respectively, for expenses paid on behalf of the Company.

Until July 28, 2009, Product Manager managed the construction of, and until September 28, 2009 the operation of, the tankers for the Company, for which it received through May 2009, the following, subject to certain specified limitations:

- an oversight fee of $1,000 per tanker, payable ratably over the course of construction of such tanker;

- an annual management fee of $1,000 for each completed tanker that is operated by the Company; and

- a delivery fee of up to $750 per tanker, depending on the delivery date and cost of construction.

The management agreement between Product Manager and the Company had an initial term of 10 years, subject to early termination under certain circumstances. The obligations under the management agreement were being performed by employees of US Shipping General Partner LLC, the Partnership's general partner. For the year ended December 31, 2009, the Partnership earned $786 in oversight fees from the Company. Subsequent to the delivery of the *Golden State* vessel in January 2009, the Partnership earned a delivery fee of $750 and management fees of $455 from the Company. The oversight, management and delivery fees are recorded by the Company within Management Fees expense in the accompanying Consolidated Statements of Operations.

In connection with the settlement of litigation between the USS Entities and the Blackstone/Cerberus Entities, as described in Note 2, the management agreement (except for certain provisions) was terminated and Product Manager ceased to manage the Company. As a result, a $14,000 settlement fee was paid to the Product Manager and recorded as Settlement Fees and Related Legal Expenses in the accompanying Consolidated Statements of Operations.

As discussed in Note 2, Product Manager earned $250 and $500 during 2010 and 2009, respectively, for cost savings realized on the construction of one vessel completed in each of the respective years. The cost savings were accrued within Due to USS Entities at December 31, 2010 and 2009 and capitalized as a cost to the respective vessels. The $500 cost savings was paid by the Company in the first quarter of 2010. The payment of the remaining $250 is expected after final settlement of the Construction Contract in 2012, as discussed in Note 6. The aggregate payable recorded within Due to USS Entities in the accompanying Consolidated Balance Sheets was $250 and $320 at December 31, 2011 and 2010, respectively.

14

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

### Blackstone/Cerberus Entities

The Company pays an annual administration fee of $300 for the Sponsor Facility to an affiliate of certain of the Class A Members. This fee is recognized as a component of interest expense, in the accompanying consolidated financial statements.

In 2011, the Company recorded $44,038 for interest-in-kind payments that were capitalized in the Sponsor Facility balance, including an interest-in-kind accrual of $30,074 at December 31, 2011. In 2010, the Company recorded $32,279 for interest-in-kind payments that were capitalized in the Sponsor Facility balance, including an interest-in-kind accrual of $26,812 at December 31, 2010. The Company paid interest of $6,283 in 2009 on the Sponsor Facility directly to certain of the Blackstone/Cerberus Entities. The 2009 payments represented interest payments through the Company's June 2009 monthly payment. Subsequently, the Company recorded $8,431 for interest-in-kind payments that were capitalized in the Sponsor Facility balance, including an accrual of $608 at December 31, 2009. The Company estimates total paid-in-kind interest of $332,699 to be capitalized under the amended Sponsor Facility for the period May 5, 2010 through May 5, 2016.

### Note 12 - Derivative Instruments

Effective April 1, 2007, the Company entered into a nine-year interest rate cap, with a notional amount of $100,000, for $1,924, including transaction fees. This interest rate cap of the three-month U.S. Dollar LIBOR of 6.0% is intended to reduce the potential negative impacts to the Company's cash flows that could result from movements in interest rates.

The Company recognizes all derivatives as either assets or liabilities in the balance sheet and measures those instruments at fair value. Changes in the fair value of those instruments are reported in earnings, as the Company did not designate the interest rate cap as a hedge. The fair market value of the interest rate cap at December 31, 2011 and 2010 was $248 and $965, respectively, and is recorded as a long-term asset in Other Assets in the accompanying Consolidated Balance Sheets. The change in the fair value of the derivative financial instrument was recorded to Derivative (Losses) Gains as losses of $718 and $1,561 and gains of $1,751 during the years ended December 31, 2011, 2010, and 2009, respectively.

### Note 13 – Fair Value of Financial Instruments

The methods and assumptions used to estimate the fair value of each class of financial instruments are set forth below:

- Cash and cash equivalents and restricted cash - the carrying amounts approximate fair value because of the relatively short time between the origination of the instrument and its expected realization.

- Derivative financial instruments - the fair value of the interest rate cap is developed from market-based inputs under the income approach, as obtained from a brokerage agency, using cash flows discounted at relevant market interest rates.

- Long-term debt – For registered debt the fair value is based on quoted prices in active markets. For all other debt the fair value is estimated based on each obligation's characteristics, using the borrowing rates currently available for the same or similar issues for debt of the same remaining maturities, and discounted back to the present value. The Company regularly monitors its credit risk in evaluating its fair value of long-term debt. Significant factors evaluated include changes in margin on its various loans and its ability to make future debt payments. At December 31, 2011, the carrying value and estimated fair value of the Company's debt was $659,141 and $693,291, respectively. At December 31, 2010, the carrying value and estimated fair value of the Company's debt was $639,985 and $655,971, respectively.

The following valuation hierarchy prioritizes the inputs for valuation used to measure fair value into three broad levels as follows:

Level 1: Quoted market prices in active markets for identical assets or liabilities.

15

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

Level 2: Observable market based inputs or unobservable inputs that are corroborated by market data.
Level 3: Unobservable inputs that are not corroborated by market data.

The Company utilizes the best available information in measuring fair value.  The Company has determined that its interest rate cap is valued using Level 2 inputs.

### Note 14 – Commitments and Contingencies

As discussed in Note 6, the Company has a contract for the construction of five product tankers which were delivered in January 2009, June 2009, December 2009, July 2010 and December 2010, respectively. The Company currently expects the cost to construct these five tankers to aggregate approximately $670,707. Payments of $668,872 have been made under these construction contracts as of December 31, 2011, including payments of $162,100, and $210,205 the years ended December 31, 2010 and 2009, respectively. The Company estimates that it will make payments under this construction contract of approximately $1,900 in 2012 as part of the final settlement.

Since July 28, 2009, the Company has engaged a third party to provide administrative, construction oversight supervision, and management services for the construction and operation of its vessels, subject to a management and construction supervision agreement (the "Agreement"). The Agreement has an initial term of 5 years with a one year extension option and is subject to early termination at any time and without cause upon 90 days notice.

### Note 15 – Financial Information by Segments and Geographic Area

The Company's business is to charter its tankers primarily in the U.S. domestic Jones Act trades to customers in the petroleum industry to and from destination points in the coastwise United States.  Each of the Company's vessels represents an operating segment.  These segments are aggregated into one reportable segment because they possess similar economic characteristics and all vessels are the same design and carry petroleum products in the U.S. coastwise trade.

### Note 16 – Guarantor Subsidiaries

APT Parent, a wholly-owned subsidiary of APT Holding (the "Parent"), and AP Tankers Co., a wholly-owned subsidiary of APT Parent, (collectively, the "Subsidiary Issuers"), issued the Notes in May 2010. The Notes are fully and unconditionally guaranteed, jointly and severally, on a senior subordinated basis by APT Holding and all of APT Parent's wholly-owned subsidiaries: APT, Intermediate Holdco, and Intermediate Holdco's wholly-owned subsidiaries, JV Tanker Charterer LLC, PI 2 Pelican State LLC, and APT Sunshine State LLC (collectively the "Guarantor Subsidiaries").

The guarantees by Parent and Guarantor Subsidiaries are senior secured obligations: equal in right of payment with any of their existing and future senior indebtedness but senior with any of their existing and future unsecured indebtedness to the extent of the value of the collateral securing the Notes; senior to any of their existing and future subordinated indebtedness; junior with any of their existing and future indebtedness with respect to any credit agreement, certain maritime liens or that are secured by assets other than the collateral securing the Notes; and junior to any existing and future obligations of any non-guarantor subsidiaries.  The Notes are secured by a first priority lien on substantially all of the assets of APT Parent and its subsidiaries subject to certain exceptions and permitted liens.

Parent is a holding company whose only asset is its ownership interests in its subsidiaries. The Company conducts virtually all of its business operations through APT Parent and its subsidiaries.  The activities for the Subsidiary Issuers relate only to the issuance and servicing of the Notes and payroll for administrative personnel. Accordingly, the Company's only material sources of cash are dividends and distributions with respect to its ownership interests in APT and the subsidiaries of Intermediate Holdco that are derived from the earnings and cash flow generated by APT and the subsidiaries of Intermediate Holdco.  Through December 31, 2011, no dividends have been paid.

16

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

   The following tables set forth, on a consolidating basis, the balance sheets, statements of operations and statements of cash flows for Parent, Subsidiary Issuers and Guarantor Subsidiaries for all financial statement periods presented in the Company's consolidated financial statements. The Subsidiary Issuers allocate interest expense to the Guarantor Subsidiaries for capitalization towards the cost of the vessels under construction. Intercompany cash advances and loans made primarily for the purpose of short-term operating needs are included in cash flows from operating activities.



17

2248

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

**Consolidating Balance Sheet**
**as of December 31, 2011**

| | Parent (Guarantor) | Subsidiary Issuers | Guarantor Subsidiaries | Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and cash equivalents | $    - | $    637 | $   30,765 | $    - | $   31,402 |
| Accounts receivable | - | - | 9,820 | - | 9,820 |
| Prepaid expenses and other current assets | - | 35 | 3,038 | - | 3,073 |
| Total Current Assets | - | 672 | 43,623 | - | 44,295 |
| Receivables due from affiliates, net | - | 195,743 | - | (195,743) | - |
| Deferred financing costs, net | - | 7,031 | 2,555 | - | 9,586 |
| Investment in affiliates | 54,022 | 108,490 | - | (162,512) | - |
| Other assets | - | 196 | 3,071 | - | 3,267 |
| Vessels and equipment, net | - | - | 669,260 | - | 669,260 |
| Total Assets | $   54,022 | $  312,132 | $  718,509 | $  (358,255) | $  726,408 |
| | | | | | |
| **Liabilities and Members' Equity** | | | | | |
| Accrued expenses and other liabilities | $    - | $    559 | $    3,399 | $    - | $    3,958 |
| Accrued interest | - | 4,408 | - | - | 4,408 |
| Payable due USS Entities | - | - | 250 | - | 250 |
| Unearned revenue | - | - | 4,629 | - | 4,629 |
| Total Current Liabilities | - | 4,967 | 8,278 | - | 13,245 |
| Payables due to affiliates, net | - | - | 195,743 | (195,743) | - |
| Long-term debt | - | 253,143 | 405,998 | - | 659,141 |
| Total Liabilities | - | 258,110 | 610,019 | (195,743) | 672,386 |
| **Members' Equity** | 54,022 | 54,022 | 108,490 | (162,512) | 54,022 |
| Total Liabilities and Members' Equity | $   54,022 | $  312,132 | $  718,509 | $  (358,255) | $  726,408 |

**Consolidating Balance Sheet**
**as of December 31, 2010**

| | Parent (Guarantor) | Subsidiary Issuers | Guarantor Subsidiaries | Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and cash equivalents | $    - | $    - | $   18,241 | $    - | $   18,241 |
| Accounts receivable | - | - | 11,095 | - | 11,095 |
| Prepaid expenses and other current assets | - | - | 453 | - | 453 |
| Restricted cash | - | 7,923 | - | - | 7,923 |
| Total Current Assets | - | 7,923 | 29,789 | - | 37,712 |
| Receivables due from affiliates, net | - | 247,683 | - | (247,683) | - |
| Deferred financing costs, net | - | 9,113 | 3,142 | - | 12,255 |
| Investment in affiliates | 89,651 | 108,991 | - | (198,642) | - |
| Other assets | - | - | 3,573 | - | 3,573 |
| Vessels and equipment, net | - | - | 692,178 | - | 692,178 |
| Total Assets | $   89,651 | $  373,710 | $  728,682 | $  (446,325) | $  745,718 |
| | | | | | |
| **Liabilities and Members' Equity** | | | | | |
| Accrued expenses and other liabilities | $    - | $    1,164 | $    5,221 | $    - | $    6,385 |
| Accrued interest | - | 4,869 | - | - | 4,869 |
| Payable due USS Entities | - | - | 320 | - | 320 |
| Unearned revenue | - | - | 4,508 | - | 4,508 |
| Total Current Liabilities | - | 6,033 | 10,049 | - | 16,082 |
| Payables due to affiliates, net | - | - | 247,683 | (247,683) | - |
| Long-term debt | - | 278,026 | 361,959 | - | 639,985 |
| Total Liabilities | - | 284,059 | 619,691 | (247,683) | 656,067 |
| | | | | | |
| **Members' Equity** | 89,651 | 89,651 | 108,991 | (198,642) | 89,651 |
| Total Liabilities and Members' Equity | $   89,651 | $  373,710 | $  728,682 | $  (446,325) | $  745,718 |

18

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

**Consolidating Statement of Operations**
**For the Year Ended December 31, 2011**

| | Parent (Guarantor) | Subsidiary Issuers | Guarantor Subsidiaries | Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| **Revenues** | $    - | $    - | $   106,282 | $    - | $   106,282 |
| **Expenses:** | | | | | |
| Vessel operating expenses | - | - | 34,306 | - | 34,306 |
| General and administrative expenses | - | 2,072 | 174 | - | 2,246 |
| Depreciation and amortization | - | 56 | 23,693 | - | 23,749 |
| Management fees | - | - | 2,969 | - | 2,969 |
| Total Expenses | - | 2,128 | 61,142 | - | 63,270 |
| **Operating (loss) income** | - | (2,128) | 45,140 | - | 43,012 |
| **Other income (expense):** | | | | | |
| Interest income | - | 4 | 3 | - | 7 |
| Interest expense | - | (30,784) | (44,926) | - | (75,710) |
| Debt extinguishment expense | - | (2,220) | - | - | (2,220) |
| Equity in (losses) income of subsidiaries | (35,629) | (501) | - | 36,130 | - |
| Derivative losses | - | - | (718) | - | (718) |
| **Net (loss) income** | $   (35,629) | $   (35,629) | $   (501) | $   36,130 | $   (35,629) |

**Consolidating Statement of Operations**
**For the Year Ended December 31, 2010**

| | Parent (Guarantor) | Subsidiary Issuers | Guarantor Subsidiaries | Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| **Revenues** | $    - | $    - | $   63,600 | $    - | $   63,600 |
| **Expenses:** | | | | | |
| Vessel operating expenses | - | - | 24,771 | - | 24,771 |
| General and administrative expenses | - | 694 | 1,364 | - | 2,058 |
| Depreciation | - | - | 17,302 | - | 17,302 |
| Management fees | - | - | 2,489 | - | 2,489 |
| Total Expenses | - | 694 | 45,926 | - | 46,620 |
| **Operating (loss) income** | - | (694) | 17,674 | - | 16,980 |
| **Other income (expense):** | | | | | |
| Interest income | - | 123 | 2 | - | 125 |
| Interest expense | - | (18,769) | (31,543) | - | (50,312) |
| Debt extinguishment expense | - | - | (7,640) | - | (7,640) |
| Equity in losses of subsidiaries | (42,408) | (23,068) | - | 65,476 | - |
| Derivative losses | - | - | (1,561) | - | (1,561) |
| **Net loss** | $   (42,408) | $   (42,408) | $   (21,068) | $   65,476 | $   (42,408) |

19

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

| | Parent (Guarantor) | Subsidiary Issuers | Guarantor Subsidiaries | Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| **Consolidating Statement of Operations** | | | | | |
| **For the Year Ended December 31, 2009** | | | | | |
| **Revenues** | $        - | $        - | $   28,867 | $        - | $   28,867 |
| **Expenses:** | | | | | |
| Vessel operating expenses | - | - | 11,917 | - | 11,917 |
| General and administrative expenses | - | - | 1,063 | - | 1,063 |
| Depreciation | - | - | 8,398 | - | 8,398 |
| Management fees | - | - | 2,740 | - | 2,740 |
| Settlement fees and related legal expense | - | - | 17,901 | - | 17,901 |
| Total Expenses | - | - | 42,019 | - | 42,019 |
| **Operating loss** | - | - | (13,152) | - | (13,152) |
| **Other income (expense):** | | | | | |
| Interest income | - | - | 15 | - | 15 |
| Interest expense | - | - | (8,639) | - | (8,639) |
| Derivative gains | - | - | 1,751 | - | 1,751 |
| **Net loss** | $        - | $        - | $  (20,025) | $        - | $  (20,025) |

20

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

**Consolidating Statement of Cash Flows**
**For the Year Ended December 31, 2011**

| | Parent (Guarantor) | Subsidiary Issuers | Guarantor Subsidiaries | Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES:** | | | | | |
| Net loss | $ (35,629) | $ (35,629) | $ (501) | $ 36,130 | $ (35,629) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | | | |
| Straight-line charter revenues | - | - | (216) | - | (216) |
| Depreciation and amortization | - | 56 | 23,693 | - | 23,749 |
| Amortization of deferred financing costs | - | 1,944 | 588 | - | 2,532 |
| Amortization of discount on notes issued | - | 1,495 | - | - | 1,495 |
| Equity in losses (income) of subsidiaries | 35,629 | 501 | - | (36,130) | - |
| Debt prepayment penalty fees | - | 810 | - | - | 810 |
| Write-off of deferred financing costs | - | 787 | - | - | 787 |
| Write-off of discount on notes issued | - | 623 | - | - | 623 |
| Derivative losses | - | - | 718 | - | 718 |
| Interest paid-in-kind | - | - | 44,038 | - | 44,038 |
| Changes in current assets and liabilities: | | | | | |
| Accounts receivables | - | - | 1,275 | - | 1,275 |
| Prepaid expenses and other current assets | - | (35) | (2,585) | - | (2,620) |
| Accrued expenses and other liabilities | - | (608) | (1,821) | - | (2,199) |
| Payable due USS Entities | - | - | (70) | - | (70) |
| Unearned revenue | - | - | 121 | - | 121 |
| Change in receivables due from/payables due to affiliates, net | - | 24,130 | (24,130) | - | - |
| Net cash (used in) provided by operating activities | - | (5,926) | 41,340 | - | 35,414 |
| | | | | | |
| **INVESTING ACTIVITIES:** | | | | | |
| Vessel and equipment additions | - | - | (1,006) | - | (1,006) |
| Software additions | - | (252) | - | - | (252) |
| Withdrawals of restricted cash | - | 7,923 | - | - | 7,923 |
| Net cash provided by (used in) investing activities | - | 7,671 | (1,006) | - | 6,665 |
| | | | | | |
| **FINANCING ACTIVITIES:** | | | | | |
| Receipts from (payments to) affiliates | - | 27,810 | (27,810) | - | - |
| Payment on long-term debt | - | (27,000) | - | - | (27,000) |
| Debt prepayment penalty fees | - | (810) | - | - | (810) |
| Payment of debt issuance costs | - | (1,108) | - | - | (1,108) |
| Net cash used in financing activities | - | (1,108) | (27,810) | - | (28,918) |
| | | | | | |
| Net increase in cash and cash equivalents | - | 637 | 12,524 | - | 13,161 |
| Cash and cash equivalents at beginning of year | - | - | 18,241 | - | 18,241 |
| Cash and cash equivalents at end of year | $ - | $ 637 | $ 34,765 | $ - | $ 31,402 |

21

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

**Consolidating Statement of Cash Flows**

**For the Year Ended December 31, 2010**

| | Parent (Guarantor) | Subsidiary Issuers | Guarantor Subsidiaries | Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES:** | | | | | |
| Net loss | $ (42,408) | $ (42,408) | $ (23,068) | $ 65,476 | $ (42,408) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | | | | |
| Straight-line charter revenues | - | - | (1,148) | - | (1,148) |
| Depreciation and amortization | - | - | 17,302 | - | 17,302 |
| Amortization of deferred financing costs | - | 1,261 | 1,752 | - | 3,013 |
| Amortization of discount on notes issued | - | 997 | - | - | 997 |
| Equity in losses of subsidiaries | 42,408 | 23,068 | - | (65,476) | - |
| Debt prepayment penalty fees | - | - | 2,814 | - | 2,814 |
| Write-off of deferred financing costs | - | - | 4,826 | - | 4,826 |
| Write-off of discount on notes issued | - | - | - | - | - |
| Derivative losses | - | - | 1,561 | - | 1,561 |
| Interest paid-in-kind | - | - | 32,279 | - | 32,279 |
| Changes in current assets and liabilities: | | | | | |
| Accounts receivables | - | - | (6,578) | - | (6,578) |
| Prepaid expenses and other current assets | - | - | (47) | - | (47) |
| Accrued expenses and other liabilities | - | 5,550 | (774) | - | 4,776 |
| Payable due USS Entities | - | - | (166) | - | (166) |
| Unearned revenue | - | - | 1,217 | - | 1,217 |
| Change in receivables due from/payables due to affiliates, net | - | 11,898 | (11,898) | - | - |
| Net cash provided by operating activities | - | 366 | 18,072 | - | 18,438 |
| | | | | | |
| **INVESTING ACTIVITIES:** | | | | | |
| (Payments to) receipts from affiliates for construction payment | - | (162,100) | 162,100 | - | - |
| Vessel additions | - | - | (170,387) | - | (170,387) |
| Change in restricted cash | - | (7,923) | 2,800 | - | (5,123) |
| Net cash used in investing activities | - | (170,023) | (5,487) | - | (175,510) |
| | | | | | |
| **FINANCING ACTIVITIES:** | | | | | |
| Proceeds from the issuance of debt | - | 277,029 | - | - | 277,029 |
| (Payments to) receipts from affiliates | - | (97,481) | 97,481 | - | - |
| Payment on long-term debt | - | - | (96,904) | - | (96,904) |
| Debt prepayment penalty fees | - | - | (2,814) | - | (2,814) |
| Payment of debt issuance costs | - | (9,891) | - | - | (9,891) |
| Net cash provided by (used in) financing activities | - | 169,657 | (2,237) | - | 167,420 |
| | | | | | |
| Net increase in cash and cash equivalents | - | - | 10,348 | - | 10,348 |
| Cash and cash equivalents at beginning of year | - | - | 7,893 | - | 7,893 |
| Cash and cash equivalents at end of year | $ - | $ - | $ 18,241 | $ - | $ 18,241 |

22

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

**Consolidating Statement of Cash Flows**

**For the Year Ended December 31, 2009**

| | Parent (Guarantor) | Subsidiary Issuers | Guarantor Subsidiaries | Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES:** | | | | | |
| Net loss | $         - | $         - | $   (20,025) | $         - | $   (20,025) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | | |
| Straight-line charter revenues | - | - | (1,460) | - | (1,460) |
| Depreciation and amortization | - | - | 8,398 | - | 8,398 |
| Amortization of deferred financing costs | - | - | 2,977 | - | 2,977 |
| Derivative gains | - | - | (1,751) | - | (1,751) |
| Interest paid-in-kind | - | - | 8,431 | - | 8,431 |
| Changes in current assets and liabilities: | | | | | |
| Accounts receivables | - | - | (4,517) | - | (4,517) |
| Prepaid expenses and other current assets | - | - | (227) | - | (227) |
| Accrued expenses and other liabilities | - | - | 3,650 | - | 3,650 |
| Payable due USS Entities | - | - | (426) | - | (426) |
| Unearned revenue | - | - | 3,291 | - | 3,291 |
| Net cash used in operating activities | - | - | (1,659) | - | (1,659) |
| | | | | | |
| **INVESTING ACTIVITIES:** | | | | | |
| Vessel and equipment | - | - | (223,309) | - | (223,309) |
| Deposits of restricted cash | - | - | (2,800) | - | (2,800) |
| Net cash used in investing activities | - | - | (226,109) | - | (226,109) |
| | | | | | |
| **FINANCING ACTIVITIES:** | | | | | |
| Proceeds from the issuance of debt | - | - | 100,000 | - | 100,000 |
| Proceeds from revolver borrowings | - | - | 144,528 | - | 144,528 |
| Payment on long-term debt | - | - | (3,096) | - | (3,096) |
| Payment of debt issuance costs | - | - | (5,787) | - | (5,787) |
| Net cash provided by financing activities | - | - | 235,645 | - | 235,645 |
| | | | | | |
| Net increase in cash and cash equivalents | - | - | 7,877 | - | 7,877 |
| Cash and cash equivalents at beginning of year | - | - | 16 | - | 16 |
| Cash and cash equivalents at end of year | $         - | $         - | $     7,893 | $         - | $     7,893 |

23

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

*Note 17 – Subsequent Events*

The Company evaluated events and transactions that occurred during the period from December 31, 2011, the date of the balance sheet, through March [30], 2011, the date of issuance of the consolidated financial statements, and identified the following events or transactions that should be disclosed:

TBD



24

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

2

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

1

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
### THE SECURITIES EXCHANGE ACT OF 1934
#### Year ended December 31, 2011

# AMERICAN PETROLEUM TANKERS PARENT LLC

**600 W. Germantown Pike, Suite 400**
**Plymouth Meeting, PA 19462**
**Registrant's Telephone number: (610) 940-1677**

**Commission File Number 333-171331**

| | |
|---|---|
| **Delaware** | **90-0587372** |
| (State of Incorporation) | (I.R.S. Employer Identification No.) |

**Securities Registered Pursuant to Section 12(b) of the Act: None**

**Securities Registered Pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act:

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☒ | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The aggregate market value of American Petroleum Tankers Parent LLC membership interest held by non-affiliates was $0 as of December 31, 2011.

### DOCUMENTS INCORPORATED BY REFERENCE—None

**AMERICAN PETROLEUM TANKERS PARENT LLC**

**FORM 10-K**

**TABLE OF CONTENTS**

<u>Item Number</u>                                                                                                          <u>Page Number</u>

**PART I**

| 1. | Business | 1 |
| 1A. | Risk Factors | 12 |
| 1B. | Unresolved Staff Comments | 22 |
| 2. | Properties | 22 |
| 3. | Legal Proceedings | 22 |
| 4. | Mine Safety Disclosures | 22 |

**PART II**

| 5. | Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 23 |
| 6. | Selected Financial Data | 23 |
| 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| 7A. | Quantitative and Qualitative Disclosures about Market Risk | 31 |
| 8. | Financial Statements and Supplementary Data | 32 |
| 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 56 |
| 9A. | Controls and Procedures | 56 |
| 9B. | Other Information | 56 |

**PART III**

| 10. | Directors, Executive Officers and Corporate Governance | 57 |
| 11. | Executive Compensation | 58 |
| 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 61 |
| 13. | Certain Relationships and Related Transactions, and Director Independence | 63 |
| 14. | Principal Accounting Fees and Services | 63 |

**PART IV**

| 15. | Exhibits and Financial Statement Schedules | 63 |
| | Signatures | 67 |

References in this annual report to "American Petroleum Tankers," "APT," "we," "our," "us," and the "Company" refer to American Petroleum Tankers Parent LLC's parent holding company, American Petroleum Tankers Holding LLC and its subsidiaries collectively, unless otherwise indicated by the context.

**FORWARD-LOOKING STATEMENTS**

This annual report contains "forward-looking statements." All statements other than statements of historical fact are "forward-looking statements" for purposes of federal and state securities laws. Forward-looking statements may include the words "may," "plans," "estimates," "anticipates," "believes," "expects," "intends" and similar expressions. Although we believe that these statements are based on reasonable assumptions, they are subject to numerous factors, risks and uncertainties that could cause actual outcomes and results to be materially different from those projected or assumed in our forward-looking statements. These factors, risks and uncertainties include, among others, the following:

- our substantial level of indebtedness;

- general economic and business conditions in the United States;

- our dependence on a limited number of customers;

- our limited operating history;

- capital expenditures required to maintain the operating capacity of our fleet;

- competitive pressures and trends;

- fluctuations in shipping volume; and

- modifications to or repeal of the Jones Act or Oil Pollution Act of 1990 ("OPA 90").

These forward-looking statements involve a number of risks and uncertainties that could cause actual results to differ materially from those suggested by the forward-looking statements. Forward-looking statements should, therefore, be considered in light of various factors, including those set forth in this annual report under "Risk Factors". In light of such risks and uncertainties, we caution you not to place undue reliance on these forward-looking statements. We do not undertake any obligation to publicly release any revisions to these forward looking statements to reflect events or circumstances after the date of this annual report or to reflect the occurrence of unanticipated events.

i

# PART I

**ITEM 1.    BUSINESS**

**General**

We are a U.S. based, provider of Jones Act marine transportation services for refined petroleum products in the U.S. domestic "coastwise" trade. Our fleet consists of five modern, double-hulled product tankers. Our fleet of five vessels has a total capacity of approximately 245,000 dwt. The Merchant Marine Act of 1920 (commonly referred to as the "Jones Act") restricts marine cargo transportation between points in the United States only to vessels documented under the U.S. flag, built in the United states, at least 75% owned by U.S. citizens (or owned by other entities meeting U.S. citizenship requirements to own vessels operating in the U.S. coastwise trade) and manned by U.S. crews.

Our current customers are BP West Coast Products LLC ("BP"), an affiliate of Chevron Corporation ("Chevron"), an affiliate of Marathon Oil Corporation ("Marathon"), and the Military Sealift Command department of the U.S. Navy ("MSC"). Three of our vessels are on time charters that range from up to three years under an evergreen type arrangement (which may be terminated at any time upon 90 days notice) to seven years. Our other two vessels are contracted to MSC for one year with four approximately one-year renewal options. However, we believe it is likely that MSC will exercise its renewal options, although there can be no assurance that they will do so.

In 2011, MSC exercised its first one-year renewal option for both the *Evergreen State* and *Empire State*. The *Pelican State* will be chartered to Shell Trading (U.S.) Company ("Shell") upon the expiration of the initial charter term with Marathon. The charter with Shell is for an initial period of three years commencing on the date of delivery of the *Pelican State* to Shell. Shell may, at its option, extend the charter for an additional two one-year periods.

**Our Manager**

Operationally, we retain all strategic and commercial management of our vessels, while the technical management of the vessels is outsourced to certain affiliates of Crowley Maritime Corporation ("Crowley" or our "Manager"). Crowley's technical management services include crewing, maintenance and repair, purchasing, insurance and claims administration, and security as well as certain accounting and reporting services. Founded in 1892, Crowley is one of the oldest maritime transportation companies in the U.S., employing approximately 5,100 employees across 80 office locations. We benefit from Crowley's operational expertise, purchasing power and relationships with vendors, suppliers and major labor organizations which are key to providing skilled and experienced crews. As of June 2011, the non-vessel accounting and GAAP reporting responsibilities were transitioned from Crowley to our staff.

Our Manager provides us with substantially all of our technical and administrative services necessary to support our business. These services are provided under the following agreements:

- the Amended and Restated Management and Construction Supervision Agreement, among Crowley Technical Management, Inc., Crowley Holdings, Inc., American Petroleum Tankers LLC, APT Parent LLC ("APT Parent") and APT Holding LLC ("Holding") "Crowley Management Agreement"; however; no services have been provided by Crowley under the Crowley Management Agreement since June 2011 and we no longer pay our Manager a fee pursuant to this agreement);

- the BIMCO / Shipman Agreement, dated July 28, 2009, between JV Tanker Charterer LLC and Intrepid Ship Management, Inc., an affiliate of Crowley ("Intrepid") (the "JV Tanker Agreement");

- the BIMCO / Shipman Agreement, dated July 28, 2009, between PI 2 Pelican State LLC and Intrepid (the "PI 2 Agreement");

- the BIMCO / Shipman Agreement, dated November 3, 2009, between APT Sunshine State LLC and Intrepid (the "Sunshine Agreement");

- the BIMCO / Shipman Agreement, dated June 13, 2010, between American Petroleum Tankers LLC and Intrepid (the "Empire Agreement"); and

- the BIMCO / Shipman Agreement, dated November 7, 2010, between American Petroleum Tankers LLC and Intrepid (the "Evergreen Agreement," together with the JV Tanker Agreement, the PI 2 Agreement, the Sunshine Agreement and the Empire Agreement, the "BIMCO Agreements," and together with the Crowley Management Agreement, the "Management Agreements").

Summaries of the Management Agreements are included below.

1

*Services*

Under the Management Agreements, our Manager is responsible for providing us with certain management services, including the following:

- technical services, which include:
    - vessel maintenance;
    - ensuring regulatory and classification society compliance;
    - crewing;
    - insurance;
    - purchasing; and
    - shipyard supervision, and
- administrative services, which include:
    - bookkeeping and accounting services.

Our Manager is required to use its best efforts to provide these services upon our request in a commercially reasonable manner and may provide these services directly to us or subcontract for certain of these services with other entities. However, our Manager will remain responsible for any subcontracted services. We are required to indemnify our Manager for losses it incurs in connection with providing these services, excluding losses caused by the gross negligence or willful default of our Manager or its employees, agents or sub-contractors; however, our Manager is not responsible for losses that are the result of any actions of the crew of each of the vessels, except to the extent such losses result from our Manager's failure to discharge their obligations under the BIMCO Agreements.

*Term and Termination Rights*

Subject to the termination rights described below, the Crowley Management Agreement, the JV Tanker Agreement and the PI 2 Agreement will each expire on July 28, 2014, the Sunshine Agreement will expire on November 3, 2014, the Empire Agreement will expire on June 13, 2015 and the Evergreen Agreement will expire on November 7, 2015.

We may terminate a BIMCO Agreement under any of the following circumstances:

- at our option upon 90 days' notice by us to our Manager;
- if our Manager experiences certain bankruptcy or insolvency events;
- if any of the following defaults occur and either cannot be or are not remedied within 30 days of our delivery of notice:
    - our Manager fails to meet its material obligations that are within our Manager's control;
    - any action is commenced against all or a substantial part of our Manager's assets that results in the entry of an order for relief and such order is not vacated within 60 days;
    - our Manager becomes insolvent;
    - any potential charterer refuses to charter a vessel on the basis that the vessel is managed by our Manager or otherwise requires a bareboat charter;
    - a default by our Manager under the Crowley Management Agreement;
    - our Manager defaults under a debt or finance agreement or any indebtedness is not paid when due or, in the case of sums payable on demand, when first demanded; or
    - our Manager breaches any warranty or covenant in any of the BIMCO Agreements.

Our Manager may terminate a BIMCO Agreement under any of the following circumstances:

- if we fail to fulfill any payment obligations to our Manager within ten days of receiving written notice by our Manager of such non-payment or if the applicable vessel is repossessed; or

2

- upon our Manager giving written notice to us of our default under either of the following and we fail to cure such default in a reasonable amount of time:

  - we fail to procure that all officers and ratings supplied by us satisfy certain specified technical requirements and fail to instruct such officers and ratings to obey all reasonable orders of our Manager; or

  - we fail to procure that the relevant vessel is in compliance with the law of the vessel's flag.

The applicable BIMCO Agreement automatically terminates in the event of (i) the sale of the vessel covered by that agreement, (ii) the vessel becomes a total loss, (iii) the vessel is declared as a constructive or compromised or arranged total loss, or (iv) the vessel is requisitioned. Further, we may terminate the Crowley Management Agreement at our option upon 90 days' notice to our Manager.

### Compensation of our Manager

In return for providing us services under Management Agreements, we pay our Manager a management fee based on the following components:

*Administrative Fee.* We pay a fee to our Manager for administrative services it provides to us of $500,000 per annum, payable on a monthly basis, in arrears until the expiration of the Crowley Management Agreement. We ceased paying our Manager an administrative fee as of June 30, 2011 when the Company assumed the responsibility for all internal financial and SEC reporting.

*Construction Oversight Fee.* We paid a construction oversight fee of $250,000 per annum, payable on a monthly basis, in arrears. We ceased paying our Manager a construction oversight fee as of December 7, 2010 when our last new build vessel was delivered.

*Reimbursable Expenses.* We are obligated to advance funds to our Manager on a monthly basis for reimbursable expenses which are known and budgeted based on our periodic budget. We are also obligated to reimburse our Manager for non-budgeted expenses provided our Manager provides written documentation in its written request for payment. Reimbursable expenses are out-of-pocket expenses incurred by our Manager and include, but are not limited to:

- reasonable out-of-pocket travel, subsistence, and accommodation expenses of our Manager's employees and/or agents incurred in performing our Manager's services;

- reasonable fees and expenses of third party experts, engaged by our Manager to attend any vessel while under construction, subject to our prior written consent;

- emergency non-budgeted expenses in relation to construction of the vessels;

- reasonable fees and expenses of external counsel engaged by our Manager on our behalf;

- costs for insurance premiums.

*BIMCO Agreements Fees.* In return for the provision of services under the BIMCO Agreements, we pay our Manager a management fee under each agreement of $1,425 per day, with a 3% escalation per year upon each annual anniversary, payable on a monthly basis in advance.

*BIMCO Agreements Expenses.* We are obligated to reimburse our Manager for postage and communication expenses, traveling expenses and other out-of-pocket expenses incurred by our Manager in providing services.

## Our Fleet and Charterers

Our fleet consists of five 49,000 dwt product tankers, three of which are currently operating in the U.S. Jones Act coastwise trades and two of which operate worldwide, depending on the needs of MSC. While our vessels currently only carry refined petroleum products they are capable of transporting crude oil and various chemicals as well.

*Golden State*, delivered in January 2009, is on time charter with BP, trading on the U.S. West Coast; *Pelican State*, delivered in June 2009, is on time charter with Marathon, trading on the U.S. Gulf Coast; and *Sunshine State*, delivered in December 2009, is on time charter with Chevron, trading on the U.S. Gulf Coast. Our final two vessels, *Empire State* and *Evergreen State*, delivered in July 2010 and December 2010, respectively, are in service with MSC.

3

While the MSC charters are contracted on a fixed basis of one year and four approximately one-year renewal options, we expect these vessels to remain on charter for the approximate five-year period. Our expectation is based on both historical chartering precedent for the four T-5 vessels previously chartered to or operated for MSC and MSC's methodology for evaluating competitive RFPs. MSC stated in its RFP, the bids were evaluated using "the net present value of charter hire rates offered for the entire charter period (base period plus options)." Further supporting this view, the day rates in the first-year of our charters with MSC are on average 25% higher than the day rates for our first-option years. We utilized this declining rate structure with a material premium in the first year to incentivize MSC to exercise each of their one-year renewal options. In addition, to better meet MSC's unique requirements, our two vessels have been enhanced with the following features: the addition of four fueling-at-sea stations, an enlarged and isolated radio room, a decontamination station, a small arms locker, machine gun mounting pads for *Evergreen State* and additional crew accommodations. In December 2011 we entered into an amendment that requires MSC to pay APT cancellation costs if MSC fails to exercise the second, third or fourth option periods or terminates for convenience during any such option period. The amendment also provides that MSC will pay APT a decreased charter hire during the second, third and fourth option periods. APT believes this will give further incentive to MSC to exercise each of the remaining MSC Charter option periods. However, we cannot assure you that MSC will continue to exercise such renewal options.

| Vessel Name | Deadweight Tonnage | Date Delivered (1) | Charterer | Initial Charter Term(2) | Renewal Options (3) | Revenue Generated During Fiscal Year Ended December 31, 2011 (in thousands) | Approximate Percentage Revenue During Fiscal Year Ended December 31, 2011 |
|---|---|---|---|---|---|---|---|
| *Golden State* | 49,000 | Jan-09 | BP | 7 years | 3 one-year options | $ 20,495 | 19% |
| *Pelican State* | 49,000 | Jun-09 | Marathon | 3 years | 2 two-year options(4) | $ 19,852 | 19% |
| *Sunshine State* | 49,000 | Dec-09 | Chevron | 9 months | 1 three month option 4 six-month options | $ 13,505 | 13% |
| *Empire State* | 49,000 | Jul-10 | MSC | 1 year | 3 one-year options; 1 eleven-month option | $ 25,505 | 24% |
| *Evergreen State* | 49,000 | Dec-10 | MSC | 1 year | 3 one-year options; 1 eleven-month option | $ 26,925 | 25% |

(1)  Date of delivery to APT after completion of construction of the vessel.
(2)  Measured from the date of delivery to charterer.
(3)  The *Golden State* and *Pelican State* are currently in their initial charter terms; the *Sunshine State* is currently in the third of its 4 six-month option periods; and the *Empire State* and *Evergreen State* are currently in the first of their 3 one-year option periods.
(4)  Upon the expiration of the initial charter term, the *Pelican State* will be chartered to Shell for an initial period of three years commencing on the date the *Pelican State* is delivered to Shell.

## Key trade routes

Two of our vessels operate worldwide, depending on the needs of MSC. Our remaining three vessels transport refined petroleum products in the U.S. Jones Act coastwise trades over two major trade routes:

- from refineries located on the Gulf Coast to Florida; and

- from refineries located on the Washington Coast to Northern California.

## Our Safety and Maintenance

### General

We are committed to operating our vessels in a manner that protects the safety and health of our employees, the general public and the environment. Our primary goal is to minimize the number of safety-and health-related accidents on our vessels and our property. Our primary concerns are to avoid personal injuries and to reduce occupational health hazards. We want to prevent accidents that may cause damage to our personnel, equipment or the environment, such as lost time incidents, fire, collisions, petroleum spills and groundings of our vessels. In addition, we are committed to reducing overall emissions and waste generation from each of our vessels and to the safe management of associated cargo residues and cleaning wastes.

4