**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMERICAN PETROLEUM TANKERS PARENT LLC, | ) ) | |
| | ) | |
| Plaintiff, | ) ) | Civil Action No. 1:12-CV-001165-CKK |
| v. | ) ) | Notice of Filing of Administrative Record |
| The UNITED STATES OF AMERICA, *et al.*, | ) ) ) | |
| Defendants. | ) | |

## NOTICE OF FILING OF VOLUME 22 OF THE ADMINISTRATIVE RECORD

Defendants hereby give notice that attached hereto is **Volume 22** of the redacted

Administrative Record in this action, which is being filed in 26 separate volumes.

Respectfully Submitted,

STUART F. DELERY
Acting Assistant Attorney General

RONALD C. MACHEN, JR.
United States Attorney

DIANE KELLEHER
Assistant Branch Director

*s/ Daniel Bensing*
DANIEL BENSING
Senior Counsel
(D.C. Bar No. 334268)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W. Room 6114
Washington D.C. 20530
Tel.: (202) 305-0693
Fax:  (202) 616-8460
Email:  Daniel.Bensing@USDOJ.gov

Attorneys for Defendants

CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2013 I electronically filed the foregoing Notice of Filing of Volume 22 of the Administrative Record with the Clerk of the Court by using the CM/ECF system.


/s/ *Daniel Bensing*
DANIEL BENSING

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

1

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

` CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

**Page 2**

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

Page 4

CONFIDENTIAL BUSINESS INFORMATION

Page 5

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

APT V. USA

CONFIDENTIAL BUSINESS INFORMATION

Page 2

CONFIDENTIAL BUSINESS INFORMATION

Page 3

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

Page 6

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

Page 8

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION



U.S. Department
of Transportation
**Maritime
Administration**

1200 New Jersey Avenue, S.E.
Washington, DC 20590

August 17, 2012

Robert K. Kurz
Chief Executive Officer
American Petroleum Tankers Parent LLC
345 Park Avenue, 29th floor
New York, New York 10154

Dear Mr. Kurz:

Thank you for your correspondence of August 9, 2012 in response to the Maritime
Administrator's August 1, 2012 denial of American Petroleum Tanker Parent LLC (APT or
Applicant)'s application for ship financing guarantees and your request that the Administrator
review APT's application for ship financing guarantees, as amended by your submissions
received on July 30. We have reviewed your correspondence as well as the amended application
materials, and have begun processing your amended application.

We request additional documentation and information in order to fully consider your amended
application. The following is a list of additional materials and information requested for this
purpose:

**Requested Materials and Information:**

1. Documents of indebtedness to sponsor-debt lenders, reflecting the amounts and all related
   terms of such. Please include complete documentation descriptive of APT's use of the
   sponsor-debt including amounts, identities of obligees, dates, and purposes for such
   funds.

2. Copies of the instruments that have been used or drafts of instruments that will be used to
   cancel obligations under promissory note(s) and/or other instruments of indebtedness to
   sponsor-debt lenders. Please note that if the application is approved, a notarized,
   executed copy of the Applicant's cancelled promissory note(s) and other instruments of
   indebtedness must be submitted in form acceptable to MarAd at least three weeks prior to
   closing on any approved guarantees; the terms of any Letter Commitment will be
   contingent on receipt of such instruments.

3. (a) Complete identification of new equity holders, amounts of equity interests, and
   copies of instruments reflecting such equity interests.

(b) Will the owners of the new equity interests be the same as the debt sponsors?

(c) Will their equity interests be in the same amounts as the debts?

(d) What right or optional provisions to that effect will equity holders have to remuneration or compensation of any kind as a consequence of their equity interests?

4. Copies of all documents relating to the conversion of sponsor-debt to equity interests.

5. Copies of all documents reflecting the nature and rights equity interests derived from sponsor-debt.

6. (a) Organizational structure charts reflecting the ownership and control relationships of all entities with an ownership or control interest in the refinanced vessels, the Applicant (APT Parent), and APT Holdings prior to conversion of debt to equity and after conversion of sponsor debt to equity.

(b) Copies of all instruments and agreements reflecting the ownership and control relationships or reflecting obligations among those entities after conversion of sponsor-debt to equity.

(c) Copies of corporate or LLC documents and bylaws for each new ownership entity not already provided.

(d) Copies of all instruments of all documents encumbering the assets of APT Holdings, the Applicant, and all subordinate entities.

7. (a) A narrative explanation on the effect of the proposed re-characterization of sponsor-debt as equity on ownership and control of the Applicant entity and refinanced vessels and as to what entity or entities have an ownership interest in the refinanced vessels, in what amounts, and in what proportion.

(b) If there is an anticipated change of control or management, please explain the effect of the change in the Applicant's operating ability.

8. Updated cash flow and pro forma financial statements showing the effects of the proposed change for each year of the duration of the requested loan guarantees. Charts should denote actual years, not "year 1, year 2", etc. A pro forma spreadsheet showing the changes should contain three columns indicating the audited 2011 financial statement,

APT V. USA

pro forma pre-conversion and pro forma post-conversion of debt to equity.  Please include footnotes for each pro forma amount explaining what each amount represents.

9.   An explanation regarding:

   (a) The assumptions used in the financial exhibits (including the "Financial Model") received on July 30 by MarAd, in support of APT's modified application including:

      i.   The rates used for each vessel for each year.  Currently, the numbers do not match the charter rates provided.
      ii.   Basis of post-charter utilization, *i.e.* Number of days of employment per vessel, per year, as each vessel ages.
      iii.   Anticipated post-charter spot market employment utilization and rates for each vessel per year.

   (b) The effect the proposed change in equity will have on the Applicant's financial statements;

   (c) The impact of the Deferred Compensation arrangement for the Chief Executive Officer relating to the amounts repaid under the sponsor-debt or the conversion of the sponsor-debt to equity along with the impact of such arrangement on the Applicant's financial statements.  Please provide a copy of the Deferred Compensation Agreement; and

   (d) Whether this change will result in an auditor's qualified opinion?  If so, what would be the basis of the qualification?

10. Will the Applicant continue to use derivatives?  If so, please explain in detail how the derivatives will be used and in what amounts.

11. Please provide a post-conversion, updated citizenship affidavit to be used to verify that the Applicant is still Jones Act compliant if there is a change in the ownership structure.

12. (a) Copies of all documents that purport to express a right or expectation of any and all distributions and payments by the Applicant entity to any superior or affiliated ownership entity or interest.

   (b) Documentation showing all equity interests' undertakings to provide warranties to the effect that sponsor-debt re-characterized as equity will not be pledged, encumbered, or made subject to indebtedness of any kind for the duration of the loan guarantees.

3

Violation of the warranties will constitute default of obligations under the security agreement.

(c) Documentation showing an undertaking by the ultimate ownership interests' to guarantee the debt.

Please respond to these requests in writing, setting forth each original numbered request immediately followed by your respective response. Please label any submitted documentation with a cover sheet listing the numbered request to which the documentation is provided. We request that your response, and any other communications with MarAd, be via our counsel at the Department of Justice.

Complete documentation and responses are requested by **August 27, 2012.** Please also submit by that date any additional documentation that you would like MarAd to review in processing your amended application. Additionally, please cause to be transferred by **August 27** a $20,000 advance on the fee for the Independent Financial Advisor's supplemental review of your amended application. The wire instructions are attached for your convenience. This fee is subject to credit for any unexpended balance and the tender of payment is necessary for consideration of the amended application. MarAd's timely completion of its review of your amended application is dependent on receipt of all documents, responses, and payments.

Thank you for your timely response to these matters.

Sincerely,

George M. Zoukee
Associate Administrator for
Business and Finance Development

4

<u>Marad Wire Transfer Instructions</u>

Receiver ABA #   -   <span style="background:black;color:white">PII</span>

Bank Name          -   Treas NYC

Account Name     -   Maritime Administration

Account Number  -   <span style="background:black;color:white">PII</span>

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

2

CONFIDENTIAL BUSINESS INFORMATION

3

CONFIDENTIAL BUSINESS INFORMATION

4

APT V. USA

CONFIDENTIAL BUSINESS INFORMATION

5

CONFIDENTIAL BUSINESS INFORMATION

6

APT V. USA

CONFIDENTIAL BUSINESS INFORMATION

7

CONFIDENTIAL BUSINESS INFORMATION

8

CONFIDENTIAL BUSINESS INFORMATION

9

CONFIDENTIAL BUSINESS INFORMATION

10

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

18

CONFIDENTIAL BUSINESS INFORMATION

19

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

APT V. USA                                                                                                    2688

CONFIDENTIAL BUSINESS INFORMATION

APT V. USA

2689

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

6

CONFIDENTIAL BUSINESS INFORMATION

DOC ID-16726420.1                              7

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

2

CONFIDENTIAL BUSINESS INFORMATION

3

CONFIDENTIAL BUSINESS INFORMATION

4

2697

CONFIDENTIAL BUSINESS INFORMATION

5

CONFIDENTIAL BUSINESS INFORMATION

6

CONFIDENTIAL BUSINESS INFORMATION

7

CONFIDENTIAL BUSINESS INFORMATION

*8*

CONFIDENTIAL BUSINESS INFORMATION

9

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

2

CONFIDENTIAL BUSINESS INFORMATION

3

CONFIDENTIAL BUSINESS INFORMATION

4

CONFIDENTIAL BUSINESS INFORMATION

5

CONFIDENTIAL BUSINESS INFORMATION

6

CONFIDENTIAL BUSINESS INFORMATION

7

CONFIDENTIAL BUSINESS INFORMATION

8

CONFIDENTIAL BUSINESS INFORMATION

9

CONFIDENTIAL BUSINESS INFORMATION

10

CONFIDENTIAL BUSINESS INFORMATION

11

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

2

CONFIDENTIAL BUSINESS INFORMATION

3

CONFIDENTIAL BUSINESS INFORMATION

4

CONFIDENTIAL BUSINESS INFORMATION

5

CONFIDENTIAL BUSINESS INFORMATION

6

CONFIDENTIAL BUSINESS INFORMATION

a.

7

CONFIDENTIAL BUSINESS INFORMATION

8

CONFIDENTIAL BUSINESS INFORMATION

9

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

2

CONFIDENTIAL BUSINESS INFORMATION

3

CONFIDENTIAL BUSINESS INFORMATION

4

CONFIDENTIAL BUSINESS INFORMATION

5

CONFIDENTIAL BUSINESS INFORMATION

6

CONFIDENTIAL BUSINESS INFORMATION

7

CONFIDENTIAL BUSINESS INFORMATION

8

CONFIDENTIAL BUSINESS INFORMATION

9

CONFIDENTIAL BUSINESS INFORMATION

10

CONFIDENTIAL BUSINESS INFORMATION

11

CONFIDENTIAL BUSINESS INFORMATION

12

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

NY1 1023827v22

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

7

NY1 1023827v22

2748

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

24

NYI 1023827v22

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

38

NY1 1023827v22

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

19107288 v16

CONFIDENTIAL BUSINESS INFORMATION

20

CONFIDENTIAL BUSINESS INFORMATION

21

CONFIDENTIAL BUSINESS INFORMATION

25

CONFIDENTIAL BUSINESS INFORMATION

27

CONFIDENTIAL BUSINESS INFORMATION

28

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

38

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure
Pursuant to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

Co
Exe
to 5

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

Confidential Business Information
Exempt from FOIA Disclosure
Pursuant to 5 U.S.C. 552(b)(4)

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

2

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

· CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

2

CONFIDENTIAL BUSINESS INFORMATION

3

CONFIDENTIAL BUSINESS INFORMATION

4

CONFIDENTIAL BUSINESS INFORMATION

5

CONFIDENTIAL BUSINESS INFORMATION

6

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

8

CONFIDENTIAL BUSINESS INFORMATION

9

CONFIDENTIAL BUSINESS INFORMATION

10

CONFIDENTIAL BUSINESS INFORMATION

11

CONFIDENTIAL BUSINESS INFORMATION

12

CONFIDENTIAL BUSINESS INFORMATION

13

CONFIDENTIAL BUSINESS INFORMATION

14

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

2

CONFIDENTIAL BUSINESS INFORMATION

3

CONFIDENTIAL BUSINESS INFORMATION

4

CONFIDENTIAL BUSINESS INFORMATION

5

CONFIDENTIAL BUSINESS INFORMATION

6

CONFIDENTIAL BUSINESS INFORMATION

7

CONFIDENTIAL BUSINESS INFORMATION

8

CONFIDENTIAL BUSINESS INFORMATION

9

CONFIDENTIAL BUSINESS INFORMATION

10

CONFIDENTIAL BUSINESS INFORMATION

11

CONFIDENTIAL BUSINESS INFORMATION

12

CONFIDENTIAL BUSINESS INFORMATION

13

CONFIDENTIAL BUSINESS INFORMATION

14

CONFIDENTIAL BUSINESS INFORMATION

**Credit Council Guidelines for the Use of Advisors External to the Department
for Title XI Applications**

A March 27, 2003, Audit Report on the Title XI Loan Guarantee Program by the DOT Inspector General stated that the Title XI "loan review process would benefit from the use of additional external review using contract resources, especially for applications involving large loan amounts, requiring modifications to the approval criteria, or involving complex, novel, or new technologies." In response to the March 27th Audit Report, MARAD implemented a requirement that all new and pending Title XI applications would undergo a review by an advisor external to the Department. Subsequently, in conference report language for the 2004 DOD Authorization Act (attached), Congress directed that MARAD should not hire external advisors for all Title XI applications.

In light of the conference report language, guidelines are needed for the use of advisors external to the Department to review Title XI applications. The Credit Council believes that the need for advisors external to the Department for the Title XI program generally falls into one of two groupings:

Applications that require review by an advisor external to the Department. An external advisor will be used when at least one of the following four criteria are met: (1) the applicant has less than five years operating experience, (2) the service will be in a new market and/or service area, (3) the project involves unproven technology, or (4) approval of the project would necessitate a modification to standard Title XI qualifying financial requirements that would increase risk to the Government.

Applications where the need for review by an advisor external to the Department is a matter of judgment. An external advisor may be used to review Title XI applications meeting at least one of the following five criteria: (1) the applicant or any corporate affiliate has previously defaulted on Title XI or non-Title XI debt, (2) the company's financial condition has not been stable during the past three years, (3) a non-conventional financial and /or ownership structure is proposed, (4) the requested Title XI financing is in excess of $100 million, or (5) approval of the application will result in more than 20 percent of the Title XI debt concentrated with one borrower.

The Credit Council places the primary responsibility for determining the need for review by an external advisor with the Title XI program manager and the Departmental financial advisor assigned to the project. For those projects determined not to require an external advisor, documentation of the rationale should be included in the project file. As recognized by the conference report language, it may be that only certain aspects of an application require external review as opposed to the entire application.

On a case-by-case basis, the determination of the use of an external advisor may take into account additional factors, such as the qualifications of the company's management, the percent of a company's debt that is Title XI guaranteed, or the concentration of the Title XI portfolio in a particular market or service area. If there are any questions as to whether an advisor external to the Department should or should not be retained, guidance should be sought in writing from the Credit Council Chair.

Approved by DOT Credit Council
May 25, 2005

Subject:     American Petroleum Tankers

From:        Harry Haskins
             Associate Administrator for Business and Finance Development

To:          David T. Matsuda
             Maritime Administrator

APT has applied for Title XI loan guarantees in the approximate amount of $470 million for mortgage period financing of five tankers. All five have been delivered. The first three are on commercial charters to BP, Marathon and Chevron. The last two are on charters to the MSC. The Title XI application was filed on September 1, 2010 and is essentially complete with the exception of the IFA review.

APT has asked that we make a request to the Credit Council for approval to engage the IFA. The request to contract for an IFA has not yet been made to the Credit Council. Credit Council policy is to not approve any requests for an IFA if the requesting Agency believes it is unlikely the application will be approved for any reason. ▋Deliberative Process▋

▋

1.  Title XI currently has approximately $76.6 million in appropriated funds available for commitments to pending applications. We currently have five pending applications including the APT application. The four other applications are further along in processing than the APT application. The IFA contracts for all four have been awarded. ▋Confidential Business Information▋
    ▋ The pending applications are listed below:

| Applicant | Title XI | Projected Subsidy |
|---|---|---|
| OSG ATBs<br>Boldini<br>VMS (Crowley)<br>OSG Tankers | ▋Confidential Business Information▋ | |
| Total<br>Appropriation<br>Shortfall | $1,032M | $81.29M<br>$76.60M<br>($4.68M) |
| APT | $470M | $28.00M |
| Total Shortfall | | ($32.68M) |

**Deliberative Process**

▋

**Deliberative Process**

2. Deliberative Process

Deliberative Process , APT has asked that the request be made to the Credit Council. APT says they understand the policy and will provide us written assurances that they recognize the risk of proceeding. APT believes their application merits approval and, frankly, priority in processing. In addition to the merits of their application, APT believes the application merits priority due to the military usefulness of the vessels. Also, one of the pending application is for an export transaction (Boldini) and, by law, their application should have priority over that application.

**Deliberative Process**

APT is looking for an answer to their request. Deliberative Process

**Goodman, Tim (OST)**

| | |
|---|---|
| **From:** | Bouril, Michael (OST) |
| **Sent:** | Friday, January 18, 2013 2:21 PM |
| **To:** | Goodman, Tim (OST) |
| **Subject:** | FW: Credit Council Vote - hiring an IFA for the Title XI application from American Petroleum Tankers |
| **Attachments:** | APT IFA request.docx |

Michael Bouril
Office of Budget and Program Performance
Office of the Secretary of Transportation
1200 New Jersey Avenue, SE
W95-119
Washington, DC  20590
(202) 366-4587
(202) 366-9654 fax

---

**From:** Bouril, Michael (OST)
**Sent:** Friday, September 23, 2011 1:01 PM
**To:** Bertram, Chris (OST); DeBoer, Joan (OST); Kienitz, Roy (OST); Matsuda, David (MARAD); Mendez, Victor (FHWA); Neal, Brandon (OST); Porcari, John (OST); Rivkin, Robert (OST); Rogoff, Peter (FTA); Streitmatter, Marlise (OST); Szabo, Joseph (FRA); Thomson, Kathryn (OST); Trottenberg, Polly (OST)
**Cc:** Amani, Barbara (FRA); Bennett, Jack (OST); Bloom, Murray (MARAD); Bouril, Michael (OST); Brown, Gregory A. (OST); Callender, Duane (FHWA); Carlson, Terence (OST); Cefalo, Nancy (FTA); Curry, Michelle (OST); Dilver-Dendy, Angela (OST); Doherty, Clare (OST); Edmondson, Mary (OST); Falk, Jacob (OST); Gilmore, David (MARAD); Huezo, Hector (OST); Hurdle, Lana (OST); Jernberg, Jorianne (FHWA); Knapp, Lindy (OST); Krepp, Denise (MARAD); Ladd, Daniel (MARAD); McCabe, Jill (OST); McElroy, Regina (FHWA); Rae, Karen (FRA); Reid, Robena (FTA); Strine, Nancy (OST); Thach, Laura (OST); Vandeventer, Margaret (MARAD); Woods, Gregory (OST); Yedinak, Tom (FTA); Ziff, Laura (OST); Garcia, Sylvia (OST)
**Subject:** Credit Council Vote - hiring an IFA for the Title XI application from American Petroleum Tankers

American Petroleum Tankers (APT) submitted a Title XI application in August 2010 to refinance five product tankers.  In March, 2011 the Credit Council recommended that MARAD not hire an independent financial advisor, based on concerns about the ownership structure (75% by Blackstone and 25% by Cerberus) and the ownership's long-term interest in the project.  APT has revised its application by lowering the requested loan guarantee amount to 60% of project cost and reducing the repayment term to 20 years.  It has also provided additional details about its ownership's history with APT and its intention to remain an active long-term owner and grow the business.

Considering the fact that the application is already over one-year old, ▮▮▮▮▮▮▮
**Deliberative Process**

By this email, I am requesting members of the Credit Council to vote on whether to recommend to MARAD to hire an independent financial advisor to evaluate the revised application from APT.  **Please vote by COB Thursday, September 29.**

A "yes" vote will recommend hiring an IFA; a "no" vote would recommend not hiring the IFA.

1

If you have any questions, please contact me.
Thanks,
Mike

2



# TITLE XI
# OFFICIAL REQUEST TO HIRE AN EXTERNAL FINANCIAL ADVISOR

**REQUEST DATE:**          September 21, 2011

**REQUESTOR:**           Daniel Ladd

**Title XI APPLICANT:**        American Petroleum Tankers LLC

**PROJECT SUMMARY:**

    **LOAN GUARANTEE AMOUNT:**     $400,000,000

    **LOAN TERM:**            20 years

    **PROJECT PURPOSE:**          Refinancing of existing debt on five product tankers

American Petroleum Tankers (APT) is a company, controlled by Blackstone Group L.P. and Cerberus Capital Management, which owns five double-hulled product tankers. APT was formed in 2009 to take control of these five vessels in the wake of the bankruptcy of U.S. Shipping Partners.

APT submitted an application for Title XI financing on September 1, 2010 for mortgage period financing for five double-hull product tankers built by National Steel and Shipbuilding Co. in San Diego. The vessels were delivered in 2009 and 2010 and are U.S.-flag. Three of the vessels are currently on time charters with affiliates of BP, Marathon and Chevron, and the other two vessels are or will be chartered to the Navy. Management and day to day operation of the vessels has been contracted to Crowley Holdings, a major U.S.-flag shipping company. The Navy has expressed to MARAD the importance of Title XI financing for this project.

The proceeds of the Title XI financing will be used to refinance $285 million of existing high-yield debt due to third parties and $85 million of the $338 million of sponsor debt that that was incurred by APT for the construction of the Vessels. The remainder will be used to pay MARAD's guarantee fee.

Deliberative Process

Deliberative Process

Under the "Credit Council Guidelines for Use of Advisors External to the Department for Title XI Applications," a review by an external advisor for this application is required, as the applicant has less than 5 years operating experience.

In March, 2011 the Credit Council denied MARAD's prior request to retain an external advisor, based on concerns about the private equity ownership's long-term interest and the relatively high ratio of debt to equity.  Since then, APT has improved its application by reducing the guarantee amount by $70 million and reducing the repayment term from 25 to 20 years.  It has also provided additional details about its ownership's history with APT and its intention to remain an active long-term owner and grow the business.

Approval of this request will permit MARAD to continuing processing of this application.  The cost of conducting an external review is borne by the applicant.


**APPROVED BY:**    _____

**APPROVAL DATE:**    _____

**Goodman, Tim (OST)**

| | |
|---|---|
| **From:** | Bouril, Michael (OST) |
| **Sent:** | Friday, January 18, 2013 2:24 PM |
| **To:** | Goodman, Tim (OST) |
| **Subject:** | FW: APT - IFA request |

Michael Bouril
Office of Budget and Program Performance
Office of the Secretary of Transportation
1200 New Jersey Avenue, SE
W95-119
Washington, DC  20590
(202) 366-4587
(202) 366-9654 fax

**From:** Bouril, Michael (OST)
**Sent:** Monday, September 26, 2011 5:39 PM
**To:** Ladd, Daniel (MARAD)
**Cc:** McMahon, Chris (MARAD); Krepp, Denise (MARAD); Bloom, Murray (MARAD); Matsuda, David (MARAD); Doherty, Clare (OST); Bertram, Chris (OST); Garcia, Sylvia (OST); Hurdle, Lana (OST)
**Subject:** RE: APT - IFA request

Dan,

This email is to confirm that via email, the Credit Council voted to recommend to the Maritime Administrator to hire an independent financial advisor to assist in evaluating the American Petroleum Tankers (APT) revised Title XI application.  For the Credit Council meeting scheduled on October 11, MARAD should be prepared to present a timeframe for the analysis of the APT application.

If you have any questions, please let me know.
Thanks,
Mike

Michael Bouril
Office of Budget and Program Performance
Office of the Secretary of Transportation
1200 New Jersey Avenue, SE
W95-119
Washington, DC  20590
(202) 366-4587
(202) 366-9654 fax

**From:** Ladd, Daniel (MARAD)
**Sent:** Thursday, September 22, 2011 11:41 AM
**To:** Bouril, Michael (OST)
**Cc:** McMahon, Chris (MARAD); Krepp, Denise (MARAD); Bloom, Murray (MARAD); Matsuda, David (MARAD)
**Subject:** APT - IFA request

Mike-

1

As we had discussed last week, MARAD seeks a Credit Council email vote on the attached request to retain an independent financial advisor to evaluate the American Petroleum Tankers application.

Please let me know what else, if anything, you need.

Many thanks!

-Dan

2

| | |
|---|---|
| **From:** | Coll, Don (MARAD) |
| **Sent:** | Friday, October 28, 2011 10:14 AM |
| **To:** | McMahon, Chris (MARAD) |
| **Cc:** | Ladd, Daniel (MARAD); Fitzgerald, Edmond J. (MARAD) |
| **Subject:** | Contacted Robert Kurz |

Chris

I contacted Robert Kurz at APT and informed him of the problem with getting cost information from NASSCO.  He said he would call Dave Baker at NASSCO and talk to him.

1

| | |
|---|---|
| **From:** | Coll, Don (MARAD) |
| **Sent:** | Thursday, November 17, 2011 6:58 AM |
| **To:** | McMahon, Chris (MARAD) |
| **Cc:** | Fitzgerald, Edmond J. (MARAD); Heller, David (MARAD); Ladd, Daniel (MARAD) |
| **Subject:** | FW: NASSCO Cost Information |

FYI

Updated on APT information

**From:** Rob Kurz [mailto:rob.kurz@americanpetroleumtankers.com]
**Sent:** Wednesday, November 16, 2011 7:02 PM
**To:** Coll, Don (MARAD)
**Subject:** RE: NASSCO Cost Information

Don:

Thanks very much for the update. For your information, Parker Larsen this past week replaced Dave Baker, who has moved on to a different position at NASSCO. In order to expedite things (I am currently traveling), Marty Gottlieb or Nancy Mattson will coordinate with you over the next couple of days to get you connected with Parker to insure that he has the correct MarAd form and that he understands what information is required. Thanks again for all of your support and good luck with everything down there in Mobile.
Very best,

Rob

**From:** Don.Coll@dot.gov [mailto:Don.Coll@dot.gov]
**Sent:** Wednesday, November 16, 2011 5:28 PM
**To:** rob.kurz@americanpetroleumtankers.com
**Subject:** RE: NASSCO Cost Information
**Importance:** High

Rob  FYI

I am Mobile, AL this week. I had a voice mail from Nancy Matson and wanted to know where I stand with NASSCo info. So far I have not received anything.

Don

**From:** Rob Kurz [mailto:rob.kurz@americanpetroleumtankers.com]
**Sent:** Tuesday, November 08, 2011 5:41 PM
**To:** Coll, Don (MARAD)
**Subject:** NASSCO Cost Information

Hi Don:

I left you a voicemail this afternoon, but figured I should follow up with an e-mail as well. Anyway, I spoke with Dave Baker this afternoon and he confirmed that he has submitted the cost information you requested to senior management at NASSCO for their approval to release it. Hopefully, the approval will be obtained by the end of this week and we can

1

get that information out to you early next week. Don't worry, we will get this done! Thanks for all of your continued support.

Very best,

Rob

Robert K. Kurz
Chief Executive Officer
American Petroleum Tankers Parent LLC
600 W. Germantown Pike, Suite 400
Plymouth Meeting, PA 19462
E-mail: Rob.Kurz@AmericanPetroleumTankers.com
(O): 610-940-1677
(M): 215-776-0173
(Fax): 610-825-7579

2

## Coll, Don (MARAD)

| | |
|---|---|
| **From:** | Larson, Parker <PLarson@nassco.com> |
| **Sent:** | Thursday, December 22, 2011 10:42 AM |
| **To:** | Coll, Don (MARAD) |
| **Subject:** | RE: Title XI infro |
| **Attachments:** | Form_MA440.pdf |

Don,

I have gotten clearance to send this form. Please see attached.

Merry Christmas!

-Parker

**From:** Don.Coll@dot.gov [mailto:Don.Coll@dot.gov]
**Sent:** Tuesday, December 20, 2011 5:14 AM
**To:** Larson, Parker
**Cc:** Daniel.Ladd@dot.gov; David.Heller@dot.gov; Chris.McMahon@dot.gov
**Subject:** Title XI infro
**Importance:** High

Larson

I spoke to you on November 17, 2011 and you indicated that we would get the information requested for the APT application.  But as of this date Dec 20, 2011, I have not seen a thing.
APT's Title XI financing,  cannot proceed  without these information.

Don

202-366-1946

**From:** Larson, Parker [mailto:PLarson@nassco.com]
**Sent:** Thursday, November 17, 2011 10:05 AM
**To:** Coll, Don (MARAD)
**Subject:** Title XI

Mr. Coll,

My name is Parker Larson and I am taking over for Dave Baker as the NASSCO point of contact for our product carrier program. Mr. Baker had been working with you to assist APT's Title XI submission (providing shipyard costs). I have had discussions with several different people involved in this application process and I would like to make sure that I fully understand which form the shipyard needs to fill out.

As I understand it, MARAD needs Form MA 440 (Cost Estimate – Summary Sheet). Is that correct?

Also, as I understand it, we can label this information as exempt from disclosure under the Freedom of Information Act. Is that correct?

I apologize in advance if you've had to provide this information to us in the past.

1

Regards,

-Parker

**Parker E. Larson**
*Program Manager*
*Business Development & Strategic Planning*
*General Dynamics NASSCO*
*Office:  619.744.1234*
*Mobile: 619.778.9473*

2

2878

| FORM MA-440 | U.S. DEPARTMENT OF TRANSPORTATION |
| | MARITIME ADMINISTRATION |

**COST ESTIMATE - SUMMARY SHEET**

| OWNER | CHARACTERISTICS | ESTIMATE NUMBER |
| | | P-1349 |
| TYPE | Confidential Business Information | PREPARED BY |
| Product Carrier | | Lisa Singleton |
| DESIGN | | APPROVED BY |
| BID DATE | | DATE |
| Aug-06 | | Dec-11 |

| ITEM | QUANTITY OR PERCENT | MATERIAL COST PER UNIT QUANTITY | MANHOUR LABOR PER UNIT QUANTITY | MATERIAL AND TOTAL COST (M) | LABOR HOURS | LABOR RATE | LABOR COST (M) |
|---|---|---|---|---|---|---|---|
| | WT | | | | | | |
| STEEL | | | | | | | |
| OUTFIT | Confidential Business Information | | | | | | |
| MACHINERY | | | | | | | |
| Sub-Total | | | | | | | |
| INDIRECT | | | | | | | |
| ENGINEERING | | | | | | | |
| Total Direct | | | | | | | |
| LABOR | | | | | | | |
| OVERHEAD | | | | | | | |
| Sub-Total | | | | | | | |
| PROFIT | | | | | | | |
| TOTAL | | | | | | | |

**All information in this form is Proprietary to General Dynamics NASSCO.  The information is presumed to be a trade secret protected under the Trade Secrets Act, 18 U.S.C. § 1905 and is exempt from public disclosure or dissemination under at least exemption (b)(4) of the Freedom of Information Act, 5 U.S.C. §552(b)(4).**

## Coll, Don (MARAD)

| | |
|---|---|
| **From:** | Larson, Parker <PLarson@nassco.com> |
| **Sent:** | Thursday, December 22, 2011 12:28 PM |
| **To:** | Coll, Don (MARAD) |
| **Subject:** | RE: Title XI infro |

**Confidential Business Information**

**From:** Don.Coll@dot.gov [mailto:Don.Coll@dot.gov]
**Sent:** Thursday, December 22, 2011 9:27 AM
**To:** Larson, Parker
**Subject:** RE: Title XI infro

Thanks, **Confidential Business Information**

Thanks

**From:** Larson, Parker [mailto:PLarson@nassco.com]
**Sent:** Thursday, December 22, 2011 12:23 PM
**To:** Coll, Don (MARAD)
**Subject:** RE: Title XI infro

Don,

Since this is a Cost Estimate Form, we based this on our cost estimate going into a contract with the owner, which is how we've filled out this form in the past (e.g., TOTE). In other words, changes were not included.

It should be noted that we had very few changes on the ship.

I assume this is okay since shipyards typically need to fill this out prior to executing the contract – similar to what we did on TOTE.

Regards,

-Parker

**From:** Don.Coll@dot.gov [mailto:Don.Coll@dot.gov]
**Sent:** Thursday, December 22, 2011 8:25 AM
**To:** Larson, Parker
**Subject:** RE: Title XI infro

Parker

**Confidential Business Information**

Thanks and Have a Merry Christmas Too

Don

1

**From:** Larson, Parker [mailto:PLarson@nassco.com]
**Sent:** Thursday, December 22, 2011 10:42 AM
**To:** Coll, Don (MARAD)
**Subject:** RE: Title XI infro

Don,

I have gotten clearance to send this form. Please see attached.

Merry Christmas!

-Parker

**From:** Don.Coll@dot.gov [mailto:Don.Coll@dot.gov]
**Sent:** Tuesday, December 20, 2011 5:14 AM
**To:** Larson, Parker
**Cc:** Daniel.Ladd@dot.gov; David.Heller@dot.gov; Chris.McMahon@dot.gov
**Subject:** Title XI infro
**Importance:** High

Larson

I spoke to you on November 17, 2011 and you indicated that we would get the information requested for the APT
application.  But as of this date Dec 20, 2011, I have not seen a thing.
APT's Title XI financing,  cannot proceed  without these information.

Don

202-366-1946

**From:** Larson, Parker [mailto:PLarson@nassco.com]
**Sent:** Thursday, November 17, 2011 10:05 AM
**To:** Coll, Don (MARAD)
**Subject:** Title XI

Mr. Coll,

My name is Parker Larson and I am taking over for Dave Baker as the NASSCO point of contact for our product carrier
program. Mr. Baker had been working with you to assist APT's Title XI submission (providing shipyard costs). I have had
discussions with several different people involved in this application process and I would like to make sure that I fully
understand which form the shipyard needs to fill out.

As I understand it, MARAD needs Form MA 440 (Cost Estimate – Summary Sheet). Is that correct?

Also, as I understand it, we can label this information as exempt from disclosure under the Freedom of Information Act.
Is that correct?

I apologize in advance if you've had to provide this information to us in the past.

Regards,

-Parker

2

2881

**Parker E. Larson**
*Program Manager*
*Business Development & Strategic Planning*
*General Dynamics NASSCO*
*Office:  619.744.1234*
*Mobile: 619.778.9473*

2

**Coll, Don (MARAD)**

| | |
|---|---|
| **From:** | Larson, Parker <PLarson@nassco.com> |
| **Sent:** | Wednesday, January 04, 2012 12:59 PM |
| **To:** | Coll, Don (MARAD) |
| **Subject:** | RE: Title XI info |

▮▮▮▮ Confidential Business Information ▮▮▮▮

**From:** Don.Coll@dot.gov [mailto:Don.Coll@dot.gov]
**Sent:** Wednesday, January 04, 2012 9:57 AM
**To:** Larson, Parker
**Subject:** RE: Title XI info

Ok, thanks for the info.  One more question – Last December Dave Baker sent Carl Setterstrom a sheet with NASSCO  cost information. ▮▮▮▮ Confidential Business Information ▮▮▮▮

Don

**From:** Larson, Parker [mailto:PLarson@nassco.com]
**Sent:** Wednesday, January 04, 2012 12:48 PM
**To:** Coll, Don (MARAD)
**Subject:** RE: Title XI info

▮▮▮▮ Confidential Business Information ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**From:** Don.Coll@dot.gov [mailto:Don.Coll@dot.gov]
**Sent:** Wednesday, January 04, 2012 7:59 AM
**To:** Larson, Parker
**Subject:** RE: Title XI info
**Importance:** High

Parker

▮▮▮▮ Confidential Business Information ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Thanks for your help

Don

**From:** Larson, Parker [mailto:PLarson@nassco.com]
**Sent:** Wednesday, January 04, 2012 10:03 AM
**To:** Coll, Don (MARAD)
**Subject:** RE: Title XI info

Don,

1

2883



Confidential Business Information

Regards,

-Parker

**From:** Don.Coll@dot.gov [mailto:Don.Coll@dot.gov]
**Sent:** Wednesday, January 04, 2012 4:27 AM
**To:** Larson, Parker
**Subject:** RE: Title XI infro

Parker

Confidential Business Information

2

Click to enlarge

**From:** Larson, Parker [mailto:PLarson@nassco.com]
**Sent:** Tuesday, January 03, 2012 4:21 PM
**To:** Coll, Don (MARAD)
**Subject:** RE: Title XI infro

████ Confidential Business ████

-----Original Message-----
**From:** Don.Coll@dot.gov [Don.Coll@dot.gov]
**Sent:** Tuesday, January 03, 2012 11:56 AM Pacific Standard Time
**To:** Larson, Parker
**Subject:** RE: Title XI infro

██ Confidential Business ██

**From:** Larson, Parker [mailto:PLarson@nassco.com]
**Sent:** Tuesday, January 03, 2012 2:54 PM
**To:** Coll, Don (MARAD)
**Subject:** RE: Title XI infro

████████ Confidential Business Information ████████

**From:** Don.Coll@dot.gov [mailto:Don.Coll@dot.gov]
**Sent:** Tuesday, January 03, 2012 11:41 AM
**To:** Larson, Parker
**Subject:** RE: Title XI infro

3

Ok, lets try it this way.  Is there any foreign steel in the construction of the vessel?

**From:** Larson, Parker [mailto:PLarson@nassco.com]
**Sent:** Tuesday, January 03, 2012 2:02 PM
**To:** Coll, Don (MARAD)
**Subject:** RE: Title XI infro

Don,

We meet the Jones Act requirement if that's the concern. We have a letter from the USCG verifying the ability to achieve a coastwise endorsement.

-Parker

**From:** Don.Coll@dot.gov [mailto:Don.Coll@dot.gov]
**Sent:** Tuesday, January 03, 2012 10:50 AM
**To:** Larson, Parker
**Subject:** Title XI infro
**Importance:** High

Parker

One more question – is all the steel in the construction of the vessel US?

Thanks

Don

**From:** Larson, Parker [mailto:PLarson@nassco.com]
**Sent:** Thursday, November 17, 2011 10:05 AM
**To:** Coll, Don (MARAD)
**Subject:** Title XI

Mr. Coll,

My name is Parker Larson and I am taking over for Dave Baker as the NASSCO point of contact for our product carrier program. Mr. Baker had been working with you to assist APT's Title XI submission (providing shipyard costs). I have had discussions with several different people involved in this application process and I would like to make sure that I fully understand which form the shipyard needs to fill out.

As I understand it, MARAD needs Form MA 440 (Cost Estimate – Summary Sheet). Is that correct?

Also, as I understand it, we can label this information as exempt from disclosure under the Freedom of Information Act. Is that correct?

I apologize in advance if you've had to provide this information to us in the past.

Regards,

-Parker

4

2886

Parker E. Larson
*Program Manager*
*Business Development & Strategic Planning*
*General Dynamics NASSCO*
*Office:   619.744.1234*
*Mobile: 619.778.9473*

5

**From:** Zoukee, George (MARAD)
**Sent:** Wednesday, May 23, 2012 4:26 PM
**To:** Matsuda, David (MARAD) (David.Matsuda@dot.gov); Parker, Franklin (MARAD)
(Franklin.Parker@dot.gov); Szabat, Joel (OST) (Joel.Szabat@dot.gov)
**Subject:** Updated APT Memo and spreadsheets

**Another brief email to follow.**

George



# **Memorandum**

U.S. Department
of Transportation

**MARITIME
ADMINISTRATION**

From:       George M. Zoukee, Associate Administrator for Business and
            Finance Development

To:         David T. Matsuda, Maritime Administrator

Re:         American Petroleum Tankers (APT) Title XI Application - Recommendations

Date:       May 23, 2012

American Petroleum Tankers (APT) applied for a Title XI loan guarantee on September 1, 2010. Their original application was for a guarantee of $470 million. Since then the application has been reduced to $400 million. APT built five vessels, the last of which they took possession in December, 2010. The approximate cost of the five vessels was just under $700 million. When filed, the application was for construction financing; the last vessel was delivered while MARAD was evaluating the application. American Petroleum Tankers Parent LLC, the applicant, is indirectly owned by Blackstone and Cebrerus, large private equity firms. There are four shipowner subsidiary companies, three of which own one vessel each and one of which owns the two vessels under charter to MSC. The shipowner companies will enter into the Title XI agreements alongside the applicant and provide cross-guarantees of the Title XI debt. The Credit Council expressed concern about the ownership of the applicant in early 2011.

MARAD received the draft IFA report on the APT application in January, 2012. The draft report indicated that the project was economically sound at a guarantee level of $340 million of debt. The IFA recommended a $16 million debt service reserve and a $10 million drydock reserve, plus a number of other measures (alternative financial tests for some covenants, pledges of owner's equity in the company and subordinated debt, mandatory pre-payment provisions if charters are cancelled and a "bankruptcy-remote" structure. Several of the recommendations reflect the IFA's greater familiarity with the TIFIA program than with Title XI, and the IFA has indicated that it is willing to revisit the recommendations to better align them with the Title XI regulations (46 CFR 298.32 and 298.35, which contain MARAD's security requirements and financial covenants).

**Delibarative Process**



Deliberative Process

Deliberative Process



**Vandeventer, Margaret (MARAD)**

| | |
|---|---|
| From: | Zoukee, George (MARAD) |
| Sent: | Thursday, May 31, 2012 12:07 PM |
| To: | Matsuda, David (MARAD) |
| Subject: | RE: Which unions |

Crowley is operating the vessels.  We believe it is SIU and AMO and I'm trying to verify that.

-----Original Message-----
From: Matsuda, David (MARAD)
Sent: Thursday, May 31, 2012 12:02 PM
To: Zoukee, George (MARAD)
Subject: Which unions

Are on the APT ships?

1

APT V. USA                                                                                                      2892

**From:** Ladd, Daniel (MARAD)
**Sent:** Thursday, May 31, 2012 12:09 PM
**To:** Zoukee, George (MARAD)
**Cc:** Matsuda, David (MARAD)
**Subject:** APT Unions

"all vessel positions are represented by the Seafarer's International Union for unlicensed and the American Maritime Officers union for all licensed personnel."

1

CONFIDENTIAL BUSINESS INFORMATION

1

| From: | Agarwal, Julie (MARAD) |
|---|---|
| Sent: | Thursday, July 12, 2012 11:14 PM |
| To: | Parker, Franklin (MARAD); Pixa, Rand (MARAD) |
| Subject: | Revised spreadsheet |
| Attachments: | REFI 7 12 12.xlsx |

Frank & Rand,

Attached is the revised spreadsheet.  Please let me know if I missed anything.  Thanks.

Sincerely,

*Julie*

Julie Agarwal
Attorney
Office of Chief Counsel
Maritime Administration
U.S. Dept. of Transportation
1200 New Jersey Avenue, SE
Mail Stop 4, Suite W24-219
Washington, DC  20590
Direct:  (202) 366-5163
Fax:  (202) 366-7485
E-Mail Address:  Julie.Agarwal@dot.gov

PRE-DECISIONAL
ATTORNEY WORK PRODUCT
ATTORNEY/CLIENT PRIVILEGED
DO NOT RELEASE UNDER FOIA

*********************************************************************************************************************
*******************************
Privileged Communication. Do not release without permission from the Office of Chief Counsel at the Maritime Administration. This e-mail (including any attachments) is intended for the use of the individual or entity to which it is addressed. It contains information that is privileged, confidential, or otherwise protected by applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this e-mail or its contents is strictly prohibited. If you have received this e-mail in error, please notify us immediately by replying to this message, and please destroy all copies of this e-mail or call (202) 366-5711.  Thank you.
*********************************************************************************************************************
*******************************

APT V. USA

2895

| | | REFINANCING NON-TITLE XI  DEBT (DOMESTIC) | | | | |
|---|---|---|---|---|---|---|
| LC Date | Company | REFI/Finance & Vessel type | Delivery | Applicant history | Collateral | Terms |
| 3-Nov-95 | Parker Towing | Finance 20 new barges **Refi deck barge; Refi transit barge** | 3/95 & 12/95; Refi - 12/93 | Estb. 1956, maritime; existing Title XI debtor | Cross-collateral all vessels | New - $3.7 M for 22 yrs **Refi - $1.8 M for 22 yrs** |
| 11-Jun-98 | Vessel Mgmt Services | Finance 8 tugs **REFI 2 tugs** | New - 1998 & 1999 Refi - 1997 | Estb. 1996; maritime industry; sub of Crowley; prior Title XI debtor | Crowley guarantee; H/H Bareboat charter to affiliate | New - $68.6 M for 25 yrs **Refi - $17.7 M for 25 yrs** |
| 21-Mar-02 | Port Imperial Ferry | Finance 4 ferries **REFI 2 ferries** (1 ferry went from finance to refi b/c of closing date) | New - 11/01 & 2002 Refi - 2000 & 5/01 | Estb. 1986; ferry routes & buses; existing Title XI debtor | | New- $4.6 M for 24 yrs **Refi - $3.3 M for 24 yrs** |
| 27-Dec-99 | Manson Int'l | **Refi 1 dredge** | Oct-98 | Sub of Manson estb. 1930; marine constr.; Manson & affiliates prior Title XI debtor | H/H charter to parent; parent on RFFA; replacement vessel | **$8.79 M for 25 yrs** |
| 3-Mar-10 | Foss Maritime | **Refi 3 barges** | 1/08; 5/08 & 2/09 | Estb. 1889; maritime; previous Title XI debtor; affiliates Title XI debtors; sub of Saltchuck; | Saltchuck guarantee w/Saltchuck & parent on RFFA | **$22.7 M for 20 yrs** |
| 13-Jul-01 | Alter Barge | Finance 44 & **Refi 44 hopper barges built at 2 shipyards** | last vessel 3/01 44 vessels over 1 yr old | Estb. 1970; maritime; subs prior Title XI debtors; ▮▮▮▮ Confidential Business Information ▮▮▮▮ | Parent guarantee & on RFFA Replacing aging fleet | New - $4.3 M for 24 1/2 yrs **Refi - $1.8 M for 24 1/2 yrs** |
| 7/12/2012 (Today) | **APT** | **Refi 5 tankers** | 1/09; 6/09; 12/09 7/10 & 12/10 | Estb. April 2010.  Start-up entity that is new to maritime industry. Subsidiary of affiliates of Blackston and Cerberus | Only the vessels | **Refi - $285M - $400M for 20 yrs** |

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

2

CONFIDENTIAL BUSINESS INFORMATION

1

CONFIDENTIAL BUSINESS INFORMATION



Deliberative Process

**From:** Hanan, Christopher (MARAD)
**Sent:** Wednesday, July 18, 2012 5:54 PM
**To:** Zoukee, George (MARAD)
**Subject:** RE: APT $406 at 12%

George,



Deliberative Process

Since I will be out until Tuesday I also attached the Excel copy of what I sent you earlier. You can see the raw data under "A Cashflow" the large printable version on "Printing Sheet" and the power point section on "Power Point Sheet". The attached version is the most recent Excel model and I made a few tweaks to some math errors that popped up in the last version I left on your desk with the ☹.

I will check back in after dinner to see if you have any other questions or edits to what I sent.

Thanks
Chris

**From:** Zoukee, George (MARAD)
**Sent:** Wednesday, July 18, 2012 5:20 PM
**To:** Hanan, Christopher (MARAD)
**Subject:** RE: APT $406 at 12%

**Thank you, Chris. This is exactly what I'm looking for.**

**George**

---

**From:** Hanan, Christopher (MARAD)
**Sent:** Wednesday, July 18, 2012 5:04 PM
**To:** Zoukee, George (MARAD)
**Subject:** APT $406 at 12%

George,

Attached is the Power point slide for 5 years (all that would fit and be readable) for the $406 Mil at 12% Deliberative Process ██████████████████████████ I ran the numbers at the $38,500 rate escalated.

Deliberative Process ████████████████████████████████████████████
████████████████████████████████

Let me know if you have any edits or changes to what I sent you.

Thanks
Chris

CONFIDENTIAL BUSINESS INFORMATION

| | |
|---|---|
| **From:** | Ladd, Daniel (MARAD) |
| **To:** | Pixa, Rand (MARAD) |
| **Cc:** | Zoukee, George (MARAD) |
| **Subject:** | APT Financial Results |
| **Date:** | Thursday, July 26, 2012 12:11:23 PM |
| **Attachments:** | image001.png |

From their audit:

American Petroleum Tankers Parent LLC
Consolidated Statements of Operations
For the Years Ended December 31,2011,2010 and 2009 (in
thousands)

| | 2011 | 2010 | 2009 |
|---|---|---|---|
| Revenues.......................................................................................................... | $ 106,282 | $ 63,600 | $ 28,867 |
| Expenses: | | | |
| Vessel operating expenses | 34,306 | 24,771 | 11,917 |
| General and administrative expenses | 2,246 | 2,058 | 1,063 |
| Depreciation and amortization | 23,749 | 17,302 | 8,398 |
| Management fees (includes amounts to related parties of$1,991 for 2009)............ | 2,969 | 2,489 | 2,740 |
| Settlement fees and related legal expenses (including amounts to related parties for $14,000 in 2009)....................................................................................... | | | 17,901 |
| Total Expenses | 63,270 | 46,620 | 42,019 |
| Operating income (loss) ................................................................... | 43,012 | 16,980 | (13,152) |
| Other income (expense): | | | |
| Interest income.................................................................................... | 7 | 125 | 15 |
| Interest expense (includes amounts to related parties, as discussed in Note 9)........ | (75,710) | (50,312) | (8,639) |
| Debt extinguishment expense | (2,220) | (7,640) | |
| Derivative (losses) gains | (718) | (1,561) | 1,751 |
| Net loss....................................................................................... | $ (35,629) | $ (42,408) | $ (20,025) |

So you can see that the vessel operations are profitable (positive operating income for both 2010 and 2011), but the interest expense of $75m in 2011 and $50m in 2010 result in a net loss for the company overall.

This has not changed in 2012. This is the results from the 1st Quarter:

American Petroleum Tankers Holding LLC Unaudited
Condensed Consolidated Statements of Operations For
the Three Months Ended March 31, 2012 and 2011
(in
thousands
)

| | 2012 | 2011 |
|---|---|---|
| **Revenues** | $ 24,080 | $ 27,005 |
| **Expenses:** | | |
| Vessel operating expenses | 8,665 | 7,915 |
| General and administrative expenses | 630 | 769 |
| Depreciation and amortization | 5,946 | 5,915 |
| Management fees | 684 | 787 |
| Total Expenses | 15,925 | 15,386 |
| **Operating income** | 8,155 | 11,619 |
| **Other income (expense):** | | |
| Interest income | — | 5 |

| | | |
|---|---|---|
| Interest expense (includes amounts to related parties, as discussed in Note 4) | (19,081) | (18,491) |
| Derivative losses | (108) | (55) |
| **Net loss** | $(11,034) | $ (6,922) |

| From: | Zoukee, George (MARAD) |
| --- | --- |
| Sent: | Monday, August 13, 2012 6:05 PM |
| To: | Parker, Franklin (MARAD) |
| Cc: | Pixa, Rand (MARAD); Agarwal, Julie (MARAD) |
| Subject: | Spot Market |

Categories:          APT

Frank,

As we discussed at the meeting this afternoon, there is the strong potential that the addition of the two Aker vessels to the small Jones Act fleet could bring imbalance to the tanker market.  Tankers coming off charter could face financial difficulties due to a lack of employment.  Tankers that could not find new charters would have to enter the spot market to find employment.  Daily rates on the spot market are generally considerably lower than they are for tankers under charter.  The two APT vessels charted to the Navy have the risk of annually appropriated funds for their continued employment.  APT faces the added risk of charters ending on their other three  tankers.  If they had to rely on the spot market to earn revenue on their vessels, they would have a great deal of difficulty paying their operations and debt service.  If you are interested in more details, I will provide spot market rates in the morning for comparison.

George

George M. Zoukee
Associate Administrator for Business and Finance Development
U.S. Department of Transportation
Maritime Administration
1200 New Jersey Avenue SE, W21-318
Washington, DC  20590
(202) 366-9595 - tel
(202) 366-6988 - fax
(202) 641-5352 - mobile
george.zoukee@dot.gov
www.marad.dot.gov

1



# **Memorandum**

**U.S. Department
of Transportation**

**Maritime
Administration**

Subject American Petroleum Tankers
Application Review

From Janice G. Weaver, Director
Office of Policy and Plans

Date October 4, 2012

Reply to
Attn of

To
George Zoukee, Associate Administrator
Business and Finance Development

### The Application



### Trades

Coastal tank vessel trades are served by crude carriers, product tankers and tank barges
(including articulated tug/barge units (ATBs)). Crude carriers serve the Alaska/West coast crude
oil trades; product tankers serve the coastal and inter-coastal petroleum products and chemicals
trades, and supplement crude carriers in the crude oil trades; and tank barges serve coastal and
short-haul inter-coastal petroleum products and chemicals trades. Product tankers and tank
barges also lighter imported crude oil at U.S. Atlantic and Gulf ports.[1]  Over the last 10 years,
domestic tank vessel trades have declined (Table 1) due largely to:

---

[1] Lightering of crude oil generally involves the use of a tank barges or product tankers to carry cargo from a crude carrier to a
U.S. port in order to reduce the crude carrier draught. This operation is usually carried out when the loaded draught of the ship is
too deep to enter a U.S. port. In 2010, product tankers lightered 2.4 million metric tons, and tank barges lightered 7.9 million
metric tons.

2

- A 4 percent decline in U.S. consumption of petroleum products;
- A 40 percent decline in Alaska crude oil production which drives domestic crude oil trades; and
- Greater use of petroleum transport alternatives including pipelines and international tankers (imports).

Table 1. U.S. Coastal Tank Vessel Trades, 2001-2011

|  | Crude Carriers | | | Product Tankers | | | Tank Barges | | |
|---|---|---|---|---|---|---|---|---|---|
| Year | Mil. MTs | Bill. MTMs | Miles | Mil. MTs | Bill. MTMs | Miles | Mil. MTs | Bill. MTMs | Miles |
| 2001 | 41.9 | 79.5 | 1,898 | 50.6 | 66.7 | 1,317 | 69.3 | 30.2 | 435 |
| 2002 | 38.6 | 71.8 | 1,860 | 48.0 | 68.5 | 1,428 | 70.1 | 32.9 | 470 |
| 2003 | 41.5 | 76.2 | 1,835 | 45.8 | 63.9 | 1,396 | 70.4 | 32.5 | 462 |
| 2004 | 39.7 | 73.2 | 1,843 | 44.6 | 64.5 | 1,447 | 71.7 | 32.2 | 449 |
| 2005 | 36.2 | 64.9 | 1,791 | 41.8 | 59.5 | 1,423 | 69.1 | 29.5 | 427 |
| 2006 | 30.2 | 51.0 | 1,685 | 38.6 | 44.7 | 1,159 | 72.1 | 31.1 | 432 |
| 2007 | 32.4 | 56.2 | 1,731 | 37.2 | 40.0 | 1,076 | 71.3 | 30.0 | 421 |
| 2008 | 30.5 | 52.2 | 1,712 | 34.9 | 35.8 | 1,027 | 66.5 | 27.2 | 408 |
| 2009 | 28.1 | 48.7 | 1,732 | 32.6 | 34.8 | 1,069 | 64.8 | 27.3 | 421 |
| 2010 | 25.2 | 44.1 | 1,746 | 31.8 | 34.4 | 1,084 | 67.1 | 29.7 | 443 |
| 2011e | 24.9 | 41.2 | 1,651 | 32.2 | 31.2 | 969 | 67.2 | 28.1 | 419 |
| % GR. | -40.6 | -48.2 | -13.0 | -36.4 | -53.2 | -26.4 | -3.0 | -6.9 | -3.7 |

MTs: metric tons. MTMs: metric ton-miles.
e: Estimates.
Source: U.S. Army Corps of Engineers, Waterborne Commerce of the United States, detail files.

For petroleum products, average hauls in coastal trades are much shorter than those in import trades. For example, Rotterdam to New York, a major import trade, is about 3,400 nautical miles, while Houston to Port Everglades, a major coastal trade, is only 1,010 nautical miles. While daily charter rates for U.S.-flag tank vessels in the coastal trades are much higher than those for international tankers in the import trades, on a voyage-by-voyage basis, the cost per voyage (charter rate x voyage days) in the coastal trades are more in line with those in the import trades.[2]

Because domestic and foreign petroleum products are substitutes, charter rates for domestic and international product tankers tend to move in the same direction over time (Figure 1).[3] Oil companies can ship petroleum products from U.S. Gulf refineries on U.S.-flag tank vessels or from foreign refineries (Caribbean and Europe) on international tankers. If domestic charter rates increase relative to international rates, domestic long-haul trades tend to decline and vice versa. That is, domestic carriers must keep their costs per voyage (charter rate x voyage days) in line with those in U.S. import trades, or accept lower trade volumes.

---

[2] Rotterdam to New York: $8,600/day * 14 days = $120,400 for the voyage. Houston to Port Everglades: $39,300/day * 3 days = $117,900 for the voyage (2011 TCE Rates).
[3] For the period 2006 to 2011, the correlation coefficient for coastal product tanker charter rates and those of similar international tankers was 0.91. A coefficient can range from 0 to 1 with 0 being no correlation and 1 being perfect correlation.



Figure 1. Time Charter Equivalent Rates,
Coastal and Import Trades, 2006-2011

$000/day

■ Coastal Product Tankers   ■ Foreign Product Tankers   □ Coastal Tank Barges

TCE rate = (voyage revenues - voyage costs)/voyage days.
Source: Overseas Shipholding Group, 10-k reports.

## Fleets

Over the last five years, coastal tank barge deadweight capacity increased by 31 percent, while product tanker capacity declined by 33 percent (Table 2).[4] The increase in tank-barge capacity, and a tendency to deploy them in longer trades, contributed to a substitution of tank barges for product tankers in coastal and lightering trades.

A decline in the size and capacity of the domestic product tanker fleet does not

Table 2. Coastal Tank Vessel Fleets and Orders, 2006, 2011
(DWT in Thousands)

| Type | 2006 Fleet | | 2011 Fleet | | 2011 DH* | | On Order | |
|---|---|---|---|---|---|---|---|---|
| Tank | No. | DWT | No. | DWT | No. | DWT | No. | DWT |
| Barges | 110 | 1,997 | 140 | 2,620 | 140 | 2,620 | 2 | 90 |
| Tankers | 58 | 4,644 | 43 | 3,206 | 39 | 3,011 | 5 | 373 |
| Crude | 15 | 2,450 | 11 | 1,730 | 11 | 1,730 | 2 | 230 |
| Product | 43 | 2,194 | 32 | 1,476 | 28 | 1,280 | 3 | 143 |
| Total | 168 | 6,641 | 183 | 5,826 | 179 | 5,631 | 7 | 463 |

* DH-Double-hull

Sources: Tankers – Clarkson Research Studies; Tank Barges – U.S. Army Corps of Engineers, Marine Log, and American Bureau of Shipping

necessarily mean a decline in petroleum transport services. There are alternatives for domestic product tanker services (other than the aforementioned tank barge services) which include pipeline service and international tanker services (imports). In 2011, for example, pipelines moved 917 million barrels in the U.S. Gulf/East Coast petroleum product trades, or roughly the maximum estimated lay-down capacity of 97 product tankers.[5] Over the next year, the Colonial Pipeline Company will add about 64 million barrels of capacity to its U.S. Gulf/East Coast pipelines, or the maximum estimated lay-down capacity of about 7 product tankers.[6]

As of year-end 2011, 7 tank vessels (2 crude carriers, 3 product tankers and 2 tank barges) were scheduled for delivery over the next 3 years. The 3 product tanker orders (totaling 143,000 DWT) will replace 4 non-double-hull product tankers (totaling 196,000 DWT), and perhaps other 25+ year old double-hull tank vessels that face high dry dock costs and inadequate charter rates. New tank vessels are typically more productive than those they replace because they require less maintenance and dry-docking time than older vessels and have 2-3 times more

[4] Deadweight (DWT) is the total weight in metric tons a ship can carry when immersed to its load line.

[5] A 325,000 barrel product tanker can make about 29 U.S. Gulf/East coast (North Carolina) voyages per year at 325,000 barrels per voyage, or 9.5 million barrels (29 x 325,000 barrels) per year.

[6] Marton-Vitale, Rose. "Colonial to Expand Northeast U.S. Pipeline Flow," Market Watch, Mar. 12, 2012, Wall Street Journal, June 1, 2012, <http://www.marketwatch.com/story/colonial-to-expand-northeast-us-pipeline-flow-2012-03-12>.

4

pumping capacity (less load/discharge time). In 2010, product tankers less than 10 years old accounted for 75 percent of fleet capacity, but 86 percent of fleet ton-miles. Likewise, tank barges less than 10 years old accounted for 67 percent of fleet capacity, but 72 percent of the fleet ton-miles (Table 3).

The U.S. coastal tank vessel market has experienced a significant newbuilding and fleet replenishment period over the last 10 years (Figure 2). The newbuilding activity was spurred largely by the double-hulling of coastal tank vessel fleets that accelerated over the last 5 years as single-hull vessels built during the 1978-1983 boom period reached their Oil Pollution Act of 1990 (OPA-90) phase-out dates.[7] A 2004-2007 increase in time-charter rates also stimulated an increase in newbuilding activity. For the period 2007-2011, 58 tank vessels were removed from

Table 3. Tank Vessel Shares of DWT and Ton-Miles by Age, 2010*

| Fleet/Age | Percent of DWT Capacity | Percent of Ton-Miles |
|---|---|---|
| **Tank Barges** | 100 | 100 |
| <10 Years | 67 | 72 |
| >=10 Years | 33 | 28 |
| **Prod. Tankers** | 100 | 100 |
| <10 Years | 75 | 86 |
| >= 10 Years | 25 | 14 |
| **Crude Carriers** | 100 | 100 |
| <10 Years | 71 | 72 |
| >=10 Years | 29 | 28 |

\* Excludes vessels that operated part of the year.
Source: U.S. Army Corps of Engineers,
Waterborne Commerce of the United States, detailed files.

service while 73 new/rebuilt double-hull tank vessels entered service. As of year-end 2011, the double-hulling of the coastal tank vessel fleets was nearly complete.

Thus far in 2012, three of the remaining four non-double-hull product tankers (147,000 DWT combined) have either been removed from service or are no longer actively trading. Three new product tankers have, or are scheduled to, come into the market in 2012 and 2013. Two of the vessels (the PENNSYLVANIA and the FLORIDA at 46,000 DWT each) will be owned/operated by Crowley and are ▮▮▮▮▮ Confidential Business Information ▮▮▮▮▮ Confidential Business Information ▮▮▮▮▮ The third (the AMERICAN PHOENIX at 49,000 DWT) will be owned by Mid Ocean Tanker Company and operated by Seabulk Tankers. It is not known yet whether this vessel is currently under a charter agreement.

Figure 2. Age Profiles for Tanker and Tank Barge Fleets, Year-end 2011 Fleet and Orders



Sources: Tankers – Clarkson Research Studies; Tank Barges – U.S. Army Corps of Engineers, Marine Log, and American Bureau of Shipping.

---

[7] 46 U.S.C. 3703a, (2005).

5

## Rates

Time-charter equivalent rates (TCE rate = (voyage revenues - voyage costs)/voyage days), as reported, are a blend of a fleet's voyage rates, both contract and spot. Therefore, TCE rates are meant to measure performance, track period-to-period changes, and are a good indicator of market activity.

For the period 2004-2007, the time charter equivalent (TCE) rate for a 45,000 DWT double-hull product tanker increased by 58 percent to $56,100 per day, while the TCE rate for a 30,000 DWT double-hull ATB increased by 59 percent to $36,400 per day (Table 4). The 2007 rates, if sustained, would have resulted in a 10 percent return on investment for new product tankers and a 12 percent return on investment for new ATBs.[8]

Table 4. Time Charter Equivalent (TCE) Rates, Coastal ATBs and Product Tankers, 2004-2011 *
($000/Day)

| Year/ Quarter | Foreign Tanker 45,000 DWT | Domestic ATB 30,000 DWT | Domestic Tanker 45,000 DWT |
|---|---|---|---|
| 2004 | 25.8 | 22.9 | 35.5 |
| 2005 | 25.3 | 30.6 | 48.7 |
| 2006 | 22.5 | 35.3 | 54.8 |
| 2007 | 21.0 | 36.4 | 56.1 |
| 2008 | 20.8 | 27.1 | 45.0 |
| 2009 | 5.9 | 24.9 | 36.7 |
| 2010 | 7.6 | 25.4 | 38.4 |
| 2011 | 8.6 | 25.4 | 39.3 |

*TCE rate = (voyage revenues-voyage costs)/voyage days.
Source: Overseas Shipholding Group, 10-Q reports.

However, there is typically a two-to-four year interval between the shipbuilding contract date and the vessel delivery date. Such a sizeable timeframe during the vessel construction period allows for the possibility of a significant shift in the market and/or possible variations in charter rates before new vessels are delivered. <span>Confidential Business Information</span>



Confidential Business Information

---

[8] The rate-of-return estimates are based on a 25-year asset life, new-build prices of $110 million and $65 million for a product tanker and ATB, and daily operating costs of $22,000 and $13,000 for the vessels.

6

**Table 5. Original Charter Summary**

| Vessel | Charterer | Term | Signed | Start | Rate | Options |
|--------|-----------|------|--------|-------|------|---------|



Confidential Business Information

**Conclusion**

The U.S. coastal product tanker market has been in a state of decline over the last ten years: ton-miles have decreased over 50 percent and capacity has decreased 33 percent. Much of the decline in the market is due to an increase in tank-barge capacity, and a willingness to deploy them in longer trades, which has contributed to a substitution of tank barges for product tankers in coastal and lightering trades. Additionally, the market has experienced a greater use of petroleum transport alternatives including pipelines and international tankers (imports).

The recent economic recession placed additional downward pressure on the market and, to a certain extent, obscured a significant market correction and contraction. The market is currently at the tail-end of a newbuilding phase following the removal of a significant amount of vessel capacity (either from OPA-90 restrictions or 25+ year-old vessels built during the 1978-1983 boom period reached the end of their useful life). Today, fleet capacity seems to be closely

matching shipping requirements, resulting in a slight improvement in TCE rates over the last two years. An improvement in the economic climate may also help improve rates going forward.

The addition of the PENNSYLVANIA, FLORIDA, and the AMERICAN PHOENIX may test the realignment of supply and demand forces within a market that is operating at, or near, full employment. Should the demand for product tankers continue to decline, and given the limited potential for further vessel removals (market correction), tank vessel operators could face the risk of underutilized assets and the potential for reductions in future charter rates. Confidential Business Information

Confidential Business Information

8

## References

American Bureau of Shipping (ABS), ABS Record. Houston: American Bureau of Shipping, April 2012.

Clarkson Research Services. Clarkson Register, January 2012. London: Clarkson Research Services, January 2012.

Energy Information Agency. Annual Energy Outlook, 2012. Washington, DC: U.S. Department of Energy, Energy Information Agency. April 2012.

Energy Information Agency. Petroleum Supply Annual, 2011. Washington, DC: U.S. Department of Energy, Energy Information Agency. March 2011.

John Snyder, ed., "U.S. Shipyard Contracts", Marine Log. New York: Simmons-Boardman. January 2012.

Overseas Shipholding Group. Annual Financial Reports. New York, NY: Overseas Shipholding Group. March 2012.

U.S. Army Corps of Engineers. Waterborne Commerce of the United States, detail files, New Orleans, LA: U.S. Army Corps of Engineers, National Data Center. February 2012.

U.S. Army Corps of Engineers. Master Vessel File. New Orleans, LA: U.S. Army Corps of Engineers, National Data Center. February 2012.

**From:**          Christopher.Hanan@dot.gov
**Sent:**          Wednesday, October 17, 2012 11:40 AM
**To:**            George.Zoukee@dot.gov
**Subject:**       RE: Spreadsheet
**Attachments:**   6 APT Cashflow $44,600 4% BE% New Expenses NO MSC.xls


George,

Attached is the updated APT model with no MSC charter post Sep 2013. I have also reduced the utilization level in 2014 to reflect the vessels entering the spot market.  I kept utilization the same in 2013 since the bulk of the period the vessels will be under charter to MSC.

<div style="background:black;color:white;text-align:center">Deliberative Process</div>

Let me know if you have any other edits or changes.

Thanks
Chris

**From:** Zoukee, George (MARAD)
**Sent:** Wednesday, October 17, 2012 11:13 AM
**To:** Hanan, Christopher (MARAD)
**Subject:** Spreadsheet

**Chris,**

**I'll call you in a few.  Tied up.  Yes, your message was correct.  Thank you!**

**G**

**George M. Zoukee**
**Associate Administrator for Business and Finance Development**
**U.S. Department of Transportation**
**Maritime Administration**
**1200 New Jersey Avenue SE, W21-318**
**Washington, DC  20590**
(202) 366-9595 - tel
(202) 366-6988 - fax
(202) 641-5352 - mobile
george.zoukee@dot.gov
www.marad.dot.gov

CONFIDENTIAL BUSINESS INFORMATION

D

# APT Parent LLC

## Maritime Administration
## Title XI
## Credit Council Working Group
## May 31, 2012



1

APT V. USA

CONFIDENTIAL BUSINESS INFORMATION

2

# Company Background

- APT was incorporated in 2006 as a joint venture with U.S. Shipping to build & operate the vessels. U.S. Shipping collapsed in bankruptcy & the other partners retained Crowley Maritime Services to operate the vessels. The applicant company markets the vessels; all other operations are performed by Crowley.

- The applicant, American Petroleum Tankers Parent LLC is a subsidiary of APT Holdings LLC, which will guarantee the Title XI debt. All of the applicant's subsidiaries will also enter into the Title XI note & attendant agreements.

3



# Corporate Structure

**American Petroleum Tankers Holding LLC (APT Holding)**

**American Petroleum Tankers Parent LLC (APT Parent) - the Applicant**

- **APT Intermediate HoldCo LLC**
  - **JV Tanker Charterer LLC**
    - *Golden State*
  - **PI 2 Pelican State LLC**
    - *Pelican State*
  - **APT Sunshine State LLC**
    - *Sunshine State*
- **AP Tankers Co.**
- **American Petroleum Tankers LLC**
  - *Empire State*
  - *Evergreen State*

4

# Transaction Structure

- APT Parent & all its subsidiaries will be co-borrowers & will enter into Title XI documents.
- APT Holding is a holding company; currently it only owns APT Parent but in the future may expand into other ventures unrelated to the Project. APT Holding will guarantee the Title XI debt.
- Title XI debt will be secured by first priority mortgages on the vessels & assignment of revenue from the vessels. All vessels will be cross-collateralized.

5



# Company Financial Standing

Deliberative Process

6

CONFIDENTIAL BUSINESS INFORMATION

CONFIDENTIAL BUSINESS INFORMATION

8



**Deliberative Process**



9

# Product Tanker Market

- Wilson Gillette reports that all 17 modern Jones Act product tankers delivered since 2005 (OSG's 12 tankers & APT's 5 vessels) have been employed since delivery on time charters with full utilization & at significantly higher time charter rates than in the Time Charter Equivalents available on the spot market.



Deliberative Process

10



Deliberative Process

