# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN PETROLEUM TANKERS PARENT LLC, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 1:12-CV-001165-CKK |
| v. | ) ) | Notice of Filing of Administrative Record |
| The UNITED STATES OF AMERICA, *et al.*, | ) ) ) | |
| Defendants. | ) | |

## NOTICE OF FILING OF VOLUME 24 OF THE ADMINISTRATIVE RECORD

Defendants hereby give notice that attached hereto is **Volume 24** of the redacted

Administrative Record in this action, which is being filed in 26 separate volumes.

Respectfully Submitted,

STUART F. DELERY
Acting Assistant Attorney General

RONALD C. MACHEN, JR.
United States Attorney

DIANE KELLEHER
Assistant Branch Director

*s/ Daniel Bensing*
DANIEL BENSING
Senior Counsel
(D.C. Bar No. 334268)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W. Room 6114
Washington D.C. 20530
Tel.: (202) 305-0693
Fax:  (202) 616-8460
Email:  Daniel.Bensing@USDOJ.gov

Attorneys for Defendants

CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2013 I electronically filed the foregoing Notice of Filing of Volume 24 of the Administrative Record with the Clerk of the Court by using the CM/ECF system.


/s/ *Daniel Bensing*
DANIEL BENSING

CHAPTER II

## GULF COAST REFINING SYSTEM AND PETROLEUM PRODUCTS SUPPLIED TO THE EAST COAST, MIDDLE WEST, ROCKY MOUNTAIN REGION AND WEST COAST

Chapter Two addresses PAD III refinery output and supplies sent from the Gulf Coast to other parts of the country.  The PAD III refinery system has consistently produced barrels in excess of local requirements and it is the major supplier of products sent to East Coast and Middle West markets that have petroleum supply deficits which are mostly covered by barrels sent from the Gulf Coast.  Due to major plant expansions underway in PAD III, the minimal increase expected in future U.S. petroleum demand growth and the displacement of Gulf Coast products from the Middle West market, refineries in Texas-Louisiana-Mississippi have large product surpluses and will remain principal suppliers to the East Coast.


A.      PAD III REFINERY SYSTEM AND GULF COAST SUPPLY BALANCE.

PAD III refinery production and barrels sent from this region to other parts of the country and supplies exported during 2002-2011 are identified in Table 15.  This schedule shows that: (1) PAD III crude oil distillation capacity expanded by 850,000 BPD over the past ten years; (2) the Gulf Coast refinery system continues to manufacture petroleum products far in excess of local requirements; (3) Gulf Coast product shipments to the Middle West fell from 1 million BPD in 2008 to 830,000 BPD this year;(4) clean product exports from refineries in Texas and Louisiana grew from 509,000 BPD in 2008 to 1,040,000 BPD during 2011; and (5) most recently Gulf

-23-

Coast product shipments to the Northeast increased to offset declines in Middle Atlantic refinery output.

TABLE 15

SUMMARY GULF COAST REFINERY PRODUCTION, PETROLEUM CONSUMPTION AND CLEAN PRODUCT SHIPMENTS TO OTHER PARTS OF THE COUNTRY, UNITS IN MILLION BARRELS PER DAY

| REFINERY PRODUCTION | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| PRODUCTION | 2002 | 2004 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011[1] |
| GASOLINE | 3.59 | 3.60 | 3.71 | 3.73 | 3.35 | 3.51 | 3.54 | 3.65 |
| DISTILLATES | 1.66 | 1.84 | 1.93 | 2.01 | 2.34 | 2.10 | 2.22 | 2.35 |
| JET FUEL | .77 | .78 | .75 | .73 | .65 | .69 | .71 | .72 |
| RESIDUAL OIL | .28 | .30 | .29 | .32 | .29 | .31 | .34 | .30 |
| OTHER | 1.87 | 1.99 | 1.88 | 1.87 | 1.55 | 1.73 | 1.70 | 1.85 |
| | 8.17 | 8.51 | 8.56 | 8.66 | 8.18 | 8.34 | 8.51 | 8.87 |
| | | | | | | | | |
| PLANT CAPACITY | | | | | | | | |
| OPERATING | 7.72 | 8.07 | 8.08 | 8.08 | 8.34 | 8.26 | 8.50 | 8.52 |
| IDLE | .08 | .04 | .25 | .26 | .08 | .18 | .13 | .13 |
| | 7.80 | 8.11 | 8.33 | 8.34 | 8.42 | 8.44 | 8.63 | 8.65 |
| | | | | | | | | |
| CLEAN PRODUCTS | | | | | | | | |
| PRODUCTION | 6.02 | 6.22 | 6.39 | 6.47 | 6.34 | 6.32 | 6.47 | 6.72 |

| INDIGENOUS PETROLEUM CONSUMPTION | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2002 | 2004 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011[1] |
| GASOLINE | 1.28 | 1.34 | 1.37 | 1.40 | 1.36 | 1.41 | 1.42 | 1.34 |
| DISTILLATES | .66 | .67 | .71 | .74 | .76 | .71 | .80 | .86 |
| JET FUEL | .43 | .32 | .28 | .20 | .18 | .13 | .16 | .16 |
| RESIDUAL OIL | .12 | .15 | .07 | .17 | .14 | .11 | .10 | .10 |
| OTHER | 2.40 | 2.54 | 2.60 | 2.87 | 2.46 | 2.49 | 2.67 | 2.71 |
| | 4.89 | 5.02 | 5.03 | 5.38 | 4.90 | 4.85 | 5.15 | 5.17 |
| | | | | | | | | |
| CLEAN PRODUCTS | | | | | | | | |
| CONSUMPTION | 2.37 | 2.33 | 2.36 | 2.35 | 2.30 | 2.25 | 2.38 | 2.36 |

| GULF COAST CLEAN PRODUCTS PRODUCTION AND SUPPLIES SHIPPED TO OTHER REGIONS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2002 | 2004 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011[1] |
| LOCAL PRODUCTION | 6.02 | 6.22 | 6.39 | 6.47 | 6.34 | 6.35 | 6.47 | 6.72 |
| IMPORTS & INTERDISTRICT | | | | | | | | |
| RECEIPTS | .22 | .29 | .18 | .20 | .22 | .18 | .18 | .25 |
| EXPORTS | (.18) | (.17) | (.29) | (.30) | (.55) | (.65) | (.85) | (1.04) |
| | 6.03 | 6.34 | 6.28 | 6.37 | 6.01 | 5.88 | 5.80 | 5.93 |
| LOCAL USE | (2.41) | (2.33) | (2.36) | (2.35) | (2.30) | (2.25) | (2.38) | (2.36) |
| DOMESTIC SURPLUS | 3.66 | 4.01 | 3.92 | 4.02 | 3.71 | 3.63 | 3.42 | 3.57 |
| | | | | | | | | |
| DISTRIBUTION TO: | | | | | | | | |
| EAST COAST | 2.40 | 2.70 | 2.58 | 2.64 | 2.48 | 2.47 | 2.55 | 2.62 |
| MIDDLE WEST | 1.15 | 1.20 | 1.16 | 1.18 | 1.00 | .90 | .80 | .83 |
| ROCKY MOUNTAINS | .01 | .02 | .03 | .03 | .03 | .03 | .03 | .03 |
| WEST COAST | .10 | .09 | .11 | .14 | .17 | .15 | .14 | .15 |
| | 3.66 | 4.01 | 3.88 | 3.99 | 3.68 | 3.55 | 3.52 | 3.63 |

SOURCES: ENERGY INFORMATION ADMINISTRATION PETROLEUM SUPPLY AND MARKETING REPORTS

-24-

1> **FIRST NINE MONTHS 2011.**

Our estimate of gasoline production in the PAD III refinery system is different from that reported by the Energy Information Administration.  EIA records finished gasoline output and excludes plant production of gasoline blending components (conventional blendstock for oxygenate blending-CBOB and reformulated blendstock for oxygenate blending-RBOB) that are shipped outside the Gulf Coast District (by pipeline and vessel) to other PADs.  When PAD III produced RBOB and CBOB are delivered to PADs I-II-V they are mixed with ethanol and recorded (by EIA) as plant production in these Districts which overstates local refinery output.  We adjusted for this distortion by quantifying PAD III RBOB and CBOB shipments sent to other Districts and: (1) subtracting these volumes from EIA's local gasoline plant production; and (2) adding these barrels back to PAD III gasoline production.

Most of the growth in U.S. refining capacity occurred on the Gulf Coast due to the region's locational advantage, sophisticated plants and extensive products pipeline infrastructure that connects PAD III with the Middle West and East Coast.  Plant expansions underway support our expectation that Gulf Coast crude oil processing capacity will grow and the additional output will exceed expected petroleum product demand requirements in PAD III, thereby increasing shipments to the East Coast market which has a longstanding supply deficit that has been covered by imports.  Refinery expansions underway in PAD III are listed below.

-25-

```
                    REFINERY EXPANSIONS UNDERWAY IN TEXAS
                        PLANT               EXPECTED         ADDITION TO
     COMPANY            LOCATION            COMPLETION       PLANT CAPACITY
     MOTIVA             PORT ARTHUR, TX     2012              325,000 BPD
     VALERO             PORT ARTHUR, TX     2011               90,000 BPD
     TOTAL              PORT ARTHUR, TX     2012               90,000 BPD
     VALERO             MCKEE, TX           2013               25,000 BPD
                                                              530,000 BPD
```

Changes in PAD III refinery capacity by individual plants during 2000-2011 are presented in

Table 16.  In the last eleven years system crude distillation capacity increased by 1.2 million

BPD with fifty-eight percent of this growth being in Texas and forty-two percent in Louisiana.

TABLE 16

CHANGES IN GULF COAST REFINERY CAPACITY, UNITS IN MILLION KBPD

| LOUISIANA | 2000 | 2011 | CHANGE |
|---|---|---|---|
| XOM-BATON ROUGE | 489 | 505 | 16 |
| CITGO-L. CHARLES | 321 | 440 | 119 |
| MARATHON-GARYVILLE | 232 | 436 | 204 |
| VALERO-NORCO | 155 | 250 | 95 |
| COP-ALLIANCE | 250 | 247 | (3) |
| COP-W. LAKE | 245 | 239 | (5) |
| MOTIVA-CONVENT | 225 | 227 | 2 |
| MOTIVA-NORCO | 220 | 220 | -- |
| XOM-CHALMETTE | 182 | 193 | 11 |
| MURPHY-MERAUX | 95 | 125 | 30 |
| ALON-K. SPRINGS | 78 | 83 | 5 |
| PLACID-P. ALLEN | 48 | 55 | 7 |
| OTHERS | 164 | 140 | (24) |
|  | 2,704 | 3,160 | 456 |
|  |  |  |  |
| MISSISSIPPI |  |  |  |
| CHEVRON    295 | 330 | 35 |  |
| ERGON | 24 | 23 | (1) |
|  | 319 | 353 | 34 |
|  |  |  |  |
| TEXAS |  |  |  |
| XOM-BAYTOWN | 465 | 576 | 111 |
| BP-TX CITY | 433 | 451 | 18 |
| XOM-BEAUMONT | 335 | 345 | 10 |
| SHELL-D. PARK | 274 | 330 | 56 |
| F. HILLS-C. CHRISTI | 297 | 289 | (8) |
| VALERO-P. ARTHUR | 203 | 310 | 107 |
| MOTIVA-P. ARTHUR | 235 | 285 | 50 |
| LYONDELL-HOUSTON | 269 | 269 | -- |
| COP-SWEENEY | 205 | 247 | 42 |
| TOTAL-P. ARTHUR | 175 | 232 | 57 |

```
        VALERO-TEXAS CITY          152        245         93
```

TABLE 16 (Cont.)

CHANGES IN GULF COAST REFINERY CAPACITY, UNITS IN MILLION KBPD

| TEXAS | 2000 | 2011 | CHANGE |
|-------|------|------|--------|
| VALERO-C. CHRISTI | 215 | 205 | (10) |
| VALERO-SUNRAY | 146 | 170 | 24 |
| CITGO-C. CHRISTI | 157 | 157 | -- |
| WRB-BORGER | 125 | 146 | 24 |
| WESTERN-EL PASO | 90 | 125 | 35 |
| PASADENA-HSTN | 100 | 117 | 17 |
| VALERO-T. RIVERS | 90 | 100 | 10 |
| VALERO-HSTN | 73 | 90 | 17 |
| OTHERS | 217 | 294 | 77 |
|  | 4,256 | 4,983 | 727 |
| TOTAL GULF COAST | 7,279 | 8,496 | 1,217 |

SOURCE: OIL AND GAS JOURNAL WORLDWIDE REFINING SURVEY.

Another development which influences the volume of surplus Gulf Coast product is the displacement of PAD III barrels from the Middle West market.  Over the past four years, 170,000 BPD of Gulf Coast clean product supply was backed-out of the PAD II market as demand declined and Middle West refinery capacity expanded.  This displacement is expected to continue as more processing capacity is added to the PAD II refinery system as a result of plant revamps made to run additional Canadian syncrude.

Thus far, a large percent of the growing Gulf Coast clean product surplus was exported with 75 percent of the foreign sales going to Latin America and Mexico product exports from PAD III during 2002-2011 and the destination of foreign sales this year are quantified in Table 17.

-27-

TABLE 17

| GULF COAST CLEAN PRODUCT EXPORTS, UNITS IN THOUSAND BARRELS PER DAY | | | |
|---|---|---|---|
| DESTINATION OF EXPORTS DURING 2011 | | | |

| | DISTILLATES | GASOLINE | JET FUEL | TOTAL |
|---|---|---|---|---|
| LATIN AMERICA | 360 | 340 | 45 | 749 |
| EUROPE | 183 | 10 | -- | 193 |
| OTHERS | 12 | 16 | 25 | 53 |
| | 555 | 366 | 70 | 995 |

EXPORT SHIPMENTS 2002-2011

| | 02 | 04 | 06 | 08 | 09 | 10 | 11 |
|---|---|---|---|---|---|---|---|
| DISTILLATES | 60 | 68 | 148 | 364 | 458 | 546 | 574 |
| GASOLINE | 122 | 140 | 126 | 119 | 174 | 280 | 366 |
| JET FUEL | 7 | 17 | 14 | 26 | 33 | 54 | 56 |
| | 189 | 225 | 280 | 509 | 665 | 880 | 995 |

SOURCE: ENERGY INFORMATION ADMINISTRATION, PETROLEUM SUPPLY ANNUAL REPORTS.

One development which may limit and could reduce future Gulf Coast clean product exports to

Latin America is the completion of four refineries under construction in Mexico, Venezuela and

Brazil. The total crude distillation capacity of these plants is 630,000 BPD and they are designed

to produce large yields of clean products which should reduce Latin America's need to import

gasoline and distillate oil from the United States.

B.      MIDDLE WEST REFINING SYSTEM AND THE PETROLEUM PRODUCT

        BALANCE.

During the past decade total clean products demand in PAD II experienced a modest decline,

local refinery output increased and gasoline-distillate-jet fuel deliveries to the Middle West from

the Gulf Coast declined from approximately 1.2 million BPD in 2004 to 810,000 BPD during

2011. Supply and demand fundamentals in PAD II are quantified in Table 18.

-28-

TABLE 18

MIDDLE WEST PETROLEUM PRODUCT BALANCE, UNITS IN MILLION BPD

PAD II PETROLEUM PRODUCT DEMAND

|  | 2002 | 2004 | 2006 | 2008 | 2009 | 2010 | 2011[1] |
|---|---|---|---|---|---|---|---|
| GASOLINE | 2.53 | 2.61 | 2.63 | 2.54 | 2.52 | 2.53 | 2.46 |
| DISTILLATES | 1.10 | 1.21 | 1.26 | 1.22 | 1.08 | 1.16 | 1.13 |
| JET FUEL | .32 | .34 | .33 | .28 | .25 | .25 | .26 |
| RESIDUAL OIL | .05 | .05 | .06 | .04 | .03 | .02 | .03 |
|  | 4.00 | 4.21 | 4.28 | 4.08 | 3.88 | 3.96 | 3.88 |

PAD II SHIPMENTS TO OTHER DISTRICTS

|  | 2002 | 2004 | 2006 | 2008 | 2009 | 2010 | 2011[1] |
|---|---|---|---|---|---|---|---|
| GASOLINE | .08 | .08 | .08 | .08 | .08 | .09 | .11 |
| DISTILLATES | .04 | .04 | .04 | .08 | .07 | .07 | .08 |
| JET FUEL | .04 | .03 | .01 | .02 | .02 | .03 | .03 |
| RESIDUAL OIL | .01 | .01 | .01 | .01 | .02 | .02 | .02 |
|  | .17 | .16 | .14 | .19 | .19 | .21 | .24 |

PAD II TOTAL REQUIREMENTS

|  | 2002 | 2004 | 2006 | 2008 | 2009 | 2010 | 2011[1] |
|---|---|---|---|---|---|---|---|
| GASOLINE | 2.61 | 2.69 | 2.71 | 2.62 | 2.60 | 2.60 | 2.57 |
| DISTILLATES | 1.14 | 1.25 | 1.30 | 1.30 | 1.15 | 1.23 | 1.21 |
| JET FUEL | .36 | .37 | .34 | .30 | .27 | .29 | .29 |
| RESIDUAL | .06 | .06 | .07 | .05 | .05 | .04 | .05 |
|  | 4.17 | 4.37 | 4.42 | 4.27 | 4.07 | 4.13 | 4.12 |

PAD III DELIVERIES TO PAD II

|  | 2002 | 2004 | 2006 | 2008 | 2009 | 2010 | 2011[1] |
|---|---|---|---|---|---|---|---|
| GASOLINE | .72 | .74 | .69 | .61 | .60 | .52 | .54 |
| DISTILLATES | .29 | .36 | .32 | .28 | .24 | .23 | .22 |
| JET FUEL | .15 | .15 | .13 | .10 | .06 | .06 | .05 |
| RESIDUAL | -- | -- | -- | -- | -- | -- | -- |
|  | 1.16 | 1.25 | 1.11 | .99 | .90 | .80 | .81 |

PAD II REFINERY PRODUCTION

|  | 2002 | 2004 | 2006 | 2008 | 2009 | 2010 | 2011[1] |
|---|---|---|---|---|---|---|---|
| GASOLINE | 1.89 | 1.95 | 2.02 | 2.01 | 2.00 | 2.02 | 2.01 |
| DISTILLATES | .85 | .89 | .98 | 1.02 | .91 | .96 | .97 |
| JET FUEL | .21 | .22 | .21 | .20 | .21 | .22 | .23 |
| RESIDUAL | .06 | .06 | .07 | .05 | .05 | .05 | .05 |
|  | 3.01 | 3.12 | 3.28 | 3.28 | 3.17 | 3.25 | 3.26 |

SOURCE: ENERGY INFORMATION ADMINISTRATION, PETROLEUM SUPPLY ANNUAL REPORTS.

[1] FIRST NINE MONTHS 2010.

We predict that the supply trends underway in the Middle West during the past decade and the displacement of Gulf Coast barrels will continue into the foreseeable future. Underlying developments that support our prediction are threefold.

First, future petroleum demand growth in the Middle West will be minimal due to the enactment of stringent federal fuel efficiency standards that govern miles per gallon realized by new cars and trucks. Moreover, regional economic activity is forecast to be below historic levels and high oil prices will depress petroleum consumption as users preferentially shift more of their fuel requirements to cheaper natural gas.

Second, plant modifications being made to PAD II refineries by BP, COP and Marathon will increase clean products output by approximately 290,000 BPD during this decade which is equivalent to seven percent of total Middle West's current consumption of gasoline-distillates-jet fuel. In addition, the increased use of ethanol and biodiesel is likely to augment future PAD II products supply.

Third, we predict that Canadian crude oil will continue to be sold at discounted prices to Middle West refineries. This raw material cost advantage will result in the PAD II refinery system operating at higher rates of utilization than plants in PAD III, thereby displacing additional Gulf Coast products from the Middle West market.

-30-

<u>Fourth</u>, the conjunctive effect of rising PAD II refinery output and flat to declining products

demand will result in the displacement of additional Gulf Coast barrels from the Middle West

market.  Gulf Coast barrels backed-out of the Middle West will augment surplus clean products

in PAD III that must find markets elsewhere.

PLANT MODIFICATIONS AND EXPANSIONS UNDERWAY IN PAD II

| PLANT | OWNER | COMPLETION | MODIFICATION | BPD ADDITIONAL CLEAN PRODUCTS |
|---|---|---|---|---|
| WOOD RIVER, IL | COP/ENCANADA | 2012 | CANADIAN H. OIL & COKERS | 80,000 |
| WHITING, IL | BP | 2012 | CANADIAN H. OIL & COKERS | 100,000 |
| DETROIT, MI | MARATHON | 2012 | CANADIAN H. OIL & COKERS | 30,000 |
| TOLEDO, OH | BP/HUSKY | 2015 | CANADIAN H. OIL & COKERS | 80,000 |
| MANDAN, ND | TESORO | 2013 | CRUDE DISTILLATION | 10,000 |
| | | | | 300,000 |

Refineries located in the Middle West and capacity changes made during 2000-2011 are

presented in Table 19.  Plant expansions in the last decade (223,000 BPD) are equal to seventy-

four percent of these (300,000 BPD) forecast to occur over the next five years.

TABLE 19

CHANGES IN MIDDLE WEST REFINERY CRUDE OIL DISTILLATION CAPACITY,
UNITS IN MILLION KBPD

| ILLINOIS | 2000 | 2011 | CHANGE | MINNESOTA | 2000 | 2011 | CHANGE |
|---|---|---|---|---|---|---|---|
| COP | 286 | 306 | 20 | FLINT HILL | 290 | 323 | 33 |
| XOM | 235 | 238 | 3 | PAUL PARK | 70 | 74 | 4 |
| MAR | 192 | 204 | 12 | | 360 | 397 | 37 |
| PDV | 158 | 159 | 1 | | | | |
| OTHERS | 68 | -- | (68) | KANSAS | 2000 | 2011 | CHANGE |
| | 939 | 907 | (32) | FRONTIER | 105 | 135 | 30 |
| | | | | COFFEYVILLE | 95 | 120 | 25 |
| OHIO | 2000 | 2011 | CHANGE | NCRA | 79 | 83 | 4 |
| PBF | 140 | 170 | 30 | | 279 | 338 | 59 |
| HUSKY | 165 | 162 | (3) | | | | |
| BP | 152 | 152 | -- | KENTUCKY | 2000 | 2011 | CHANGE |
| MAR | 73 | 78 | 5 | MAR | 222 | 226 | 4 |
| | 530 | 562 | 32 | SOMERSET | 6 | 6 | -- |
| | | | | | 228 | 232 | 4 |
| OKLAHOMA | 2000 | 2011 | CHANGE | | | | |
| COP | 174 | 187 | 13 | TENNESSEE | | | |
| VALERO | 85 | 92 | 7 | | 2000 | 2011 | CHANGE |

-31-

| F. HOLLY | 85 | 125 | 40 |
|---|---|---|---|
| SINCLAIR | 50 | 75 | 25 |
| WYNN. RFG | 45 | 53 | 8 |
| | 439 | 532 | 93 |

| VALERO | 175 | 195 | 20 |
|---|---|---|---|

| MICHIGAN | 2000 | 2011 | CHANGE |
|---|---|---|---|
| MAR | 74 | 106 | 32 |

| INDIANA | 2000 | 2011 | CHANGE |
|---|---|---|---|
| BP | 410 | 385 | (25) |
| COUNTRYMARK | 24 | 27 | 3 |
| | 434 | 412 | (22) |

| NORTH DAKOTA | 2000 | 2011 | CHANGE |
|---|---|---|---|
| TESORO | 58 | 58 | -- |

| WISCONSIN | 2000 | 2011 | CHANGE |
|---|---|---|---|
| MURPHY | 33 | 33 | -- |

| TOTAL | 2000 | 2011 | CHANGE |
|---|---|---|---|
| PAD II | 3,549 | 3,772 | 223 |

SOURCES:  ENERGY INFORMATION ADMINISTRATION, PETROLEUM SUPPLY ANNUAL REPORTS, THE OIL AND GAS JOURNAL AND PETROLEUM COMPANY FINANCIAL REPORTS.

## CHAPTER III

### WEST COAST (PAD V) PETROLEUM BALANCE 2002-2011.

Approximately 26 percent of the Jones Act product tanker/ATB fleet (20 vessels with unit capacities above 16,000 DWT) is employed on the West Coast.  These vessels are mostly engaged in product service and several transport Alaska crude oil for Tesoro and Exxon Mobil. Chapter III addresses the West Coast petroleum balance in terms of:  (A) product supply/demand; (B) intra regional marine movements; and (C) shipments pipelined to Arizona from the Gulf Coast and California.  Particulars of the PAD V petroleum supply balance are quantified in Table 20.  Due to high product prices and a recession, West Coast clean products consumption fell from 2.62 million BPD in 2008 to 2.43 million BPD during 2011.  The reduction was mostly absorbed by waterborne shipments sent from Puget Sound and San Francisco to Southern California.  Jones Act product movements on the West Coast include:

• Gasoline-distillates-jet fuel sent from refineries in Puget Sound and San Francisco to Los Angeles.

• Waterborne product movements sent from PAD V refineries to markets not served by pipelines.

• Intra-regional shipments of intermediate products sent from less sophisticated to more sophisticated refineries where these supplies are upgraded into gasoline.

-32-

TABLE 20

SUMMARY PAD V REFINERY PRODUCTION, RECEIPTS FROM OTHER DISTRICTS, IMPORTS AND PRODUCT EXPORTS 2002-2011, UNITS IN MILLION BARRELS PER DAY

| REFINERY OUTPUT | 2002 | 2004 | 2007 | 2008 | 2009 | 2010 | 2011[1] |
|---|---|---|---|---|---|---|---|
| GASOLINE | 1.46 | 1.49 | 1.46 | 1.47 | 1.47 | 1.54 | 1.54 |
| DISTILLATES | .50 | .51 | .54 | .57 | .49 | .50 | .53 |
| JET FUEL | .42 | .43 | .40 | .46 | .40 | .39 | .41 |
| RESIDUAL | .16 | .16 | .16 | .15 | .13 | .12 | .13 |
| OTHER | .40 | .39 | .53 | .40 | .35 | .35 | .35 |
| | 2.94 | 2.98 | 3.09 | 3.05 | 2.84 | 2.90 | 2.96 |
| | | | | | | | |
| PLANT CAPACITY | 3.16 | 3.16 | 3.19 | 3.20 | 3.22 | 3.22 | 3.13 |
| | | | | | | | |
| RECEIPTS FROM PAD III & IV | | | | | | | |
| GASOLINE | .12 | .15 | .14 | .15 | .14 | .13 | .14 |
| DISTILLATES | .02 | .02 | .03 | .04 | .03 | .03 | .04 |
| JET FUEL | .01 | .01 | .01 | .01 | .01 | .01 | .01 |
| | .15 | .18 | .18 | .20 | .18 | .17 | .19 |
| | | | | | | | |
| IMPORTS | | | | | | | |
| GASOLINE | .03 | .06 | .10 | .02 | .05 | .04 | -- |
| DISTILLATES | -- | .02 | .03 | -- | .01 | .01 | .01 |
| JET FUEL | .06 | .07 | .12 | .03 | .03 | .04 | .03 |
| RESIDUAL | .02 | .03 | .03 | .03 | .04 | .06 | .04 |
| OTHER | .12 | .06 | .09 | .10 | .07 | .05 | .01 |
| | .23 | .24 | .37 | .18 | .20 | .20 | .09 |
| | | | | | | | |
| EXPORTS | | | | | | | |
| GASOLINE | (.01) | (.01) | -- | (.03) | (.03) | (.04) | (.04) |
| DISTILLATES | (.03) | (.04) | (.04) | (.10) | (.07) | (.05) | (.10) |
| RESIDUAL | (.04) | (.04) | (.04) | (.03) | (.03) | (.02) | (.03) |
| OTHER | (.14) | (.12) | (.12) | (.11) | (.14) | (.14) | (.16) |
| | (.22) | (.21) | (.20) | (.27) | (.27) | (.25) | (.33) |
| | | | | | | | |
| NET SUPPLY | | | | | | | |
| GASOLINE | 1.60 | 1.69 | 1.70 | 1.61 | 1.63 | 1.54 | 1.53 |
| DISTILLATES | .49 | .51 | .56 | .51 | .46 | .50 | .50 |
| JET FUEL | .49 | .51 | .53 | .50 | .44 | .39 | .43 |
| RESIDUAL | .14 | .15 | .15 | .15 | .14 | .12 | .14 |
| OTHER | .38 | .33 | .50 | .30 | .28 | .35 | .25 |
| | 3.10 | 3.19 | 3.44 | 3.07 | 2.95 | 2.90 | 2.85 |

SOURCES:   ENERGY INFORMATION ADMINISTRATION PETROLEUM SUPPLY ANNUAL REPORTS

[1]  FIRST NINE MONTHS 2011.

-33-

A.      <u>SUPPLY DEVELOPMENTS</u>.

West Coast refinery capacity was upgraded during the last ten years with investments made in destructive processing that increased clean products output. Changes in West Coast refinery capacity by plant during 2000-2011 are identified in Table 21.

TABLE 21

| CHANGES IN WEST COAST CRUDE OIL REFINERY CAPACITY, UNITS IN THOUSAND BPD | | | |
|---|---|---|---|
| CALIFORNIA | 2000 | 2011 | CHANGE |
| CHEVRON-EL SEGUNDO | 260 | 280 | 20 |
| CHEVRON-RICHMOND | 225 | 245 | 20 |
| BP-CARSON | 255 | 265 | 10 |
| SHELL-MARTINEZ | 155 | 160 | 5 |
| TESORO-WILMINGTON | 90 | 100 | 10 |
| COP-CARSON | 125 | 140 | 15 |
| COP-RODEO | 114 | 120 | 6 |
| TESORO-AVON | 156 | 166 | 10 |
| VALERO-BENICIA | 130 | 170 | 40 |
| VALERO-WILMINGTON | 72 | 135 | 63 |
| XOM-TORRANCE | 130 | 150 | 20 |
| OTHERS | 193 | 210 | 17 |
|  | 1,905 | 2,141 | 236 |
| WASHINGTON |  |  |  |
| BP-CHERRY POINT | 203 | 225 | 22 |
| SHELL | 142 | 145 | 3 |
| TESORO | 108 | 120 | 12 |
| COP | 89 | 100 | 11 |
| U.S. OIL | 40 | 40 | -- |
|  | 582 | 630 | 48 |
| ALASKA |  |  |  |
| FLINT HILLS | 197 | 215 | 18 |
| TESORO | 72 | 72 | -- |
| PETROSTAR | 52 | 48 | (4) |
| BP | 29 | 13 | (16) |
|  | 350 | 348 | (2) |
| HAWAII |  |  |  |
| TESORO | 94 | 94 | -- |
| CHEVRON | 54 | 54 | -- |
|  | 148 | 148 | -- |
| TOTAL | 2,985 | 3,267 | 282 |

SOURCE: ENERGY INFORMATION ADMINISTRATION, PETROLEUM SUPPLY ANNUAL REPORTS & THE OIL AND GAS JOURNAL

-34-

California accounts for 60 percent of petroleum consumption in PAD V and a long-standing

supply deficit exists in Los Angeles-Long Beach-San Diego which is covered by coastwise

products (approximately 150,000 BPD) shipped by water from Puget Sound and San Francisco.

Refineries in San Francisco and Los Angeles also supply gasoline-distillates-jet fuel by pipeline

(approximately 134,000 BPD) to Arizona and Nevada.  The remainder of clean products supply

in Arizona and Nevada (190,000 BPD) is delivered by pipeline from Texas.  Clean products

consumption by states in PAD V during 2000-2010 is quantified in Table 22.

TABLE 22

STATE PETROLEUM CONSUMPTION IN PAD V, UNITS IN MILLION BARRELS PER DAY

| GASOLINE | 2002 | 2004 | 2008 | 2009 | 2011[1] | |
|---|---|---|---|---|---|---|
| CA-AZ-NV | 1.20 | 1.22 | 1.19 | 1.20 | 1.16 | |
| WA-OR | | .29 | .30 | .27 | .29 | .27 |
| AK-HI | | .04 | .05 | .05 | .05 | .05 |
| | | 1.53 | 1.57 | 1.51 | 1.54 | 1.48 |
| | | | | | | |
| JET FUEL | | | | | | |
| CA-AZ-NV | .33 | .33 | .28 | .26 | .26 | |
| WA-OR | | .07 | .07 | .06 | .06 | .05 |
| AK-HI | | .08 | .10 | .10 | .09 | .10 |
| | | .48 | .50 | .44 | .41 | .41 |
| | | | | | | |
| DISTILLATES | | | | | | |
| CA-AZ-NV | .30 | .32 | .34 | .33 | .32 | |
| WA-OR | | .12 | .12 | .13 | .12 | .12 |
| AK-HI | | .04 | .04 | .04 | .03 | .03 |
| | | .46 | .48 | .51 | .48 | .47 |
| | | | | | | |
| TOTAL | | | | | | |
| CA-AZ-NV | 1.83 | 1.87 | 1.81 | 1.79 | 1.74 | |
| WA-OR | | .48 | .49 | .46 | .47 | .44 |
| AK-HI | | .16 | .19 | .19 | .17 | .18 |
| | | 2.47 | 2.55 | 2.46 | 2.43 | 2.36 |

SOURCES:        ENERGY INFORMATION ADMINISTRATION STATE ENERGY DATA REPORTS
ENERGY INFORMATION ADMINISTRATION PETROLEUM MARKETING REPORTS

[1]  FIRST NINE MONTHS 2011.

B.      OCEANGOING PETROLEUM PRODUCT MOVEMENTS IN THE WEST COAST
        TRADE.

Twelve tankers and six ATBs are employed in West Coast service and they are identified in

Table 23.  Presently, one ATB (550-1) is laid-up and BP will redeploy the OS Long Beach to

Gulf Coast service in January 2012 where this ship will replace the OS Texas City which BP is

releasing from its time charter.

TABLE 23

TANKERS AND LARGE OCEANGOING BARGES EMPLOYED IN WEST COAST PRODUCTS/CRUDE OIL SERVICE
FOURTH 2011 WITH CAPACITIES ABOVE 16,000 DWT

| VESSEL | TYPE | KDWT | CHARTER | OWNER-OPERATOR |
|---|---|---|---|---|
| EMPIRE STATE | SHIP | 49.0 | MSC | CROWLEY/BLACKSTONE |
| GOLDEN STATE | SHIP | 49.0 | BP | CROWLEY/BLACKSTONE |
| LONG BEACH | SHIP | 46.6 | BP | AS/OSG |
| LOS ANGELES** | SHIP | 46.6 | BP | AS/OSG |
| OS BOSTON | SHIP | 46.6 | TESORO | AS/OSG |
| OS MARTINEZ | SHIP | 46.6 | TESORO | AS/OSG |
| OS NIKISKI | SHIP | 46.6 | TESORO | AS/OSG |
| OS TAMPA | SHIP | 46.6 | CHEVRON | AS/OSG |
| M. VOYAGER | SHIP | 46.0 | CHEVRON | CHEVRON |
| O. VOYAGER | SHIP | 46.0 | CHEVRON | CHEVRON |
| C. VOYAGER* | SHIP | 46.0 | CHEVRON | CHEVRON |
| F. VOYAGER | SHIP | 46.0 | CHEVRON | CHEVRON |
| A. PROGRESS | SHIP | 46.0 | XOM | XOM |
| 650-2 | ATB | 27.0 | SHELL | CROWLEY |
| 650-6 | ATB | 27.0 | BP | CROWLEY |
| 650-10 | ATB | 20.0 | SHELL | CROWLEY |
| 550-1 | ATB | 20.0 | SPOT | CROWLEY |
| 550-2 | ATB | 20.0 | COP | CROWLEY |
| 550-3 | ATB | 20.0 | CROWLEY | CROWLEY |
| 550-4 | ATB | 20.0 | LAY-UP | CROWLEY |
| | | 768.0 | | |

*    GULF TO WEST COAST SERVICE.
**   WILL BE REPOSITIONED TO THE GULF COAST JANUARY 2012.

The volume of petroleum products transported in the intra West Coast trade during the 2002-

2011 interval is quantified in Table 24.  As was noted in Table 20, the decline in PAD V

petroleum consumption was especially sharp in California due to the state's high unemployment

rate and sharply rising fuel prices.  Because waterborne shipments from Puget Sound and San

Francisco are the most costly external supply delivered to Southern California, they absorbed a

disproportionate share of the decline in West Coast petroleum demand.

TABLE 24

**PETROLEUM PRODUCTS TRANSPORTED IN THE PRINCIPAL WEST COAST OCEANGOING TRADES, UNITS IN THOUSAND BARRELS PER DAY**

FROM PUGET SOUND TO:

|  | 06 | 07 | 08 | 09 | 10 | 11 | 02 | 04 | 05 |
|---|---|---|---|---|---|---|---|---|---|
| AK & HI | 21 | 4 | 4 | 1 | 3 | 5 | 8 | 5 | 5 |
| PORTLAND | 59 | 40 | 40 | 38 | 41 | 42 | 40 | 40 | 35 |
| LONG BEACH | 48 | 69 | 66 | 86 | 100 | 125 | 120 | 70 | 65 |
|  | 148 | 113 | 110 | 125 | 144 | 172 | 168 | 115 | 105 |

FROM SAN FRANCISCO TO:

|  | 02 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|
| WA-AK-HI | 12 | 12 | 10 | 11 | 20 | 25 | 30 | 30 | 25 |
| PORTLAND | 42 | 35 | 28 | 35 | 38 | 40 | 40 | 40 | 39 |
| LONG BEACH | 47 | 56 | 61 | 88 | 100 | 120 | 130 | 50 | 50 |
|  | 101 | 103 | 99 | 134 | 158 | 185 | 200 | 120 | 114 |

TOTAL SHIPMENTS FROM:

|  | 02 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|
| PUGET SOUND | 148 | 113 | 110 | 125 | 144 | 172 | 168 | 115 | 105 |
| SAN FRANCISCO | 101 | 103 | 99 | 134 | 158 | 185 | 200 | 120 | 114 |
|  | 249 | 216 | 209 | 259 | 302 | 357 | 368 | 235 | 219 |

TOTAL SHIPMENTS TO:

|  | 02 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|
| AK & HI | 33 | 16 | 14 | 12 | 23 | 30 | 38 | 35 | 30 |
| PORTLAND | 101 | 75 | 68 | 73 | 79 | 82 | 80 | 80 | 74 |
| LONG BEACH | 115 | 125 | 137 | 174 | 200 | 245 | 250 | 120 | 115 |
|  | 249 | 216 | 219 | 259 | 302 | 357 | 368 | 235 | 219 |

## CHAPTER IV

### FUTURE U.S. PETROLEUM DEMAND, OUTPUT FROM
### THE DOMESTIC REFINING SYSTEM AND PRODUCT IMPORTS

Chapter Four estimates future U.S. petroleum use, output from domestic refineries, interdistrict shipments, supply deficits and the requirement for clean product imports.  The purpose of this analysis is to determine whether the volume of domestic clean products available for shipment in the coastwise trade is likely to undergo a material change over the next ten years.  Since the mid-1990s, there was a moderate ongoing reduction in coastwise product shipments caused by growing gasoline imports to the East Coast. However, due to atypical developments underway in the U.S. downstream sector it is unlikely these historical trends will continue.  Expectations are that future growth in domestic petroleum demand will be slower than in the past and expanding PAD III refinery output will find markets in the Northeast and abroad.

Furthermore, the closure of 928,000 BPD of refining capacity in the Delaware Valley will create the need for additional replacement barrels in Pennsylvania, New Jersey, New York, and New England.  We expect that the conjunctive effect of these developments will result in increased coastwise shipments and the need for additional vessels in the Jones Act products trade.  The underpinnings of our forecast are sevenfold.

First, new federal automotive fuel efficiency standards will increase miles per gallon and stabilize future U.S. gasoline consumption as the number of vehicles and highway traffic continues to grow.

Second, additional highway diesel fuel use is forecast to occur as diesel powered pickup trucks capture half of this market which is presently dominated by gasoline engines.  Due to this development we expect total domestic distillate demand will grow from 3.8 million BPD in 2010 to approximately 5.3 million BPD by 2030.

Third, due to the depletion of low cost oil reserves crude and petroleum product prices are forecast to remain high over the next twenty years.

Fourth, major refinery expansions underway on the Gulf Coast and increased production from these system additions will be marketed outside PAD III.

Fifth, additional Gulf Coast petroleum products will be displaced from the Middle West market as: (1) the indigenous refinery system is modified/expanded to process more Canadian syncrude; and (2) ethanol use is increased in the local gasoline supply.  The upshot of these two developments is that displacement of Gulf Coast barrels from the Middle West market will continue and this will augment the PAD III product surplus that must find outlets elsewhere.

Sixth, in the future we believe that the opportunity to export large volumes of surplus clean products from the Gulf Coast to nearby markets in Latin America will be limited by refinery system expansions now underway in Mexico, Brazil and Venezuela.

Seventh, the influx of more Gulf Coast products being delivered by pipeline to the Northeast depressed Middle Atlantic refinery processing margins and this caused additional plants to be shut down in PAD IB.  During 2000-2011, U.S. crude oil distillation capacity grew from 16.5 to 17.4 million BPD with most of this increase occurring in PAD III.  These changes are quantified in Table 25.

TABLE 25

U.S. OIL REFINERY CRUDE DISTILLATION CAPACITY BY PAD REGION,
UNITS IN MILLION BARRELS PER DAY

| PAD[*] REGION | 02 | 04 | 08 | 09 | 10 | 11 | 12 | CHANGE 00-12 |
|---|---|---|---|---|---|---|---|---|
| I | 1.72 | 1.74 | 1.72 | 1.37 | 1.30 | 1.12 | .79 | (.93) |
| II | 3.59 | 3.53 | 3.66 | 3.67 | 3.72 | 3.72 | 3.80 | .21 |
| III | 7.78 | 7.90 | 8.42 | 8.42 | 8.63 | 8.65 | 9.00 | 1.22 |
| IV | .58 | .58 | .60 | .60 | .67 | .64 | .64 | .06 |
| V | 3.13 | 3.16 | 3.20 | 3.20 | 3.22 | 3.27 | 3.27 | .14 |
| | 16.80 | 16.91 | 17.60 | 17.26 | 17.54 | 17.40 | 17.50 | .70 |

SOURCES:  ENERGY INFORMATION ADMINISTRATION PETROLEUM SUPPLY ANNUAL REPORTS AND OIL
AND GAS JOURNAL.

[*]     PAD I-EAST COAST
PAD II-MIDDLE WEST
PAD III-GULF COAST
PAD IV-ROCKY MOUNTAINS
PAD V-WEST COAST

The consequence of altered supply dynamics underway in the domestic downstream sector are addressed below in terms of: (A) forecast petroleum product demand; and (B) estimated interdistrict shipments of clean products.

A. <u>FORECAST PETROLEUM DEMAND</u>.

The U.S. Energy Information Administration's reference case estimate of future domestic

petroleum product demand is used in our analysis and it is based on $100 per barrel crude oil, 2.4

percent annual economic growth and a 1 percent yearly increase in population during the next

twenty years.  Overall, U.S. petroleum product use is forecast to increase by approximately 0.6

percent a year during the 2010-2030 interval with the consumption of some products growing

more rapidly than others.  EIA's forecast is presented in Table 26.

TABLE 26

U.S. ENERGY INFORMATION ADMINISTRATION REFERENCE CASE ESTIMATE OF FUTURE
DOMESTIC LIQUID FUEL USE 2010-2030, UNITS IN MILLION BARRELS PER DAY

| PRODUCT | 10 | 15 | BY FUEL 20 | 25 | 30 | ANNUAL GROWTH % 10-30 |
|---|---|---|---|---|---|---|
| GASOLINE | 9.03 | 9.37 | 9.24 | 9.32 | 9.35 | .02 |
| DISTILLATES | 3.79 | 4.24 | 4.41 | 4.65 | 5.30 | 1.6 |
| JET FUEL | 1.42 | 1.57 | 1.68 | 1.75 | 1.80 | 1.2 |
| HFO | .55 | .66 | .66 | .66 | .67 | 1.0 |
| OTHER | 4.36 | 4.49 | 4.56 | 4.49 | 4.45 | 0.1 |
| | 19.15 | 20.35 | 20.55 | 20.87 | 21.57 | 0.6 |

As noted, the most rapid petroleum product demand growth is predicted to be in distillates and

jet fuel with their future use forecast to increase at approximately 1.5 percent a year.  For

planning purposes, we consider intermediate term estimates more useful than longer term

forecasts whose predictions are often undermined by unforeseen economic developments,

changes in government policy and structural alterations in worldwide petroleum supply.  Our

regional petroleum demand estimates are presented in Table 27.  This regional product

consumption forecast is a baseline from which future supply balances for PADs I-II-III-IV-V are

calculated in Section B.

TABLE 27

FORECAST REGIONAL PETROLEUM PRODUCT DEMAND, UNITS IN MILLION BPD

| EAST COAST-PAD I | 10 | 15 | 20 | 25 | 30 |
|---|---|---|---|---|---|
| GASOLINE | 3.2 | 3.3 | 3.3 | 3.3 | 3.4 |
| DISTILLATES | 1.2 | 1.4 | 1.5 | 1.6 | 1.7 |
| JET FUEL | .5 | .5 | .6 | .6 | .6 |
| HFO | .3 | .5 | .5 | .5 | .5 |
| OTHER | .4 | .3 | .3 | .3 | .4 |
| | 5.6 | 6.0 | 6.2 | 6.3 | 6.6 |
| | | | | | |
| MIDDLE WEST-PAD II | | | | | |
| GASOLINE | 2.5 | 2.6 | 2.6 | 2.6 | 2.6 |
| DISTILLATES | 1.1 | 1.2 | 1.2 | 1.3 | 1.4 |
| JET FUEL | .3 | .3 | .3 | .3 | .3 |
| OTHER | .6 | .6 | .5 | .5 | .6 |
| | 4.5 | 4.7 | 4.6 | 4.7 | 4.9 |
| | | | | | |
| GULF COAST-PAD III | | | | | |
| GASOLINE | 1.4 | 1.5 | 1.5 | 1.5 | 1.5 |
| DISTILLATES | .8 | .9 | 1.0 | 1.1 | 1.2 |
| JET FUEL | .2 | .2 | .2 | .2 | .2 |
| HFO | .1 | .1 | .1 | .1 | .1 |
| OTHER | 3.0 | 3.1 | 3.4 | 3.4 | 3.5 |
| | 5.5 | 5.8 | 6.2 | 6.3 | 6.5 |
| | | | | | |
| ROCKY MOUNTAINS-PAD IV | | | | | |
| GASOLINE | .3 | .3 | .3 | .3 | .3 |
| DISTILLATES | .2 | .2 | .2 | .2 | .2 |
| JET FUEL | .1 | .1 | .1 | .1 | .1 |
| OTHER | .1 | .1 | .1 | .1 | .1 |
| | .7 | .7 | .7 | .7 | .7 |
| | | | | | |
| WEST COAST-PAD V | | | | | |
| GASOLINE | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 |
| DISTILLATES | .5 | .6 | .6 | .7 | .8 |
| JET FUEL | .4 | .5 | .5 | .6 | .6 |
| HFO | .1 | .1 | .1 | .1 | .1 |
| OTHER | .3 | .2 | .2 | .2 | .3 |
| | 2.9 | 3.0 | 3.0 | 3.3 | 3.4 |
| TOTAL | | | | | |
| GASOLINE | 9.0 | 9.3 | 9.3 | 9.3 | 9.4 |
| DISTILLATES | 3.8 | 4.3 | 4.5 | 4.9 | 5.3 |
| JET FUEL | 1.5 | 1.6 | 1.7 | 1.8 | 1.8 |
| HFO | .5 | .7 | .7 | .7 | .7 |
| OTHER | 4.4 | 4.5 | 4.5 | 4.5 | 4.9 |
| | 19.2 | 20.4 | 20.7 | 21.3 | 22.1 |

B.      ESTIMATED INTERDISTRICT SHIPMENTS OF CLEAN PRODUCTS.

Interdistrict shipments of clean products are predicted employing subset analysis which

considers petroleum demand, future refinery output, pipeline movements, coastwise shipments

and imports.  Within interior markets (Middle West-South Atlantic States-Rocky Mountains)

supply shortfalls are assumed to be covered by pipeline shipments sent from refineries in PAD

III.  Gulf Coast barrels available for coastwise shipments and exports are the supplies that remain

after local product requirements are covered and pipeline deliveries are made to other parts of the

country.  The resultant Gulf Coast surplus is then allocated to markets that generate the best

netbacks to PAD III refineries.  Remaining supply deficits are then assumed to be covered by

product imports.  Our estimate of the Gulf Coast clean product supply and its distribution during

the 2010-2030 interval is presented in Table 28.

TABLE 28

FORECAST GULF COAST CLEAN PRODUCT SUPPLY AND ITS DISTRIBUTION,
UNITS IN MILLION BPD

| | 10 | 15 | 20 | 25 | 30 |
|---|---|---|---|---|---|
| GC PLANT PRODUCTION | 6.5 | 7.3 | 7.4 | 7.5 | 7.6 |
| LOCAL USE | (2.3) | (2.6) | (2.7) | (2.8) | (2.9) |
| SURPLUS | 4.2 | 4.7 | 4.7 | 4.7 | 4.7 |

DISTRIBUTION OF SURPLUS

| | 10 | 15 | 20 | 25 | 30 |
|---|---|---|---|---|---|
| NORTHEAST | | | | | |
| GC PIPE | .7 | .9 | 1.0 | 1.1 | 1.1 |
| US SHIP | -- | .1 | .2 | .2 | .3 |
| | .7 | 1.0 | 1.2 | 1.3 | 1.4 |
| SOUTH ATLANTIC | | | | | |
| GC PIPE | 1.4 | 1.5 | 1.6 | 1.7 | 1.8 |
| US SHIP | -- | .1 | .1 | .1 | .1 |
| | 1.4 | 1.6 | 1.7 | 1.8 | 1.9 |
| FLORIDA | | | | | |
| US SHIP | .6 | .8 | .9 | 1.0 | 1.0 |
| MIDDLE WEST | | | | | |
| GC PIPE | .7 | .5 | .4 | .2 | .2 |
| EXPORTS | .8 | .8 | .5 | .4 | .3 |
| | 4.2 | 4.7 | 4.7 | 4.7 | 4.7 |

The primary finding of this analysis is that additional clean products output from Gulf Coast

refinery expansions will be sold in East Coast markets.  A main determinant in this assessment is

the sharp reduction in Northeast refinery capacity-production that will increase regional

shortfalls which must principally be covered by replacement barrels supplied from the Gulf

Coast.  Barrels delivered to PAD I will be influenced by the following factors.

First, products pipeline capacity from the Gulf to East Coast will be increased with expansions

made on the Plantation and Colonial systems.  In the near term (one to two years) these capacity

increases will be modest (approximately 200,000 BPD) and primarily made by Colonial who

would increase pumping  station horsepower and inject drag reducing chemicals into their

shipments.

Some unused delivery capacity also exists on Plantation.  Shippers who transport barrels to the

South Atlantic region on Colonial can redirect their barrels on to Plantation and increase

Colonial's delivery capacity into the Northeast.  Plantation is estimated to have 100,000 BPD of

spare capacity.

Second, in the longer term (three to five years) much larger increases in pipeline capacity can be

made by looping lines around constrained areas and adding new pumping stations between

existing facilities.  Moreover, Kinder Morgan is building a 20-inch products pipeline (Parkway)

that will connect additional refineries on the Mississippi River with Collins, Mississippi.  At

Collins, the Parkway system will connect with the Plantation Pipe Line.  Plantation is owned by

Kinder Morgan (49 percent) and Exxon Mobil (51 percent).  In total, these expansions (by

Colonial and Plantation) would increase Gulf to East Coast products pipeline capacity by another

400,000 BPD.


Third, due to reduced distillate oil output in the Middle Atlantic refinery system and minimal

supplies being available in foreign market, the Gulf Coast is the logical source for replacement

barrels.  Because of constraints on Gulf to Northeast pipeline capacity we believe a requirement

will exist to transport distillate oil by tankship to the Middle Atlantic region.  Forecast clean

petroleum product supply balances in the U.S. during the 2010-2030 interval are quantified in

Table 29.


TABLE 29

FORECAST DOMESTIC CLEAN PRODUCT SUPPLY BALANCES, IN MILLION BPD

| NORTHEAST | 10 | 15 | 20 | 25 | 30 |
|---|---|---|---|---|---|
| L. REFINERY | 1.1 | .6 | .6 | .6 | .6 |
| GC PIPE | .7 | .9 | 1.0 | 1.1 | 1.1 |
| IMPORTS | .8 | 1.1 | .9 | .8 | .8 |
| GC SHIP | -- | .1 | .2 | .2 | .3 |
| | 2.6 | 2.7 | 2.7 | 2.7 | 2.8 |
| | | | | | |
| SOUTH ATLANTIC | | | | | |
| GC PIPE | 1.4 | 1.5 | 1.6 | 1.6 | 1.7 |
| IMPORTS | .1 | -- | -- | -- | -- |
| GC SHIP | -- | .1 | .1 | .2 | .2 |
| | 1.5 | 1.6 | 1.7 | 1.8 | 1.9 |
| | | | | | |
| FLORIDA | | | | | |
| GC SHIP | .6 | .8 | 1.0 | 1.0 | 1.0 |
| IMPORTS | .2 | .1 | -- | -- | -- |
| | .8 | .9 | 1.0 | 1.0 | 1.0 |
| | | | | | |
| MIDDLE WEST | | | | | |
| L. REFINERY | 2.9 | 3.3 | 3.4 | 3.7 | 3.8 |
| GC PIPE | .7 | .5 | .4 | .2 | .2 |
| | 3.6 | 3.8 | 3.8 | 3.9 | 4.0 |
| | | | | | |
| GULF COAST | | | | | |
| L. REFINERY | 6.5 | 7.3 | 7.4 | 7.5 | 7.6 |
| L. USE | (2.3) | (2.6) | (2.7) | (2.8) | (2.9) |
| EXPORTS | (.8) | (.8) | (.5) | (.4) | (.3) |
| | 3.4 | 3.9 | 4.2 | 4.3 | 4.4 |
| | | | | | |
| ROCKY MOUNTAINS | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| L. REFINERY | .6 | .6 | .6 | .6 | .6 |
| L. USE | (.6) | (.6) | (.6) | (.6) | (.6) |
| | -- | -- | -- | -- | -- |
| **WEST COAST** | | | | | |
| L. REFINERY | 2.4 | 2.4 | 2.4 | 2.6 | 2.6 |
| GC PIPE | .1 | .1 | .1 | .1 | .1 |
| IMPORTS | -- | .2 | .2 | .3 | .3 |
| | 2.5 | 2.7 | 2.7 | 3.0 | 3.0 |
| **TOTAL GULF COAST WATER** | | | | | |
| NORTHEAST | -- | .1 | .2 | .2 | .3 |
| SOUTH ATLANTIC | -- | .1 | .1 | .2 | .2 |
| FLORIDA | .6 | .8 | 1.0 | 1.0 | 1.0 |
| | .6 | 1.0 | 1.3 | 1.4 | 1.5 |

3464

CHAPTER V

ESTIMATED DEMAND FOR JONES ACT VESSELS ABOVE
16,000 DWT CAPACITY IN THE OCEANGOING PETROLEUM
PRODUCT AND CHEMICAL-SPECIALTY TRADES
_____

In this chapter, we address current and future cargo shipments in the coastwise products-chemicals trade and the associated requirement for domestic tonnage.  All OPA-90 qualified shipping is considered with vessels having capacities between 16,000 and 57,000 DWT.  Equipment excluded from our forecast includes: (a) vessels employed in product movements sent from the Middle Atlantic region to New York State and New England where voyages are short; (b) intra regional shipments between Louisiana-Mississippi-Texas; and (c) equipment used in asphalt service.  Vessels engaged in chemical-specialty transportation are included because this equipment can carry petroleum products.


A.      CURRENT FLEET DEPLOYMENT.

The employment of the Jones Act petroleum and specialties fleet during December 2011 is quantified in Table 30.  Presently, 48 percent of fleet capacity is engaged in cross-Gulf products service, 25 percent is deployed in the intra West Coast trade, 10 percent in chemicals-specialties, 10 percent is in crude oil transportation, 4 percent in Military Sealift Command employment, 2 percent in Gulf-West Coast traffic and 1 percent is in lay-up.  A summary of coastwise vessel deployments over the past four years is given below.  With domestic trade requirements continuing to be depressed in 2011, 500,000 DWT of trade qualified single hull shipping was sent to the breakers before statutory retirement dates during the past 12 months.

DEPLOYMENT OF VESSELS WITH CAPACITIES BETWEEN 16-57 KDWT EMPLOYED IN THE COASTWISE
PETROLEUM-SPECIALTY TRADES IN MILLION DWT

| TRADE | 2008 | 2009 | 2010 | JUNE 2011 | DEC 2011 |
|---|---|---|---|---|---|
| CROSS GULF PRODUCTS | 1.54 | 1.46 | 1.34 | 1.31 | 1.28 |
| INTRA WEST COAST | .61 | .55 | .67 | .72 | .66 |
| CRUDE OIL | .13 | .30 | .31 | .26 | .28 |
| CHEMICALS/SPECIALTIES | .39 | .24 | .24 | .26 | .28 |
| MSC | .12 | .12 | .09 | .10 | .10 |
| GC/WC | .09 | .09 | .09 | .09 | .05 |
| GRAIN | .19 | .09 | -- | -- | -- |
| LAY-UP | -- | .55 | .35 | .07 | .02 |
| | 3.07 | 3.40 | 3.09 | 2.81 | 2.67 |

TABLE 30

ESTIMATED COASTWISE DEPLOYMENT OF PETROLEUM PRODUCT AND CHEMICAL/SPECIALTY
VESSELS WITH CAPACITIES ABOVE 16,000 DWT FOURTH QUARTER 2011

IN MILLION DWT

| TRADE | TANKER | BARGE | TOTAL |
|---|---|---|---|
| PETROLEUM PRODUCTS | | | |
| GULF TO EAST COAST | .512 | .771 | 1.283 |
| INTRA WEST COAST | .515 | .141 | .656 |
| GULF TO WEST COAST | .046 | -- | .046 |
| MSC | .098 | -- | .098 |
| | 1.171 | .912 | 2.083 |
| CHEMICALS-SPECIALTIES | .083 | .197 | .280 |
| CRUDE OIL | | | |
| ALASKA | .045 | -- | .045 |
| DE BAY LIGHTERS | -- | .120 | .120 |
| GOM SHUTTLE | .093 | -- | .093 |
| EAGLE FORD | -- | .022 | .022 |
| | .138 | .142 | .280 |
| GRAIN TRADE | -- | -- | -- |
| LAY-UP | -- | .020 | .020 |
| TOTAL | 1.392 | 1.271 | 2.663 |

TABLE 30 (Cont.)

ESTIMATED COASTWISE DEPLOYMENT OF PETROLEUM PRODUCT AND CHEMICAL/SPECIALTY
VESSELS WITH CAPACITIES ABOVE 16,000 DWT FOURTH QUARTER 2011

| NUMBER OF VESSELS | | | TRADE |
|---|---|---|---|
| PETROLEUM PRODUCTS | TANKER | BARGE | TOTAL |
| GULF TO EAST COAST | 11 | 32 | 43 |
| INTRA WEST COAST | 11 | 6 | 17 |
| GULF TO WEST COAST | 1 | -- | 1 |
| MSC | 2 | -- | 2 |
| | 25 | 38 | 63 |
| CHEMICALS-SPECIALTIES | 2 | 9 | 11 |
| CRUDE OIL | | | |
| ALASKA | 1 | -- | 1 |
| DE BAY LIGHTERS | -- | 3 | 3 |
| GOM SHUTTLES | 2 | -- | 2 |
| EAGLE FORD | -- | 1 | 1 |
| | 3 | 4 | 7 |
| GRAIN TRADE | -- | -- | -- |
| LAY UP | -- | 1 | 1 |
| TOTAL | 30 | 52 | 82 |

B.    COASTWISE TRADE FORECAST.

Our estimate of future tonnage requirements is predicted using the following assumptions.

• Additions to Gulf Coast refinery capacity.  Over the 2012-2015 interval, we predict that the

capacity of the  PAD III refining system will expand by 530,000 BPD.  In addition, Gulf

Coast clean product shipments to the Middle West will continue to decline due to minimal

demand growth in PAD II and increased output from indigenous refineries. Together, these

two developments are predicted to increase the size of the Gulf Coast clean product surplus.

Furthermore, future growth in Latin American refinery capacity and attendant plant

production will limit the amount of Gulf Coast gasoline and distillates that can be sold

profitably in the export market.  The conjunctive result of these developments will be to force

more Gulf Coast barrels into the East Coast market that has a supply deficit which is covered

in part by imports which have been in decline.


• The capacity and production of the Middle Atlantic refining system will continue to be

reduced due to weak processing margins and costly plant upgrades that are required to stay in

business.  The resultant supply deficit will be covered by additional Gulf Coast barrels and

imports.


• Additional Gulf Coast barrels sent to the East Coast will be transported by pipeline and ship.

Near term expansions in pipeline capacity will be limited and shortfalls in Northeast distillate

supply will be covered in part by Jones Act vessel cargos.


• The intra West Coast products trade will recover as overall economic activity returns to

normal levels.  This development will increase West Coast tankship-barge employment by

several vessels.


• Chemical cargos.  We expect there will be moderate growth in the upcoast chemical-

specialties trade as foreign suppliers reduce their deliveries to the U.S.  The high cost of

foreign feedstocks relative to those paid by domestic chemical producers has given U.S.

companies a material advantage over imports.  Gradually domestic chemical suppliers will

regain some of the East Coast markets lost to imports over the last decade, thereby increasing

U.S. tonnage requirements in this trade.

• <u>Military Sealift Command</u>.  MSC replaced three T-5 tankers with two newbuildings. One T-5

tanker (Gianelia) remains in MSC service as a prepositioning vessel stationed at Diego

Garcia.  In addition, the Houston (a T-5 tanker renamed the Darnell) is now used by MSC to

deliver petroleum products to Navy bases in Key West and Jacksonville, Florida.  During the

forecast interval 2012-2020, we expect that MSC's additional international tanker needs will

be covered by reflagged foreign built vessels.


• <u>Crude oil shuttle tankers Gulf of Mexico</u>.  Two 43,000 DWT tankers (OS Cascade and OS

Chinook) were chartered by Petrobras. These vessels were purchased by OSG from Aker

Philadelphia Shipyard for $115 million each.  Petrobras time chartered the Cascade for five

years and the Chinook for four years.  Petrobras has options to time charter these ships

beyond the initial employment term.  We predict that over the next decade (2011-2020) a

total of 4-6 ships could be employed in Gulf of Mexico crude oil shuttle service.  Moreover,

Shell Oil is presently considering the use of two shuttle tankers that would be delivered in

2014 and used to transport crude oil from their Stone Field discovery (Walker Ridge) which

is adjacent to the Chinook and Cascade fields developed by Petrobras.


We addressed future tonnage requirements in the coastwise trade in several scenarios.  The <u>first</u>

is our base case estimate which assumes growth in the cross-Gulf trade, intra West Coast

shipments and the number of tankers employed in Gulf of Mexico crude oil shuttle service.  The
second is a low case assessment which predicts more moderate growth in cross-Gulf shipments,
fewer tankers employed in Gulf of Mexico shuttle service and termination of Jones Act tanker
employment in the P.L. 480 grain business. The third is a high case forecast which assumes
substantial growth in the cross-Gulf trade, increased shipments to the Northeast, more tankers
employed in Gulf of Mexico shuttle service and continuing Jones Act tankship employment
opportunities in the P.L. 480 grain trade.  Our trade demand estimates are presented in Table 31.

TABLE 31

**ESTIMATED SHIPPING DEMAND FOR PRODUCT TANKERS, SPECIALTY VESSELS AND OCEANGOING BARGES
IN THE JONES ACT TRADES WITH CAPACITIES ABOVE 16,000 DWT, UNITS IN MILLION DWT**

BASE CASE ASSESSMENT

| TRADE | 2011 | 2012 | 2014 | 2016 | 2018 | 2020 |
|---|---|---|---|---|---|---|
| GULF TO FLORIDA | 1.48 | 1.58 | 1.68 | 1.70 | 1.71 | 1.73 |
| GULF TO E. COAST | .28 | .34 | .42 | .42 | .42 | .42 |
|  | 1.76 | 1.92 | 2.10 | 2.12 | 2.13 | 2.15 |
|  |  |  |  |  |  |  |
| INTRA WEST COAST | .58 | .55 | .60 | .70 | .70 | .75 |
| GULF TO WEST COAST | .05 | .05 | .05 | .05 | .05 | .05 |
|  | .63 | .60 | .65 | .75 | .75 | .80 |
|  |  |  |  |  |  |  |
| MSC | .10 | .13 | .13 | .13 | .13 | .13 |
|  |  |  |  |  |  |  |
| DE BAY LIGHTERS | .12 | .09 | -- | -- | -- | -- |
| GOM SHUTTLE | .09 | .09 | .09 | .13 | .13 | .18 |
| ALASKA | .04 | .04 | .04 | -- | -- | -- |
| EAGLE FORD | .02 | .06 | .10 | .12 | .12 | .12 |
|  | .27 | .28 | .23 | .25 | .25 | .30 |
|  |  |  |  |  |  |  |
| P.L. 480 | -- | -- | -- | -- | -- | -- |
|  | 2.76 | 2.93 | 3.11 | 3.25 | 3.26 | 3.38 |

LOW CASE ASSESSMENT

| TRADE | 2011 | 2012 | 2014 | 2016 | 2018 | 2020 |
|---|---|---|---|---|---|---|
| GULF TO FLORIDA | 1.48 | 1.58 | 1.68 | 1.70 | 1.71 | 1.73 |
| GULF TO E. COAST | .28 | .30 | .35 | .35 | .35 | .35 |
|  | 1.76 | 1.88 | 2.03 | 2.05 | 2.06 | 2.08 |
|  |  |  |  |  |  |  |
| INTRA WEST COAST | .58 | .55 | .60 | .60 | .60 | .70 |
| GULF TO WEST COAST | .05 | .05 | .05 | .05 | .05 | .05 |
|  | .63 | .60 | .65 | .65 | .65 | .75 |
|  |  |  |  |  |  |  |
| MSC | .10 | .10 | .10 | .10 | .10 | .10 |

| | | | | | | |
|---|---|---|---|---|---|---|
| DE BAY LIGHTERS | .12 | .09 | -- | -- | -- | -- |
| GOM SHUTTLE | .09 | .09 | .09 | .09 | .09 | .09 |
| ALASKA | .04 | .04 | .04 | -- | -- | -- |
| EAGLE FORD | .02 | .04 | .06 | .10 | .10 | .12 |
| | .27 | .26 | .19 | .19 | .19 | .21 |
| P.L. 480 | -- | -- | -- | -- | -- | -- |
| | 2.76 | 2.84 | 2.97 | 2.99 | 3.00 | 3.14 |

3471

TABLE 31 (Cont.)

ESTIMATED SHIPPING DEMAND FOR PRODUCT TANKERS, SPECIALTY VESSELS AND OCEANGOING BARGES
IN THE JONES ACT TRADES WITH CAPACITIES ABOVE 16,000 DWT, UNITS IN MILLION DWT

HIGH CASE ASSESSMENT

| TRADE | 2011 | 2012 | 2014 | 2016 | 2018 | 2020 |
|---|---|---|---|---|---|---|
| GULF TO FLORIDA | 1.48 | 1.60 | 1.70 | 1.80 | 1.85 | 1.87 |
| GULF TO E. COAST | .28 | .34 | .42 | .42 | .42 | .42 |
| | 1.76 | 1.94 | 2.12 | 2.22 | 2.27 | 2.29 |
| | | | | | | |
| INTRA WEST COAST | .58 | .64 | .70 | .70 | .70 | .75 |
| GULF TO WEST COAST | .05 | .05 | .05 | .05 | .05 | .05 |
| | .63 | .69 | .75 | .75 | .75 | .80 |
| | | | | | | |
| MSC | .10 | .13 | .13 | .13 | .13 | .13 |
| | | | | | | |
| DE BAY LIGHTERS | .12 | .09 | .04 | .04 | .04 | .04 |
| GOM SHUTTLE | .09 | .09 | .09 | .13 | .13 | .18 |
| ALASKA | .04 | .04 | .04 | -- | -- | -- |
| EAGLE FORD | .02 | .06 | .10 | .12 | .14 | .16 |
| | .27 | .28 | .27 | .29 | .31 | .38 |
| | | | | | | |
| P.L. 480 | -- | .04 | .04 | .04 | .04 | .04 |
| | 2.76 | 3.08 | 3.31 | 3.43 | 3.50 | 3.64 |

Each of the following forecasts predicts dissimilar rates of trade growth and the principal underlying assumptions are: (1) the extent to which coastwise product movements rise in response to expanding PAD III refinery output; (2) the source of replacement barrels in the Northeast caused by Middle Atlantic plant shut downs; (3) the pace of economic recovery, overall growth in petroleum use and the associated increase in intra West Coast product shipments; (4) how many tankers will be employed in Gulf of Mexico crude oil lightering service; and (5) the extent to which condensate produced by the Eagle Ford shale project will be transported by water to Gulf Coast refineries and petrochemical plants.  Particulars of our trade estimates are discussed below.

1.  <u>Gulf Coast to East Coast</u>.

This is the largest segment of the coastwise trade and it employs approximately 50 percent of

fleet capacity.  There are two dissimilar parts of the Gulf to East Coast trade.  <u>First</u>, is petroleum

products transportation.  <u>Second</u>, are chemical-specialty shipments sent to the South Atlantic

region and the Northeast.


<u>Florida</u>.  PAD III product shipments sent to Tampa-Port Everglades-Jacksonville hold a

competitive advantage over foreign supplies due to shorter voyages, lower unit transportation

charges and most foreign cargos being subject to federal import tariffs.  Employing these factors

and assuming moderate petroleum demand growth and increased PAD III refinery capacity-

production, domestic clean product cargos sent to Florida and the South Atlantic States are

forecast to grow throughout the interval with Jones Act shipping requirements predicted to rise

from 1.4 million DWT to 1.7 million DWT over the 2010-2020 interval.  Our estimate assumes

expanded clean product output in the PAD III refinery system and associated growth in cross-

Gulf shipments that will displace most of the foreign barrels now being sold in Florida and the

South Atlantic States.  Moreover, we note that during the recent decline in Florida's petroleum

use imports absorbed most of the reduction in barrels delivered to Tampa-Port Everglades-

Jacksonville.

Our estimate of clean petroleum shipments sent from PAD III to FL-GA-SC-NC during the

2010-2030 interval is summarized below.  This forecast assumes product imports to the

Southeast will be largely displaced by more competitively priced domestic cargos transported on

Jones Act vessels from the Gulf Coast.

FORECAST CLEAN PETROLEUM PRODUCTS TRANSPORTED BY WATER TO
FL-GA-SC-NC, UNITS IN KBPD

| FLORIDA | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| GASOLINE | 520 | 540 | 560 | 540 | 520 |
| DISTILLATES | 120 | 155 | 180 | 220 | 250 |
| JET FUEL | 80 | 95 | 115 | 130 | 150 |
|  | 720 | 790 | 855 | 890 | 920 |
| | | | | | |
| GA-SC-NC | 70 | 80 | 90 | 100 | 110 |
|  | 790 | 870 | 945 | 990 | 1,030 |
| IMPORTS | (170) | (155) | (110) | (100) | (100) |
| GULF COAST BY SHIP | 620 | 715 | 835 | 890 | 930 |

South Atlantic and Northeast.  Forecasting the future volume of clean products sent to the South

Atlantic and Northeast markets is problematic.  Domestic petroleum product shipments going

above Cape Hatteras have been episodic and those delivered to Savannah-Charleston-

Wilmington are under pressure from imports.  However, structural changes now underway in

Gulf/East Coast petroleum supply and logistics suggest that upcoast clean products shipments

will experience a revival.  As previously noted, products pipeline capacity to the Northeast is

operating close to capacity, Gulf Coast refinery systems are being expanded and additional

output must find markets outside PAD III.  Moreover, refinery capacity in the Middle Atlantic

region is being reduced and the clean products deficit is growing.  For incremental Gulf Coast

gasoline/distillate production the Northeast constitutes the most profitable market and this

alternative is decidedly superior to export sales made in the Atlantic Basin.

3474

Coastwise chemical and specialties traffic from the Gulf to East Coast declined during the past decade due to the reduction in shipments of paraxylene, caustic soda, lube oils, and gasoline blending components.  Due to the recent disparity between domestic and foreign chemical feedstock costs, U.S. companies are enjoying a reversal of fortune as they recapture East Coast markets lost to imports during the past decade.  The resultant increase in chemical shipments from the Gulf Coast will result in more waterborne commodities being sent to the South Atlantic region and the Northeast on U.S. vessels.

2.      Intra West Coast.

Presently 17 vessels (11 ships and 6 ATBs) with capacities above 16,000 DWT are employed in West Coast products service.  This fleet has 656,000 DWT capacity and three tankers employed on the West Coast (138,000 DWT) transport some Alaska crude oil.  Within two years, we expect coastwise product shipments to Southern California will return to normal levels which will: (a) generate in full fleet employment in the Pacific trade; and (b) result in several vessels being redeployed from Gulf to West Coast service.

Over the longer term, we expect additional upgrades will be made to refineries in Puget Sound and San Francisco that will increase clean product output.  This development combined with a large clean products deficit in Los Angeles-San Diego is predicted to result in increased waterborne shipments in the West Coast trade.  Based on these considerations, we estimate that

tonnage employed in intra PAD V products service will grow from 630,000 DWT in 2011 to

800,000 DWT by 2020.

3.      Gulf to West Coast.

Presently, the California Voyager (Chevron) is used in ratable movements between the

company's Pascagoula refinery and the West Coast.  In addition, several other product tankers

are episodically employed in Gulf to West Coast service.  We expect future Gulf Coast to

California shipments will continue to require the use of one or two ships during the forecast

interval.

4.      Crude Oil Lightering in Delaware Bay.

OSG maintains a lightering operation at Big Stone Anchorage in Delaware Bay which employs

three vessels (OSG-350, OSG-351 and OSG-243) with a combined capacity of 120,000 DWT.

Vessels lighter cargos from SUEZMAX tankers that deliver crude oil to Sunoco's Philadelphia

refinery.  However, Sunoco is shutting down their Delaware Valley plants and we expect that

when they are closed the OSG lightering vessels will be unemployed.  Because the OSG-350 and

OSG-351 were built with Capital Construction Financing they cannot be used in the coastwise

trade unless substantial financial penalties are paid to the U.S. Treasury.

Our low and base case estimates assume all of OSG's lightering vessels are removed from Delaware Bay lightering service after 2012 and the high case assessment assumes one lightering vessel remains employed at Big Stone after 2012.

5.    Military Sealift Command.

Blackstone's Empire State and Evergreen State are employed by the Military Sealift Command under a five year contract. The Empire State is used on the West Coast and the Evergreen State is employed in the Far East. In addition, MSC employs the Gianelia as a pre-positioning tanker at Diego Garcia. We believe that due to the high cost of domestic ship construction, the Military Sealift Command's future requirements for Jones Act tankers employed under time charter contracts will be limited to two ships.

6.    Shuttle Tankers Gulf of Mexico Crude Oil Service.

We estimate that over the 2012-2020 interval up to six product sized tankers will be employed in Gulf of Mexico crude oil shuttle service. This includes two ships presently on charter to Petrobras (O.S. Cascade and O.S. Chinook) that will enter crude oil lightering service during 2012. We believe another four ships could be used as shuttle vessels with projects sited in Walker Ridge and Kethley Canyon. Pursuant to additional shuttle tanker requirements, Shell Oil issued a RFP for two shuttle tankers that could be used in GOM shuttle service starting in 2014. Shell's decision to use ships or a pipeline at their Stones Field (in Walker Ridge) will be made during the second quarter of 2012.

7.      <u>Large Barges Used to Transport Eagle Ford Condensate from Corpus Christi</u>.

At present, approximately 90,000 BPD of Eagle Ford condensate is being transported by barge

from Corpus Christi to other refinery and petrochemical centers on the Gulf Coast.  Due to

limited dock capabilities, 30,000 barrel barges are transporting most of the cargos although the

OSG 192 (172,000 barrels capacity) is also employed in this trade by Valero.  Oceangoing barge

terminals are being built at Corpus Christi to handle Eagle Ford cargos and when completed,

coastwise shipments will approach 300,000 BPD.  We estimate that during this decade up to six

large oceangoing barges could be employed in the Eagle Ford trade.


Of the three deep water areas in the Gulf of Mexico being developed, Kethley Canyon and

Walker Ridge offer the best opportunities for additional shuttle tanker employment.  The absence

of nearby pipeline connections to shore suggest shuttle tankers may have some applications in

these finds.

## CHAPTER VI

### FORECAST CAPACITY OF THE DOMESTIC PETROLEUM-CHEMICAL-SPECIALTY TANKER AND LARGE OCEANGOING BARGE FLEET

Capacity of the Jones Act petroleum product-chemical-specialties fleet (vessels with capacities between 16,000-55,000 DWT) is predicted below.  Newbuildings recently completed and those underway total 40 vessels with a combined capacity of 1.5 million DWT.   Among the newbuildings, tankers account for 61 percent of the tonnage and ATBs 39 percent.  Thirty-six newbuildings have time charter contracts and 4 do not.  These particulars are quantified in the schedules below.

SUMMARY   OF   JONES   ACT   PRODUCT   TANKERS   AND   ATB   NEWBUILDINGS

| SHIPS | 2006-2011 | COMPLETED | REMAINING | TOTAL |
|---|---|---|---|---|
| NUMBER | 17 | 3 | 20 | |
| KDWT | 805 | 142 | 947 | |
| | | | | |
| ATBs | | | | |
| NUMBER | 18 | 2 | 20 | |
| KDWT | 512 | 90 | 602 | |
| | | | | |
| TOTAL | | | | |
| NUMBER | 35 | 5 | 40 | |
| KDWT | 1,317 | 232 | 1,549 | |

OIL COMPANIES WITH TIME CHARTERS ON NEWBUILDS WITH CAPACITIES ABOVE 16,000 DWT, NUMBER OF VESSELS

| | SHIPS | ATBs | TOTAL |
|---|---|---|---|
| BP | 4 | 3 | 7 |
| MARATHON | 1 | 6 | 7 |
| TESORO | 4 | 1 | 5 |
| SHELL | 2 | 3 | 5 |
| CHEVRON | 2 | 1 | 3 |
| MSC | 2 | -- | 2 |
| PETROBRAS | 2 | -- | 2 |
| SUNOCO | -- | 2 | 2 |
| COP | -- | 1 | 1 |
| DOW | -- | 1 | 1 |
| COAs | -- | 1 | 1 |
| NO CHARTER | 3 | 1 | 4 |
| | 20 | 20 | 40 |

Details supporting the preceding tabulation are given in Tables 32 and 33 which identify yards that build these vessels, companies who operate them, delivery dates and shippers who have them under time charters.

TABLE 32

TANKERS RECENTLY COMPLETED AND THOSE UNDER CONSTRUCTION

**AKER PHILADELPHIA**

| VESSEL | OPERATOR | KDWT | DELIVERY | TIME CHARTER |
|---|---|---|---|---|
| HOUSTON | OSG | 46.7 | 2007[*] | SHELL |
| LONG BEACH | OSG | 46.7 | 2007[*] | BP |
| LOS ANGELES | OSG | 46.7 | 2007[*] | BP |
| NEW YORK | OSG | 46.7 | 2008[*] | SHELL |
| TEXAS CITY | OSG | 46.7 | 2008[*] | BP |
| BOSTON | OSG | 46.7 | 2009[*] | TESORO |
| NIKISKI | OSG | 46.7 | 2009[*] | TESORO |
| CASCADE | OSG | 46.7 | 2009[*] | PETROBRAS |
| MARTINEZ | OSG | 46.7 | 2010[*] | TESORO |
| ANACORTES | OSG | 46.7 | 2010[*] | TESORO |
| CHINOOK | OSG | 46.7 | 2011[*] | PETROBRAS |
| TAMPA | OSG | 46.7 | 2011[*] | CHEVRON |
| TBN-1 | NA | 46.7 | 10.12 | NA |
| TBN-2 | NA | 46.7 | 3.13 | NA |

**NASSCO**

| VESSEL | OPERATOR | KDWT | DELIVERY | TIME CHARTER |
|---|---|---|---|---|
| G. STATE | BLACKSTONE | 49.0 | 2009[*] | BP |
| P. STATE | BLACKSTONE | 49.0 | 2009[*] | MARATHON |
| S. STATE | BLACKSTONE | 49.0 | 2009[*] | CHEVRON |
| EV. STATE | BLACKSTONE | 49.0 | 2010[*] | MSC |
| EMP. STATE | BLACKSTONE | 49.0 | 2010[*] | MSC |

**BAE ALABAMA**

| VESSEL | OPERATOR | KDWT | DELIVERY | TIME CHARTER |
|---|---|---|---|---|
| A. PHOENIX | MID-OCEAN | 48.5 | 9.12 | NA |

[*] DELIVERED.

APT V. USA

TABLE 33

ATBs RECENTLY COMPLETED AND THOSE UNDER CONSTRUCTION

| VESSEL | BAY SHIP OPERATOR | KDWT | DELIVERY | TIME CHARTER |
|---|---|---|---|---|
| G. TRANSPORTER | USS | 19.9 | 2007* | DOW |
| P.C. PRODUCER | USS | 19.9 | 2008* | COAs |
| P.C. TRADER | USS | 19.9 | 2008* | COAs |
| P.C. SUPPLIER | USS | 19.9 | 2009* | COP |
| DUBLIN SEA | K-SEA | 27.0 | 2009* | TESORO |

| VESSEL | HALTER OPERATOR | KDWT | DELIVERY | TIME CHARTER |
|---|---|---|---|---|
| 650-1 | CROWLEY | 27.0 | 2006** | SPOT |
| 650-2 | CROWLEY | 27.0 | 2006* | SHELL |
| 650-3 | CROWLEY | 27.0 | 2007* | BP |
| 650-4 | CROWLEY | 27.0 | 2007* | BP |
| 650-5 | CROWLEY | 27.0 | 2008* | MARATHON |
| 650-6 | CROWLEY | 27.0 | 2008* | BP |
| 650-7 | CROWLEY | 27.0 | 2009* | MARATHON |
| 650-8 | CROWLEY | 27.0 | 2010* | MARATHON |
| 650-9 | CROWLEY | 27.0 | 2010* | CHEVRON |
| 650-10 | CROWLEY | 27.0 | 2011* | SHELL |
| 750-1 | CROWLEY | 45.0 | 2011* | MARATHON |
| 750-2 | CROWLEY | 45.0 | 7.12 | MARATHON |
| 750-3 | CROWLEY | 45.0 | 3.13 | MARATHON |

| VESSEL | HALTER OPERATOR | KDWT | DELIVERY | TIME CHARTER |
|---|---|---|---|---|
| OSG-350 | OSG | 45.0 | 2010* | SUNOCO |
| OSG-351 | OSG | 45.0 | 2011* | SUNOCO |

* DELIVERED.

Shipyard prices for the newbuildings are listed below.  Aker Philadelphia Shipyard's (APS) price for the ten tankers sold to American Shipping (AS) averaged $104 million each on the first six ships and $110 million each on the remaining four ships.  APS also sold two Veteran Class tankers (Cascade and Chinook) to Overseas Shipholding in 2010 for $115 million each.  The Nassco product tanker building program included five ships sold to Blackstone with the average vessel price being approximately $130 million each.

ATB newbuilding programs included: 13 vessels built at Halter for Crowley Maritime, 5 built at

Bay Shipbuilding for U.S. Shipping and K-Sea and 2 completed at Halter for Overseas

Shipholding.  Vessels recently completed and those underway, have a total investment value of

$3.94 billion.

ESTIMATED SHIPYARD PRICES FOR NEWBUILDINGS

| PROJECT | VESSEL TYPE | CAPACITY BARRELS | NUMBER | UNIT PRICE MILLIONS |
|---|---|---|---|---|
| APS-AAS | TANKER | 46.7 | 10 | $104-110 |
| APS-OSG | TANKER | 46.7 | 2 | 115 |
| NASSCO-BLACKSTONE | TANKER | 49.0 | 5 | 125 |
| HALTER-CROWLEY | ATB-750 | 45.0 | 3 | 126 |
| HALTER-CROWLEY | ATB-650 | 27.0 | 10 | 52 |
| HALTER-OSG | ATB | 45.0 | 2 | 200 |
| BAY-USS | ATB | 19.9 | 3 | 70 |
| APS-SPFC | TANKER | 46.7 | 2 | 95 |

A.   JONES ACT FLEET FORECAST.

Future fleet capacity is estimated on the basis of newbuilding programs underway and the

retirement of single hull vessels and older double hull vessels in operation.  Our forecast is

presented in Table 34. We predict that coastwise fleet capacity will decline from 2.7 million

DWT in 2011 to 2.3 million DWT by 2020..

TABLE 34

FORECAST JONES ACT PRODUCT TANKER AND OCEANGOING BARGE FLEET CAPACITY
WITH VESSELS BETWEEN 16,000-55,000 DWT

| TANKERS | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| NUMBER | 30 | 27 | 30 | 30 | 30 | 28 | 28 | 28 | 28 | 28 |
| MILLION DWT | 1.3 | 1.2 | 1.4 | 1.4 | 1.4 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 |
| | | | | | | | | | | |
| BARGES | | | | | | | | | | |
| NUMBER | 52 | 51 | 52 | 51 | 51 | 49 | 45 | 42 | 39 | 38 |
| MILLION DWT | 1.4 | 1.3 | 1.3 | 1.3 | 1.3 | 1.2 | 1.2 | 1.1 | 1.0 | 1.0 |
| | | | | | | | | | | |
| TOTAL | | | | | | | | | | |
| NUMBER | 82 | 78 | 82 | 81 | 81 | 77 | 73 | 70 | 67 | 66 |
| MILLION DWT | 2.7 | 2.5 | 2.7 | 2.7 | 2.7 | 2.5 | 2.5 | 2.4 | 2.3 | 2.3 |

Of the 17 companies operating large oceangoing vessels in the coastwise petroleum products trade, the long term presence of Hornbeck, Keystone, Seabulk and USS is considered problematic.  K-Sea enjoyed a reversal of fortune after it was acquired by Kirby in 2011. Summary fleet particulars are identified in Table 35.

TABLE 35

FORECAST JONES ACT PRODUCT TANKER-BARGE FLEET CAPACITY BY SHIPPING COMPANY

IN NUMBER OF VESSELS

| | 16 | 17 | 18 | 19 | 20 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|
| AKER PHILA | -- | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| ALLIED | 4 | 4 | 4 | 4 | 4 | 3 | 3 | 3 | 3 |
| BLACKSTONE | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| BOUCHARD | 5 | 5 | 5 | 5 | 5 | 4 | 3 | 2 | 2 |
| CHEVRON | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| CROWLEY | 16 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| HORNBECK | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| KEYSTONE | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| K-SEA | 3 | 3 | 3 | 3 | 2 | 2 | 2 | 2 | 2 |
| MARTIN GAS | 1 | 1 | 1 | 1 | 1 | -- | -- | -- | -- |
| MID-OCEAN | -- | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| MORAN | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | -- |
| OSG | 22 | 22 | 21 | 21 | 20 | 19 | 17 | 15 | 15 |
| PENN MAR. | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| SEARIVER | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| SEABULK | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| USS | 6 | 6 | 6 | 6 | 4 | 4 | 4 | 4 | 4 |
| | 78 | 82 | 81 | 81 | 77 | 73 | 70 | 67 | 66 |

IN MILLION DWT

| | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|
| AKER PHILA | -- | .09 | .09 | .09 | .09 | .09 | .09 | .09 | .09 |
| ALLIED | .08 | .08 | .08 | .08 | .08 | .08 | .08 | .08 | .08 |
| BLACKSTONE | .25 | .25 | .25 | .25 | .25 | .25 | .25 | .25 | .25 |
| BOUCHARD | .13 | .13 | .13 | .13 | .13 | .11 | .08 | .06 | .06 |
| CHEVRON | .18 | .18 | .18 | .18 | .18 | .18 | .18 | .18 | .18 |
| CROWLEY | .44 | .48 | .48 | .48 | .48 | .48 | .48 | .48 | .48 |
| HORNBECK | .04 | .04 | .04 | .04 | .04 | .04 | .04 | .04 | .04 |
| KEYSTONE | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| K-SEA | .07 | .07 | .07 | .07 | .05 | .05 | .05 | .05 | .05 |
| MARTIN GAS | .02 | .02 | .02 | .02 | .02 | -- | -- | -- | -- |
| MID-OCEAN | -- | .05 | .05 | .05 | .05 | .05 | .05 | .05 | .05 |
| MORAN | .02 | .02 | .02 | .02 | .02 | .02 | .02 | .02 | -- |
| OSG | .86 | .86 | .84 | .84 | .81 | .78 | .72 | .72 | .72 |
| PENN MAR. | .10 | .10 | .10 | .10 | .10 | .10 | .10 | .10 | .10 |
| SEARIVER | .04 | .04 | .04 | .04 | .04 | .04 | .04 | .04 | .04 |
| SEABULK | .13 | .13 | .13 | .13 | .13 | .13 | .13 | .13 | .13 |
| USS | .15 | .15 | .15 | .15 | .08 | .08 | .08 | .08 | .08 |

2.51    2.70    2.70    2.60    2.55    2.46    2.37    2.35    2.33

B.    PRODUCT TANKER FORECAST.

Due to the recent announcement of two new construction projects by Aker Philadelphia (2 ships) and Mid-Ocean (1 ship), the forecast capacity of the coastwise tanker fleet remains stable over the 2011-2020 interval.  This is because the existing fleet is comprised of newbuildings and two single hull ships remain in service.  Product tanker fleets in Jones Act service are identified by company in Table 36.

TABLE 36

FORECAST CAPACITY OF JONES ACT PRODUCT-CHEMICAL-SPECIALTY TANKER FLEETS BY COMPANY, VESSELS WITH CAPACITIES ABOVE 16,000 DWT

| | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|
| | **NUMBER OF VESSELS** | | | | | | | | |
| AKER | -- | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| BLACKSTONE | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| CHEVRON | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| KEYSTONE | 1 | -- | -- | -- | -- | -- | -- | -- | -- |
| MID-OCEAN | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| OSG | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| SEARIVER | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| SEABULK | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| USS | 2 | 2 | 2 | 2 | -- | -- | -- | -- | -- |
| | 29 | 30 | 30 | 30 | 28 | 28 | 28 | 28 | 28 |
| | **MILLION DWT** | | | | | | | | |
| | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| AKER | -- | .09 | .09 | .09 | .09 | .09 | .09 | .09 | .09 |
| BLACKSTONE | .25 | .25 | .25 | .25 | .25 | .25 | .25 | .25 | .25 |
| CHEVRON | .18 | .18 | .18 | .18 | .18 | .18 | .18 | .18 | .18 |
| KEYSTONE | .02 | -- | -- | -- | -- | -- | -- | -- | -- |
| MID-OCEAN | .04 | .05 | .05 | .05 | .05 | .05 | .05 | .05 | .05 |
| OSG | .55 | .55 | .55 | .55 | .55 | .55 | .55 | .55 | .55 |
| SEARIVER | .04 | .04 | .04 | .04 | .04 | .04 | .04 | .04 | .04 |
| SEABULK | .13 | .13 | .13 | .13 | .13 | .13 | .13 | .13 | .13 |
| USS | .07 | .07 | .07 | .07 | -- | -- | -- | -- | -- |
| | 1.28 | 1.36 | 1.36 | 1.36 | 1.29 | 1.29 | 1.29 | 1.29 | 1.29 |

C.    BARGE TANKER FORECAST.

Our estimate of ATB-TBU fleet capacity indicates that tonnage will decline from 1.29 million DWT in 2012 to 1.04 million DWT by 2020.  This reduction results from: (1) the absence of newbuildings  (excluding Crowley's 750 series) underway; and (2) our expectation that single hull barges reconstructed to double hull vessels will be retired 15 years after their conversions.  Shorter vessel service lives with reconstructions result from more exacting oil company vetting standards now being imposed on the Jones Act fleet.  Company barge fleets are summarized in Table 37 and complete fleet details are given in Table 38.

TABLE 37

FORECAST CAPACITY OF THE JONES ACT PRODUCT-CHEMICAL-SPECIALTY OCEANGOING
BARGE FLEETS BY COMPANY, VESSELS WITH CAPACITIES ABOVE 16,000 DWT

| NUMBER OF VESSELS | | | | | | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|
| | 16 | 17 | 18 | 19 | 20 | | | | |
| ALLIED | 4 | 4 | 4 | 4 | 4 | 3 | 3 | 3 | 3 |
| BOUCHARD | 5 | 5 | 5 | 5 | 5 | 4 | 3 | 2 | 2 |
| CROWLEY | 16 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| HORNBECK | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| K-SEA | 3 | 3 | 3 | 3 | 2 | 2 | 2 | 2 | 2 |
| MARTIN GAS | 1 | 1 | 1 | 1 | 1 | -- | -- | -- | -- |
| MORAN | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | -- |
| OSG | 10 | 10 | 9 | 9 | 8 | 7 | 5 | 3 | 3 |
| PENN MAR | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| USS | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| | 51 | 52 | 51 | 51 | 49 | 45 | 42 | 39 | 38 |

MILLION DWT

| | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|
| ALLIED | .08 | .08 | .08 | .08 | .08 | .06 | .06 | .06 | .06 |
| BOUCHARD | .13 | .13 | .13 | .13 | .13 | .11 | .08 | .06 | .06 |
| CROWLEY | .44 | .48 | .48 | .48 | .48 | .48 | .48 | .48 | .48 |
| HORNBECK | .04 | .04 | .04 | .04 | .04 | .04 | .04 | .04 | .04 |
| K-SEA | .07 | .07 | .07 | .07 | .05 | .05 | .05 | .05 | .05 |
| MARTIN GAS | .02 | .02 | .02 | .02 | .02 | -- | -- | -- | -- |
| MORAN | .02 | .02 | .02 | .02 | .02 | .02 | .02 | .02 | -- |
| OSG | .31 | .31 | .29 | .29 | .26 | .23 | .17 | .17 | .17 |
| PENN MAR | .10 | .10 | .10 | .10 | .10 | .10 | .10 | .10 | .10 |
| USS | .08 | .08 | .08 | .08 | .08 | .08 | .08 | .08 | .08 |
| | 1.29 | 1.33 | 1.31 | 1.31 | 1.26 | 1.17 | 1.08 | 1.06 | 1.04 |

Coastwise Product Tanker Study
December 2011
Page 66

TABLE 38

JONES ACT TANKERS AND LARGE ITBs-ATBs-TBUs ENGAGED IN DOMESTIC PRODUCTS AND SPECIALTY SERVICE

| VESSEL | KDWT | SERVICE | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| **AKER PHILA** | | | | | | | | | | |
| 1.  TBN #1 | 46 | PRODUCTS | -- | 46 | 46 | 46 | 46 | 46 | 46 | 46 |
| 2.  TBN #2 | 46 | PRODUCTS | -- | 46 | 46 | 46 | 46 | 46 | 46 | 46 |
| **ALLIED** | | | | | | | | | | |
| 3.  ATC 25[*] | 25 | CHEM | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| 4.  ATC 23[*] | 23 | W. PORT | 22 | 22 | 22 | 22 | 22 | -- | -- | -- |
| 5.  ATC 21[*] | 20 | CHEMICALS | 18 | 21 | 18 | 18 | 18 | 18 | 18 | 18 |
| 6.  TMI 17[*] | 18 | CHEMICALS | 16 | 21 | 16 | 16 | 16 | 16 | 16 | 16 |
| **BLACKSTONE** | | | | | | | | | | |
| 7.  G. STATE | 49 | TC-BP | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 |
| 8.  P. STATE | 49 | TC-MARATHON | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 |
| 9.  S. STATE | 49 | TC-CHEVRON | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 |
| 10. EV. STATE | 49 | MSC | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 |
| 11. EMP. STATE | 49 | MSC | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 |
| **BOUCHARD** | | | | | | | | | | |
| 12. 245[*] | 37 | SPOT | 37 | 37 | 37 | 37 | 37 | 37 | 37 | 37 |
| 13. 255[*] | 26 | SPOT | 26 | 26 | 26 | 26 | 26 | 26 | 26 | -- |
| 14. 265[*] | 26 | GLENCORE | 26 | 26 | 26 | 26 | 26 | 26 | -- | -- |
| 15. 275[*] | 26 | SEMPRA | 26 | 26 | 26 | 26 | 26 | -- | -- | -- |
| 16. 240[*] | 19 | SPOT | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 |
| **CHEVRON** | | | | | | | | | | |
| 17. F. VOYAGER | 46 | CLEAN | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 |
| 18. C. VOYAGER | 46 | CLEAN | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 |
| 19. M. VOYAGER | 46 | CLEAN | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 |
| 20. O. VOYAGER | 46 | CLEAN | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 |
| **CROWLEY** | | | | | | | | | | |
| 21. 750-1[*] | 44 | TC-MARATHON | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 |
| 22. 750-2[*] | 44 | TC-MARATHON | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 |
| 23. 750-3[*] | 44 | TC-MARATHON | -- | 44 | 44 | 44 | 44 | 44 | 44 | 44 |
| 24. 650-1[*] | 27 | SPOT-GC | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 |
| 25. 650-2[*] | 27 | SHELL-WC | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 |
| 26. 650-3[*] | 27 | TC-BP-CH | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 |
| 27. 650-4[*] | 27 | TC-BP-CH | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 |

3486

Coastwise Product Tanker Study
December 2011
Page 67

```
28. 650-5*        27    TC-BP          27    27    27    27    27    27    27    27
29. 650-6*        27    TC-BP-WC       27    27    27    27    27    27    27    27
30. 650-7*        27    TC-MARATHON    27    27    27    27    27    27    27    27
31. 650-8*        27    TC-MARATHON    27    27    27    27    27    27    27    27
32. 650-9*        27    TC-CHEVRON     27    27    27    27    27    27    27    27

*  BARGE
```

Coastwise Product Tanker Study
December 2011
Page 68

TABLE 38 (Cont.)

JONES ACT TANKERS AND LARGE ITBs-ATBs-TBUs ENGAGED IN DOMESTIC PRODUCTS AND SPECIALTY SERVICE

| VESSEL | KDWT | SERVICE | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| **CROWLEY** | | | | | | | | | | |
| 33. 650-10* | 27 | SHELL-W. COAST | 27 | 27 | 27 | 27 | 27 | 20 | 27 | 27 |
| 34. 550-1* | 20 | LAY-UP-W. COAST | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 |
| 35. 550-2* | 20 | TC-COP-W. COAST | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 |
| 36. 550-3* | 20 | ALASKA-CROWLEY | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 |
| 37. 550-4* | 20 | SPOT-W. COAST | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 |
| **HORNBECK** | | | | | | | | | | |
| 38. E. 11103* | 19 | SPOT | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 |
| 39. E. 13502 | 19 | SPOT | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 |
| **KEYSTONE** | | | | | | | | | | |
| 40. D. TRADER | 50 | TC-MURPHY | 20 | -- | -- | -- | -- | -- | -- | -- |
| **K-SEA** | | | | | | | | | | |
| 41. D. SEA* | 27 | TC-TESORO-C | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 |
| 42. DBL-155* | 19 | TC-BP | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 |
| 43. DBL-151* | 20 | TC-RIO-D | 20 | 20 | 20 | 20 | -- | -- | -- | -- |
| **MARTIN GAS** | | | | | | | | | | |
| 44. POSEIDON* | 18 | SPOT-D | 18 | 18 | 18 | 18 | 18 | -- | -- | -- |
| **MID-OCEAN** | | | | | | | | | | |
| 45. TBN #1 | 48 | NEWBUILD | -- | 48 | 48 | 48 | 48 | 48 | 48 | 48 |
| **MORAN** | | | | | | | | | | |
| 46. M. BAY* | 21 | SPOT GC | 21 | 21 | 21 | 21 | 21 | 21 | 21 | -- |
| **OSG** | | | | | | | | | | |
| 47. HOUSTON | 46 | TC-SHELL-GC | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 |
| 48. LONG BEACH | 46 | TC-BP-WC | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 |
| 49. LOS ANGELES | 46 | TC-BP-WC | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 |
| 50. NEW YORK | 46 | TC-SHELL-GC | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 |
| 51. TEXAS CITY | 46 | TC-MURPHY | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 |
| 52. BOSTON | 46 | TC-TESORO-WC | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 |
| 53. NIKISKI | 46 | TC-TESORO-WC | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 |
| 54. CASCADE | 46 | P. BRAS-GC | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 |

Coastwise Product Tanker Study
December 2011
Page 69

| | | | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| 55. MARTINEZ | 46 | TESORO-WC | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 |
| 56. ANACORTES | 46 | TESORO-GC | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 |
| 57. CHINOOK | 46 | T.C. P. BRAS-GC | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 |
| 58. TAMPA | 46 | T.C. CHEVRON-WC | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 |
| 59. 350* | 45 | SUNOCO LIGHTER | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 |
| 60. 351* | 45 | SUNOCO LIGHTER | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 |
| 61. 252* | 31 | MORGAN-GC | 31 | 31 | 31 | 31 | 31 | 31 | -- | -- |
| 62. 254* | 31 | PMI-GC | 31 | 31 | 31 | 31 | 31 | -- | -- | -- |

* BARGE

TABLE 38 (Cont.)

JONES ACT TANKERS AND LARGE ITBs-ATBs-TBUs ENGAGED IN DOMESTIC PRODUCTS AND SPECIALTY SERVICE

| VESSEL | KDWT | SERVICE | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| **OSG** | | | | | | | | | | |
| 63. 242* | 29 | SPOT USG | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 |
| 64. 243* | 29 | SUNOCO LIGHTER | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 |
| 65. 244* | 29 | SPOT USG | 29 | 29 | 29 | 29 | -- | -- | -- | -- |
| 66. 214* | 26 | LAY-UP | 26 | 26 | 26 | 26 | -- | -- | -- | -- |
| 67. 209* | 24 | SPOT | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 |
| 68. 192* | 22 | KOCH | 22 | 22 | -- | -- | -- | -- | -- | -- |
| **PENN MARITIME** | | | | | | | | | | |
| 69. EVERGLADES | 27 | SPOT USGC | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 |
| 70. K. WEST | 21 | COLONIAL | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 |
| 71. YUCATAN | 20 | SPOT USGC | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 |
| 72. CARIBBEAN | 17 | SPOT USGC | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| 73. P. 120 | 18 | SPOT USGC | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 |
| **SEARIVER** | | | | | | | | | | |
| 74. A. PROGRESS | 46 | OIL ALASKA | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 |
| **SEABULK** | | | | | | | | | | |
| 75. CHALLENGE | 50 | CITGO | 42 | 42 | 42 | 42 | 42 | 42 | 42 | 42 |
| 76. TRADER | 50 | CITGO | 42 | 42 | 42 | 42 | 42 | 42 | 42 | 42 |
| 77. ARCTIC | 46 | TC-VALERO | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 |
| **U.S. SHIPPING** | | | | | | | | | | |
| 78. CHEM PIONEER | 35 | CHEMICALS | 35 | 35 | 35 | 35 | -- | -- | -- | -- |
| 79. CHARLESTON | 48 | CHEMICALS | 46 | -- | -- | -- | -- | -- | -- | -- |
| 80. HOUSTON | 30 | TC-MSC | 30 | 30 | 30 | 30 | -- | -- | -- | -- |
| 81. TRANSPORTER* | 20 | DOW-CHEM | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 |

Coastwise Product Tanker Study
December 2011
Page 70

```
82.  PRODUCER*     20    SPOT-C0A        20    20    20    20    20    20    20    20
83.  TRADER*       20    SPOT-COA        20    20    20    20    20    20    20    20
84.  SUPPLIER*     20    TC-COP          20    20    20    20    20    20    20    20

*  BARGES
```

CHAPTER VII

FUTURE JONES ACT FLEET EMPLOYMENT AND ESTIMATED VESSEL REVENUES

This chapter addresses employment prospects for tonnage engaged in the coastwise petroleum product-chemical-specialty trade,  reviews vessel time charter rates earned during 1980-2011 and forecasts hire revenues likely to be realized over the next ten years.

A.  TRENDS IN FLEET EMPLOYMENT AND CHARTER RATES.

After the enactment of OPA in 1990, expectations were that statutory vessel retirements would tighten the tonnage balance, raise the level of fleet utilization and in concert these developments would increase charter revenues-ship income needed to pay for newbuilds.   Market developments during the 1990s failed to meet these expectations for several reasons.  First, the collapse in shipping demand (e.g. Military Sealift Command and Virgin Islands to U.S. Mainland) released trade qualified vessels that subsequently entered coastwise service.  Second, CDS tankers became twenty years old and federal subsidies needed to keep them operating in foreign service were terminated.  CDS product ships then became Jones Act eligible and they entered the coastwise trade.  Third, ten double hull tankers were built in anticipation of shipping demand expected to result from statutory vessel retirements.  In conjunction, these developments increased the number of vessels seeking employment in coastwise service when the demand for domestic shipping was in decline.  Due to overtonnaging downward pressure persisted on product tanker charter rates throughout the 1990s.

After September 2000, period fixtures realized by modern U.S. tonnage experienced significant improvement when major oil companies began to cover most of their coastwise transportation requirements with vessels employed under time charter contracts.  Due to declining fleet capacity and more tonnage employed under period fixtures, tanker revenues more than doubled during the 2000-2008 interval.

Fundamentals of the coastwise products trade experienced a material change in 2009.  This was caused by: (1) a sharp drop in domestic petroleum consumption (caused by a deep and prolonged economic recession), which reduced shipping demand; and (2) the expansion in fleet capacity as additional newbuildings entered service.  Due to these developments, the fleet became overtonnaged, charter rates were reduced and many older trade qualified vessels were scrapped.  Sectorial use of vessels in the Jones Act product tanker/barge fleet by type of employment during 1999-2011 is identified in Table 39.  Presently all of the domestic tankers are employed under time charters and sixteen barges are engaged in the spot trade.  In addition, the number of vessels in lay-up declined from 14 to 1 during the 2009-2011 interval.

TABLE 39

NUMBER OF VESSELS WITH CAPACITIES BETWEEN 16,000 AND 55,000 DWT EMPLOYED
IN JONES ACT SERVICE BY TYPE OF CONTRACT

| | 1999 | 2004 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|
| TIME CHARTERS & COAs | 29 | 64 | 60 | 65 | 61 | 53 | 51 | 50 |
| SPOT MARKET | 36 | 6 | 5 | 5 | 13 | 15 | 15 | 16 |
| CHEMICALS-SPECIALTIES | 12 | 12 | 12 | 11 | 13 | 9 | 9 | 10 |
| PROPRIETARY | 8 | 5 | 5 | 7 | 8 | 6 | 7 | 5 |
| LAY-UP | 5 | -- | -- | -- | -- | 14 | 6 | 1 |
| | 90 | 87 | 82 | 88 | 95 | 97 | 88 | 82 |

Changes in coastwise fleet capacity after 1990 are quantified in Table 40.  During the past twenty-two years, tonnage additions offset 68 percent of capacity lost due to vessel retirements and total fleet size declined from 4.1 million DWT to 2.7 million DWT.  However, between 2006 and 2009 total fleet capacity grew from 2.7 to 3.1 million DWT because newbuilding additions were double the capacity lost from vessel retirements.  This trend was reversed during 2010-2011 as newbuilding additions to the fleet declined and the retirement of single hull vessels increased due to the absence of employment opportunities for older tankers in the coastwise products trade..

TABLE 40

COASTWISE OCEANGOING PRODUCT TANKER-BARGE FLEET INCLUDING VESSELS
WITH CAPACITIES ABOVE 16,000 DWT

| | UNITS IN MILLION DWT | | |
| | ADDITIONS | RETIREMENTS | FLEET CAPACITY |
|---|---|---|---|
| 1990 | .05 | (.25) | 4.08 |
| 1991 | -- | (.25) | 3.83 |
| 1992 | -- | (.20) | 3.63 |
| 1993 | .07 | (.28) | 3.42 |
| 1994 | .04 | (.24) | 3.22 |
| 1995 | .20 | (.33) | 3.09 |
| 1996 | .20 | (.25) | 3.04 |
| 1997 | .20 | (.14) | 3.10 |
| 1998 | .21 | (.10) | 3.21 |
| 1999 | .30 | (.14) | 3.37 |
| 2000 | .11 | (.10) | 3.36 |
| 2001 | .10 | (.14) | 3.32 |
| 2002 | .12 | (.32) | 3.12 |
| 2003 | .03 | (.29) | 2.86 |
| 2004 | .04 | (.04) | 2.86 |
| 2005 | -- | (.10) | 2.76 |
| 2006 | .07 | (.13) | 2.71 |
| 2007 | .22 | (.06) | 2.87 |
| 2008 | .24 | (.15) | 2.96 |
| 2009 | .40 | (.23) | 3.13 |
| 2010 | .38 | (.63) | 2.88 |
| 2011 | .22 | (.39) | 2.71 |

Time charter revenues earned by oceangoing vessels employed in domestic product service are quantified in Tables 41 and 42.  Information presented in Table 41 identifies period fixtures realized by ships and ITBs operating in the coastwise trade during 1980-2011.  With the

exception of four (Arctic-Challenge-Trader-Delaware Trader) vessels that remain in service, all

of the other ships referenced in this schedule were retired.  Table 42 quantifies time charter rates

earned by tankships and ATBs built after 2005.  We believe current time charter information on

modern tonnage (Table 42) is most useful in addressing earning prospects for new vessels

employed in the domestic trade.  In contrast, older information presents a historical context in

which to evaluate longer term vessel earnings in the Jones Act trade.

TABLE 41

AVERAGE TIME CHARTER REVENUES EARNED BY TANKERS AND ITBS EMPLOYED IN THE JONES ACT
TRADE, UNITS IN THOUSAND DOLLARS PER DAY

|  | CHALLENGE & TRADER | CROWLEY DOUBLE EAGLES | SEABULK PHILA | OSG ITBs | U.S. SHIPPING REBUILDS | AHL B. RIDGE & C. TRADER |
|------|------|------|------|------|------|------|
| 1980 | NA | NA | NA | NA | NA | NA |
| 1982 | $34 | NA | NA | NA | NA | NA |
| 1984 | 25 | NA | NA | NA | NA | NA |
| 1986 | 28 | NA | NA | NA | NA | NA |
| 1988 | 23 | NA | NA | NA | NA | NA |
| 1990 | 32 | NA | $36 | NA | NA | NA |
| 1992 | 40 | NA | 32 | NA | NA | NA |
| 1994 | 36 | NA | 24 | NA | NA | NA |
| 1996 | 25 | NA | 24 | NA | NA | NA |
| 1998 | 23 | $25 | NA | $21 | $22 | $21 |
| 2000 | 23 | 27 | 28 | 23 | 24 | 23 |
| 2001 | 32 | 34 | 32 | 26 | 27 | 23 |
| 2002 | 34-36 | 35 | 35 | 30 | 28-30 | 30-34 |
| 2003 | 36 | 35 | 35 | 36 | 30-31 | 34 |
| 2004 | 36 | 36 | 35 | 37 | 31 | 35 |
| 2005 | 37 | 37 | 36 | 39 | 32 | 36 |
| 2006 | 42 | 40 | 37 | 40 | 33 | 37 |
| 2007 | NA | 44 | 39 | 41 | 34 | 38 |
| 2008 | 36 | 45 | 34 | 35 | 34 | 38 |
| 2009 | 32 | 48 | 32 | NA | 22 | 37 |
| 2010 | 30 | 38 | NA | NA | NA | 37 |
| 2011 | 31 | 39 | NA | NA | NA | NA |

|  | DELAWARE TRADER | HOUSTON | SPOT MARKET |
|------|------|------|------|
| 1980 | NA | NA | $29 |
| 1982 | NA | NA | 14 |
| 1984 | NA | NA | 13 |
| 1986 | NA | NA | 18 |
| 1988 | NA | NA | 16 |
| 1990 | NA | NA | 23 |
| 1992 | NA | NA | 16 |
| 1994 | NA | NA | 21 |

| 1996 | NA | NA | 20 |
| 1998 | NA | NA | 19 |
| 2000 | NA | NA | 22 |
| 2001 | NA | NA | 28 |
| 2002 | NA | NA | 25 |
| 2003 | NA | NA | 25 |
| 2004 | $33 | NA | 28 |
| 2005 | 34 | NA | 32 |
| 2006 | 35 | 37 | 42 |
| 2007 | 36 | 38 | 48 |
| 2008 | 36 | 39 | 28 |
| 2009 | 34 | 40 | 27 |
| 2010 | 34 | 40 | 25 |
| 2011 | 35 | 40 | 36 |

As is shown in the preceding schedule, time charter revenues earned by product tankers experienced considerable variation during the 1980-2011 interval. These changes reflected dissimilar business and economic conditions under which Jones Act vessels operated over the last 30 years. Trade developments that occurred during the 1980-2011 interval are discussed below.

Between 1980-1988, the demand for domestic tonnage declined sharply after federal oil price and export controls were terminated in 1981. When in effect, government regulations subsidized major waterborne product movements (i.e. 300,000 BPD) sent from the Gulf Coast to the Northeast. These long haul coastwise shipments became uneconomic after federal controls ended and the corresponding trade decline caused the domestic product tanker fleet to become overtonnaged. In response to these developments, time charter rates fell sharply (from $32,000 to $22,000 per day on modern ships) and the spot market declined (from $29,000 to $14,000 per day with stream ships) to a level where vessel operating costs were barely covered.

<u>Time charter revenues earned by modern product tankers increased temporarily in the early</u>

<u>1990s</u>.  This change was due to accelerated shipping needs of the Military Sealift Command

during the first war with Iraq.  In response to this event, time charter revenues realized by

modern diesel ships rose to $30,000-$36,000 per day and continued at this level until MSC

contracts expired in 1991-1992.

<u>Throughout the 1990s tankship charter revenues were subject to downward pressure</u> caused by

the enactment of OPA-90 and the redeployment of vessels previously used in the subsidized-

preference trades to coastwise service.  Financial liability provisions in OPA-90 caused oil

companies to take domestic cargos off the water whenever possible using exchanges and by

importing more foreign barrels.  At the same time, shipping employment in the non-core

preference-subsidized trades was eliminated when government funding for maritime assistance

programs ended.  Lacking employment opportunities elsewhere, tankers displaced from U.S. flag

foreign service entered the coastwise fleet where they overtonnaged the products trade.  Due to

overtonnaging, time charter revenues earned by modern ships in domestic products service

remained in the $22,000-$24,000 per day interval throughout the 1993-1999 period.

<u>Business fundamentals in the coastwise trade improved after September 2000</u> when oil

companies changed their domestic marine transportation policies and employed more vessels

under time charters.  This shift was due to: a perceived long term decline in fleet capacity; safety

premiums placed on the use of modern ships; the absence of newbuilding programs underway;

and future transportation expense being more effectively controlled with time charters in a tight

shipping market.  Responding to these developments, time charter revenues earned by modern

tankers employed in coastwise product service increased from the $23,000/$27,000 per day level

in 2000 to the $44,000/$54,000 per day level by 2009.

Newbuilding additions to the fleet and reduced coastwise product shipments during 2010-2011

eliminated the need for many older vessels that entered lay-up and were subsequently scrapped

before their statutory trading lives expired.  The only sector of the domestic fleet that earned

strong time charter revenues over the last two years were newbuildings employed under long

term contracts negotiated before 2009.  Most recently several newbuildings: (1) came off time

charters and were forced into the spot market; and (2) others were completed and put into

operation with short term non-compensatory period fixtures.  A tabulation of estimated contract

rates earned by 32 newbuilds during the 2006-2013 interval is presented in Table 42.

TABLE 42

ESTIMATED TIME CHARTER RATES REALIZED BY NEWBUILDINGS,
IN THOUSAND OF DOLLARS PER DAY

| BLACKSTONE | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|
| GOLDEN GATE | -- | -- | -- | $53.0 | $53.8 | $54.8 | $55.4 | $56.2 |
| PELICAN STATE | -- | -- | -- | 51.0 | 51.5 | 52.5 | 53.0 | NA |
| SUNSHINE STATE | -- | -- | -- | -- | 42.0 | 42.0 | 42.0 | NA |
| EMPIRE STATE | -- | -- | -- | -- | 63.0 | 60.0 | 58.0 | 56.0 |
| EVERGREEN STATE | -- | -- | -- | -- | 63.0 | 60.0 | 58.0 | 56.0 |
| | | | | | | | | |
| CROWLEY | | | | | | | | |
| 750-1 | -- | -- | -- | -- | -- | 43.0 | 44.2 | 45.4 |
| 750-2 | -- | -- | -- | -- | -- | -- | 43.0 | 44.2 |
| 750-3 | -- | -- | -- | -- | -- | -- | -- | 43.0 |
| 650-1 | 25.0 | 25.8 | 26.5 | 27.2 | SPOT | SPOT | NA | NA |
| 650-2 | 26.1 | 27.1 | 29.3 | SPOT | SPOT | 26.5 | 27.5 | 28.5 |
| 650-3 | -- | 26.2 | 26.8 | 27.4 | 28.0 | 28.8 | 29.6 | 30.4 |
| 650-4 | -- | -- | 26.2 | 27.2 | 28.2 | 29.2 | 30.2 | 31.2 |
| 650-5 | -- | -- | 31.0 | 31.0 | 31.0 | 32.0 | 33.0 | 34.0 |
| 650-6 | -- | -- | -- | 28.5 | 29.3 | 30.0 | NA | NA |
| 650-7 | -- | -- | -- | 32.7 | 32.7 | 32.7 | 32.7 | NA |
| 650-8 | -- | -- | -- | -- | 32.7 | 32.7 | 32.7 | NA |
| 650-9 | -- | -- | -- | -- | 32.6 | 33.7 | 34.6 | NA |
| 650-10 | -- | -- | -- | -- | -- | 32.0 | 32.5 | 33.0 |

```
OSG
HOUSTON          --    42.5   43.3   44.1   44.9   45.7   46.5   47.3
LONG BEACH       --    44.0   44.9   45.8   46.7   47.6   48.5   49.4
LOS ANGELES      --    44.0   44.9   45.8   46.7   47.6   48.5   49.4
NEW YORK         --    --     42.5   43.4   44.1   44.9   45.7   46.5
TEXAS CITY       --    --     53.0   53.8   54.6   55.4   50.0   51.0
NIKISKI          --    --     --     49.5   50.3   51.1   NA     NA
BOSTON           --    --     --     49.5   50.3   51.1   51.9   52.7
MARTINEZ         --    --     --     --     53.2   54.1   55.0   NA
ANACORTES        --    --     --     --     53.2   54.1   --     --
TAMPA            --    --     --     --     --     42.0   42.0   NA
CASCADE          --    --     --     65.0   66.6   68.2   69.8   71.4
CHINOOK          --    --     --     --     70.2   71.8   73.4   75.0


U.S. SHIPPING
CHEM PRODUCER    --    --     32.5   33.0   33.5   34.0   NA     NA
CHEM SUPPLIER    --    --     --     32.0   33.0   35.0   36.0   NA
```

Time charter rates presently being earned by modern product tankers entering into employment contracts with new shippers (during 2012) are materially improved over those negotiated in 2011. Last year, the Sunshine State and OS Tampa entered into 12 month contracts at time charter rates estimated to be in the range of $42,000 per day with Chevron.  Recently, the OS Texas City was released from its BP contract and this vessel secured 2012 time charter employment with Murphy Oil at a rate of approximately $50,000 per day.

In addition, Petrobras most recently relet the OS Cascade to Exxon Mobil for six months employment (during 2012) at a rate of $47,000 per day.  This is significantly above the $40,000 per day SeaRiver paid for the OS Anacortes under a relet contract with Tesoro in 2011.

Moreover, Overseas Shipholding is taking the Anacortes back from Tesoro and will employ this ship in spot service where its time charter equivalent earnings will be equal to $56,000 per day.

A list of modern vessels employed under time charters is given in Table 43.

TABLE 43

CONTRACT DETAILS WITH VESSELS EMPLOYED UNDER TIME CHARTERS

| BLACKSTONE | TYPE | KDWT | YB | CHARTER | INITIAL TERM/ RENEWAL DATE |
|---|---|---|---|---|---|
| GOLDEN STATE | SHIP | 49 | 2009 | BP | 2016 |
| PELICAN STATE | SHIP | 49 | 2009 | MARATHON | 7.12 |

| SUNSHINE STATE | SHIP | 49 | 2009 | CHEVRON | 12.12 |
| EMPIRE STATE | SHIP | 49 | 2010 | MSC | 2015 |
| EVERGREEN STATE | SHIP | 49 | 2010 | MSC | 2015 |

**CROWLEY**

| 650-2 | ATB | 27 | 2007 | SHELL | 3 YEARS |
| 650-3 | ATB | 27 | 2007 | BP | 7 YEARS |
| 650-4 | ATB | 27 | 2008 | BP | 7 YEARS |
| 650-5 | ATB | 27 | 2008 | BP | 3 YEARS |
| 650-6 | ATB | 27 | 2008 | BP | 3 YEARS |
| 650-7 | ATB | 27 | 2009 | MARATHON | 3 YEARS |
| 650-8 | ATB | 27 | 2009 | MARATHON | 3 YEARS |
| 650-9 | ATB | 27 | 2010 | CHEVRON | 3 YEARS |
| 650-10 | ATB | 27 | 2011 | SHELL | 3 YEARS |
| 750-1 | ATB | 45 | 2011 | MARATHON | 7 YEARS |
| 750-2 | ATB | 45 | 2012 | MARATHON | 7 YEARS |
| 750-3 | ATB | 45 | 2013 | MARATHON | 7 YEARS |

**OSG AMERICA**

| HOUSTON | SHIP | 46 | 2007 | SHELL | 3.12 |
| LONG BEACH | SHIP | 46 | 2007 | BP | 6.13 |
| LOS ANGELES | SHIP | 46 | 2007 | BP | 11.13 |
| NEW YORK | SHIP | 46 | 2007 | SHELL | 4.15 |
| TEXAS CITY | SHIP | 46 | 2008 | BP | 1.12 |
| BOSTON | SHIP | 46 | 2009 | TESORO | 1.12 |
| NIKISKI | SHIP | 46 | 2009 | TESORO | 6.12 |
| CASCADE | SHIP | 46 | 2009 | PETROBRAS | 4.13 |
| MARTINEZ | SHIP | 46 | 2010 | TESORO | 5.15 |
| CHINOOK | SHIP | 46 | 2010 | PETROBRAS | 4.13 |
| ANACORTES | SHIP | 46 | 2011 | TESORO | 9.13 |
| TAMPA | SHIP | 46 | 2011 | CHEVRON | 5.12 |

**U.S. SHIPPING**

| P.C. SUPPLIER | ATB | 20 | 2009 | COP | 3 YEARS |

Vessels whose time charter contracts expire in 2012 are listed below along with their probable future deployments.

PRODUCT TANKERS WHOSE TIME CHARTER CONTRACTS EXPIRE IN 2012

| VESSEL | CURRENT HIRE | CHARTER EXPIRATION | NEW DEPLOYMENT |
|---|---|---|---|
| OS TEXAS CITY | BP | 1.12 | TC MURPHY |
| OS ANACORTES | TESORO | 1.12 | SPOT SERVICE |
| OS HOUSTON | SHELL | 3.12 | TC SHELL |
| OS TAMPA | CHEVRON | 5.12 | UNKNOWN |
| OS NIKISKI | TESORO | 6.12 | TC TESORO |
| PELICAN STATE | MARATHON 7.12 | | UNKNOWN |
| SUNSHINE STATE | CHEVRON | 12.12 | UNKNOWN |

At present, the future direction in vessel hire rates is best measured by addressing developments

in the spot market.  With most of the Jones Act tankers employed under time charters, the proxy

for spot tonnage is represented by OSG's ITBs which include six vessels with 161,000 DWT

capacity.  These vessels are deployed in cross-Gulf product transportation and they are being

spot chartered at approximately AR 270 versus AR 195 twelve months ago.  The time charter

equivalent revenues earned by the OSG vessels are quantified below.

| VESSEL | BARRELS CAPACITY | DAILY TCE REVENUE | | |
|--------|------------------|-------------------|-------------------|-------------------|
|        |                  | OCT 2010 | OCT 2011 | DEC 2011 |
| OSG 252 | 250,000 | $20,600 | $27,000 | $29,000 |
| OSG 254 | 250,000 | 22,600 | 29,000 | 30,500 |
| OSG 244 | 235,000 | 19,600 | 26,000 | 28,000 |

B.      GULF COAST REFINERY NETBACKS REALIZED FROM CLEAN CARGOS SOLD
        IN FLORIDA AND LIMITATIONS IMPOSED ON JONES ACT TRANSPORTATION
        RATES BY THE LANDED PRICE OF PRODUCT IMPORTS.

Refinery netbacks earned from Texas-Louisiana-Mississippi gasoline cargos sold in Florida

versus those earned from inland sales (e.g. the Middle West) influence what is paid for Jones Act

transportation in the cross-Gulf trade.  Factors entering this equation are: (1) differences between

the price of clean products sold in Texas and Florida; (2) U.S. marine transportation charges; (3)

the landed cost of foreign supply on the East Coast; and (4) Gulf Coast refining margins.

1.      Clean Product Prices in Texas and Florida.  The price difference between clean products

sold in Florida and Texas helps to support marine transportation expense incurred in moving

Gulf Coast cargos to Tampa-Port Everglades-Jacksonville.  Locational differences in clean

product prices sold in these markets (during the 1994-2011 interval) are quantified in Table 44.

TABLE 44

PRODUCT PRICE DIFFERENCE BETWEEN TEXAS AND FLORIDA, REFINER BULK SALES FOR RESALE, UNITS IN DOLLARS PER BARREL

| | REGULAR CONVENTIONAL GASOLINE | DISTILLATE OIL | JET FUEL KEROSENE | AVERAGE CLEAN CARGO |
|---|---|---|---|---|
| 1994 | $1.72 | $1.26 | $1.18 | 1.55 |
| 1996 | 1.81 | 1.30 | 2.10 | 1.75 |
| 1998 | 1.18 | 0.96 | 2.23 | 1.50 |
| 2000 | 1.64 | 1.75 | 1.64 | 1.65 |
| 2001 | 1.05 | 1.43 | 1.38 | 1.18 |
| 2002 | 1.21 | 1.30 | 1.75 | 1.31 |
| 2003 | 1.10 | 1.25 | 1.68 | 1.21 |
| 2004 | 2.01 | 2.21 | 1.09 | 1.92 |
| 2005 | 2.29 | 1.85 | 1.80 | 2.10 |
| 2006 | 0.78 | 1.39 | 2.20 | 1.11 |
| 2007 | 2.41 | 1.93 | 2.91 | 2.41 |
| 2008 | 2.57 | 2.81 | 3.07 | 2.68 |
| 2009 | 2.38 | 3.24 | 2.48 | 2.52 |
| 2010 | 1.89 | 2.39 | 2.02 | 2.05 |
| 2011 | 1.09 | 2.33 | 2.24 | 1.62 |

SOURCE: ENERGY INFORMATION ADMINISTRATION, PETROLEUM MARKETING MONTHLIES.

After 2000, rising domestic marine transportation expense reduced refinery netbacks generated by cross-Gulf sales to Florida.  During the 1990s, the average locational product price difference (with clean products) was $1.60 per barrel, cross-Gulf marine transportation expense averaged $0.85 per barrel and plant netbacks realized from Florida sales produced a $0.75 per barrel gain. After 2004, average cross-Gulf marine transportation expense increased to $1.70 per barrel,  the locational clean product price difference rose to $2.07 per barrel and Gulf Coast plant netbacks earned from Florida sales declined to a $0.37 per barrel.

2.   Jones Act Marine Transportation Charges. Estimated cross-Gulf marine transportation charges incurred during the 2000-2011 interval are presented in Table 45.  Our estimate includes port charges, dock fees, Harbor Maintenance Taxes and direct maritime transportation expense.

TABLE 45

ESTIMATED AVERAGE PER BARREL TRANSPORTATION CHARGES FROM GULF COAST

| REFINING CENTERS TO TAMPA AND PORT EVERGLADES 2000-2011 | | | | | | |
|---|---|---|---|---|---|---|
| | 00 | 04 | 06 | 09 | 10 | 11 |
| CORPUS CHRISTI | $0.98 | $1.34 | $1.75 | $2.00 | $1.95 | $1.90 |
| HOUSTON | 0.93 | 1.27 | 1.70 | 1.95 | 1.90 | 1.85 |
| TEXAS CITY | 0.91 | 1.24 | 1.70 | 1.95 | 1.90 | 1.85 |
| BEAUMONT & PORT ARTHUR | 0.90 | 1.22 | 1.65 | 1.85 | 1.80 | 1.75 |
| LAKE CHARLES | 0.88 | 1.19 | 1.60 | 1.80 | 1.75 | .70 |
| MISSISSIPPI RIVER | 0.82 | 1.11 | 1.45 | 1.70 | 1.65 | 1.60 |
| PASCAGOULA | 0.76 | 1.02 | 1.18 | 1.45 | 1.40 | 1.35 |

3.      The Landed Cost of Foreign Clean Products Supplied to NYH and their Impact on

Domestic Barrels Sold in the Northeast.  Factors that govern the competitive dynamics between

foreign and domestic clean cargos delivered to the East Coast are threefold.  First and most

important is the FOB product price at the refinery center that supplies the cargo.  In a perfect

economic environment FOB product prices at refinery export centers throughout the world

would be similar.  However, regional disparities between indigenous plant output and local

product demand create supply imbalances that distort FOB export prices which impact the

competitiveness of cargos sold in import markets.  Second, is the expense of foreign shipping.

Third, is the difference between refinery profitability in Western Europe and the U.S. Gulf Coast.

Gulf Coast refinery operations have historically been more profitable than those in Europe.

Higher profits allow PAD III downstream operations (when necessary) to subsidize clean

product sales in Florida whose volumes are needed to maintain high throughput levels at Gulf

Coast plants that are unable to profitably market their incremental barrels elsewhere.  The

economics of shipping European gasoline to the East Coast is demonstrated by adding cross

Atlantic marine transportation charges to the difference in regional product prices.

Supporting calculations are presented in Table 46 with a negative number in the last column identifying how much delivered European gasoline is priced below the NYH market and a positive number indicating how much European gasoline is priced above the NYH market. During 2011, the average delivered cost of a European gasoline cargo conventional regular was $1.78 per barrel above the prevailing spot price in the NYH market.  We attribute this narrowing of the Atlantic Basin arbitrage window for gasoline to structural changes in East Coast product supply.  First, is the expanding Gulf Coast gasoline surplus which is depressing product prices throughout the eastern U.S.  Second, are additional pipeline shipments of Gulf Coast gasoline to NYH that are now setting prices in the Northeast instead of imports.  Third, is the declining surplus of European gasoline and reduced volumes being exported.  Due to these developments Gulf Coast barrels have become much more competitive in East Coast markets than when the delivered lower cost European supplies set gasoline prices in NYH (e.g. 2008) and made upcoast shipments of gasoline to the Northeast unprofitable.

TABLE 46

NEW YORK HARBOR VERSUS WESTERN EUROPE, GASOLINE IN DOLLARS PER BARREL

| | FOB PRICE DIFFERENCE | MARINE CHARGE | (COST ADVANTAGE LANDED) OR DISADVANTAGE OF IMPORTS |
|---|---|---|---|
| 2000 | $(1.30) | $1.95 | $0.65 |
| 2001 | (2.05) | 2.43 | 0.38 |
| 2002 | (2.18) | 1.70 | (0.48) |
| 2003 | (2.84) | 2.36 | (0.48) |
| 2004 | (2.56) | 2.87 | 0.31 |
| 2005 | (3.11) | 2.84 | (0.27) |
| 2006 | (4.16) | 3.03 | (1.13) |
| 2007 | (5.47) | 2.59 | (2.88) |
| 2008 | (2.81) | 3.62 | 0.81 |
| 2009 | (1.68) | 2.10 | 0.42 |
| 2010 | (0.84) | 2.00 | 1.16 |
| 2011 | (0.54) | 2.32 | 1.78 |

The locational price difference between gasoline-heating oil-jet fuel sold in Houston and New York Harbor identifies the extent to which the expense of the Colonial Pipeline tariff ($1.85 per barrel) can be absorbed by Gulf Coast products transported to the Northeast.  Historically, the locational price difference between distillates (heating oil and jet fuel) was sufficient to cover most of the pipeline charge incurred in product shipments to NYH.  In contrast, the locational price difference between gasoline sold in NYH and Houston was minimal and shippers had to absorb most of the pipeline expense incurred in transporting this product to the Northeast which explains why only minimal shipments occurred.  However, altered petroleum supply economics discussed in this report caused a widening in the locational price difference between gasoline sold in Houston and it is now sufficient to absorb the Colonial Pipeline tariff expense incurred in transporting this product to NYH.  A summary of these price differences is given below and a timeline that quantifies annual differences is presented in Table 47.

SUMMARY LOCATIONAL PRICE DIFFERENCES BETWEEN HOUSTON AND NYH, DOLLARS PER BARREL

| | AVERAGE 2000-2010 | AVERAGE 2011 | 2000-2011 CHANGE |
|---|---|---|---|
| GASOLINE | $0.17 | $2.27 | $2.10 |

|  | | |
|---|---|---|
| HEATING OIL | 1.40 | 1.61 | .21 |
| JET FUEL | 1.87 | 1.86 | (.01) |

TABLE 47

DIFFERENCE BETWEEN FOB SPOT PRICES NYH AND HOUSTON FOR 87 RON UNLEADED GASOLINE,
HEATING OIL AND FUEL, IN DOLLARS PER BARREL

|  | GASOLINE | HEATING OIL | JET FUEL |
|---|---|---|---|
| 2000 | $0.76 | $2.90 | $2.60 |
| 2001 | 0.04 | 0.96 | 0.76 |
| 2002 | 0.08 | 0.97 | 0.97 |
| 2003 | 0.54 | 1.85 | 1.76 |
| 2004 | 0.46 | 1.47 | 1.89 |
| 2005 | (1.31) | 0.40 | -- |
| 2006 | (0.41) | 0.13 | 1.22 |
| 2007 | 0.41 | 0.88 | 3.36 |
| 2008 | (1.68) | 1.85 | 3.02 |
| 2009 | 1.26 | 1.21 | 1.51 |
| 2010 | 1.55 | 1.42 | 1.64 |
| 2011 | 2.27 | 1.61 | 1.86 |

4.    Refinery Profitability.  Gulf Coast refinery operations are more profitable than those in

Western Europe that are the principal suppliers of foreign gasoline delivered to the East Coast.

Higher downstream profits in Gulf Coast plants support clean product shipments to Florida and

NYH which encounter competition from gasoline imports.  Gulf Coast refineries are more

profitable because: (a) they process lower gravity cheaper crude oils; and (b) produce greater

relative volumes of higher valued clean products.  A comparison between refinery profitability in

Western Europe and the Gulf Coast is presented in Table 48.

TABLE 48

ESTIMATED CASH OPERATING INCOME OF REFINERIES IN WESTERN EUROPE AND
THE GULF COAST, DOLLARS PER BARREL

|  | GULF COAST | N.W. EUROPE | GULF COAST PREMIUM |
|---|---|---|---|
| 2001 | $4.52 | $1.96 | $2.29 |
| 2002 | 2.02 | 0.72 | 1.30 |
| 2003 | 3.21 | 2.89 | 0.32 |
| 2004 | 6.16 | 5.08 | 1.08 |
| 2005 | 12.53 | 5.51 | 7.02 |
| 2006 | 12.49 | 5.88 | 6.61 |
| 2007 | 12.60 | 5.75 | 6.85 |
| 2008 | 9.09 | 6.35 | 2.74 |
| 2009 | 3.03 | 1.66 | 1.37 |
| 2010 | 4.52 | 1.70 | 2.82 |

```
            2011          6.16           4.38            1.78
```
SOURCE: MUSE, STANCIL & CO.

C.      FORECAST FLEET EMPLOYMENT AND FUTURE TIME CHARTER RATES.

The trend in future fleet employment is predicted by contrasting expected shipping demand with

forecast fleet capacity.  These estimates were developed earlier in this report and our findings are

summarized in Table 49 which depicts several trade demand scenarios.  Factors that govern this

prediction are twofold.


First, is the ongoing decline in fleet capacity which is expected to result from the retirement of

older barges and ATBs that were reconstructed as double hull vessels.  Tighter oil company

vetting standards are presumed to force the retirement of older reconstructed tonnage.  Second, is

anticipated  domestic trade growth that is likely to come from several sources including: (1) the

resumption of normal intra West Coast product movements when the economy returns to historic

levels of operation; (2) upcoast product movements needed to cover some of distillate shortfalls

expected to result from refinery closures in the Middle Atlantic region; and (3) increased

coastwise shipments to the Florida and the South Atlantic region caused by refinery expansion

and production on the Gulf Coast.


A constant in each of the three scenarios is the elimination of substandard tonnage which reduces

existing fleet capacity to 2.3 million DWT at the end of this decade.  The reciprocal

consideration is that coastwise shipping demand is conservatively estimated to remain at 2.7

million DWT in our no growth scenario.  Alternatively, we assumed some trade growth occurs

during this decade and that coastwise shipping demand returns historical levels (i.e. 3 to 3.1 million deadweight tons) by 2020.  A more aggressive trade growth scenario (high case) is also postulated which establishes an upper bound limit in our analysis.  Under each fleet balance estimate shipping shortfalls occur with the differences being in timing and the size of forecast tonnage deficits.  These shortfalls are assumed to be covered with additional newbuildings whose construction cost and attendant compensatory hire revenues will exert upward pressure on time charter rates earned by all Jones Act tankships and oceangoing barges employed in the coastwise petroleum products trade.

TABLE 49

FORECAST TONNAGE BALANCES IN THE COASTWISE TRADE WITH PRODUCT SHIPS AND OCEANGOING BARGES HAVING CAPACITIES BETWEEN 16,000-55,000 DWT ASSUMING NO NEWBUILDINGS BEYOND THOSE NOW UNDER CONTRACT, UNITS IN MILLION DWT

NO TRADE GROWTH ASSESSMENT

|     | FLEET CAPACITY | SHIPPING DEMAND | TONNAGE BALANCE | NEED FOR ADDITIONAL SHIPS IN NUMBER OF VESSELS |
|-----|------|------|------|------|
| 11  | 2.70 | 2.70 | --    | --  |
| 12  | 2.60 | 2.70 | (.10) | 2.3 |
| 13  | 2.70 | 2.70 | --    | --  |
| 14  | 2.70 | 2.70 | --    | --  |
| 15  | 2.70 | 2.70 | --    | --  |
| 16  | 2.50 | 2.70 | (.20) | 4.3 |
| 17  | 2.50 | 2.70 | (.20) | 4.5 |
| 18  | 2.40 | 2.70 | (.30) | 6.5 |
| 19  | 2.30 | 2.70 | (.40) | 8.7 |
| 20  | 2.30 | 2.70 | (.40) | 8.7 |

LOW TRADE GROWTH ASSESSMENT

|     | FLEET CAPACITY | SHIPPING DEMAND | TONNAGE BALANCE | NEED FOR ADDITIONAL SHIPS IN NUMBER OF VESSELS |
|-----|------|------|------|------|
| 11  | 2.70 | 2.70 | --    | --   |
| 12  | 2.60 | 2.90 | (.30) | 6.5  |
| 13  | 2.70 | 2.93 | (.23) | 5.0  |
| 14  | 2.70 | 2.96 | (.26) | 5.6  |
| 15  | 2.70 | 2.97 | (.27) | 5.9  |
| 16  | 2.50 | 2.98 | (.48) | 12.6 |
| 17  | 2.50 | 2.98 | (.48) | 12.6 |
| 18  | 2.40 | 2.99 | (.59) | 14.8 |
| 19  | 2.30 | 3.05 | (.75) | 16.3 |
| 20  | 2.30 | 3.11 | (.81) | 17.6 |

HIGH CASE TRADE GROWTH ASSESSMENT

|    | FLEET CAPACITY | SHIPPING DEMAND | TONNAGE BALANCE | NEED FOR ADDITIONAL SHIPS IN NUMBER OF VESSELS |
|----|----------------|-----------------|-----------------|-----------------------------------------------|
| 11 | 2.70 | 2.70 | -- | -- |
| 12 | 2.60 | 2.94 | (.34) | 7.4 |
| 13 | 2.70 | 3.01 | (.31) | 6.7 |
| 14 | 2.70 | 3.09 | (.39) | 8.5 |
| 15 | 2.70 | 3.14 | (.44) | 8.6 |
| 16 | 2.50 | 3.19 | (.69) | 15.0 |
| 17 | 2.50 | 3.19 | (.69) | 15.0 |
| 18 | 2.40 | 3.20 | (.80) | 17.2 |
| 19 | 2.30 | 3.26 | (.96) | 20.9 |
| 20 | 2.30 | 3.32 | (1.02) | 22.2 |

Our forecast average time charter rates are based on the assumptions discussed below and the results are presented in Table 50.

First, vessels relevant to the estimate are: (1) modern product tankers added to the fleet after 2006; and (2) similar type newbuildings that will be needed to cover shipping deficits that result from trade growth and tonnage lost due to vessel retirements.  Predicted tankship newbuilding requirements were developed in Table 49.

Second, due to all of the modern ships being employed under time charters we expect that most of these vessels will continue to be employed under their existing contracts for the remaining term including options exercised by the same shippers.  Thereafter, these vessels will have their contracts renewed at our forecast charter rates.

Third, the construction cost of newbuildings added to the fleet will be more expensive than their immediate predecessors due to: (a) the amortization of engineering/design expense over fewer production units; and (b) additional steel content being required by the new common structural

rules.  Based on these metrics, Aker Philadelphia and Nassco indicate that 46,000 DWT product

tankers built to the new common structural rules would be sold at prices between $120 and $130

million each.  Compensatory time charter rates needed to support these vessels are estimated to

be approximately $65,000 based on current operating and overhead costs and a required return

on investment to the ship owners.


Fourth, the entry of more costly tonnage being added to fleet will exert upward pressure on

future time charter rates with their overall effect determined by the number of newbuildings put

in service.


Fifth, based on petroleum product supply and logistics analysis presented in this report, we

predict that a requirement will exist to transport an additional 150,000 to 200,000 BPD of

increased Gulf Coast clean products to East Coast markets.  Furthermore, there will be additional

product shipments on the West Coast as the economy returns to more normal levels of business

and commercial activity.  These increased coastwise movements can be accommodated in the

existing logistics system by preferentially deploying the new and more costly tankers in the short

haul trades where the impact of higher marine transportation charges are minimal.

TABLE 50

FORECAST AVERAGE TIME CHARTER RATES REALIZED BY MODERN TANKERS EMPLOYED IN THE
COASTWISE PETROLEUM PRODUCT FLEET 2011-2020, UNITS IN THOUSAND DOLLARS PER DAY

|      | NO TRADE GROWTH | AVERAGE NO AND LOW TRADE GROWTH | LOW TRADE GROWTH |
|------|-----------------|---------------------------------|------------------|
| 2011 | $50.9           | $50.9                           | $50.9            |
| 2012 | 52.0            | 53.4                            | 54.3             |
| 2013 | 55.8            | 57.0                            | 58.0             |
| 2014 | 58.0            | 59.0                            | 60.0             |
| 2015 | 59.6            | 60.5                            | 61.3             |

| 2016 | 61.2 | 62.9 | 63.0 |
|------|------|------|------|
| 2017 | 62.8 | 63.3 | 64.3 |
| 2018 | 64.7 | 65.6 | 66.1 |
| 2019 | 66.2 | 67.4 | 68.2 |
| 2020 | 67.4 | 68.6 | 69.0 |

FLEET MIX[*]

| EXISTING | 20 | 20 | 20 |
|------------|-----|-----|-----|
| ADDITIONAL | 9 | 13 | 18 |
| | 29 | 33 | 38 |

[*]   TANKER FLEET (46,000 DWT VESSELS) AS OF 2020 EXCLUDES 6 DOUBLE EAGLE SHIPS AND 2 RECONSTRUCTIONS.



U.S. Department
of Transportation
**Maritime
Administration**

Administrator

1200 New Jersey Avenue, S.E.
Washington, DC 20590

August 1, 2012

**VIA ELECTRONIC MAIL**

Mr. Robert K. Kurz
Chief Executive Officer
American Petroleum Tankers Parent LLC
345 Park Avenue, 29th Floor
New York, New York  10154

      Re:    American Petroleum Tankers Parent LLC:
             Application for Ship Financing Program Loan Guarantees - Decision

Dear Mr. Kurz:

      Thank you for your cooperation in the process by which the Maritime Administration
(MarAd) has carefully evaluated your application for loan guarantees under the Ship Financing
Program provided by Title 46, United States Code, Chapter 537, and administered under Title
46, Code of Federal Regulations, Part 298.  American Petroleum Tankers Parent LLC (APT) has
pending an application for loan guarantees in the amount of $340 million to refinance five
previously acquired petroleum product tankers, which was received by MarAd on August 31,
2010, and deemed to be complete on December 29, 2010.  APT's proposal was to refinance
existing debt for ships already constructed and in service.  APT's proposal would not finance the
construction of new vessels.

      Upon exhaustive review of the record, and consideration of applicable law and
regulations, I am denying APT's application for a Ship Financing Program loan guarantee.  My
decision, made pursuant to 46 U.S.C. § 53703, is final with respect to this application.

    **I.**    **Standards of Review**

      As an initial matter, the Federal Ship Financing Program is discretionary.  46 USC §
53702(a) provides that "The Secretary or the Administrator, on terms the Secretary or
Administrator may prescribe, *may guarantee* or make a commitment to guarantee the payment of
the principal of and interest on an obligation eligible to be guaranteed under this chapter . . .".
(emphasis added).  No statute or regulation specifies that loan guarantees must, shall, or should
be made, or states that if certain specified conditions are satisfied that a request for loan
guarantees will be approved.  The absence of any such provision, coupled with the statutory

provision in 46 U.S.C. § 53702(a), supports that the Federal Ship Financing Program is discretionary.

Chapter 537 of the United States Code Title 46 and Part 298 of Title 46 of the Code of Federal Regulations detail the factors the agency must consider in processing loan applications. These include, among other things, a determination that an obligor under a loan guarantee "is responsible and has the ability, experience, financial resources, and other qualifications necessary for the adequate operation and maintenance of each vessel that will serve as security for the guarantee." 46 U.S.C. § 53707(a).

Further, the MarAd Administrator "may not guarantee or make a commitment to guarantee an obligation under this chapter unless the Administrator finds that the property or project for which the obligation will be executed will be economically sound." 46 U.S.C. § 53708(a). The specific factors set forth in Section 53708(a) that the Administrator considers in making that finding are, in pertinent part:

> (1) the need in the particular segment of the maritime industry for new or additional capacity, including any impact on existing equipment for which a guarantee under this chapter is in effect;
> (2) the market potential for employment of the vessel over the life of the guarantee;
> (3) projected revenues and expenses associated with employment of the vessel;
> (4) any charter, contract of affreightment, transportation agreement, or similar agreement or undertaking relevant to the employment of the vessel;
> (5) other relevant criteria.

MarAd has by regulation adopted additional factors that must be considered. Factors that MarAd considers include, among other things, degrees of risk (46 C.F.R. § 298.3(g)); citizenship (46 C.F.R. § 298.10); vessel criteria requirements (46 C.F.R. §298.11); operating qualifications (46 C.F.R. § 298.12); how the costs of the project will be funded (46 C.F.R. §298.13(c)(1)); an applicant's financial strength (including 3 years of audited financial statements in accordance with generally accepted accounting principles (46 C.F.R. § 298.13(c)(2) & (e)); and the economic soundness of project and the applicant's ability to repay (46 C.F.R. § 298.14(a)).

MarAd also considers project feasibility. To demonstrate the economic feasibility of the project over the guarantee period, MarAd's analysis includes, among other things: (1) a detailed purpose for the obligations to be guaranteed; (2) relevant market information including the service or routes in which the vessels will be employed, suitability of the vessels for their anticipated use, significant factors influencing expectations for the future market for the vessels, including any existing charters; (3) revenues expected to be earned with an estimate of vessel operating expenses including any debt (such as Title XI debt); (4) forecast of operating cash flow; and (5) an affirmative finding of economic soundness based on an assessment of the entire project. *See, e.g.,* 46 C.F.R. § 298.14(c). Moreover, limited resources require that each application be considered on its own merits and in light of not only other pending applications but also those which may be forthcoming.

2

Further, 46 C.F.R. § 298.3(k) specifies the priority for processing applications. Consideration of vessels which may be useful as "naval and military auxiliaries" is given precedence as a consequence of the priority conferred on them by 46 U.S.C. § 53706(c); the other priorities are considered of equal precedence.

## II.    Materials Considered

MarAd has thoroughly reviewed APT's application and the entire record, including, among other things, APT's application, correspondence from APT's financial advisor, the Argent Group Ltd., correspondence from APT, the independent financial advisor's draft and final reports by Scully Capital Services, Inc., materials provided in meetings with APT and APT's financial advisors, materials supplied by NASSCO San Diego (the shipyard that built the five vessels for which you sought refinancing), APT's response to MarAd's application completion deficiency letter, and industry information available to MarAd.

In reviewing your application, MarAd also considered the recommendation of the Department of Transportation's Credit Council. The Credit Council, among other things, sets the Department's credits policies and oversees all of the Department's credit programs, including the review of existing guidance and agreements among the Department's operating administrations, the Office of the Secretary, and the Office of Management and Budget. *See* DOT Order 2301.1B (Sept. 22, 2010), ¶ 6. The Credit Council recommends the approval or disapproval of proposed credit assistance for not only Ship Financing Program loans guarantees, but also for credit programs under the Transportation Infrastructure Finance and Innovation Act of 1998 ("TIFIA") Program, administered by the TIFIA Joint Program Office; the Railroad Rehabilitation and Improvement Financing Program, administered by the Federal Railroad Administration; and the Minority Business Resource Center Short-Term Lending Program, administered by the Office of Small and Disadvantaged Business Utilization within the Office of the Secretary.

Here, in the case of Ship Financing Program loan guarantee matters, the Credit Council "provide[s] a recommendation regarding the financial viability of the proposed project and the merits of the requested credit assistance and its consistency with departmental credit policies to the . . . MARAD Administrator . . . who will approve or disapprove the request for credit assistance." *Id.* at ¶ 9(a). APT's application was presented to or considered by the Department's Credit Council during at least six different meetings.

During the course of MarAd's lengthy review of APT's application, as with any credit application, MarAd formed tentative views regarding the merit and viability of APT's application, as well as the deficiencies and weaknesses in the proposal. After receiving the benefit of MarAd staff analysis and the views of an independent financial analyst retained pursuant to 46 U.S.C. § 53708(d), Scully Capital Services, I tentatively determined that APT's application should be denied for the reasons more fully set forth in my decision today. Subsequently, I asked the Credit Council for its recommendation on APT's loan guarantee application, and on July 31, 2012, the Credit Council unanimously recommended that APT's application should be denied. My decision to deny APT's application was informed by, but not dependent upon, the Credit Council's recommendation.

3

We were unable, however, to consider your recent correspondence regarding changes to your loan application. On July 23, 2012, APT's agent sent an email to members of my staff regarding APT's application. That email described certain changes to APT's application. On July 30, 2012, MarAd received correspondence from APT, dated July 28, 2012, wherein APT formally amended its application. Attached to that correspondence was a 19-page document setting forth new and revised financial assumptions and analyses in support of APT's amended application.

MarAd reviewed the submitted amendment on July 30 and 31, 2012 and determined that APT's amendment constitutes a material change in its application. This amendment requires extensive and time-consuming review of the entire amended application package. We believe a proper assessment of the amended application will require, among other things, a comprehensive financial analysis by an independent financial analyst and MarAd staff, an analysis of supporting financial statements, and a review of the applicant corporate structure. Such an undertaking would require up to ten weeks to complete, assuming that further audited materials were not needed as part of that review. The need for further audited statements or materials would extend that time period. However, MarAd does not have sufficient time to complete this review, as it is required to make a decision on your application by August 31, 2012. *See Am. Petroleum Tankers Parent LLC v. United States, et al.*, Civil Action No. 12-1165 (D.D.C.) (ECF No. 7). That case sought to compel MarAd to issue a decision on APT's application by August 31, 2012, and on July 23, the government and APT stipulated that the government will issue a decision by August 31. Thus, your submitted amendment cannot be considered at this time as a part of the application upon which this decision is made.

However, in these circumstances, if you wish, I will consider the submitted materials. With appropriate support from APT, MarAd tentatively anticipates that it could complete review of those materials within approximately ten weeks. Should you wish for me to consider the submitted materials, please so advise and MarAd will immediately undertake to do so.

### III.   **Reasons for Denial**

MarAd's determination to deny APT's application is based upon several factors. APT's project is not economically sound overall; it seeks refinancing for two particularly vulnerable vessels; and it seeks to refinance at least three ships over one year old at the time of closing projected when the application was received, which in view of limited resources would be inconsistent with expressions of statutory and regulatory policy favoring newer ships. Furthermore, the amount of the project to be refinanced is much more than any previous refinancing and, if granted, would consume almost all of the remaining monies available for the ship financing program. Scarcity of ship financing program resources must be taken into consideration, particularly in light of other pending or potential applications for which funding would be insufficient if APT's application were approved.

After review of all the application materials and consideration of the foregoing, I have determined that the application should be denied. As noted above, my proposed determination was subsequently presented by MarAd to the Department's Credit Council on July 31, 2012, which recommended as well that the application should be denied.

4

## A. APT's Project Is Economically Unsound

Consistent with the discretionary nature of the program and the necessity for careful stewardship, issuance of a Letter Commitment for a loan guarantee requires a finding that the proposed project is economically sound and that the applicant will be able to repay its obligations. 46 C.F.R. § 298.14(a) specifies that "[w]e shall not issue a Letter Commitment for guarantees unless we find that the proposed project ... will be economically sound." This requirement flows from the economic soundness requirements set forth at, among other provisions, 46 U.S.C. § 53703(b) and § 53708(a). The economic soundness requirement necessitates an affirmative finding of economic soundness because "the Administrator may not guarantee or make a commitment or guarantee an obligation under this chapter unless the ... Administrator certifies that a full and fair consideration of all the regulatory requirements, including economic soundness and financial requirements applicable to the obligor and related parties, and a thorough assessment of the technical, economic, and financial aspects of the loan application, has been made." 46 U.S.C. § 53703(b). An applicant's economic soundness is critical to MarAd's decision because the government's financial security is premised on the ability of the applicant to repay its debt from the proceeds of vessel operations. In MarAd's experience, the government sustains a loss whenever there is a default since collateral and other security enhancements have almost always been inadequate to pay off the debt. Thus, the government is only secure against such default, to the greatest degree possible, if the project fundamentals are economically sound.

MarAd's analysis found APT's financial figures troubling. To date, APT consistently operated at a net loss, to wit $42.4 million in 2010, $35.6 million in 2011, and $11 million in the first quarter of 2012. Even though all five of APT's vessels were under charter in 2011 and 2012, APT still showed a net loss. The agency's financial concerns were discussed and clarified in the independent financial analysis of the application conducted by Scully Capital Services, and the report further informed MarAd's analysis of the application.[1] See 46 U.S.C. § 53708(d) (providing for the engagement of a third-party expert to conduct an independent financial analysis (IFA) of significant features of a ship financing application). First, the report noted that APT has had difficulty meeting its current financial obligations. The IFA Report noted that APT "is burdened with significant leverage in its capital structure [and] is unable to meet interest payment requirements on a current basis. Additionally, [APT] is exposed to changes in the product tanker market and its ability to meet financial obligations could be impaired should negative changes occur in the future"[2] and "the cash flow available for drydocking is constrained in several years."[3]

Second, the IFA report noted that even if MarAd approved the loan guarantee, such that APT benefitted from a lower interest rate, APT would have difficulty repaying its loan

---

[1]     Scully Capital Services, Inc., "Financial Evaluation of American Petroleum Tankers Parent LLC Title XI Loan Guarantee Application, " June 22, 2012 (hereinafter "IFA report").

[2]     IFA Report at 35.

[3]     Id. at 47.

5

obligations. "[I]nterest expense on both the existing debt and the Title XI debt have large impacts on profitability and will result in negative net income."[4]  Even if MarAd were to issue loan guarantees to lower APT's high third-party debt costs, the operation would still lose money because amortization of obligations to repay sponsor debt is at an exceedingly high, 12-percent rate. APT has capitalized "paid-in-kind" (PIK) interest owed to its sponsor debt, causing sponsor-debt principal to increase annually.  APT's financial statements indicate the PIK balance was $8.4 million in 2009, $32.3 million in 2010, and $44 million in 2011.  With such large interest expense owed to its equity, it is apparent that the leverage structure of APT is not viable and even with reduced debt service costs, the underlying APT operation is dis-economic.  These circumstances create significant concerns about APT's ability to repay its debt from the proceeds of vessel operations itself, not on the value of collateral available for foreclosure sale or other risk-management techniques.

Additionally, APT's financial figures raise additional concerns when viewed in connection with APT's present operations plan.  The viability of APT's operations is further put into question because the length of APT's charters is substantially shorter than the guarantee period and the market into which any or all of the ships might be introduced is uncertain.  The IFA report warned that "the deep and prolonged recession has reduced coastwise petroleum shipments in recent years, depressing the underlying fundamentals of the Jones Act refined product-chemical-specialties trade.  As a result . . . [APT] will likely face periods of industry growth and expansion as well as economic challenges that will place downward pressure on earnings."[5]  Thus, APT's operations model further exacerbates concerns that APT will not be able to repay its debt obligations.

### B.  APT's Refinancing Project Does Not Warrant Priority

MarAd "will give priority for processing ... [r]equests for financing construction of equipment or vessels less than one year old as opposed to the refinancing of existing equipment or vessels that are one year old or older." 46 C.F.R. § 298.3(k).  The same preference for support of newer ships finds expression in 46 U.S.C. § 53706(a)(1)(B) and 46 C.F.R. § 298.17(a) which provides "[i]n evaluating project applications we shall also consider whether the application provides for ... (2) [t]he financing of the Vessels within one year after delivery...."  APT's application seeks refinancing for five vessels, only two of which were built within the last year and are thus entitled to priority under the statute and regulations.  The APT vessels were delivered on the following schedule: GOLDEN STATE, January 9, 2009; PELICAN STATE, June 15, 2009; SUNSHINE STATE, December 3, 2009; EMPIRE STATE, July 13, 2010; and EVERGREEN STATE, December 7, 2010.  Giving APT the benefit of the expectation the application would have been due initially for closing at an earlier date, and because the projected closing date is the date for measuring the age of the ships, the three oldest ships would have been well over a year old at that time.  Thus, the majority of the funds devoted to refinancing will be allocated to vessels that are not preferred by the statute.

---

[4] *Id.* at 32.

[5] *Id.* at 19.

### 1. APT Seeks Financing for Two Economically Vulnerable Vessels

In addition to the negative implications of APT's overall financial structure, the two ships entitled to priority for refinancing under the statute and regulations are economically vulnerable. The EMPIRE STATE and EVERGREEN STATE, the two ships that can be considered for refinancing because they were newer than one year old at the presumed time of closing, are both engaged by the U.S. Navy. *See* 46 C.F.R. § 298.3(k). Although refinancing of these vessels is preferred, they are also the most susceptible to early charter termination. All government contracts are subject to funds availability, and recent prospective cuts to the Defense budget increase, in our judgment, the likelihood that the options on these two ships may not be renewed and that they would become unemployed.

Charter and market uncertainty are also aggravated by the fact that APT is a recent start-up company in the maritime industry. APT was founded in 2006 and lacks resources upon which it can draw as a matter of right. Accordingly, even though measures might be taken to improve the government's security position in the event of default, those steps do not address inherent economic unsoundness.

### 2. The Majority of APT's Application Seeks to Refinance At Least Three Ships Over One Year Old

The majority of APT's application seeks to refinance APT's three older ships, in contravention of the statutory and regulatory preference for the disbursement of these limited funds. Furthermore, even if "refinancing" loan guarantees were to be made for only three of the ships, proportionately for $204 million (assuming 3/5 X $340 million), that refinancing would be dramatically larger than any prior refinancing of older vessels, deviating widely from prior agency practice. MarAd has approved only a handful of projects for the U.S. coastwise trade that refinanced existing non-program debt. All were to refinance existing non-program debt for projects for less than $25 million, and in some cases included a larger component to finance new construction. It would be departure from prior practice for MarAd to approve a project that seeks to refinance more than $200 million in non-program debt.

### C. APT's Requested Loan Guarantee Is Substantial and Would Exhaust MarAd's Limited Resources

The mere size of the request is also of concern for MarAd. APT seeks guarantees for $340 million. But since 1994, MarAd has approved only two projects for the U.S. coastwise trade in an amount in excess of $300 million; neither project was to refinance existing non-program debt. In light of prior practice, it is especially important to note that the large amount of the guarantee would exhaust available program resources. Moreover, the policy point favoring newer vessels made by both the processing and evaluative criteria is especially important in this case because there are two other applications currently pending which both are for new vessels. Moreover, there are two, new, comparable vessels that might be eligible for financing under this program. Application of the policy favoring newer vessels is relevant because there are insufficient resources to support approval of loan guarantees to all three existing applications, let alone to address potential, future applications.

7

### D. Other Considerations

Finally, evaluation of APT's application took into consideration that the vessels covered by the application might have potential usefulness as naval auxiliaries under 46 U.S.C. § 53706(c) and 46 C.F.R. § 298.17(a)(1), which reflect a preference for commercial vessels that are capable of supporting naval or military contingencies.  Noting the significance of military usefulness, whether vessels are so qualified is not solely dispositive.  Economic soundness considerations are overarching.  Evaluative criteria specified by 46 C.F.R. § 298.17(a), including consideration of military usefulness and age-of-vessel/refinancing concerns are thus taken into consideration in that context.  It is also important to note that when considering any evaluative factor, the status of other pending and potential applications must be taken into consideration.  With respect to APT's application, that vessels proposed by another pending application and those potentially eligible for program financing would also meet the military-usefulness standard and not suffer from the disfavor associated with older vessels.  Accordingly, notwithstanding military usefulness, APT's application was viewed in light of the broad discretion of the program, its relative economic soundness, the relevance of evaluative criteria, constrained resources, and other applications.

For all the foregoing reasons, I am denying APT's application for a Ship Financing Program loan guarantee.  Your professionalism and courtesy during the consideration of your loan guarantee application have been appreciated.

Sincerely,

David T. Matsuda

8



U.S. Department
of Transportation
**Maritime
Administration**

Administrator

1200 New Jersey Avenue, S.E.
Washington, DC 20590

November 9, 2012

**VIA ELECTRONIC MAIL ONLY**

Mr. Robert K. Kurz
Chief Executive Officer
American Petroleum Tankers Parent LLC
345 Park Avenue, 29th Floor
New York, New York 10154

>    Re:   **American Petroleum Tankers Parent LLC: Decision on
>    Modified Application for Ship Financing Program Loan Guarantees**

Dear Mr. Kurz:

   American Petroleum Tankers Parent LLC (APT) previously submitted an application for
loan guarantees in the amount of $340 million to refinance five previously acquired petroleum
product tankers, which application was received by the Maritime Administration (MarAd) on
August 31, 2010, and deemed to be complete on December 29, 2010. APT submitted additional
materials subsequent to that date, including a letter dated July 28, 2012, in which APT outlined a
proposed modification to its application that would have converted certain APT debt to
stockholder equity.

   MarAd carefully evaluated APT's application for loan guarantees under the Federal Ship
Financing Program provided by Title 46, United States Code, Chapter 537, and on August 1,
2012, denied that application. In that August 1, 2012 decision, I declined to consider APT's
additional materials in connection with a proposed conversion of certain APT debt to stockholder
equity, but offered to consider the submitted materials as part of a modified application.

   Subsequently, in a letter dated August 9, 2012, APT requested, in response to MarAd's
offer, that MarAd consider the materials modifying APT's previously denied application. As
with its original application, APT's modified application seeks to refinance existing debt for five
ships already constructed and in service. APT's modified application, which provided for the
conversion of certain sponsor debt to stockholder equity, would not finance the construction of
new vessels.

   I have carefully reviewed APT's modified application. Upon exhaustive review of the
record, and consideration of applicable law and regulations, I am denying APT's modified
application for a Ship Financing Program loan guarantee. My decision, made pursuant to 46
U.S.C. § 53703, is final with respect to this modified application.

## I.   Standards of Review

As an initial matter, the Federal Ship Financing Program is discretionary.  46 U.S.C. § 53702(a) provides that "The Secretary or the Administrator, on terms the Secretary or Administrator may prescribe, *may guarantee* or make a commitment to guarantee the payment of the principal of and interest on an obligation eligible to be guaranteed under this chapter . . .". (emphasis added).   No statute or regulation specifies that loan guarantees must, shall, or should be made, or states that if certain specified conditions are satisfied that a request for loan guarantees will be approved.  The absence of any such provision, coupled with the statutory provision in 46 U.S.C. § 53702(a), supports the conclusion that the Federal Ship Financing Program is discretionary.

Chapter 537 of the United States Code Title 46 and Part 298 of Title 46 of the Code of Federal Regulations detail the factors the agency must consider in processing loan applications. These include, among other things, a determination that an obligor under a loan guarantee "is responsible and has the ability, experience, financial resources, and other qualifications necessary for the adequate operation and maintenance of each vessel that will serve as security for the guarantee."  46 U.S.C. § 53707(a).

Further, the MarAd Administrator "may not guarantee or make a commitment to guarantee an obligation under this chapter unless the Administrator finds that the property or project for which the obligation will be executed will be economically sound."  46 U.S.C. § 53708(a).  The specific factors set forth in Section 53708(a) that the Administrator considers in making that finding are, in pertinent part:

> (1) the need in the particular segment of the maritime industry for new or additional capacity, including any impact on existing equipment for which a guarantee under this chapter is in effect;
> (2) the market potential for employment of the vessel over the life of the guarantee;
> (3) projected revenues and expenses associated with employment of the vessel;
> (4) any charter, contract of affreightment, transportation agreement, or similar agreement or undertaking relevant to the employment of the vessel;
> (5) other relevant criteria.

MarAd has by regulation adopted additional factors that must be considered.  Factors that MarAd considers include, among other things, degrees of risk (46 C.F.R. § 298.3(g)); citizenship (46 C.F.R. § 298.10); vessel criteria requirements (46 C.F.R. §298.11); operating qualifications (46 C.F.R. § 298.12); how the costs of the project will be funded (46 C.F.R. §298.13(c)(1)); an applicant's financial strength (including 3 years of audited financial statements in accordance with generally accepted accounting principles (46 C.F.R. § 298.13(c)(2) & (e)); and the economic soundness of project and the applicant's ability to repay (46 C.F.R. § 298.14(a)).

2

MarAd also considers project feasibility. To demonstrate the economic feasibility of the project over the guarantee period, MarAd's analysis includes, among other things: (1) a detailed purpose for the obligations to be guaranteed; (2) relevant market information including the service or routes in which the vessels will be employed, suitability of the vessels for their anticipated use, significant factors influencing expectations for the future market for the vessels, including any existing charters; (3) revenues expected to be earned with an estimate of vessel operating expenses including any debt (such as Title XI debt); (4) forecast of operating cash flow; and (5) an affirmative finding of economic soundness based on an assessment of the entire project. *See, e.g.,* 46 C.F.R. § 298.14(c). Moreover, limited resources require that each application be considered on its own merits and in light of not only other pending applications but also those which may be forthcoming.

Further, 46 C.F.R. § 298.3(k) specifies the priority for processing an application vis-a-vis other applications. Consideration of vessels which may be useful as "naval and military auxiliaries" is given precedence as a consequence of the priority conferred on them by 46 U.S.C. § 53706(c); the other priorities are considered of equal precedence. Evaluation criteria are provided by 46 C.F.R. § 298.17, although by their terms all criteria are not applicable to all applications.

## II.    Materials Considered

MarAd has thoroughly reviewed APT's modified application, including, among other things, all amending materials and supporting documentation submitted to MarAd, correspondence from APT's financial advisor Argent Group Ltd., and correspondence from APT. Specifically, we have closely analyzed the amending materials including communications from APT's financial advisor consisting of an e-mail message dated July 23, 2012, and a letter dated July 28, 2012, and APT's letters dated August 9, August 24, September 13, and October 9, 2012, with their various enclosures. Additionally, we reviewed and considered your correspondence dated October 2, 2012, and October 15, 2012, in which you described a contingent agreement between an APT affiliate and General Dynamics NASSCO (formerly known as National Steel and Shipbuilding Company) for the construction of two new product tankers.

In reviewing your modified application, MarAd also considered the recommendation of the Department of Transportation's Credit Council. The Credit Council, among other things, sets the Department's credit policies and oversees all of the Department's credit programs, including the review of existing guidance and agreements among the Department's operating administrations, the Office of the Secretary, and the Office of Management and Budget. See DOT Order 2301.1B (Sept. 22, 2010), ¶ 6. The Credit Council recommends the approval or disapproval of proposed credit assistance for not only Ship Financing Program loan guarantees, but also for credit programs under the Transportation Infrastructure Finance and Innovation Act of 1998 ("TIFIA") Program, administered by the TIFIA Joint Program Office; the Railroad Rehabilitation and Improvement Financing Program, administered by the Federal Railroad Administration; and the Minority Business Resource Center Short-Term Lending Program, administered by the Office of Small and Disadvantaged Business Utilization within the Office of the Secretary.

3

Here, in the case of Ship Financing Program loan guarantee matters, the Credit Council "provide[s] a recommendation regarding the financial viability of the proposed project and the merits of the requested credit assistance and its consistency with departmental credit policies to the . . . MARAD Administrator . . . who will approve or disapprove the request for credit assistance." *Id.* at ¶ 9(a).

During the course of MarAd's review, as with any credit application, MarAd formed tentative views regarding the merit and viability of APT's modified application as well as the deficiencies and weaknesses in the proposal.  After receiving the benefit of MarAd staff analysis and the views of an independent financial advisor ("IFA") retained pursuant to 46 U.S.C. § 53708(d), Scully Capital Services, I tentatively determined that APT's modified application should be denied for the reasons more fully set forth in my decision today.

Having reached a preliminary determination to deny APT's modified application, I subsequently asked the Credit Council for its recommendation on denying APT's modified application.  On November 8, 2012, the Credit Council unanimously recommended that APT's modified application should be denied.  My decision to deny APT's modified application was informed by, but not dependent upon, the Credit Council's recommendation.

### III.    **Reasons for Denial**

MarAd's determination to deny APT's modified application is based upon several factors.  APT modified its previously-denied application by offering to convert a portion of its existing sponsor debt not repaid through the proceeds of the Title XI financing into stockholder equity of APT's parent, American Petroleum Tankers Holding LLC.  If effected, the conversion would have amounted to an accounting change since debt to repay an initial infusion of capital by the owners (so-called sponsor debt) would have been converted to enlarge the sponsor owners' equity position.  Although the conversion would have eliminated a large 2016 balloon payment obligation that would otherwise potentially endanger the solvency of the APT operation were it made or enforced by the sponsor-owners, the accounting change would not improve APT's revenue prospects; it only would remove one potentially adverse consequence to APT.

Despite APT's modifications, APT's project remains not economically sound overall. APT's modified application still seeks refinancing for two particularly vulnerable vessels. APT's modified application also still seeks to refinance at least three ships over one year old at the time of closing projected from when the application was received, which in view of limited resources would be inconsistent with expressions of statutory and regulatory policy favoring more recently built vessels.  Furthermore, the amount of the project to be refinanced is much more than any previous refinancing and, if granted, would consume almost all of the remaining monies available for the ship financing program at the likely expense of other pending or potential applications.

4

## A. The Economic Unsoundness of APT's Project is a Critical Flaw

The Maritime Administration previously found APT's project to be economically unsound. The fundamental revenue flow was not sufficiently strong or reliable to support the operation over time in other than very favorable circumstances. That posture was made worse because progressively larger sums were owed as sponsor-debt to the firm's equity interests and that was made even worse by a 2016 balloon payment, that, if made or enforced, would have had a particularly negative effect on APT. To deal with that problem, APT modified its application to convert the so-called sponsor debt to equity without the right to demand payment. Although removing a major concern, the accounting change the modification represented did not improve the fundamentals of APT's business model because revenue projections did not grow and as a result of the change there would be no new infusion of cash. Reexamination of the fundamental business model showed the same problems which proved APT's project to be economically unsound in the first instance.

Consistent with the discretionary nature of the program and the necessity for careful stewardship of agency resources, issuance of a Letter Commitment for a loan guarantee requires a finding that the proposed project is economically sound and that the applicant will be able to repay its obligations. 46 C.F.R. § 298.14(a) specifies that "[w]e shall not issue a Letter Commitment for guarantees unless we find that the proposed project ... will be economically sound." This requirement flows from the economic soundness requirements set forth at, among other provisions, 46 U.S.C. § 53703(b) and § 53708(a). The economic soundness requirement necessitates an affirmative finding of economic soundness because "the Administrator may not guarantee or make a commitment or guarantee an obligation under this chapter unless the ... Administrator certifies that a full and fair consideration of all the regulatory requirements, including economic soundness and financial requirements applicable to the obligor and related parties, and a thorough assessment of the technical, economic, and financial aspects of the loan application, has been made." 46 U.S.C. § 53703(b). An applicant proposal's economic soundness is critical to MarAd's decision because the government's financial security is premised on the ability of the applicant to repay its debt from the proceeds of vessel operations. In MarAd's experience, the government sustains a loss whenever there is a default since collateral and other security enhancements have almost always been inadequate to pay off the debt. Thus, the government is only secure against such default, to the greatest degree possible, if the project fundamentals are economically sound.

Against these standards, APT's modified application is economically unsound. Although APT's July 28 proposal to convert sponsor debt to be considered as equity might ameliorate one aspect of APT's previously economically unsound proposal, the fundamental economic unsoundness of the APT project remains. As I explained in my August 1, 2012, denial of APT's original application, "[e]ven if MarAd were to issue loan guarantees to lower APT's high third-party debt costs, the operation would still lose money because amortization of obligations to repay sponsor debt is at an exceedingly high, 12-percent rate" because "APT [had] capitalized 'paid-in-kind' (PIK) interest owed to its sponsor debt, causing sponsor-debt principal to increase annually." At best, the July 28 modification might nominally alleviate that concern because the former obligation to pay paid-in-kind interest to APT sponsors would be eliminated by conversion of those sponsor debt obligations to equity interests. The alleviation, if any, that

5