**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMERICAN PETROLEUM TANKERS PARENT LLC, | ) ) | |
| Plaintiff, | ) ) | Civil Action No. 1:12-CV-001165-CKK |
| v. | ) ) | Notice of Filing of Administrative Record |
| The UNITED STATES OF AMERICA, *et al.*, | ) ) ) | |
| Defendants. | ) | |

### NOTICE OF FILING OF VOLUME 25 OF THE ADMINISTRATIVE RECORD

Defendants hereby give notice that attached hereto is **Volume 25** of the redacted

Administrative Record in this action, which is being filed in 26 separate volumes.

Respectfully Submitted,

STUART F. DELERY
Acting Assistant Attorney General

RONALD C. MACHEN, JR.
United States Attorney

DIANE KELLEHER
Assistant Branch Director

*s/ Daniel Bensing*
DANIEL BENSING
Senior Counsel
(D.C. Bar No. 334268)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W. Room 6114
Washington D.C. 20530
Tel.: (202) 305-0693
Fax:  (202) 616-8460
Email:  Daniel.Bensing@USDOJ.gov

Attorneys for Defendants

CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2013 I electronically filed the foregoing Notice of Filing of Volume 25 of the Administrative Record with the Clerk of the Court by using the CM/ECF system.


/s/ Daniel Bensing
DANIEL BENSING

might be realized would be nominal, however, because as APT observed in its letter of August 9, 2012, the analytical model used in MarAd's initial assessment had already considered sponsor debt to be equity for purposes of financial modeling. Paid-in-kind interest merely exacerbated an already-unsatisfactory projection for operating revenue. At bottom, APT's operating revenue model continues to be problematic since the modification proposed by APT does not change operating revenue or cash flow projections and does not represent an infusion of new working capital into APT. That is significant because, despite current charters, future employment of the vessels is anything but certain.

In reviewing APT's modified application, the IFA explained, as a general consideration, that "[s]ince the credit strength of the Applicant [APT] is based on the revenue-generating capability of each of the five Vessels, the predictability, sustainability and potential volatility of the Vessel's revenues need to be examined over the Title XI guarantee period. As creditor, MarAd needs to be protected from business cycles and other market disruptions that could result in projected revenues being less than expected."[1] A core concern derives from APT's charters that are much shorter than the guarantee period in the context of the uncertainty of the market into which any or all of the ships might be introduced. Even though APT seeks loan guarantees for twenty years, all of its current charters expire by February 2016, and two charters are subject to very uncertain annual renewal every October 1st.

Consistent with its prior expressions of cautionary concern, the IFA noted "[t]he largest area of Project risk relates to the uncertainty of the market in the long-term. When combined with the limited breadth of operations of the Applicant [APT], this exposes Project debt to business cycles that may be experienced over the course of the 20-year amortization period."[2] With respect to APT's forecasted charter rates, the IFA supplemental report stated that "the Applicant [APT] expects that time charter renewals will realize the price forecast rejected by Wilson Gillette in its most recent publications."[3] To support its finding, the IFA noted that "[d]espite recent conditions, the outlook for future time charter rates is positive, albeit expectations for long-term future demand have moderated from those predicted two years ago."[4] Further to observations regarding vessel employment and charter rates, the IFA concluded "[w]hile the projections provided by the Applicant are reasonable, the debt will be exposed to changes that cannot be foreseen at this time."[5]

Both post-initial-charter utilization and daily charter rates are uncertain. The IFA suggested that a 1.5:1 debt service coverage ratio is the appropriate standard by which to

---

[1]   *See* Scully Capital Services, Inc., "Financial Evaluation of American Petroleum Tankers Parent LLC Title XI Loan Guarantee Application," dated November 5, 2012 (hereinafter "IFA supplemental report"), at 9.

[2]   *Id.* at 30.

[3]   *Id.* at 32.

[4]   *Id.* at 26.

[5]   *Id.* at 30.

6

measure the adequacy of APT's cash flow.[6] It is of grave concern that APT is not projected to meet that standard over almost half the period of the requested loan guarantees. Adjusted for uncertainty, MarAd's neither-best-nor-worst-case financial model showed APT's projected operations would not generate sufficient revenue to meet a 1.5:1 cash flow-to-debt service ratio in nine of the twenty guarantee years. It is critically important that in three of those nine years the ratio is dangerously close to 1:1, such that any unforeseen disruption of revenue or increase in operating costs would likely result in a payment default. The IFA found that APT "is exposed to changes in the product tanker market and its ability to meet financial obligations could be impaired should negative changes occur in the future."[7]

In addition to the nine years in which APT is not projected to meet the 1.5:1 ratio, MarAd's analysis shows in four other years the projections for APT are below 1.55:1, barely over the acceptable threshold. Also noteworthy is that if loan guarantees were to be provided in 2012, MarAd's projections show that APT would almost immediately, that is as soon as 2014, fail to meet the 1.5:1 ratio. Thus, APT's operations model further amplifies concerns that APT will not be able to repay its debt obligations and is not economically sound.

When considering debt service ratios it is important to put the IFA's observations in context in light of MarAd's own financial analysis. APT may assert that MarAd's analysis supporting its decision is unnecessarily conservative. That is not the case. MarAd's conclusions reflect the careful considerations which should be expected of a Government steward of public resources. APT, in providing information to the IFA, has referred to much more favorable debt service ratios ranging from 2.44:1 in the past to 3.53:1 based on APT's own optimistic numbers reflected in the IFA's supplemental report.[8] The IFA's projections forecast debt service ratios as low as 0.64:1.[9] That dramatic variability compels two conclusions. First, the most pessimistic, yet plausible, scenarios are very risky for the Government. Second, the IFA's conclusions of viability are not dispositive because in many instances the IFA's apparent even-handedness leaves the decision without a conclusion by the IFA as to which calculation is more likely.[10] Accordingly, although informed by the IFA's considerations, the Government must rely on its own analysis because it is ultimately accountable for the outcome of any loan guarantee decision.

Likewise it is important to note that although the IFA's report may be read to suggest a loan guarantee for the benefit of APT is technically viable,[11] it is only so if various precautionary structures would be put into place.[12] The very fact that support mechanisms are necessary to

---

[6]     *Id.* at ES-6. *See also* Scully Capital Services, Inc., "Financial Evaluation of American Petroleum Tankers Parent LLC Title XI Loan Guarantee Application," June 22, 2012 (hereinafter "IFA report"), at 6.

[7]     *Id.* at 24.

[8]     *Id.* at 35, Exhibit 21.

[9]     *Id.* at 37-43, passim.

[10]    *E.g., id.* at ES-5.
[11]    *Id.*

[12]    *Id.* at ES-5-6.

7

bolster APT's project to make it marginally acceptable from a lender's perspective is clear indication that the project would not stand on its own without those supports; that is, it is inherently economically unsound.  To approve loan guarantees would be inconsistent with the underlying premise that a project must be economically sound before taking other matters into consideration.   46 C.F.R. § 298.14(a), discussed above, specifies the core prerequisite for a Federal ship financing program loan guarantee.

Finally, APT's proposed conversion of debt to equity does not remedy this economic unsoundness.  The proposal offered by APT would (a) alleviate APT's heavy burden of capitalized paid-in-kind interest related to the sponsor debt since the sponsor debt would no longer exist as a result of the conversion; and (b) eliminate potential insolvency issues of APT related to the 2016 balloon payment due under the terms of the sponsor debt.  However, the proposed conversion would not infuse any new funds into APT or improve APT's cash flow.  Moreover, the IFA supplemental report also noted that the conversion of certain sponsor debt to equity "did not affect Scully Capital's analysis because this debt was assumed to be subordinated to the Title XI debt in Scully Capital's original analysis."[13]

Thus, the underlying fundamental risks of operating revenue shortfall remain, exacerbated by the fact that APT, formed in 2010, is a start-up company in the maritime industry without resources upon which it can draw as a matter of right in the event of macroeconomic disruption or unforeseen interruption of its revenue stream.

### B.  APT's Refinancing Project Does Not Warrant Priority

The various priorities for processing an application vis-à-vis other applications are set forth at 46 C.F.R. § 298(k).  As discussed in consideration of the nearly parallel evaluative criteria listed by 46 C.F.R. § 298.17, none of the individual criteria is solely dispositive, but each must be considered together.  Accepting for the sake of consideration that APT's vessels are of a nature that is susceptible for their use as naval and military auxiliaries under section 298(k)(1), the same priority of consideration would have to be given to vessels offered by another applicant that would have the same ancillary utility.  But because another currently pending application has such vessels, APT does not enjoy a particular advantage.  Likewise, APT might have argued that its project should enjoy priority under section 298(k)(4) because it seeks loan guarantees for twenty years when it may claim the vessels have a useful life of twenty-five years.  That argument would be meaningless because the additional security the Government might expect to enjoy as a result is vitiated by the simple fact that APT's project is economically unsound.  The priority criteria listed by 46 C.F.R. § 298(k)(3) and (5) are inapplicable to APT's application.  That leaves the important consideration of the age of APT's vessels.  46 C.F.R. § 298(k)(2)

MarAd "will give priority for processing … [r]equests for financing construction of equipment or vessels less than one year old as opposed to the refinancing of existing equipment or vessels that are one year old or older."  46 C.F.R. § 298.3(k)(2).  The same preference for support of newer ships finds expression in 46 U.S.C. § 53706(a)(1)(B) and 46 C.F.R. § 298.17(a)

---

[13]     *Id.* at 2.

which provides "[i]n evaluating project applications we shall also consider whether the application provides for … (2) [t]he financing of the Vessels within one year after delivery…." APT's modified application seeks refinancing for five vessels.

The APT vessels were delivered on the following schedule: GOLDEN STATE, January 9, 2009; PELICAN STATE, June 15, 2009; SUNSHINE STATE, December 3, 2009; EMPIRE STATE, July 13, 2010; and EVERGREEN STATE, December 7, 2010. As with APT's original application, APT's modified application still seeks to refinance at least three ships over one year old at the time of closing projected from when the application was received. Consequently, only two of the five vessels would be entitled to priority under the statute and regulations. Thus, the majority of the funds devoted to refinancing will be allocated to three vessels that do not qualify for preference in contravention of the statutory and regulatory preference for the disbursement of these limited funds.

Even if "refinancing" loan guarantees were to be made for only three of the ships, proportionately for $204 million (assuming 3/5 X $340 million), that refinancing would be dramatically larger than any prior refinancing of older vessels, deviating widely from prior agency practice. MarAd has approved only a handful of projects for the U.S. coastwise trade that refinanced existing non-program debt. All were to refinance existing non-program debt for projects of less than $25 million, and in some cases included a larger component to finance new construction. APT's modified application would constitute the largest refinancing ever undertaken by MarAd by a factor of eight-fold in the context that there have been very few refinancings at all. Large and unprecedented loan guarantees would not reflect the careful stewardship of resources appropriate for a financially constrained program, and APT's application to refinance approximately $204 million relating to three vessels more than one-year old at the projected time of closing would be a great departure from MarAd's practice and inconsistent with the governing statute, 46 U.S.C. § 53706(a)(1)(B), and implementing regulation, 46 C.F.R. § 298.17(a)(2), providing preference to vessels less than one-year old.[14]

### C.  APT Seeks Financing for Two Economically Vulnerable Vessels

Nonetheless, the two remaining ships entitled to priority for financing under the statute and regulations[15] are economically vulnerable. EMPIRE STATE and EVERGREEN STATE, the two ships newer than one year old at the presumed time of closing, are both chartered by the U.S. Navy. Although renewed for the new fiscal year, albeit at daily charter rates reduced from

---

[14]     APT has previously contended in its August 9, 2012 letter to MarAd that the agency has often approved Title XI applications and, in some cases, closed Title XI guarantee commitments for projects involving vessels that were or would be more than one year old at closing, and has raised as examples transactions involving OSG Delaware Bay Lightering LLC, Foss Maritime Company, Canal Barge Company, and Vessel Management Service, Inc. As set forth more fully in the attached appendix to this decision, APT's contentions are inaccurate, as each of these transactions is distinguishable from APT's application to refinance approximately $204 million relating to three vessels more than one-year old at the projected time of closing. *See* Appendix: Comparative History of 46 USC Chapter 537 Federal Ship Financing Program Refinancing, which is hereby incorporated into this decision by reference.

[15]     *See* 46 U.S.C. § 53706(a)(1)(B) and 46 C.F.R. § 298.3(k).

$57,910 to $52,500 for the current fiscal year, both are subject to non-renewal of their annual charters. Two significant forces are at work that create additional risk for these two vessels because overall Navy demand for their services may decrease. First, the decreasing operational tempo in the Middle East may reduce the need for shuttle tankers supporting movements of Atlantic Fleet ships to the Pacific, a trade in which these two APT ships now engage. And second, the Navy has announced its plans to homeport more of its ships on the West Coast to assume a 60/40 West Coast-East Coast posture,[16] a move that would also reduce the need for APT's tankers. Potential budget reductions as part of the annual appropriations process might also have adverse effects on employment of APT's vessels.

The fragility of APT's circumstances is further demonstrated by the IFA's modeling. The IFA calculated that the unemployment of even one of APT's ships might have devastating effects on APT's cash flow as shown in the 2019 circumstance when, under one scenario, the displacement of one vessel could result in a debilitating 0.64:1 debt service ratio.[17] And in a market for such vessels which is in balance now, their prospects for other charters would not be good if systemic changes by the Navy were to reduce overall demand. The charters for these vessels, especially in the current circumstances, are not sufficiently predictable to warrant long-term loan guarantees.

### D. APT's Requested Loan Guarantee Is Substantial and Would Exhaust MarAd's Limited Resources

APT requests loan guarantees in the amount of $340 million and asserts that MarAd's available funding is sufficient to provide for them. That argument is correct in that there may be presently available funds sufficient to provide for APT, but it would be APT alone. The problem is that if that were to be done, notwithstanding that there may be much more sound and desirable applications pending and possibly forthcoming, there would be insufficient funds left to even consider those other applications. No new subsidy funds have been made available to the Federal Ship Financing Program since fiscal year 2011 and available funds were reduced by rescission in fiscal year 2012. Provision for APT's loan guarantees would nearly exhaust available resources, when there are other pending applications for guarantees to finance new vessels, which may be economically sound or preferable for other reasons. Even if APT's project were economically sound, which it is not, it would not necessarily prevail over other competing projects.

### E. Other Considerations

Although our evaluation of APT's modified application took into consideration that the vessels might have potential usefulness as naval auxiliaries under 46 U.S.C. § 53706(c) and 46 C.F.R. § 298.17(a)(1), whether vessels are so qualified is not solely dispositive. Economic

---

[16]    *See* Leon E. Panetta, Secretary of Defense, Address at the Shangri-La Security Dialogue (June 2, 2012), *available at* http://www.defense.gov/speeches/speech.aspx?speechid=1681; Leon E. Panetta, Secretary of Defense, Address to International Security Assistance Force Joint Command Troops in Afghanistan (June 7, 2012), *available at* http://www.defense.gov/transcripts/transcript.aspx?transcriptid=5057.

[17]    IFA supplemental report at 39.

10

soundness considerations are overarching. It is for that reason also that consideration of APT's project under 46 C.F.R. § 298.17(a)(4) would not be helpful to APT. Although APT has requested guarantees for only twenty years when APT might argue the service life of the vessels may be twenty-five years, that the risks are unacceptable for a twenty-year term inexorably would lead to the conclusion that the risks would be even greater for a longer period. Evaluative criteria specified by 46 C.F.R. § 298.17(a), including consideration of military usefulness, age-of-vessel/refinancing, and length-of-guarantee- period concerns are thus taken into consideration in that context.[18]

It is also important to note that when considering any evaluative factor, the status of other pending and potential applications must be taken into consideration. While the APT vessels may have potential usefulness as naval auxiliaries, another pending applicant's vessels do as well. The other vessels are new ships and would not be refinanced. Accordingly, notwithstanding military usefulness, APT's modified application was viewed in light of the broad discretion of the program, its relative economic soundness, relevant evaluative criteria, constrained resources, and other applications.

For all the foregoing reasons, I am denying APT's modified application for a Ship Financing Program loan guarantee. Your professionalism and courtesy during the consideration of your loan guarantee application have been appreciated.

Sincerely,

David T. Matsuda

---

[18]    46 C.F.R. § 298.17(a)(3), (5) and (6) are not applicable in this instance. The APT application does not involve vessels already financed under Title XI or financing for shipyards.

11

American Petroleum Tankers Parent LLC:
**Decision on Modified Application for Ship Financing Program Loan Guarantees**

**Appendix:**
**Comparative History of Chapter 537 Federal Ship Financing Program Refinancing**

November 9, 2012

### I.   Introduction.

American Petroleum Tankers Parent LLC (APT) submitted an application to the Maritime Administration (MarAd) for loan guarantees under the Ship Financing Program provided at Title 46, United States Code, Chapter 537 on August 31, 2010.  APT requested financing and refinancing of existing debt in its application regarding five tanker vessels in an amended amount of $340 million.  Four of the five vessels had been delivered at the time APT submitted its application on August 31, 2010:  Golden State was delivered on January 9, 2009; Pelican State was delivered on June 15, 2009; Sunshine State was delivered on December 3, 2009; Empire State was delivered on July 13 2010; and Evergreen State was scheduled to be and was delivered on December 7, 2010.

APT has contended in its letter of August 9, 2012, that four previous Title XI transactions are comparable to APT's proposed refinancing: (a) a 2009 application by Canal Barge Company (Canal Barge); a 2008 application by Vessel Management Services, Inc.'s (VMS); (c) a 2009 application by OSG Delaware Bay Lightering, LLC's (OSG); and, (d) a 2010 transaction involving Foss Maritime Company (Foss).  Each of these transactions is distinguishable from APT's proposed refinancing application and thus does not affect our analysis.

### II.   Legal Background.

Financing and refinancing under the Ship Financing Program are distinct under applicable law.  The governing statute, 46 U.S.C. § 53706(a)(1)(B) describing eligibility for financing, states: "A guarantee may not be made more than one year after delivery of the vessel…unless the proceeds of the obligation are used to finance the construction…of a vessel…."  The accompanying regulation, 46 C.F.R. § 298.3(k), states in pertinent part that "We will give priority for processing … (2) Requests for financing construction of equipment or vessels less than one year old as opposed to the refinancing of existing equipment or vessels that are one year old or older."  Additionally, there are specific regulatory provisions that address refinancing (46 C.F.R. § 298.23)[1] and financing a vessel more than a year after delivery (46

---

[1]      Section 298.23 states in pertinent part: "(a) We may approve guarantees…to refinance…existing non-Title XI debt…."  The limits in which refinancing may occur are then set forth in the regulation.

C.F.R. § 298.24).[2]  Loan guarantees are issued and come into existence at the time of closing, which is when the determination of whether a vessel is financed or refinanced is made.  Under the existing statute, the closing date may be expected to be 270 days plus six weeks after the date the "signed application [was] received."  46 U.S.C. § 53703(a).

### III.   The Four Transactions Raised by APT.

As set forth below, all four of the transactions raised by APT are distinguishable from APT's own proposal.

#### A. Canal Barge.

Canal Barge's transaction is readily distinguishable because it involved vessel financing, not refinancing as proposed by APT in its modified application.  Canal Barge applied on May 15, 2009, to finance nine asphalt barges and 30 hopper barges for a loan guarantee amount of approximately $41 million.  The asphalt barges had expected delivery dates between September through December 2009, and the hopper barges had expected delivery dates between February and May 2010.  At the time of application, none of Canal Barge's vessels had been delivered.  Canal Barge's project closed in November 2009, only a few months after the delivery of three asphalt barges while the other 36 vessels were still under construction.

#### B. VMS.

The VMS transaction is similarly distinguishable from the APT proposal because it involved vessel financing, not refinancing as APT seeks here.  VMS applied on April 8, 2008, to finance five articulated tug-barges (ATBs) for a loan guarantee amount of approximately $269 million.  At the time of application, none of VMS' vessels had been delivered.  The delivery dates of the five VMS vessels were:  August 2008, March 2009, August 2009, February 2010 and August 2010.  The VMS project closed in May 2009, at which time neither of the two delivered vessels financed were more than one year old while the other three vessels were still under construction.

---

[2]     Section 298.24 states in pertinent part: "(a) We may approve Guarantees for a Vessel which has been delivered...more than one year prior to the issuance of the Guarantees only if: ... (2) The proceeds of the Obligation financing such existing Vessel are used to finance: (i) The construction...of a different Vessel within one year of that Vessel's delivery...."

### C. OSG.

The OSG transaction likewise involved a vessel financing proposal, not refinancing as APT seeks in its proposal. OSG applied on June 10, 2009, to finance two ATBs for a loan guarantee amount of $210.9 million. At the time of application, neither of the OSG vessels had been delivered. OSG's vessels were delivered in February 2010 and April 2011. Although the OSG application was approved in June 2011, MarAd has not consummated its approval and no loan guarantees have been issued.

### D. Foss.

Foss's transaction was a vessel refinancing project, but is nonetheless distinguishable from the APT's proposal. Historically, MarAd has closed on very few refinancing only projects. Of the limited few, the largest coastwise-trade refinancing was approximately $22.5 million for Foss.

Foss applied on December 30, 2008, requesting refinancing of existing debt. Two of its three vessels had been delivered prior to the time application; the first vessel was delivered on January 28, 2008, the second vessel was delivered on May 23, 2008; and third vessel was scheduled to be and was delivered on February 15, 2009. Due to the timing of Foss' application, it was unlikely a closing would occur within one year of the delivery date of the first two delivered vessels so the first two vessels were considered to seek refinancing. The closing of the Foss project occurred in May, 2010, which resulted in all three vessels being refinanced at an amount of approximately $22.5 million.

With this understanding, APT's modified application here is distinguishable in several respects from the Foss transaction. Among other things, unlike the Foss transaction, APT's request - $204 million - is for a significantly higher loan guarantee amount – well beyond the $22.5 million refinancing in Foss. And at the time of APT's application, it was unlikely that a closing, had the project been approved, would occur within one-year of the delivery of the first three vessels. Providing refinancing for a project at an amount of $204 million would be a substantial departure from prior practice.

# #

**From:** Rob Kurz [mailto:rob.kurz@americanpetroleumtankers.com]
**Sent:** Monday, April 23, 2012 1:11 PM
**To:** 'joel.szabat@dot.gov'
**Cc:** 'George.Zoukee@dot.gov'
**Subject:** APT Title XI Application

Joel:

I am hoping to talk with you to follow up on our meeting of April 12th.  I will call your office in the hope that we can connect "live".

I am particularly interested in an update on the status of the memo regarding the priority of Title XI applications that we discussed at our meeting.  It is my understanding that that memo is a precondition to MarAd and DOT meeting with the IFR, and then moving our Title XI application along to the Credit Council.  In that context, I thought that it would be worth providing some specifics about how our application meets the priorities set forth in the Title XI statute and regulations.
46 USC Chapter 537, Section 53706(c) provides a statutory priority in granting a guarantee for Title XI debt for vessels that can serve as a naval auxiliary in time of war or national emergency.  As you know, our application is for five newly-built product tankers, two of which are on charter to the Military Sealift Command.  These two vessels are the only new product tankers that have been built with National Defense Features.  We understand that the Department of Defense supports the statutory priority of our vessels.
The regulations (46 CFR Part 298 Section 298.3(k)) similarly provide a priority in processing Title XI applications for:

- vessels capable of serving as a naval and military auxiliary in time of war or national emergency, which ours do as outlined above;

- financing construction of vessels less than one year old (at the time of our application, 3 of our vessels were either under construction or less than one year old); and

- a guarantee term less than the normal term for that class of vessel (as you know, we have requested a term of just 20 years, rather than the normal term of 25 years for this class of vessel).

It is clear to us that our application meets the priority criteria set forth in the statute and regulations and we hope that the memo reflects that priority.

Separately, we continue to be concerned about the delays in moving our application forward.  If there are any issues or concerns with our application, we request the opportunity to discuss them directly.  As of May 1st, we have the right to refinance the bonds issued in connection with the construction of our vessels, and we are anxious to undertake that refinancing with the Title XI debt as soon as possible.  We are also concerned that time is starting to get short before the second anniversary of the filing of the application.

I hope that we will have the chance to talk together soon and would appreciate any guidance that you can provide in moving our application along to a successful conclusion.

Thanks and best regards,

Rob

Robert K. Kurz
Chief Executive Officer
American Petroleum Tankers Parent LLC
600 W. Germantown Pike, Suite 400
Plymouth Meeting, PA 19462
E-mail: Rob.Kurz@AmericanPetroleumTankers.com
(O): 610-940-1677
(M): 215-776-0173
(Fax): 610-825-7579



# American Petroleum Tankers

## March 2012

CONFIDENTIAL



# APT Cash Flows Support $400M of Title XI Debt

CONFIDENTIAL

2

APT v. USA

3537

3



Confidential Business Information Exempt from FOIA Disclosure Pursuant To 5 U.S.C. 552(b)(4)

4

Confidential Business Information Exempt from FOIA Disclosure Pursuant To 5 U.S.C. 552(b)(4)

5



.ciates, Inc.

6

Confidential Business Information Exempt from FOIA Disclosure Pursuant To 5 U.S.C. 552(b)(4)

7

Confidential Business Information Exempt from FOIA Disclosure Pursuant To 5 U.S.C. 552(b)(4)

8

Confidential Business Information Exempt from FOIA Disclosure Pursuant To 5 U.S.C. 552(b)(4)



Confidential Business Information Exempt from FOIA Disclosure Pursuant To 5 U.S.C. 552(b)(4)

9

3544

10

Confidential Business Information Exempt from FOIA Disclosure Pursuant To 5 U.S.C. 552(b)(4)

11

Confidential Business Information Exempt from FOIA Disclosure Pursuant To 5 U.S.C. 552(b)(4)



# Reserves are Unnecessary

CONFIDENTIAL

13

Confidential Business Information Exempt from FOIA Disclosure Pursuant To 5 U.S.C. 552(b)(4)

14

Confidential Business Information Exempt from FOIA Disclosure Pursuant To 5 U.S.C. 552(b)(4)



# Title XI Documentation and Transaction Structure Provide Adequate Protections for MarAd

CONFIDENTIAL

Confidential Business Information Exempt from FOIA Disclosure Pursuant To 5 U.S.C. 552(b)(4)

16

3551

Confidential Business Information Exempt from FOIA Disclosure Pursuant To 5 U.S.C. 552(b)(4)

17

3552

18

Confidential Business Information Exempt from FOIA Disclosure Pursuant To 5 U.S.C. 552(b)(4)



# APT Application has Significantly Lower Risk than Other Transactions

CONFIDENTIAL

20

Confidential Business Information Exempt from FOIA Disclosure Pursuant To 5 U.S.C. 552(b)(4)

Confidential Business Information Exempt from FOIA Disclosure Pursuant To 5 U.S.C. 552(b)(4)

21



# Conclusion and Next Steps

CONFIDENTIAL

# Conclusion and Next Steps



- APT cash flows support $400M of Title XI debt

    - Lender's Case rate and other assumptions and sensitivities not in line with industry experts, nor reflective of most recent market fixtures and market trends

- Reserves are unnecessary

- Standard Title XI documentation and proposed transaction structure provide adequate MarAd protections

- APT application has significantly lower risk than other transactions

- Next Step – APT's objective is to move application along to April credit council meeting

23

Confidential Business Information Exempt from FOIA Disclosure Pursuant To 5 U.S.C. 552(b)(4)



# Appendix

CONFIDENTIAL



# MCA ASSOCIATES, INC. ——————————

8 Sound Shore Drive
Greenwich, CT 06830

Telephone: (203) 622-6878
Fax: (203) 622-6519

February 23, 2012

Robert K. Kurz
Chief Executive Officer
American Petroleum Tankers Parent LLC
600 W. Germantown Pike, Suite 400
Plymouth Meeting, PA 19462

Private & Confidential

Re:  Jones Act Tanker Market – Recent Time Charter Fixtures and Trends

Rob:

Further to our discussions and as requested, following is a summary of the most recent time charter fixtures of modern tonnage in the Jones Act tanker market:

- The OVERSEAS TEXAS CITY was fixed in late December 2011 for a one-year term to Murphy Oil at approximately $51,000 per day.
- The PELICAN STATE was fixed in January, 2012 to Shell Oil for 3 years averaging close to mid-$50,000's per day.
- The OVERSEAS ANACORTES was fixed in February, 2012 to Chevron for 6-12 months in the mid-$50,000's per day.

The trend for the future remains strong as a result of full employment of the existing tanker fleet, and supply/logistics concerns related to the Philadelphia and St. Croix refinery closings.  As we speak, Chevron is in charter discussions for the next available tanker, the OVERSEAS TAMPA, whose charter expires in July.  Negotiations for a 1-year extension are in excess of $50,000 per day.

The information herein is tracked on a daily basis in our capacity as Jones Act charter broker specialists.  I have attached an updated copy of our company CV.

Will be happy to be of whatever further assistance you may need on this subject.

Best regards,

MCA ASSOCIATES, INC., as brokers

Andrew A. McAleer

AAM/

enclosure

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

 # MCA ASSOCIATES, INC.

8 Sound Shore Drive
Greenwich, CT 06830

Telephone: (203) 622-6878
Fax: (203) 622-6519

## MCA ASSOCIATES, INC.

### CURRICULUM VITAE 2012

MCA Associates Inc. was established in 1983 as a ship brokerage concern. Its late president and founder, Joseph McAleer, had previously been a senior executive and partner with leading New York-based ship brokerage firms.

MCA Associates conducts business worldwide, while specializing in the US domestic tanker trade. The cumulative industry expertise of its 3 brokers is more than 67 years. MCA's areas of brokerage activity include tanker and barge projects, time chartering, spot chartering, ship sales and consulting.

Some of the firm's notable accomplishments in recent years include:

- Consultative and brokerage work since 1994 with the Government of Israel on tanker issues, and conclusion of a series of sensitive term contracts (since 1999 as exclusive broker) between Israeli Ministry of Defense and various U.S. tanker companies for jet fuel shipments under U.S. Flag, approximating 57 million barrels to date.
- Consultative services to Burmah Gas Transport during 1997 and 1998 on U.S. Flag LNG issues, including re-flagging and financial consolidation of LNG fleet.
- Participation as broker in divestment of Amoco domestic tug and barge fleet operation to Keystone Shipping Company, necessitated by BP-Amoco merger of December 1998.
- Negotiation of longterm creative charter contracts in 2000 between Attransco and SeaRiver Maritime on two 50,000 dwt tankers for Alaska trading.
- Conclusion of a series of term charters between 2003 and the present providing the US Navy's Military Sealift Command with US re-flag tanker transportation by Maersk Lines in overseas trades. Consultative and exclusive brokerage services for Maersk resulted in growth of this business to a second reflagged tanker in 2008, a third in 2010, and a fourth, ice-class tanker in 2011, all under MSC charters.
- Sale of Attransco's tanker fleet to OSG and Keystone, respectively, in 2004.
- Negotiation in 2004 of first double-hull barge charters for Shell Oil in Florida utilities fuel oil trade, and renewal of contracts thru 2009.
- Conclusion of longterm charters between 2005 and 2011 with Shell, BP, Tesoro and Chevron on all ten of OSG's original ten-ship newbuilding tanker program with Aker Philadelphia (subsequently expanded to 12 ships).
- Conclusion of longterm tanker time charter for Chevron USA in 2005 – the first such charter supplemental to Chevron's proprietary Jones Act fleet. Later concluded Chevron's first Jones Act double-hull longterm timecharters, with OSG and Crowley, in 2008.
- Conclusion of longterm charters with BP in 2005-06 for three Crowley newbuilding ATB's for paraxylene and clean petroleum products trade.
- Conclusion of Marathon Petroleum's first longterm, modern, double-hull Jones Act tanker timecharter, the NASSCO-built PELICAN STATE, in 2007.
- Close consultative and brokerage services for the Blackstone Group on Jones Act maritime issues since 2008, culminating in timecharter of its sole unfixed NASSCO newbuilding tanker, the SUNSHINE STATE, to Chevron in late 2009.
- Negotiation of creative barge contract for crude well-testing in Gulf of Mexico between BP and Moran Towing covering period 2000-2010, and conclusion of similar contract in 2012 between Chevron and Penn Maritime.
- Conclusion of longterm, exclusive transportation contract in 2011 between BP and Vane Brothers for comprehensive bunker barge services in New York Harbor.

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

**Product Tanker Fleet**

| Owner/Operator | MJLF April 2010 Report | | Current Fleet | | | |
| | Vessel | Year Built | Vessel | Year Built | Year to be Retired | Notes |
|---|---|---|---|---|---|---|
| APT | | | | | | |
| | Golden State | 2009 | Golden State | 2009 | | |
| | Pelican State | 2009 | Pelican State | 2009 | | |
| | Sunshine State | 2009 | Sunshine State | 2009 | | |
| | Empire State | 2010 | Empire State | 2010 | | |
| | Evergreen State | 2010 | Evergreen State | 2010 | | |
| Chevron | | | | | | |
| | California Voyager | 1999 | California Voyager | 1999 | | Double Eagle -owned by Seabulk |
| | Oregon Voyager | 1999 | Oregon Voyager | 1999 | | Double Eagle -owned by Seabulk |
| | Mississippi Voyager | 1998 | Mississippi Voyager | 1998 | | Double Eagle -owned by Seabulk |
| | Colorado Voyager | 1976 | | | | |
| | Washington Voyager | 1976 | | | | |
| | | | Florida Voyager | 1998 | | Double Eagle -owned by Seabulk |
| Crowley | | | | | | |
| | Blue Ridge | 1981 | | | | |
| | Coast Range | 1981 | | | | |
| Heavylift | | | | | | |
| | Anasazi | 1958 | | | | |
| | Cpt. H.A.Downing | 1957 | | | | |
| | New River | 1960 | | | | |
| | The Monseigneur | 1959 | | | | |
| Keystone | | | | | | |
| | Delaware Trader | 1982 | | | | |
| Ocean Ship | | | | | | |
| | L. Gianella | 1985 | | | | MSC-owned; prepo service |
| | P. Buck | 1985 | | | | |
| | P. Matthiesen | 1985 | | | | |
| | S. Cobb | 1985 | | | | |
| OSG | | | | | | |
| | Galena Bay | 1982 | | | | |
| | Puget Sound | 1983 | | | | |
| | Overseas Philadelphi | 1982 | | | | |
| | Overseas N. Orleans | 1983 | | | | |
| | Diligence | 1977 | | | | |
| | Overseas Boston | 2009 | Overseas Boston | 2009 | | |
| | Overseas Nikiski | 2009 | Overseas Nikiski | 2009 | | |
| | Overseas New York | 2008 | Overseas New York | 2008 | | |
| | Overseas Texas City | 2008 | Overseas Texas City | 2008 | | |
| | Overseas Houston | 2007 | Overseas Houston | 2007 | | |
| | Overseas Long Beach | 2007 | Overseas Long Beach | 2007 | | |
| | Overseas Los Angeles | 2007 | Overseas Los Angeles | 2007 | | |
| | Overseas Cascade | 2010 | Overseas Cascade | 2010 | | |
| | Overseas Martinez | 2010 | Overseas Martinez | 2010 | | |
| | Overseas Anacortes | 2010 | Overseas Anacortes | 2010 | | |
| | Overseas Chinook | 2010 | Overseas Chinook | 2010 | | |
| | Overseas Tampa | 2010 | Overseas Tampa | 2011 | | |
| Seabulk | | | | | | |
| | Seabulk Challenge | 1981 | Seabulk Challenge | 1981 | | converted to double hull |
| | Seabulk Trader | 1981 | Seabulk Trader | 1981 | | converted to double hull |
| | Seabulk America | 1980 | | | | |
| | Seabulk Arctic | 1998 | Seabulk Arctic | 1998 | | Double Eagle |
| | Seabulk Pride | 1998 | | | | Florida Voyager-chartered by Chevron |
| SeaRiver | | | | | | |
| | S/R Wilmington | 1984 | | | | |
| | S/R American Progress | 1997 | S/R American Progress | 1997 | | Double Eagle |
| U.S. Shipping | | | | | | |
| | Charleston | 1983 | Charleston | 1983 | 2013 | mostly chemical service |
| | Chemical Pioneer | 1968 | Chemical Pioneer | 1968 | | chemical service |
| | Houston | 1985 | Houston | 1985 | | |
| Mid-Ocean | | | | | | |
| | American Phoenix | 2012 | American Phoenix | 2012 | | MJLF showed as Heavylift ship |
| Aker | | | | | | |
| | | | NewBuild 1 | 2013 | | |
| | | | NewBuild 2 | 2013 | | |
| Total No. of Ships | | 49 | | 31 | | |

Confidential Business Information
Exempt from FOIA Disclosure Pursuant
to 5 U.S.C. 552(b)(4)

Product Tanker Fleet_4.xls, 2/29/2012, 4:04 PM



**U.S. Department of
Transportation**

Office of the Secretary
of Transportation

DEC   7 2009

| DOT 2301.1A |

Subject: **U.S. Department of Transportation Credit Council**

1. **PURPOSE.** This order establishes the responsibilities and duties of the U.S. Department of Transportation (DOT) Credit Council.

2. **CANCELLATION.** This order terminates DOT 2301.1, Establishment of the Department of Transportation Credit Council, dated 6-10-2004.

3. **APPLICABILITY.** This order applies to all credit programs administered by DOT, unless otherwise specified by the Secretary of Transportation.

   The DOT currently administers four credit programs: (1) the Transportation Infrastructure Finance and Innovation Act of 1998 (TIFIA) Program, administered by the TIFIA Joint Program Office; (2) the Railroad Rehabilitation and Improvement Financing (RRIF) Program, administered by the Federal Railroad Administration (FRA); (3) the Maritime Guaranteed Loan (Title XI) Program, administered by the Maritime Administration (MARAD); and, (4) the Minority Business Resource Center (MBRC) Short-Term Lending Program, administered by the Office of Small and Disadvantaged Business Utilization within the Office of the Secretary of Transportation (OST).

4. **BACKGROUND.** On January 2, 2001, the Department established the TIFIA Credit Council for the administration of the TIFIA Program, via a Memorandum of Understanding entered into by the Secretary of Transportation and the Administrators of the Federal Highway Administration, FRA, and the Federal Transit Administration.

   In 2004, the Department restructured the oversight and management of its four credit programs at the request of the Office of Management and Budget (OMB) to ensure the application of consistent credit policies and management practices across all DOT credit programs. The restructuring plan called for the expansion of the TIFIA Credit Council into a new DOT Credit Council. It also recommended the establishment of a Joint Credit Office that would, among other responsibilities, carry out the financial analysis of applications in concert with the Operating Administrations (OA) and the Office of Budget and Program Performance within OST (OST/B).