**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN PETROLEUM TANKERS PARENT LLC, ) ) ) Plaintiff, ) ) v. ) ) The UNITED STATES OF ) AMERICA, *et al.*, ) ) Defendants. ) | Civil Action No. 1:12-CV-001165-CKK Defendants' Motion for Summary Judgment and for Revision of Interlocutory Order |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND FOR REVISION OF INTERLOCUTORY ORDER**

Defendants, the United States of America, the Secretary of Transportation, and the Administrator of the Maritime Administration, hereby move the Court to enter summary judgment in Defendants' favor pursuant to Rule 56 of the Federal Rules of Civil Procedure.  In support of this motion, Defendants refer the Court to the attached memorandum.

Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, Defendants also move the Court to revise the portion of its interlocutory order and memorandum opinion of May 6, 2013 (ECF Nos. 24-25) that denied denying Defendants Motion to Dismiss the second cause of action in the Supplemental Complaint.  In support of this motion, Defendants refer the Court to the attached memorandum, specifically, pages 31-45 therein.  Pursuant to Local Civil Rule 7(m), undersigned counsel conferred with counsel for Plaintiff regarding its Rule 54(b) motion.  Counsel for Plaintiff indicated that Plaintiff opposes the Rule 54(b) motion, but agrees that issues pertaining to reconsideration or revision of the May 6, 2013 order should be addressed in the course of the parties' summary judgment briefing.

1

Dated: July 9, 2013

Respectfully submitted,

STUART F. DELERY
Principal Deputy Assistant Attorney General

JUDRY L. SUBAR
Assistant Branch Director

*/s/ Jesse Z. Grauman*
JESSE Z. GRAUMAN (Va. Bar No. 76782)
U.S. Department of Justice
Civil Division, Federal Programs Branch

Mailing Address:
Post Office Box 883
Washington, D.C.  20044

Courier Address:
20 Massachusetts Ave., N.W., Room 5374
Washington, D.C. 20001
Telephone:     (202) 514-2849
Fax:              (202) 305-8517
Email:           jesse.z.grauman@usdoj.gov

Counsel for Defendants

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN PETROLEUM
TANKERS PARENT LLC, )
)
)
Plaintiff, )
)
v. )
)
The UNITED STATES OF )
AMERICA, *et al.*, )
)
Defendants. )

Civil Action No. 1:12-CV-001165-CKK

Memorandum in Support of Defendants'
Motion for Summary Judgment
and for Revision of Interlocutory Order

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT
## AND FOR REVISION OF INTERLOCUTORY ORDER

Dated: July 9, 2013

Respectfully submitted,

STUART F. DELERY
Principal Deputy Assistant Attorney General

JUDRY L. SUBAR
Assistant Branch Director

*/s/ Jesse Z. Grauman*
JESSE Z. GRAUMAN (Va. Bar No. 76782)
U.S. Department of Justice
Civil Division, Federal Programs Branch

Mailing Address:
Post Office Box 883
Washington, D.C.  20044

Courier Address:
20 Massachusetts Ave., N.W., Room 5374
Washington, D.C. 20001
Telephone:   (202) 514-2849
Fax:             (202) 305-8517
Email:          jesse.z.grauman@usdoj.gov

Counsel for Defendants

## INTRODUCTION

Plaintiff American Petroleum Tankers Parent LLC ("APT"), an unsuccessful applicant for over $300 million in government loan guarantees to refinance its substantial pre-existing shipbuilding debt, seeks review of two decisions by the Department of Transportation's ("DOT") Maritime Administration ("MarAd") ("Defendants") denying such assistance.  APT, giving only lip service to the deferential standard of review under the Administrative Procedure Act ("APA"), urges the Court to wholesale second-guess MarAd's assessments of APT's financial viability, the state of the market for its ships, and other factors that led MarAd to conclude that APT's application was economically unsound, all matters which fall squarely within the agency's expertise.  Plaintiff also incorrectly presumes that MarAd may not consider other factors, including a statutory and regulatory preference for applications that – unlike APT's effort to refinance its existing debt – construct new ships (and create new jobs and increased capacity in the nation's merchant marine).  APT also would have the Court ignore MarAd's reasonable exercise of its discretion to deny APT's application based upon the sheer size of Plaintiff's refinance loan amount, which would have virtually depleted Title XI program funds.

A review of the decisions, the record, and the relevant authority demonstrates otherwise. The Maritime Administrator appropriately determined that the risks posed by APT's application were too great to warrant granting it.  The Court should not disturb this finding, which was based on substantial evidence and neither arbitrary nor capricious.  DOT also lawfully required that APT's application be reviewed by the DOT Credit Council, an advisory body established by the Secretary (in part, as we explain below, in the wake of significant criticism for past inadequate oversight and management of the Title XI program that resulted in nine defaults totalling $1.3 billion) that reviews all applications for credit under DOT loan programs, and twice made

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND .....................................................................................................................2

I.  The Title XI Federal Ship Financing Program and Application Process. ...........................2

II. Plaintiff's Application for a Title XI Loan Guarantee. ........................................................4

    A. APT's Title XI Application. ...........................................................................................4

    B. Review by Independent Financial Advisor...................................................................5

    C. Litigation and Subsequent Modifications to APT's Application. ................................6

    D. August 1, 2012 Denial of APT's Application. .............................................................7

    E. November 9, 2012 Denial of APT's Modified Application. ........................................9

    F. APT's Supplemental Complaint. ................................................................................10

STANDARD OF REVIEW ...................................................................................................11

I.  Summary Judgment under the Administrative Procedure Act. ..........................................11

II. Motion to Revise Interlocutory Order Under Rule 54(b)...................................................13

ARGUMENT .........................................................................................................................14

I.  THE MARITIME ADMINISTRATOR'S DENIAL OF APT'S LOAN GUARANTEE
    APPLICATIONS IS SUPPORTED BY SUBSTANTIAL EVIDENCE IN THE
    ADMINISTRATIVE RECORD..........................................................................................14

    A. Substantial Evidence Supported the Administrator's Decisions
       that APT's Applications Were Not Economically Sound... ........................................15

       1.  August 1 Decision Letter...........................................................................................15

       2.  November 9 Decision Letter......................................................................................21

    B. APT's Objections to Defendants' Economic Soundness Determinations
       Cannot Overcome the Substantial Evidence Supporting Denial.. ..............................23

    C. Most of APT's Project Would Have Refinanced Three Vessels Over A
       Year Old and Therefore Did Not Warrant Priority......................................................26

    D. APT's Application Would Have Exhausted MarAd's Limited
       Resources. ....................................................................................................................29

II. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON APT'S CLAIMS
    CONCERNING THE CREDIT COUNCIL.........................................................................31

    A. APT Lacks Standing to Challenge Any Delays Attributable to the
       Credit Council, and Any Such Delays Would Constitute At Most
       Harmless Error. ............................................................................................................31

B. The Credit Council's Involvement in Title XI Applications Is Lawful.....................32

   1.   The Plain Language of the 2006 Amendments Lawfully Permits Activity by the Secretary and, Hence, the Credit Council.............................................................................................................33

   2.   Congress Uses Express, Unambiguous Language When Divesting Department Heads of Authority Over Agency Components. ...................................................................................................35

   3.   The 2006 Title XI Amendments Do Not Satisfy the Criteria For Repeal by Implication. .................................................................37

   4.   The Legislative History Does Not Support Plaintiff's Arguments. ...........................................................................................38

   5.   The 2008 Amendments and "Findings" Are Irrelevant and In Any Event Support Defendants' Position.............................................40

   6.   Plaintiff Bears the Burden to Show that the Secretary Lacked Authority to Direct the Credit Council to Review Title XI Applications..............................................................................................42

   7.   If the Court finds the Statutory Language Ambiguous, It Should Defer to Defendants' Reasonable Interpretation.....................43

C. The Credit Council's Recommendations Were Advisory. .........................................45

CONCLUSION................................................................................................................35

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*A.L. Pharma, Inc. v. Shalala,*
   62 F.3d 1484 (D.C. Cir. 1995) ................................................................... 24

*Air Transport Ass'n of America, Inc. v. Nat'l Mediation Bd.*,
   719 F. Supp. 2d 26 (D.D.C. 2010) ........................................................... 24

*AJP Const., Inc. v. Sec'y of Labor,*
   357 F.3d 70 (D.C. Cir. 2004) .................................................................... 13

*Am. Wildlands v. Kempthorne,*
   530 F.3d 991 (D.C. Cir. 2008) ................................................................. 12

*Barnhart v. Walton,*
   535 U.S. 212 (2002) ................................................................................. 43

*Bragdon v. Abbott,*
   524 U.S. 624 (1998) ................................................................................. 44

*Burlington Truck Lines v. United States*,
   371 U.S. 156 (1962) ................................................................................. 12

*Callejas v. McMahon,*
   750 F.2d 729 (9th Cir. 1984) ................................................................... 35

*Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.,*
   630 F.3d 217 (D.C. Cir. 2011) ................................................................. 13

*CFTC v. Schor,*
   478 U.S. 833, 856 (1986) ......................................................................... 45

*Chem. Waste Mgmt., Inc. v. EPA,*
   976 F.2d 22 (D.C. Cir. 1992) ................................................................... 31

*Chevron v. NRDC,*
   467 U.S. 837 (1984) ........................................................................... 40, 43

*City of Arlington, Tex. v. FCC,*
   133 S. Ct. 1863 (2013) ......................................................................... 37, 43

*Citizens to Preserve Overton Park, Inc. v. Volpe*
   401 U.S. 402 (1971) ................................................................................. 12

*Cobell v. Norton,*
   224 F.R.D. 266 (D.D.C. 2004) ........................................................................ 14

*Cottage Health System v. Sebelius,*
   631 F. Supp. 2d 80 (D.D.C. 2009) .................................................................. 13

*Dep't of the Treas. v. Fed. Labor Relations Auth.,*
   494 U.S. 922 (1990) ....................................................................................... 43

*Engine Mfrs. Ass'n v. U.S. E.P.A.,*
   88 F.3d 1075 (D.C. Cir. 1996) ....................................................................... 38

*Fed. Express Corp. v. Holowecki,*
   552 U.S. 389 (2008) ....................................................................................... 44

*Fla. Power & Light Co. v. Lorion,*
   470 U.S. 729 (1985) ....................................................................................... 32

*FPL Energy Me. Hydro, LLC v. FERC,*
   287 F.3d 1151 (D.C.Cir.2002) ....................................................................... 12

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.,*
   130 S. Ct. 3138 (2010) ................................................................................... 45

*Hagelin v. FEC,*
   411 F.3d 237 (D.C. Cir. 2005) ....................................................................... 11

*Hamdan v. Rumsfeld,*
   548 U.S. 557 (2006) ....................................................................................... 39

*Kremer v. Chemical Const. Corp.,*
   456 U.S. 461 (1982) ....................................................................................... 38

*Kay v. FCC,*
   396 F.3d 1184 (D.C.Cir.2005) ....................................................................... 12

*Kucana v. Holder,*
   558 U.S. 233, 250 (2010) ............................................................................... 42

*Langevine v. District of Columbia,*
   106 F.3d 1018 (D.C. Cir. 1997) ..................................................................... 13

*Lewis v. Dist. of Columbia,*
   736 F. Supp.2d 98 (D.D.C. 2010) .................................................................. 14

*Lincoln v. Vigil,*
   508 U.S. 183 (1993) ........................................................................................... 30

*Lomak Petroleum, Inc. v. FERC,*
   202 F.3d 1193 (D.C. Cir. 2000) ........................................................................ 42

*Lozowski v. Mineta,*
   292 F.3d 840 (D.C. Cir. 2002) .......................................................................... 11

*Mail Order Ass'n of Am. v. U.S. Postal Serv.,*
   2 F.3d 408 (D.C. Cir. 1993)............................................................................... 13

*Managed Pharmacy Care v. Sebelius,*
   705 F.3d 934 (9th Cir. 2012)............................................................................. 44

*Mem'l Hosp./Adair Cty. Health Ctr., Inc. v. Bowen,*
   829 F.2d 111 (D.C. Cir. 1987)........................................................................... 12

*MK. v. Tenet,*
   196 F. Supp. 2d 8 (D.D.C. 2001)....................................................................... 13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ...................................................................................... 12, 24

*Morrison v. Olson,*
   487 U.S. 654 (1988) .......................................................................................... 45

*Murphy Exploration & Prod. Co. v. U.S. Dep't of Interior,*
   252 F.3d 473 (D.C. Cir. 2001)........................................................................... 35

*Myers v. United States,*
   272 U.S. 52 (1926) ............................................................................................ 45

*Navegar, Inc. v. U.S.,*
   192 F.3d 1050 (D.C. Cir. 1999)......................................................................... 38

*North v. DOJ,*
   892 F. Supp. 2d 297 (D.D.C. 2012)............................................................ 13, 14

*Norton v. S. Utah Wilderness Alliance,*
   542 U.S. 55 (2004) ............................................................................................ 45

*NOW, Washington D.C. Chapter v. Social Sec. Admin. of Dep't of Health & Human Services.,*
   736 F.2d 727 (D.C. Cir. 1984)........................................................................... 13

*Occidental Eng'g Co. v. INS,*
    753 F.2d 766 (9th Cir.1985) ........................................................... 13

*Orum v. C.I.R.,*
    412 F.3d 819 (7th Cir.2005) .......................................................... 45

*Parsons Steel, Inc. v. First Ala. Bank,*
    474 U.S. 518 (1986) ...................................................................... 34

*Posadas v. Nat'l City Bank,*
    296 U.S. 497 (1936) ...................................................................... 38

*Postal Serv, v. Gregory,*
    534 U.S. 1 (2001) .......................................................................... 45

*Randall v. Loftsgaarden,*
    478 U.S. 647 (1986) ...................................................................... 37

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979) ...................................................................... 35

*Safir v. Dole,*
    718 F.2d 475 (D.C. Cir. 1983) ...................................................... 13

*San Luis Obispo Mothers For Peace v. NRC,*
    789 F.2d 26 (D.C.Cir.1986) ........................................................... 24

*Serono Labs., Inc. v. Shalala,*
    158 F.3d 1313 (D.C. Cir. 1998) ..................................................... 24

*Sierra Club v. Mainella,*
    459 F. Supp. 2d 76 (D.D.C. 2006) ................................................ 11

*Skidmore v. Swift,*
    323 U.S. 134 (1944) ...................................................................... 44

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ........................................................................ 31

*United States v. Gonzales,*
    520 U.S. 1 (1997) .......................................................................... 43

*United States v. Rose,*
    28 F.3d 181 (D.C. Cir. 1994) ........................................................ 13

*United States v. Tingey*,
  30 U.S. (5 Pet.) 115 (1831) .......................................................................... 43

*Weber v. U.S. Dept. of State*,
  885 F. Supp. 2d 46 (D.D.C. 2012) ............................................................... 11

## STATUTES

5 U.S.C. § 706 ................................................................................. 10, 11, 31
10 U.S.C. § 139(c) ...................................................................................... 36
2 U.S.C. § 661c(b) ........................................................................................ 2
20 U.S.C. § 1098(b) ................................................................................... 36
20 U.S.C. § 9621(f)(1) ............................................................................... 36
28 U.S.C. § 594(i) ...................................................................................... 36
29 U.S.C. § 1302(d)(5)(B) ..................................................................... 36, 37
42 U.S.C. § 7172(g) ................................................................................... 36
46 U.S.C. § 109 ..................................................................................... 37, 44
46 U.S.C. App. § 1273(a) . ......................................................................... 33
46 U.S.C. App. § 1271(n) ........................................................................... 33
46 U.S.C. § 50101(a) ................................................................................. 27
46 U.S.C. § 53701 ....................................................................................... 2
46 U.S.C. § 53702 ..................................................................................... 2,4
46 U.S.C. § 53703(a)(1) ............................................................................. 26
46 U.S.C. § 53704 ............................................................................... *passim*
46 U.S.C. § 53706 ............................................................................... *passim*
46 U.S.C. § 53707 ....................................................................................... 2
46 U.S.C. § 53708 ............................................................................... *passim*
46 U.S.C. § 53711 ....................................................................................... 2
49 U.S.C. § 106 ..................................................................................... 35, 36
49 U.S.C. § 109 ............................................................................. 34, 37, 43
49 U.S.C. § 322 .......................................................................................... 44
49 U.S.C. § 703(c) ................................................................................. 35, 36

Pub. L. No. 74-835, 49 Stat. 1985 ......................................................... 2, 27
Pub. L. No. 109-163, 119 Stat. 3136 .......................................................... 33
Pub. L. No. 109-304, 120 Stat. 1485 .......................................................... 41
Pub. L. No. 110-181, 122 Stat. 3 ................................................................ 41

REGULATIONS

46 C.F.R. § 298.13 ................................................................................................ 18, 26
46 C.F.R. § 298.14 ................................................................................................ *passim*
46 C.F.R. § 298.17 ................................................................................................ *passim*
46 C.F.R. § 298.36 ................................................................................................ 17
46 C.F.R. § 298.3 ................................................................................................. *passim*
49 C.F.R. § 1.66 ................................................................................................. 38

RULES

Fed. R. Civ. P. 54(b) ........................................................................................ 14, 32, 33

ORDERS

DOT Order 2301.1 .............................................................................................. *passim*
DOT Order 2301.1A ........................................................................................... *passim*
DOT Order 2301.1B ........................................................................................... *passim*

# INTRODUCTION

Plaintiff American Petroleum Tankers Parent LLC ("APT"), an unsuccessful applicant for over $300 million in government loan guarantees to refinance its substantial pre-existing shipbuilding debt, seeks review of two decisions by the Department of Transportation's ("DOT") Maritime Administration ("MarAd") ("Defendants") denying such assistance.  APT, giving only lip service to the deferential standard of review under the Administrative Procedure Act ("APA"), urges the Court to wholesale second-guess MarAd's assessments of APT's financial viability, the state of the market for its ships, and other factors that led MarAd to conclude that APT's application was economically unsound, all matters which fall squarely within the agency's expertise.  Plaintiff also incorrectly presumes that MarAd may not consider other factors, including a statutory and regulatory preference for applications that – unlike APT's effort to refinance its existing debt – construct new ships (and create new jobs and increased capacity in the nation's merchant marine).  APT also would have the Court ignore MarAd's reasonable exercise of its discretion to deny APT's application based upon the sheer size of Plaintiff's refinance loan amount, which would have virtually depleted Title XI program funds.

A review of the decisions, the record, and the relevant authority demonstrates otherwise.  The Maritime Administrator appropriately determined that the risks posed by APT's application were too great to warrant granting it.  The Court should not disturb this finding, which was based on substantial evidence and neither arbitrary nor capricious.  DOT also lawfully required that APT's application be reviewed by the DOT Credit Council, an advisory body established by the Secretary (in part, as we explain below, in the wake of significant criticism for past inadequate oversight and management of the Title XI program that resulted in nine defaults totalling $1.3 billion) that reviews all applications for credit under DOT loan programs, and twice made

appropriate recommendations regarding APT's loan guarantee application.  To the extent that the

Court's opinion denying Defendants' motion to dismiss found otherwise, the Court should revise

its earlier interlocutory decision in light of the full record and the arguments herein.

In sum, the Court should resist Plaintiff's wholly improper invitation for the Court to

conduct its own review of APT's application for federal assistance, an effort which plainly is

contrary to established law in APA review cases.  MarAd's decisions are supported by

substantial evidence in the administrative record, and there, the Court's inquiry should end.

Summary judgment should therefore be granted to Defendants.

## BACKGROUND

### I.      The Title XI Federal Ship Financing Program and Application Process.

Title XI of the Merchant Marine Act of 1936, as amended, authorizes MarAd, an

operating administration of DOT, to issue Government-backed loan guarantees to owners of

vessels and shipyards.  See 46 U.S.C. § 53701 et seq..  The Maritime Administrator

("Administrator") authorizes such guarantees using funds appropriated for that purpose by

Congress.  2 U.S.C. § 661c(b); 46 U.S.C. § 53702(a).  Loan guarantees under Title XI are

intended to "foster the development and encourage the maintenance of" U.S. merchant marine

and shipyards.  Merchant Marine Act of 1936, Pub. L. No. 74-835, § 101, 49 Stat. 1985 (1936).

Applicants submit a Title XI application to MarAd, which reviews it to determine if it is

complete and eligible.  See 46 U.S.C. § 53706.  MarAd then evaluates eligible applications based

on a variety of factors.  See 46 U.S.C. §§ 53707, 53711.  In particular, the Administrator may not

approve a loan guarantee if he does not find "that the property or project for which the obligation

will be executed will be economically sound."  46 U.S.C. § 53708(a).  In evaluating economic

soundness, the Administrator must consider, inter alia,

> (1) the need in the particular segment of the maritime industry for new or additional capacity . . . (2) the market potential for employment of the vessel over the life of the guarantee; (3) projected revenues and expenses associated with employment of the vessel; (4) any charter, contract of affreightment, transportation agreement, or similar agreement or undertaking relevant to the employment of the vessel; [and] (5) other relevant criteria[.]

Id.  The Administrator also may not issue a loan guarantee without considering certain "factors" when evaluating applications, including inter alia, the length of the guarantee period; the amount of the guaranteed loan relative to the total project cost; the financial condition of the applicant; the projected employment of, and the market that will be served by, each vessel to be financed; the collateral provided; the applicant's management and operating experience; and whether the project provides for the financing of vessels within one year after delivery .  See 46 U.S.C. § 53704(c)(4); 46 C.F.R. § 298.17.  Additionally, certain types of vessels receive priority, see 46 U.S.C. § 53706(c), though any such priority does not eliminate the Administrator's responsibility to make findings required for approval, including economic soundness.  46 U.S.C. § 53708(a).

In evaluating applications, MarAd often requires input from a "third party expert[]" who conducts an "independent analysis."  46 U.S.C. § 53708(d).   Additionally, as with all credit programs administered by DOT, Title XI applications are reviewed by the DOT Credit Council. See DOT Order 2301.1B, Sept. 29, 2010 ¶¶ 4-9 (ECF No. 18-2); DOT Order 2301.1A, Dec. 7, 2009 ¶¶ 4-9 (AR3563-3567), DOT Order 2301.1, June 10, 2004 ¶¶ 4-9 (attached as Ex. A). The Credit Council, which, as we explain below, was created in 2004 in part in response to past inadequate oversight and management of the Title XI program, consists of the heads of several of DOT's operating administrations, including the Administrator, and other senior DOT officials such as the Deputy Secretary and the General Counsel.  AR3564, ¶ 5.  The Credit Council "provide[s] a recommendation regarding the financial viability of the proposed project and the merits of the requested credit assistance and its consistency with departmental credit policies" to

the Administrator.  AR3565, ¶ 9(a).  Although the Credit Council makes an advisory

recommendation, the final decision on an application rests with the Administrator, who

"approve[s] or disapprove[s] the request for credit assistance."  Id. ; see 46 U.S.C. § 53702(a).

## II.    Plaintiff's Application for a Title XI Loan Guarantee.

### A.  APT's Title XI Application.

Plaintiff APT is a limited liability company formed in April 2010.  AR1543, 3350.  APT

is a subsidiary of American Petroleum Tankers Holding LLC ("APT Holding"), which is

ultimately owned 75 percent by the Blackstone Group and 25 percent by Cerberus Capital

Management.  AR3350.[1]  APT owns three subsidiaries – APT Intermediate HoldCo LLC, AP

Tankers Co., and American Petroleum Tankers LLC.  AR2662.  Each of APT Intermediate

HoldCo LLC's subsidiaries owns one vessel – the Golden State, Pelican State, and Sunshine

State.  Id., AR6.  American Petroleum Tankers LLC owns two vessels, the Empire State and the

Evergreen State.  Id., AR6.  All five vessels are "product tankers," ships that transport

petrochemicals.  The Golden State was delivered (completed) in January 2009, the Pelican State

in June 2009, the Sunshine State in December 2009, the Empire State in July 2010, and the

Evergreen State in December 2010.  AR7, 3348.  APT contracted for and obtained $285 million

in third-party private financing and $325 in financing from its equity owners (known as "sponsor

debt') for the construction of all five vessels.  AR29, 1554.  It is this pre-existing debt that APT

sought to refinance, and thereby to reduce its interest expenses, with funds from the federal fisc.

On August 30, 2010, APT submitted an application for a Title XI loan guarantee to

MarAd.  See AR1-33, see generally AR1-1538.  The application requested a $470 million

---

[1] Prior to April 2010, APT Holding was part of a joint venture between Blackstone, Cerberus, and U.S. Shipping Partners LP.  AR1543, 3350.  Subsequently, U.S. Shipping went bankrupt and Blackstone and Cerberus became the sole ultimate owners of what became APT.  AR2919, 1707.

guarantee to cover the cost of refinancing its existing debt that was incurred to construct the above-described vessels.  AR6.  After APT submitted its application, MarAd requested additional information.  <u>See</u> AR1563-1566.  APT submitted the additional information, <u>see</u> AR1567-1614, as well as other information, and MarAd determined that APT's application was complete on December 29, 2010.  <u>See</u> AR3511, 3519.  Throughout the process, APT also sent MarAd information reflecting updates to its application, including renewed charters, updated charter rates, and financial models reflecting those updates.  <u>See generally</u> AR1539-2864.

### B. Review by Independent Financial Advisor.

Since 2005, MarAd has engaged an independent financial advisor ("IFA") in all Title XI applications where, as here, the applicant or an affiliate has less than five years of operating experience, as well as in certain other cases.  AR2865, 2871; <u>see</u> 46 U.S.C. § 53708(d)**.**  After APT agreed to pay for an IFA despite understanding that it was possible, if not likely, that insufficient funds would be available for its application, AR1702, 2866-67, MarAd approached the Credit Council to seek its recommendation to hire an IFA in early 2011.  AR2868, 2871.  The Credit Council recommended against hiring an IFA, based on concerns about APT's owners' long-term interests in the maritime industry and the company's "relatively high" debt-to-equity ratio.  AR2868, 2871.  APT requested that this decision be reconsidered, AR1704-1707, and later modified its application by reducing the requested guarantee amount to $400 million and the guarantee period from 23.5 to 20 years.  AR1716.  In September 2011, MarAd again requested that the Credit Council recommend hiring an IFA, and on September 26, 2011, the Credit Council voted to recommend retaining an IFA.  AR2870-72.  On November 21, 2011, MarAd retained Scully Capital Services, Inc. ("Scully") as the IFA.  <u>See</u> AR 3168.  Scully provided a draft report in January 2012, AR2978-3152, and a final report in June 2012, AR3153-3335.

### C.  Litigation and Subsequent Modifications to APT's Application.

On May 2, 2012, APT expressed willingness to reduce the requested loan guarantee from $400 million to $340 million, as Scully recommended in its January draft report.  AR2442-2444, 2984.  On July 17 and 18, 2012, APT filed a Complaint and Motion seeking to compel MarAd to issue a decision on its application by August 31, 2012.  ECF Nos. 1, 4.  After MarAd agreed to issue a decision by August 31, APT withdrew its Motion.  ECF No. 7.  On July 23, 2012, APT indicated to MarAd that as part of a closing on a Title XI loan guarantee, it would convert "the portion of [its] Sponsor Debt [debt owed to APT's equity 'sponsors,' its ultimate owners] not repaid through the proceeds of the Title XI debt into equity of [APT Holding, its parent], which [would] then make an equity contribution of the same amount to [APT]."  AR2580.  APT did not formally amend its application or submit financial projections reflecting such a change.

On Sunday, July 29, 2012, APT confirmed that it was amending its application to reduce the requested guarantee amount to $340 million, AR2582-2584, and to incorporate the sponsor debt conversion to equity.  Id.  APT also sent a financial model to reflect these changes.  See AR2589-2608.  The sponsor debt conversion proposal, however, came too late to be incorporated into APT's application, which was in the final stages of consideration.  AR3514.  On July 31, 2012, after the Administrator tentatively determined to deny APT's application, AR3513, MarAd presented APT's application to the Credit Council for its recommendation prior to the Administrator making his decision.  AR2963-2967.[2]  The Credit Council agreed, unanimously recommending to the Administrator that APT's application be denied by MarAd.  AR3513.

---

[2] APT's application had previously been presented to the Credit Council on June 12, 2012, AR2932-2953, and on July 10, 2012, AR2956-2957.  It had also been presented to the Credit Council Working Group (staff members supporting members of the Credit Council) on May 31, 2012, AR2917-2931, June 28, 2012, AR2954-2955, and July 26, 2012, AR2958-2962.

**D.  August 1, 2012 Denial of APT's Application.**

The Administrator denied APT's application on August 1, 2012.  AR3511-3518.  The

decision was "informed by, but not dependent upon, the Credit Council's recommendation."

AR3513.  It also explained that it could not consider APT's belated July 2012 amendments, but

would consider them as part of a modified application if APT so requested.  AR3514.

The Administrator based his August 1, 2012 denial on several factors.  First, he found

that APT's application was "economically unsound."  AR3515.  He noted that APT had

"consistently operated at a net loss," id., and that as per Scully's report, APT was "burdened with

significant leverage in its capital structure" and unable to make interest payments on its debt, id.

(quoting AR3195), and was exposed to an evolving, uncertain market for product tankers, id.

The Administrator found that APT's interest expenses would "have large impacts on profitability

and [would] result in negative net income," particularly APT's substantial "paid-in-kind" interest

owed on its "sponsor debt."  AR3516 (quoting AR3192).  As a result, the Administrator found,

"the leverage structure of APT [was] not viable," "the underlying APT operation [was] dis-

economic" and there were "significant concerns about APT's ability to repay its debt from the

proceeds of vessel operations[.]"  AR3516.  Finally, the Administrator explained that APT's

operations plan raised additional concerns given the short length of APT's charters and the

uncertain state of the market, particularly in light of the recent recession.  Id.

In addition to economic unsoundness, the Administrator found that other reasons

warranted the denial of APT's application.  Specifically, the Administrator found that the

application did not warrant statutory or regulatory priority pursuant to 46 C.F.R. § 298.3(k)(2),

46 U.S.C. § 53706(a)(1)(B), and 46 C.F.R. § 298.17(a)(2), given that three of APT's five ships–

the Golden State, Pelican State, and Sunshine State – would have been well over one year old at

the time APT's application was scheduled for closing and APT was seeking refinancing, not financing. AR3516. Moreover, providing over $200 million to refinance pre-existing debt would have been dramatically larger than prior refinancing projects approved by MarAd. AR3517. As to the two ships that would have been newer than one year old at the presumed time of closing – the Empire State and Evergreen State – the Administrator found that although financing of those vessels was "preferred" due to this factor, these vessels were economically vulnerable because they were chartered by the Navy's Military Sealift Command ("MSC"), and thus subject to potential non-renewal on an annual basis as well as to the limited availability of federal funds, particularly in light of prospective Defense budget cuts. AR3517. The Administrator further noted that these uncertainties were heightened because APT was a recent start-up company and lacked resources upon which it could draw as a matter of right. Id.

Additionally, the Administrator found that the amount of guarantees APT sought would exhaust available resources for Title XI, and that other new, comparable vessels would be unable to receive funding if APT's application were approved. Id. Moreover, given the amount of funding sought, there would be insufficient funding for all three existing applications. Id.

Finally, the Administrator considered factors that pointed in APT's favor. Specifically, he recognized that APT's vessels "might have potential usefulness as naval auxiliaries" under statutes that prioritize applications for such vessels. AR3518. The Administrator noted, however, that this factor was not dispositive, and that concerns regarding APT's application, particularly economic soundness, outweighed this factor, given that vessels proposed by other pending applications would also meet the military-usefulness criterion. Id.

Following the denial, APT sent a letter to the Administrator, AR2609-2624, asking MarAd to review and consider the modifications sent by APT, and disputing the conclusions

made by MarAd in the August 1 decision letter.  AR2610-2612, AR2615-2622.  MarAd

promptly indicated that it would consider APT's modified application, and requested further

information from APT.  AR2625-2628, 2737-2738, 2782-2783.  APT provided MarAd with

additional information.  AR2630-2736, 2739-2778, 2784-2864.  MarAd obtained a new report by

Scully that analyzed APT's modified application.  AR3336-3510.  Like the original application,

APT's modified application was presented to the Credit Council and its working group.

AR2968-2977.  The Credit Council again unanimously recommended to the Administrator that

the application be denied, confirming the Administrator's tentative determination.  AR3522.

### E.  November 9, 2012 Denial of APT's Modified Application.

On November 9, 2012, the Administrator denied APT's modified application.  AR3519-

3532.  The Administrator again stated that his decision "was informed by, but not dependent

upon, the Credit Council's recommendation."  AR3522.  This decision again found APT's

proposal economically unsound, noting that although the conversion of sponsor debt to equity

resolved one concern, the others remained, especially since the conversion did not infuse any

new money into APT.  AR3523-3526.  Specifically, the Administrator reiterated that the

application was still risky given significant uncertainty regarding future employment of APT's

vessels, particularly given that all of APT's charters expire by February 2016 with two charters

subject to very uncertain annual renewal every October 1st.  AR3524.  He further noted that

notwithstanding positive forecasts, future charter rates and vessel utilization were uncertain in

light of unforeseeable market conditions.  Id.  Additionally, the Administrator noted that APT

was not projected to meet the 1.5:1 debt service coverage ratio recommended by Scully for nine

of the twenty guarantee years, including 2014, based on MarAd's "neither-best-nor-worst-case

financial model," AR3525; see also AR2916 (MarAd financial model), and that in four other

9

years, that ratio was projected to be below 1.55:1.  AR3525.  The Administrator emphasized that

although more optimistic scenarios painted a more favorable picture, "the most pessimistic, yet

plausible, scenarios are very risky for the Government."  Id.  Moreover, the Administrator noted

that to the extent that Scully's report suggested that approving APT's application was

"technically viable," that was only with certain "support mechanisms" in place, which indicated

that the project was "inherently economically unsound" absent artificial support.  AR3525-3526.

In addition to finding the modified application economically unsound, the Administrator

reiterated, and in some cases elaborated on, his conclusions from the previous decision as to the

other factors warranting denial.  Specifically, the Administrator noted that three of APT's vessels

were over one year old at the projected time of closing, AR3527, that the two remaining ships

were economically vulnerable in light of Defense budget constraints, AR3527-3528, that the

substantial guarantee would nearly exhaust MarAd's resources, AR3528, and that the vessels'

potential uses as military auxiliaries could not overcome the other factors weighing in favor of

denial, especially economic soundness.  AR3528-29.  In addition, the Administrator attached an

appendix demonstrating that contrary to APT's contentions, previous applications for refinancing

that were approved were distinguishable from APT's modified application.  AR3530-3532.

### F.  APT's Supplemental Complaint.

Following the August 1 and November 9 decisions, APT filed a Supplemental Complaint

on December 10, 2012, ECF No. 14, alleging three claims.  First, it alleges that the

Administrator's decisions were "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with the law." See Supp. Compl. ¶¶ 103-08 (quoting 5 U.S.C. § 706(2)).  Second,

APT alleges that the Secretary and Credit Council's involvement in the application process is

contrary to "the clear mandate of Congress" and seeks an order directing the agency to "cease

and desist" submitting applications to the Credit Council.  Id. ¶¶ 109-14.  Third, APT alleged

that the Administrator was "incapable of fairly assessing the merits of APT's Title XI

application," and sought an order mandating that the Administrator recuse himself from any

further proceedings.  Id. ¶ 115.  On January 18, 2013, Defendants moved to dismiss the

Supplemental Complaint for failure to state a claim and for lack of subject matter jurisdiction.

ECF No. 18.  On May 6, 2013, the Court dismissed the third count, but found that Plaintiff had

stated a claim on the first and second counts sufficient to proceed to lodging an administrative

record and resolving the case on summary judgment.  ECF No. 25.  On June 10, 2013,

Defendants filed the administrative record.  ECF No. 30.  On June 14, 2013, Plaintiff moved to

supplement the record and for "limited discovery;" that motion is fully briefed and is pending

before the Court.  ECF No. 60.  Defendants now move for summary judgment and for

reconsideration of the Court's May 6, 2013 Order as to the second count.

## STANDARD OF REVIEW

### I.        Summary Judgment under the Administrative Procedure Act.

APA cases are "typically decided via summary judgment."  Weber v. U.S. Dep't of State,

885 F. Supp. 2d 46, 53 (D.D.C. 2012).  "[I]nstead of determining whether a genuine issue of

material fact exists . . . summary judgment in an APA case is a 'mechanism for deciding, as a

matter of law, whether the agency action is supported by the administrative record.'"  Id.

(quoting Sierra Club v. Mainella, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)).  A court may only set

aside an agency's actions, findings, or conclusions if they are "arbitrary, capricious, an abuse of

discretion, otherwise not in accordance with law, or unsupported by substantial evidence."

Lozowski v. Mineta, 292 F.3d 840, 845 (D.C. Cir. 2002) (citing 5 U.S.C. § 706) (internal

quotation marks omitted).  This standard is "[h]ighly deferential," Hagelin v. FEC, 411 F.3d 237,

242 (D.C. Cir. 2005), as the court "is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). The Court's review is confined to the administrative record that was before the agency. See Am. Wildlands v. Kempthorne, 530 F.3d 991, 1002 (D.C. Cir. 2008) (citing Volpe, 401 U.S. at 420).

Agency action is "arbitrary and capricious" only if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). The "substantial evidence" test is "that aspect of the arbitrary and capricious test usually applied to review of agency adjudications, but its use does not connote stricter scrutiny of agency action." Mem'l Hosp./Adair Cty. Health Ctr., Inc. v. Bowen, 829 F.2d 111, 117 (D.C. Cir. 1987). The agency need only "examine the relevant data" and "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). This standard "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." FPL Energy Me. Hydro, LLC v. FERC, 287 F.3d 1151, 1160 (D.C. Cir. 2002); see also Kay v. FCC, 396 F.3d 1184, 1188 (D.C. Cir. 2005) ("substantial evidence" is "the amount of evidence constituting enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury" (internal punctuation and citation omitted)).

In APA cases, "it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to

determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" Cottage Health System v. Sebelius, 631 F. Supp. 2d 80, 89-90 (D.D.C. 2009) (quoting Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985)).   "The question [a court] must answer . . . is not whether record evidence supports [a plaintiff's] version of events, but whether it supports [the agency's]." AJP Const., Inc. v. Sec'y of Labor, 357 F.3d 70, 73 (D.C. Cir. 2004).  For pure questions of law, although the court may make the final decision, it "should give some deference to the administrative decision where the agency has a lengthly [sic] record of practical experience with the subject matter." NOW, Washington D.C. Chapter v. Social Sec. Admin. of Dep't of Health & Human Services., 736 F.2d 727, 735 n. 78 (D.C. Cir. 1984).  Finally, when an agency offers multiple grounds for a decision, the court will affirm the agency so long as any one of the grounds is valid, unless it is demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable.  Mail Order Ass'n of Am. v. U.S. Postal Serv., 2 F.3d 408, 434 (D.C. Cir. 1993).

## II.    Motion to Revise Interlocutory Order Under Rule 54(b).

Defendants are also moving the Court to revise its order finding that Plaintiff had stated a claim as to Count Two.  As a denial of a motion to dismiss, this ruling was interlocutory.  See MK. v. Tenet, 196 F. Supp. 2d 8, 12 (D.D.C. 2001) (citing United States v. Rose, 28 F.3d 181, 185 (D.C. Cir. 1994).[3]  As this Court has recognized,

> Under Rule 54(b) . . . a district court may revise its own interlocutory orders "at any time before the entry of judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b).  Rule 54(b) recognizes the inherent power of the courts

---

[3] Because the Court's decision was interlocutory, the discretionary "law of the case" doctrine does not apply, and the Court is permitted to revise its earlier decision.  See Langevine v. District of Columbia, 106 F.3d 1018, 1023 (D.C. Cir. 1997) ("Interlocutory orders are not subject to the law of the case doctrine and may always be reconsidered prior to final judgment."); see also Safir v. Dole, 718 F.2d 475, 481 n. 3 (D.C. Cir. 1983) ("law of the case" doctrine is discretionary).

to reconsider interlocutory orders "as justice requires." <u>Capitol Sprinkler Inspection, Inc.</u> <u>v. Guest Servs., Inc.</u>, 630 F.3d 217, 227 (D.C. Cir. 2011).

<u>North v. DOJ</u>, 892 F. Supp. 2d 297, 298-99 (D.D.C. 2012) (Kollar-Kotelly, J.). "The Court has broad discretion to consider whether relief is 'necessary under the relevant circumstances.'" <u>Id.</u> (quoting <u>Lewis v. Dist. of Columbia</u>, 736 F. Supp. 2d 98, 102 (D.D.C. 2010)) [4].

## ARGUMENT

As the administrative record establishes, the Maritime Administrator's decisions to deny APT's applications were fully justified. Notwithstanding APT's vessels' potential military usefulness, the applications' lack of economic soundness, as well as the limited potential benefit to fulfill the purposes of the Title XI program by extending a substantial loan guarantee to refinance existing debt for vessels that were already constructed, warranted denial of APT's applications. Additionally, the Secretary of Transportation lawfully required that APT's applications be reviewed by the Credit Council for a recommendation prior to the Administrator's final decision – an approach permitted by the statutory regime and grounded in good government. Summary judgment should therefore be granted to Defendants.

**I.     THE MARITIME ADMINISTRATOR'S DENIAL OF APT'S LOAN GUARANTEE APPLICATIONS IS SUPPORTED BY SUBSTANTIAL EVIDENCE IN THE ADMINISTRATIVE RECORD.**

The Administrator's conclusion that APT's original and modified applications were not economically sound were supported by substantial evidence in the administrative record,

---

[4] In <u>North</u>, the Court cited a non-exclusive list of circumstances that may justify revision under Rule 54(b), including "where the court has patently misunderstood the parties, strayed far afield of the issues presented, or failed to consider a controlling or significant change in the law or facts since the submission of the issue." <u>North</u>, 892 F. Supp. 2d at 299 (citing <u>Cobell v. Norton</u>, 224 F.R.D. 266, 272 (D.D.C. 2004)). However, the Court went on to clarify a court's "broad discretion" to award relief. <u>Id.</u> (citing <u>Lewis</u>, 736 F. Supp. 2d at 102. Moreover, as the court in <u>Cobell</u>, made clear, the standard for a 54(b) motion is flexible, and not as demanding as the standards for reconsideration under Rule 59(b) or Rule 60(b). <u>Cobell</u>, 224 F.R.D. at 272.

including, among other things, the documentation provided by APT, the analyses by Scully, and

MarAd's own analyses made with its expertise under the Title XI program.  While APT's ships

were potentially useful as naval auxiliaries, three of the five ships did not warrant priority since

they were over one year old and that APT was seeking refinancing instead of financing, and the

other two were particularly economically vulnerable due to their reliance on Navy charters.

MarAd's conclusions in both decisions were neither arbitrary nor capricious.  Finally, the

Administrator's denial on the additional basis that APT's application would have exhausted

nearly all of the agency's resources was within his discretion and is supported by the record.

### A.  Substantial Evidence Supports the Administrator's Decisions that APT's Applications Were Not Economically Sound.

MarAd may not issue a loan guarantee if an application is not economically sound.  46

U.S.C. § 53708(a), 46 C.F.R. § 298.14(a).  Although the Title XI statutes and regulations set

forth specific mandatory factors for evaluating economic soundness, see 46 U.S.C. § 53708(a),

46 C.F.R. § 298.14(b), the Administrator is not limited to those factors, but may consider any

"other relevant criteria."  46 U.S.C. § 53708(a)(5); 46 C.F.R. § 298.14(b)(6); see also 46 C.F.R.

§ 298.14 (stating that the economic soundness factors "include[e], but [are] not limited to"

specific enumerated criteria); accord Mem. Op., May 6, 2013 (ECF No. 25) at 13 (noting that the

Administrator may consider "other criteria relevant to whether the underlying obligation will be

economically sound") (emphasis in original omitted).  The Administrator found that APT's

original and modified applications were not economically sound, and the record supports that

finding with substantial evidence.  Because the two decisions set forth different reasons due to

the modification to APT's application after the August decision, each is discussed in turn.

### 1.  August 1 Decision Letter.

The August decision's finding of economic unsoundness was grounded in three primary

rationales. First, APT consistently operated at a net loss and had difficulty meeting its current obligations. AR3515. Second, and relatedly, APT was accumulating a large, growing, and disturbing amount of debt to its ultimate owners ("sponsors") at a very high interest rate. AR3515-16. Finally, the Administrator cited significant uncertainty in the market for APT's tankers, particularly in light of the recent recession, and found that APT's situation was exacerbated because of the short length of its charters and its lack of resources to draw upon given its relatively young age. AR3516. Each of these rationales is supported by the record.

**Net Losses:** It is undisputed that APT's net losses were $42.4 million in 2010, $35.6 million in 2011, and $11 million in the first quarter of 2012. AR2460, 2555, 2904-05, 3515. The majority of these losses were attributable to interest expenses, $50 million in 2010, $75 million in 2011, and $19 million in the first quarter of 2012. AR2460, 2555, 2904-2905. This observation was not only MarAd's; Scully found that APT was "burdened with significant leverage in its capital structure" and was "unable to meet interest payment requirements on a current basis." AR3515 (citing AR3195). Likewise, Scully stated that ████████████████

████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

**APT's Significant Debt:** Chief among MarAd's concerns was the significant amount APT owed to its ultimate owners, or "sponsors," Blackstone and Cerberus. AR3515-16. Rather than being paid in cash on a monthly basis (and thus reducing over time), under APT's

arrangement with its sponsors, the interest payments were paid-in-kind – in other words, the interest was simply added to the principal of the debt APT owed to its sponsors.  See AR29, 53-54.  Additionally, the interest on the sponsor debt accumulated at a high, fixed rate of 12 percent.  AR47, 54.[5]  As of May 31, 2010, the outstanding amount of sponsor debt was $338 million, AR29, and by December 31, 2011 it had increased to $406 million.  AR2563 (showing sponsor debt as $405,998,000).  MarAd projected that if it were to issue a Title XI loan guarantee that would only refinance APT's third-party debt, and not the sponsor debt, the accumulated principal APT owed to its sponsors ███████████████████ by the end of the guarantee period in 2032.  AR2900, 2903; see also AR3516 ("Even if MarAd were to issue loan guarantees to lower APT's high third-party debt costs, the operation would still lose money[.]").[6]  Moreover, even if MarAd had approved the requested $340 million guarantee, it would have refinanced only ██████, a small portion of APT's sponsor debt.  AR2944.  Over █████████ would have remained outstanding, though it would have been subordinated to the Title XI debt.  Id.  Thus, even the full $340 million loan guarantee APT sought would have addressed less than █████████ of the sponsor debt, hardly enough to mitigate the long-term risks to APT's operations.

APT has sought to dismiss the sponsor debt, █████████████████████ ███████████████.  But APT's attempted minimization conflicts with its own

---

[5] The high interest rate resulted from agreements APT made with its sponsors to change the interest rate from a more favorable rate of an adjusted LIBOR interest rate plus 4.5 percent – constituting 4.7% as of December 31, 2009 – to a high, fixed rate of 12%.  AR53.  Under these agreements, monthly interest payments were treated as "paid-in-kind" in lieu of monthly cash payments by APT issuing additional debt that was added to the principal amount owed, and the maturity of the sponsor debt was extended to 2016.  AR47, 53-54.

[6] The spreadsheets at AR2900 and 2903 ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████.  See 46 C.F.R. § 298.36.

representations to MarAd on March 16, 2011 that 

clearly speak to the overall economic soundness of its application.  See 46

U.S.C. § 53704 (listing "the financial condition of an obligor or applicant for a guarantee" as a

"risk factor").  Moreover, as noted above, even if MarAd had approved a $340 million Title XI

loan guarantee to refinance some of the sponsor debt, APT still would have been left with

of sponsor debt at 12 percent interest.  AR2944.  Thus, absent an agreement to forgive

and terminate the sponsor debt or to convert it to equity – which APT had not agreed to when

MarAd was preparing the August decision[7] – the sponsor debt presented an ongoing, serious

threat to APT's viability – and therefore to the economic soundness of APT's application.

Similarly, APT argues that MarAd should have disregarded the sponsor debt because it

would have been subordinated to the Title XI debt.  See Supp. Compl. ¶¶ 68-69.  This argument

is based on a flawed reading of MarAd's regulations that permit MarAd to consider subordinated

debt as equity for certain specific purposes.  See 46 C.F.R. § 298.13(h) (permitting treatment of

subordinated debt to meet "the Equity requirements applicable under [46 C.F.R. § 298.13](c) and

(f)").  Section 298.13(h) does not require MarAd to consider subordinated debt as equity in all

respects, and it certainly does not compel the agency to ignore $400 million worth of debt –

subordinated or otherwise – when considering an applicant's viability over a 20-year period.

To find otherwise would be inconsistent with other provisions that require MarAd to

---

[7] APT has argued that the August decision was improper because APT had previously indicated that it would be willing to convert its sponsor debt to equity.  See Supp. Compl. ¶ 69.  APT indicated such a "willingness" via letter on July 23, 2012.  AR2580.  But a "willingness" to take an action is not a formal amendment to an application, and APT did not amend its application until Monday, July 30 – too late to be considered in the August decision.  AR2582-2584.

make a holistic judgment as to an applicant's finances.  See 46 U.S.C. § 53704(c)(4)(D) (MarAd

must consider "the financial condition of an obligor or applicant for a guarantee"); 46 U.S.C.

§ 53708(a)(5) (permitting Administrator to consider "other relevant criteria" when determining

economic soundness; 46 C.F.R. § 298.14(b) (economic soundness factors "include[e], but [are]

not limited to" certain factors); 46 C.F.R. § 298.3(g) ("When processing applications, we will

consider the different degrees of risk involved with different applications."); 46 C.F.R.

§ 298.3(h)  (permitting MarAd to require additional assurances if "[applicant is] not a well

established firm with strong financial qualifications" with other indicia of low risk).  Here, APT

was accumulating massive amounts of debt that, by the agreement of its equity owners, would

remain unpaid for years.  The Administrator properly found that the "significant leverage,"

AR3515 (citing AR3195), created in part by this debt made APT unsustainable in the long term.[8]

    Additionally, whether the sponsor debt would have been subordinated to MarAd is beside

the point.  The primary factor MarAd must consider is whether an applicant would be able to

repay its Title XI debt – not whether MarAd might ultimately recoup its losses in the event of a

default.[9]  See 46 C.F.R. § 298.14(a) ("We will consider the value of the collateral for which we

will issue the Obligations as only a secondary consideration in determining your ability to repay

---

[8] APT argues that it "had the right to pay, and in fact had been paying, [the sponsor] debt with 'payments in kind,' that is, by issuing additional subordinated debt to the debt holder in lieu of cash."  Supp. Compl. ¶ 69.  While APT may have "the right" to make whatever arrangements it wishes with its equity sponsors, MarAd is not required to blindly accept such arrangements.  Taking APT's argument to its logical conclusion, APT could have continued to issue additional subordinated debt for the life of the 20-year guarantee – which would have caused the total accumulated sponsor debt to grow to ████████, AR2900, 2903 – and MarAd would have been compelled to ignore the growth in unpaid debt  This absurd result cannot be, and is not, the law.

[9] The reason for this distinction is that a default of a Title XI loan guarantee is costly to the government, which always sustains a loss from a default because collateral and security enhancements are almost always inadequate to repay the debt.  AR3515, 3523.  Additionally, MarAd must obtain the vessel and the Department of Justice must pursue foreclosure proceedings.  AR2937.  In the event of a bankruptcy, additional proceedings are required.  Id.

the Obligations.").  Thus, even assuming MarAd would have ultimately recovered any losses

based on its priority – which in most cases MarAd does not, see n. 9 – this would not undermine

the Administrator's determination that APT's application was economically unsound.

　　　**Market Uncertainty:** The final reason for MarAd's conclusion regarding economic

soundness was that APT's charters were for significantly less than the twenty-year guarantee

period and the market for the ships was fraught with uncertainty.  AR3516.  The state of the

market and the nature of an applicant's charters are required considerations under the Title XI

statutes and regulations.  See 46 U.S.C. 53708(a)(1),(2),( 4), 46 C.F.R. 298.14(b)(1),(2),(4).

　　　APT's charter lengths are undisputed.  At the time of the August decision, ████████

████████████████████████████████████████████████████████

████████████████████████████████ ███████ In the

Administrator's view, this made APT's prospects over the life of the guarantee uncertain at best.

The Administrator's conclusions were supported by substantial evidence.  A December 2011

study by Wilson Gillette and Company regarding the market for product tankers and oceangoing

barges through 2020, incorporated into the Scully report, AR3218-3335, concluded that

"economic fundamentals impacting the Jones Act petroleum products trade reached the bottom

--------

[10] ████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████

of the business cycle during the second quarter of 2011 and that the elements of recovery [were] underway." AR3229.   Based on this study and one other, Scully concluded that "[w]hile the near-term prospects for the coastwise product tanker market appear favorable, uncertainties remain for the long-term." AR3214.  In particular, Scully noted the significant effects of the recent "deep and prolonged recession," AR3179, the potential for "periods of intense competitive rivalry" in the industry, AR3200, the "limited breadth of operations of [APT]," AR3201, and the "uncertainty of the market in the long-term," which it called the "largest area of Project risk." Id. In sum, Scully concluded that "[w]hile the projections provided by the Applicant are reasonable, the debt will be exposed to changes that cannot be foreseen at this time." Id.

While APT will no doubt urge the Court to make a different finding, that is not the test under the APA's substantial evidence standard.  The record provides substantial evidence to support the Administrator's decision that APT's operations in a market that had only recently reached "the bottom of the business cycle" posed an unacceptable risk.  The coastwise product tanker market at the time of the decision was at best ambiguous, and notwithstanding Wilson Gillette's cautiously optimistic predictions, the long-term future "[could] not be foreseen." These risks were heightened because APT operated solely in that market.  In the face of a cloudy future, the Administrator acted prudently when he determined that the risks posed by APT's application were too high, and as demonstrated above, that decision is supported by the record.

### 2.  November 9 Decision Letter.

The November decision letter's economic soundness determination cited some of the same reasons discussed in the August letter, but also a number of other reasons, given that APT's modified application resolved the sponsor debt issue.  AR2583-2586.  MarAd's review of the modified application nonetheless concluded that APT's application was not economically sound.

Specifically, the November decision reiterated MarAd's concerns regarding APT's brief charter

length and the uncertainty of the market.  AR3524.  MarAd's concerns were amplified by an

October 4, 2012 analysis done by its Office of Policy and Plans ("OPP").  AR2907-2914.  OPP

concluded that "[t]he U.S. coastal product tanker market has been in a state of decline over the

last ten years," exacerbated by the recent recession.  AR2912.  OPP expressed some cautious

optimism that an improving economy and a closer match between supply and demand could

improve the market, AR2912-13, but warned that if this did not occur, "tank vessel operators

[like APT] could face the risk of underutilized assets and the potential for reductions in future

charter rates."  AR2913.  Similarly, MarAd's Associate Administrator for Business and Financial

Development stated that there was a "strong potential" that the impending introduction of two

new vessels by another company could upset the delicate market balance and further heighten the

uncertainty regarding APT''s charter rates.  AR2906.  In short, MarAd's concerns regarding the

market and its potential to impact APT's operations only increased with the information it

gathered after the August decision, uncertainty supported by substantial evidence in the

administrative record.

The November decision also discusses a MarAd "neither-best-nor-worst-case" model

under which APT's projected operations would not generate sufficient revenue to meet a 1.5:1

debt service coverage  ratio – a ratio recommended by Scully, AR3343 – in nine of twenty years,

with the ratio close to 1:1 in three of those years, and four additional years below 1.55:1.

AR3525.  This model is set forth in the record.  See AR2916.  It assumes that when APT's

vessels' current charters expire, their daily rate will be ███████████████████████████.

Id.  This reflects an average of a conservative rate of ████████████████████████

████████████████████████████████████████████████████████



███████ Additionally, reflecting the increased risk associated with APT's MSC charters –

which are restricted to one-year renewals and dependent on funding, AR1598, 2911 – MarAd's

model did not assume that those charters would be renewed after ███████████. AR2916.[12]

Under these assumptions, APT would not generate a 1.5:1 debt service coverage ratio in ██████

████████████████████████████. AR2916.  Additionally, the ratio would be

close to 1.0 – the minimum permitted by 46 C.F.R. § 298.14(d)(4)  – in ████████████,

id., and just above 1.5 in ███████████████.  Such findings demonstrated to the

Administrator that APT's application was too risky to be economically sound.

**B.  APT's Objections to Defendants' Economic Soundness Determinations Cannot Overcome the Substantial Evidence Supporting Denial.**

APT has voiced numerous objections to MarAd's conclusions.  But APT's urgings all, at

bottom, misconstrue the nature of APA review and, if adopted by the Court, will lead it astray.

If, as here, MarAd's decisions are grounded in substantial evidence in the record, the Court's

inquiry should end, and summary judgment in favor of Defendants is warranted.  It does not

matter whether APT, or even the Court, might have a different view.  To the extent that different

evaluators might have reasonably come to different conclusions about APT's application, such a

---

[11] This utilization rate represented an important factor distinguishing MarAd's model from Scully's "Lender Case."  The Lender Case, while conservative in other respects, unreasonably assumed 100% post-charter utilization for all five vessels for the entire twenty year period, even when none of the vessels have charters that are twenty years in length.  AR3380.

[12] MarAd gave APT the benefit of assuming that the other three ships' charters would be renewed through their option years.  AR2916.

conclusion does not defeat Defendants' motion for summary judgment.  Accord Air Transport

Ass'n of America, Inc. v. Nat'l Mediation Bd., 719 F. Supp. 2d 26, 44 (D.D.C. 2010) ("Although

reasonable minds could disagree about [whether new agency rule was essential], 'a court is not to

substitute its judgment for that of the agency.'") (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at

43.).  On that basis, summary judgment in favor of Defendants is appropriate.

    For example, APT chides MarAd for not adopting the more optimistic assessments of

market conditions and charter rates in the Scully and Wilson Gillette reports.  See Supp. Compl.

¶¶ 63-75.  But under the APA, an "'agency's evaluations of scientific data within its area of

expertise' . . . [are] entitled to 'a high level of deference[.]'"  Serono Labs., Inc. v. Shalala, 158

F.3d 1313, 1320 (D.C. Cir. 1998) (quoting A.L. Pharma, Inc. v. Shalala, 62 F.3d 1484, 1490

(D.C. Cir. 1995).  Such deference is appropriate even when the decisionmaker elects not to adopt

the recommendations of other agency personnel, see id. at 1321 ("high level of deference" due to

FDA decisionmaker even where internal memoranda indicated disagreement among chemists);

San Luis Obispo Mothers For Peace v. NRC, 789 F.2d 26, 33 (D.C. Cir. 1986) (en banc)

("position of an agency's staff, taken before the agency itself decided the point, does not

invalidate the agency's subsequent application and interpretation of its own regulation").  This is

even more true when the assessments the decisionmaker declined to adopt were those not of

agency personnel, but of analysts outside the government.

    Defendants do not dispute that the record contains some evidence that would have

supported approving Plaintiff's application.  For example, Defendants recognize that the Scully

reports concluded that APTs application was "feasible" under certain conditions, AR3215, 3342,

and that the Wilson Gillette report painted an optimistic, if uncertain, picture of the market.  But

under the "substantial evidence" test, MarAd need not show that a "preponderance" of the

evidence supports its decision, but merely a "rational connection between the facts found and the choice made." See supra at 12.  Moreover, in the November decision letter, the Administrator stated his reasons for disagreeing with these optimistic reports.  He correctly noted that Scully's reports that found APT's application "feasible" also recommended certain structural supports, such as a ███████████████████████████████████████████████████ ████████████████████████████████████.  See, AR3032-3034, 3215-3217, 3390-3392.  It was well within the Administrator's discretion to conclude that an application in need of this degree of structural support lacked sufficient economic soundness.  AR3525-3526.  Moreover, the Administrator correctly noted that "the most pessimistic, yet plausible, scenarios are very risky for the Government."  AR3525.  MarAd's "neither-best-nor-worst-case" scenario was within the realm of possibility and reasonable to raise concerns.  Id.  Regarding Wilson Gillette, the Administrator similarly noted that despite the optimistic forecast, "[b]oth post-initial-charter utilization and daily charter rates [were] uncertain" for the reasons discussed above.  AR3524.

Finally, in several locations, APT invokes Title XI regulatory provisions to argue that MarAd's decisions violated those regulations.  But the regulatory provisions at issue are a floor – not a ceiling – of an applicant's qualifications for economic soundness.  For example, APT cites the economic soundness factors listed in 46 C.F.R. § 298.14, particularly § 298.14(d)(1), which requires that "[t]he projected long-term demand [for the vessel] to be financed must exceed the supply of similar vessels . . . in the applicable markets," and criticizes MarAd for examining, in part, the length of APT's charters.  See Supp. Compl. ¶¶ 70-71, 77.  Likewise, APT criticizes MarAd for the November decision letter's reliance on a debt service coverage ratio of 1.5:1 as an acceptable standard, when MarAd's regulations require only a ratio "in excess of 1:1."  See id. ¶ 80 (citing 46 C.F.R. § 298.14(d)(4)).  Similarly, as noted above, APT criticized MarAd for not

considering its subordinated sponsor debt as equity, see id. ¶ 69, as permitted by 46 C.F.R.
§ 298.13(h).  In all of these scenarios, APT mistakes the regulations at issue as limiting MarAd's
discretion, when in fact each regulation clearly prescribes only bare minimum criteria that
MarAd is free to exceed, depending on its evaluation of a particular application.  See, e.g., 46
C.F.R. § 298.14(d) (stating that to approve a project, MarAd "must determine that a project
meets the following criteria," but not stating that such criteria are exhaustive).

In sum, the Administrator's determinations that APT's two applications were not
economically sound were well within the bounds of the statutory and regulatory provisions he
has been charged with administering, were neither arbitrary nor capricious, and were supported
by substantial evidence.  These findings alone compelled denial of APT's applications, and
mandates summary judgment in favor of Defendants.

### C.  Most of APT's Project Would Have Refinanced Three Vessels Over A Year Old and Therefore Did Not Warrant Priority.

MarAd gives "priority for processing ... [r]equests for financing construction of
equipment or vessels less than one year old as opposed to the refinancing of existing equipment
or vessels that are one year old or older."  46 C.F.R. § 298.3(k)(2).  Likewise, "[MarAd] shall
also consider whether the [Title XI] application provides for . . . [t]he financing of the Vessel(s)
within one year after delivery."  46 C.F.R. § 298.17(a)  In calculating the age of vessels, MarAd
uses the projected closing date of the loan guarantee, which may be expected to be no earlier
than 270 days plus six weeks after the date the signed application is received.   AR3516, 3531;
46 U.S.C. § 53703(a)(1); 46 C.F.R. § 298.3(f)(5).

Although not explicitly stated in the regulations, the reason for the preference to finance
vessels less than one year old is evident from the basic purposes of the Title XI program, to
"foster the development and encourage the maintenance of" the U.S. merchant marine and

shipyards.  Pub. L. No. 74-835, § 101; see 46 U.S.C. § 50101(a) ("It is necessary for the national

defense and the development of the domestic and foreign commerce of the United States that the

United States have a merchant marine[.]")  A refinancing transaction – one that replaces an

existing debt obligation with one having different terms – is one whose primary aim is to put the

debtor in a more favorable financial position.  In contrast with a transaction to finance new

vessel construction, refinancing does not add to the capacity of the merchant marine fleet, does

not create new potential military auxiliaries, and does not create shipbuilding jobs.  Its benefit to

the U.S. merchant marine is at best attenuated.  MarAd's statutes and regulations recognize this

distinction, and provide a preference for transactions incurred to finance new vessel construction.

Pursuant to these statutory and regulatory preferences, MarAd has engaged in relatively few

refinancing transactions under Title XI, all of which were to refinance projects of less than $25

million, and in some cases included a larger component to finance new construction.  AR3527.

It is undisputed that three of the five vessels APT was seeking to refinance – the Golden

State, the Pelican State, and the Sunshine State – would have been well over a year old at the

projected closing date.  These vessels were delivered in January, June, and December, 2009,

respectively, see AR3171, and because APT submitted its application on August 31, 2010, AR1,

using the 270-day-plus-six-week calculation, the original projected closing date would have been

July 11, 2011.[13]  Assuming that the three older vessels constituted a proportionate share of the

$340 million APT sought, the amount of refinancing attributable to them would have been $204

million.  AR3517, 3527.  This would have constituted the largest refinancing ever undertaken by

_____

[13] In using a projected closing date based on APT's original submission, MarAd gave APT a
more favorable analysis than would have resulted had it used the projected closing date at time of
its decision.  AR3516, 3527.  Since MarAd rendered its decisions in 2012, had it used the actual
projected closing date, none of APT's ships would have warranted priority under this factor.

MarAd by a factor of eight, as all of MarAd's previous refinancing projects in U.S. coastwise trade were for projects of less than $25 million.  AR3517, 3527.[14]

Despite MarAd's analysis, which is set forth in the decisions and supported by substantial evidence in the record, APT has argued that this factor is outweighed by a statutory and regulatory priority in favor of vessels capable of serving as naval and military auxiliaries.  See 46 U.S.C. § 53706(c); 46 C.F.R. § 298.3(k)(1); id. § 298.17(a)(1).  Although Defendants do not dispute that APT's vessels may meet this standard, this did not distinguish APT's refinancing application from others.  At least one other pending application sought financing for new ships that were also useful as military auxiliaries, and other potential applicants met this criterion as well.  AR3518, 3529.  Likewise, although APT argued that the Empire State and Evergreen State enjoyed priority because they would have been less than a year old on the projected closing date,  this was not the case for two reasons.  First, no statute or regulation confers priority for an application for the refinancing of vessels, whether or not they are less than a year old; the relevant provisions prioritize only applications for financing.  See 46 C.F.R. § 298.3(k), id. § 298.17(a), 46 U.S.C. § 53706(a)(1)(B).  Second, even assuming that the Empire State and Evergreen State enjoyed this priority factor, these were economically vulnerable, as that their charters with the Navy were each subject to potential annual non-renewal, Defense budget restrictions, and potential fluctuation in Navy demand.  AR3517, 3527-28.  Finally, although APT argued for priority, AR2618, because its requested 20-year guarantee was less than the

---

[14] In its response letter to MarAd following the August 1 decision, APT raised examples of four other transactions that it contended constituted Title XI refinancing projects for older vessels.  AR2620-2621.  In the November 9 decision, MarAd explained why those transactions were distinguishable.  AR3530-3532.  Of the four transactions APT cited, three were for vessel financing, not refinancing.  AR3531-3532.  Although the fourth was a refinancing project of vessels more than one year old, it sought a guarantee of only $22.5 million, which was the largest coastwise-trade refinancing project MarAd has approved.  AR3532.

vessels' expected 25-year life, see 46 C.F.R. 298.3(k)(4) (prioritizing guarantees for less time than the normal term for that class of vessel), the Administrator found that the risks of APT's application were nonetheless unacceptable due to lack of economic soundness.  AR3528-29.

The Administrator's weighing of the factors for and against priority for APT, and finding that any such priority factors alone did not counsel approval of APT's application, was eminently reasonable and supported by substantial evidence in the record.  The Administrator determined that the priority factors favoring APT were either non-distinguishing or outweighed by overarching economic soundness concerns, whereas the priority factor weighing against APT was significant, particularly in light of the substantial, unprecedented amount of loan guarantees being requested to refinance three ships over a year old.  This determination was well within the substantial discretion provided to the Administrator, and was neither arbitrary nor capricious.[15]

### D.  APT's Application Would Have Exhausted MarAd's Limited Resources.

A final reason the Administrator cited for the denial in both letters was that the $340 million guarantee APT sought would have virtually exhausted MarAd's limited resources for the Title XI program.  AR3517, 3528.  At the time, MarAd's appropriations for Title XI guarantees totaled only approximately $27.5 million.  See Stmt. of David T. Matsuda Before the Subcomm. on Coast Guard & Maritime Transp., The Maritime Administration's Fiscal Year 2013 Budget

---

[15] At a late stage, in October 2012, APT informed MarAd that ███████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████  MarAd's determination that this contingent, future transaction by another entity was irrelevant, AR2970, was proper.  While a statutory provision does indicate some preference for transactions when the proceeds of a Title XI guarantee are used to finance new ship construction, see 46 U.S.C. 53706(a)(1)(B), it contains no mention of transactions that may be incurred by affiliates of an applicant for an unrelated project. Moreover, the Title XI regulatory provisions concerning priority and evaluation relate to the assessment of the transaction at hand, not separate transactions into which the applicant or affiliated entities might enter in the future.  See, e.g., 46 C.F.R. §§ 298.3, 298.17.

Request, Mar. 7, 2012 available at http://testimony.ost.dot.gov/test/pasttest/12test/matsuda1.htm; see also AR2621 (APT's estimate that MarAd has $27 million remaining for Title XI).[16]  Based on a subsidy rate of 7.26 percent from the President's budget, see Ofc. Of Mgmt. & Budget, Federal Credit Supp., Budget of the U.S. Gov't, Fiscal Year 2013, at 15, available at http://www.whitehouse.gov/sites/default/files/omb/budget/fy2013/assets/cr_supp.pdf, this allowed for guarantee authority of only about $379 million.  See also AR2621 (APT's estimate that approximately $372 million in guarantee authority remained).  Thus, APT's $340 million loan guarantee would have exhausted nearly all of MarAd's Title XI authority.

A determination that takes into account the remaining available program funding is supported by the Title XI statute.  See 46 U.S.C. § 53704(c)(3)(D) (prohibiting the Administrator from issuing guarantee obligations if the amount available is reduced to zero).  Additionally, it would be inconsistent with the goals of Title XI if such a substantial amount of MarAd's remaining funds were to be used for one application – particularly an application to refinance existing private sector debt, which would further not the larger purposes of Title XI, but the economic bottom line of APT.  See supra at 26-29.  And finally, the ability to balance the merits of a project against the finite resources of a government funding program is one inherent in administrative authority.  Accord Lincoln v. Vigil, 508 U.S. 182, 193 (1993) (agency's allocation of funds involves, inter alia, "whether the agency has enough resources to fund a program at all") (internal citation omitted).  For these reasons, the Administrator considered APT's application in light of the remaining funds available to MarAd, and determined that the sheer size of APT's requested guarantee was an additional factor that weighed in favor of denial.

---

[16] Additionally, no new subsidy funds were made available to the Title XI program since fiscal year 2011 and available funds were reduced by rescission in fiscal year 2012.  AR3528.

II.      **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON APT'S CLAIMS CONCERNING THE CREDIT COUNCIL.**

A.    **APT Lacks Standing to Challenge Any Delays Attributable to the Credit Council, and Any Such Delays Would Constitute At Most Harmless Error.**

Although APT raises several allegations regarding the Credit Council's involvement in MarAd's decision, many of these claims merely challenge pre-decision procedural delays.  See Supp. Compl. ¶¶ 29-38 (alleging that the Credit Council delayed the processing of APT's application and the hiring of an IFA).  Such claims are not justiciable, either because APT lacks standing as to those claims or because the Credit Council's actions were, at most, harmless error.

A party seeking injunctive relief lacks standing to challenge procedural delays that were cured because no order the Court can hasten issuance of an administrative ruling that has already been issued.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 105-10 (1998) (finding that the injunctive relief sought was not redressable when defendant ceased the challenged activity before the complaint was filed).  Additionally, any alleged procedural deficiencies that were cured would (at most) constitute harmless error, and under the APA, remand is required only "when there is substantial doubt that the administrative agency would have reached the same result it did absent [the alleged error.]"  Chem. Waste Mgmt., Inc. v. EPA, 976 F.2d 2, 32 (D.C. Cir. 1992) (per curiam) (internal citation omitted); see 5 U.S.C. § 706 (in judicial review under the APA, "due account shall be taken of the rule of prejudicial error.").

These doctrines apply to Plaintiff's claims concerning any actions by the Credit Council that predated its review of the merits of APT's application in 2012.  Defendants do not dispute that the Credit Council raised concerns that postponed the processing of APT's application and the hiring of an IFA until September 2011.  See AR2868, 2871.  However, APT's application was eventually reviewed by an IFA, see AR2872, AR2978-3510, and evaluated by MarAd with

the benefit of Scully's IFA report, see AR3511-3532.  Thus, any pre-decision procedural delays

cannot entitle APT to the only type of relief it could receive in this action – a remand to re-

evaluate its application once more.  See Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744

(1985) ("If the record before the agency does not support the agency action . . . the proper

course, except in rare circumstances, is to remand to the agency[.]").  No relief the Court could

provide would redress the earlier delays; thus, APT lacks standing to challenge them.  Likewise,

although these initial delays meant that APT's application was pending for a longer period of

time, there is no indication that they materially affected its outcome.[17]

## B.  The Credit Council's Involvement in Title XI Applications Is Lawful.

Any alleged delays in processing APT's application – before MarAd denied APT's

applications - cannot form the basis for relief.  Accordingly, the only potentially justiciable

Credit Council claims concern whether the Credit Council lawfully conducted an advisory

review and recommendation on the merits of APT's application, at the direction of the Secretary

who retains plenary authority over MarAd and the Administrator.  Such claims must fail.

In its interlocutory order denying Defendants' motion to dismiss count two, the Court

found that amendments to Title XI adopted in 2006 and 2008, which authorize the Administrator

to make credit decisions of the sort challenged in this case, actually go farther and prohibit the

Secretary from requiring an advisory review and recommendation by the Credit Council prior to

the Administrator's final decision.  See Mem. Op. at 15-20.  Pursuant to Fed. R. Civ. P. 54(b),

which permits the Court to revise its interlocutory decisions "as justice requires" and if relief is

"necessary under the relevant circumstances," see supra at 14, Defendants respectfully request

that the Court revise its decision and find that these statutes do not prohibit the Credit Council's

---

[17] Rather, the evidence is to the contrary.  See, e.g., AR3516 (MarAd used original projected
closing date to determine if APT's ships would have been more than a year old at closing).

activities alleged in the Supplemental Complaint and evidenced in the record.

Under DOT Orders 2301.1, 2301.1A, and 2301.1B, the Credit Council reviews, and provides recommendations to MarAd on, Title XI applications. See AR3565, ¶ 9(a). Defendants do not dispute that the 2006 amendments to Title XI, see Pub. L. No. 109-163, 119 Stat. 3136, § 3507 (2006), granted the Administrator the sole authority to approve or deny Title XI applications. See ECF No. 18 at 23, ECF No. 22 at 16. However, the 2006 amendments did not divest the Secretary of any oversight role of the Title XI program, including the authority to require that applications be presented to the Credit Council for an advisory recommendation to foster "consistent credit policies and management practices across all DOT credit programs." AR3563. Congress should not be presumed to have taken such action without having done so explicitly, and neither the plain language nor the legislative history supports such a construction.

### 1. The Plain Language of the 2006 Amendments Lawfully Permits Activity by the Secretary and, Hence, the Credit Council.

Before passage of the 2006 amendments, "the Secretary" was authorized to make the relevant decisions regarding Title XI loan guarantees. E.g., 46 U.S.C. App. § 1273(a) (2005). The 2006 amendments made two changes. First, Congress re-defined "Secretary" so the term refers not to the Secretary of Transportation, but to the Secretary of Commerce with respect to applications pertaining to fishing vessels. See Pub. L. 109-163, § 3507(b)(1).[18] Second, Congress replaced the term "Secretary" in various locations with either "Secretary or [Maritime Administrator]" or simply "[Maritime] Administrator," see id. § 3507(a). As a result of these

---

[18] Previously, the statute defined "Secretary" as "the Secretary of Commerce with respect to fishing vessels and fishing facilities . . . and the Secretary of Transportation with respect to all other vessels and general shipyard facilities[.]" 46 U.S.C. App. § 1271(n) (2005). The 2006 amendments deleted the portion referencing the Secretary of Transportation. See Pub. L. No. 109-163, § 3507(b)(1).

somewhat opaque amendments, the Maritime Administrator is now the sole entity authorized by statute to render "[d]ecisions" on Title XI applications, i.e., to issue commitments to guarantee or enter into guarantees and to make the determinations necessary to do so.  See id. § 3507 (titled "Transfer of Authority for Title XI Non-Fishing Loan Guarantee Decisions to Maritime Administration" (emphasis added).  But the statute says nothing explicit about what authority the Secretary of Transportation – the Administrator's superior – has as to Title XI loan guarantees.

The statutes at issue (a) do not refer to the Credit Council, and (b) contain no express prohibitions on the Secretary's exercise of his authority, a point Plaintiff concedes.  See ECF No. 19 at 29 ("It might be possible to read the bare words of section 109 of title 49 and chapter 537 of title 46 and reasonably conclude that" the Credit Council may play a role in Title XI).  In the absence of an express prohibition, the statute can and must be read in harmony with the Secretary's plenary authority over MarAd and the Administrator.  See 49 U.S.C. §§ 109(b) (the Administrator "shall report directly to the Secretary of Transportation and carry out the duties prescribed by the Secretary"), 109(d) ("All duties and powers of the Maritime Administration are vested in the Secretary."); see also Parsons Steel, Inc. v. First Ala. Bank, 474 U.S. 518, 524 (1986) ("[W]henever possible, statutes should be read consistently.").  Such authority includes the ability to impose a requirement that the Credit Council review Title XI applications and provide a non-binding recommendation, while still leaving the decisions to the Administrator. This approach is consistent with the statutory change because it leaves the ultimate decision regarding an application to the Administrator.  There is nothing in the 2006 amendments that prohibits the Secretary from imposing pre-decisional review procedures or requiring the Administrator to consider a recommendation from the Secretary – from whom all his powers flow by act of Congress – through the Administrator's colleagues on the Credit Council.

34

Reading the statutory scheme in this fashion is consistent with two other principles of interpretation.  First, a court "'construing a statute [is] obliged to give effect, if possible, to every word Congress used.'"  <u>Murphy Exploration & Prod. Co. v. U.S. Dep't of Interior</u>, 252 F.3d 473, 481 (D.C. Cir. 2001) (quoting <u>Reiter v. Sonotone Corp.</u>, 442 U.S. 330, 339 (1979)).  Defendants' proposed construction, which gives meaning to both elements of the legislation – the part that gives the Administrator decisionmaking authority and the part that gives the Secretary oversight authority – does just that.  Second, "[t]he mere fact of [a statutory] amendment itself does not indicate that the legislature intended to change a law."  <u>Callejas v. McMahon</u>, 750 F.2d 729, 731 (9th Cir. 1984).  Particularly in light of the express congressional grant of authority to the Secretary to oversee the work of MarAd, it would be a mistake to find any congressional intention to limit the Secretary's authority in a manner that Congress did not expressly articulate.

## 2.   Congress Uses Express, Unambiguous Language When Divesting Department Heads of Authority Over Agency Components.

That Congress did not intend to render MarAd wholly independent of the Secretary and, hence, the Credit Council as to Title XI applications is confirmed by comparing the 2006 legislation and the Title XI statute to statutes that <u>do</u> create independence for components and processes within agencies.  Defendants previously cited two examples in DOT – the Federal Aviation Administration ("FAA") and the Surface Transportation Board ("STB") – that fit into the latter category.  <u>See</u> ECF No. 22 at 23-24; 49 U.S.C. § 106(f)(2)(D) (stating that the FAA Administrator "shall not be required to coordinate, submit for approval or concurrence, or seek the advice or views of the Secretary or any other officer or employee of the Department of Transportation on any matter with respect to which the Administrator is the final authority"); <u>id.</u> §§ 106(b); 106(f)(1) (stating that the Secretary controls the FAA "[e]xcept as provided" in the above provision); 49 U.S.C. § 703(c) ("In the performance of their functions, the members,

employees, and other personnel of the [STB] shall not be responsible to or subject to the

supervision or direction of any officer, employee, or agent of any other part of [DOT].").

But the FAA and STB are merely two examples of a Congressional intent to vest

exclusive decisionmaking authority in a component agency within a larger executive department.

Beyond DOT, the federal code contains numerous provisions evidencing explicit directives of

independence.  See, e.g., 10 U.S.C. § 139(c) (Director of Operational Test and Evaluation in

Department of Defense is "independent of . . . the Under Secretary of Defense for Acquisition,

Technology, and Logistics and all other officers and entities of the Department of Defense

responsible for acquisition"); 20 U.S.C. § 1098(b) ("Notwithstanding Department of Education

policies and regulations, the Advisory Committee [on Student Financial Assistance] shall exert

independent control of its budget allocations, expenditures and staffing levels, personnel

decisions and processes, procurements, and other administrative and management functions . . .

Reports, publications, and other documents of the Advisory Committee, including such reports . .

. shall not be subject to review by the Secretary.  The recommendations of the Committee shall

not be subject to review or approval by any officer in the executive branch, but may be submitted

to the Secretary for comment . . . "); 20 U.S.C. § 9621(f)(1) ("[T]he [National] Assessment

[Governing] Board shall be independent of the Secretary and the other offices and officers of the

Department [of Education]."); 28 U.S.C. § 594(i) (independent counsel is "separate from and

independent of the Department of Justice" with regard to specified purposes); 42 U.S.C.

§ 7172(g) ("The decision of the [Federal Energy Regulatory] Commission involving any

function within its jurisdiction . . . shall not be subject to further review by the Secretary or any

officer or employee of the Department [of Energy]."); 29 U.S.C. § 1302(d)(5)(B) ("the authority

of the General Counsel [of the Pension Benefit Guaranty Corporation] shall not extend to the

Office of Inspector General and the independent legal counsel of such Office.").

In these and other provisions, Congress has made component agencies independent from control by their parent departments through the use of direct, unambiguous language.  See City of Arlington, Tex. v. FCC, 133 S. Ct. 1863, 1868 (2013) ("Congress knows to speak in plain terms when it wishes to circumscribe . . . agency discretion.")  In stark contrast, no such direct or unambiguous language is present here.  Nor does the statute impose any restrictions or limitations on the Secretary's authority.  The contrasting provisions set forth above constitute compelling grounds for the Court to conclude that the statutory scheme adopted by Congress means what it says: the Administrator has statutory authority to make Title XI decisions, and the Secretary has statutory authority to direct the activity of his subordinate, the Administrator.

### 3. The 2006 Title XI Amendments Do Not Satisfy the Criteria For Repeal by Implication.

In its earlier interlocutory order, the Court recognized that its reading of the 2006 amendments would effect an implied repeal of 46 U.S.C. § 109(b) and (d) as to Title XI.  The Court recognized the "cardinal principle of statutory construction that repeals by implication are not favored," Randall v. Loftsgaarden, 478 U.S. 647, 661 (1986), but found that "absent an implied repeal of 49 U.S.C. § 109(b) and (d) as to the Title XI loan guarantee program, the 2006 and 2008 statutory amendments to the program are rendered superfluous."  Mem. Op. at 19-20.

The Court should revise this analysis for two reasons.  First, as discussed below, see infra § 5, the 2008 amendments were not substantive, but merely re-codified the 2006 amendments.  Thus, whether they were superfluous is irrelevant.  As to the 2006 amendments, Defendants' interpretation renders these amendments meaningful, since under Defendants' interpretation the Administrator may decide Title XI applications without a delegation from the Secretary and is the only federal official expressly vested with such authority – which was not the case before

2006.[19]  Moreover, repeal by implication is only justified "where provisions in the two acts are in

irreconcilable conflict" or "if the later act covers the whole subject of the earlier one and is

clearly intended as a substitute."  Kremer v. Chemical Const. Corp., 456 U.S. 461, 468 (1982)

(quoting Posadas v. Nat'l City Bank, 296 U.S. 497, 503 (1936)).  Neither of these elements is

met here.  There is no "irreconcilable conflict," as any perceived conflict can be reconciled by

reading the statute to say that the Administrator is authorized to decide and the Secretary retains

plenary power to oversee the relevant DOT operating administration, MarAd, and his

subordinate, the Administrator.  And the 2006 amendments clearly do not cover "the whole

subject" of 49 U.S.C. § 109.  Given that "Congress is normally expected to be aware of its

previous enactments and to provide clear statement of repeal if it intends to do so," Navegar, Inc.

v. U.S., 192 F.3d 1050, 1063 n.8 (D.C. Cir. 1999), the Court should not presume that Congress

took the unusual step of repealing § 109(b) and (d) by implication as to Title XI only.

### 4.   The Legislative History Does Not Support Plaintiff's Arguments.

While legislative history can be helpful in construing a statute, it cannot give meaning to

a statute that its text does not provide.  Accord Engine Mfrs. Ass'n v. U.S. E.P.A., 88 F.3d 1075,

1088-89 (D.C. Cir. 1996) ("[T]he court's role is not to 'correct' the text so that it better serves the

statute's purposes[.]").  As the Court noted in its earlier opinion, see Mem. Op. at 18, a

conference report related to the 2006 amendments stated that "'[t]he conferees intend for the

[Maritime Administration] to retain adequate resources with sufficient expertise to perform all

functions of this program without requiring assistance from the Department of Transportation or

other agencies.'"  Id. (quoting H.R. Conf. Rep. 109-360, at 906 (2005)) (emphasis added in

---

[19] Prior to 2006, the Maritime Administrator's authority to issue decisions on Title XI applications stemmed from a regulatory delegation of power.  See 49 C.F.R. § 1.66(e) (2005).

opinion).  Like the statute, this excerpt contains no expression of intent to prohibit oversight by

the Secretary and, hence, the Credit Council.  It does not state, for example, that "the conferees

intend for the Maritime Administration to perform all functions of this program independently of

oversight, control, or direction by the Department of Transportation."  Rather, the conferees

expressed their intention that MarAd "retain adequate resources" to perform its tasks "without

requiring assistance" from DOT.  Id. (emphasis added).  The most natural reading of this

language suggests that the conferees may have been concerned that MarAd did not have

adequate funding or staff to evaluate and decide Title XI applications properly – not that they

intended to remove the Secretary, the Administrator's superior, from the picture entirely.[20]

Importantly, to the extent that legislative history is relevant, the Court should also

consider the history of the Credit Council.  The Title XI program came under significant

criticism a decade ago for inadequate oversight in the wake of nine defaults on guarantee

commitments totaling over $1.3 billion, with the defaulted amounts totaling $489 million.  See

GAO, Weaknesses Identified in Management of the Title XI Loan Guarantee Program 1 (June 5,

2003), available at http://www.gao.gov/assets/110/109959.pdf; DOT Ofc. of the Inspector Gen.,

Title XI Loan Guarantee Program 3 (Mar. 27, 2003), available at

http://www.oig.dot.gov/sites/dot/files/pdfdocs/cr2003031.pdf (listing nine defaults from 1998-

2002).  The Credit Council, created in 2004, was intended to strengthen the management of Title

---

[20] This interpretation is supported by the contrast between the conference committee report and the Senate Commerce Committee report on S. 2029, the Maritime Administration Enhancement Act, which was eventually incorporated into § 3507.  The Commerce Committee "expect[ed] that the Title XI program remain exclusively within MARAD[.]"  Sen. Rep. No. 109-183 (2005). Notably, this "exclusiv[ity]" language was not used by the conference committee.  Cf. Hamdan v. Rumsfeld, 548 U.S. 557, 580 (2006) (finding that "Congress' rejection of the very language that would have achieved the result . . . urge[d] . . . weighs heavily against the [proposed] interpretation").  Ultimately, though, if these conflicting reports prove anything, it is that the Court should look not to the legislative history, but to the plain language of the codified statute.

XI and other DOT credit programs.  See DOT Order 2301.1 (Ex. A); DOT Ofc. of the Inspector

Gen., Title XI Loan Guarantee Program 15 (Sept. 28, 2004), available at

http://www.oig.dot.gov/sites/dot/files/pdfdocs/cr2004095.pdf ("The . . . Credit Council should

afford an excellent mechanism to ensure that the procedures developed by MARAD . . . provide

the intended benefits and risk reduction to the Title XI Loan Guarantee Program.").

In view of this reality, though Congress may have intended to reduce the Secretary's role

in Title XI, it did not go so far as to remove him from the process.  Doing so would have risked

returning to the days of minimal oversight of the Title XI program (a point conveniently ignored

by APT), when many guarantees were improvidently approved and went into default.  Rather,

the balance Congress struck, and which the Court should not upset, is that the Administrator is

the decisionmaker, but the Secretary, who remains vested with plenary power over MarAd and

its Administrator, retains authority to provide management and oversight, including the Credit

Council's advisory recommendations before applications are approved or denied by MarAd.[21]

### 5.  The 2008 Amendments and "Findings" Are Irrelevant and In Any Event Support Defendants' Position.

APT has also argued that the 2008 "amendments" to Title XI further support its position.

See Supp. Compl. ¶¶ 24-25.  APT is wrong.  The 2008 provisions it cites had no substantive

---

[21] That two divergent interests appear to have been at play provides a further reason for the Court to defer to the agency's interpretation:

> Congress intended to accommodate both interests, but did not do so itself on the level of specificity presented by these cases.  Perhaps that body consciously desired the Administrator to strike the balance at this level, thinking that those with great expertise and charged with responsibility for administering the provision would be in a better position to do so; perhaps it simply did not consider the question at this level; and perhaps Congress was unable to forge a coalition on either side of the question . . . .  For judicial purposes, it matters not which of these things occurred.

Chevron v. NRDC, 467 U.S. 837, 865 (1984); see infra § 7.

effect.  The amendments to Title XI transferring the Secretary's authority to the Administrator were passed in 2006.  <u>See</u> Pub. L. No. 109-163, § 3507.  However, they were enacted too late to be included in the codification of Title 46 later that year.  <u>See</u> Codification of Title 46, Pub. L. No. 109-304, 120 Stat. 1485 (2006).  Although the amendments were deemed effective, <u>see</u> <u>id.</u> § 18(a), Congress edited the re-codified statute in 2008 to reflect these changes, properly describing these edits as "Technical Corrections."  <u>See</u> National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, 122 Stat. 3 § 3522, (2008); <u>accord</u> H.R. Conf. Rep. 110-477 (2008), at 1305 ("[T]hese provisions are technical or clarifying in nature and are part of the ongoing work of the Office of Law Revision Counsel to complete the re-codification of title 46").[22]  Thus, APT's assertion that "Congress has twice passed legislation divesting the Secretary of … authority [over Title XI]," ECF No. 19 at 24, is doubly incorrect.  The legislation was passed only once, and did not, even that one time, divest the Secretary of any such authority.

Moreover, the Congressional "findings" from the 2008 statute regarding the "current process for review of applications for maritime loans [sic] in the Department of Transportation" on which Plaintiff has relied, <u>see</u> Supp. Compl. ¶¶ 24-25, and which the Court cited, <u>see</u> Mem. Op. at 17, were made not in connection with these "technical corrections."  Rather, Congress made these findings as a preface to a <u>separate</u> provision of Pub. L. No. 110-181 that required the Administrator to "develop and implement a comprehensive plan for the review of [Title XI applications]," <u>see</u> Pub. L. No. 110-181, § 3517.  Section 3517 made no changes to the role of the Secretary (or Credit Council) with respect to Title XI applications, and is thus irrelevant.

To the extent that the 2008 legislation is relevant, it buttresses Defendants' position.

---

[22] H.R. Conf. Rep. 110-477 pertained to H.R. 1585, which was vetoed.  Eventually, H.R. 4986, a nearly identical bill, became Pub. L. No. 110-181; that bill has no separate legislative history.

Plaintiff contends that the "current process for review of [Title XI] applications," described in Pub. L. 110-181 § 3517 as having "effectively discontinued the program as envisioned by the Congress," referred in part to the Credit Council.  Suppl. Compl. ¶ 25.  The Credit Council has played a role in the review of Title XI applications since its establishment in 2004.  See DOT Order 2301.1 ¶ 8 (Ex. A).  If Congress truly intended in 2006 to prohibit the Secretary from participating in the Title XI application process, why – notwithstanding the Secretary's continued participation in that process – would Congress have merely re-codified these same provisions in 2008?  Congress could have passed legislation making its intent clear, or at minimum could have clearly stated its understanding of the previously-enacted provisions.  But Congress did neither and has taken no action since, despite DOT's twice re-affirming the role of the Credit Council, first in 2009 and then in 2010.  See DOT Order 2301.1A, AR3563-3567; DOT Order 2301.1B, ECF No. 18-2.  This is further proof that Congress did not intend for the 2006 amendments to divest the Secretary and Credit Council of any role in Title XI applications. See Kucana v. Holder, 558 U.S. 233, 250 (2010) (interpreting "the Legislature's silence" as meaning that "Congress left the matter where it was" before a statutory amendment).

### 6.  Plaintiff Bears the Burden to Show that the Secretary Lacked Authority to Direct the Credit Council to Review Title XI Applications.

It is Plaintiff, not Defendants, that has the burden of making its case, particularly at the summary judgment stage.  But cf. Mem. Op. at 20 (denying motion to dismiss, noting that Defendants did not identify authority by which the Secretary could require Credit Council review of Title XI applications).  Placing the burden on Defendants would be improper because in an APA case, "the party challenging an agency's action as arbitrary and capricious bears the burden of proof."  Lomak Petroleum, Inc. v. FERC, 206 F.3d 1193, 1198 (D.C. Cir. 2000) (internal citation omitted).  But even if Defendants did have some burden, they have certainly met it here

by citing the Secretary's plenary authority over DOT, including MarAd, 49 U.S.C. § 109(b), (d). Indeed, not only is the Secretary <u>authorized</u> to supervise MarAd as to Title XI applications, but the Executive "is bound to avail himself of every appropriate means [to execute the laws] not forbidden by law." <u>United States v. Tingey</u>, 30 U.S. (5 Pet.) 115, 122 (1831).  It is <u>APT</u> that must identify authority "forbid[ding]" the Secretary from establishing the advisory procedures at issue.

### 7.  If the Court finds the Statutory Language Ambiguous, It Should Defer to Defendants' Reasonable Interpretation.

As explained above, the statutes at issue unambiguously retain the Secretary's discretion to supervise the Administrator and policies relating to DOT credit programs, including Title XI, through the Credit Council.  Consequently, the Court's analysis need go no further.  See <u>United States v. Gonzales</u>, 520 U.S. 1, 8 (1997) ("Where there is no ambiguity in the words, there is no room for construction.").  In the alternative, the 2006 amendments are at most ambiguous, and the Court should defer to Defendants' reasonable interpretation.

When a statute is "silent or ambiguous" about a matter, courts must defer to an agency's interpretation as long as it is reasonable.  See <u>Chevron</u>, 467 U.S. at 842-44; <u>see also</u> <u>Dep't of the Treas. v. Fed. Labor Relations Auth.</u>, 494 U.S. 922, 928 (1990) (agency's interpretation must be upheld unless "flatly contradicted" by the plain language).  Such deference applies to statutes concerning "the <u>scope</u> of the agency's statutory authority (that is, its jurisdiction)."  <u>City of Arlington</u>, 133 S. Ct. at 1868, including "statutes designed to <u>curtail</u> the scope of agency discretion."  <u>Id.</u> at 1872 (emphasis in original).  Finally, <u>Chevron</u> deference applies even to agency interpretations that are not issued in the context of a formal rulemaking or adjudication if the agency is authorized to promulgate rules with the force of law.  See <u>Barnhart v. Walton</u>, 535 U.S. 212, 221-22 (2002) (applying <u>Chevron</u> deference to interpretation made through means less formal than notice-and-comment rulemaking).

Such deference is appropriate here.  The Secretary is expressly authorized to promulgate rules with the force of law.  See 49 U.S.C. § 322.  The 2006 amendments are "silent" about the issue at hand, neither mentioning the Credit Council nor expressly prohibiting conduct by the Secretary.  And the Secretary's interpretation of the statute is evidenced in two orders post-dating the 2006 amendments that set forth the responsibilities of the Credit Council, including a required advisory review of Title XI applications.  See DOT Order 2301.1A, AR3563-3567; DOT Order 2301.1B, ECF No. 18-2.  DOT's interpretation that the Secretary retains the authority to require referral of Title XI applications to the Credit Council is not "flatly contradicted" by the amended statute and should be validated by this Court.[23]

Even if a lesser level of deference or "respect" to DOT's interpretation applies, see Skidmore v. Swift, 323 U.S. 134, 140 (1944), that interpretation should still be upheld.  Agency orders such as those setting forth the Credit Council's responsibilities "reflect 'a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'"  Fed. Express Corp. v. Holowecki, 552 U.S. 389, 399 (2008) (quoting Bragdon v. Abbott, 524 U.S. 624, 642 (1998)).  That DOT has consistently required Title XI applications to be referred to the Credit Council since its formation also weighs in favor of the persuasiveness of DOT's interpretations.  See id. at 399 (one factor a court may consider is "whether the agency has applied its position with consistency").  Thus, if the Court finds the provisions here ambiguous, it is Defendants' reasonable interpretation – not Plaintiff's self-serving construction – that must prevail.  The Court should not construe a statute to place severe limits on Executive

---

[23] Although the Credit Council orders do not explicitly reference the 2006 amendments or 46 U.S.C. § 109, they should be understood to reflect DOT's interpretations of the statutes it is entrusted to administer.  See Managed Pharmacy Care v. Sebelius, 705 F.3d 934, 946 (9th Cir. 2012) (agency's "implicit interpretation" of a statute may be expressed through its "explicit determination[s]" in making specific decisions).

decisionmaking that Congress has not explicitly imposed.  Accord Orum v. C.I.R., 412 F.3d 819, 821 (7th Cir. 2005) (the "Judicial Branch does not instruct the Executive Branch how to make executive decisions.") (citing Norton v. S. Utah Wilderness Alliance, 542 U.S. 55 (2004)).[24]

### C.  The Credit Council's Recommendations Were Advisory.

If the Court revises its interlocutory decision and agrees with Defendants' interpretation of the statutes allocating decisionmaking and oversight authority between the Maritime Administrator and the Secretary, the only question remaining is whether the Secretary or Credit Council was the final decisionmaker on APT's application in contravention of the 2006 amendments.  On that point, the Administrator's decision letters are clear: his review of the merits of APT's application was "informed by, but not dependent upon, the Credit Council's recommendation." AR3513, 3522.   Based on this representation by the Administrator, which is entitled to a presumption of regularity, see Postal Serv. v. Gregory, 534 U.S. 1, 10 (2001), and absent evidence to the contrary, Defendants are entitled to summary judgment on Count Two.

### CONCLUSION

For the foregoing reasons, summary judgment should be granted to Defendants.

---

[24] The "Take Care" Clause of the Constitution makes it the President's duty to "take Care that the Laws be faithfully executed." U.S. Const. Art. II, § 3; see Free Enterprise Fund v. Public Co. Accounting Oversight Bd., 130 S. Ct. 3138, 3152 (2010) ("Article II confers on the President 'the general administrative control of those executing the laws.'") (quoting Myers v. United States, 272 U.S. 52, 164 (1926)).  Likewise, the President must have "sufficient control over [entities within the Executive Branch] to ensure that [he] is able to perform his constitutionally assigned duties."  Morrison v. Olson, 487 U.S. 654, 695-96 (1988), and acts of one branch of government may not "impermissibly undermine" the powers of another, CFTC v. Schor, 478 U.S. 833, 856 (1986).  Even if Congress might, if it so chooses, create some measure of independence for MarAd, in the absence of explicit statutory language doing so, a judicial order that divests a cabinet Secretary of any role in a process by which an agency component disburses hundreds of millions of dollars significantly undermines the power of the Executive to make consistent and informed policy decisions.  If the Secretary's authority is to be cabined in this manner, such a directive should come from a clear and explicit statutory restriction.

Dated: July 9, 2013                    Respectfully submitted,


                                       STUART F. DELERY
                                       Principal Deputy Assistant Attorney General

                                       JUDRY L. SUBAR
                                       Assistant Branch Director

                                       */s/ Jesse Z. Grauman*
                                       JESSE Z. GRAUMAN (Va. Bar No. 76782)
                                       U.S. Department of Justice
                                       Civil Division, Federal Programs Branch

                                       Mailing Address:
                                       Post Office Box 883
                                       Washington, D.C.  20044

                                       Courier Address:
                                       20 Massachusetts Ave., N.W., Room 5374
                                       Washington, D.C. 20001
                                       Telephone:      (202) 514-2849
                                       Fax:            (202) 305-8517
                                       Email:          jesse.z.grauman@usdoj.gov

                                       Counsel for Defendants