# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AMERICAN PETROLEUM TANKERS PARENT LLC,   )
)
      *Plaintiff,*   )
)
      *v.*   )      Civil Action No. 12-1165-CKK
)
THE UNITED STATES OF AMERICA, *ET AL.*,   )
)
      *Defendants.*   )
)

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REVISION OF INTERLOCUTORY ORDER

Michael Joseph (DC Bar No. 6593)
Alex Blanton (DC Bar No. 169623)
Joseph O. Click (DC Bar No. 417294)
 Blank Rome LLP
 600 New Hampshire Ave. NW
 Washington, D.C.  20037
 (202) 772-5966
 click@blankrome.com

*Counsel for Plaintiff*

August 8, 2013

## TABLE OF CONTENTS

Page

Table of Contents ...................................................................................................i

Table of Authorities ..............................................................................................iii

Introduction ............................................................................................................1

The Relevant Statute and Regulations ..................................................................3

Statement of Facts ..................................................................................................5

    A.  The Initial Processing of APT's Application ...........................................5

    B.  The First Financial Analysis of the Application ......................................7

    C.  The Continued Processing of the Application..........................................11

    D.  The August 2012 Denial of APT's Application........................................17

    E.  The Processing of APT's Amended Application .....................................18

    F.  The November 2012 Denial of the Amended Application.......................22

Standard of Review................................................................................................24

Argument ...............................................................................................................26

I.    Defendants' Economic Soundness Determinations Are Unsupported
      by the Record and Are Arbitrary, Capricious and Contrary to Law.........................26

    A.  Defendants' Reliance on Net Losses Contravened MarAd's
        Regulations...............................................................................................27

    B.  Defendants' Reliance on APT's Purported Inability to Meet its
        Interest Payments Ignored MarAd's Regulations and Was
        Unsupported by the Record .....................................................................28

    C.  Defendants' Determination that APT Did Not Satisfy the DSCR
        Criterion Contravened MarAd's Regulation and Is Unsupported
        by the Record ...........................................................................................31

    D.  Defendants' Determination that there was Insufficient Demand
        For APT's Vessels Is Unsupported by the Record ..................................36

II.   Defendants' Priority Determinations Are Unsupported by the Record
      and Arbitrary, Capricious and Contrary to Law ....................................................42

III.   Defendants' Exhaustion-of-Funds Rationale Is Arbitrary, Capricious and Contrary to Law ...................................................................................45

IV.   The DOT Credit Council Unlawfully Controlled both the Administrator's Decision-Making Process and His Decision ................................49

    A.   The Credit Council Unlawfully Controlled the Administrator's Decision-Making Process ................................................................50

    B.   The Credit Council Unlawfully Controlled the Administrator's Decision ................................................................................53

        1.   Even if the Credit Council's Input Had Been Advisory, It Unlawfully Infected the Administrator's Decision with DOT's Extra-Legal, Non-public Credit Policies.....................................................53

        2.   The Credit Council's Input Was Not Advisory; It Effectively Vetoed the Administrator's Decision to Approve APT's Application and Forced Him to Deny It ......................................................54

Conclusion ...............................................................................................59

Appendix..................................................................................................60

## TABLE OF AUTHORITIES

**Page**

CASES

*Algonquin Gas Transmission Co. v. FERC*, 938 F.2d 1305 (D.C. Cir. 1991) .........................25, 28

*American Iron and Steel Institute v. OSHA*, 939 F.2d 975 (D.C. Cir. 1991) ...............................26

*ATX, Inc. v. United States Dep't of Transp.*, 41 F.3d 1522 (D.C. Cir. 1994) ...............................58

*D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231 (D.C. Cir. 1972) ..........................................58

*Dickson v. Secretary of Defense*, 68 F.3d 1396 (D.C. Cir. 1995) ....................................................24

*Environmental Defense Fund v. EPA*, 852 F.2d 1316 (D.C. Cir. 1988) ........................................24

*Estate of Gaither v. District of Columbia*, 771 F. Supp. 2d 5 (D.D.C. 2011) ..............................50

*In re Enron Corp. Sec. Litig.*, 2010 WL 9077875 (S.D. Tex. Jan. 19, 2010) ................................27

*Jarrott v. Scrivener*, 225 F. Supp. 827 (D.D.C. 1964) ....................................................................52

*Liberty Maritime Corp. v. United States*, 928 F.2d 413 (D.C. Cir. 1991) ....................................45

*Lincoln v. Vigil*, 508 U.S. 182 (1993) .............................................................................................47

*Morton v. Ruiz*, 415 U.S. 199 (1974) ..............................................................................................48

*National Maritime Safety Ass'n v. OSHA*, 649 F.3d 743 (D.C. Cir. 2011) ...................................26

*NetworkIP, LLC v. FCC*, 548 F.3d 116 (D.C. Cir. 2008) ...............................................................25

*Otay Mesa Property, LP v. United States Dep't of the Interior*,
    646 F.3d 914 (D.C. Cir. 2011) ....................................................................................................26

*Owner-Operator Independent Drivers Ass'n v. Federal Motor Carrier Safety Admin.*, 494
    F.3d 188 (D.C. Cir. 2007) .....................................................................................................24, 33

*Peter Kiewit Sons' Co. v. United States Army Corps of Eng'rs*,
    714 F.2d 163 (D.C. Cir. 1983) ....................................................................................................58

*Reuters Ltd. v. FCC*, 781 F.2d 946 (D.C. Cir. 1986) .....................................................................25

*Rossello v. Astrue*, 529 F.3d 1181 (D.C. Cir. 2008) ......................................................................25

*Safe Extensions, Inc. v. FAA*, 509 F.3d 593 (D.C. Cir. 2007) .......................................................25

iii

*Service v. Dulles*, 354 U.S. 363 (1957)..........................................................................25

*Siegel v. SEC*, 592 F.3d 147 (D.C. Cir. 2010) ..............................................................26

*Smith v. Astrue*, 2013 WL 1290990 (D.D.C. March 30, 2013) ....................................26

*Van Dyke v. NTSB*, 286 F.3d 594 (D.C. Cir. 2002) .......................................................25

*In re Vivendi Universal, S.A. Sec. Litig.*, 605 F. Supp. 2d 586 (S.D.N.Y. 2009) ..........27

*Western Resources, Inc. v. FERC*, 9 F.3d 1568 (D.C. Cir. 1993)...................................24

## STATUTES AND SESSION LAWS

5 U.S.C. § 706(2) ...........................................................................................................24

46 U.S.C. §§ 53701, *et seq.*............................................................................................3

46 U.S.C. § 53702(a) ......................................................................................................51

46 U.S.C. § 53704(c)(3)(D) ............................................................................................46

46 U.S.C. § 53706(c) ..........................................................................................4, 42, 43

46 U.S.C. § 53708(a) .......................................................................................................3

46 U.S.C. § 53708(d) ................................................................................................5, 51

46 U.S.C. § 53709(b)(2) ..................................................................................................5

46 U.S.C. 53710(a)(3)(A) ..............................................................................................43

Pub. L. No. 109-304, 120 Stat. 1485 (Oct. 6, 2006) .......................................................3

## RULES AND REGULATIONS

Federal Rules of Civil Procedure, Rule 54(b)..................................................................49

Federal Rules of Civil Procedure, Rule 56(d)..................................................................56

46 C.F.R. § 298.3(b)(2)....................................................................................................37

46 C.F.R. § 298.3(k)(1)....................................................................................................42

46 C.F.R. § 298.13(h).......................................................................................................29

46 C.F.R. § 298.14 .......................................................................................................3, 26

46 C.F.R. § 298.14(a)........................................................................................................3

46 C.F.R. § 298.14(b)(2) ........................................................................................37

46 C.F.R. § 298.14(c)(3)(iv) ...................................................................................37

46 C.F.R. § 298.14(c)(3)(v) ....................................................................................37

46 C.F.R. § 298.14(d) .................................................................................4, 31, 36

46 C.F.R. § 298.14(d)(1) ............................................................................4, 37, 38

46 C.F.R.§ 298.14(d)(4) ............................................................................... passim

46 C.F.R. § 298.17(a) ......................................................................................5, 42

46 C.F.R. § 298.17(a)(4) ........................................................................................43

46 C.F.R. § 298.35(b)(2) ...................................................................................6, 29

### ADMINISTRATIVE ORDERS

*Final Text of Voluntary Tanker Agreement*, 73 Fed. Reg. 521692, 51659 (Sept. 4, 2008) ...........43

Department of Transportation Credit Council Guidelines,
DOT Order 2301.1B .............................................................................53, 54

Maritime Administrative Order (MAO) 520-1, as amended, (April 17, 1997). ........................4, 38

### OTHER AUTHORITIES

American Bar Foundation, *Commentaries on Indentures*, § 101-12 at 404-10 ............................33

Maritime Administration, Coastal Tank Vessel Market Snapshot,
http://www.marad.dot.gov/documents/Coastal_Tank_Vessel_Market_Snapshot.pd .............40

Maritime Administration, List of Pending Title XI Applications,
http://www.marad.dot.gov/documents/Current_Pending_List_.pdf .......................................47

Maritime Administration, News Release No. DOT-83-11 (July 8, 2011), *U.S. Maritime
Administration Approves Title XI Ship-Construction Loan Guarantee for New York
Based Shipholding Group* ...........................................................................................46

Maritime Administration, Voluntary Tanker Agreement, http://www.marad.dot.gov/
ships_shipping_landing_page/national_security/Voluntary_Tanker_Agreement-
landing_page.htm ...........................................................................................................43

Military Sealift Command, Inventory of Ships, http://www.msc.navy.mil/inventory/
ships.asp?ship=207 ........................................................................................................41

## INTRODUCTION

Plaintiff, American Petroleum Tankers Parent LLC (APT), seeks review of final actions of the Maritime Administrator denying its application and amended application for loan guarantees under Title XI of the Merchant Marine Act, 1936, as amended, to refinance the construction of five newly built oil tankers.

The Administrator's denial of the original application was based primarily on his determination that APT's project was not economically sound.  His decision, however, failed even to acknowledge that his agency's independent financial consultant had, in a thorough analysis of APT's project, reached the opposite conclusion, not only when using what it found to be APT's "reasonable" projections and assumptions, but also when using the consultant's much more conservative projections and assumptions.  The Administrator's conclusion was based on his own superficial page-and-a-half analysis that was not only economically flawed, but violated MarAd's own regulations in three fundamental respects.  First, the Administrator evaluated APT's financial performance using net income rather than operating cash flow as required by MarAd's regulations.  Second, he found APT's project "dis-economic" because of the interest payable on its sponsor debt, even though that interest was not payable in cash (*i.e.*, APT had the right to pay interest by issuing additional debt), would in any event be fully subordinated to the Title XI debt and qualified for treatment as equity under MarAd's regulations, and APT had already committed to converting the debt to equity, thus eliminating any concern about this debt.  Third, the Administrator found APT's viability questionable because the terms of its current tanker charters were not commensurate with the 20-year term of the requested guarantees, ignoring (a) MarAd's internal regulations, which require the use of market estimates "[i]n the absence of long-term [vessel] employment contracts," (b) its own industry expert's positive

market projections, and (c) the undisputable fact that no tanker application approved by MarAd during the past 39 years has had a full-guarantee-term charter.

The denial of the amended application was also based primarily on economic soundness grounds. While the Administrator continued to ignore the conclusion of his independent financial consultant, which had provided a supplemental report reaching the same favorable conclusions as its original report, this time he recognized that the regulations required an analysis of projected operating cash flow. His denial letter thus referred to previously non-public MarAd staff projections that he said caused "grave concern" because they indicated that during "almost half" the guarantee period APT would not have a debt service coverage ratio of 1.5-to-1, which, according to his letter, the independent financial consultant had suggested as "the appropriate standard by which to measure the adequacy of APT's cash flow." In fact, the consultant had made no such suggestion, but had merely recommended that MarAd should restrict APT from paying dividends when the ratio fell below 1.5-to-1. More importantly, MarAd's own regulations require only that the ratio exceed 1-to-1, which was fully satisfied even under the MarAd staff projections.

This memorandum will demonstrate that both determinations, in these and all other respects, were arbitrary, capricious and otherwise not in accordance with law, primarily because they (1) are unsupported by substantial evidence, (2) are contrary to the Title XI statute and the agency's own regulations, and (3) were unlawfully influenced by the Department of Transportation Credit Council, whose lack of authority with respect to Title XI was addressed by the Court in its denial of defendants' motion to dismiss. Indeed, the explanations for the denials are so lacking in reasoned analysis and support in the record that they serve as independent evidence that they are mere pretexts for the true reason for the denial—the Credit Council's

unlawful determination to exclude APT from the Title XI program because it is owned by

investment funds managed by a private equity company, as the Administrator had stated to APT

on four separate occasions.[1]

## THE RELEVANT STATUTE AND REGULATIONS

The Title XI loan guarantee program was established by Congress in 1936 to encourage

the growth and modernization of the U.S. merchant marine and to support U.S. shipyards by

making federally backed loan guarantees available to shipowners for the purpose of financing or

refinancing the construction of vessels in U. S. shipyards.[2]  Title XI provides that the Maritime

Administration (MarAd) may not issue such guarantees unless it finds that the project is

"economically sound," 46 U.S.C. § 53708(a), as do MarAd's implementing regulations, 46

C.F.R. § 298.14(a).  Accordingly, MarAd's regulations require a Title XI applicant to submit

substantial information concerning its project and its economic characteristics, including the

need in the specific market for new or additional capacity, the market potential for the vessels,

the revenues and expenses associated with operating the vessels, and any vessel charters or other

transportation agreements relevant to their employment.  *See* 46 C.F.R. § 298.14; *see also* 46

U.S.C. § 53708(a).  Its administrative orders provide that in its evaluation of applications,

> [i]n the absence of long-term [vessel] employment contracts, revenue shall be
> predicated on the estimates of supply-demand conditions . . . by industry experts,
> government experts, and other sources of objective data . . . .

---

[1]  Three of those occasions occurred between May 2012 and July 2012, the latter just
weeks before the first denial letter, but neither decision letter contains any reference to this issue
even though it was seemingly the most prevalent objection to the APT application raised
repeatedly by the Credit Council.

[2]  Although Title XI, as amended, was codified and enacted into positive law as 46
U.S.C. §§ 53701-35 (by Pub. L. No. 109-304, 120 Stat. 1485 (Oct. 6, 2006)), the program is still
commonly known as, and the relevant regulations (46 C.F.R. part 298) still refer to, Title XI loan
guarantees or Title XI financing.

3

Maritime Administrative Order (MAO) 520-1, as amended, § 3.02(3) (April 17, 1997).[3]

According to its regulations, MarAd is supposed to evaluate a project's economic soundness using "Objective Criteria." 46 C.F.R. § 298.14(d).  In particular, MarAd requires that the projected long-term demand (equal to the length of time for which guarantees are requested) "exceed the supply of similar vessels ... in the applicable markets."  *Id.*, § 298.14(d)(1).  The regulations also provide that, with respect to the financial aspects of the project,

> The operating cash flow to Obligation debt service ratio over the term of the Guarantee must be in excess of 1:1.  Operating cash flow means revenues less operating and capital expenses including taxes paid but exclusive of interest, accrued taxes, depreciation and amortization for the Title XI asset.  Debt service means interest plus principal.

*Id.*, § 298.14(d)(4).  The Administrative Order prescribing the process for evaluating Title XI applications further mandates that "primary consideration" is to be given to this ratio.  MAO 520-1, *supra*, at § 3.02(5) (April 17, 1997).

Title XI also provides a statutory priority for funding to certain vessels.  Specifically, "[i]n guaranteeing or making a commitment to guarantee an obligation . . . the Administrator shall give priority to" vessels that are suitable for service as naval auxiliaries in time of war or national emergency, as determined by the Secretary of Defense.  46 U.S.C. § 53706(c).  MarAd's regulations identify evaluation criteria, other than those concerning economic soundness, that MarAd will use, including

1. The capability of the Vessel(s) serving as a naval and military auxiliary in time of war or national emergency.

2. The financing of the Vessels(s) within one year after delivery.

---

[3] This Order is exhibit 1 to the Declaration of Jean E. McKeever.  ECF Doc. No. 60-3.  It is also available at http://www.marad.dot.gov/about_us_landing_page/ freedom_of_information_act/foia_elec_reading_room/foia_mao/Administrative_Orders.htm.

3. The acquisition of Vessel(s) currently financed under Title XI by assumption of the total obligation(s).

4. The Guarantees extend for less than the normal term of loans for that class of vessel.

46 C.F.R. § 298.17(a).

The Title XI statute authorizes MarAd to obtain an "independent analysis" of an application, but only where it determines "that aspects of [the] application … require independent analysis to be conducted by third party experts due to risk factors associated with markets, technology, or financial structures." 46 U.S.C. § 53708(d). Such a determination presupposes that MarAd requires outside expertise to supplement its in-house capability to make such an analysis.

## STATEMENT OF FACTS

### A. The Initial Processing of APT's Application.

APT is majority-owned by investment funds managed by The Blackstone Group LLP, a publicly traded private equity company that was formed and began operations in 2006. On August 30, 2010, APT filed its application for an aggregate of $470 million of Title XI loan guarantees to refinance indebtedness incurred to construct five new petroleum tankers operating in the U.S. coastwise trade, commonly called the Jones Act trade. The requested guarantees would cover approximately 70% of the "actual cost" of the five vessels, well below the 87.5% that MarAd is authorized to guarantee. 46 U.S.C. § 53709(b)(2). APT's application sought a guarantee for a term of 25 years, the maximum term authorized by Title XI and the normal guarantee term for this class of vessel. *See* 46 U.S.C. § 53709(b)(2); 46 C.F.R. § 298.20(a)(2). APT thereafter provided MarAd with additional information it had requested, and in December 2010 MarAd considered APT's Title XI application to be complete. Administrative Record (AR) 3511.

Although neither the statute nor MarAd's regulations require MarAd to obtain an

independent financial analysis of a Title XI applicant's project, the guidelines of the Department

of Transportation Credit Council, because APT had less than five years of operating experience,

required such an analysis of APT's application. AR 2865, 2817. The guidelines also required

MarAd to obtain the Council's authorization before it could retain an expert to provide the

analysis. MarAd first sought such authorization at the Credit Council's March 2011 meeting, but

the Credit Council denied MarAd's request based on the Credit Council's concern that APT is

owned by private equity entities, a concern about these owners' long-term commitment to APT's

business, and APT's purportedly high debt-to-equity ratio. AR 1704-07, 2866, 2871.[4]

On March 16, 2011, APT wrote the Maritime Administrator, at his request, addressing

the private equity issue raised by the Credit Council and requesting a meeting with the Deputy

Secretary of Transportation who chaired the Credit Council. AR 1703-07. It was not until six

months later, however, that the Deputy Secretary agreed to meet with APT. At their September

11, 2011 meeting APT attempted to gain the Deputy Secretary's support in getting the Credit

Council's authorization for MarAd to obtain the required independent financial analysis of

APT's application. AR 1714-16; 2438-39; Declaration of Robert K. Kurz (Kurz Decl.), ¶¶ 19-

20.[5] As a result of that meeting, APT understood that it had resolved the Deputy Secretary's and

---

[4] As the Court will recall, the role of private equity companies was a major political issue
during the campaigns preceding the 2012 presidential election. The administrative record
contains no documents showing the basis for the Credit Council's concerns, and they are hard to
understand. The record does contain substantial information about Blackstone's significant
investment in APT and the role that private equity had played in the maritime industry in the past
eight years. AR 1704-07. APT's long term debt-to-equity ratio was 1.69:1 based on a $470
million guarantee amount (AR 110), well within the 2:1 ratio permitted by MarAd's regulations.
46 C.F.R. § 298.35(b)(2). Moreover, the record nowhere indicates why an independent financial
analysis would not address any issues raised by such a ratio.

[5] ECF Doc. No. 4-2. APT finds it necessary to support its statement of facts related to
the actions of the Credit Council with citations to the Declaration of Mr. Kurz, APT's Chief

Credit Council's objections about APT's private equity ownership and that the Deputy Secretary would support submitting the APT application for independent financial analysis. AR 2438-39; Kurz Decl., ¶¶ 20, 21, 26. Also as a result of that meeting, APT reduced the amount of the guarantees sought from $470 million to $400 million (approximately 60% of the vessels' cost) and reduced the guarantee period from 25 to 20 years to alleviate any funding concerns and further improve its application's economic soundness. AR 1714-18; Kurz Decl., ¶ 19.

Following APT's meeting with the Deputy Secretary, MarAd again sought the Credit Council's authorization to obtain an independent financial analysis of APT's application. Its "Official Request to Hire an External Financial Advisor" noted that Credit Council guidelines specific to the Title XI program "required" an independent review, that the Credit Council had "denied MARAD's prior request" and that "[a]pproval of this request will permit MARAD to continue processing of this application," confirming that all work on APT's application had ceased after the Credit Council's denial of MarAd's request for authorization six months earlier. AR 2870-71. On September 21 the Credit Council finally authorized MarAd to retain an independent financial analyst (IFA). AR 2868, 2872.

### B. The First Financial Analysis of the Application.

MarAd retained Scully Capital Services, Inc. as its IFA "to provide an independent evaluation of the financial capability of the Applicant, the economic soundness of the Project and the viability of the Applicant's proposed financial plan." AR 2872-73, 2980; *see also* AR 2987, 3161, 3168, 3338, 3345. Scully submitted a draft report on January 12, 2012 (which it finalized

---

Executive Officer, because the Credit Council's record of its actions related to APT's application have not been included in the Administrative Record, which therefore does not fully disclose the facts underlying APT's claim that the Credit Council unlawfully controlled the Administrator's processing of APT's application and his decision on that application.

in June 2012).  While APT's application was deemed complete in December 2010, this is the

first financial analysis of APT's application by or on behalf of MarAd contained in the record.

Scully's "Financial Capability Analysis" found that "the Applicant has performed well

under challenging market conditions" (AR 2998, 3179) and its "financial condition is healthy

despite the performance suggested by the income statement" (AR 3005, 3186).[6]  It analyzed the

projected financial results under various assumptions, discussed below, to determine APT's debt

service coverage ratio for each year that the guaranteed debt would be outstanding.  Scully's debt

service coverage ratio ("DSCR") is the ratio of operating income to the sum of the debt payments

actually due and is virtually identical to the debt service ratio that is to be given "primary

consideration" under MarAd's regulations.[7]  For the "supply-demand" estimates contemplated

by the regulations, Scully retained an industry expert, Wilson Gillette & Co., to provide a

detailed study of the Jones Act petroleum tanker market (AR 3036-52), which Scully described

as "an excellent overview of the market for transporting refined petroleum products and similar

liquid cargo in the coastwise trade within and around the U.S."  AR 3196, 3369.

Using the assumptions and projections provided by APT, Scully first found that the

DSCR for the period 2012 to 2021 would average 2.43:1 (*i.e.*, APT would generate 143% more

revenue than was necessary to service its debt) with the lowest DSCR being 1.43:1 in 2012, and

the DSCR exceeding 2:1 in 2015 and thereafter—all far in excess of MarAd's required 1:1.  AR

---

[6]  Scully also noted that APT's "capital structure includes significant debt and PIK interest which is leading to sizable book and tax losses." AR 3005, 3186.  In the August letter, the defendants ignored the distinction between operating revenue (as defined in MarAd's regulations) and "book and tax losses."

[7]  Scully defines operating income as EBITDA, *i.e.*, gross revenues minus operating expenses, but not including debt payments to be serviced, accrued (but unpaid) taxes, and non-cash items such as depreciation and amortization.  See AR 3002-03, 3005, 3183-84, 3186. MarAd's regulations define "operating cash flow" as "revenues less operating and capital expenses including taxes paid but exclusive of interest, accrued taxes, depreciation and amortization for the Title XI asset."  *See* 46 C.F.R. § 298.14(d)(4).

3023.  While Scully found APT's assumptions and projections to be "reasonable" (AR 3020,

3022, 3201, 3203), it also analyzed a so-called "Lender's Case," using substantially more

conservative assumptions.  First, Scully assumed that 2012 charter rates would be $38,500/day, a

discount of almost 30% from the $55,000/day rate projected by Scully's industry market expert

and the actual market rates in early 2012.[8]  The Lender's Case also (a) increased APT's projected

annual "off-hire" (i.e., idle) days from 7 to 10 days per vessel for vessels under 10 years of age

and from 7 to 14 days for those aged 11 to 20 years, (b) assumed operating expenses would

escalate at 3% per year, a rate that was higher than its assumed 2.5% rate of inflation, and (c)

assumed that APT would not earn any interest on cash balances it maintained with financial

institutions.  AR 3025-26, 3206.

Applying these conservative assumptions to MarAd's requirement of a 1:1 DSCR over

the term of the proposed $400 million in guarantees, Scully found in its January and June

Reports that average DSCR over the 20-year term of the guarantees would be 1.21:1 and 1.27:1,

respectively.  AR 3026, 3207.  Even under these conservative assumptions, Scully found that

"The analysis supports a conclusion that the Project is economically feasible.  While the

Lender's Case suggests the need for additional protections, the Project economics and market

application appear feasible."  AR 3032, 3215.

---

[8]  The AR indicates that the daily charter rate of $38,500 upon which the Lender's Case
was based was a one-time transaction for the first new vessel delivered to APT.  It was initially
chartered to REDACTED in 2009—in the midst of the recession—for three years.  AR 3205.  Prior to
its expiration in 2012, REDACTED signed a new two-year charter at more than REDACTED
beginning in 2013.  AR 3357.  Scully noted that "[i]n response to Chevron's commitment to
modernize its fleet profile, the Sunshine State [APT's first vessel] has become their core Vessel
in this trade[,]" thus indicating the continuing demand for the vessel.  AR. 3182.  Further, in
2012, the daily rates for all of APT's charters exceeded REDACTED.  AR 3356-57; 2916.  Wilson
Gillette, the industry expert retained by Scully, projected daily rates of $52,000 beginning in
2012 increasing to $67,000 by 2020 assuming that there was no growth in the Jones Act
petroleum tanker trade.  AR 3198, 3371.

Scully then analyzed APT's project under three "specific stress test conditions" (AR 3026), each of which started with the conservative assumptions of the Lender's case and then added additional assumptions that would put downward pressure on financial performance. For Stress Case 1, Scully assumed that operating and maintenance expenses would escalate by 3.75% over the 20-year term of the guarantees, rather than the 3% escalation rate assumed in the Lender's Case. AR 3026, 3208. Under Stress Case 1, the average DSCR was 1.06:1. AR 3027, 3208. Scully tempered these results, however, by noting that such an increase in operating and maintenance expenses would likely be industry-wide, leading to increased charter rates above those assumed in Stress Case 1. AR 3027, 3208. Stated differently, a scenario where vessel operators did not increase charter rates to cover their operating costs was not likely to occur.

For Stress Case 2, Scully assumed that one of APT's vessels would be out of service for an entire year beginning in 2013. AR 3027, 3209. This case also assumed that the idle vessel would continue to incur operating expenses, even though, in fact, it would not. Under Stress Case 2, the average DSCR was 1.25:1. AR 3028, 3209.

For Stress Case 3, Scully assumed that the charters for the two vessels APT had chartered to the Military Sealift Command (MSC) would terminate in 2011, and that these two vessels would earn charter rates of only $38,500 per day (escalated annually by 2.5%) beginning in 2012. AR 3028-29, 3210. Under Stress Case 3, the average DSCR was 1.16:1 in the January Report and 1.25:1 in the June Report. AR 3029, 3211.

Finally, Scully performed an analysis under a "Recommended Case" that used all of the conservative assumptions of the "Lender's Case," but reduced the guaranteed loan amount from $400 million to $340 million. AR 3027, 3211-12. Under this case, average DSCR was 1.43:1. AR 3030, 3212.

From all of this, Scully found APT's project economically feasible even under the conservative Lender's Case, AR 3032, 3215, but nonetheless recommended that the loan guarantee amount be reduced from $400 million to $340 million (as in the Recommended Case), and that the guarantee agreement require certain "structural supports to provide additional risk mitigation over the amortization term." AR 3032, 3215. These included (1) establishment of a drydock reserve fund to assure that sufficient funds would be available for vessel maintenance, (2) establishment of a debt service reserve fund to assure that cash would be available to make scheduled payments on the guaranteed debt in the event of "temporary conditions such as depressed market conditions or a vessel going out of service for an extended period of time," and (3) a provision limiting APT's payment of dividends to periods where the 12-month trailing DSCR and 12-month projected DSCR fell below 1.5:1. AR 3032-33, 3215-16.[9]

## C. The Continued Processing of the Application.

Between early March and mid-April 2012, MarAd staff worked on a memorandum concerning statutory and regulatory priorities for Title XI applications, which the Credit Council had demanded as a prerequisite to its consideration of APT's application. AR 2436, 2439; Kurz Decl., ¶ 24. The purpose of this memorandum was unclear, as both MarAd and the Credit Council already knew that APT's application met the statutory and regulatory requirements for priority treatment and was much more advanced than the two other pending applications, which had been filed nearly a year and a half after APT's application. AR 2435; 2439; Kurz Decl., ¶ 24. Defendants have admitted that, despite weeks of work, this memorandum was never "finalized." *See* Memorandum in Opposition to Plaintiff's Motion to Compel (ECF No. 64) at 1.

---

[9] Scully's final report amended these "Recommended Structural Supports" to provide MarAd more flexibility in light of the similar requirements already provided for in MarAd's regulations and standard Title XI documents. AR 3153-58, 3215-17.

In an April 30, 2012, meeting with APT, the Administrator expressed his support for APT's application, but advised APT that, in the aftermath of the Solyndra loan default at the Department of Energy, applications for loan guarantees were being given more scrutiny and that the issue of providing loan guarantees to applicants owned by private equity firms had again been raised. AR 2441-42; Kurz Decl., ¶ 26. APT expressed dismay that the private equity issue had arisen again, having understood that it had been resolved with the Deputy Secretary seven months earlier. Kurz Decl., ¶ 26. The Administrator asked that APT allow him more time to work on the issues that had been raised by DOT officials. Kurz Decl., ¶ 26. After this meeting, on May 2, 2012, APT further enhanced its application to expedite its processing by reducing the amount of the requested guarantees from $400 million to $340 million, consistent with Scully's "Recommended Case." AR 2441-43.

In late May 2012, MarAd informed APT that its application would be reviewed by the Credit Council at its June 12 meeting. Kurz Decl., ¶ 28. Further, in response to APT's inquiry, the MarAd staff advised that there was no more information required for this meeting, that they considered APT's project to be financially and economically sound, and that they were advocating approval of the application. Kurz Decl., ¶ 28.

At a May 31, 2012 meeting of the Credit Council working group, MarAd made a PowerPoint presentation concerning APT's application. Although defendants have heavily redacted this presentation, enough is disclosed in the record to show that MarAd was not seeking the Credit Council's "guidance" or "recommendation" as to the application's consistency with DOT policy, but rather that MarAd was recommending approval and seeking the Credit Council's authorization to do so. MarAd stated "MARAD *is proposing* a guarantee of $340 million, 51% of depreciated actual cost & 47% of total actual cost." AR 2918 (emphasis added).

With this introduction, MarAd's presentation then described APT and the guarantee transaction itself in terms that indicated MarAd's expectation that the Credit Council would authorize MarAd to approve the application.[10]

Later that same day, APT's agent, Martin Gottlieb of Argent Group Ltd., spoke with George Zoukee, MarAd's Associate Administrator for Finance and Business Development, about the meeting. AR 2450. The next day Mr. Gottlieb summarized that conversation in writing to Mr. Zoukee, confirming Zoukee had told him that "APT's application is strong, meets the 'economic soundness' requirement, and is being recommended for approval at the June/July Credit Council meetings." *Id.* Gottlieb concluded by stating "APT appreciates MarAd's continued support and advocacy for approval of its Title XI application. We look forward to seeing it through to approval and closing." *Id.* Nothing in the record indicates that the Associate Administrator disagreed with any of the statements that Mr. Gottlieb attributed to him.

MarAd next made a PowerPoint presentation to the Credit Council itself at its June 12, 2012 meeting. Although that presentation is also heavily redacted, enough is disclosed in the AR to show that MarAd here was requesting that the Credit Council approve APT's application. MarAd stated that "MARAD *is proposing* a guarantee of $340 million, 51% of depreciated actual cost & 47% of total actual cost." (AR 2918 (emphasis added)) and repeated many of the

---

[10] *See* AR 2918 ("Loan terms & conditions *will be* strengthened from MARAD standard" and "MARAD *will collect* an estimated $14.5 million in fees from the project"); AR 2919 (APT's parent "*will guarantee* the Title XI debt" "All of the applicant's subsidiaries *will also enter* into the Title XI note & attendant agreements"); AR 2921 ("APT Parent & all of its subsidiaries *will be* co-borrowers & *will enter into* Title XI documents," "APT Holding *will guarantee* the Title XI debt," "Title XI debt *will be secured* by first priority mortgages on the vessels & assignment of revenue from the vessels," and "All vessels *will be* cross-collateralized"). (All emphasis added).

other May 31 statements indicating MarAd's expectation that authorization would be given.[11]

Significantly, unlike the presentation to the working group, MarAd's June 12 presentation to the

Credit Council included descriptions of the "Benefits of Request" (AR 2934) and "Credit

Enhancements" (AR 2935-36) made to APT's application. Although these pages have been

redacted in their entirety, they almost certainly referred to the "benefits" of MarAd's "proposal"

and the "credit enhancements" that further protected MarAd and thus further supported approval

of APT's application. Nothing disclosed in the AR suggests any discussion of risks to MarAd

(much less undue risks) or anything indicating that there was any downside to approval.

On June 13, 2012, MarAd advised APT that the Credit Council had deferred

consideration of APT's application and that it would be presented to the Credit Council for a

vote at its July 10 meeting. Kurz Decl., ¶ 29. The next day APT's CEO sought an explanation

for the Credit Council's action from the Administrator, who stated that while he continued to

advocate the APT application, "Things do not look good." Kurz Decl., ¶ 30. He stated that the

issue of APT's ownership by private equity firms had been raised again along with a new

concern about providing guarantees for a new company. *Id.* APT expressed extreme

disappointment that the private equity issue was again being raised and reminded the

Administrator that APT was not a new company, since it had been formed in 2006 and has been

successfully operating five vessels. *Id.* APT again outlined the strength of its application and

asked, "What do we need to do to get our application approved?" *Id.* The Maritime

---

[11] *See* AR 2940 (APT's parent "*will guarantee* the Title XI debt" and "All of the
applicant's subsidiaries *will also enter* into the Title XI note & attendant agreements"); AR 2942
("APT Parent & all of its subsidiaries *will be* co-borrowers & *will enter into* Title XI
documents," "APT Holding *will guarantee* the Title XI debt," "Title XI debt *will be secured* by
first priority mortgages on the vessels & assignment of revenue from the vessels," and "All
vessels *will be* cross-collateralized"). (All emphasis added).

Administrator responded that he did not know and asked again for more time to deal with the Credit Council's issues relating to APT's application. *Id.*

On June 22, 2012, Scully issued its final report along with an addendum. AR 3153-3218. The final report contained the same financial analyses as the January draft, *i.e.*, the Applicant's Case (AR 3205), Lender's Case (AR 3207), three Stress Cases and a Recommended Case (AR 3208-12), which produced the same results. It also concluded that APT's assumptions under the Applicant's Case were reasonable, and even under the ultraconservative Lender's Case, APT's project was economically feasible. As in the draft report, these results were based on $400 million of guarantees, even though APT had amended its application to reduce the amount to $340 million. AR 2980, 3161. The final report also evidenced MarAd's continued support and intention to approve APT's application at this late date, stating that "Scully Capital received an overview of the terms and conditions that MarAd *will* require in its financing documentation." AR 3153.

MarAd again made PowerPoint presentations concerning APT's application, first to the Credit Council working group on June 28 and then to the Credit Council on July 10, 2012. AR 2954-57. These presentations apparently discussed only "Outstanding Concerns & Current Status." *Id.* Defendants have redacted these presentations in their entirety, so it cannot be determined what "outstanding concerns" were discussed, much less whether they were legitimate and related to the evaluation criteria prescribed by the Title XI statute and regulations, or whether the concerns were those of MarAd or the Credit Council. Nothing in the AR suggests that anyone at MarAd expressed any concerns about the application to APT, or was recommending disapproval.

15

Meanwhile, APT moved to remove any concerns that might be caused by the subordinated debt held by its sponsors.  On July 2, 2012, Mr. Gottlieb informed Associate Administrator Zoukee that APT's sponsors were willing to convert this debt to equity "in an effort to further enhance the Application and to demonstrate the commitment of the Applicant's sponsors to investing in the Jones Act industry."  AR 2585.  Later, on July 23, APT committed in writing that the subordinated sponsor debt would be converted to equity as part of the closing.  AR 2580, 2583.  Also on July 2, to assist MarAd at the July Credit Council meeting, APT provided a summary of its application and the basis on which it was fully qualified to be approved.  AR 2572-79.

On July 9, the Maritime Administrator advised APT's CEO that he did not intend to ask for a vote on APT's application at the July 10 Credit Council meeting because he felt there was not support among the Council's members for approving it.  Kurz Decl., ¶ 33 and Ex. 5.  When asked why, he responded again saying that APT's private equity ownership remained an issue and that APT was a "new" company, also noting that APT's vessels had short-term charters.  Kurz Decl., ¶ 33 and Ex. 5.  The next day, APT's CEO requested that the Administrator ask for a vote on APT's application at that day's meeting.  Kurz Decl., ¶ 33 and Ex. 6.  After this July 9 conversation, however, APT was unable to obtain any further information from MarAd concerning the status of its application, Kurz Decl., ¶ 36, and on July 17, 2012, APT commenced the present action, seeking a writ of mandamus compelling the Maritime Administrator to either grant or deny its application.

On July 30, 2012, APT confirmed its May 2 reduction of the requested guarantee amount to $340 million and its July 2 and July 23 agreements to convert the subordinated debt held by

APT's sponsor to equity.  AR 2583-84.  APT also sent *pro forma* balance sheets and projections

of revenue and expenses reflecting these amendments to APT's application.  AR 2589-2608.

MarAd made PowerPoint presentations concerning APT's application to the Credit

Council working group on July 26, 2012 and to the Credit Council on July 31, 2012.  AR 2958-

67.  Each presentation consisted of four slides.  *Id.*  One set forth the most basic information

about APT's application (*e.g.*, the guarantee amount is $340 million for a 20-year term to

refinance five tankers that carry petroleum products).  AR 2960, 2965.  Another slide purported

to set forth "Company Background" but merely noted that (a) APT is a subsidiary (and the only

asset) of APT Holdings LLC, which agreed to guarantee the debt,  (b) all of APT's subsidiaries

would also sign the loan note and accompanying agreements, and (c) the identity of the company

that will manage vessel operations for APT.  AR 2961, 2966.

The two remaining slides, which purportedly contained a "Summary" (AR 2959, 2964)

and "Conclusions" (AR 2962, 2967) have been redacted in their entirety.  There is no indication

that the presentations included, or that the Credit Council or its working group considered, (a)

any of the evaluation criteria specified in the Title XI statute or MarAd's regulations, (b) Scully's

financial analysis or (c) the Wilson Gillette market study.

**D.  The August 2012 Denial of APT's Application.**

The Administrator denied APT's  application by letter dated August 1, 2012.  AR 3511-

18.  The denial was based primarily on the conclusion that APT's project was economically

unsound, which in turn was based on findings that APT had thus far operated at a net loss, it was

unable to pay the interest on its subordinated debt on a current basis, and its vessels' charters

were for less than the 20-year term of the proposed guarantees and the market was uncertain.

AR 3515-16.  The letter made no mention of (1) the contrary conclusion of Scully, MarAd's

independent financial analyst, (2) APT's DSCR, which MarAd's regulations say must be given primary consideration, (3) the fact that the interest on APT's subordinated debt was payable in kind (*i.e.*, by issuing more debt), with the debt qualified for treatment as equity, or (4) the industry expert's supply-and-demand study that its regulations require "in the absence of long-term employment contracts."

The letter also described other factors influencing the decision, including a finding that the requested guarantee amount was substantial and would "consume almost all of the remaining monies available for the ship financing program," (AR 3514; *see also* AR 3517), and that APT's application was not entitled to any priority under either the Title XI statute or MarAd's regulations (AR 3516-17). It further stated that the Administrator had "asked the Credit Council for its recommendation on APT's loan guarantee application," and that "on July 31, 2012, the Credit Council unanimously recommended that APT's application should be denied." AR 3513. The letter stated that the Administrator's decision "was informed by, but not dependent upon, the Credit Council's recommendation." *Id.* Finally, the August 1 letter informed APT that, in reaching the decision to deny the application, MarAd did not consider APT's amendment committing to convert its subordinated debt to equity, explaining that this amendment constituted a "material change" that would require "extensive and time-consuming review of [APT's] entire application package." AR 3514.

### E. The Processing of APT's Amended Application.

On August 9, 2012, APT formally requested that MarAd consider the amended application. AR 2609-24. In doing so, APT explained in detail the reasons it believed the August 1 decision failed to comply with the Title XI statute, MarAd's regulations, sound financial analysis and MarAd's historical practice. AR 2610-12; 2615-22. Between August 11

and October 9, MarAd made several requests for additional information, and APT complied promptly and fully with each request. AR 2625-28, 2630-2778, 2782-2830, 2833-63.

On November 5, 2012, Scully, which continued to serve as MarAd's IFA, submitted its updated report, this time using $340 million as the guarantee amount. Its conclusions were the same as, or more favorable than, those reached in its prior reports in every material respect.

The updated report used the same projected scenarios as the original. Under the Applicant's Case (using APT's assumptions and projections), the average DSCR over the term of the guarantee was 3.53:1. AR 3379. Scully again considered APT's assumptions and projections "reasaonble." AR 3374, 3376. This model also assumed that APT would maintain a debt reserve fund with a minimum balance of $32.6 million. AR 3379. For the Lender's Case, with its more conservative assumptions, the average DSCR was 1.73:1 with an assumed minimum reserve fund balance of $13.6 million. AR 3381. Scully concluded, "[g]iven the time charter rates that were incorporated into the Lender Case revenue assumptions, Scully Capital believes that the Lender Case provides a reasonable assurance of timely repayment of the Title XI loan." AR 3381.

The DSCRs for the three Stress Cases also improved. For Stress Case 1 (which assumed increased operating expenses), the average DSCR was 1.48:1. AR 3382. For Stress Case 2 (which assumed one vessel would be removed from service in 2019 for an entire year), the average DSCR was 1.7:1 (and a minimum reserve fund balance of $4.5 million). AR 3383. For Stress Case 3 (non-renewal of the MSC charters for two vessels), the average DSCR was 1.72:1. AR 3385.

The updated report analyzed two additional Stress Cases. In Stress Case 4, Scully assumed that the interest rate for the guaranteed debt would be 100 basis points greater than in

19

the Applicant and Lender Cases (*i.e.*, 4.1% for Stress Case 4, versus 3.10% for the Applicant and Lender Cases). AR 3385. Under this case, the average DSCR was 1.63:1. AR 3386. Scully concluded that "[t]he results suggest that a significant upward movement in interest rates could be experienced without causing a payment default (all else being equal)." AR 3386. As with the other Stress Cases, Stress Case 4 used the other conservative assumptions of the Lender's Case.

Scully used Stress Case 5 to "calculate[ ] a minimum utilization which pays all debt service and depletes the debt service reserve fund." AR 3386. The resulting utilization rate was 85%, meaning that even if all five vessels were off hire and not generating revenue for 54 days each year, APT would still be able to service its debt. Under this case, the average DSCR remained above 1:1, at 1.19:1. AR 3381. In only four years during the 20-year loan guarantee term would the DSCR fall below 1:1. *Id.* Scully concluded from this test that "the Vessels will need to achieve an average annual utilization rate of 85% or more if charter rates fall to Lender Case levels." AR 3387.

As with its original reports, Scully's updated report found that APT's project was economically feasible. AR 3390. It also recommended certain structural supports, similar to those recommended in the original report, be included "to provide additional risk mitigation over the amortization term." AR 3390-91.

Before Scully completed its updated report, MarAd created a spreadsheet setting forth a DSCR for each year of the 20-year guarantee period using specific assumptions. AR 2915-16. This appears to be "MarAd's neither-best-nor-worst-case financial model" referenced in the November denial letter discussed below. AR 3525. On this spreadsheet, MarAd made the following assumptions: (1) 2012 charter rates would be $44,600 per day, escalated by 2% annually, for each vessel following expiration of its current charter; (2) in the post-charter

20

periods, each vessel would be utilized only 90.7% of the year (*i.e.*, would generate revenue for only 331 days a year), (3) expenses would increase by 3% annually, and (4) interest on the guaranteed loans would be 4%.  AR 2916.

The AR does not indicate the basis for these assumptions, or who developed them.  By comparison to other data in the record, the $44,600 daily charter rate appears to be the midpoint between the ultraconservative rates assumed in Scully's Lender's Case and REDACTED

REDACTED                                                                                      *See* AR 2916

(charter rates for 2013 on MarAd spreadsheet).  The 4% interest rate MarAd assumed is essentially the same as the 4.1% interest rate assumed in Stress Case 4 of Scully's November Report.  AR 2916, 3385.  Under the assumed 90.7% utilization rate, each vessel would be off-hire and not generating revenue for 34 days every year.  AR 2916.  Under Scully's conservative Lender's Case in its June report, Scully assumed each vessel would be off-hire for 10 days per year until they were ten years old, and 14 days per year after that.  AR 3206.  And in Scully's updated report, the Lenders Case assumed off-hire days "[c]onsistent with the Applicant Case," which was seven days per year.  *Compare* AR 3380 with AR 3206.  Nonetheless, even under the spreadsheet's unexplained assumptions, the average DSCR over the term of the guarantees was 1.53:1, still well above the required 1:1.  AR 2916.

MarAd made PowerPoint presentations concerning APT's s amended application to the Credit Council working group on November 1, 2012—before Scully issued its November report—and to the Credit Council on November 8, 2012.  AR 2958-67.  Like its July 26 and July 31 presentations, these consisted of four slides.  *Id.*  So far as the AR reveals, each presentation was virtually identical to the July presentations.  Each contained slides entitled "Application" and "Company Background" that were substantially identical to (and as uninformative as) the

July Presentations, except to note that APT and its sponsors had agreed to convert the sponsors' subordinated debt to equity, and APT had informed MarAd "of a potential transaction by an affiliate to finance construction of two new Jones Act product tankers." *Compare* AR 2960 *with* AR 2970; AR 2961 *with* AR 2971. And like the July presentations, each contained slides entitled "Summary" and "Conclusions," which defendants have redacted in their entirety. *Compare* AR 2959 *with* AR 2969; AR 2962 *with* AR 2877. There is no indication in these presentations that MarAd presented, or the Credit Council or its working group considered, (a) any of the Title XI statutory and regulatory evaluation criteria, (b) the updated Scully report, (c) the Wilson Gillette market study, or (d) any other materials or information.

## F.   The November 2012 Denial of the Amended Application.

By letter dated November 9, 2012, the Administrator advised APT that its amended application was also denied. Like the August letter, the November denial was based primarily on the conclusion that APT's project was economically unsound. AR 3523-26. The November letter first stated that the economic soundness conclusion in the August letter had been based on a finding that APT's "fundamental revenue flow" was not sufficiently strong (AR 3523), although the earlier letter nowhere mentioned such a concept. It went on to conclude that APT's proposed conversion of its subordinated debt to equity would do little to alleviate this problem. AR 3523-24. While the conversion of subordinated debt to equity was, according to the August letter, a "material change" requiring extensive review, the November letter concluded that the conversion had only a "nominal" effect because Scully's report "had already considered sponsor debt to be equity." *Id.* Then, again ignoring MarAd's regulations, under which APT's subordinated debt qualified as equity and which thus made it irrelevant to any analysis of projected operating cash flow, the letter stated that the subordinated debt's "[p]aid-in-kind

22

interest merely exacerbated an already-unsatisfactory projection of operating revenue." AR 3524. The letter did not attempt to explain how operating revenue might be affected by payment of interest on indebtedness by increasing its principal amount, or how this was even relevant, given APT's commitment to convert the debt to equity.

The letter also referred for the first time to previously undisclosed MarAd projections (presumably the spreadsheet discussed above), which caused "grave concern" because they indicated that during "almost half" the guarantee period APT's debt service coverage ratio would be less than 1.5:1, which, according to the letter, Scully had suggested as "the appropriate standard by which to measure the adequacy of APT's cash flow." AR 3524-25. In fact, Scully had made no such suggestion, but had merely recommended that MarAd prohibit APT from paying dividends at those times (if any) where the 12-month trailing and projected DSCR fell below 1.5:1. AR 3391. The letter nowhere referred to MarAd's regulations, which require only that the ratio exceed 1:1.

Also like the August letter, the November letter found that APT's vessels were not entitled to a priority and that the requested guarantee amount of $340 million was substantial and would "consume almost all of the remaining monies available for the ship financing program." AR 3522, 3526-27, 3528. The letter further stated that the Administrator had "asked the Credit Council for its recommendation on denying APT's modified application," and that "[o]n November 8, 2012, the Credit Council unanimously recommended that APT's application should be denied." AR 3522. The letter reiterated that the Administrator's decision "was informed by, but not dependent upon, the Credit Council's recommendation." *Id.*

## STANDARD OF REVIEW

The Court must "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2).

"The requirement that agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result." *Dickson v. Secretary of Defense*, 68 F.3d 1396, 1404 (D.C. Cir. 1995) (quoting *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993)). "The agency must *cogently* explain why it has exercised its discretion in a given manner ... and that explanation must be sufficient to enable [a reviewing court] to conclude that the agency's action is the product of *reasoned* decisionmaking." *Owner-Operator Independent Drivers Ass'n, Inc. v. Federal Motor Carrier Safety Admin.*, 494 F.3d 188, 203 (D.C. Cir. 2007) (emphasis added).

Reasoned decision making is "a process demonstrating the connection between the facts found and the choice made." *Western Resources, Inc. v. FERC*, 9 F.3d 1568, 1572 (D.C. Cir. 1993) (internal quotation marks omitted). "[T]he agency must articulate a *satisfactory* explanation for its action including a '*rational* connection between the facts found and the choice made.'" *Environmental Defense Fund v. EPA*, 852 F.2d 1316, 1326 (D.C. Cir. 1988) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 48 (1983)) (emphasis added). Accordingly, the Court can affirm defendants' decisions here only if they are "based on substantial evidence in the record and [defendants] correctly applie[d] the relevant

24

legal standards." *Rossello v. Astrue*, 529 F.3d 1181, 1184-85 (D.C. Cir. 2008) (internal quotation marks omitted).

As to the law applied, "[i]t is axiomatic that 'an agency is legally bound to respect its own regulations, and commits procedural error if it fails to abide by them.'" *Algonquin Gas Transmission Co. v. FERC*, 948 F.2d 1305, 1315 (D.C. Cir. 1991) (quoting *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989)); *see also Service v. Dulles*, 354 U.S. 363, 379-80 (1957); *NetworkIP, LLC v. FCC*, 548 F.3d 116, 127 (D.C. Cir. 2008); *Reuters Ltd. v. FCC*, 781 F.2d 946, 950-51 (D.C. Cir. 1986) (*ad hoc* departures from rules are prohibited because "therein lies the seeds of destruction of orderliness and predictability which are the hallmarks of lawful agency action").

In informal adjudications, the "substantial evidence" standard is but one subcategory of the "arbitrary and capricious" standard. "The agency's decision must be supported by substantial evidence—otherwise it would be arbitrary and capricious." *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007). "[I]t is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense." *Id.* (quoting *Association of Data Processing Serv. Orgs., Inc. v. Board of Governors of the Federal Reserve System*, 745 F.2d 677, 684 (D.C. Cir. 1984)). The "substantial evidence" standard in informal adjudication requires the same amount of evidence as is required in formal agency adjudication. *Id.* The only difference is the location of the evidence. *Id.*

"Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' taking 'into account whatever in the record fairly detracts from its weight.'" *Van Dyke v. NTSB*, 286 F.3d 594 (D.C. Cir. 2002) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) and *Universal Camera Corp. v. NLRB*, 340 U.S. 474,

488 (1951)).  Conversely, the Court "'may not find substantial evidence merely on the basis of evidence which in and of itself justified [the agency's decision], without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Siegel v. SEC*, 592 F.3d 147, 155 (D.C. Cir. 2010) (quoting *Morall v. DEA*, 412 F.3d 165, 177 (D.C. Cir. 2006) and *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d. 955, 962 (D.C. Cir. 2003)).  "The test requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *Smith v. Astrue*, 2013 WL 1290990 at *5 (D.D.C. March 30, 2013).

Defendants contend that their findings are entitled to deference.  Mem. 24.  "Substantial evidence is a deferential standard.  But deference is not abdication." *Otay Mesa Property, LP v. United States Dep't of the Interior*, 646 F.3d 914, 916 (D.C. Cir. 2011).  Courts may not be "lamely deferential" to agency determinations no matter how technical. *National Maritime Safety Ass'n v. OSHA*, 649 F.3d 743, 753-54 (D.C. Cir. 2011), *cert. denied*, 132 S. Ct. 1960 (2012) (vacating finding that OSHA inspection standard was "technologically feasible" because it was not based on substantial evidence); *see also American Iron and Steel Institute v. OSHA*, 939 F.2d 975, 980 (D.C. Cir. 1991) (stating that in reviewing OSHA safety standards "the test for feasibility cannot be lamely deferential").

**ARGUMENT**

## I. Defendants' Economic Soundness Determinations Are Unsupported by the Record and Are Arbitrary, Capricious and Contrary to Law.

Defendants twice determined that APT's project was not economically sound.  The August letter's determination was, as noted, based primarily on three underlying findings: APT's financial statements showed a net loss, APT was unable to pay its debt obligations on a current basis, and the vessels' charters were for less than the 20-year period during which the debt would be guaranteed and the market was uncertain.  These findings disregarded or misrepresented the

prior analysis of MarAd's professional staff, the 48-page analysis of its IFA, and the 88-page

market study conducted by acknowledged industry experts. The November determination,

relying on a half-page spreadsheet based upon unexplained and unrealistic assumptions and

misrepresenting the opinion of its independent analyst, added a finding that APT's projected debt

service coverage ratio was unsatisfactory. Both determinations ignored MarAd's regulations and

bear no rational connection to anything, let alone substantial evidence, in the administrative

record.

### A. Defendants' Reliance on Net Losses Contravened MarAd's Regulations.

Despite Scully's statement that APT's "financial condition is healthy despite the

performance suggested by the income statement" (AR 3005, 3186), the Administrator chose to

rely on the income statement, stating that "APT has consistently operated at a net loss, to wit

$42.4 million in 2010, $35.6 million in 2011, and $11 million in the first quarter of 2012." AR

3515. In relying on net losses, the Administrator failed to comply with MarAd's regulation,

which requires the agency to consider operating cash flow, not net income or losses. 46 C.F.R. §

298.14(d)(4). The August letter nowhere mentions APT's operating cash flow.

The regulation's use of operating cash flow instead of net income or loss is not

happenstance. Operating cash flow, as prescribed by MarAd, is similar to both operating income

and a standard financial measure known as earnings before interest, taxes, depreciation and

amortization, or EBITDA, which are the conventional measures used by investors to evaluate a

company's ability to service its debt. *See In re Enron Corp. Sec. Litig.*, 2010 WL 9077875, at

*11 n.24 (S.D. Tex. Jan. 19, 2010); *In re Vivendi Universal, S.A. Sec. Litig.*, 605 F. Supp. 2d

586, 589 n.4 (S.D.N.Y. 2009). Like operating income and EBITDA, MarAd's definition of

"operating cash flow" excludes "interest, accrued taxes, depreciation and amortization," 46

C.F.R. § 298.14(d)(4), all of which are included in determining net income or loss.

Operating cash flow is particularly important in determining the economic soundness of a Title XI project, because it is used to determine the "operating cash flow to Obligation debt service" ratio (referred to in the Scully reports as the debt service coverage ratio or DSCR), a key component of the economic analysis prescribed by MarAd's regulations.  46 C.F.R. § 298.14(d)(4).  Those regulations, quoted at p. 4, *supra*, provide that the ratio need only exceed 1:1, and MarAd's Administrative Orders make clear that the ratio is the single most important, if not determinative, factor in evaluating a Title XI application.  Again, the August letter nowhere even mentions the concept.

Had the Administrator addressed APT's operating cash flow, he would have found APT's project economically sound, as Scully had.  The same financial statements that reflected the net losses relied upon in the letter also reflected positive operating cash flow (as defined in MarAd's regulations) of $34.3 million in 2010, $66.8 million in 2011, and $14.1 million in just the first quarter of 2012.  AR 3186, 3360.

An agency is legally bound by its own regulations, and acts arbitrarily and capriciously when it fails to do so.  *Algonquin Gas Transmission Co. v. FERC, supra,* 948 F.2d at 1315.  The Administrator's failure to use his agency's own regulatory "objective criteria" alone rendered the August economic soundness determination arbitrary, capricious and an abuse of discretion.

**B.  Defendants' Reliance on APT's Purported Inability to Meet Its Interest Payments Ignored MarAd's Regulations and Was Unsupported by the Record.**

The August letter also based its negative economic soundness determination on APT's purported inability to make its current interest payments, quoting statements in the Scully report that there was "significant leverage in [APT's] capital structure" resulting in an inability for APT "to meet interest payment requirements on a current basis."  AR 3515.  The letter concluded that "[w]ith such large interest expense owed to its equity, it is apparent that the leverage structure of

APT is not viable and even with reduced debt service costs, the underlying APT operation is dis-economic." AR 3516.

While the Scully report did contain the sentence fragments quoted in the August letter, neither those fragments nor anything else in the AR supports the letter's conclusions. First, as Scully noted, the subordinated debt "would be fully subordinated to Title XI and be structured in such a way as to resemble equity." AR 3014. The subordinated debt met all of MarAd's requirements for treatment as equity, and Scully considered it as equity in its January and June reports. AR 3022-23; 3203-04. MarAd's regulations provide that for subordinated debt to be treated as equity, payments on such debt can be made only from funds available to pay dividends. 46 C.F.R. § 298.13(h); *see also* 46 C.F.R. § 298.35(b)(2)(x) (providing that Title XI agreements must contain a covenant placing significant restrictions on payment of subordinated debt without MarAd's consent). Stated differently, payments on the Title XI debt would be made before any payments were made on the subordinated debt.[12]

Second, the subordinated debt agreements provided that no principal was due until 2016 and that APT could, at its option, pay interest "in kind" (*i.e.*, with additional debt). AR 3005, 3010, 3186, 3191.[13] As Scully noted, APT had in fact been making payments in kind on the subordinated debt. AR 3009, 3190. Thus Scully's statement that APT was unable "to meet interest payment requirements on a current basis" was, as MarAd must have known,

---

[12] Thus, contrary to defendants' suggestion here (Mem. 19-20 and n.9), the subordinated debt was not subordinated to the Title XI debt only if APT defaulted. Nor would it increase the possibility that APT might become insolvent during the term of the guarantees.

[13] Despite defendants' implication that APT had only an informal "arrangement" regarding the payment of interest on the subordinated debt, it had a binding contract with its subordinate debt holders that allowed APT, at *its* discretion, to make payments in kind rather than in cash. While defendants assert (Mem. 18) that MarAd's regulations do not compel the agency to "ignore $400 million worth of debt—subordinated or otherwise—when considering an applicant's viability over a 20-year period," ignoring the terms and conditions of payment of that debt is plainly arbitrary and capricious.

demonstrably incorrect. AR 3014. Indeed, the record contains a July 18, 2012 spreadsheet in which MarAd staff acknowledged that APT paid the subordinated debt in kind. AR 2899-2903.[14]

In short, the only evidence in the record shows that the subordinated debt did not in any way impair APT's cash flow, APT's ability to make cash payments of principal and interest on the Title XI debt, or the DSCR during the guarantee period under all of the cases analyzed by Scully.

If all this were not enough, before the August letter was issued, APT had three times—twice in writing—communicated its commitment to actually convert the subordinated debt to equity, thereby eliminating any possible concerns about APT's "leveraged structure," the subordinated debt's effect on its ability to pay the Title XI debt, or its financial condition as a whole. AR 2580, 2583. Faced with the removal of this contrived obstacle to a finding of economic soundness, the August letter stated that APT's conversion of subordinated debt to equity was a "material change in [APT's] application" that "require[d] extensive and time-consuming review of the entire amended application package" that "would require up to ten weeks to complete." AR 3514.

In denying APT's amended application 15 weeks later, however, defendants brushed aside APT's commitment to convert the subordinated debt to equity as much ado about nothing. After misrepresenting the August economic soundness determination as having been based on a

---

[14] Defendants point to a March 2011 statement in which APT asserted that the interest rate (not the payment of interest) on its subordinated debt made it difficult for it to compete. Mem. 18 (citing AR 1705). That APT earlier misspoke about the effect of its subordinated debt cannot change the fact that interest on the subordinated debt was payable in kind. In any event, defendants did not rely on this statement in either the August or November letters, and even counsel, who advances this claim for the first time here, admits that the debt was payable in kind, not cash, and would be fully subordinated to the Title XI debt. Mem. 7, 16-17, 17 n.7.

lack of "fundamental revenue flow . . . sufficient . . . to support the operation over time in other

than very favorable circumstances" (AR 3523),[15] the November letter characterized the

conversion as an ineffective attempt to alleviate that unexplained insufficiency,

> The alleviation, if any, that might be realized would be nominal, however,
> because as APT observed in its letter of August 9, 2012, the analytical model used
> in MarAd's initial assessment had already considered sponsor debt to be equity
> for purposes of financial modeling.

AR 3523-24.  The disingenuous nature of this statement is breathtaking.  By these statements,

defendants effectively admitted that, contrary to the position taken in the August letter, (a) the

subordinated debt, and the net losses caused by the paid-in-kind interest on that debt, was never

relevant to MarAd's determination of economic soundness because the debt was treated as equity

and (b) the commitment to convert the sponsor debt to equity, rather than being a "material"

change that would require at least ten weeks of "extensive and time-consuming review," had

already been analyzed by Scully and MarAd prior to the August letter.

### C.  Defendants' Determination that APT Did Not Satisfy the DSCR Criterion Contravened MarAd's Regulation and Is Unsupported by the Record.

After APT pointed out that the August letter's reliance on "net losses" was improper,

defendants took care not to make that mistake again.  The November letter does not use that

term, and one would never know from reading it that the prior economic soundness

determination was based on net losses.  Like the August letter, however, the November letter

also failed to mention the regulatory terms "operating cash flow" or "operating cash flow to

Obligation debt service ratio."  Nor did it even cite 46 C.F.R. § 298.14(d), which sets forth the

"objective criteria" MarAd says it uses to evaluate Title XI applications, or 46 C.F.R.

---

[15]  Contrary to this assertion in the November letter, defendants did not use the word "revenue," let alone the term "fundamental revenue flow," in their August economic soundness analysis.  Indeed, the word "revenue" appears only twice in the entire August letter, once in quoting 46 U.S.C. § 53708(a) and once in paraphrasing 46 C.F.R. § 298.14(c).  AR 3512.

§ 298.14(d)(4), the "objective criterion" defining "operating cash flow" and prescribing a 1:1

"operating cash flow to Obligation debt service ratio."

The November letter did, however, discuss the October 2012 spreadsheet prepared by

MarAd's staff, discussed at pp. 20-21, *supra*, which the letter described as a "neither-best- nor-

worst-case financial model." AR 3525. The November letter explained:

> The IFA [Scully] suggested that a 1.5:1 debt service coverage ratio is the
> appropriate standard by which to measure the adequacy of APT's cash flow.  It is
> of grave concern that APT is not projected to meet that standard over almost half
> the period of the requested loan guarantees.  Adjusted for uncertainty, MarAd's
> neither-best-case-nor-worst-case financial model showed APT's projected
> operations would not generate sufficient revenue to meet a 1.5:1 cash-flow-to-
> debt service ratio in nine of the twenty guarantee years.  It is critically important
> that in three of those nine years the ratio is dangerously close to 1:1, such that any
> unforeseen disruption of revenue or increase in operating costs would likely result
> in a payment default.  The IFA found that APT "is exposed to changes in the
> product tanker market and its ability to meet financial obligations could be
> impaired should negative changes occur in the future."

> In addition to the nine years in which APT is not projected to meet the 1.5:1 ratio,
> MarAd's analysis shows in four other years the projections for APT are below
> 1.55:1, barely over the acceptable threshold.  Also noteworthy is that if loan
> guarantees were to be provided in 2012, MarAd's projections show that APT
> would almost immediately, that is as soon as 2014, fail to meet the 1.5:1 ratio.
> Thus, APT's operations model further amplifies concerns that APT will not be
> able to repay its debt obligations and is not economically sound.

AR 3524-25.  This analysis was legally and factually erroneous.

First, the letter's assertion that Scully suggested 1.5:1 as the appropriate standard by

which to measure the adequacy of APT's operating cash flow misrepresents what Scully actually

said.  After finding that APT's application was economically feasible even under the

conservative Lender's Case (AR 3390), Scully nonetheless recommended that the guarantee

agreement itself include a provision *precluding APT from paying dividends any time its 12-

month trailing and projected DSCR fell below 1.5:1.*  AR 3391.  Such loan covenants restricting

payment of dividends have been common for years.  *See, e.g.*, American Bar Foundation,

*Commentaries on Indentures*, § 101-12 at 404-410.  The "objective criterion" of the regulations is 1:1 (*see* 46 C.F.R. §298.14(d)(4)), and defendants cannot avoid using that criterion by misrepresenting the only expert evaluation of APT's project in the record.

The November letter's characterization of the spreadsheet as a "neither-best-nor-worst-case financial model" is also erroneous.  The characterization is apparently based on the spreadsheet's assumed charter rates falling squarely in the middle of the charter rates assumed in Scully's conservative Lender's Case and the actual rates being earned by APT's vessels (before substantial increases in 2012).  AR 3525.  But nothing the record explains why the actual charter rates that APT was in fact earning (or even the future charter rates projected by Wilson Gillette) were a "best case" instead of a "realistic" case.  Indeed, those rates are much better suited to serve as the basis for a "neither-best-nor-worst-case financial model" than the rates that MarAd, for all the record shows, pulled out of thin air.  "When an agency uses a computer model, it must explain the assumptions and methodology used in preparing the model." *Owner-Operator Independent Drivers Admin.*, 494 F.3d at 204 (internal quotations and citations omitted); *see also id.* ("the issue is not whether a curve should have been used, but why the agency chose to draw the curve" the way it did).

Apart from the assumed charter rate, the spreadsheet's remaining assumptions are also unexplained, and even more conservative than the conservative assumptions used by Scully.  The spreadsheet's assumed interest rate of 4% is, as noted, essentially the same as the 4.1% interest rate assumed as the extreme condition underlying Scully's Stress Case 4.  AR 3385-86.  Its

assumed utilization rate of 90.7 is well below the utilization rate that Scully used in the Lender's Case and all of the Stress Cases (except Stress Case 5) in all of its reports. AR 3386-87.[16]

The proof is in the pudding. The results of the November letter's "neither-best-nor-worst-case" analysis were *worse* than the results for Scully's conservative Lender's Case. The spreadsheet assumptions produced an average DSCR of 1.53:1 (AR 2916), while the Lender's Case average DSCR was 1.73:1 (AR 3381). Indeed, the average DSCR for the "neither-best-nor-worst-case" analysis (1.53:1) was virtually the same as the average DSCR for Scully's Stress Case 1 (1.48:1) and even worse than the average DSCR for its Stress Case 2 (1.70:1) (AR 3382), Stress Case 3 (1.72:1) (AR 3385) and Stress Case 4 (1.63:1) (AR 3386). In short, the spreadsheet was, despite defendants' "neither-best-nor-worst" characterization, simply another worst—indeed, the worst of the worst—case.

To justify its negative economic soundness determination, the November letter then used the results of the spreadsheet to determine that APT's application did not meet the 1.5:1 DSCR that it falsely claimed Scully had suggested as the appropriate measure of the adequacy of APT's operating cash flow. AR 3524-25. An "analysis" thus contrived simply cannot serve as "substantial evidence" to support a determination that APT's project was not economically sound, particularly in light of the contrary reasoned analysis of the agency's independent expert—the only reasoned analysis in the record.

Ironically, when measured by the actual objective criteria prescribed by MarAd's regulations and administrative orders, APT's project would be deemed economically sound even using the spreadsheet's unrealistic assumptions. MarAd's regulation provides that the DSCR

---

[16] As explained in Scully's November report, Stress Case 5 was designed to determine the minimum average utilization rate APT could suffer and still be able to pay the Title XI debt. AR 3386-87. The 85% utilization rate used in that test was thus the result produced by the analysis, not an assumption on which it was based.

must exceed 1:1 "over the term of the guarantee." 46 C.F.R. § 298.14(d)(4).  The average DSCR

of 1.53:1 under the spreadsheet met this standard and, indeed, even defendants' contrived 1.5:1

standard.  It even satisfied the regulatory DSCR on a yearly basis, even though the ratio need

only be met over the guarantee term.  According to the November letter, the spreadsheet showed

that APT's projected DSCR exceeded 1:1 for all 20 years in the guarantee term, exceeded 1.5:1

for 11 of those years, and "came close" to, but did not dip below, 1:1 in three of the remaining

nine years of the term.

     In their memorandum here, defendants only once cite 46 C.F.R. § 298(d)(4), which

prescribes the 1:1 debt service coverage ratio, and do so only to criticize APT for relying on the

regulation.  Mem. 25-26.  According to defendants, APT's reliance on the regulation is

misguided because the 1:1 ratio is merely a "floor" that the Administrator may disregard in his

discretion in any particular case.  *Id.*  This is makeweight.  The Administrator did not purport to

be deviating from some minimum DSCR when he selected a ratio of 1.5:1.  Rather, he purported

to select that ratio because "the IFA [Scully] suggested" that it "is the appropriate standard by

which to measure the adequacy of APT's cash flow," AR 3524-25, which completely

misrepresents Scully's suggestion.  There is simply no justification in defendants' letters, or

elsewhere in the record, for the use of a DSCR that is 50% higher than the one prescribed by

MarAd's regulations (and whose importance is stressed in its Administrative Order).

     Defendants do not, and cannot, point to any pronouncement by which MarAd has

interpreted or informed the public that section 298.14(d)(4) of its regulations sets minimum

standards that may be disregarded.  Nor does anything in the regulation's language come close to

suggesting that an application showing a DSCR exceeding 1:1 is nonetheless subject to denial

due to insufficient coverage.  Any such reading would make the regulation senseless: a DSCR

exceeding 1:1, by definition, establishes that the applicant's project generates sufficient cash to make Title XI debt payments.  Moreover, defendants' reading of the regulation converts what MarAd itself describes as an "objective" criterion into a wholly subjective one; a project with a DSCR exceeding a 1:1 ratio will be found economically sound, but only if MarAd, at its whim, determines that the regulatory 1:1 ratio applies to that project.  In the final analysis, the notion that the 1:1 ratio is a floor that MarAd may disregard when it pleases is little more than an assertion that the Administrator has unlimited, unreviewable discretion, something the Court has already rejected in denying defendants' motion to dismiss.  At the very least, it constitutes an unexplained (and inexplicable)—and therefore arbitrary—change in MarAd's interpretation of its regulation.  Agencies may not adopt new interpretations of rules in adjudications, even if the interpretation is not written but merely reflected in agency practice, without complying with the APA's notice-and-comment requirements. *See Shell Offshore, Inc. v. Babbitt*, 238 F.3d 622, 628-630 (D.C. Cir. 2001).  "Otherwise, the practice of administrative law would come to resemble Russian roulette." *Satellite Broadcasting Co. v. FCC*, 824 F.2d 1, 4 (D.C. Cir. 1987). While section 298.14(d) may provide a floor below which MarAd will not approve an application, nothing in its language or MarAd's practice suggests that the 1:1 ratio may be changed at defendants' whim.

## D. Defendants' Determination that there Was Insufficient Demand for APT's Vessels Is Unsupported by the Record.

Both denial letters cited a lack of market demand as an additional basis for concluding that APT's project was not economically sound.  The August letter noted that APT's vessels were currently chartered for less than the 20-year term for which guarantees were sought and the market "might be" uncertain (AR 3516), while the November letter relied upon what it described as a "core concern" that "APT's charters are much shorter than the guarantee period," reiterating

that the market into which the vessels "might" operate was uncertain (AR 3524). Defendants'

reliance on the length of APT's current vessel charters ignored MarAd's regulations, and its

determination that the future market was uncertain is a tautology that has no place in evaluating a

project's economic soundness under MarAd's regulations.

There is no requirement that an applicant have in place charters of any particular length,

much less charter terms commensurate with the guarantee period, in order to qualify for Title XI

financing. Common sense counsels that applicants seeking Title XI financing for vessels they

*plan* to build often do not even have charters, much less charters for the entire loan guarantee

period. MarAd's regulations thus contemplate that applicants may not have long-term charters

or any charters at all, but instead require projections of the future market for the vessels. *See* 46

C.F.R. § 298.3(b)(2) (requiring applicant to submit information concerning any "time charters in

excess of six months"); *id.*, § 298.14(b)(2) (identifying as an economical feasibility factor "[t]he

market potential for the employment of the Vessel"); *id.*, § 298.14(c)(3)(iv) (requiring applicant

to submit information concerning "[s]ignificant factors influencing your expectations for the

future market for the Vessel(s)"); *id.*, 298.14(c)(3)(v) (requiring applicant to submit, along with

any charters or transportation agreements, "*proposed* charters, contracts of affreightment,

transportation agreements and *letters of intent* from *prospective* customers).[17]

Nor do the regulatory "Objective Criteria" by which MarAd evaluates an application for

economic soundness prescribe the length of vessel charters as a criterion in determining

---

[17] The vessels covered by MarAd's most-recently approved Title XI applications for
tankers had charters with terms of less than 20 years. MarAd has consistently approved Title XI
applications for vessels whose current charters are no longer than APT's charters and has
approved some applications where the vessels had no charter commitments at all. As MarAd
well knows, the oil companies that charter tankers like APT's rarely, if ever, charter them for 20-
year periods. In fact, the vast majority of charters concluded over the past 25 years have had
terms of three to five years or less.

economic soundness, or otherwise require that an applicant have charters whose terms equal the

guarantee period   46 C.F.R. § 298.14(d).  Instead of charter length, MarAd's regulations provide

that MarAd will consider "long-term market demand (equal to the length of time [for which the

applicant] request[s] financing." 46 C.F.R. § 298.14(d)(1).  And, in recognition of the rarity of

charters exceeding more than a few years, MarAd's Administrative Order 520-1 provides that

projected revenue shall be predicated on market estimates by industry or government experts

"[i]n the absence of long-term [vessel] employment contracts," *i.e.*, charters.

    Although Scully had provided a market estimate by an industry expert, defendants did not

refer to that estimate but instead plucked boilerplate cautionary statements about future

uncertainty from Scully's reports.  In the August letter, the only mention of market uncertainty

supported by anything in the AR was a reference to Scully's assertion that APT "is exposed to

changes in the product tanker market and its ability to meet financial obligations could be

impaired should negative changes occur in the future." (AR 3515 (quoting Scully's June report

at AR 3195)).  The November letter added a quote from Scully's November report that "[t]he

largest area of Project risk relates to the uncertainty of the market in the long-term" and that

"[w]hen combined with the limited breadth of operations of the Applicant [APT], this exposes

Project debt to business cycles that may be experienced over the course of the 20-year

amortization period." AR 3524 (quoting November Scully report at AR 3374).[18]  Of course, if

exposure to unknowable future market fluctuations were used as a basis for its decisions, MarAd

would never have approved a Title XI application.  Such cautionary statements about the future

market from a financial analyst do not even meet the proverbial "scintilla of evidence" and are

---

[18]  The August and November letters also stated that "the length of APT's charters is substantially shorter than the guarantee period and the market into which any or all of the ships might be introduced is uncertain" but cited absolutely nothing to support this.  AR 3516, 3524.

plainly insufficient. Indeed, such truisms that the future is uncertain—even from a market expert—do not provide any evidence, much less substantial evidence, to support an economic soundness determination. In any event, the so-called "structural supports" that Scully recommended were specifically intended to "mitigate[e] the Applicant's exposure to changes in the market and/or vessel performance." AR 3213, 3388.[19]

The record evidence that projected demand and charter rates for APT's vessels would be strong, on the other hand, was substantial indeed. As part of its independent review, Scully, as noted, commissioned Wilson Gillette & Co. to update the analysis of the Jones Act market that APT had submitted with its application. AR 3394-3510. Scully repeatedly characterized the Wilson Gillette Report as "an excellent overview of the market for transporting refined petroleum products and similar liquid cargo in the coastwise trade within and around the U.S." AR 3015, 3196, 3369. In its detailed 88-page report, Wilson Gillette projected that by the end of 2020, fleet capacity (*i.e.*, supply) would be 2.3 million DWT (deadweight tons, the customary measure of tanker capacity), while even under a "no growth scenario" demand would be 2.7 million DWT (AR 3051), with the deficiency in the number of vessels needed to service demand in 2020 projected to range from 8.7 vessels under a "no growth scenario" to 17.6 vessels in a "low trade growth" scenario (AR 3051-52). Inexplicably, defendants chose to ignore these projections in favor of the cautionary generalities plucked from the Scully Report.

---

[19] The November letter stated that "although the IFA's report may be read to suggest a loan guarantee for the benefit of APT is technically viable, it is only so if various precautionary structures would be put in place" and then concluded that the structural supports made APT's application "marginally acceptable from a lender's perspective" and that the application without such supports "is inherently economically unsound." AR 3525-26. This reasoning fights the Scully Report's language, which describe the supports as "standard" and recommends them to provide further protection against market risk to an economically sound project. AR. 3213, 3388.

Defendants here (Mem. 22) attempt to justify their finding that the future market for APT's vessels was too uncertain to support approval by citing an October 4, 2012 memorandum prepared by the Director of MarAd's Office of Policy and Plans (OPP) regarding APT's application. AR 2907-14. Defendants claim that this memorandum "expressed some cautious optimism that an improving market and a closer match between supply and demand could improve the market" and then "warned that if this did not occur, 'tank vessel operators [like APT] could face the risk of underutilized assets and the potential for reductions in future charter rates.'" Mem. 22 (quoting October OPP memorandum, AR 2913). These statements, however, are essentially the same as Scully's truisms that things could change in the future.

In fact, the OPP memorandum, to the extent it is at all relevant, supports approval of APT's application. For the most part, the memorandum is a cut-and-paste job of a June 2012 document entitled "Coastal Tank Vessel Market Snapshot, 2011."[20] As its name indicates, this document provided a "snapshot" of the coastwise petroleum vessel market from 2001 to 2011. It did not (and was not intended to) project future demand or charter rates, but instead discussed the decrease in the Jones Act tanker trade and decline in tonnage due to the retirement of single-hull vessels, required by the Oil Pollution Act of 1990, and the greater capacity and efficiency of modern double-hull vessels. The OPP memorandum added two tables (AR 2911-12) showing how rates had increased from 2004 to 2007, dropped precipitously during the 2008-09 recession, and began to recover in 2010 and 2011. To the extent it expressed any opinion, it concluded, "[w]ith excess tonnage coming off the books, and a relatively thin orderbook, it seems reasonable to assume that rates should continue their steady growth for the foreseeable future" (AR 2911), consistent with the Wilson Gillette report.

---

[20] This document is available online at http://www.marad.dot.gov/documents/ Coastal_Tank_Vessel_Market_Snapshot.pdf.

The November letter singled out the two vessels APT had chartered to MSC and concluded that they were "economically vulnerable" because their "annual charters" might not be renewed. AR 3527-28. This conclusion is not supported by the record. MarAd did not consult MSC to find out its plans before issuing the August and November letters and had no basis for concluding that funding would be cut. More importantly, the claim is a red herring. Even if MSC did not exercise the options, or enter into a new charter after completion of the entire term, the Wilson Gillette Report projected that there would be sufficient, if not strong, future demand in the commercial market for all five of APT's tankers.

In any event, the AR indicates that funding for the MSC vessels was not likely to be cut. First, the charters were structured as one-year charters with four one-year renewal options because, as Scully explained, the Navy is prohibited by law from entering into charters of more than one year—a circumstance that Scully viewed only as "adding some degree of risk to the vessel charters." AR 3182. Nonetheless, MSC's Web site discloses that MSC considers these vessels as being under "Long Term Charter." *See* http://www.msc.navy.mil/inventory/ships.asp?ship=207. Second, the two MSC-chartered vessels replaced tankers that MSC had chartered continuously for the prior 20 years. AR 161-14, 3182. Third, APT's two vessels were, and continue to be, the only newly built tankers in the Jones Act fleet with special National Defense Features. AR 3183. Finally, when MarAd sought the Credit Council's authorization to obtain an independent financial analysis of APT's application in September 2011, it specifically noted the two vessels chartered to the Navy and relayed that "[t]he Navy has expressed to MARAD the importance of Title XI financing for this project." AR 2870.

Defendants attempt to buttress their "economic vulnerability" thesis by citing two June 2012 speeches given by the Secretary of Defense and then asserting (AR 3528):

> Two significant forces are at work that create additional risk for these two vessels because overall Navy demand for their services may decrease. First, the decreasing operational tempo in the Middle East may reduce the need for shuttle tankers supporting movements of Atlantic Fleet ships to the Pacific, a trade in which these two APT ships now engage. And second, the Navy has announced its plans to homeport more of its ships on the West Coast to assume a 60/40 West Coast-East Coast posture, a move that would reduce the need for APT's tankers.

AR 3528.[21] This is speculative nonsense. As the Record shows, MSC was using the two vessels on the West Coast and had previously deployed one in the Far East. AR 1950, 3182. The notion that the Navy's deployment of even *more vessels* to the West Coast would somehow create *less demand* for the two MSC-chartered tankers is irrational. Moreover, neither speech discussed a "decreasing operational tempo in the Middle East," and even if it had, defendants' statement that it "*may* reduce the need" for APT's vessels (AR 3528 (emphasis added)) is on its face speculation unsupported by any evidence.

The record thus supports no conclusion other than that the long-term demand for all five of APT's vessels will, as the only market expert to consider the issue concluded, be at least sufficient, if not strong.

## II.    Defendants' Priority Determinations Are Unsupported by the Record and Arbitrary, Capricious and Contrary to Law.

A Title XI application is entitled to a priority for guarantees under certain limited circumstances, including a statutory priority for vessels capable of use as naval auxiliaries in time of war or national emergency (46 U.S.C. § 53706(c); 46 C.F.R. § 298.3(k)(1)), and a regulatory priority when the term of the guarantee is less than the maximum term permitted by

---

[21]   Both speeches were given well before, but are not mentioned in, the August Letter, further reflecting defendants' catch-as-catch-can scramble to find some basis, no matter how flimsy, for denying APT's application.

the Title XI statute (46 C.F.R. § 298.17(a)(4)).[22]  Both the August and November letters found

that APT's vessels were not entitled to either priority because they did not qualify under a

*different* regulatory priority for vessels less than one year old.  AR 3516, 3526-27.  These

determinations were incorrect as a matter of law.  APT's tankers were entitled to both priorities.

The conclusion that the vessels were entitled to the regulatory priority related to the term

of the guarantee is obvious.  The normal term of guarantees for tanker vessels under the Title XI

statute and regulations is 25 years after delivery.  *See* 46 U.S.C. § 53710(a)(3)(A).  The term of

the guarantees sought by APT was 20 years.  AR 3163, 3341, 3346, 3353.  Thus APT was

entitled to the priority for applicants seeking guarantees for terms less than the maximum

permitted.

The conclusion with respect to military utility is equally obvious.  MarAd has for years

recognized that tankers are capable of serving as naval auxiliaries in times of war or national

emergency.  This is evidenced by MarAd's "Voluntary Tanker Agreement" (VTA) program,

which "is designed to create a close working relationship among the Administrator, the

Commander of the U.S. Transportation Command … and the Participant through which DoD

requirements and the needs of the civil economy can be met through cooperative agreement."

*Final Text of Voluntary Tanker Agreement*, 73 Fed. Reg. 521692, 51659 (Sept. 4, 2008).[23]  In

establishing the program, the Administrator "certified that a standby agreement for the utilization

of tanker capacity is necessary for the national defense."  *Id.*  The VTA provides a means "to

provide tanker capacity to support DoD contingency requirements."  *Id.*  As MarAd explains on

---

[22]  Defendants incorrectly assert (Mem. 28) that the statutory priority is available only for "financing," not refinancing.  The statute, however, commands MarAd to accord the priority in "guaranteeing or making a commitment to guarantee an obligation" under Title XI.  46 U.S.C. § 53706(c).

[23]  *See also* http://www.marad.dot.gov/ships_shipping_landing_page/national_security/ Voluntary_Tanker_Agreement-landing_page.html.

its Web site, "VTA participants' tankers must meet militarily useful criteria. Eligible tankers are those greater than 20,000 deadweight tons (DWT) up to 100,000 DWT."[24] All five of APT's 49,000 DWT tankers (AR 3161, 3170, 3338, 3348) are unarguably capable of serving as naval auxiliaries and thus qualify for the statutory priority.

The length to which defendants were willing to go to deny priority to APT's vessels is demonstrated by their denial of the naval-auxiliary priority to two vessels that were specially built to serve, and are actually serving, as naval auxiliaries. AR 1611-14, 3001-02, 3182-83.[25] These two vessels were built with specific national defense features approved by MSC, including gun mounts (AR 1689-98), weapons lockers (AR 1683), fueling-at-sea stations (AR 1951), a decontamination station (AR 1682, 1951), an enlarged and isolated radio room (AR 1951), and additional crew accommodations (AR 1951). Both have been under charter to MSC, and thus serving as naval auxiliaries, since they were delivered from the shipyard. They are thus the epitome of vessels capable of serving as naval auxiliaries in time of war or national emergency.

As to the other three tankers, defendants did not consider them to be militarily useful, even though, as noted, MarAd has consistently so considered tankers. Instead, the August letter found that because these vessels would be more than one year old on the closing date of a Title XI transaction, they were not entitled to the regulatory priority for vessels less than one year old. AR 3516-17, 3526-27. The letters nowhere explained, however, how the vessels' failure to qualify under this priority somehow disqualified them from receiving the priorities for militarily useful vessels or for vessels with guarantee terms shorter than permitted by law. Nor did they

---

[24] *Id.*

[25] Incredibly, the Administrator actually cited these two vessels' current service as MSC naval auxiliaries as a reason for denying that they warrant priority. AR 3516-17, 3527-28. He did so, as noted, by declaring that the vessels were "economically vulnerable" because funding for the charters could be cut at any time. AR 3517, 3527-28.

explain how MarAd's *regulatory* priority for vessels less than one year old trumped the statutory

priority for militarily useful vessels mandated by Congress.[26]

In summary, APT's vessels were unarguably entitled to both (a) a statutory priority because

they are capable of being used as naval auxiliaries in time of war or national emergency and (b) a

regulatory priority because the term of the requested guarantee was less than that permitted by the

Title XI statute. Defendants' contrary conclusion was arbitrary, capricious, an abuse of discretion

and contrary to law.

## III.   Defendants' Exhaustion-of-Funds Rationale Is Arbitrary, Capricious and Contrary to Law.

The final basis for denial of APT's application was that the amount sought by APT would

exhaust available funds that might otherwise be available to grant pending and possibly

forthcoming applications that MarAd might, in the future, deem more sound and desirable.  AR

3517, 3526.  To be clear, the denial letters nowhere stated that MarAd did not have sufficient

funding for the guarantees, only that it would not have funds remaining if it approved APT's

---

[26] The denial letters referred, without citation or explanation, to a "policy point favoring newer vessels." AR 3517. Defendants attempt to explain this "policy point" by claiming that it furthers the purpose of the Merchant Marine Act, 1936, to "foster the development and maintenance of" the U.S. merchant marine and shipyards." Mem. 26-27 (quoting 46 U.S.C. § 50101(a)). According to defendants, the benefit of refinancing construction debt accrues only to the shipowner, while "[i]ts benefit to the U.S. merchant marine is at best attenuated." This argument is, again, irrational. First, defendants recognize that the Act's purpose includes the "maintenance" of the U.S. merchant marine. Title XI loan guarantees allow a vessel owner to finance or refinance construction debt at more favorable interest rates. Lowering vessels costs for vessel owners, as the Act's now-defunct operating subsidy program did, (*see Liberty Maritime Corp. v. United States*, 928 F.2d 413, 414-15 (D.C. Cir. 1991)), furthers "maintenance" of the U.S. merchant marine. Second, APT *is* part of the U.S. merchant marine. Because a Title XI guarantee would benefit APT, it would by definition benefit the U.S. merchant marine. Third, Congress has already determined that refinancing promotes maintenance of the U.S. merchant marine by providing for refinancing guarantees.

application.[27]  MarAd's reliance on the amount of the requested guarantee and other pending

applications is manufactured out of whole cloth.

First, as a legal matter, the letters did not cite any statute or regulation that allows MarAd

even to consider—let alone base its rejection of a project that qualifies for guarantees under the

statute and regulations upon—other pending applications that *may* be eligible for funding in the

future, or applications that are "possibly forthcoming."  AR 3528.  Such factors have no basis in

law, and defendants' claim that they may base a decision on factors not authorized by the statute

and regulations is little more than a claim that the Administrator has unfettered, unreviewable

discretion to deny a Title XI application.

Defendants here (Mem. 30) for the first time cite 46 U.S.C. § 53704(c)(3)(D) as legal

authority for the defendants to "take[] into account the remaining available program funding,"

parenthetically describing that statute as "prohibiting the Administrator from issuing guarantees

if the amount available is reduced to zero[.]"  That statute, however, does not say what

defendants claim.  It merely provides that the Administrator "may not guarantee obligations . . .

*after* the total amount available . . . under appropriations law for the cost of loans is considered to

---

[27]  Factually, the claim that funding APT's project would have exhausted available funds
is technically true, but disingenuous.  The "pending" applications were filed more than 16
months after APT's and had been pending little more than six months when the August letter was
issued.  Moreover, as defendants note (Mem. 29-30), MarAd had enough funding to support
guarantees of $379 million.  What they do not state is that additional funds were effectively
available, requiring only that MarAd take appropriate ministerial action.  In June 2011, MarAd
committed to guarantee $210 million of debt issued by OSG Delaware Bay Lightering LLC, a
subsidiary of Overseas Shipping Group, Inc. (OSG)  *See U.S. Maritime Administration Approves
Title XI Ship-Construction Loan Guarantee for New York Based Shipholding Group*, Maritime
Administration News Release No. DOT-83-11 (July 8, 2011), *available at* http://www.marad.
dot.gov/news_room_landing_page/news_releases_summary/news_release/DOT_83-11.htm.
OSG had subsequently suffered serious financial setbacks and in November 2012, two weeks
after it denied APT's amended application, MarAd terminated its commitment, something that it
certainly knew it was going to do on November 9.  The terminating letter is reproduced in the
Appendix, *infra*.  Thus when the November letter was issued, MarAd in reality had more than
$500 million of funding capability at its disposal.

be reduced to zero . . . ." 46 U.S.C. § 53704(c)((3)(D) (emphasis added).  In other words, the

statute merely prohibits issuing a guarantee if there are no funds available.[28]

The denial letters state that that there was another pending application for "vessels" that

could be used as naval auxiliaries, AR 3526, 3529, and went on to assert that if MarAd approved

APT's application "there would be insufficient funds left to even consider those other

applications."  AR 3528; *see also* Mem. 28 (("[a]t least one other pending application sought

financing for new ships that were also useful as military auxiliaries, and other potential

applicants met this criterion as well") Mem. 28.  This is not accurate.  When defendants issued

the November letter, there was one application (filed on January 25, 2012) requesting a

guarantee for one vessel (a container/roll on-roll off vessel) that could qualify as militarily

useful.  *See* List of Pending Title XI Applications, http://www.marad.dot.gov/documents/

Current_Pending_List_.pdf.[29]  There is no evidence in the record that the Navy or Department of

Defense considers that one vessel more militarily valuable than APT's five tankers.  Absent such

evidence, a determination to deny an application for five vessels capable of adding to the

nation's national defense because there is an application pending for one such vessel that

defendants someday might (or might not) decide is more sound and desirable is, on its face,

arbitrary, capricious and irrational, as well as an abuse of discretion, especially since, as

---

[28] Defendants also cite *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993), for the proposition that an agency's allocation of funds involves whether an agency has enough resources to fund a program at all.  The case is inapposite.  First, there is no dispute that MarAd had sufficient funding to approve guarantees for APT.  Further, in *Lincoln v. Vigil* the Supreme Court determined that the allocation of a *lump sum appropriation* among various programs operated by the agency was committed to agency discretion by law.  Here, the Court has already rejected defendants claim that a denial of a Title XI applications is so committed, the Title XI fund specifically applies to the Title XI program and is not the subject of a lump-sum appropriation, and the Title XI statute and MarAd's regulations specify the criteria for issuing a guarantee.

[29] The other application, seeking a guarantee of $320 million, was for ten oil platform supply boats.  *See* List of Pending Applications, http://www.marad.dot.gov/documents/ Current_Pending_List_.pdf.

explained in note 29 *supra*, MarAd in reality had sufficient funds to cover the guarantees sought

in both applications.

Defendants claim, also incorrectly, that they have "inherent" authority to "balance the

merits of a project against the finite resources." Mem. 30.  In *Morton v. Ruiz*, 415 U.S. 199

(1974), a case concerning an agency-administered program providing financial assistance to

needy Native Americans, the Supreme Court set forth the responsibilities of administrative

agencies in distributing limited funds:

> [I]f there were only enough funds appropriated to provide meaningfully for
> 10,000 needy Indian beneficiaries and the entire class of eligible beneficiaries
> numbered 20,000, it would be incumbent upon the BIA to develop an eligibility
> standard to deal with this problem, and the standard, if rational and proper, might
> leave some of the class otherwise encompassed by the appropriation without
> benefits.  But in such a case, the agency must, at a minimum, let the standard be
> generally known so as to assure that it is being applied consistently and so as to
> avoid both the reality and the appearance of arbitrary denial of benefits to
> potential beneficiaries.

*Id.* at 231.  The Supreme Court went on to conclude, "No matter how rational or consistent with

congressional intent a particular decision might be, the determination of eligibility cannot be

made on an ad hoc basis by the dispenser of the funds."  *Id.* at 232.

Other than the statutory and regulatory priority provisions discussed *supra*, there are no

regulations dealing with approval of Title XI applications where there is funding available for

fewer than all eligible applications, and MarAd has no inherent authority to make *ad hoc*

decisions in such circumstances.  Here, APT's was the only application that had been fully

processed and was ready for decision; the "pending applications" were still being processed by

staff and, as defendants admitted, might in the future be deemed eligible.[30]

---

[30] As explained below, but for delays caused by the Credit Council, MarAd would likely
have completed its evaluation of APT's application well before it received the other applications.

In short, it is the height of arbitrariness to conclude that an application under

consideration must, regardless of its merit when judged by existing statutory and regulatory

criteria, be disapproved on the speculation that doing so *might* limit defendants' ability to

approve some other pending or not-yet-filed applications that at some future time *might* be found

to be more deserving.

**IV.   The DOT Credit Council Unlawfully Controlled both the Administrator's Decision-
Making Process and His Decision.**

This Court has already concluded that the "plain text of the Title XI loan guarantee

program, as modified by the 2006 and 2008 amendments, grants the Maritime Administrator

exclusive authority to grant or deny applications." May 6, 2013 Mem. Op. (ECF Doc. 25) at 17.

The Court elaborated as follows:

> Congress specifically amended the Title XI program so that the Maritime
> Administrator, rather than the Secretary of Transportation, would have authority
> to administer the program, request independent analysis of applications, and
> ultimately grant or deny applications. The Defendants failed to identify any
> statutory or other authority by which Secretary of Transportation can require the
> Maritime Administrator to submit applications for Title XI loan guarantees to the
> Credit Council to obtain the Council's recommendation before the Administrator
> may grant or deny the applications.

*Id.* at 20. "There simply is no textual basis for the Defendants' assertion that the Secretary can

impose additional conditions on the Administrator's approval or denial of applications for Title

XI loan guarantees after Congress gave authority over the program to the Administrator." *Id.* at

18. "Congress intended for the Maritime Administrator to independently exercise authority over

the Title XI loan guarantee program and to exercise his discretion in deciding when to obtain

third party analysis of applications." *Id.* at 18-19.[31]

---

[31] Defendants' Rule 54(b) Motion for Revision of the Order and Memorandum Opinion
by which the Court denied, in the relevant part, defendants' motion to dismiss is procedurally
and substantively defective and should be stricken. Defendants offer nothing that was not, or
could not have been, raised in its prior motion to dismiss. Paragraph 13 of the Court's Standing

The evidence shows that the Secretary of Transportation, through the Credit Council, unlawfully imposed additional requirements on the Administrator's decision-making process and overruled his decision to approve APT's application.

## A. The Credit Council Unlawfully Controlled the Administrator's Decision-Making Process.

The Credit Council's role in decisions on Title XI applications is not optional and its actions are not advisory. The governing DOT Order authorizes the Credit Council to establish departmental credit policies governing Title XI applications and *requires* the Administrator to seek the Credit Counsel's guidance before denying or approving a Title XI application. The Credit Counsel's "Guidelines" (AR 2865) *require* MarAd to use an independent financial analyst to review Title XI applications like APT's. And although the requirement itself is not explicitly stated in the record, the record discloses (AR 2866, 2868, 2871-73), and defendants here concede (Mem. 31), that the Credit Council required MarAd to seek and receive Credit Council consent prior to retaining an IFA. There is nothing in the record to suggest that the Administrator voluntarily sought the Credit Council's input or guidance. Thus, as the Court has already concluded, "[t]his case does not require the Court to consider whether the Maritime Administrator, on his own accord, may seek the advice of the Credit Council or others within the Department of Transportation before granting or denying applications for Title XI loan guarantees." May 6, 2013 Mem. Op. at 16, n.6.

---

Order instructs that such a motion will not be entertained: "[T]he Court will not entertain: (a) motions which simply reassert arguments previously raised and rejected by the Court; or (b) arguments which should have been previously raised, but are being raised for the first time. . . . Motions not in compliance with these instructions may be stricken." ECF Doc. 8, filed July 27, 2012 (citing *National Trust v. Department of State*, 834 F. Supp. 453, 455 (D.D.C. 1993)); *see also Estate of Gaither v. District of Columbia*, 771 F. Supp. 2d 5, 8-9 (D.D.C. 2011). If, despite the apparent certainty of the disposal required by its standing order, the Court decides to reconsider its prior ruling, APT asks that it be given an opportunity to address the substance of defendants' arguments.

Defendants concede that, in March 2011, the Credit Council vetoed MarAd's "request" to retain an IFA (AR 2871).[32]  By doing so, the Council effectively usurped the Administrator's statutory authority to hire an IFA.  46 U.S.C. § 53708(d).  And because the Credit Council had previously made analysis by an IFA a prerequisite to a decision, its refusal to permit the Administrator to retain an IFA also usurped his authority to decide whether to approve or deny Title XI applications.  *Id.*, § 53702(a).[33]  By the simple expedient of requiring Credit Council approval before MarAd could proceed with the processing of a Title XI application, the Council effectively took control over the Title XI program.

This is demonstrated by the effect that the Credit Council's refusal to permit MarAd to retain an IFA had on APT's application.  The AR discloses that MarAd's activity on APT's application came to a screeching halt after January 2011 and did not resume until October 2011, after the Credit Council relented and "recommended" that MarAd hire an IFA in late September 2011.  Plainly, Credit Council "recommendations" are treated by both the Council itself and the Administrator as directives.[34]  As the Court long ago recognized in a similar context, nominally non-compulsory input from "highly placed officers" may have an insidious effect on the decisions of subordinates.

---

[32]  The Credit Council's March 2011 denial of MarAd's request is not contained in the Administrative Record.  It is, however, recounted in a September 21, 2011 memorandum (AR 2871) and a September 23, 2011 e-mail (AR 2868).  As with other significant Credit Council actions, the only reasonably contemporaneous record of the Credit Council's denial of the Administrator's request is APT's ensuing communications with MarAd.  See AR 1704.

[33]  In fact, the Record shows that Credit Council policies interfered with MarAd's processing of APT's application as early as January 2011.  AR 1701-02 (email and memo from APT's CEO to the Administrator urging MarAd to proceed with the hiring of an IFA, which was apparently being delayed by "Credit Council policy").

[34]  The Credit Council's refusal to permit MarAd to hire an IFA was overcome, not by MarAd, but by APT, whose CEO met directly with the chairman of the Credit Council and persuaded him to relent.  AR 1703-07, 1714, 2438-39, 2441-43.

> Two of the [decision makers] … were relatively subordinate government employees and the contacts were made by highly placed officers of the Federal and District Governments.  If nothing else, these two [decision makers] were made to know that a favorable decision would be pleasing, and an unfavorable decision displeasing, to persons in very high governmental brackets.  These officials possess vast power to bestow or not to bestow benefits of various kinds upon subordinate employees.  The pressures were not crudely or indelicately exerted.  There was no threat or command.  There was no promise of reward.  But the pressures were nevertheless real, and the [decision makers] could not fail to be aware that they would incur administrative displeasure if they decided the appeal unfavorably.

*Jarrott v. Scrivener*, 225 F. Supp. 827, 834 (D.D.C. 1964).  That insidious effect is even worse where, as here, the decision maker is a direct subordinate of the officer whose "non-compulsory" body is making the "recommendation."  Its effect in the present case was clearly demonstrated when, in a June 2012 discussion of the Credit Council's failure to consider APT's application, APT's CEO asked the Maritime Administrator what APT needed to do to get its application approved, and the Administrator responded that he did not know.  *See* Kurz Decl., ¶ 30.

Defendants pretend that the Credit Council's action with respect to the retention of an IFA was irrelevant except for the delay it caused in the ultimate consideration and disposition of APT's application, and that the delay caused APT no harm.  Mem. 31-32.  The evidence is to the contrary.  One of the reasons cited for denying APT's application was the supposed need to preserve funds for other pending Title XI applications, if they were deemed worthy of approval.  The two-then pending applications were filed in or after January 2012.  Using defendants' 270-day projected processing period (Mem. 26), MarAd could have, and but for the delay imposed by the Credit Council, likely would have, completed its processing of APT's application (filed on August 30, 2010) around the end of May 2011, well before the two other applications were even filed.

In any event, the Credit Council, by "recommending" that MarAd not retain an IFA, completely forestalled MarAd's consideration of, and thus effectively (and unlawfully)

52

prevented the Administrator from approving (or denying), APT's application.  As next shown, the Credit Council's subsequent "recommendation" that MarAd disapprove APT's application had an even more egregious, and unlawful, effect.

### B. The Credit Council Unlawfully Controlled the Administrator's Decision.

No matter how the Credit Council's action are portrayed, the Record discloses that they had an unlawful effect on MarAd and the Administrator

### 1. Even if the Credit Council's Input Had Been Advisory, It Unlawfully Infected the Administrator's Decision with DOT's Extra-Legal, Non-public Credit Policies.

The Credit Council's governing directive provides that one of the Council's responsibilities is "[t]o set the Department's credit policies and oversee the Department's credit programs," including MarAd's Title XI program.  DOT Order 2301.1B (ECF Doc. 18-2) ¶ 6.  Its review of applications is to focus on, among other things, the project's "consistency with Departmental credit policies."  *Id.*, ¶ 9.  For Title XI applications, the Credit Council is to provide a recommendation regarding, among other things, the application's "consistency with the departmental credit policies."  *Id.*  The credit policies established and used by the Credit Council to review and analyze Title XI applications were developed without public input, have not been published and are not included in the AR.[35]

The Administrator conceded that his decisions "were informed by" the Credit Council's recommendations, which he was required to obtain after completing his review and before issuing a final decision.  AR 3513, 3522.  The Credit Council's recommendations were based, at

---

[35]  According to the governing DOT Order, the Office of the Assistant Secretary for Budget and Programs and Chief Financial Officer is "responsible for recording the Credit Council's votes, preparing and coordinating the Credit Council's recommendations to" department operating administrations, including MarAd.  DOT Order 2301.1B ¶ 7.  Defendants have made none of this documentation available to APT or the Court.

least in part, on the application's consistency with DOT's non-public credit policies, which the

Credit Council had developed without observing the procedures required by the APA.  And in

taking the Credit Council's "recommendation" into account, the Administrator's final decision

was necessarily infected by these unidentified policies.

Apparently these non-public credit polices include a policy of denying credit assistance to

companies that, like APT, are owned by investment funds managed by private equity firms.  That

was the primary reason the Credit Council gave for its opposition to APT's application, both at

the IFA-retention stage (AR 1704-07, 2868, 2871; Kurz Decl., ¶ 16) and at the final-decision

stage (Kurz Decl., ¶ 33 and Exhibit 5).[36]  Consideration of such factors is nowhere addressed,

much less sanctioned, in the Title XI statute or regulations

### 2. The Credit Council's Input Was Not Advisory; It Effectively Vetoed the Administrator's Decision to Approve APT's Application and Forced Him to Deny It.

MarAd made its first presentation to the Credit Council's working group (AR 2917-31)

on May 31, 2012 and its first presentation to the Credit Council itself (AR 2932-53) on June 12,

2012.  Most of these presentations have been redacted, but the remaining portion is sufficient to

disclose that MarAd was, at that time, proposing approval of APT's application for a guarantee

in the amount of $340 million.  AR 2918 (presentation to working group: "MARAD is proposing

a guarantee of $340 million, 51% of depreciated actual cost & 47% of total actual cost."); AR

2933 (presentation to Credit Council: same).  According to the DOT Order, MarAd's

presentation of its proposal to the Credit Council signified that MarAd had *completed* its review

of the application.  DOT Order 2301.1B ¶ 9.

---

[36]  The Credit Council's concern about APT's ownership structure was confirmed by its chairman, the Deputy Secretary of Transportation, during his meeting with APT's CEO on September 7, 2011.  Kurz Decl., ¶ 19.

That MarAd had decided to approve APT's application is corroborated by other evidence in the record. In the May 23, 2012 memorandum by which he made his recommendation on APT's application to the Administrator—most of which has been redacted—the Associate Administrator for Business and Finance Development noted that the January 2012 draft IFA Report (AR 2978-3152) then available to MarAd "indicated that the [APT] project was economically sound at a guarantee level of $340 million of debt." AR 2889. Although the analysis and recommendation in the Associate Administrator's memorandum have been redacted, it is fair to infer that he recommended that APT's application be approved, especially since he informed APT on May 31 that he and the Administrator were recommending that the application be approved. AR 2450. In addition, on April 1, 2012, the Administrator told APT's CEO that he personally supported APT's application. Kurz Decl. ¶ 26; AR 2442. Also, in late May 2012, MarAd's staff informed APT that its application would be reviewed by the Credit Council at its June meeting, that MarAd considered APT's application to be complete, to be financially and economically sound and that MarAd staff and the Administrator were recommending that it be approved. *Id.* ¶ 28; AR 2450, 2452.[37]

The attitude of the Administrator and his staff changed drastically after their favorable "proposal" was presented to the Credit Council on June 12. On June 13, MarAd staff advised APT that its application had been discussed at the Credit Council's June 12 meeting, but that action on it had been deferred until the Credit Council's next meeting scheduled for July 10. Kurz Decl., ¶ 29. The next day, the Administrator informed APT that, while he continued to advocate for approval of APT's application, "things do not look good." *Id.* ¶ 30 and Exhibit 3. The Administrator informed APT that he would not push for a vote at the July 10 meeting

---

[37] *See* notes 10 and 11 and accompanying text, *supra*, for additional evidence that MarAd had decided to approve the application.

because the application appeared to lack support among Council members, based primarily on

APT's private equity ownership. *Id.*, ¶ 33 and Exhibit 5. If APT had not forced the issue on July

17, 2012 by seeking a court order requiring the Administrator to make a decision, the Credit

Counsel could have, and likely would have, prevented the Administrator from acting on APT's

application by simply refusing to issue its prerequisite "recommendation," just as it had

previously prevented the Administrator from acting on APT's application by refusing to permit

MarAd to retain an IFA until APT confronted the Council's chairman.

Based on these facts, it is fair to infer that (1) the Credit Council, at its June 12 meeting,

voiced displeasure at MarAd's positive recommendation and (2) not wanting to openly disagree

with MarAd's recommendation, the Council deferred action on the matter. After APT filed its

complaint on July 17, 2012, the Council, recognizing that it could no longer kill APT's

application merely by refusing to take action on it, directed the Administrator to propose denying

APT's application.[38]

In any event, the Administrator, just as he had with respect to the Credit Council's

"recommendation" that he not retain an IFA, took the Credit Council's "recommendation" that

he deny APT's application as a mandate. In a four-page presentation on July 31, 2012 (which

contained only one (redacted) page of "analysis") (AR 2963-67), he gave the Credit Council

what it demanded: a proposal to deny APT's application.[39] The Credit Council immediately

---

[38] APT believes that these inferences are compelled by the current record and evidence. If the Court is not satisfied in this regard, APT asks the Court, via the accompanying Rule 56(d) Declaration, to defer its disposition of the parties' motions for summary judgment until APT has had an opportunity to obtain the testimony of George Zoukee who was MarAd's Associate Administrator for Business and Financial Development, with oversight of the Title XI program, during June and July 2012 and who attended the meetings at which the Credit Council considered APT's application.

[39] The unredacted portions of the presentations by which MarAd presented its status reports and recommendation regarding APT's application to the Credit Council and its working

concurred and recommended that the Administrator deny APT's application.  He did so the next

day in an eight-page letter (AR 3511-18) that, as demonstrated above, is an obvious pretext; it

distorts the Title XI statute and MarAd's regulations and it disregards or misrepresents the prior

analysis of MarAd's professional staff, the 48-page analysis by MarAd's specially commissioned

IFA, and the 88-page market study conducted by acknowledged and respected experts.[40]

As defendants acknowledge, "agency action is 'arbitrary and capricious' … if the agency

'relied on factors which Congress has not intended it to consider ….'"  Mem. 12 (quoting *Motor

Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Here, as shown

by its 2006 and 2008 legislation, Congress did not intend the Administrator to be subject to the

DOT Credit Council's mandatory procedures or for him to be required to consider the DOT

Credit Council's recommendation or the DOT credit policies, including an aversion to approving

credit assistance to companies owned by private equity funds, that were inherent in that

recommendation.  Thus his decision, which was admittedly based, at least in part, on those

factors, is arbitrary and capricious.

As defendants suggest (Mem.12), the Administrator's decision on APT's application

constituted an informal adjudication.  He was thus acting in a quasi-judicial capacity and was

engaged in judicial decision-making.  "With regard to judicial decisionmaking, whether by court

or agency, the appearance of bias or pressure may be no less objectionable than the reality."

---

group after June 12 (AR 2932-53) do not contain the positive language (and proposed approval)
that the May 31 and June 12 presentations did.

[40]  A similar charade was performed in November 2012, when the Credit Council
"recommended" that the Administrator deny APT's modified application.  The Administrator's
ensuing November denial letter (AR 3519-29), in addition to ignoring or distorting MarAd's
regulations and misrepresenting the Scully report, relies heavily on a half-page spreadsheet (AR
2916) and a simplistic, internally inconsistent staff memorandum (AR 2907-14) that are based on
unsupported and unrealistic assumptions and are flatly contradicted by MarAd's prior analysis,
the Scully report, and the industry expert's market study.

*D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1247 (D.C. Cir. 1972). "Well-established principles" provide that a decision made under improper pressure cannot stand, "even without showing that the pressure … actually influenced the … decision." *Id.* "If, in the course of reaching his decision, [the decision-maker] took into account 'considerations that Congress could not have intended to make relevant," his action proceeded from an erroneous premise and his decision cannot stand. The error would be more flagrant, of course, if the [decision maker] had based his decision solely on [that forbidden consideration]. But it should be clear that his action would not be immunized merely because he also considered some relevant factors. *Id.*, 459 F.2d at 1247-48 (footnotes omitted). "The test is whether 'extraneous factors intruded into the calculus of consideration' of the individual decisionmaker." *Peter Kiewit Sons' Co. v. United States Army Corps of Eng'rs*, 714 F.2d 163, 170 (D.C. Cir. 1983) (quoting *Volpe*, 459 F.2d at 1246); *see also ATX, Inc. v. United States Dep't of Transp.*, 41 F.3d 1522, 1527 (D.C. Cir. 1994). The pressure applied by the Credit Council was unlawful. It was an extraneous factor that intruded into the Administrator's consideration of APT's Title XI application. The decision on that application must be set aside.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion for Summary

Judgment and for Revision of Interlocutory Order and grant APT's Cross-Motion for Summary

Judgment.

Respectfully submitted,


/s/Michael Joseph_____
Michael Joseph (DC Bar No. 6593)
Alex Blanton (DC Bar No. 169623)
Joseph O. Click (DC Bar No. 417294)
 Blank Rome LLP
 600 New Hampshire Ave. NW
 Washington, D.C.  20037
 (202) 772-5966
 click@blankrome.com

*Counsel for Plaintiff*

August 8, 2013

# APPENDIX



U.S. Department
of Transportation

ADMINISTRATOR

1200 New Jersey Avenue, SE
Washington, DC 20590

**Maritime
Administration**

November 26, 2012

Captain Robert Johnston
Senior Vice President
Overseas Shipholding Group, Inc.
666 Third Avenue
New York, New York 10017

Dear Captain Johnston:

This is in reference to the Letter Commitment, dated June 16, 2011, from the Maritime
Administration (MarAd) to OSG Delaware Bay Lightering, LLC (OSG), which approved and
authorized a guarantee of obligations under Title 46, United States Code, Chapter 537, to
finance part of the cost of construction of two articulated tug barge units, OSG VISION (tug)/OSG
350 (barge) and OSG HORIZON (tug)/OSG 351 (barge).

A Closing has not yet occurred under the Letter Commitment.   Recommendation XXXII of the
Commitment provides that it may be terminated at the option of the Maritime Administrator if OSG
has not had a Closing within six months of the date of the Commitment.  As a consequence,
MarAd is exercising this option and hereby terminates the Letter Commitment, effective this
date.

Sincerely,

David C. Matsuda
Maritime Administrator



U.S. Department of Transportation
**Maritime Administration**

# CONCURRENCE RECORD   11/26/2012

| ORIGINATING OFFICE MAR- 720 | SUBJECT: OSG Delaware Bay Lightering, LLC Termination Letter | | | |
|---|---|---|---|---|

| SEQUENCE | CODE NO. | ORGANIZATIONAL UNIT | INITIALS WITHIN OFFICE | OFFICE HEAD | DATE |
|---|---|---|---|---|---|
| 4 4 5 | 100 | MARITIME ADMINISTRATOR | Pg | | 11/26 |
| 4 4 | 110 | DEPUTY MARITIME ADMINISTRATOR | Pg | | 1/26 |
| 3 | 120 | EXECUTIVE DIRECTOR | JS | JS | 11/26 |
| | 130 | OFFICE OF CIVIL RIGHTS | | | |
| 2 | 220 | OFFICE OF CHIEF COUNSEL    RMV 11/15/12 | RMV 11/15 | | 11/2/12 |
| | 221 | DIVISION OF LITIGATION AND GENERAL LAW | | | |
| | 222 | DIVISION OF MARITIME PROGRAMS | | | |
| | 225 | DIVISION OF LEGISLATION AND REGULATIONS | | | |
| | 230 | ASSISTANT ADMINISTRATOR | | | |
| | 231 | OFFICE OF INTERNATIONAL ACTIVITIES | | | |
| | 232 | OFFICE OF POLICY AND PLANS | | | |
| | 240 | OFFICE OF CONGRESSIONAL AND PUBLIC AFFAIRS | | | |
| | 250 | OFFICE OF CHIEF FINANCIAL OFFICER | | | |
| | 300 | ASSOCIATE ADMINISTRATOR FOR ADMINISTRATION | | | |
| | 340 | OFFICE OF CHIEF INFORMATION OFFICER | | | |
| | 360 | OFFICE OF HUMAN RESOURCES | | | |
| | 380 | OFFICE OF ACQUISITION | | | |
| | 390 | OFFICE OF MANAGEMENT AND ADMINISTRATIVE SERVICES | | | |
| | 400 | ASSOCIATE ADMINISTRATOR FOR ENVIRONMENT AND COMPLIANCE | | | |
| | 410 | OFFICE OF ENVIRONMENTAL COMPLIANCE | | | |
| | 420 | OFFICE OF SECURITY | | | |
| | 430 | OFFICE OF SAFETY | | | |
| | 500 | ASSOCIATE ADMINISTRATOR FOR INTERMODAL SYSTEM DEVELOPMENT | | | |
| | 510 | OFFICE OF INFRASTRUCTURE DEVELOPMENT AND CONGESTION MITIGATION | | | |
| | 520 | OFFICE OF MARINE HIGHWAYS AND PASSENGER SERVICES | | | |
| | 530 | OFFICE OF DEEPWATER PORTS AND OFFSHORE ACTIVITIES | | | |
| | 540 | OFFICE OF SHIPPER AND CARRIER OUTREACH | | | |
| | 550 | OFFICE OF GATEWAYS | | | |
| | 600 | ASSOCIATE ADMINISTRATOR FOR NATIONAL SECURITY | | | |
| | 610 | OFFICE OF SHIP OPERATIONS | | | |
| | 620 | OFFICE OF EMERGENCY PREPAREDNESS | | | |
| | 630 | OFFICE OF SEALIFT SUPPORT | | | |
| | 640 | OFFICE OF SHIP DISPOSAL | | | |
| | 700 | ASSOCIATE ADMINISTRATOR FOR BUSINESS AND WORKFORCE DEVELOPMENT | | | |
| | 710 | OFFICE OF FINANCIAL APPROVALS AND MARINE INSURANCE | | | |
| 1 | 720 | OFFICE OF SHIPYARDS AND MARINE FINANCE | A. G. | KC H (Acting) | 11/15/12 |
| | 730 | OFFICE OF CARGO PREFERENCE AND DOMESTIC TRADE | | | |
| | 740 | OFFICE OF MARITIME WORKFORCE DEVELOPMENT | | | |
| | 5100 | U.S. MERCHANT MARINE ACADEMY | | | |

| SUMMARY OF DOCUMENT: | 11-26-12    RMK |
|---|---|

FORM MA-71 (Rev. 8-12)  (PRESCRIBED BY MAO 240-3)

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2013, the foregoing was filed electronically with the court's CM/ECF system and will be served on parties of record by the Court's CM/ECF system.

/s/ MICHAEL JOSEPH
Michael Joseph (DC Bar No. 6593)
Blank Rome LLP
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 772-5966
click@blankrome.com

*Counsel for Plaintiff*