UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN PETROLEUM TANKERS PARENT LLC,<br>Plaintiff, | ) ) ) ) | |
| v. | ) ) | Civil Action No. 1:12-CV-001165-CKK |
| The UNITED STATES OF AMERICA, *et al.*,<br>Defendants | ) ) ) ) ) | |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AND FOR REVISION OF
INTERLOCUTORY ORDER AND IN OPPOSITION TO PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

Dated: September 3, 2013

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

JUDRY L. SUBAR
Assistant Branch Director

*/s/ Jesse Z. Grauman*
JESSE Z. GRAUMAN (Va. Bar No. 76782)
U.S. Department of Justice
Civil Division, Federal Programs Branch

Mailing Address:
Post Office Box 883
Washington, D.C.  20044

Courier Address:
20 Massachusetts Ave., N.W., Room 5374
Washington, D.C. 20001
Telephone:    (202) 514-2849
Fax:              (202) 305-8517
Email:          jesse.z.grauman@usdoj.gov

Counsel for Defendants

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ....................................................................................................... 1

FACTS ........................................................................................................................ 2

ARGUMENT ............................................................................................................. 4

I.    MARAD'S ECONOMIC SOUNDNESS FINDINGS WERE SUPPORTED BY
SUBSTANTIAL EVIDENCE AND WERE IN ACCORDANCE WITH THE
STATUTES AND REGULATIONS GOVERNING TITLE XI. .........................4

    A. APT's Losses, Significant Interest, and Highly Leveraged Structure Justified
MarAd's Finding in the August Decision Letter that APT's Application Was
Not Economically Sound. ........................................................................4

    B. MarAd Did Not Act Arbitrarily, Capriciously, or Contrary To Law by
Denying APT's Modified Application Based on its Failure to Meet a 1.5:1
Debt Service Coverage Ratio. ..................................................................9

    C. MarAd Was Not Required to Accept the Conclusions of Scully's Reports,
and Those Reports Were Not Unqualified Endorsements of APT's
Application in Any Event.. .....................................................................15

    D. MarAd's Findings on Market Demand Are Supported by the Record..........16

    E. APT's Self-Interested Claims Conflict with its Own Representations in its
Form 10-K Filed with the Securities and Exchange Commission..................21

II.    EVEN ASSUMING THAT APT'S VESSELS COULD BE USEFUL AS MILITARY
AUXILIARIES, ITS APPLICATION DID NOT MERIT APPROVAL..........................25

    A. Any Potential Military Usefulness of APT's Vessels Was Outweighed by
Other Factors.......................................................................................25

    B. MarAd Has Discretion to Reasonably Weigh Priorities and Other Factors
Affecting APT's Application. .................................................................27

III.    MARAD ACTED WITHIN ITS AUTHORITY IN CONSIDERING, IN
CONJUNCTION WITH OTHER FACTORS, THE SIZE OF APT'S REFINANCING
APPLICATION AND THE POTENTIAL EXHAUSTION OF AVAILABLE TITLE
XI FUNDS...........................................................................................30

IV. THE CREDIT COUNCIL'S INVOLVEMENT IN APT'S APPLICATION DOES
NOT WARRANT REVERSAL. ................................................................................33

    A. APT's Allegations About the Credit Council's Influence Should be
       Rejected...................................................................................................................33

    B. That MarAd's Views Changed After Consultation with the Credit Council
       Does Not Warrant A Conclusion that the Credit Council Acted
       Impermissibly. .......................................................................................................35

    C. The Mere Involvement of the Credit Council, Even if Required by
       Departmental Order, Cannot, By Itself, Warrant Reversal and Remand.......................39

    D. APT's Arguments Fail to Refute Defendants' Contention that any Delays
       Attributable to the Credit Council Constitute At Most Harmless Error. ........................41

    E. Required Review By the Credit Council Does Not Violate The Title XI
       Statute. ...................................................................................................................42

CONCLUSION.........................................................................................................43

## TABLE OF AUTHORITIES

**CASES**                                                                                      **PAGE(S)**

*A.L. Pharma, Inc. v. Shalala,*
   62 F.3d 1484 (D.C. Cir. 1995).................................................................................... 15

*Air Line Pilots Ass'n v. Dep't of Transp.,*
   791 F.2d 172 (D.C. Cir.1986)..................................................................................... 28

*AJP Constr., Inc. v. Sec'y of Labor,*
   357 F.3d 70 (D.C. Cir. 2004)........................................................................... 15, 36, 37

*Animal Legal Def. Fund v. Glickman,*
   204 F.3d 229 (D.C. Cir. 2000).................................................................................... 28

*Batterton v. Marshall,*
   648 F.2d 694 (D.C. Cir. 1980).................................................................................... 11

*Broadgate Inc. v. U.S. Citizenship & Immigration Servs.,*
   730 F. Supp. 2d 240 (D.D.C. 2010)............................................................................ 11

*Burlington Truck Lines v. United States,*
   371 U.S. 156 (1962) .................................................................................................... 25

*Chem. Waste Mgmt., Inc. v. EPA,*
   976 F.2d 2 (D.C. Cir. 1992)................................................................................. 40, 41

*D.C. Fed'n of Civic Ass'ns v. Volpe,*
   459 F.2d 1231 (D.C. Cir. 1972)............................................................................ 37, 38

*DCP Farms v. Yeutter,*
   957 F.2d 1183 (5th Cir. 1992) .................................................................................... 39

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) .................................................................................................... 35

*Heckler v. Chaney,*
   470 U.S. 821 (1985) .................................................................................................... 31

*Hinckley v. United States,*
   140 F.3d 277 (D.C. Cir. 1998).................................................................................... 35

*In re Polar Bear Endangered Species Act Listing and 4(d) Rule Litigation,*
   794 F. Supp. 2d 65 (D.D.C. 2011).............................................................................. 28

*In re Subpoena Duces Tecum*,
   156 F.3d 1279 (D.C. Cir. 1998)..................................................................... 33, 34

*Int'l Union, United Gov't Sec. Officers of Am. v. Clark*,
   878 F. Supp. 2d 127 (D.D.C. 2012)..................................................................... 43

*Jarrott v. Scrivener*,
   225 F. Supp. 827 (D.D.C. 1964)..................................................................... 37, 38

*Lynch v. U.S. Parole Comm'n*,
   768 F.2d 491 (2d Cir.1985) ..................................................................... 11

*Mail Order Ass'n of Am. v. U.S. Postal Serv.*
   2 F.3d 408 (D.C. Cir. 1993)..................................................................... 42

*Marshall Cnty. Health Care Auth. v. Shalala*,
   988 F.2d 1221 (D.C. Cir. 1993)..................................................................... 33, 34

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ..................................................................... 31

*Morton v. Ruiz*,
   415 U.S. 199 (1974) ..................................................................... 30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..................................................................... 15, 25

*Natural Res. Defense Council, Inc. v. U.S. E.P.A.*,
   25 F.3d 1063 (D.C. Cir.1994)..................................................................... 28

*North v. DOJ*,
   892 F. Supp. 2d 297 (D.D.C. 2012)..................................................................... 43

*Peter Kiewit Sons' Co. v. U.S. Army Corps of Eng'rs*,
   714 F.2d 163 (D.C. Cir. 1983)..................................................................... 39

*Shell Offshore, Inc. v. Babbitt*,
   238 F.3d 622 (5th Cir. 2001) ..................................................................... 11

*Sierra Club v. Thomas*,
   828 F.2d 783 (D.C. Cir. 1987)..................................................................... 31

*U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*,
   467 U.S. 797 (1984) ..................................................................... 31

*United Space Alliance, LLC v. Solis*,
   824 F. Supp. 2d 68 (D.D.C. 2011) ....................................................................... 11

## STATUTES

5 U.S.C. § 554 ................................................................................................. 38
5 U.S.C. § 556 ................................................................................................. 38
5 U.S.C. § 557 ................................................................................................. 38
5 U.S.C. § 706 ........................................................................................ 1, 31, 41
46 U.S.C. § 53704(c)(4)(D) ..................................................................... 7, 9, 31
46 U.S.C. § 53704(c)(4)(K) ............................................................................. 32
46 U.S.C. § 53706(b) ............................................................................... 25, 29
46 U.S.C. § 53706(c) ............................................................................... 25, 26
46 U.S.C. § 53708(a) ................................................................................ passim
46 U.S.C. § 53710(a)(3)(A) ............................................................................ 27
46 U.S.C. § 56301 ............................................................................................ 26

## REGULATIONS

46 C.F.R. § 298.3(b) ........................................................................................ 17
46 C.F.R. § 298.3(g) .......................................................................................... 9
46 C.F.R. § 298.3(h) ..................................................................................... 9, 17
46 C.F.R. § 298.3(k)(1) ............................................................................ 25, 26
46 C.F.R. § 298.3(k)(2) ....................................................................... 25, 28-29
46 C.F.R. § 298.3(k)(4) .................................................................................... 27
46 C.F.R. § 298.13(h) ........................................................................................ 7
46 C.F.R. § 298.14(a) ................................................................................ passim
46 C.F.R. § 298.14(b) ................................................................................ passim
46 C.F.R. § 298.14(c)(3)(v) ............................................................................. 17
46 C.F.R. § 298.14(d) ............................................................................. 8, 9, 10
46 C.F.R. § 298.17(a) ......................................................................... 25, 26, 29
46 C.F.R. § 298.35(a) ....................................................................................... 12

## OTHER

Victor G. Hanson, John V. Berry,
   *The Diminution of the Merchant Marine: A National Security Risk*
   74 Univ. of Detroit Mercy L. Rev. 465 (1997) ........................................... 26

Sarah Halzack, Defense contractors gird for "fiscal cliff,"
   *Washington Post*, Oct. 25, 2012 .............................................................. 21

Nick Taborek, Fearing "fiscal cliff," investors bearish about U.S. contractors,
   *Washington Post*, July 16, 2012 .............................................................. 21

United States Maritime Administration,
  Maritime Administrative Order 520-1, Amdt. 2 (Apr. 17, 1997).............................................. 11

## <u>INTRODUCTION</u>

Congress gives federal administrative agencies – and not the entities that they regulate – the authority to decide how such regulation is to be carried out.  Consequently, judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, is highly deferential to agency decision-making.  If the APA standard of review is to be given its intended effect, the summary judgment motion by Plaintiff American Petroleum Tankers Parent LLC ("APT") must be denied, and the corresponding motion by the Maritime Administration ("MarAd") and the Department of Transportation ("DOT") ("Defendants") must be granted.

APT's cross-motion and opposition brief contend that MarAd's denial of its applications for $400 million, and then $340 million, in government loan guarantees was arbitrary, capricious, contrary to law, or unsupported by substantial evidence.  But at their core, APT's brief and Supplemental Complaint truly ask this Court to substitute APT's reading of the Title XI statutes and regulations for the agency's reasonable interpretations, and to replace MarAd's reasoned analysis of the record evidence with an outcome that is favorable to APT.  Put simply, APT requests that the Court conduct a *de novo* review of both the agency's legal interpretations and its fact-finding – a type of review not permitted under the APA.

APT also asks the Court to set aside MarAd's decisions on the grounds that they were subject to allegedly improper influence by DOT's Credit Council, but offers nothing to overcome the general rule that an agency's actions under the APA must be reviewed according to its stated reasons.  Even if Credit Council review was not permissible (and Defendants respectfully submit that it was, and ask the Court to so rule), APT has failed to show that the Credit Council acted improperly during the course of its review or that the Administrator's decisions should be reversed simply because the Credit Council offered its recommendations in the process.

In short, when viewed in light of the proper standards applicable to this APA case, APT has failed to meet its burden to show that MarAd's decisions denying its application were arbitrary, capricious, contrary to law, or unsupported by substantial evidence. Summary judgment should therefore be granted to Defendants and denied to Plaintiff.

## FACTS

The facts of the case are set forth in detail in Defendants' opening brief, *see* Mem. in Support of Mot. for Summ. J. and for Revision of Interlocutory Order, ECF No. 69 ("Defs.' Mem."), at 2-11, and are summarized here. This action concerns an application by APT, a company formed in 2010, AR1543, 3350,[1] for government loan guarantees under Title XI of the Merchant Marine Act of 1936, as amended ("Title XI"). APT has sought the guarantees to refinance debt it incurred to construct five vessels. AR6. APT's original application, AR1-33, sought $470 million in guarantees, but it eventually reduced that amount, first to $400 million, AR1716, and later to $340 million, AR2582-2584. MarAd referred APT's application to Scully Capital, an independent financial advisor ("IFA"), for review in November 2011. AR3168. Scully produced a draft report in January 2012, AR2978-3152, and a final report in June 2012, AR3153-3335.

On August 1, 2012, the Maritime Administrator, informed in part by the recommendations of the DOT Credit Council, denied APT's application, finding that it did not

---

[1] A clarification of Plaintiff's corporate structure is helpful in addressing confusion regarding the entity at issue and certain inconsistencies in the administrative record reflecting this confusion. The Plaintiff and Title XI applicant, American Petroleum Tankers Parent LLC (abbreviated herein for convenience as "APT"), was created in 2010. AR8, 11. APT has a similarly-named wholly-owned subsidiary, American Petroleum Tankers LLC, which was incorporated in 2006, AR8, and is the owner of two vessels of the Plaintiff's five-vessel fleet. AR3172. In its brief, Plaintiff conflates the two entities, incorrectly claiming that APT has existed since 2006. *See* Pl.'s Mem. at 5, 14. The confusion stemming from the similar names also resulted in MarAd's inadvertently stating, in its August decision letter, that APT was formed in 2006. AR3517. This misstatement was corrected in the November decision letter. AR3526.

meet the statutory and regulatory requirement of economic soundness.  AR3511-18.  The August

decision noted APT's consistent net losses, significant leverage, extremely high debt to its equity

sponsors, and the risks posed by the short length of APT's charters combined with the uncertain

state of the Jones Act (U.S. coastwise) tanker market.  AR3515-16.  Additionally, the

Administrator found that three of the vessels for which APT sought refinancing were over one

year old and thus not entitled to statutory or regulatory priority.  AR3516.  Although two of the

five vessels would have been less than one year old on the original projected closing date, those

vessels were economically vulnerable due to their reliance on Navy charters subject to potential

non-renewal on an annual basis and the impact of prospective Defense budget cuts.  AR3517.

Additionally, although the Administrator considered the potential military usefulness of APT's

ships, he found that APT's application lacked the "overarching" statutory requirement of

economic soundness.  AR3518.  Finally, the Administrator found that the amount of guarantees

APT sought was extremely large, particularly compared to prior refinancing projects under Title

XI, and would have exhausted most, if not all, available funds for Title XI guarantees.  AR3517.

MarAd next considered a modified application in which APT's sponsor debt would be

converted to equity, though without the infusion of any additional capital into APT.  AR2582-84,

2589-2608.  Scully provided an updated analysis of APT's modified application on November 5,

2012.  AR3336-3510.  On November 9, 2012, the Administrator denied APT's modified

application.  AR3519-3532.  It found that the majority of circumstances that gave rise to

MarAd's concerns remained unchanged, and that although the sponsor debt issue was resolved,

other barriers to economic soundness, including an inadequate debt service coverage ratio,

remained.  AR3525.

APT seeks review of both decisions, and has also challenged the role of the Credit

Council in its application.  Defendants filed the Administrative Record on June 10, 2013, ECF

No. 30, and on July 10, 2013, the Court substantially denied APT's motion to supplement the

record and to take discovery, including the depositions of the former Maritime Administrator and

Associate Administrator.  ECF No. 73.  Both parties have now moved for summary judgment.

ECF Nos. 69, 79.

## ARGUMENT

I.   **MARAD'S ECONOMIC SOUNDNESS FINDINGS WERE SUPPORTED BY SUBSTANTIAL EVIDENCE AND WERE IN ACCORDANCE WITH THE STATUTES AND REGULATIONS GOVERNING TITLE XI.**

A.   **APT's Losses, Significant Interest, and Highly Leveraged Structure Justified MarAd's Finding in the August Decision Letter that APT's Application Was Not Economically Sound.**

The Maritime Administrator is prohibited from approving a loan guarantee under Title XI

unless he finds "that the property or project for which the obligation will be executed will be

economically sound." 46 U.S.C. § 53708(a); *see* 46 C.F.R. § 298.14(a).  MarAd's August

decision letter found that APT's application did not meet the economic soundness requirement

due in part to APT's consistent net losses and significantly leveraged capital structure, including

$406 million of "sponsor debt."  AR3515-16.  While APT's brief does not contest that it had, and

has, a substantial amount of debt resulting in significant losses, APT asserts that such losses

should have been disregarded by MarAd because much of APT's debt is "paid-in-kind" interest

on debt to its equity sponsors and would be subordinated to any Title XI debt.  *See* Mem. in

Supp. Of Pl.'s Cross-Mot. for Summ. J. & in Opp. To Defs.' Mot. For Summ. J. and Revision of

Interlocutory Order, ECF No. 81 ("Pl.'s Mem") at 29-30.

An explanation of APT's paid-in-kind agreement with its sponsors is in order.  APT was

given a loan in the original principal amount of $325 million from its "Equity Sponsors and other

parties." AR10.  APT has never repaid any of its sponsor debt – interest or principal – in cash.

AR29, 3189.  Instead, the sponsors and APT subsequently agreed that periodic interest on that

debt – at a 12 percent rate – would be paid "in kind" by APT's issuing additional debt securities

to the sponsors.  AR29; *see also* AR3360 ████████ Confidential Business Information ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████  The amount of each interest "payment"

was then added to the principal, resulting in a principal amount that grew over time, in contrast

to a traditional loan that is paid off as time goes by.  AR29, 2563.  It is undisputed that as a result

of this contractual agreement[2] between APT and the sponsors, by the time APT first submitted

its application, the total balance on this sponsor loan was about $338 million, AR29, and when

MarAd was considering APT's application, the balance had risen to $406 million.  AR2563.

Like all good things, however, the forbearance of APT's sponsors is scheduled to come to

an end.  Specifically, the sponsor debt is scheduled to mature in May 2016.  *See* AR47, 1615.[3]

At that time, APT must repay the aggregated principal – including all accumulated principal as a

result of debt issued as paid-in-kind interest – in cash.  ████████ Confidential Business Information ████████

████████████████████████████████████████████████████████  ████████

████████████████████████  This would result in a remaining unpaid principal amount in 2016 of

---

[2] Contrary to APT's assertion, *see* Pl.'s Mem. at 29 n.13, Defendants' use of the word
"arrangement" in their opening brief, *see* Defs.' Mem. at 17, 19 n.8, was not intended to suggest
that APT's payment of interest in kind was only an "informal" agreement.

[3] Oddly, APT's Title XI application stated that "[t]here [were] no scheduled principal
repayments" on the sponsor debt.  AR29.  But the record is clear that the principal on the sponsor
debt is scheduled to be repaid in full, including all capitalized paid-in-kind interest, in 2016.  *See*
AR47, 1526, 1615.

[4] ████████████████ Confidential Business Information ████████████████
████████████

well over $400 million, and potentially much more.  MarAd's calculations in the record

projected that with some debt relief from a Title XI loan of ████████, APT's accumulated

principal owed by the end of 2015, six months before APT was required to repay the sponsor

debt, would still be about ████████.  AR2903.[5]  According to APT's own projections, had it

refinanced a portion of the sponsor debt under the $400 million Title XI guarantee APT

originally requested, the debt still would have grown to more than ████████ in principal at

the end of 2015.  AR2107, 2109.[6]  Had APT refinanced a smaller portion of the sponsor debt

with a reduced $340 million Title XI guarantee, based on straightforward arithmetic calculations,

the total sponsor debt at the end of 2015 would have been at least ████████.[7]  And finally,

without relief to any of the sponsor debt via Title XI refinancing, the same arithmetic

calculations show that the sponsor debt would have risen to $638.84 million at the end of 2015.[8]

---

[5] This amount actually *underestimated* the projected sponsor debt for two reasons.  First, MarAd used $406 million as the starting point for calculating the paid-in-kind interest that would accumulate in 2013 and future years, even though this amount was the balance due at the end of 2011, not 2012.  ████████ Confidential Business Information ████████ ████████ The balance at the end of 2012 would have been higher. The other reason the ████████ number underestimated the sponsor debt amount is because it offset each year's projected sponsor debt balance by projected cash flows to APT.  AR2903. Because APT was paying its interest in kind, not in cash, such an offset by MarAd was overly generous to APT.

[6] The projections on AR2107 and 2109 are part of updated projections APT submitted to MarAd in early 2012.  *See* AR2100.

[7] MarAd calculated that under a $340 million guarantee, there would have been ████████ outstanding on the sponsor debt at closing.  AR2944.  Assuming that closing would have occurred at the end of 2012, and giving APT the benefit of the doubt that no additional interest would have accrued that year, application of the 12 percent paid-in-kind interest rate each year would yield a balance of ████████ Confidential Business Information ████████ ████████

[8] $406 million was due on APT's sponsor debt at the end of 2011.  *See* AR2563.  By the end of 2012, applying a 12 percent rate, that amount would have been ($406 million + ($406 million * 12 percent)) = $454.72 million.  Applying the same 12 percent rate each year, the balance on the sponsor debt would have been $509.28 million at the end of 2013, $570.4 million at the end of

This looming day of reckoning was of great concern to MarAd and was only resolved when APT's sponsors committed to forgiving the debt by agreeing to convert it to equity in APT. *See* AR3522 (describing, prior to conversion of the debt to equity, the "large 2016 balloon payment obligation that would otherwise potentially endanger the solvency of the APT operation were it made or enforced by the sponsor-owners").  Nowhere in the record or in its opposition brief does APT indicate how it planned to repay the sponsor debt when it matured in May 2016.  Instead, APT continues to argue that the sponsor debt was merely an inconvenient book entry.

Apparently, APT believes the sponsor debt should have been unimportant in MarAd's decision-making because of its ultimate subordinated position.  But the issue here is what *MarAd* considered important and unimportant.  And contrary to APT's contentions, 46 C.F.R. § 298.13(h), a Title XI regulation that discusses subordinated debt, does not prohibit MarAd from considering the risks that such debt may pose to an applicant's overall operations, nor does it relieve MarAd of its statutory requirement to consider "the financial condition of an obligor or applicant for a guarantee."  46 U.S.C. § 53704(c)(4)(D).[9]  The risk posed by the sponsor debt was not whether the debt would be paid before or after the Title XI debt, but that the debt and looming balloon payment in 2016 threatened APT's very solvency.  *See* AR3516 ("[T]he leverage structure of APT is not viable and even with reduced debt service costs, the underlying APT operation is dis-economic.").  Subordination of the sponsor debt was not a panacea.  It would not have made the debt disappear.  And even assuming *arguendo* that the sponsor debt

---

2014, and $638.84 million at the end of 2015.

[9]APT also incorrectly suggests that Scully made an independent determination that the subordinated debt should be considered as equity.  Pl.'s Mem. at 29.  To the contrary, Scully stated that ██████████ Confidential Business Information ██████████

holders would not force APT to pay the full amount due upon maturity, APT would still be financially overburdened from the mounting "paid-in-kind" interest during the 20-year term of the loan guarantee. This could cause APT to become insolvent or file for bankruptcy, in which case MarAd would likely have to pay out a substantial amount on the government guarantee while trying to recoup its losses through bankruptcy proceedings.

The only way this issue could be resolved was if APT's sponsors would do what MarAd and the Title XI regulations could not – forgive APT's debt. Eventually, APT and its sponsors did agree to convert the debt to equity. AR2582-84. Although APT contends that it had "three times – twice in writing – communicated its commitment to actually convert the subordinated debt to equity" prior to the August 1, 2012 letter, Pl.'s Mem. at 30, the first time MarAd received any written communication of such a commitment was July 23, 2012, and this communication came unaccompanied by any adjusted financial projections. AR2580. The projections did not arrive until Sunday, July 29, 2012, AR2589-2608, a few days before MarAd issued its August 1, 2012 decision. Given that MarAd had committed to issuing a decision by August 31, 2012 as a result of APT's motion for a preliminary injunction, *see* ECF No. 7, it was unreasonable to expect MarAd to analyze and rely on these eleventh-hour financial projections, particularly since MarAd was presenting APT's application to the Credit Council for its recommendation on July 31. AR2963-2966. For this reason, the August decision letter did not take the conversion of debt to equity into account, *see* AR3514, and in any event, this issue was rendered moot by MarAd's subsequent consideration of APT's modified application in its November decision.

Finally, in arguing, *see* Pl.'s Mem. at 27-28, that MarAd's examination of APT's net losses rather than its "operating cash flow" violated MarAd's regulations, APT misapprehends what these regulations require. The regulation on which APT relies cites several "[o]bjective

criteria" that a Title XI project *must* meet "to receive approval." 46 C.F.R. § 298.14(d). One such requirement is that "the operating cash flow to Obligation debt service ratio over the term of the Guarantee must be in excess of 1:1[.]" 46 C.F.R. § 298.14(d)(4). Nowhere does this regulation *prohibit* MarAd from examining net losses or any metric other than "operating cash flow" that could indicate that a project may be economically unsound. The plain language of the regulation is to the contrary, emphasizing that "[MarAd] must make a finding of economic soundness as to each project *based on an assessment of the entire project*." 46 C.F.R. § 298.14(d) (emphasis added), and that "[i]n making the economic soundness findings, we shall consider all relevant factors, *including, but not limited to* [five enumerated factors and] other relevant criteria." 46 C.F.R. § 298.14(b) (emphasis added). *See also* 46 U.S.C. § 53704(c)(4)(D) (MarAd must consider "the financial condition of an obligor or applicant for a guarantee"); 46 U.S.C. § 53708(a)(5) (permitting Administrator to consider "other relevant criteria" when determining economic soundness); 46 C.F.R. § 298.3(g) ("When processing applications, we will consider the different degrees of risk involved with different applications."); 46 C.F.R. § 298.3(h) (permitting MarAd to require additional assurances if "[applicant is] not a well-established firm with strong financial qualifications" with other indicia of low risk). MarAd thus acted reasonably and in compliance with all relevant legal mandates in its August denial of APT's application.

### B. MarAd Did Not Act Arbitrarily, Capriciously, or Contrary To Law by Denying APT's Modified Application Based on its Failure to Meet a 1.5:1 Debt Service Coverage Ratio.

As Defendants set forth in their opening brief, the November decision was grounded in MarAd's determination that the cash flow generated from APT's charters would not provide MarAd with a sufficient degree of certainty that APT would repay its Title XI debt. APT's chief

objection to MarAd's analysis is that MarAd relied on APT's failure to meet a 1.5:1 Debt

Service Coverage Ratio ("DSCR"), whereas MarAd's Title XI regulations reference a 1:1 ratio.

However, much like APT's regulatory arguments discussed above, APT presumes that the

regulation binds MarAd to a single criterion when it does not.  The relevant regulation, 46 C.F.R.

§ 298.14(d)(4), states that "*for the project to receive approval . . .* [the DSCR] *must* be in excess

of 1:1."  (emphasis added).  The plain language of this regulation, as Defendants have previously

demonstrated, creates a floor and not a ceiling.[10]  Nowhere does it preclude MarAd from

determining that a higher benchmark may be more appropriate under certain circumstances, and

nowhere does it constrain MarAd to find that an application is economically sound merely

because it meets a 1:1 DSCR.[11]

APT's argument that MarAd's interpretation of 46 C.F.R. § 298.14(d)(4) is somehow a

---

[10] APT similarly misconstrues the Court's holding that the decision under review is not committed to agency discretion by law.  *See* Pl.'s Mem. at 36.  The Court found that "the Administrator's discretion is limited to considering other criteria relevant to whether the underlying obligation will be economically sound."  Mem. Op., May 6, 2013 (ECF No. 25) at 13. The Court did not find that the Title XI statute or regulations preclude MarAd from grounding findings of economic unsoundness on metrics that are not specifically enumerated in the regulations.  To the contrary, the Court specifically found that 46 U.S.C. § 53708(a)(5), which states that "in making [the economic soundness] finding, the Administration shall consider [four listed factors and] other relevant criteria," permits the Administrator "to consider[] other criteria relevant to whether the underlying obligation will be economically sound."  *Id.* (emphasis in original omitted).  Likewise, the economic soundness regulation explicitly states that "[i]n making the economic soundness findings, we shall consider all relevant factors, *including, but not limited to* [five enumerated factors and] other relevant criteria."  46 C.F.R. § 298.14(b) (emphasis added).

[11] Additionally, APT contends that the meaning of the regulatory DSCR requirement of at least 1:1 "over the term of the Guarantee," 46 C.F.R. § 298.14(d)(4), is that the *average* DSCR over the term of the guarantee must exceed 1:1.  *See* Pl.'s Mem. at 34-35.  The phrase "over the term of the guarantee" can just as easily be read to mean that the 1:1 ratio must be met *throughout* the term of the guarantee, *i.e.*, each year.  Indeed, such a reading is more reasonable given that if the ratio goes below 1:1 in a given year, then there is inadequate cash flow to service the debt, leading to a default unless the borrower (APT in this case) has adequate reserves to cover the cashflow shortfall.  *See, e.g.*, AR3383.

violation of the APA because such interpretation requires notice and comment, *see* Pl.'s Mem. at

36, requires only passing mention. The case APT cites, *Shell Offshore, Inc. v. Babbitt*, 238 F.3d

622, 628-30 (5th Cir. 2001) (which APT incorrectly cites as a D.C. Circuit case) concerned the

Department of the Interior's adoption, during the course of an adjudication, of a new regulatory

interpretation that "contradict[ed] Interior's prior consistent interpretation of the regulation." *Id.*

at 629. APT points to no prior "consistent interpretation" wherein MarAd consistently

understood the 1:1 DSCR as binding the agency to accept, as economically sound, any

application that met this ratio, and as preventing the agency from analyzing an application under

a more demanding DSCR if the circumstances warrant.[12]

Indeed, APT's arguments stem from an incorrect fundamental premise – that the Title XI

---

[12] APT cites internal MarAd guidance, Maritime Administrative Order 520-1 (as amended), for the principle that "primary consideration" must be given to the 1:1 ratio, *see* Pl.'s Mem. at 4 (citing MAO 520-1, Amdt. 2 (Apr. 17, 1997), § 3.02(5) (ECF No. 60-3 at 19)), though in other locations it incorrectly states that the "primary consideration" language is grounded in "MarAd's regulations," *id.* at 8. To the extent that APT might claim that this internal guidance is a "consistent interpretation" from which MarAd has improperly deviated, such a claim fails for several reasons. First, "[t]he general rule is that 'internal house-keeping measures organizing agency activities' are non-binding statements of general policy." *United Space Alliance, LLC v. Solis*, 824 F. Supp. 2d 68, 90 (D.D.C. 2011) (quoting *Batterton v. Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980)). Thus, "[e]xcept in unusual circumstances, 'the internal procedures manual of an executive agency does not create due process rights in the public.'" *Id.* (quoting *Lynch v. U.S. Parole Comm'n*, 768 F.2d 491, 497 (2d Cir.1985)). The cited MarAd document containing the "primary consideration" language is such an "internal procedures manual," explicitly stating that it "is intended only to improve the internal management of MARAD and is not intended to create any right or benefit, substantive or procedural, enforceable at law by any party against the United States, MARAD, its officers, or any person." MAO 520-1, Amdt. 2, at 1. Moreover, even if it were binding on MarAd, the language regarding the 1:1 ratio, like the regulation, does not constrain the agency's discretion, as it states, "The Title XI loan guarantee approval process *should* give primary consideration to operating cash flow to debt-service ratios of more than 1:1 on existing debt." *Id.* § 3.02(5) (emphasis added). The use of the term "should" rather than "must" makes it clear that it is non-binding, *see Broadgate Inc. v. U.S. Citizenship & Immigration Servs.*, 730 F. Supp. 2d 240, 245 (D.D.C. 2010) ("[A] good indication of a general policy statement is the agency's use of permissive, rather than binding, language[.]"), and in any case, the language of the Order does not, by its terms, require MarAd to approve an application merely because its DSCR exceeds 1:1.

11

regulations are intended to protect the interests of *applicants*, rather than the public fisc.  With respect to economic soundness, the regulations' intention – in *prohibiting* MarAd from issuing a guarantee *unless* it determines that the project is economically sound, *see* 46 C.F.R. § 298.14(a); *see also* 46 U.S.C. § 53708(a), and in permitting MarAd to consider "all relevant factors, including, but not limited to" those listed, 46 C.F.R. § 298.14(b) – is to provide MarAd and the federal taxpayers with security and assurances that the Title XI debt will be repaid.  *See also* 46 C.F.R. § 298.35(a) (regulation outlining requirements for the Title XI Reserve Fund and Financial Agreement, stating that the purpose of such requirements is "to provide us with further security and to ensure payment of the interest and principal due on the Obligations").  The language that prohibits MarAd from issuing a guarantee *unless* the DSCR is 1:1, but does not prohibit MarAd from using a more demanding ratio when necessary, should be read consistently with the intent of protecting the public fisc.

APT also urges the Court to find that MarAd's use of a 1.5:1 DSCR was arbitrary and capricious.  *See* Pl.'s Mem. at 32-33.  But this ratio is rooted in the Scully reports, which recommended that ██████████████ Confidential Business Information ██████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████ Thus, Scully recommended 1.5:1 as a threshold level ████████████████████████
████████████████████████████████████████████████████████████
████████

MarAd reasonably concluded that it would have been irresponsible for the federal government to issue a $340 million loan guarantee to a borrower in a situation in which the

borrower could not meet Scully's recommended 1.5:1 level and lacked resources to pay any shortfall.  As the decision letter stated, "[t]he very fact that support mechanisms [such as those referenced above] are necessary to bolster APT's project to make it marginally acceptable from a lender's perspective is clear indication that the project would not stand on its own without those supports; that is, it is inherently economically unsound."  AR3525-26.  Thus, MarAd's use of the 1.5:1 level was not arbitrary.  It was derived from Scully's reports and was consistent with MarAd's responsibilities as a steward of the public fisc.  And it reflected MarAd's determination – informed by the Scully reports – that a loan guarantee to APT would not have been able to go forward without the need to prop up APT using support mechanisms.  When the agency's independent analyst invoked a 1.5:1 ratio as a threshold for requiring support measures to prevent a default, MarAd reasonably used that ratio as a means of evaluating whether providing a loan guarantee to APT would have been unduly risky.[13]

APT also argues that MarAd's model referenced in the November decision letter – under which APT failed to meet a 1.5:1 coverage ratio in nine of twenty years, *see* AR2916 – was overly conservative, and even more conservative than Scully's Lender Case.  *See* Pl.'s Mem. at 33-34.  But as a government steward of taxpayer funds in the role of a lender, MarAd is not required to accept an applicant's more favorable projections without also incorporating the risks it recognizes that a 20-year loan guarantee will entail.

To address the risks involved over a 20-year term, MarAd's November decision cited a model that was "neither-best-nor-worst-case" with regard to the post-charter rates that APT's

---

[13] While APT asserts that Scully calls the support mechanisms "standard," AR3213, or "common in project finance transactions," AR3388, *see* Pl.'s Mem. at 39 n.19, no law or regulation requires the federal government to approve any transaction requiring allegedly "common" or "standard" support mechanisms. *Accord* AR3525 ("MarAd's conclusions reflect the careful considerations which should be expected of a Government steward of public resources.").

vessels were projected to receive.  AR2916.  The "worst case" scenario in the record in this

regard, the Lender Case, envisioned post-charter rates equal to the actual 2012 charter rate for

APT's *Sunshine State* in 2012, namely, ███████.  AR2894, 2923, AR3379.[14]  The rate MarAd

projected, ███████, was the mid-point between that "worst case" and $50,700, AR2916, a rate

that MarAd calculated to be the approximate average rate for similar vessels and was similar to

those used in the forecasts of Wilson Gillette, AR3151, the market analyst whose report is

appended to the Scully reports.

      Thus, MarAd's scenario was not the "worst case."  This is underscored by Scully's Stress

Case 1, which resulted in Confidential Business Information, *see* AR3382, and even more

importantly, Scully's Stress Case 2, which – unlike MarAd's model – ███████████████

███████████, *see* AR3383.  In other words, both of these scenarios were worse than the

one cited by MarAd in its decision letter.

      Furthermore, although APT contends that the "breakeven" utilization rate in MarAd's

model, 90.7 percent, is unnecessarily low, it was necessary for MarAd to use a more realistic

estimate of post-charter utilization given that all of Scully's models, including the Lender Case,

projected post-charter utilization at 100 percent, *see* AR3380, an unrealistically high projection

given market conditions, for reasons discussed below.  In short, while Scully's Lender Case was

conservative in some respects, it was overly optimistic in other aspects such as utilization.

---

[14] The Lender Case used the 2012 charter rate earned by one of APT's vessels as the "worst-case" scenario.  APT argues that using such a "low" charter rate is "ultraconservative," Pl.'s Mem. at 21, since it reflected the charter rate for "APT's first vessel," the *Sunshine State*, Pl.'s Mem. at 9 n.8.  In fact, the *Sunshine State* was APT's third vessel of its five-vessel fleet.  *See, e.g.*, AR7, 1542.  That APT secured ███████████████████████ demonstrates how much charter rates can vary in the Jones Act tanker market during a short period of time, and MarAd's need to consider scenarios that contemplated such rates.  *See* AR3205 (Scully report noting that Confidential Business Information ███████████████████████████████████ ").

Finally, even if MarAd's model was, in fact, a "worst case," nothing in the Title XI statute, regulations, or the APA precludes the use of a "worst case scenario" when evaluating an application for over $300 million in government-backed loan guarantees for a start-up applicant that is a newcomer to the industry with a limited operating history and no reserves for contingencies.  If anything, the statutory and regulatory provisions that *prohibit* MarAd from issuing guarantees unless it finds economic soundness suggest that such a conservative, more cautious approach was highly appropriate and advisable.

### C. MarAd Was Not Required to Accept the Conclusions of Scully's Reports, and Those Reports Were Not Unqualified Endorsements of APT's Application in Any Event.

Under the APA, "a court is not to substitute its judgment for that of the agency," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), particularly with regard to an "agency's evaluations of scientific data within its area of expertise," which receive "a high level of deference."  *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1490 (D.C. Cir. 1995); *see also AJP Constr., Inc. v. Sec'y of Labor*, 357 F.3d 70, 73 (D.C. Cir. 2004) ("The question [a court] must answer . . . is not whether record evidence supports [a plaintiff's] version of events, but whether it supports [the agency's].").  Thus, APT's assertion that MarAd's decisions must be set aside because the agency reached different determinations than those in the Scully reports is simply wrong.

Moreover, the Scully reports in fact provide ample record support for MarAd's decisions. Although Scully found APT's project to be feasible with the implementation of support mechanisms, AR3390-92, it made several findings that gave MarAd reason to question the wisdom of approving APT a loan guarantee.  First, Scully observed ██████████████

Confidential Business Information



Scully also examined APT's finances over a variety of conservative scenarios, not all of which projected favorably for APT.  Under Scully's Lender Case,

Under a stress case examining increased operating expenses, , and in a scenario with increased interest rate assumptions, .  AR3382, AR3386. Perhaps most troublingly, under a stress case involving an extended off-hire period in which one vessel is out of service for a full year,

Confidential Business Information

. Finally, Scully found that with utilization reduced to 85 percent,

Thus, *all* of the scenarios Scully examined – with the exception of the optimistic scenario painted by APT –

**D.  MarAd's Findings on Market Demand Are Supported by the Record.**

APT's arguments seeking to undermine MarAd's conclusions regarding market demand are similarly unconvincing.  Though APT contends that it was improper for MarAd to consider the brief length of APT's charters because the regulations list other factors to consider when projecting market demand, Pl.'s Mem. at 37-38, such arguments ignore that the regulations do not create a closed set of factors that the agency may consider.  *See* 46 C.F.R. § 298.14(b)(2)

(MarAd "shall consider *all relevant factors, including, but not limited to* . . . [t]he market potential for employment of the Vessel") (emphasis added). Likewise, MarAd's requirement that applicants submit information regarding "time charters in excess of six months," 46 C.F.R. § 298.3(b)(2) and "proposed charters" and "letters of intent from prospective customers," *id.* § 298.14(c)(3)(v), does not preclude MarAd from examining, as one factor, the length of the charters of APT's vessels. To the contrary, these regulations speak to the importance of the assurance of future employment of any vessels for which Title XI funding is sought.

APT's assertions that MarAd may approve, and has approved, applications where vessels had similar or shorter charter lengths than APT's are misplaced. MarAd's concerns regarding APT's charter lengths did not arise in a vacuum, but against the backdrop of several factors that heightened the risks posed by APT's project.

First, APT was a recent startup company, established in April 2010, rather than an established entity in the maritime industry. AR8, 11, 3526; *see supra* n.1. Thus, APT had been in existence for just over two years at the time of MarAd's August 2012 decision, had only two employees, AR2375, and was a newcomer to the Jones Act tanker industry with less than a two-year history of operating five vessels, *see* AR3171 (noting that APT's last vessel was delivered in December 2010). In contrast, some entities receiving Title XI funding have been in existence for decades or over a century. *See* AR2896. MarAd's regulations contemplate that greater scrutiny be given to younger, less experienced applicants, authorizing MarAd to impose "additional assurances if [the applicant is] not a well-established firm with strong financial qualifications and strong market shares seeking financing guarantees for replacement vessels in an established market in which projected demand exceeds supply." 46 C.F.R. § 298.3(h). Such assurances include "[f]irm charter commitments," 46 C.F.R. § 298.3(h)(1), emphasizing the

17

importance of such commitments for entities that are not "well established."  Here, APT was far

from "well-established," its finances were – as discussed above – highly leveraged, and thus, a

benefit of the doubt that might be appropriate in other circumstances was not appropriate here.

Second, APT operated in only one market, the Jones Act (U.S. coastwise) product tanker

market.  *See* AR3201 (noting "the limited breadth of operations of [APT]").  Thus, unlike a

larger entity with a more diverse fleet, the success or failure of APT relies entirely on one slice

of the overall shipping market.

Third, as the record shows, the Jones Act tanker market is volatile and, at the time of

APT's application, was at a delicate balance of supply equaling demand.  Although APT relies

on favorable projections from Wilson Gillette., *see* Pl.'s Mem. at 38, that report includes many

cautionary notes.  It notes, for example, that several reversals in trends in charter prices for

product tankers have occurred over the past three decades.  From 1980 to 1988, "time charter

rates fell sharply . . . to a level where vessel operating costs were barely covered."  AR3320.

They then increased temporarily in the early 1990s due to military needs resulting from the First

Gulf War, AR3321, before being "subject to downward pressure" in the 1990's as a result of

"overtonnage" – an excess of supply of tankers versus demand.  *Id.*  After rates increased from

2002-2008, they then declined again due to a "material change" in "fundamentals of the

coastwise products trade" caused by the prolonged recession and an expansion in fleet capacity

that exceeded demand.  AR3317.  Wilson Gillette also noted that "[t]he only sector of the

domestic fleet that earned strong time charter revenues over [2010-2011] were newbuildings

employed under long term contracts negotiated before 2009."  AR3322.  Other ships "came off

time charters and were forced into the spot market," or were "put into operation with short term

non-compensatory period fixtures."  *Id.*  This history highlights and justifies MarAd's concerns

regarding the potential negative outcomes associated with APT's short-term charters.

Wilson Gillette predicted in 2011 that due to anticipated economic growth and a decline in fleet capacity, market conditions and charter rates would likely improve.  AR3331.  Notably, though, the primary rationale on which it based these predictions – retirements of older vessels, which would reduce the supply of vessels so that it more tightly matched demand – is strikingly similar to the rationale that formed the basis for prior "expectations" that rates would rise in the 1990s.  AR3316.  As it turned out, these earlier predictions turned out to be wrong, and instead, "downward pressure persisted on product tanker charter rates throughout the 1990s" due to apparently unforeseen developments, including a substantial influx of additional ships into the coastwise market from other markets (including, in part, ships previously employed by the Navy's Military Sealift Command ("MSC")) and the construction of several new tankers.  *Id.*  Thus, supply outstripped demand and charter rates did not increase as expected.

MarAd thus had every reason to be skeptical of Wilson Gillette's optimistic projections and to be concerned that history could repeat itself, particularly given that warning signs were already present.  In particular, MarAd noted in a memorandum by its Office of Policy and Plans ("OPP") that three new ships had, or were scheduled to, come into the coastwise product tanker market in 2012 and 2013, AR2910, 2913, and that the addition of these vessels "may test the realignment of supply and demand forces within a market that is operating at, or near, full employment."  AR2913.  Far from being a "truism" that "things could change in the future," Pl.'s Mem. at 40, this mirrors the increase in supply that depressed charter prices in the 1990's. This concern was similarly voiced by MarAd Associate Administrator George Zoukee.  AR2906 (noting "the strong potential that the addition of the two Aker vessels to the small Jones Act fleet could bring imbalance to the tanker market").  Moreover, in October 2012 APT communicated to

MarAd that ████████████ Confidential Business Information ████████████

████████████████████████████████████████████████████████

████████████████████████████████

MarAd's OPP also noted additional factors contributing to the recent decline in charter rates on which Wilson Gillette had not focused: overall increases in tank barge capacity, a willingness to deploy tankers in longer trades, and a greater use of alternatives to tankers, including pipelines and international tankers.  AR2907-08, 2912.  These developments, in contrast to the time-limited impacts of the recession and a temporary oversupply of ships, would be more likely to have a long-term adverse effect on the only market in which APT operates.[15]

Finally, it is undisputed that two of APT's five vessels – 40 percent of its entire fleet – were subject to one-year charters to the Navy's MSC and potential termination on an annual basis.  While APT notes that MSC's previous charters existed for 20 years, Pl.'s Mem. at 41, as APT recognizes, the Navy lacks the legal authority to renew charters for more than one year no matter what it might intend or desire.  AR1598, 2911.[16]  As long as APT remains reliant on MSC for the charters for 40 percent of its fleet during the current budgetary environment, these charters will be subject to significant uncertainty each year depending on the funding appropriated by Congress and the decisions of policymakers.  MarAd was fully justified in taking this into account in reaching its decision.

---

[15] Additionally, the Navy's MSC currently accounts for 4 percent of the overall Jones Act fleet's employment.  To the extent that budget cutbacks, discussed *infra*, prevent MSC from renewing its charters, such cutbacks could further adversely impact the market.

[16] For this reason, whether MarAd contacted MSC to learn about the agency's "plans," Pl.'s Mem. at 41, is irrelevant.  The most MSC could have communicated was whether, once it confirmed sufficient appropriated funds, it would charter the vessels for 2013.  And ████ Confidential Business ████████████████████████████████.  *See* AR2916 (listing *Empire State* and *Evergreen State* charters as continuing through September 2013).

Finally, the uncertainty at the time of MarAd's decisions in August and November 2012 was significant.  Notwithstanding APT's unsupported claim that MarAd "had no basis for concluding that funding [to MSC] would be cut," Pl.'s Mem. at 41, MarAd was reasonable in concluding that "recent prospective cuts to the Defense budget increase[d] . . . the likelihood that the options on these two ships may not be renewed and that they would become unemployed."  AR3517; s*ee also* AR3528 (citing "[p]otential budget reductions as part of the annual appropriations process").[17]  While APT claims it could simply obtain other charters if its Navy charters are not renewed, Pl.'s Mem. at 41, such speculation is overly optimistic, for reasons discussed above.

In sum, substantial evidence in the record supported MarAd's concerns that given APT's short history, its lack of long-term charters, its heavy reliance on the Navy MSC, and the questionable state of the market, APT's economic position was simply too risky to support a $340 million loan guarantee.

### E.  APT's Self-Interested Claims Conflict with its Own Representations in its Form 10-K Filed with the Securities and Exchange Commission.

While APT accuses Defendants of making "cautionary generalities plucked from the Scully Report," Pl.'s Mem. at 39, the caution and skepticism voiced by MarAd regarding the economic soundness of APT's application were consistent with APT's own representations.  As Defendants previously pointed out, APT represented to MarAd, contrary to its current contentions, that its sponsor debt "impose[d] costs on APT that make it difficult for APT to

---

[17] As the Court is aware, the summer and fall of 2012 were fraught with questions as to how Congress would address looming federal budget cuts, particularly with regard to defense spending.  Background information can be found at, *e.g.*, Nick Taborek, Fearing "fiscal cliff," investors bearish about U.S. contractors, *Washington Post*, July 16, 2012 (noting "possibility of $500 billion in defense cuts scheduled to begin Jan. 2"), and Sarah Halzack, Defense contractors gird for "fiscal cliff," *Washington Post*, Oct. 25, 2012 (citing fear of "sequestration" cuts that could reduce defense programs by $55 billion).

compete." Defs.' Mem. at 18 (citing AR1705). Curiously, APT's only response is to state, in a

footnote, that APT "misspoke about the effect of its subordinated debt," Pl.'s Mem. at 30 n.14,

without explaining how exactly APT "misspoke."

      If APT "misspoke" in the above quote, it "misspoke" considerably more in its 2011 Form

10-K, filed with the Securities and Exchange Commission ("SEC") on March 30, 2012. *See*

*generally* AR2361-2435. In this filing, under the heading "Risk Factors," AR2375-85, APT

made several factual concessions that fly in the face of the arguments it has made to MarAd and

to the Court. Regarding APT's debt level and leveraged structure, APT stated that "[o]ur

substantial level of indebtedness could adversely affect our financial condition." AR2375.

Potential adverse consequences could include, according to APT, that "our high level of

indebtedness could place us at a competitive disadvantage compared to our competitors," and

that "we must use a substantial portion of our cash flow from operations to pay interest . . . which

will reduce the funds available to us for operations and other purposes." *Id.* APT further stated

that the company "may not be able to generate sufficient cash to service all of our indebtedness .

. ." and that "in the absence of [sufficient] operating results and resources, we could face

substantial liquidity problems and might be required to sell material assets or operations to

attempt to meet our debt service and other obligations." AR2376. As to the sponsor debt

specifically, APT stated that "[t]he indenture governing the Notes and our Sponsor Facility

impose significant operating and financial restrictions on us[,]" and that the Sponsor Debt could

"limit our ability to plan for or react to market conditions and could otherwise restrict corporate

activities." AR2376. This squarely contradicts APT's contentions that the sponsor debt was

simply a meaningless book entry with no real-world implications.

      APT's statements to the SEC also confirm MarAd's concerns regarding APT's short-term

charters and the potential risks when those charters expire.  As APT stated, the company

"derive[s its] revenues from a limited number of customers and the loss of any of these

customers or time charters with any of them could result in an adverse effect on our business and

results of operations."  AR2377.  As APT correctly noted, the MSC charters could be terminated

"for the convenience of the U.S. Government[,]" and as to the charters generally, "[t]here can be

no assurance that, if we fail to renew our agreements or if our agreements are terminated prior to

their expiration dates, we will be successful in negotiating and entering into substitute

agreements with third parties and, even if we succeed in doing so, the terms and conditions of

these new agreements, individually or in the aggregate, may be significantly less favorable to

us[.]"  *Id.*  Consistent with the results of Scully's Stress Case 2, APT's SEC filing further noted

that "[w]e have a limited number of vessels and any loss of use of a vessel would adversely

affect our results of operations . . . *Due to our limited number of vessels and our lack of business*

*diversification, an adverse development in our business or involving our fleet would have a*

*significantly greater impact on our business and results of operations than if we maintained and*

*operated a more diverse business*."  AR2381 (emphasis added).

      Similarly, APT conceded that its future operations and charter rates – and the market as a

whole – are subject to significant variability and risk.  It stated that "[w]e have a limited

operating history, which makes it more difficult to accurately forecast our future results and may

make it difficult for investors to evaluate our business and our future prospects."  AR2378.  APT

conceded that "[i]f supply [of Jones Act vessels] increases and demand does not, the charter rates

for our vessels could decline *significantly*," *id.* (emphasis added), and perhaps most strikingly,

"[t]he U.S. flag shipping industry is unpredictable, which may lead to lower charter hire rates

and over time, vessel values may fluctuate substantially[.]"  AR2379.  Factors APT listed as

potentially impacting its profits and charter rates included, *inter alia*, rising fuel prices, AR2381, decreases in U.S. refining activity particularly in the Gulf Coast region, AR2382, a decrease in the cost of importing refined petroleum products from foreign countries, AR2382, and dry-docking of vessels for maintenance, AR2383.

It is difficult to conceive of a document that is more consistent with MarAd's decision letters – and more inconsistent with APT's arguments – than APT's own 10-K filing.  In painstaking detail, the 10-K discusses the risks of (a) APT's significant debt, including the sponsor debt, (b) the potential expiration of APT's charters, (c) the limited scope, and lack of diversity, of APT's operations and the resulting magnification of any adverse development on APT's business, and (d) the uncertain Jones Act tanker market and its potential impact on APT's operations.  These are the *precise* reasons MarAd found APT's operations to be economically unsound – and APT's own statements confirm that MarAd's findings were reasonable, based on substantial evidence, and neither arbitrary nor capricious.

APT will undoubtedly respond that in making these disclosures in its 10-K, it was legally required to anticipate and set forth every possible worst-case scenario that could influence the decisions of its investors, and that its speculation as to what *could* happen does not necessarily reflect its belief as to what *will* happen.  Even if this point is conceded, such an argument fails to recognize that MarAd's responsibility as a taxpayer-funded government loan guarantor is to anticipate these very scenarios.  *See* AR3525.  As Defendants noted in their opening brief, MarAd was subject to significant scrutiny as a result of approving unduly risky Title XI applications in the past, a development that led, in part, to more effective management and oversight of Title XI.  *See* Defs.' Mem. at 39-40 (citing 2003 reports by DOT Inspector General and Government Accountability Office in the wake of nine defaults on Title XI guarantee

commitments totaling over $1.3 billion, with the defaulted amounts totaling $489 million).  The
Court should not fault MarAd for adopting a more prudent course, and should reject APT's self-
serving assertions that its application is "one of the lowest risk Title XI projects ever considered
by MarAd," AR2579, when APT's representations to the SEC show otherwise.

The APA requires that agency findings be supported by "substantial evidence," meaning
that the agency must "articulate a satisfactory explanation for its action including a 'rational
connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting
*Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  APT's admissions in its
10-K are fully consistent with MarAd's determinations and provide facts that are more than
sufficient, upon APA review, to show that MarAd's finding of economic unsoundness was a
"rational" one.

## II.   EVEN ASSUMING THAT APT'S VESSELS COULD BE USEFUL AS MILITARY AUXILIARIES, ITS APPLICATION DID NOT MERIT APPROVAL.

### A.  Any Potential Military Usefulness of APT's Vessels Was Outweighed by Other Factors.

MarAd also reasonably found in its decision letters that any statutory or regulatory
priority that APT's vessels enjoyed as a result of their potential military usefulness, *see* 46
U.S.C. § 53706(c); 46 C.F.R. § 298.3(k)(1); *id.* § 298.17(a)(1), was outweighed by the overall
economic unsoundness of APT's application and by other factors, including the lack of priority
for applications to refinance previously-incurred debt for vessels that are one year or older.  46
C.F.R. § 298.3(k)(2), 46 C.F.R. § 298.17(a)(2); *see also* 46 U.S.C. § 53706(b).  In asking the
Court to set aside these determinations, *see* Pl.'s Mem. at 42-45, APT fundamentally
mischaracterizes MarAd's findings.  Nowhere did MarAd find that APT's vessels "were not
entitled," *id.* at 43, to the priority accorded to vessels capable of serving as naval and military

auxiliaries.  *See also id.* at 44 (describing MarAd's "denial of the naval-auxiliary priority" and asserting that MarAd determined that APT was "disqualified . . . from receiving the priorities for military useful vessels").  Rather, MarAd found that even though APT's vessels merited that priority, APT's application would be denied because, overall, any such priority was outweighed by other factors, including, most notably, the statutory and regulatory requirement of economic soundness.  *See* AR3518 ("Noting the significance of military usefulness, whether vessels are so qualified is not solely dispositive.  Economic soundness considerations are overarching."); AR3528-29 (same).

Nor is the potential military usefulness of APT's vessels inconsistent or irreconcilable with MarAd's finding that two of APT's vessels were economically vulnerable because of their one-year charters to the Navy MSC.  *See* Pl.'s Mem. at 44 n.25.  The question of military usefulness is whether the vessel can potentially be used as a military auxiliary "in time of war or national emergency."  46 U.S.C. § 53706(c)(1)(B)(i); *see* 46 C.F.R. §§ 298.3(k)(1), 298.17(a)(1).  This priority – which focuses on a vessel's *capabilities*, not on its *actual use* – reflects the merchant marine's historic role assisting military efforts during wartime[18] and with the Secretary of Transportation's general authority to requisition, purchase, or charter any United States vessels during national emergencies.  *See* 46 U.S.C. § 56301.  But this priority does not require that an application to refinance debt for an already-built vessel be automatically approved or given priority because the vessel is presently being used by a military entity.  More importantly, the military usefulness priority does not relieve MarAd of its statutory and regulatory

---

[18] For example, during World War II, the merchant marine was instrumental in delivering troops and supplies to both the European and Pacific fronts, often at great risk of attack.  *See* Victor G. Hanson, John V. Berry, *The Diminution of the Merchant Marine: A National Security Risk,* 74 Univ. of Detroit Mercy L. Rev. 465, 469-70 (1997).

prohibitions against approving an application when it is not economically sound. *See* 46 U.S.C. § 53708(a); 46 C.F.R. § 298.14(a). As APT concedes, the MSC is prohibited from renewing charters for more than one year at a time, and such renewals are dependent on available funding. *See* AR1598, 2911, Pl.'s Mem. at 41. This prohibition directly impacts the revenues of the *Evergreen State* and *Empire State,* which constitute 40 percent of APT's fleet. Thus, the significant uncertainty concerning the renewal of MSC's annual charters is directly relevant to whether APT's underlying project is economically sound.

APT also argues that it was entitled to a regulatory priority because it sought a guarantee of 20 years and Title XI provides for a priority for "applicants seeking guarantees for terms less than the maximum permitted." Pl.'s Mem. at 43. But no such priority exists. The relevant regulation provides a priority for "[a]pplications from those willing to take guarantees for less than the *normal* term for that class of vessel." 46 C.F.R. § 298.3(k)(4) (emphasis added); *see id.* § 298.17(a)(4). The statutory provision APT invokes, 46 U.S.C. § 53710(a)(3)(A), states only that the *maximum* permissible term for a guarantee is 25 years; it says nothing about what the *normal* guarantee term would be for a product tanker. Thus, APT has failed to establish that its application was entitled to any priority based on the length of its requested guarantee term.

### B. MarAd Has Discretion to Reasonably Weigh Priorities and Other Factors Affecting APT's Application.

APT takes issue with MarAd's determination that other factors can outweigh the potential military usefulness of APT's vessels. *See* Pl.'s Mem. at 42-45. But as MarAd found, "whether vessels are so qualified [as potential military auxiliaries] is not solely dispositive." AR3518, 3528. The decision as to how much weight should be accorded the factors enumerated in the Title XI statute and regulations is a matter for MarAd's discretion because neither the statute nor the regulations direct MarAd to accord specific weights to specific factors (except, of course, for

the prohibition against approving an economically unsound application). *See, e.g., Natural Res. Defense Council, Inc. v. U.S. E.P.A.*, 25 F.3d 1063, 1071 (D.C. Cir.1994) (Because "[n]either [the relevant statute] nor [the agency's] regulations purports to assign any particular weight to the factors listed . . . the Administrator was free to emphasize or deemphasize particular factors, constrained only by the requirements of reasoned agency decisionmaking."); *Air Line Pilots Ass'n v. Dep't of Transp.,* 791 F.2d 172, 177-78 (D.C. Cir.1986) (although statute required agency to "*consider* all these factors, the weight to be given to any particular factor lies largely within its discretion" because "[t]he Act itself does not dictate that the Board give priority to" any one factor); *In re Polar Bear Endangered Species Act Listing and 4(d) Rule Litigation*, 794 F. Supp. 2d 65, 90 (D.D.C. 2011) ("Where an agency has exercised its Congressionally–authorized discretion to weigh the relevant factors, and it has made a listing determination based on a reasoned choice, the Court will not disturb its conclusion.") (citing *Animal Legal Def. Fund v. Glickman,* 204 F.3d 229, 235 (D.C. Cir. 2000). Accordingly, MarAd had the discretion to weigh the various factors in favor of and against APT's application and to render a reasonable decision in accordance with its assessment of those factors. Moreover, its determination regarding the economic vulnerability of the MSC vessels – which MarAd determined outweighed any positive value of those vessels' potential military usefulness – goes directly to a requirement that MarAd is *not* free to override, no matter how militarily useful a vessel might be: economic soundness. *See* 46 U.S.C. § 53708(a); 46 C.F.R. § 298.14(a).

In addition to APT's failure to meet the economic soundness requirement, among the factors that MarAd found warranted denial of APT's application was the fact that three of APT's vessels were greater than one year old and thus were not entitled to priority under 46 C.F.R. § 298.3(k)(2), which requires MarAd to give "priority for processing ... [r]equests for financing

construction of equipment or vessels less than one year old as opposed to the refinancing of existing equipment or vessels that are one year old or older." *See also*, 46 C.F.R. § 298.17(a) (MarAd must "consider whether the [Title XI] application provides for . . . [t]he financing of the Vessel(s) within one year after delivery.").  APT argues that the priority for projects that finance new vessel construction is somehow arbitrary because Congress has provided for the possibility of refinancing guarantees under Title XI and because such guarantees further "maintenance" of the U.S. merchant marine.  *See* Pl.'s Mem. at 45 n. 26.  This misses the point.  Defendants do not dispute that refinancing debt under Title XI benefits the merchant marine in some fashion.  But a transaction that directly facilitates the construction of new ships adds to the Nation's shipping capacity, furthers national security by adding potential naval auxiliaries, and creates job opportunities for construction workers, repair and support staff, and merchant mariners in a way that a refinancing transaction simply does not.  MarAd's statutes and regulations recognize this distinction by prioritizing guarantees for financing new vessels, rather than refinancing vessels one year or older.  *See* 46 C.F.R. § 298.3(k)(2); 46 C.F.R. § 298.17(a); *see also* 46 U.S.C. § 53706(b).  The majority of APT's project falls into the latter category.  Moreover, as MarAd found, APT's request, had it been approved, would have constituted the largest refinancing project in Title XI history by a factor of eight.  *See* AR2896 (spreadsheet comparing previous Title XI refinancing projects to APT's application).

Finally, APT makes the rather breathtaking assertion that "[b]ecause a Title XI guarantee would benefit APT, it would by definition benefit the U.S. merchant marine."  Pl.'s Mem. at 45 n.26.  APT is a single company with exactly two employees, AR2375, a limited operating history that paled in comparison to that of other entities that were issued Title XI guarantees to refinance non-Title XI debt, *see* AR2378, 2896, that owns (subject to its ability to repay its high-interest

debt) five ships in a single, volatile market.  Under the rationale of APT's *ipse dixit* notion that

the Nation's merchant marine must benefit because APT is able to refinance its existing debt at a

more favorable interest rate, any Title XI application would be meritorious.  This cannot be, and

is not, the case.

III.   **MARAD ACTED WITHIN ITS AUTHORITY IN CONSIDERING, IN CONJUNCTION WITH OTHER FACTORS, THE SIZE OF APT'S REFINANCING APPLICATION AND THE POTENTIAL EXHAUSTION OF AVAILABLE TITLE XI FUNDS.**

MarAd's assessments of the size of APT's refinancing application and its potential

impact on the agency's available funds for Title XI applications were neither arbitrary nor

capricious.  As an initial matter, APT's arguments to the contrary misconstrue MarAd's decision

letters.  Defendants do not contend that the potential exhaustion of Title XI funds, by itself,

would have necessarily justified denial of a loan guarantee to APT had the application been

meritorious in all other respects.  Rather, the sheer size of APT's refinancing request and its

potential to significantly deplete or exhaust Title XI funds was one factor that, together with

MarAd's concerns regarding economic soundness, priority, and other principles, contributed to

the denial of APT's application.

Contrary to APT's contention, it was permissible for MarAd to take agency funding

constraints into account.[19]  The courts have long recognized that the realities of funding

---

[19] The case APT cites, *Morton v. Ruiz*, 415 U.S. 199 (1974), supports Defendants' position rather than undermining it.  The Supreme Court in *Morton* found that to the extent that an agency's appropriated funds are not sufficient to provide funding to the entire class of potential beneficiaries, the agency may develop a standard for evaluating potential beneficiaries, and must "let the standard be generally known so as to assure that it is being applied consistently and so as to avoid both the reality and the appearance of arbitrary denial of benefits to potential beneficiaries."  *Morton*, 415 U.S. at 231.  That is exactly what MarAd has done by promulgating regulations governing the evaluation of Title XI applications, *see generally* 46 C.F.R. Part 298, and by evaluating APT's application against those regulatory (and statutory) standards.  MarAd's conclusion that it lacked sufficient funding to provide to APT, AR3517, 3528, was thus based on

constraints force agencies to make choices in how they fulfill their missions.  *See Massachusetts v. EPA*, 549 U.S. 497, 527 (2007) ("As we have repeated time and again, an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities."); *U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 820 (1984) (upholding FAA program of "spot-checking" manufacturers for compliance with safety standards "best accommodates the goal of air transportation safety and the reality of finite agency resources"); *Sierra Club v. Thomas*, 828 F.2d 783, 798 (D.C. Cir. 1987) ("Given that Congress provides EPA with finite resources to satisfy [its] various responsibilities, the agency cannot avoid setting priorities among them."); *see also Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985) (finding that "whether agency resources are best spent on this violation or another" and "whether the agency has enough resources to undertake [an enforcement] action at all" are "factors which are peculiarly within [an agency's] expertise); *id.* at 842 ("*On the merits*, then, a decision not to enforce that is based on valid resource-allocation decisions will generally not be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'") (Marshall, J., concurring in the judgment) (emphasis in original) (citing 5 U.S.C. § 706(2)(A)).[20]  MarAd's decision to consider such constraints was therefore consistent with judicial precedent.

Additionally, MarAd was entitled to take into account prospective applications as well as pending ones.  Title XI is not an entitlement program, and no statute or regulation requires

---

its governing statutes and the regulatory standards developed by the agency, pursuant to which MarAd determined that APT's application was (a) not economically sound, and (b) not entitled to priority.

[20] Although the instant case does not concern "a decision not to enforce," the language in *Heckler* amply supports the point that MarAd was neither arbitrary nor capricious when it took funding constraints into account in evaluating APT's application.

applications to be evaluated on a "first in first out" basis.  MarAd has significant experience

evaluating Title XI applications and is familiar with the types of applications that it tends to

receive under the program.  Even if MarAd had found that APT's application was, as a technical

matter, economically sound and been inclined to approve its application notwithstanding the

potentially adverse consequences, it was entitled to consider whether approving that application

would (a) be unduly risky in that it would concentrate a substantial amount of the agency's

remaining funds in one company, *see*, *e.g.*, 46 U.S.C. § 53704(c)(4)(K) (requiring MarAd to

consider "the concentration risk presented by an unduly large percentage of loans outstanding by

any one borrower or group of affiliated borrowers"), and (b) leave the agency without sufficient

funds to provide to a more meritorious project.  Put differently, even assuming *arguendo* that

APT's application were found to be economically sound, no provision of Title XI required

MarAd to allocate all or nearly all of the program's remaining funds to that application.

    Finally, it was not only the potential exhaustion of funds that concerned MarAd, but the

sheer size of the requested refinancing, which was more than any prior project for refinancing

non-Title XI debt.  *See* AR3517 (noting that "[t]he mere size of the request is also of concern for

MarAd," that "[i]t would be departure from prior practice for MarAd to approve a project that

seeks to refinance more than $200 million in non-program debt," and that "since 1994, MarAd

has approved only two projects for the U.S. coastwise trade in an amount in excess of $300

million; neither project was to refinance existing non-program debt"); *see also* AR2896

(spreadsheet comparing previous Title XI refinancing projects to APT's application).  Thus, even

absent the potential exhaustion of funds,[21] the size of the refinancing guarantee that APT sought

---

[21] APT refers to another application which was terminated shortly after MarAd denied APT's
application and argues that APT's project would not have actually exhausted available funds.
*See* Pl.'s Mem. at 46 n.27.  Even assuming that MarAd knew that it was about to terminate the

was problematic and provided further support for MarAd's decision.

**IV.   THE CREDIT COUNCIL'S INVOLVEMENT IN APT'S APPLICATION DOES NOT WARRANT REVERSAL.**

    **A.   APT's Allegations About the Credit Council's Influence Should be Rejected.**

"Challengers to agency action are not . . . ordinarily entitled to augment the agency's record with either discovery or testimony presented in the district court." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). Moreover, "[w]hen a party challenges agency action as arbitrary and capricious the reasonableness of the agency's action is judged in accordance with its *stated reasons* . . . because the actual subjective motivation of agency decisionmakers is immaterial as a matter of law—unless there is a showing of bad faith or improper behavior." *In re Subpoena Duces Tecum*, 156 F.3d 1279, 1279-80 (D.C. Cir. 1998). This Court recognized and applied these rules in its July 10, 2013 order substantially denying APT's motion to supplement the administrative record and to take discovery. *See* ECF No. 73. Consequently, APT's attempts to rely on what it says the Credit Council did in connection with this matter should be rejected.

APT references two categories of evidence related to the role of the Credit Council, neither of which should have any bearing on the Court's decision in this matter. The first is the declaration of its Chief Executive Offer, Robert Kurz, which APT cites liberally throughout its brief, particularly in its statement of facts. *See* Pl.'s Mem. at 54, 5-23. The Kurz Declaration is outside the administrative record and thus, any facts derived from it cannot be considered by the Court at summary judgment in this APA action in light of the general rule prohibiting extra-

---

other application, the demise of an application by a company that "suffered serious financial setbacks" since the approval of its application constituted further cause for MarAd to be concerned about a request of even *greater* size and scope.

record evidence.  *See Marshall Cnty. Health Care Auth.*, 988 F.2d at 1226.[22]

 The second category of evidence cited by APT consists of references in the record to concerns voiced by the Credit Council at earlier stages of the administrative process regarding APT's ownership structure and the ownership's long-term interest in the project to be financed by the proposed Title XI guarantee.  *See* AR1704-07, 2868, 2871.  But as the Court found in denying APT's motion to compel, these excerpts show that  "[t]he concern was not the ownership of the Plaintiff in isolation, but whether the owners of the Plaintiff had a long-term interest in the project the Maritime Administration was being asked to finance[.]"  Mem. Op., ECF No. 73, at 32; *see also* AR2868 (Credit Council's initial recommendation against hiring an IFA was "based on concerns about the ownership structure (75% by Blackstone and 25% by Cerberus) *and the ownership's long-term interest in the project*)" (emphasis added); AR2871 (referencing "concerns about the private equity ownership's long-term interest *and the relatively high ratio of debt to equity*") (emphasis added).  The final record excerpt APT cites, AR1704-07, is a letter by Mr. Kurz speculating that "[a]n under-current to the [initial] decision by the Credit Council [not to recommend hiring an IFA] *may be* that it is unnecessary or undesirable to support companies in which investments have been made by private equity firms."  AR1706 (emphasis added).  But as the D.C. Circuit has found, and as the Court noted in denying Plaintiff's Motion to Compel, "the reasonableness of the agency's action is judged in accordance with its stated reasons."  Mem. Op., ECF No. 73, at 18 (quoting *In re Subpoena Duces Tecum*, 156 F.3d at 1279-80).  The "stated reasons" in MarAd's decision letters pertain not to APT's ownership by private equity but to lack of economic soundness, lack of priority, and the size of the refinancing

---

[22] Although APT contends that it "finds it necessary to support its statement of facts related to the actions of the Credit Council with citations to the Declaration of Mr. Kurz," Pl.'s Mem. at 6-7 n.5, it does not explain how this declaration is permissible in light of the Court's July 10 order.

guarantee amount – and the Court has already found that APT failed to demonstrate "bad faith or improper behavior" that would justify inquiry into the decisionmakers' "subjective motivation." *Id.* at 18-21.  Thus, MarAd's decision must be evaluated based on the reasons stated in the decision letters and the administrative record – not based on APT's allegations regarding the Credit Council members' subjective motivations.

### B. That MarAd's Views Changed After Consultation with the Credit Council Does Not Warrant a Conclusion that the Credit Council Acted Impermissibly.

It is basic principle of APA law that an agency is entitled to change its mind, and when it does so, a Court should accord its decisions no less deference than it would otherwise.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-15 (2009).  Thus, even though MarAd staff had a tentative inclination to approve APT's application that was ultimately denied, such facts do not support reversal of the agency's decisions.

Defendants do not dispute that MarAd staff had initially favorable views of APT's application, but those views eventually changed after further analysis.  *See* Defs.' Opp. to Pl.'s Mot. to Compel, ECF No. 64 (noting that "the agency changed its views after further consideration and analysis").  Nor do Defendants dispute that MarAd began to re-assess aspects of APT's application subsequent to the June 12 meeting with the Credit Council.  But as the Court has already found, these facts alone do not warrant a finding of impropriety that would justify looking behind the agency's reasons articulated in the decision letters.  *See* Mem. Op., ECF No. 73, at 30 ("The fact that the Maritime Administration's initial position with respect to the Plaintiff's application differed from the ultimate decision reached after extensive consultation with the Credit Council 'does not suggest . . . any improper motivations.'") (quoting *Hinckley v. United States*, 140 F.3d 277, 286 (D.C. Cir. 1998)).  Similarly, the Court found that APT's

contention that MarAd had "decided to approve APT's application," Pl.'s Mem. at 55, prior to meeting with the Credit Council "would be counter-factual," since Credit Council review was required before any final "decision" could be made. *See* Mem. Op., ECF No. 73, at 26.[23]

Likewise, the record demonstrates that between the June 12 Credit Council meeting and the August 1 decision, MarAd produced several documents demonstrating some of the factors on which it ultimately based its decision, including a spreadsheet demonstrating the significant size of APT's refinancing request compared to MarAd's previous refinancing transactions, AR2896, and documents demonstrating the growth of APT's sponsor debt and APT's losses generally, AR2899-2905. MarAd produced additional such documents prior to the November decision, including documents reflecting its views regarding the Jones Act tanker market, AR2906-2914, and an analysis of the projected debt service coverage ratio under APT's modified application, AR2916. The decision letters demonstrate that MarAd – not the Credit Council – rendered the final decision. *See* AR3513, 3522. In short, while Defendants do not dispute that MarAd ultimately came to a different resolution of APT's application than the one to which staff members may have initially been inclined, there is no evidence in the record that (1) an original MarAd "decision" was "vetoed" by the Credit Council, (2) MarAd's subsequent decision was coerced or "directed" by the Credit Council,] or (3) MarAd's final decisions were based on factors other than those articulated in the decision letters. And even if the Court were to find that the administrative record *could* support the inferences APT asks it to draw, in an APA case, as noted above, "[t]he question [a court] must answer . . . is not whether record evidence supports [a plaintiff's] version of events, but whether it supports [the agency's]." *AJP Constr.*, 357 F.3d at

---

[23] In any event, the record makes it clear that MarAd made no "decision" prior to the June Credit Council meeting. *See* AR2918 (MarAd was "proposing" a Title XI loan guarantee). MarAd's decision became final when the Administrator signed the decision letters, and not beforehand.

73.[24]

The cases that APT cites in this regard do not support its position.  They involved egregious types of "bias or pressure" easily distinguishable from anything that APT alleges here.  In *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231 (D.C. Cir. 1972), the Chairman of the Subcommittee on the District of Columbia of the House Appropriations Committee made several public statements that he would block appropriations for the Washington, D.C. subway system unless a bridge construction project over the Potomac River would be approved.  *Id.* at 1236-37.  Subsequently, the D.C. City Council, reversing its earlier position, voted in favor of approval, with several members explicitly stating that they would not have changed their votes otherwise.  *Id.* at 1237.  The Secretary of Transportation then approved the project as well, *id.,* indicating contemporaneously that the Congressman's pressure factored into his decision, *id.*at 1246.  In reversing the agency's decision, the D.C. Circuit found both that the Congressman's statements were improper external pressure, *id.* at 1245-46, and that that there was a "complete non-existence of any contemporaneous administrative record" to support the Secretary's decision, *id.* at 1237.  In *Jarrott v. Scrivener*, 225 F. Supp. 827 (D.D.C. 1964), the other primary case on which APT relies, the Secretary of State interfered in a decision by the District of Columbia Board of Zoning Adjustment by pressuring the Board to approve a zoning exception to erect a Soviet embassy building in a residential zone.  *Id.* at 832.  High-level officials within the D.C. government contacted two members of the Board, who were "relatively subordinate government

---

[24] As to APT's contention that it be permitted to submit testimony on this issue, via declaration, by former Associate Administrator George Zoukee, *see* Pl.'s Mem. at 56 n.38 & Decl. of Alex Blanton, that position seeks to revisit an issue that the Court has already resolved and should be summarily denied.  As the Court is aware, it previously denied APT's motion to take the depositions of Mr. Zoukee and former Maritime Administrator David Matsuda.  *See* Mem. Op., ECF No. 73, at 26-32.  APT's 56(d) declaration presents no grounds for the Court to permit Mr. Zoukee's testimony via declaration and should be disregarded.

employees," *id.* at 834, asking them to keep the federal government's position in mind to "do the right thing." *Id.* at 831-832. After the Board, on a 3-2 vote, approved the exception, the Court ruled that plaintiffs who objected to the exception were denied a "fair and impartial hearing" as a result of these contacts, particularly given that Board was a "quasi-judicial tribunal," *id.* at 833.

This case is readily distinguishable. Though Defendants do not dispute that members of the Credit Council expressed their views regarding APT's application to MarAd, the record contains no evidence that the Credit Council threatened MarAd or the Administrator with some adverse consequence if he approved the application, as was the case in *D.C. Fed'n of Civic Ass'ns*. There is also no evidence that the Administrator received any coercive communications from outside his parent agency or from a different level of government concerning extraneous matters unrelated to the merits of APT's application,[25] such as in *Jarrott*. The decisionmaker at issue, the Maritime Administrator, is a high-level federal official appointed by the President and confirmed by the Senate, not a "relatively subordinate government employee[]" who would be expected to easily capitulate simply after hearing the views of others within his Department. And unlike in *D.C. Fed'n of Civic Ass'ns*, the Administrator has produced a full and ample administrative record, and two lengthy decision letters, in support of the agency's determination.

Furthermore, no statute or regulation prohibits communications between the Administrator and the Credit Council. The processing of a Title XI application is not a formal adjudication, *compare* 5 U.S.C. §§ 554(a), 556, 557(a), in which *ex parte* contacts are generally prohibited and agency employees who investigate or prosecute the matter are generally prohibited from also serving as adjudicators. *See* 5 U.S.C. § 554(d), 5 U.S.C. § 557(d). Rather,

---

[25] As noted above, the Court has already observed that the Credit Council's concerns regarding APT's ownership that are evidenced in the record were related to its concerns regarding the viability of the project MarAd was being asked to finance. *See* Mem. Op., ECF No. 73, at 32.

as the Court has already found, nothing in the statutory provisions that APT has cited prohibits

the Administrator from considering opinions voiced by members of the Credit Council (or others

within DOT) prior to rendering a final decision:

> Though the Court concluded [in denying Defendants' Motion to Dismiss the
> Credit Council count] that the Defendant failed to identify any authority
> permitting the Secretary of Transportation to require the Maritime Administration
> to consult with the Credit Council before issuing a decision on a Title XI loan
> application, the Court did not hold (as the Plaintiff suggests) that the Credit
> Council has *no* lawful role in the Title XI application process. There is nothing to
> suggest that the Maritime Administration could not, for example, seek the opinion
> of the Credit Council on his own accord before granting or denying an
> application.

Mem. Op., ECF No. 73, at 25.  Thus, to the extent Credit Council members – none of whom had

the authority to render the decision on APT's application – raised questions about APT's

ownership by private equity, it would not rise to the level of the sort of interference that courts

have found warrant reversal of an agency's well-reasoned decision.  *Accord DCP Farms v.*

*Yeutter*, 957 F.2d 1183, 1188 (5th Cir. 1992) ("Actual bias is ordinarily required to invalidate

decisions by federal agencies."); *Peter Kiewit Sons' Co. v. U.S. Army Corps of Eng'rs*, 714 F.2d

163, 170 (D.C. Cir. 1983) ("A court must consider the decisionmaker's input, not the [allegedly

improper influencer's] output. The test is whether 'extraneous factors intruded into the calculus

of consideration' of the individual decisionmaker.") (internal citation omitted).  There is nothing

in the record here to demonstrate inappropriate influence.

### C.  The Mere Involvement of the Credit Council, Even if Required by Departmental Order, Cannot, By Itself, Warrant Reversal and Remand.

The only remaining question is whether the mere involvement of the Credit Council in

the process is a procedural error that warrants reversal and remand.  The Court should decide this

question in the negative.  As an initial matter, as Defendants have demonstrated in their opening

brief, *see* Defs.' Mem. at 31-45, the Court should reconsider and revise its prior opinion finding

that the requirement of a Credit Council recommendation violates the 2006 and 2008 amendments to Title XI. *See infra* § E.  However, even if the Court does not revise its earlier opinion, Defendants are entitled to summary judgment on Plaintiff's Credit Council claim based on the rule of prejudicial error and the futility of any remand.   While Defendants do not dispute that the Credit Council's involvement had an impact on APT's application, Plaintiff cannot show that the *requirement* of a Credit Council recommendation was prejudicial.  Put differently, to the extent that the Court has found that the Administrator could have permissibly sought the Credit Council's views of his own accord, *see* Mem. Op., ECF No. 73, at 25, Plaintiff cannot show "substantial doubt that the [Administrator] would have reached the same result [he] did," *Chem. Waste Mgmt., Inc. v. EPA*, 976 F.2d 2, 32 (D.C. Cir. 1992), if review by the Credit Council was merely optional.

Likewise, APT cannot show that reversal and remand – if it is for the sole reason that the required Credit Council recommendation was contrary to law – is likely to lead to a different result.  In light of the Secretary's clear preference for a Credit Council recommendation, unless the Court were to order – as APT requested in its Complaint – that any further review by MarAd upon remand be done "without regard to the opinions, objections, recommendations or authorization of the Credit Council," Supp. Compl. at 39 (a ruling that would be inconsistent with the Court's finding that "[t]here is nothing to suggest that the Maritime Administration could not . . . seek the opinion of the Credit Council on his own accord before granting or denying an application"), there is no "substantial doubt" that APT's application would be adjudicated any differently upon a remand with instructions that the Secretary not require a Credit Council recommendation.

To the extent that the Court's previous two opinions, read together, hold that Credit Council recommendations regarding Title XI applications are prohibited if required by the Secretary, but permissible if initiated by the Administrator of his own accord, remand of this matter based solely on the Credit Council count would serve no purpose because there is no reason to believe that MarAd would not seek the views of the Credit Council of its own accord upon remand, let alone "substantial doubt" as to whether it would do so.  Furthermore, whatever MarAd staff members may have been inclined to recommend initially, the Administrator ultimately found in his decision letters that APT's application warranted denial based on lack of economic soundness and other factors.  Thus, there is no reason to believe that upon remand, MarAd's findings would be any different.

### D. APT's Arguments Fail to Refute Defendants' Contention that any Delays Attributable to the Credit Council Constitute At Most Harmless Error.

Under the "rule of prejudicial error," 5 U.S.C. § 706, remand is required only "when there is substantial doubt that the administrative agency would have reached the same result it did absent [the alleged error.]"  *Chem. Waste Mgmt.*, 976 F.2d at 32 (internal citation omitted). This rule applies to APT's allegations regarding the Credit Council's role in postponing of the processing of APT's application by delaying the hiring of an IFA until late in 2011.  *See* Defs.' Mem. at 31-32; *accord* Mem. Op., ECF No. 73, at 32 (noting that "despite [the Credit Council's concerns regarding APT's ownership], the Credit Council ultimately recommended that the Administration hire an IFA") (citing AR2872).

APT spends two and a half pages of argument contending that the Credit Council's involvement in the IFA retention process was improper, Pl.'s Mem. at 50-52, but only one paragraph addressing Defendant's harmless-error point.  The only prejudice APT contends resulted is that MarAd was unable to process APT's application before two other applications

were submitted, thereby enabling MarAd to invoke the potential exhaustion of funds as an additional basis to deny APT's application.  Pl.'s Mem. at 52. This response is unavailing for multiple reasons.  As discussed above, the exhaustion of funds was one of several reasons why APT's application was denied, and MarAd made it clear that economic soundness was, far and away, its primary concern.  *See* AR3518, 3528-29 ("Economic soundness considerations are overarching.").  Given that MarAd is prohibited from issuing a guarantee absent economic soundness, APT cannot show that the delay was prejudicial merely because circumstances may have developed that gave rise to an additional basis.  *See Mail Order Ass'n of Am. v. U.S. Postal Serv.*, 2 F.3d 408, 434 (D.C. Cir. 1993) (when agency offers multiple grounds for a decision, the court will affirm the agency so long as any one of the grounds is valid, unless it is demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable).

Additionally, even assuming *arguendo* that the procedural delays allegedly caused by the Credit Council's involvement were to be deemed prejudicial error, APT nowhere addresses Defendants' point that such delays are ultimately not redressable given that the delays eventually ended in September 2011 when Scully was retained.  *See* AR2868, 2871 (Scully was retained as IFA in September 2011).  The Court cannot remand the matter to the agency to direct it to cease delays that ended two years ago.  In sum, APT's argument that the Credit Council "completely forestalled . . . APT's application," Pl.'s Mem. at 52, is not an issue that is properly before the Court.

### E.  Required Review By the Credit Council Does Not Violate The Title XI Statute.

Finally, the relief Defendants sought under Rule 54(b) – revision of the Court's interlocutory order finding that 2006 and 2008 amendments to Title XI prohibit required review by the Credit Council – is procedurally appropriate for several reasons.  First, Rule 54(b) permits

revision of an interlocutory order "as justice requires," and "[t]he Court has broad discretion to consider whether relief is 'necessary under the relevant circumstances.'" *North v. DOJ*, 892 F. Supp. 2d 297, 299 (D.D.C. 2012) (Kollar-Kotelly, J.) (internal citations omitted).  Whether the Court's view of Defendants' position, as articulated in its prior decision, is due to a lack of clarity on Defendants' part or for some other reason, the Court should look at this issue anew because, in the words of the case law applying Rule 54(b), "justice requires" reconsideration.

Further, revision is particularly appropriate where the order at issue is a denial of motion to dismiss, which simply left the Credit Council claim to be resolved later in the case, rather than disposing of a claim or otherwise ordering relief, and where the Court now has the benefit of evaluating the case against the backdrop of the full administrative record.  *See Int'l Union, United Gov't Sec. Officers of Am. v. Clark*, 878 F. Supp. 2d 127, 133-34 (D.D.C. 2012) (finding that "denial of a motion to dismiss is an interlocutory order," and thus "not subject to law of the case doctrine" and "may always be reconsidered prior to final judgment," and that the "law of the case doctrine is discretionary, and cannot be invoked to limit the Court's ability to reconsider interlocutory orders when new evidence is introduced after a motion to dismiss has been decided").  Whether through the lens of Rule 54(b) or simply in the course of adjudicating the parties' summary judgment motions under Rule 56, the Court should find that the Secretary is permitted to require advisory Credit Council review of Title XI applications.

## **CONCLUSION**

For the foregoing reasons, and for those set forth in Defendants' opening brief, summary judgment should be granted to defendants.

Dated: September 3, 2013                              Respectfully submitted,

                                                                     STUART F. DELERY
                                                                     Assistant Attorney General

43

JUDRY L. SUBAR
Assistant Branch Director

*/s/ Jesse Z. Grauman*
JESSE Z. GRAUMAN (Va. Bar No. 76782)
U.S. Department of Justice
Civil Division, Federal Programs Branch

Mailing Address:
Post Office Box 883
Washington, D.C.  20044

Courier Address:
20 Massachusetts Ave., N.W., Room 5374
Washington, D.C. 20001
Telephone:      (202) 514-2849
Fax:                (202) 305-8517
Email:              jesse.z.grauman@usdoj.gov

Counsel for Defendants